## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------- X
                                            :
In re                                       :      Chapter 11
                                            :
CHECKOUT HOLDING CORP., et al.,             :      Case No. 18-[_____] (___)
                                            :
            Debtors.¹                       :      Joint Administration Requested
                                            :
------------------------------------------------------------- X
```

## MOTION OF DEBTORS PURSUANT
## TO 11 U.S.C. §§ 105(a), 363(b), AND 507(a) FOR
## INTERIM AND FINAL AUTHORITY TO PAY PREPETITION
## WAGES, SALARIES, COMMISSIONS, EMPLOYEE BENEFITS,
## AND OTHER COMPENSATION AND MAINTAIN EMPLOYEE BENEFIT
## PROGRAMS AND TO PAY RELATED ADMINISTRATIVE OBLIGATIONS

Checkout Holding Corp. and its affiliated debtors in the above-captioned chapter

11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"), respectfully

represent as follows in support of this motion (the "**Motion**"):

## Background

1.      On the date hereof (the "**Petition Date**"), the Debtors each commenced

with the United States Bankruptcy Court for the District of Delaware (the "**Court**") a voluntary

case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The

Debtors are authorized to continue to operate their businesses and manage their properties as

debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee,

examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.

---

¹ The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Catalina Marketing Corporation (9007); Catalina Marketing Procurement, LLC (9333); Catalina Marketing Technology Solutions, Inc. (8728); Catalina Marketing Worldwide, LLC (9687); Cellfire Inc. (5599); Checkout Holding Corp. (4651); Modiv Media, Inc. (3507); PDM Group Holdings Corporation (9148); PDM Holdings Corporation (5025); PDM Intermediate Holdings A Corporation (6409); and PDM Intermediate Holdings B Corporation (3278). The Debtors' principal offices are located at 200 Carillon Parkway, St. Petersburg, FL 33716.

2.    Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of the chapter 11 cases pursuant to rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and rule 1015-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**").

3.    Before the Petition Date, the Debtors, with the support of their secured lenders, began the solicitation of votes on their *Joint Prepackaged Chapter 11 Plan of Checkout Holding Corp. and Its Affiliated Debtors* (the "**Prepackaged Plan**"), through their *Disclosure Statement for Joint Prepackaged Chapter 11 Plan of Checkout Holding Corp. and Its Affiliated Debtors* pursuant to sections 1125 and 1126(b) of the Bankruptcy Code.  The Debtors expect that the Prepackaged Plan will be accepted by all classes entitled to vote in excess of the statutory thresholds specified in section 1126(c) of the Bankruptcy Code.   Consistent with their obligations under that certain *Restructuring Support Agreement*, dated as of December 11, 2018 (as amended from time to time and including all exhibits thereto, the "**RSA**"), the Debtors are seeking to emerge from chapter 11 on an expedited timeframe.

4.    Information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Robert A. Del Genio* (the "**Del Genio Declaration**"), which has been filed with this Court contemporaneously with the Motion.

### Jurisdiction

5.    The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant

to 28 U.S.C. § 157(b) and, pursuant to Local Rule 9013–1(f), the Debtors consent to the entry of

a final order by the Court in connection with this Motion to the extent that it is later determined

that the Court, absent consent of the parties, cannot enter final orders or judgments consistent

with Article III of the United States Constitution.  Venue is proper before the Court pursuant to

28 U.S.C. §§ 1408 and 1409.

### Relief Requested

6.    By this Motion pursuant to sections 105(a), 363(b), and 507(a) the

Bankruptcy Code, the Debtors request authority to, in their discretion: (a) pay Employee

Compensation Obligations and obligations relating to Employee Benefit Plans (each as defined

below) and related expenses, fees, and costs incident to the foregoing, including amounts owed

to third-party service providers and administrators and tax authorities; and (b) maintain, continue

to honor, and pay amounts with respect to the Debtors' business practices, programs, and

policies for their employees as such were in effect as of the commencement of these chapter 11

cases and as such may be modified or supplemented from time to time in the ordinary course of

business (the "**Employee Obligations**").  The Debtors further request that the Court authorize

financial institutions to receive, process, honor, and pay all checks presented for payment and to

honor all funds transfer requests related to such obligations.

7.    No party in interest will be prejudiced by the relief requested by this

Motion because Employees, as defined below, are unimpaired under the Prepackaged Plan and

will be paid in full.  Thus, the relief requested herein seeks to alter only the timing, not the

amount or priority, of such payments.

8.    A proposed form of order granting the relief requested herein on an

interim basis is annexed hereto as **Exhibit A** (the "**Proposed Interim Order**") and, pending a

3

final hearing on the relief requested herein, on a final basis as **Exhibit B** (the "**Proposed Final Order**" and, together with the Proposed Interim Order, the "**Proposed Orders**").

**The Debtors' Workforce and Wage and Benefit Obligations**

## I.    The Debtors' Workforce

9.    As of the Petition Date, the Debtors employ approximately 589 employees, of which approximately 581 are full-time and approximately eight (8) are part-time (collectively, the "**Employees**").  As of the Petition Date, approximately 522 Employees were salaried and approximately 67 Employees were paid on an hourly-basis.[2]

10.    Employees fill a wide variety of roles and perform a wide range of tasks for the Debtors.  Employees generally fall into one of three categories: corporate management, operations, and sales.  Corporate management Employees provide the Debtors with the legal, financial, human resources, and coordination services necessary to operate a global enterprise effectively.  Operations Employees develop, update, and maintain the data, software, and hardware that the Debtors require to support their service offerings.  Sales Employees create, cultivate, and maintain relationships with customers to expand and maintain Debtors' customer and revenue base.

11.    The Debtors also utilize the services of independent contractors, consultants, and temporary workers generally sourced from various staffing agencies (the "**Staffing Agencies**") to provide critical platform design and engineering support and sales support and to perform other operation support (collectively, the "**Supplemental Workforce**" and, together with the Employees, the "**Workforce**").  The Supplemental Workforce is an

---

[2] None of the Employees are subject to a collective bargaining agreement or other similar labor agreement.

integral component of the Debtors' enterprise and consists of approximately 25 individuals as of the Petition Date.

## II.     Employee Compensation Obligations

12.     The outstanding amounts for employee compensation obligations are summarized in the following chart, and are described in further detail below:

| Prepetition Obligations | Description | Total Relief Requested | Interim Relief Requested |
|---|---|---|---|
| Base Compensation Obligations | Obligations related to Employees' salaries and wages and, for certain eligible Employees, paid leave and overtime. | $382,000 | $381,000 |
| General Retention Program | Obligations related to Employee Retention. | $350,000 | $0 |
| Supplemental Workforce Obligations | Obligations related to Supplemental Workforce and Staffing Agency compensation. | $392,000 | $204,000 |
| Expenses | Obligations related to advances or the reimbursement of certain expenses, such as job-related travel and meal expenses, that Employees incur in performing their employment duties. | $225,000 | $45,000 |
| Employer Payroll Taxes | Wage-based taxes owing pursuant to applicable federal and local laws. | $98,000 | $98,000 |
| Total Employee Compensation Obligations ($) | | $1,447,000 | $728,000 |

### A.     Unpaid Compensation

13.     In the ordinary course of business, the Debtors incur and pay obligations relating to Employees' salaries and wages, and for certain non-exempt Employees, paid leave and overtime (the "**Base Compensation Obligations**").

14.     The Debtors pay Base Compensation Obligations every two weeks (the "**Pay Period**") on a current basis for all regular, full-time hourly and salaried Employees

and in arrears for all regular, part-time hourly employees.  On average, the Debtors' pay Base Compensation Obligations of approximately $3 million per Pay Period.

15.     The Base Compensation Obligations are paid by direct deposit through electronic transfers of funds to Employees' bank accounts, although the Debtors can make payroll payments to Employees by check in the event a direct deposit fails or an Employee has not yet completed his or her payment election to receive his or her net pay via direct deposit.

16.     The Debtors estimate that as of the Petition Date they owe approximately $382,000 to Employees on account of prepetition Base Compensation Obligations arising from December 10, 2018 through December 11, 2018.  Approximately $381,000 of such prepetition Base Compensation Obligations will become due and owing within twenty-one (21) days of the Petition Date (the "**Interim Period**").  The Debtors are *not* seeking authority through this Motion to pay any prepetition Base Compensation Obligations in excess of the per Employee statutory cap of $12,850 imposed by section 507(a)(4) of the Bankruptcy Code.

### B.     Employee Incentive Programs

17.     The Debtors also maintain, in the ordinary course, a discretionary employee bonus program for certain Employees (the "**Employee Bonus Program**").  In previous years, the Debtors have paid, in the aggregate, approximately $5.3 million annually to eligible non-insider Employees under the Employee Bonus Program.  Bonuses paid in accordance with the Employee Bonus Program were typically determined and paid in March of each year as part of an Employee's overall compensation package.  To be eligible for the Employee Bonus Program, Employees were required to be employed at the time the bonus was due, as well as during the preceding year.  As of the Petition Date, the Debtors do not owe Employees any prepetition amounts on account of the Employee Bonus Program.  The Debtors

are not seeking relief pursuant to this Motion to pay any amounts under the Employee Bonus Program; to the extent the Debtors desire to pay any amounts pursuant to the Employee Bonus Program, however, the Debtors reserve all rights to seek appropriate relief from this Court to pay such amounts in the future.

18.     In addition to the Employee Bonus Program, the Debtors maintain a sales-based incentive program (the "**Sales Incentive Program**") to incentivize and compensate members of their sales teams.  Under this program, participating Employees, who are employed by the Debtors on the disbursement date, receive payment in variable percentages based on the amount of services sold through their individual efforts (the "**Disbursement**").[3]   The Disbursements are finalized on a quarterly basis and paid 45 days thereafter coincident with the scheduled on-cycle payroll pay date.  The Debtors expect that annual expenditure pursuant to this program will be approximately $6.2 million dollars for the 2018 fiscal year.   The Disbursements constitute a substantial portion of participating Employees' overall compensation packages and many of them rely on the Disbursements for their daily living expenses.  Failure to pay such Disbursements would impose an undue hardship on the Employees and potentially cause them to seek employment elsewhere to the detriment of the Debtors' business and the success of these chapter 11 cases.

19.     As of the Petition Date, the Debtors do not believe that any amounts are due and owing under this program.  The Debtors are seeking authority to honor Sales Incentive Program obligations as they arise in the ordinary course of business.  For the avoidance of doubt, the Debtors are not seeking authority to pay, pursuant to this Motion, any Sales Incentive

---

[3] Under the laws of some states in which the Debtors operate, the Debtors must calculate and make Disbursements upon the termination of an eligible Employee.

Program obligations owed to "Insiders," as the term is defined in section 101(31) of the Bankruptcy Code.

### C.    General Retention Program

20.    As part of their prepetition restructuring initiatives, the Debtors engaged in a review of their existing bonus programs and assessed the need for additional programs to ensure appropriate Employee retention.  Based on this review, the Debtors determined that it was necessary, and in their best interests, to implement additional bonus programs for certain Employees who they deemed necessary to maintain operations during the critical period within which the Debtors are seeking to restructure their businesses and operations.

21.    Accordingly, the Debtors implemented a retention program (the "**General Retention Program**").  Pursuant to the initial terms of the General Retention Program, a group of covered Employees were entitled to receive payment at a date agreed upon under the retention agreement and a separate group of covered Employees were entitled to receive an initial payment upon execution of a retention agreement and a second payment in January 2019 in exchange for agreeing to remain with the Company through a specified date.  Subsequently, as the Debtors' restructuring efforts moved closer toward a chapter 11 filing, the Company decided to pull forward all remaining payments of the General Retention Program to provide assurance to Employees that they would receive the full payment.[4]  In aggregate, approximately 75 non-insider Employees are covered under the General Retention Program and the Debtors have paid an aggregate amount of $2,105,000.  As of the Petition Date, the Debtors estimate they owe approximately $7,500 under the General Retention Program.

---

[4] Some "Insiders," as the term is defined in section 101(31) of the Bankruptcy Code received initial retention payments under this program in the amount of $2.0 million.  The Debtors did not pull forward the contemplated second payment to any "insiders."  For the purposes of clarity, this Motion does not seek any relief with respect to payments to "insiders."

22.     In addition, in connection with the transition of certain of the Debtors' operations to Costa Rica, the Debtors implemented a retention program to retain and incentivize key personnel assisting with the transition (the "**Costa Rica Retention Program**").  The Costa Rica Retention Program consists of two groups of employees: (a) approximately 60 employees who will remain with the company following the operations transition (the "**Retained Transition Employees**") and (b) approximately 30 individuals who will be exiting the company following the completion of the operations transition (the "**Exiting Transition Employees**" and together with the Retained Transition Employees, the "**Transition Employees**").  Pursuant to the initial terms of the Costa Rica Retention Program, the Transition Employees were entitled to receive a retention payment in January 2019; however, for reasons similar to those discussed above with respect to the General Retention Program, the Company modified the payment structure to provide for payments in November 2018, December 2018, and January 2019.  As of the Petition Date, the Debtors have paid $259,000 on account of the Costa Rica Retention program.  The Debtors seek authority to continue satisfying their estimated $350,000 of obligations under the Costa Rica Retention Program in the ordinary course of business.  For the avoidance of doubt, the Debtors are not seeking authority to pay, pursuant to this Motion, any Costa Rica Retention Program obligations owed to "Insiders," as the term is defined in section 101(31) of the Bankruptcy Code.

**D.      Gross Pay Deductions, Governmental Withholdings and Payroll Taxes**

23.     For each applicable Pay Period, the Debtors routinely deduct certain amounts from each Employee's gross pay including, without limitation, garnishments, child support, spousal support, service charges and similar deductions, and other pre- and after-tax deductions payable pursuant to certain employee benefit plans discussed herein, including each

9

Employee's share of health care benefits and insurance premiums, contributions under flexible spending plans and retirement savings plan, legally ordered deductions, and other miscellaneous deductions (collectively, the "**Deductions**").[5]   The Debtors make a total of approximately $300,000 in Deductions from Employees' pay per Pay Period, which the Debtors remit, as necessary, to the appropriate third-party recipients.

24.    In addition to the Deductions, state and federal law requires the Debtors to withhold amounts from the Employees' gross pay related to federal, state, and local income taxes, including Social Security and Medicare taxes, for remittance to the appropriate federal, state, or local taxing authority (collectively, the "**Withholdings**").   The Debtors must then match, from their own funds, amounts for Social Security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (collectively the "**Employer Payroll Taxes**," and together with the Withholdings, the "**Payroll Taxes**").   In the aggregate, the Payroll Taxes, including both the Employee and employer portions, total approximately $284,000 per pay period.[6]   As of the Petition Date, the Debtors estimate they owe, or are required to remit, approximately $98,000 on account of prepetition Employer Payroll Taxes.

25.    It is possible the Debtors may not have forwarded certain of the Deductions or Payroll Taxes to the appropriate third-party recipients prior to the Petition Date. To the extent any of the Deductions or Payroll Taxes may not have been forwarded to the appropriate third-party recipients, the Debtors seek authority to forward the prepetition

---

[5] Certain of the Deductions, particularly with respect to the Health Benefits Plans and FSAs (each, as defined below) are discussed further below in connection with the Employee Benefit Obligations.

[6] The Debtors have separately sought authority to pay Employees' workers compensation claims through the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 362(d), 363(b), and 503(b) for Interim and Final Authority to Continue Their Insurance Policies and Programs, Pay All Obligations with Respect Thereto, and Granting Related Relief* (the "**Insurance Motion**") filed contemporaneously herewith.

Deductions and Payroll Taxes (and to continue to forward the Deductions and Payroll Taxes on a postpetition basis whether or not related to the prepetition period) to the applicable third-party recipients in the ordinary course of business and consistent with past practice.

### E.    Reimbursable Expenses

26.    In the ordinary course of business, the Debtors reimburse certain Employees for tuition expense, relocation expenses, and reasonable and customary expenses incurred in the scope of their employment (the "**Reimbursable Expenses**").

27.    Reimbursable Expenses generally are travel-related expenses including transportation, lodging, and meals, as well as other necessary and pre-approved Employee expenses.  Most Reimbursable Expenses are incurred by Employees through a corporate-issued travel card, and as discussed further in the Cash Management Motion[7], in addition to expenses incurred through a corporate-issued meeting card, such expenses are paid by the Debtors to American Express or Suntrust Bank Inc.[8]  The remainder of the Reimbursable Expenses are incurred by Employees using their own funds, and the Debtors reimburse such amounts to Employees directly.  The Debtors review, audit, and approve all such Reimbursable Expenses before reimbursing an Employee for any Reimbursable Expenses.

28.    The Debtors also provide reimbursement to Employees for approved job related educational expenses at accredited educational institutions.    Employees receive

---

[7] The Debtors have filed the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), 363(c), 364(a), And 503(b)(1) And Fed. R. Bankr. P. 6003 And 6004 For (I) Interim and Final Authority To (A) Continue Existing Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Maintain Business Forms and Existing Bank Accounts; and (II) Related Relief* (the "**Cash Management Motion**") contemporaneously herewith.

[8] Through the Cash Management Motion, the Debtors have sought authority, but not direction to, in the ordinary course of business, continue their cash management system, including the maintenance of their travel and meeting cards issued to Employees.  By this Motion, the Debtors do not seek authority to continue the maintenance of their travel and meeting cards.

reimbursement within sixty (60) days from the end of the semester or term in which they satisfactorily complete the course.  If an Employee resigns within twelve (12) months of receipt of tuition reimbursement, they must repay the Debtors.  The Debtors approve all course selections in advance.

29.     The Debtors also provide reimbursement to Employees for approved relocation expenses.  Relocation reimbursements are determined on an employee by employee basis upon Debtor directed transfer.

30.     The Debtors estimate that they incur liabilities of approximately $430,000 per month of Reimbursable Expenses.  As of the Petition Date, the Debtors estimate that approximately $45,000 in Reimbursable Expenses related to business expenses remain outstanding, a portion of which will become due and payable during the Interim Period.

### F.     Severance

31.     In the ordinary course of business, the Debtors offer a limited period of salary continuation to certain non-executive Employees whose employment with the Debtors is ended through no fault of their own (the "**Non-Insider Severance Guidelines**").

32.     To qualify under the Non-Insider Severance Guidelines, an Employee must: (a) have been actively employed by the Debtors for more than 90 days; (b) have no other entitlement to severance from the Debtors; (c) be separated from the Debtors due to: termination without cause, permanent reductions-in-force, elimination of the Employee's position, or closure of a Debtor's operating facilities; and (d) enter into a separation and release agreement with the Debtors.

33.     The Non-Insider Severance Guidelines provide for the payment of two weeks of salary for every year a terminated qualified Employee was employed by the company

12

subject to minimum and maximum time periods defined in reference to the level of Employee's position with the Debtors.  Such payment comes in the form of a lump sum payment, subject to the Withholdings.

34.     As previously discussed, pursuant to the Debtors' transition of certain operations to Costa Rica, Exiting Transition Employees will be exiting the company in early 2019.  In addition to the payments under the Costa Rica Retention program, the Exiting Transition Employees will also be entitled to severance in accordance with the Company's severance policy.  In order to retain and incentivize the Existing Transition Employees to complete the transition, the Debtors have advanced a portion of the severance obligations pursuant to the modified Costa Rica Retention Program schedule discussed above.

35.     As of the Petition Date, the Debtors do not believe that any amounts are due and owing under this program.  Accordingly, the Debtors seek authority to continue applying the Non-Insider Severance Guidelines with respect to the remaining obligations due to the Costa Rica Employees upon their exit and any other non-insider Employees terminated postpetition.

III.     **Supplemental Workforce Obligations**

36.     To compensate the Supplemental Workforce, the Debtors pay the Staffing Agencies that in turn pay the Supplemental Workforce on the Debtors' behalf (the "**Supplemental Workforce Obligations**").  The Supplemental Workforce Obligations are paid in lump-sum amounts to the Staffing Agencies, and in some cases directly to individual members of the supplemental workforce.  Staying current with respect to the Supplemental Workforce Obligations will help minimize unnecessary disruption to the Debtors' business.

37.     On average, the Debtors pay approximately $1.1 million in aggregate Supplemental Workforce Obligations each year.  As of the Petition Date, the Debtors estimate

that they owe approximately $392,000 in Supplemental Workforce Obligations, a portion of which will become due and payable during the Interim Period.  For avoidance of doubt, the Debtors do not seek authority to pay such Supplemental Workforce Obligations in excess of the statutory cap of $12,850 per Employee imposed by section 507(a)(4) of the Bankruptcy Code.

IV.    **Employee Benefit Plans**

38.    In the ordinary course of business, the Debtors make various benefit plans available to their Employees.  These benefit plans fall within the following categories: (i) paid time off, including personal time off and holidays (collectively, the "**Employee Leave Benefits**"); (ii) medical, dental, vision, and prescription drug benefits, life insurance, accidental death and dismemberment insurance ("**AD&D**"), disability insurance, flexible spending accounts and health savings accounts (collectively, the "**Health and Welfare Benefits**"); (iii) retirement savings plans including a 401(k) plan (the "**Retirement Benefits**"); and (iv) certain other benefits (each of (i)-(iv), an "**Employee Benefit**").  Although the Debtors maintain most Employee Benefit plans themselves, certain other Employee Benefit plans, such as certain of the Health and Welfare Benefits, are administered by third parties.  The prepetition Employee Benefit Obligations are summarized in the following chart and are described in further detail below:

14

| Prepetition Obligations | Description | Total Relief Requested | Interim Relief Requested |
|---|---|---|---|
| Health Benefit Plan | Obligations related to payment of self-funded benefit plans. | $1,000,000 | $850,000 |
| Government Health Care Expenses | Obligations related to Patient-Centered Outcomes Research Trust Fund fee (PCORI). | $3,000 | $0 |
| Welfare Benefits | Obligations for Flexible Spending, Health Savings Accounts, and other voluntary programs. | $95,000 | $16,000 |
| Retirement Benefits | Obligations related to 401(k) Plan and retiree health insurance plan. | $8,500 | $8,500 |
| Total Employee Benefit Obligations ($) | | $1,106,500 | $874,500 |

### A.     Employee Leave Benefits

39.     The Employee Leave Benefits are provided and administered by the Debtors and include, among other things, flexible time off, employee and family sick leave, federal holidays, bereavement leave, domestic violence leave, community service days, jury duty, time off to vote, volunteer civil service/emergency responder leave, and military service leave.  The Debtors' Employee Leave Benefits may vary slightly by state to comply with all applicable state laws.

40.     As part of the Employee Leave Benefits, the Debtors provide leave benefits in excess of the minimum requirements set forth in the federally-mandated Family and Medical Leave Act ("**FMLA**").  The Debtors provide eligible Employees up to twelve (12) weeks paid leave during a twelve (12) month period for valid FMLA reason.  During such leave, Employees are eligible to continue health plan coverage at Employee rates, draw upon any accrued sick or disability benefit plan as qualified, and to return to the same job, or a job with equivalent status, pay, benefits, and other employment terms.  All U.S. based Employees are eligible for these benefits.

15

**B.     Health and Welfare Benefits**

41.     The Debtors sponsor several Health and Welfare Benefits plans to provide benefits to eligible Employees.  The Health and Welfare Benefits include: medical, vision, dental, and prescription drug plans (each, a "**Health Benefits Plan**"); AD&D and life insurance plans; short-term and long-term disability benefits ("**Disability Benefits**"); flexible spending accounts; health saving accounts; and other voluntary health and welfare programs.  The Health and Welfare Benefits are more fully described below.

i.     *Health Benefits Plans*

42.     The Debtors offer the following Health Benefits Plans, which are self-insured by the Debtors but administered through various insurers to Employees, and their families:

| Type of Benefits | Benefits Provider |
|---|---|
| Medical | AETNA Life Insurance Company |
| Prescription Drugs | CVS Caremark |
| Dental | Aetna |
| Vision | Vision Service Plan Insurance Company ("**VSP**") |
| COBRA | PayFlex |

43.     The main benefits providers listed above (each a "**Health Benefits Provider**") are preferred provider organizations under which improved benefits are available when using a doctor, dentist, or other healthcare provider within a network of preferred providers.  With the exception of the vision care component, the Health Benefits Plans are self-funded plans by the Debtors and administered by the respective Health Benefits Provider.  In the ordinary course of business, each Health Benefits Provider's administrative fees and, in the case

16

of VSP, premium may vary as the number of Employees enrolled in the Health Benefits Provider's plans changes and as the Health Benefits Providers change their prices.

44.     As self-funded plans, the Debtors fund and insure all medical and dental claims submitted to the relevant Health Benefits Providers on account of services provided to Employee participants (the "**Health Benefit Claims**").  Health Benefit Claims are paid as they are processed by the Health Benefit Providers.  The average monthly amount of Health Benefits Claims has been approximately $850,000.  As of the Petition Date, the Debtors estimate that approximately $1,000,000 of Health Benefit Claims have not yet been processed.

45.     As the Debtors have primarily self-funded Health Benefits Plans, the Debtors maintain a stop-loss policy through Westport Insurance Corporation to protect against exposure to large medical claims under such plans.  The policy covers healthcare expenses in excess of $250,000 on a per Employee per year basis but is subject to an aggregating specific deductible of $65,000, whereby the Debtors must fund the first $65,000 that could have otherwise have been covered by this policy.  The Debtors pay Westport Insurance Corporation approximately $25,000 at the beginning of each month for the stop-loss policy premium for the previous month.  As of the Petition Date, the Debtors estimate that they owe approximately $25,000 with respect to the stop-loss policy, which will become due and payable during the Interim Period.

46.     Under the Patient Protection and Affordable Health Care Act (the "**ACA**"), effective January 1, 2014, the Debtors incur expenses for certain employer health care obligations.  More specifically, the ACA requires employers that maintain self-funded group health insurance plans to pay a Patient-Centered Outcomes Research Trust Fund fee (the "**PCORI**").  The amount of the PCORI owed by an employer for any given policy year is

based on the average number of covered members under the health insurance plan multiplied by a pre-established dollar amount. The PCORI is paid in arrears on an annual basis in July. The Debtors estimate that they will owe approximately $3,000 for PCORI, inclusive of prepetition amounts, on July 31, 2019.

47.    Under the Consolidated Omnibus Budget Reconciliation Act ("**COBRA**"), Employees who are terminated have the right to continue health benefits from their employer for a limited period of time and under certain circumstances. COBRA benefits are provided to exiting Employees as required by law. The Debtors' COBRA program is administered by PayFlex Systems USA, Inc. ("**Payflex**"). Upon termination of an Employee qualified for COBRA coverage, the Debtors inform Payflex, Payflex then notifies the terminated Employee of his or her rights, determines if he or she wishes to continue coverage, collects COBRA premiums from the terminated Employee and remits them to the Debtors, and furnishes the Debtors with reports of its activities. In exchange for administration of the Debtors' COBRA program, Payflex Insurance is entitled to ongoing service fees and 2% of the COBRA premiums collected.

48.    Under the Health Benefits Plans, the Debtors pay fees for the administrative services provided by the Health Benefits Providers to Employees who subscribe to the Health Benefits Plans.

49.    Additionally, as referenced above, the Debtors pay a premium in exchange for the vision care coverage, which is insured and administered by VSP. The Debtors fund the premiums, but the coverage is partially subsidized by Employee-contributions withheld from gross pay.

50.    On an average monthly basis, the Debtors' aggregate portion of vision care premium and administrative fees owed to the Health Benefits Providers on account of the

Health Benefits Plans is $25,000.  As of the Petition Date, the Debtors estimate that they owe approximately $25,000 in respect of these programs, a portion of which will become due and payable during the Interim Period.

ii.      *Disability Benefits Programs*

51.      The Debtors offer insurance benefit plans to their Employees under various policies and program, in some cases automatically and in others upon election by a particular eligible Employee.  These include the life, Disability Benefits, supplemental insurance plans, and the Critical Illness Insurance Plan.  The chart below outlines the available programs.

| **Type of Benefit** | **Provided by Debtors/Voluntary** |
| --- | --- |
| Life Insurance and Disability Benefits | Provided by Debtors |
| Supplemental Insurance | Voluntary |
| Critical Illness | Voluntary |

52.      The Debtors provide all Employees with life insurance and Disability Benefits, which are fully insured by the Liberty Mutual Insurance Company ("**Liberty Mutual**").  The Debtors pay 100% of premiums totaling approximately $37,500 a month.  As of the Petition Date, the Debtors estimate that they owe approximately $47,000 in respect of these programs, a portion of which will become due and payable during the Interim Period.

53.      Employees can elect to purchase additional insurance coverage plans (the "**Supplemental Plans**") at their own expense.  The Supplemental Plans include additional life, disability, and AD&D coverage provided by Liberty Mutual.  Premiums for the Supplemental Plans are deducted from program participating Employees' payroll, and then transferred by the Debtors to Liberty Mutual on behalf of the Employees.  The Debtors transfer approximately $19,000 per month in connection with the Supplemental Plans.  As of the Petition

Date, the Debtors estimate that they owe approximately $2,400 in respect of these programs, a portion of which will become due and payable during the Interim Period.

54.    Employees can elect to purchase critical illness insurance (the "**Critical Illness Insurance Plan**") at their own expense.    The Critical Illness Insurance Plan provides Employees coverage in connection with certain critical illnesses, including, but not limited to: Alzheimer's Disease, cancer, and kidney failure.    The Critical Illness Insurance Plan is administered by Metropolitan Life Insurance Company ("**MetLife**").    The Debtors withhold the applicable amount from participating Employees' wages and transfer those premiums to MetLife monthly.    The Debtors transfer approximately $1,800 per month in withheld Employee contributions to MetLife.    As of the Petition Date, the Debtors estimate that they owe approximately $2,413 in respect of these programs, a portion of which will become due and payable during the Interim Period.

iii.    *Welfare Benefits*

55.    The Debtors offer welfare benefit plans to their Employees under various policies and program, in some cases automatically and in others upon election by a particular eligible Employee.    These include health advocacy, legal assistance, and flexible spending accounts.    The chart below outlines the available programs:

| **Type of Benefit** | **Provided by Debtors/Voluntary** |
| --- | --- |
| Health Advocacy | Provided by Debtors |
| Flexible Spending Accounts | Voluntary |
| Healthcare Savings Accounts | Voluntary |
| Legal Assistance | Voluntary |

56.    The Debtors provide eligible Employees and their families with Health Advocacy services provided by Health Advocate, Inc. ("**Health Advocate**").    Such services

include, but are not limited to: care management, in person assistance, medical bill reduction, and access to medical decision resources.  The Debtors pay Health Advocate $2.75 per participant per month to maintain this program.  As of the Petition Date, no amounts are outstanding in respect of this program.

57.    The Debtors provide certain eligible Employees the option to contribute to Flexible Spending Accounts (the "**FSAs**").  The FSAs allow for pre-tax payroll deductions to pay for qualified medical, transportation, and dependent care expenses.  Discovery Benefits, Inc. ("**Discovery**") administers the FSA.  The Debtors pay Discovery $4.00 per participating Employee per month to maintain this program.  As of the Petition Date, the Debtors estimate that they hold $95,000 of unclaimed Employee FSA contributions relating to the prepetition period.

58.    The Debtors also provide the option for eligible Employees to participate in a Health Savings Plan (the "**HSA**").  Under the HSA, the Debtors and Employees jointly contribute to an account the Employees may use to pay for their health insurance deduction and other qualified medical expenses not covered by their health insurance.  The HSA is administered by WageWorks, Inc.  The Debtors fund their HSA contributions in January, and thereafter make additional contributions as new employees are added to the program.  As of the Petition Date, the Debtors have remitted approximately $594,000 to WageWorks in 2018 in satisfaction of all of their current 2018 HSA obligations.

59.    The Debtors provide the option for eligible Employees to participate in the legal assistance program at their own expense.  The program provides legal assistance through Hyatt Legal Plans, Inc. ("**MetLaw**").  The legal assistance program provides Employees access to: advice and consultation, a variety of legal services, and discounts for certain type of legal representations.  The Debtors withhold applicable premiums from participating Employees'

21

wages and transfer those premiums to MetLaw by the last day of each month on behalf of the participating Employees.    As of the Petition Date, the Debtors estimate that they owe approximately $656 in respect of these programs, a portion of which will become due and payable during the Interim Period.

## V.    Retirement Plans

60.    The Debtors provide Retirement Benefits to eligible Employees.    These benefits include participation in a savings and retirement plan comprised of a 401(k) plan for Employees and a retiree medical plan available to a limited subset of Employees.

### A.    401(k) Plans

61.    The 401(k) Plan is provided by Wells Fargo and administered by the Plan Administrative Committee of Catalina Marketing Corporation.    In 2018, each Employee participant in the 401(k) Plan may elect to contribute up to $18,500 of his or her annual salary to his or her plan, plus an additional $6,000 per year in catch-up contributions if the Employee is age 50 and over, subject to limitations under applicable law.    The Debtors match 100% of such Employees' contributions up to a cap equal to 3% of such Employee's total eligible annual compensation (collectively, the "**401(k) Match**").    The Debtors estimate that they contribute approximately $218,000 each month on account of the 401(k) Match.    The Debtors' approximate annual contribution to the 401(k) Plan is $2.51 million, inclusive of the 401(k) Match and a *de minimis* amount of certain related administration fees.    As of the Petition Date, the Debtors' owe $8,500 on account of the 401(k) Match program.

### B.    Retirement Healthcare Plan

62.    The Debtors maintain a legacy retirement plan for certain former Employees (the "**Retirees**") who were either shareholders of the Debtors or served as the

Debtors' Chief Executive Officer at the time they retired and permanently retired from the company on or before June 1, 2012 (the "**Legacy Retirement Plan**"). Only seven (7) Retirees and their families participate in the program. The Debtors administer the following health benefits plans (each, a "**Retiree Health Benefits Plan**") through various insurers for the benefit of the Retirees and their families:

| Type of Benefits | Benefits Provider |
| --- | --- |
| Medical | Aetna Life Insurance Company |
| Dental | Aetna Life Insurance Company |
| Vision | VSP |

63.     The main benefits providers listed above (each a "**Retiree Health Benefits Provider**") are preferred provider organizations under which improved benefits are available when using a doctor, dentist, or other healthcare provider within a network of preferred providers. In the ordinary course of business, each Retiree Health Benefits Provider's premium and administrative fees may vary as the number of Employees enrolled in the Health Benefits Provider's plans changes and as the Health Benefits Providers change their prices.

64.     The Debtors and Retirees pay a joint premium[9] in exchange for medical and dental coverage, which is insured and administered by Aetna Life Insurance Company, and vision coverage, which is insured and administered by VSP. On an annual basis, the Debtors' aggregate portion of premiums paid to the Retiree Health Benefits Providers on account of the Retiree Health Benefits Plans is approximately $206,000. As of the Petition Date, no amounts are outstanding in respect to this program.

---

[9] The Retirees' contribution is approximately 30% of medical and dental premiums and 50% of vision premiums.

## Basis for Relief Requested

65.     The Debtors do not seek to alter any of the Employee Benefit Plans, the Employee Leave Benefits, and the Other Employee Programs.  This Motion requests only permission for the Debtors, in their sole discretion, to (i) make payments consistent with existing practices, policies, and programs to the extent such payments would otherwise be inconsistent with the provisions of the Bankruptcy Code and (ii) continue to honor their practices, programs, and policies with respect to their Employees, as such were in effect as of the Petition Date.

### A.     Payment of the Employee Obligations is Warranted Under Section 363(b)(1) of the Bankruptcy Code and the Doctrine of Necessity

66.     The Court may grant the relief requested herein pursuant to section 363 of the Bankruptcy Code.  Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ."  11 U.S.C. § 363(b)(1).

67.     Under section 363 of the Bankruptcy Code, a court may authorize a debtor to pay certain prepetition claims if a sound business purpose exists for doing so.  *See In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (requiring that debtor show a "sound business purpose" to justify its actions under section 363 of Bankruptcy Code); *see also In re Phoenix Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987).  Moreover, if "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task").

68.     In addition, the Court has the authority, pursuant to its equitable powers under section 105(a) of the Bankruptcy Code, to authorize the relief requested herein, because such relief is necessary for the Debtors to carry out their fiduciary duties under section 1107(a) of the Bankruptcy Code.  Section 1107(a) of the Bankruptcy Code "contains an implied duty of the debtor-in-possession" to act as a fiduciary to "'protect and preserve the estate, including an operating business' going-concern value,'" on behalf of the debtor's creditors and other parties in interest.  *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)); *see also Unofficial Comm. of Equity Holders v. McManigle (In re Penick Pharm., Inc.)*, 227 B.R. 229, 232-33 (Bankr. S.D.N.Y. 1998) ("[U]pon filing its petition, the Debtor became debtor in possession and, through its management . . . was burdened with the duties and responsibilities of a bankruptcy trustee.").

69.     The Court may also authorize the payment of prepetition claims in appropriate circumstances under section 105(a) of the Bankruptcy Code and the doctrine of necessity when such payment is essential to the continued operation of a debtor's business.  *See*, *e.g.*, *Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) of Bankruptcy Code provides a statutory basis for payment of prepetition claims under doctrine of necessity and noting that "[t]he Supreme Court, the Third Circuit and the District of Delaware all recognize the court's power to authorize payment of pre-petition claims when such payment is necessary for the debtor's survival during chapter 11"); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (confirming that doctrine of necessity is standard in Third Circuit for enabling a court to authorize payment of prepetition claims prior to confirmation of a reorganization plan); *see also In re Ionosphere Clubs*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989)

(applying section 105(a) to justify an order authorizing the payment of certain pre-petition wages, salaries, medical benefits, and business expense claims to debtor's employees).

70.     This "doctrine of necessity" functions in a chapter 11 reorganization as a mechanism by which the Court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code.  *See, e.g.*, *Just for Feet*, 242 B.R. 821, 824-25 (D. Del. 1999) (holding that section 105(a) of Bankruptcy Code provides statutory basis for payment of prepetition claims under the doctrine of necessity particularly when such payment is necessary for the debtor's survival during chapter 11); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (confirming that the doctrine of necessity is standard for enabling a court to authorize payment of prepetition claims prior to confirmation of a reorganization plan).

71.     The relief requested by this Motion represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates and is justified under sections 105(a) and 363(b) of the Bankruptcy Code. Authorizing the Debtors to pay prepetition wages, employee benefits, and similar items will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption.  Indeed, without the relief requested herein being granted, the Debtors' Employees may seek alternative opportunities, perhaps with the Debtors' competitors. The loss of valuable Employees, who are the lifeblood of the Debtors' operations, would deplete the Debtors' workforce, thereby hindering the Debtors' ability to meet their customer obligations and, likely, diminishing stakeholder confidence in the Debtors' ability to successfully carry out their chapter 11 strategy and reorganize under the Prepackaged Plan.

72.    Failure to satisfy certain prepetition obligations will likely lead to significant attrition and jeopardize Employee morale and loyalty at a time when Employee support is critical to the Debtors' businesses.  The majority of the Debtors' Employees rely exclusively on their compensation, benefits and reimbursement of expenses to satisfy their daily living expenses.  These Employees will be exposed to significant financial difficulties and other distractions if the Debtors are not permitted to honor their obligations for unpaid compensation, benefits and reimbursable expenses.  Furthermore, if the Court does not authorize the Debtors to honor their various obligations under the insurance programs, many Employees lose access to health coverage at a time when the Debtors need such Employees to perform their jobs at peak efficiency.  As set forth above, Employee attrition would cause the Debtors to incur additional expenses to find appropriate and experienced replacements, severely disrupting the Debtors' operations at a critical juncture.

73.    Similarly, the Supplemental Workforce is an important component of the Debtors' operations, and ensures that key operational initiatives that are critical to the Debtors' reorganizational prospects, including the upgrade of certain key IT functions, assessment and reallocation of sales and vendor assets, and an overhaul of the Debtors' analytics platforms, are adequately staffed.  Accordingly, failure to timely pay the Supplemental Workforce Obligations would endanger the Debtors' prospects of a successful reorganization and would cause widespread negative effects throughout the Debtors' businesses.

**B.    Payment of the Employee Obligations Would Not Prejudice Parties in Interest**

74.    The Debtors believe that the vast majority of the prepetition Employee Obligations constitute priority claims under sections 507(a)(4) or (5) of the Bankruptcy Code.  As priority claims, the Employee Obligations are entitled to payment in full before any general

unsecured claims asserted against the Debtors can be satisfied.  Thus, the relief requested largely affects only the timing of the payment of the priority Prepetition Employee Obligations and should not prejudice the rights of general unsecured creditors or other parties in interest. Furthermore, the estimated Prepetition Employee Obligations of $2.7 million are relatively *de minimis* in the context of the Debtors' operations.

### C.    Payment of Certain Employee Obligations is Required by Law

75.    The Debtors seek authority to pay Deductions and Payroll Taxes to the appropriate entities.  These amounts principally represent Employee earnings that governments, Employees and judicial authorities have designated for deduction from Employees' paychecks. Indeed, certain Deductions, including contributions to the Employee Benefit Programs and child support and alimony payments, are not property of the Debtors' estates because they have been withheld from Employees' paychecks on another party's behalf.  *See* 11 U.S.C. § 541(b). Further, federal and state laws require the Debtors and their officers to make certain tax payments that have been withheld from their Employees' paychecks.  *See* 26 U.S.C. § 6672 and 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95-97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *DuCharmes & Co., Inc. v. State of Mich* (*In re DuCharmes & Co.*), 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes).  Because the Deductions and Payroll Taxes are not property of the Debtors' estates, the Debtors request that the Court authorize them to transmit the Payroll Taxes to the proper parties in the ordinary course of business.

28

**D.**     **Debtors Do Not Seek to Make Severance Payments Outside the Scope of Section 503(c) of the Bankruptcy Code**

76.     Out of an abundance of caution, and in an effort to provide comfort to employees given the uncertainty attendant to a company operating in chapter 11, the Debtors request authority to continue the Non-Insider Severance Plan with respect to non-insider employees terminated postpetition in the ordinary course of business.  Section 363(c)(1) of the Bankruptcy Code authorizes the debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing."  The purpose of section 363(c)(1) is to provide a debtor in possession with the flexibility to engage in the ordinary transactions required to operate its business without unneeded oversight by its creditors or the court.  *See In re Roth Am., Inc.*, 975 F.2d 949, 952 (3d Cir. 1992).

77.     The Non-Insider Severance Program does not implicate section 503(c)(2) of the Bankruptcy Code because none of the participants in such practice are insiders.   In addition, the Non-Insider Severance Plan does not implicate section 503(c)(3) of the Bankruptcy Code because it is within the ordinary course of the Debtors' business.  *See* 11 U.S.C. § 503(c)(3) (prohibiting certain payments "outside of the ordinary course of business").  If section 503(c) is not implicated, the Court may grant the requested relief if it finds that the Non-Insider Severance Program satisfies the requirements of section 363(c)(1) of the Bankruptcy Code.  *See In re Nellson Nutraceutical, Inc.,* 369 B.R. 787, 796 (Bankr. D. Del. 2007) (noting that ordinary course transfers under section 363(c)(1) of the Bankruptcy Code do not implicate 503(c)).  For the reasons stated, discretion to continue this practice – like all of the relief sought in this Motion – is critical and necessary to assuage fear and motivate the Workforce to help achieve the Debtors' chapter 11 objectives.  Accordingly, the requested relief should be approved.

**Reservation of Rights**

78.    Nothing contained herein is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors, (ii) an agreement or obligation to pay any claims, (iii) an admission as to the validity of any liens satisfied pursuant to this Motion, (iv) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, or (v) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code.  Likewise, if this Court grants the relief sought herein, any payment made pursuant to this Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

**Applicable Financial Institutions
Should Be Authorized, at the Debtors' Direction to Receive, Process, Honor,
and Pay Checks Issued and Transfers Requested to Pay Employee Obligations**

79.    The Debtors further request that the Court authorize applicable financial institutions (the "**Banks**") to receive, process, honor, and pay any and all checks issued, or to be issued, and electronic funds transfers requested, or to be requested, by or on behalf of the Debtors relating to the prepetition Employee obligations, to the extent that sufficient funds are on deposit and standing in the Debtors' credit in the applicable bank accounts to cover such payment.  The Debtors represent that these checks are drawn on identifiable disbursement accounts and can be readily identified as relating directly to payment authorized by this Court or as a matter of law.  Accordingly, the Debtors believe that checks other than those relating to authorized payments will not be honored inadvertently.  Any such financial institution may rely on the representations of such Debtors as to which checks are issued or wire transfers are made (or, as applicable, requested to be issued or made) and authorized to be paid in accordance with this Motion without any duty of further inquiry and without liability for following the Debtors'

30

instructions. The Debtors also seek authority to issue new postpetition checks or effect new postpetition electronic funds transfers in replacement of any checks or funds transfer requests on account of prepetition Employee obligations dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases.

### The Debtors Satisfy Bankruptcy Rule 6003(b)

80.     Bankruptcy Rule 6003(b) provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a Bankruptcy Court may issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" before twenty-one (21) days after filing of the petition. Fed. R. Bankr. P. 6003(b). As described herein, the Debtors' business operations rely heavily on the work of their Employees, without whose skills, talents, and abilities the Debtors' business operations would suffer dramatically. Accordingly, the Debtors submit that the relief requested herein is necessary to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003 is satisfied.

### Bankruptcy Rules 6004(a) and (h)

81.     The Debtors believe that, under the circumstances of these chapter 11 cases, notice of the Motion, as set forth below, is adequate under Bankruptcy Rule 6004(a). Notwithstanding any applicability of the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h), the Debtors respectfully request that the Motion be approved and the relief requested be immediately effective and enforceable.

### Notice

82.     Notice of this Motion shall be provided to (i) the Office of the United States Trustee for the District of Delaware; (ii) the holders of the five (5) largest secured claims against the Debtors (on a consolidated basis); (iii) the holders of the thirty (30) largest unsecured

claims against the Debtors (on a consolidated basis); (iv) Jones Day, 250 Vesey Street, New York, NY 10281 (Attn: Scott J. Greenberg, Esq. and Michael J. Cohen, Esq.) and Pachulski Stang Ziehl & Jones LLP, 919 N. Market Street, Wilmington, DE 19801 (Attn: Laura Davis Jones, Esq.), as counsel to the DIP lenders and the ad hoc group of lenders under the First Lien Credit Agreement; (v) Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, NY 10019 (Attn: Brian S. Hermann, Esq. and Robert A. Britton, Esq.) and Young Conaway Stargatt & Taylor LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware, 19801 (Attn.: Pauline K. Morgan, Esq.), as counsel to an ad hoc group of certain holders of term loans under the Second Lien Term Loan, dated as of April 9, 2014; (vi) Davis Polk & Wardwell LLP, 450 Lexington Ave, New York, NY 10017 (Attn: Brian M. Resnick, Esq.) and Landis Rath & Cobb LLP, 919 Market Street, Wilmington, DE 19801 (Attn: Adam Landis, Esq. and Kerri Mumford, Esq.), as counsel to JPMorgan Chase Bank, N.A., as administrative agent under the First Lien Credit Agreement; (vii) Wilmer Cutler Pickering Hale and Dorr LLP, 7 World Trade Center, 250 Greenwich Street, New York, NY 10007 (Attn: Andrew N. Goldman, Esq.), as counsel to Wilmington Savings Fund Society, FSB, as administrative agent under the Second Lien Credit Agreement; (viii) Debevoise & Plimpton LLP, 919 Third Avenue, New York, NY 10022 (Attn: My Chi To, Esq.), as counsel to an ad hoc group of holders of the HoldCo PIK Toggle Notes of PDM Intermediate Holdings B Corporation; (ix) the Internal Revenue Service; (x) the United States Attorney's Office for the District of Delaware; (xi) the Banks; and (xii) any other party entitled to notice pursuant to Local Rule 9013-1(m) (collectively, the "**Notice Parties**").  As this Motion is seeking "first day" relief, the Debtors will serve copies of this Motion and any order entered in respect of the Motion as

required by Local Rule 9013-1(m).    The Debtors submit that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

83.    No previous request for the relief sought herein has been made by the Debtors to this or any other court.

[*Remainder of Page Intentionally Left Blank.*]

WHEREFORE the Debtors respectfully request entry of the Proposed Interim Order and, following the Final Hearing (if one is required), the Proposed Final Order, in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively, granting the relief requested herein and such other and further relief as this Court may deem just and appropriate.

Dated: December 12, 2018
      Wilmington, Delaware

                                         */s/ Jason M. Madron*

                                        Mark D. Collins (No. 2981)
                                        Jason M. Madron (No. 4431)
                                        **RICHARDS, LAYTON & FINGER, P.A.**
                                        One Rodney Square
                                        920 North King Street
                                        Wilmington, Delaware 19801
                                        Telephone: (302) 651-7700
                                        Facsimile: (302) 651-7701

                                        -and-

                                        Gary T. Holtzer (*pro hac vice* admission pending)
                                        Ronit J. Berkovich (*pro hac vice* admission pending)
                                        Jessica Liou (*pro hac vice* admission pending)
                                        Kevin Bostel (*pro hac vice* admission pending)
                                        **WEIL, GOTSHAL & MANGES LLP**
                                        767 Fifth Avenue
                                        New York, New York 10153
                                        Telephone: (212) 310-8000
                                        Facsimile: (212) 310-8007

                                        *Proposed Attorneys for Debtors*
                                        *and Debtors in Possession*

## Exhibit A

## Proposed Interim Order

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------ X
                                                             :
In re                                                        :        Chapter 11
                                                             :
CHECKOUT HOLDING CORP., et al.,                              :        Case No. 18-[_____] (____)
                                                             :
            Debtors.¹                                        :        Joint Administration Requested
                                                             :
                                                             :
------------------------------------------------------------ X
```

### INTERIM ORDER PURSUANT
### TO 11 U.S.C. §§ 105(a), 363(b) AND
### 507(a) AUTHORIZING DEBTORS TO PAY PREPETITION
### WAGES, SALARIES, COMMISSIONS, EMPLOYEE BENEFITS,
### AND OTHER COMPENSATION AND MAINTAIN EMPLOYEE BENEFIT
### PROGRAMS AND TO PAY RELATED ADMINISTRATIVE OBLIGATIONS

Upon the motion (the "**Motion**") [2] of Checkout Holding Corp. and its affiliated debtors in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"), pursuant to sections 105(a) and 363(b) of title 11 of the United States Codes (the "**Bankruptcy Code**"), for an order (i) authorizing debtors to (a) pay prepetition wages, salaries, commissions, employee benefits, and other compensation and (b) maintain employee benefit programs and payment of related administrative obligations, and (ii) authorizing, at the Debtors' direction, financial institutions to honor and process checks and transfers related to such obligations , all as more fully set forth in the Motion; and this Court

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Catalina Marketing Corporation (9007); Catalina Marketing Procurement, LLC (9333); Catalina Marketing Technology Solutions, Inc. (8728); Catalina Marketing Worldwide, LLC (9687); Cellfire Inc. (5599); Checkout Holding Corp. (4651); Modiv Media, Inc. (3507); PDM Group Holdings Corporation (9148); PDM Holdings Corporation (5025); PDM Intermediate Holdings A Corporation (6409); and PDM Intermediate Holdings B Corporation (3278).  The Debtors' principal offices are located at 200 Carillon Parkway, St. Petersburg, FL 33716.

[2] Capitalized terms used, but not otherwise defined, herein shall have the same meanings ascribed to such terms in the Motion.

having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and notice of the Motion having been given as provided in the Motion, and such notice having been adequate and appropriate under the circumstances; and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion; and a hearing having been held to consider the relief requested in the Motion (the "**Hearing**"); and upon the Del Genio Declaration filed contemporaneously with the Motion, the record of the Hearing, and all of the proceedings had before this Court; and this Court having found and determined that the relief sought in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates as contemplated by Bankruptcy Rule 6003; and this Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates, creditors, and all parties in interest, and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted on an interim basis as set forth herein.

2.      The Debtors are authorized, but not directed pursuant to sections 105(a), 363(b), and 507(a) of the Bankruptcy Code to (i) pay, in their discretion, obligations incurred, directly or indirectly, under or relating to the Employee Obligations, related expenses, and all fees and costs incident to the foregoing, including amounts owed to third-party administrators and providers and tax authorities; and (ii) maintain and continue to honor and pay, in their

discretion, amounts with respect to the Debtors' business practices, programs, and policies for their employees as such were in effect as of the commencement of these chapter 11 cases and as such may be modified or supplemented from time to time in the ordinary course of business, in the case of the foregoing clauses (i) and (ii) collectively, up to a maximum aggregate cap of $1.8 million for all amounts authorized to be paid under this order.

3.      Nothing in the Motion or this Interim Order shall be deemed to authorize the Debtors to accelerate any payments not otherwise due prior to the date of the hearing to consider entry of an order granting the relief requested in the Motion on a final basis (the "**Final Hearing**").

4.      Nothing in the Motion or this Interim Order, pending entry of a final order, shall be deemed to authorize the Debtors to make any payment to, or on behalf of, any Employee or any individual of the Supplemental Workforce, on account of wages and other compensation obligations in excess of the statutory caps set forth in sections 507(a)(4) and (5) of the Bankruptcy Code or authorize the payments of any amounts which are subject to section 503(c) of the Bankruptcy Code.

5.      The Banks are authorized to receive, process, honor, and pay any and all checks issued, or to be issued, and electronic funds transfers requested, or to be requested, by the Debtors relating to the obligations, to the extent that sufficient funds are on deposit and standing in the Debtors' credit in the applicable bank accounts to cover such payments.  The Banks are authorized to accept and rely on all representations made by the Debtors with respect to which checks, drafts, wires, or automated clearing house transfers should be honored or dishonored in accordance with this or any other order of this Court, whether such checks, drafts, wires, or

3

transfers are dated prior to, on, or subsequent to the Petition Date, without any duty to inquire otherwise, and without liability for following the Debtors' instructions.

6.      The Debtors are further authorized, but not directed, to issue postpetition checks, or to effect postpetition funds transfer requests, in replacement of any checks or funds transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to any prepetition amounts that are authorized to be paid pursuant to this Interim Order.

7.      Notwithstanding anything contained in the Motion or this Interim Order, any payment made, and any authorization of the Debtors contained herein shall be subject to the terms and conditions contained in any orders entered by this Court authorizing the Debtors to obtain debtor-in-possession financing and/or authorizing the use of cash collateral (each such order, a "**DIP Order**"), the documentation in respect of any such debtor-in-possession financing or use of cash collateral, and any budget in connection with any such debtor-in-possession financing and/or use of cash collateral.  To the extent there is any inconsistency between the terms of any DIP Order and any action taken or proposed to be taken by the Debtors hereunder, the terms of the DIP Order shall control.

8.      Nothing contained in the Motion or this Interim Order or any payment made pursuant to the authority granted by this Interim Order is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, or (iii) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code.

RLF1 20430308V.1

9.      Notwithstanding entry of this Interim Order, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by, any party.

10.     The requirements of Bankruptcy Rule 6003(b) have been satisfied.

11.     Under the circumstances of these chapter 11 cases, notice of the Motion is adequate under Bankruptcy Rule 6004(a).

12.     Notwithstanding any applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order shall be immediately effective and enforceable upon its entry.

13.     The Final Hearing on the Motion shall be held on **[_____], 2018 at [_____] (Eastern Standard Time)** and any objections or responses to the Motion shall be in writing, filed with this Court, and served upon (i) the proposed attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153 (Attn: Gary T. Holtzer, Esq., Ronit J. Berkovich, Esq., and Kevin Bostel, Esq.) and Richards, Layton & Finger, P.A., 920 North King Street, Wilmington, DE 19801 (Attn: Mark D. Collins, Esq. and Jason M. Madron, Esq.); and (ii) the Notice Parties, in each case so as to be received no later than **4:00 p.m. (Eastern Standard Time) on [_____], 2018**.

14.     This Interim Order is effective only from the date of entry through this Court's disposition of the Motion on a final basis; provided that this Court's ultimate disposition of the Motion on a final basis shall not impair or otherwise affect any action taken pursuant to this Interim Order.

15.     The Debtors are authorized to take all action necessary to implement the relief granted in this Interim Order.

16.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Interim Order.

Dated: _____, 2018
       Wilmington, Delaware

                                               _____
                                            UNITED STATES BANKRUPTCY JUDGE

**Exhibit B**

**Proposed Final Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
--------------------------------------------------------- X
                                          :
In re                                     :        Chapter 11
                                          :
CHECKOUT HOLDING CORP., et al.,           :        Case No. 18-[_____] (___)
                                          :
            Debtors.¹                     :        Joint Administration Requested
                                          :
                                          :
--------------------------------------------------------- X
```

## FINAL ORDER PURSUANT
## TO 11 U.S.C. §§ 105(a), 363(b) AND 507(a)
## AUTHORIZING DEBTORS TO PAY PREPETITION
## WAGES, SALARIES, COMMISSIONS, EMPLOYEE BENEFITS,
## AND OTHER COMPENSATION AND MAINTAIN EMPLOYEE BENEFIT
## PROGRAMS AND TO PAY RELATED ADMINISTRATIVE OBLIGATIONS

Upon the motion (the "**Motion**")[2] of Checkout Holding Corp. and its affiliated debtors in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"), pursuant to sections 105(a) and 363(b) of title 11 of the United States Codes (the "**Bankruptcy Code**"), for an order (i) authorizing debtors to (a) pay prepetition wages, salaries, commissions, employee benefits, and other compensation and (b) maintain employee benefit programs and payment of related administrative obligations, and (ii) authorizing, at the Debtors' direction, financial institutions to honor and process checks and transfers related to such obligations , all as more fully set forth in the Motion; and this Court

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Catalina Marketing Corporation (9007); Catalina Marketing Procurement, LLC (9333); Catalina Marketing Technology Solutions, Inc. (8728); Catalina Marketing Worldwide, LLC (9687); Cellfire Inc. (5599); Checkout Holding Corp. (4651); Modiv Media, Inc. (3507); PDM Group Holdings Corporation (9148); PDM Holdings Corporation (5025); PDM Intermediate Holdings A Corporation (6409); and PDM Intermediate Holdings B Corporation (3278).  The Debtors' principal offices are located at 200 Carillon Parkway, St. Petersburg, FL 33716.

[2] Capitalized terms used, but not otherwise defined, herein shall have the same meanings ascribed to such terms in the Motion.

having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012 and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and notice of the Motion having been given as provided in the Motion, and such notice having been adequate and appropriate under the circumstances; and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion; and this Court having held hearings to consider the relief requested in the Motion on an interim (the "**Interim Hearing**") and final basis (the "**Final Hearing**"); and this Court having entered an order granting the relief requested in the Motion on an interim basis; and upon the Del Genio Declaration, the record of the Interim Hearing, the Final Hearing, and all of the proceedings had before this Court; and this Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates, creditors, and all parties in interest, and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted on a final basis as set forth herein.

2.      The Debtors are authorized, but not directed pursuant to sections 105(a), 363(b), and 507(a) of the Bankruptcy Code to (i) pay, in their discretion, obligations incurred, directly or indirectly, under or relating to the Employee Obligations, related expenses, and all fees and costs incident to the foregoing, including amounts owed to third-party administrators and providers; and (ii) maintain and continue to honor and pay on a post-petition basis, in their

discretion, amounts with respect to the Debtors' business practices, programs, and policies for their employees as such were in effect as of the commencement of these chapter 11 cases and as such may be modified or supplemented from time to time in the ordinary course of business; provided that any such modifications shall not be inconsistent with any DIP Order (defined below).

3.      The Banks are authorized to receive, process, honor, and pay any and all checks issued, or to be issued, and electronic funds transfers requested, or to be requested, by the Debtors relating to the obligations, to the extent that sufficient funds are on deposit and standing in the Debtors' credit in the applicable bank accounts to cover such payments.  The Banks are authorized to accept and rely on all representations made by the Debtors with respect to which checks, drafts, wires, or automated clearing house transfers should be honored or dishonored in accordance with this or any other order of this Court, whether such checks, drafts, wires, or transfers are dated prior to, on, or subsequent to the Petition Date, without any duty to inquire otherwise and without liability for following the Debtors' instructions.

4.      The Debtors are further authorized, but not directed, to issue postpetition checks, or to effect postpetition funds transfer requests, in replacement of any checks or funds transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to any prepetition amounts that are authorized to be paid pursuant to this Final Order.

5.      Notwithstanding anything other provisions of the Motion, the Interim Order or this Final Order shall be deemed to authorize the Debtors to make any payment to, or on behalf of, any Employee or any individual of the Supplemental Workforce, on account of wages and other compensation obligations in excess of the statutory caps set forth in sections

3

507(a)(4) and (5) of the Bankruptcy Code or authorize the payments of any amounts which are subject to section 503(c) of the Bankruptcy Code.

6.      Notwithstanding anything contained in the Motion, the Interim Order, or this Final Order, any payment made, and any authorization of the Debtors contained herein shall be subject to the terms and conditions contained in any orders entered by this Court authorizing the Debtors to obtain debtor-in-possession financing and/or authorizing the use of cash collateral (each such order, a "**DIP Order**"), the documentation in respect of any such debtor-in-possession financing or use of cash collateral, and any budget in connection with any such debtor-in-possession financing and/or use of cash collateral.   To the extent there is any inconsistency between the terms of any DIP Order and any action taken or proposed to be taken by the Debtors hereunder, the terms of the DIP Order shall control.

7.      Nothing contained in the Motion or this Final Order or any payment made pursuant to the authority granted by this Final Order is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, or (iii) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code.

8.      Notwithstanding entry of this Final Order, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by, any party.

9.      Under the circumstances of these chapter 11 cases, notice of the Motion is adequate under Bankruptcy Rule 6004(a).

10.      Notwithstanding any applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Final Order shall be immediately effective and enforceable upon its entry.

4

11.    The Debtors are authorized to take all action necessary to carry out this Final Order.

12.    This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Final Order.

Dated: _____, 2018
          Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE