## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------- X
                       :

| | | |
|---|---|---|
| In re | : | **Chapter 11** |
| | : | |
| **CHECKOUT HOLDING CORP.**, *et al.*, | : | **Case No. 18-[_____] (____)** |
| | : | |
| Debtors.[1] | : | **Joint Administration Requested** |
| | : | |

-------------------------------------------------------------- X

### MOTION OF DEBTORS PURSUANT TO
### 11 U.S.C. §§ 105, 363, AND 503 AND FED. R. BANKR. P. 6003 AND 6004
### FOR INTERIM AND FINAL AUTHORITY TO PAY PREPETITION
### TRADE CLAIMS IN ORDINARY COURSE OF BUSINESS

Checkout Holding Corp. and its affiliated debtors in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"), respectfully represent as follows in support of this motion (the "**Motion**"):

### Background

1.        On the date hereof (the "**Petition Date**"), the Debtors each commenced with the United States Bankruptcy Court for the District of Delaware (the "**Court**") a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Catalina Marketing Corporation (9007); Catalina Marketing Procurement, LLC (9333); Catalina Marketing Technology Solutions, Inc. (8728); Catalina Marketing Worldwide, LLC (9687); Cellfire Inc. (5599); Checkout Holding Corp. (4651); Modiv Media, Inc. (3507); PDM Group Holdings Corporation (9148); PDM Holdings Corporation (5025); PDM Intermediate Holdings A Corporation (6409); and PDM Intermediate Holdings B Corporation (3278). The Debtors' principal offices are located at 200 Carillon Parkway, St. Petersburg, FL 33716.

2.     Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of the chapter 11 cases pursuant to rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and rule 1015–1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**").

3.     Before the Petition Date, the Debtors, with the support of their secured lenders, began the solicitation of votes on their *Joint Prepackaged Chapter 11 Plan of Checkout Holding Corp. and Its Affiliated Debtors* (the "**Prepackaged Plan**"), through their *Disclosure Statement for Joint Prepackaged Chapter 11 Plan of Checkout Holding Corp. and Its Affiliated Debtors* pursuant to sections 1125 and 1126(b) of the Bankruptcy Code.  The Debtors expect that the Prepackaged Plan will be accepted by all classes entitled to vote in excess of the statutory thresholds specified in section 1126(c) of the Bankruptcy Code.   Consistent with their obligations under that certain *Restructuring Support Agreement*, dated as of December 11, 2018 (as amended from time to time and including all exhibits thereto, the "**RSA**"), the Debtors are seeking to emerge from chapter 11 on an expedited timeframe.

4.     Information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Robert A. Del Genio* (the "**Del Genio Declaration**"), which has been filed with this Court contemporaneously with the Motion.

## **Jurisdiction**

5.     The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Local Rule 9013–1(f), the Debtors consent to the entry of

a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Relief Requested

6.       By this Motion, pursuant to sections 105(a), 363(b), and 503(b)(9) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, and consistent with the unimpaired treatment of General Unsecured Claims under the Prepackaged Plan, filed contemporaneously herewith, the Debtors request authority to pay in full in their discretion and in the ordinary course of business, allowed prepetition claims of creditors (the "**Trade Creditors**") that provide goods or services related to the Debtors' operations (collectively, the "**Trade Claims**").  The Debtors estimate that total aggregate Trade Claims are approximately $23.0 million.  Certain of the Trade Claims (a) are entitled to statutory priority under section 503(b)(9) of the Bankruptcy Code or (b) may give rise to shippers, warehouseman, mechanics, or other liens against the Debtors' property if unpaid (collectively, the "**Priority Trade Claims**").  The Debtors estimate the Priority Trade Claims total approximately $3.7 million.  In addition, of the Trade Claims, approximately $7.7 million represent Critical Vendor Claims (as defined herein) that the Debtors believe must be paid to maintain the going concern value of the Debtors' enterprise.  Excluding the Priority Trade Claims and the Critical Vendor Claims, the Debtors estimate that the total Trade Claims are approximately $11.6 million (the "**Non-Priority Trade Claims**").   The Debtors further request that this Court confirm administrative priority status of all undisputed obligations of the Debtors owing to vendors and suppliers arising from the postpetition delivery of goods and provision of services ordered before the Petition Date under the Prepetition

Purchase Orders (as defined herein) and authorize the Debtors to pay such obligations in the ordinary course of business.

7.      No party in interest will be prejudiced by the relief requested by this Motion because the Trade Claims are unimpaired under the Prepackaged Plan and will be paid in full.  Thus, the relief requested herein seeks to alter only the timing, not the amount or priority, of such payments.  Moreover, authority to pay the Trade Claims in the ordinary course of business is necessary to avoid the risk of key vendors and service providers withholding essential services or refusing to sell goods to the Debtors.

8.      A proposed form of order granting the relief requested herein on an interim basis is annexed hereto as **Exhibit A** (the "**Proposed Interim Order**") and, pending a final hearing on the relief requested herein, on a final basis as **Exhibit B** (the "**Proposed Final Order**" and, together with the Proposed Interim Order, the "**Proposed Orders**").

## Debtors' Business and Trade Creditors

9.      As discussed in the Del Genio Declaration, one of the Debtors' primary lines of business is the development and deployment of in-store, analytics driven marketing campaigns (the "**Campaigns**").  The Campaigns are designed to drive products sales, typically by delivering print and digital promotional materials, often in the form of coupons, to shoppers who frequent the over 24,000 retail locations of the Debtors' approximately 61 retailer partners (the "**Retailers**," and their networked store locations, the "**Retailer Network**").  The unique combination of items purchased by a shopper during each shopping trip is analyzed against Catalina's historical shopper purchase database (the "**Shopper Database**"), and, through the application of the Debtors' proprietary analytics software (the "**Analytics Platform**"), the Debtors use the Shopper Database and real-time shopper data to make accurate predictions about a shopper's future purchasing behavior, ultimately resulting in the delivery of a digital coupon or

4

printed promotional materials generated by one of the Debtors' global network of high-speed printers ("**Networked Printers**") located at a number of checkout, point-of-sale location ("**POS**") in each of the Retailers' stores. A significant portion of the Debtors' revenues are dependent on promotional impressions that are successfully distributed to shoppers.

10.     The Trade Creditors provide the Debtors with the essential goods and services that facilitate these and other of their operations. The Trade Claims include claims of the Debtors' (a) Retailers for fees owed on account of the shopper data provided by the Retailer Network; (b) third-party software engineering service providers and related support servicers; (c) providers of digital advertisement and promotional support and distribution services that reach shoppers through in-store, internet, and mobile device platforms; (d) providers of software warranty and maintenance and other IT support for the Debtors' software and related hardware; (e) providers of digital security for software vulnerability and malware protection; (f) other software servicers that provide critical support necessary for the continuous, on-demand transmission of data and promotional messaging; (g) suppliers of ink, paper, replacement printer components, computers, and computer components all necessary to maintain consistent POS service at the various store locations in the Retailer Network and day-to-day business operations; (h) maintenance service providers for the consistent repair and maintenance of the Networked Printers across the Retailer Network; (i) utility service providers; and (j) other general operational expenses that are not addressed in other first day motions.

## <u>Trade Claims</u>

11.     The Debtors incur numerous fixed, liquidated, and undisputed payment obligations to the Trade Creditors in the ordinary course of business. For the 12 months before the Petition Date, the Debtors' average monthly payment to Trade Creditors was approximately

5

$16.0 million.   The Debtors estimate that, as of the Petition Date, they owe a total of approximately $23.0 million on account of undisputed Trade Claims.  The Debtors estimate that approximately $10.0 million of that amount will become due within the interim period before a final hearing on this Motion (the "**Interim Period**").  The following table summarizes the types of Trade Claims held by the Trade Creditors, and provides the Debtors' estimate of the total amount of each type of Trade Claim outstanding as of the Petition Date, including estimates for the portion of such total coming due within the Interim period:

| Category | Description of Claims | Estimated Total Amount Outstanding as of Petition Date | Estimated Amount Due Within Interim Period |
|---|---|---|---|
| 503(b)(9) Claims | Claims entitled statutory priority under section 503(b)(9) of the Bankruptcy Code. | $2.2 million | $1.3 million |
| Lien Claimants' Charges | Claims that may give rise to shippers, warehouseman, mechanics, or other liens against the Debtors' property if unpaid. | $1.5 million | $1.0 million |
| Critical Vendor Claims | Claims of certain Trade Creditors that are essential to maintaining the going concern value of the Debtors' enterprise. | $7.7 million | $2.0 million |
| Non-Priority Trade Claims | All other Trade Claims incurred in the ordinary course of business. | $11.6 million | $5.7 million |
| **Total Trade Claims:** | | **$23.0 million** | **$10.0 million** |

12.    The Debtors are not seeking to pay these amounts immediately or in one lump sum; rather, the Debtors intend to pay these amounts as they become due and payable in the ordinary course of the Debtors' business.  Concurrently with the filing of this Motion, the Debtors have filed the *Motion of Debtors for (I) Authority to (A) Obtain Postpetition Senior Secured Financing, (B) Use Cash Collateral, (C) Grant Adequate Protection to Prepetition Secured Parties, (D) Grant Liens and Superpriority Claims, (E) Modifying the Automatic Stay, and (II) Related Relief* (the "**DIP Motion**"), which, in addition to the cash generated by the Debtors' business, will provide the necessary additional liquidity for the Debtors to continue

6

operations in the ordinary course of business. As set forth in the budget (the "**Budget**") annexed to the DIP Motion, the Debtors' proposed expenditures set forth in the Budget include payment of the Trade Claims the Debtors are seeking authority to pay pursuant to this Motion. Accordingly, the Debtors believe they will have ample liquidity to pay the Trade Claims in the ordinary course during the administration of these chapter 11 cases.

<u>**Conditions on Authority to Pay Trade Claims in Ordinary Course**</u>

13.     The Debtors request authority to pay all Trade Claims on the following terms and conditions:

(a)     The Debtors, in their sole discretion, subject to the limitations set forth below, shall determine which Trade Claims, if any, will be paid pursuant to the Proposed Orders.

(b)     If a creditor accepts payment under the Proposed Orders, such creditor is deemed to have agreed to continue to provide goods or services to the Debtors on terms that are as good as or better than the terms and conditions, including credit terms, that existed 180 days before the Petition Date (before any unilateral acceleration), or on other terms satisfactory to the Debtors in the reasonable exercise of their sound business judgment (the "**Customary Trade Terms**"), during the pendency of and after these chapter 11 cases.

(c)     In the event that the relationship between a creditor accepting payment under the Proposed Orders and the Debtors does not extend to 180 days before the Petition Date, the Customary Trade Terms shall mean the terms that the creditor generally extends to its customers or such terms as are acceptable to the Debtors in the reasonable exercise of their sound business judgment.

(d)     If a creditor accepts payment under the Proposed Orders and thereafter does not continue to provide goods or services on at least the Customary Trade Terms during the pendency of and after these chapter 11 cases, then (i) any payment on a prepetition claim received by such creditor shall be deemed to be an unauthorized voidable postpetition transfer under section 549 of the Bankruptcy Code and, therefore, recoverable by the Debtors in cash upon written request and (ii) upon recovery by the Debtors, any such prepetition claim shall be reinstated as if the payment had not been made.

(e)     If the Debtors seek to recover a payment from a creditor because the creditor does not continue to provide goods or services to the Debtors on at least the Customary Trade Terms during the pendency of and after these chapter 11 cases, the creditor may contest such action by making a written request (a "**Request**") to the Debtors

7

to schedule a hearing before this Court.  If such a Request is made, the Debtors shall provide notice of a hearing on such Request to the creditor making the Request and other interested parties in accordance with the Bankruptcy Code and the orders of this Court.

(f)     Before making a payment to a creditor under the Proposed Orders, the Debtors may, in their discretion, settle all or some of the prepetition claims of such creditor for less than their face amount without further notice or hearing.

### Treatment of Trade Claims Under Prepackaged Plan

14.     The goal of the Debtors' prepackaged chapter 11 cases is to deleverage the Debtors' balance sheet with minimal interruption of their business operations.  Disruption to the Debtors' timely receipt of necessary goods and services could negatively impact the Debtors' operations, which would harm their businesses, damage their market reputation, and possibly result in a loss of customers.  Accordingly, it is imperative that the Debtors maintain positive relationships with the providers of the goods and services essential to their business operations throughout of these cases.  The Debtors negotiated the terms of the Prepackaged Plan with this goal in mind: under the Prepackaged Plan, the legal, equitable, and contractual rights of Trade Creditors must be unimpaired to avoid disruption to the normal operations of the business. Accordingly, the relief requested in this Motion furthers the Debtors' overarching restructuring goals to maximize the value of the estates without prejudice to the Debtors' stakeholders, all in accordance with the Prepackaged Plan.

15.     Furthermore, with the exception of a single executory contract that the Debtors may be obligated to reject if a consensual resolution cannot be reached with the contract counterparty, pursuant to the terms of the RSA, all executory contracts and unexpired leases to which any of the Debtors are parties, and which have not expired by their own terms on or before the effective date of the date an order is entered confirming the Prepackaged Plan, shall be assumed.  Any outstanding amounts owed under any executory contract or unexpired lease to be

8

assumed under the Prepackaged Plan shall be paid or otherwise "cured" pursuant to section 365(b)(1) of the Bankruptcy Code.

**Basis for Relief Requested**

A.      **Payment of Trade Claims is Warranted Under Sections 363(b) and 105(a) of Bankruptcy Code**

16.      This Court may grant the relief requested herein pursuant to section 363 of the Bankruptcy Code.  Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  To approve the use of assets outside the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code, courts require only that the debtor "show that a sound business purpose justifies such actions." *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (internal citations omitted); *see also In re Phoenix Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987); *In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task").

17.      In addition, this Court has the authority, pursuant to its equitable powers under section 105(a) of the Bankruptcy Code, to authorize the relief requested herein, because such relief is necessary for the Debtors to carry out their fiduciary duties under section 1107(a) of the Bankruptcy Code.  Section 1107(a) of the Bankruptcy Code "contains an implied duty of the debtor-in-possession" to act as a fiduciary to "protect and preserve the estate, including an operating business' going-concern value," on behalf of the debtor's creditors and other parties in interest.  *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)); *see also Unofficial Comm. of Equity Holders v. McManigle (In re Penick Pharm., Inc.)*, 227 B.R. 229, 232–33 (Bankr.

9

S.D.N.Y. 1998) ("[U]pon filing its petition, the Debtor became debtor in possession and, through its management . . . was burdened with the duties and responsibilities of a bankruptcy trustee."). Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. 11 U.S.C. § 105(a); *see Ionosphere Clubs*, 98 B.R. at 175 (applying section 105(a) to justify an order authorizing the payment of certain prepetition wages, salaries, medical benefits, and business expense claims to debtor's employees); *In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code provides a statutory basis for the payment of prepetition claims).

18.    In a long line of well-established cases, courts consistently have permitted payment of prepetition obligations where necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors.  *See, e.g.*, *Miltenberger v. Logansport, C&S W.R. Co.*, 106 U.S. 286, 312 (1882) (payment of pre-receivership claim prior to reorganization permitted to prevent "stoppage of the continuance of [crucial] business relations"); *In re Lehigh & New Eng. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that "if payment of a claim which arose prior to reorganization is essential to the continued operation of the . . . [business] during reorganization, payment may be authorized even if it is made out of [the] corpus"); *Dudley v. Mealey*, 147 F.2d 268, 271 (2d Cir. 1945) (extending doctrine for payment of prepetition claims beyond railroad reorganization cases), *cert. denied* 325 U.S. 873 (1945); *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 285–86 (S.D.N.Y. 1987) (approving lower court order authorizing payment of prepetition wages, salaries, expenses, and benefits).

19.     This "doctrine of necessity" functions in a chapter 11 reorganization as a mechanism by which the Court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code.  *See, e.g.*, *Just for Feet*, 242 B.R. 821, 824-25 (D. Del. 1999) (holding that section 105(a) of Bankruptcy Code provides statutory basis for payment of prepetition claims under the doctrine of necessity particularly when such payment is necessary for the debtor's survival during chapter 11); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (confirming that the doctrine of necessity is standard for enabling a court to authorize payment of prepetition claims prior to confirmation of a reorganization plan).

20.     It is a sound exercise of the Debtors' business judgment to pay the Trade Claims as they become due in the ordinary course of business because doing so will avoid value-destructive business interruption and will not prejudice the Debtors' other stakeholders.  The Prepackaged Plan, which the Debtors' secured lenders have agreed to support and vote in favor of by the requisite voting majorities, provides for the full and uninterrupted payment of such claims.  The goods and services provided by Trade Creditors are necessary for the continued, uninterrupted operation of the Debtors' businesses.  The Debtors anticipate that failure to pay the Trade Claims as they become due is likely to result in many Trade Creditors refusing to provide essential goods and services or conditioning the delivery of such goods and services on compliance with onerous and commercially unreasonable terms.

21.     Nonperformance by numerous Trade Creditors could materially disrupt the Debtors' business operations and jeopardize the continued viability of the Debtors' business and these cases to the detriment of all of the Debtors' stakeholders.  In addition, because the Trade Creditors are already familiar with the Debtors' assets and business needs based on years

of the Debtors' building relationships with such vendors, they are in the best position to provide the necessary goods and services to the Debtors, and are the most likely to do so on commercially reasonable terms.  If certain of the Trade Creditors refuse to perform on their obligations, the Debtors may find it very difficult to locate replacement vendors of geographic or logistical scope necessary to support their operations throughout their officers and the Retailer Network, and indeed, may make it difficult to maintain business operations and the Retailer Network.  Therefore, even if it were possible to obtain replacement goods and services, doing so would likely cause substantial delay and significant costs.

22.     Moreover, no party in interest will be prejudiced by the relief requested herein because the Trade Claims are unimpaired and will be paid in full under the Prepackaged Plan and, as discussed below in more detail, many of the Trade Claims enjoy statutory or other priority and are otherwise entitled to be paid in full.  Specifically, of the total approximate Trade Claims of $23.0 million, only approximately $11.6 million, or approximately 50%, are Non-Priority Trade Claims.  The relief requested herein seeks to alter only the timing, not the amount or priority, of such payments.  Furthermore, paying the modest amount of Trade Claims—approximately 1% of the total debt to be restructured in these cases—in the ordinary course is prudent when compared to the amount the Debtors' stakeholders stand to lose if the Debtors' businesses were to be interrupted.  Accordingly, continued payment of the Trade Claims as provided herein is a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, is in the best interests of the Debtors' and their respective estates and creditors, and is warranted under the circumstances..

23.     Courts in this district have authorized payment of prepetition general unsecured claims in the ordinary course of business where a debtor's proposed prepackaged plan

of reorganization provides for a 100% recovery on general unsecured claims. *See, e.g.*, *In re Mattress Firm, Inc.*, No. 18-12241 (CSS) (Bankr. D. Del. Oct. 26, 2018) (D.I. 425) (authorizing payment of prepetition general unsecured claims in the ordinary course of business); *In re Southeastern Grocers, LLC*, No. 18-10700 (MFW) (Bankr. D. Del. Apr. 23, 2018) (D.I. 336) (same); *In re Tidewater Inc.*, No. 17-11132 (BLS) (Bankr. D. Del. June 13, 2017) (D.I. 219) (same); *In re American Gilsonite Co.*, No. 16-12316 (CSS) (Bankr. D. Del. Nov. 18, 2016) (D.I. 128) (same); *In re Basic Energy Servs., Inc.*, No. 16-12320 (KJC) (Bankr. D. Del. Nov. 17, 2016) (D.I. 168) (same).

**B.    Additional Bases for Payment of Certain Trade Claims**

*i.    Certain Trade Claims Are Administrative Expenses*

24.    Trade Claims in an aggregate amount of approximately $2.2 million, roughly 10% of all Trade Claims, are entitled to the statutory priority for goods delivered to the Debtors in the ordinary course of business within 20 days before the Petition Date.  Section 503(b)(9) of the Bankruptcy Code provides that claims for goods delivered to the Debtors in the ordinary course of business within 20 days after the Petition Date are administrative expense claims against the applicable Debtor's estate.  *See* 11 U.S.C. § 503(b)(9).  The Debtors, therefore, are required to pay such claims in full to confirm a plan of reorganization.  *See id*.; 11 U.S.C. § 1129(a)(9)(A) (requiring payment in full of claims entitled to administrative expense priority).  Instead of paying such Trade Claims on the effective date of the Prepackaged Plan, the Debtors seek authority to pay the Trade Claims during the pendency of these chapter 11 cases as they become due.  The Bankruptcy Code requires, and the Prepackaged Plan provides for, payment in full of administrative expense claims on the effective date of the Prepackaged Plan, or as soon as practicable thereafter.  Thus, payment of Trade Claims entitled to priority under section 503(b)(9) of the Bankruptcy Code under the Proposed Orders will effect only a change in

the timing of such payments, not the amounts or priority thereof. Finally, authorizing the Debtors to pay Trade Claims pursuant to the terms set forth herein should eliminate the burden on this Court and the Debtors arising from numerous individual motions requesting payment on account of 503(b)(9) claims.

25.     Courts in this district have frequently authorized the payment of vendor claims entitled to administrative priority pursuant to section 503(b)(9) of the Bankruptcy Code. *See, e.g.*, *In re Mattress Firm, Inc.*, No. 18-12241 (CSS) (Bankr. D. Del. Oct. 26, 2018) (D.I. 425) (authorizing debtors to pay 503(b)(9) claims); *In re Southeastern Grocers, LLC*, No. 18-10700 (MFW) (Bankr. D. Del. Apr. 23, 2018) (D.I. 336) (same); *In re Tidewater Inc.*, No. 17-11132 (BLS) (Bankr. D. Del. June 13, 2017) (D.I. 219) (same); *In re American Gilsonite Co.*, No. 16-12316 (CSS) (Bankr. D. Del. Nov. 18, 2016) (D.I. 128) (same); *In re Basic Energy Servs., Inc.*, No. 16-12320 (KJC) (Bankr. D. Del. Nov. 17, 2016) (D.I. 168) (same). Of the Trade Claims, an amount of approximately $2.2 million are 503(b)(9) claims, with approximately $1.3 million coming due and payable during the Interim Period.

*ii.    Certain Trade Claims May be Secured by Liens*

26.     In operating their businesses, particularly in connection with maintaining the Networked Printers, the Debtors use shippers, delivery servicers, and distributors (collectively, the "**Shippers**") to ship, transport, and otherwise facilitate the movement of paper, ink, printers, printer components, computer components, and other supplies and items (collectively, the "**Goods**"), some of which are stored at third-party warehouses (the "**Warehousemen**"). In addition, the Debtors rely on printer repairmen and mechanics (the "**Mechanics**," and together with the Shippers and Warehousemen, the "**Lien Claimants**") to ensure that the Networked Printers and computers necessary for business operations are continuously on-line and fully operational.

14

27.     The services provided by the Lien Claimants are critical to the Debtors' day-to-day operations.  If the Goods in transport are not timely delivered to the Debtors and through the Retailer Network, the Debtors' business operations would be materially damaged. Moreover, the services provided by the Mechanics are essential to maintaining a sufficient number of operable Networked Printers and network-related hardware.  Interruption to any of these services could result in material harm to the Debtors' business and estate value. Accordingly, the Debtors have implemented an efficient system, which relies heavily on third parties, including the Lien Claimants, to maintain uninterrupted operations, distribute Goods, and repair and maintain the Networked Printers and the Debtors' network-related hardware necessary for ordinary course operations.

28.     At any given time the Debtors may owe the Shippers and Warehousemen fees related to a number of different shipments or warehoused Goods.  In turn, the Shippers may have multiple vehicles in transit carrying Goods on behalf of the Debtors, and Warehousemen may be holding Goods in storage on behalf of the Debtors.  In addition, the Mechanics may hold at their facilities in Florida and Texas any number of Networked Printers or printer components currently under repair for which the Debtors may owe the Mechanics fees and other amounts. Accordingly, the refusal of any Lien Claimant to perform their services could negatively impact the Debtors' ability to maintain their day-to-day business operations.

29.     Because of the commencement of these chapter 11 cases, certain Shippers and Warehousemen that hold Goods for delivery to or from the Debtors and the Retailer Network, or certain Mechanics that hold Networked Printers in their possession for repairs, may refuse to release the Goods or Networked Printers pending receipt of payment for their prepetition services.  Under certain state laws, a Shipper or Warehouseman may have a lien on

15

the Goods in its possession to secure the charges or expenses incurred for the transportation or storage of Goods.  Likewise, under certain state laws, a Mechanic may also have a lien on Networked Printers and other Goods in its possession to secure its fees or expenses incurred in furtherance of its services relating such items.[2]  Furthermore, pursuant to section 363(e) of the Bankruptcy Code, certain of the Lien Claimants, as bailees, may be entitled to adequate protection as holders of possessory liens.  As discussed, because of the Debtors' supply needs, any delay in shipments or release of the Goods and Networked Printers would materially disrupt the Debtors' operations and could harm the Debtors' reorganization efforts.

30.     Accordingly, it imperative that the Debtors be authorized to pay any compensation to the Lien Claimants' arising out of their provision of services to the Debtors (the "**Lien Claimants' Charges**"), whether they arose before or after the Petition Date, which the Debtors determine in their business judgment they must pay to ensure the uninterrupted shipment and delivery of the Goods or maintenance, repair, and release of the Networked Printers and printer components.  Of the Trade Claims, an amount of approximately $1.5 million relate to the Lien Claimants' Charges, with approximately $1.0 million coming due and payable during the Interim Period.

31.     The need for the continued receipt, release, and distribution of Goods and Networked Printers that the Lien Claimants may hold on the Petition Date or assert liens against amply justifies the relief sought herein.  The Debtors rely heavily on the Lien Claimants, many of which currently hold property of the Debtors, to transport expeditiously their Goods and Networked Printers throughout the Retailer Network and to the Debtors' offices, and to

---

[2] For example, under Florida state law, possessory liens arise where mechanics perform services or other labor on the personal property of another that is within their possession—this would likely include work performed on the Networked Printers.  *See, e.g.*, Fla. Stat. §§ 713.50; 713.56; 713.61 (2018).

otherwise provide essential ongoing maintenance and repair services to the Networked Printers and the Debtors' other computer hardware. If the Debtors are unable to access the Goods and Networked Printers held by and the services provided by the Lien Claimants, their operations will likely suffer material disruptions, derailing these chapter 11 cases. If the Debtors' ability to distribute promotional materials are compromised, the Debtors' revenue generation will be impaired. Thus, the prompt payment to the Lien Claimants and satisfaction of any purported asserted liens is an exercise of the Debtors' sound business judgment and crucial for the orderly and efficient operation of the Debtors' business.

32.    Furthermore, under section 363(e) of the Bankruptcy Code, Trade Creditors with liens may be entitled to adequate protection of their liens, which may impose additional costs on the Debtors' estates. In addition, under the Prepackaged Plan, Trade Claims supported by liens are "Other Secured Claims" that are unimpaired and will be paid in full on the effective date of the Prepackaged Plan.

33.    Courts in this district have frequently authorized similar relief. *See, e.g.*, *In re Mattress Firm, Inc.*, No. 18-12241 (CSS) (Bankr. D. Del. Oct. 26, 2018) (D.I. 425) (authorizing debtors to pay prepetition claims of potential lien claimants); *In re Southeastern Grocers, LLC*, No. 18-10700 (MFW) (Bankr. D. Del. Apr. 23, 2018) (D.I. 336) (same); *In re Tidewater Inc.*, No. 17-11132 (BLS) (Bankr. D. Del. June 13, 2017) (D.I. 219) (same); *In re American Gilsonite Co.*, No. 16-12316 (CSS) (Bankr. D. Del. Nov. 18, 2016) (D.I. 128) (same); *In re Basic Energy Servs., Inc.*, No. 16-12320 (KJC) (Bankr. D. Del. Nov. 17, 2016) (D.I. 168) (same).

<ul>
<li><em>iii.    Certain Trade Creditors Are Critical Vendors Necessary to Ensure Continuation of Debtors' Operations</em></li>
</ul>

34.    The Debtors have determined that certain of the Trade Creditors are essential to maintaining the going concern value of the Debtors' enterprise (the "**Critical Vendors**" and their prepetition Trade Claims, the "**Critical Vendor Claims**").  These Critical Vendors include, among others, those Retailers which provide shopper data essential to maintain the continuity of the Shopper Database, those software servicers and support providers which assist in maintaining or protecting the integrity of the Debtors' software and data, and those vendors which provide necessary goods and support for the Networked Printers and the Debtors' network-related hardware.  Of the Trade Claims, an amount of approximately $7.7 million represent Critical Vendor Claims, with approximately $2.0 million coming due and payable during the Interim Period.

35.    Payment of Critical Vendors is necessary for the Debtors to maintain operations, to preserve the value of the Debtors' business, and moreover, to enable the Debtors to function in the ordinary course.  Many of the Critical Vendors are providers of operations-necessary data, specialized software support services, or printer repair, maintenance, and supplies; none of which can be easily replaced in a feasible manner due to, among other things, the (a) need to maintain current a Shopper Database to provide seamless transmission to POS promotional impressions created with the Analytics' Platform, without any interruption or risks to the integrity of the Shopper Database and (b) sheer volume of goods or services that would be required to enable the Debtors to facilitate their impression printing ability across their Retailer Network and ensure the consistent maintenance of their Networked Printers.

36.    Failure to pay the Critical Vendor Claims would result in a loss of value to the Debtors' businesses, which would suffer from material disruptions without the continued

support provided by the Critical Vendors. Indeed, without ensuring payment to the Critical Vendors, the Debtors believe that at best, the integrity and seamless transmission of their data analysis could be materially inhibited, and at worst, the Debtors would be completely unable to generate a material portion of their revenue due to a disruption in their ability to distribute promotional impressions. Without the ability to distribute promotional materials, which requires the seamless transmission of the Debtors' data, the Debtors' ability to generate revenue would be severely compromised. This would not only restrain the Debtors' cash flow, but would harm the Debtors' relationships with their customers on a go-forward basis, and could cause the Debtors' customers to seek business from the Debtors' competitors, threatening to derail the Debtors' entire reorganizational efforts, including the success of the Prepackaged Plan. Accordingly, the Debtors have concluded that if they do not make Critical Vendor payments, their value will be reduced by amounts well in excess of amounts that the Debtors seek authorization to pay. In addition, the Debtors believe that maintaining favorable trade terms with the Critical Vendors is in the best interests of all parties in interest in these cases.

37. Courts in this district regularly grant relief to pay critical vendors consistent with that which the Debtors are seeking in this Motion. *See, e.g.*, *In re LBI Media, Inc.*, No. 18-12655 (CSS) (Bankr. D. Del. Nov. 21, 2018) (D.I. 82) (authorizing debtors to pay prepetition claims of critical vendors); *In re The NORDAM Grp., Inc.*, No. 18-11699 (MFW) (Bankr. D. Del. Aug. 29, 2018) (D.I. 224) (same); *In re Claire's Stores, Inc.*, No. 18-10584 (MFW) (Bankr. D. Del. Apr. 17, 2018) (D.I. 279) (same); *In re TK Holdings Inc.*, No. 17-11375 (BLS) (Bankr. D. Del. Aug. 9, 2017) (D.I. 445) (same).

**C.      Confirmation of Administrative Expense Status of Prepetition Purchase Orders is Appropriate and Necessary to Debtors' Reorganization**

38.     Furthermore, as of the Petition Date, the Debtors have certain prepetition purchase orders (the "**Prepetition Purchase Orders**") outstanding with various third party vendors and suppliers (the "**Vendors**") for goods or services ordered by the Debtors that have not yet been delivered or provided to the Debtors.   These Vendors may be concerned that, because the Debtors' obligations under the Prepetition Purchase Orders arose before the Petition Date, such obligations will be treated as general unsecured claims in these chapter 11 cases. Accordingly, certain Vendors may refuse to provide goods or services to the Debtors purchased pursuant to the Prepetition Purchase Orders unless the Debtors issue substitute purchase orders postpetition or obtain an order of the Court (a) confirming that all undisputed obligations of the Debtors arising from the postpetition delivery of goods or services subject to Prepetition Purchase Orders are afforded administrative expense priority status under section 503(b) of the Bankruptcy Code and (b) authorizing the Debtors to satisfy such obligations in the ordinary course of business.

39.     It is necessary to the uninterrupted operation of the Debtors' business that obligations owed under the Prepetition Purchase Orders for goods or services delivered or provided postpetition be explicitly granted administrative expense status.   Pursuant to section 503(b)(1)(A) of the Bankruptcy Code, obligations that arise in connection with the postpetition delivery of necessary goods and services are afforded administrative expense priority status. *See, e.g.*, *Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944, 956 (2d Cir. 1993) ("[A] claim will be afforded priority 'only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business.'") (quoting *Trustees of Amalgamated Ins. Fund v. McFarlin's,*

20

*Inc.*, 789 F.2d 98, 101 (2d Cir. 1986) (quoting *In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir. 1976))); *In re Tropicana Entm't, LLC*, No. 08-10856 (KJC), 2015 WL 6112064, at *5 (Bankr. D. Del. Oct. 14, 2015) (internal quotation omitted) ("[Pursuant to] Bankruptcy Code § 503(b)(1)(A), the Court may allow as administrative expenses, the actual, necessary costs and expenses of preserving the estate, including wages, salaries, commissions for services rendered after the commencement of the case."); *In re Blockbuster Inc.*, No. 10-14997, 2010 WL 5559538, at *3 (Bankr. S.D.N.Y. Oct. 27, 2010) (final order ruling that "Debtors' undisputed obligations . . . that arise from the postpetition delivery of materials, goods, and services that were ordered in the prepetition period shall have administrative expense priority status pursuant to section 503(b) of the Bankruptcy Code.").  Thus, the granting of the relief requested herein will not provide the Vendors with any greater priority than they otherwise would have if the relief were not granted, and will not prejudice any other parties in interest.

40.    Similar relief to that requested herein has been granted in other chapter 11 cases in this and other districts.  *See, e.g.*, *In re Tidewater Inc.*, No. 17-11132 (BLS) (Bankr. D. Del. June 13, 2017) (D.I. 219) (granting administrative expense status to undisputed obligations to vendors arising from postpetition delivery of goods and services ordered prepetition); *see also In re The NORDAM Grp., Inc.*, No. 18-11699 (MFW) (Bankr. D. Del. Aug. 29, 2018) (D.I. 224) (granting administrative expense status to undisputed obligations to vendors arising from postpetition delivery of goods and services ordered prepetition); *In re The Bon-Ton Stores, Inc.*, No. 18-10248 (MFW) (Bankr. D. Del. Feb. 6, 2018) (D.I. 115) (same); *In re TK Holdings Inc.*, No. 17-11375 (BLS) (Bankr. D. Del. July 26, 2017) (D.I. 327) (same).

## **Reservation of Rights**

41.    Nothing contained herein is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors, (ii) an agreement or obligation to

pay any claims, (iii) an admission as to the validity of any liens satisfied pursuant to this Motion, (iv) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, or (v) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code.  Likewise, if this Court grants the relief sought herein, any payment made pursuant to this Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

**Applicable Banks Should Be Authorized, at Debtors'
Direction, to Receive, Process, Honor, and Pay Checks
Issued and Transfers Requested to Pay Trade Claims**

42.    The Debtors further request that the Court authorize applicable financial institutions (the "**Banks**") to receive, process, honor, and pay any and all checks issued, or to be issued, and electronic funds transfers requested, or to be requested, by or on behalf of the Debtors relating to prepetition Trade Claims, to the extent that sufficient funds are on deposit and standing in the Debtors' credit in the applicable bank accounts to cover such payment.  The Debtors represent that these checks are drawn on identifiable disbursement accounts and can be readily identified as relating directly to payment authorized by this Court or as a matter of law. Accordingly, the Debtors believe that checks other than those relating to authorized payments will not be honored inadvertently.  Any such financial institution may rely on the representations of such Debtors as to which checks are issued or wire transfers are made (or, as applicable, requested to be issued or made) and authorized to be paid in accordance with this Motion without any duty of further inquiry and without liability for following the Debtors' instructions.  The Debtors also seek authority, but not direction, to issue new postpetition checks or effect new postpetition electronic funds transfers in replacement of any checks or funds transfer requests on

22

account of prepetition Trade Claims dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases.

### The Debtors Satisfy Bankruptcy Rule 6003

43.     Bankruptcy Rule 6003 provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a Bankruptcy Court may issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" before twenty-one (21) days after filing of the petition. Fed. R. Bankr. P. 6003(b).  As described in the Del Genio Declaration, the Debtors would suffer immediate and irreparable harm if the relief sought herein is not promptly granted.  Accordingly, the Debtors have satisfied the requirements of Bankruptcy Rule 6003 is satisfied.

### Bankruptcy Rules 6004(a) and (h)

44.     The Debtors believe that, under the circumstances of these chapter 11 cases, notice of the Motion, as set forth below, is adequate under Bankruptcy Rule 6004(a). Notwithstanding any applicability of the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h), the Debtors respectfully request that the Motion be approved and the relief requested be immediately effective and enforceable.

### Notice

45.     Notice of this Motion shall be provided to (i) the Office of the United States Trustee for the District of Delaware; (ii) the holders of the five (5) largest secured claims against the Debtors (on a consolidated basis); (iii) the holders of the thirty (30) largest unsecured claims against the Debtors (on a consolidated basis); (iv) Jones Day, 250 Vesey Street, New York, NY 10281 (Attn: Scott J. Greenberg, Esq. and Michael J. Cohen, Esq.) and Pachulski Stang Ziehl & Jones LLP, 919 N. Market Street, Wilmington, DE 19801 (Attn: Laura Davis

23

Jones, Esq.), as counsel to the DIP lenders and the ad hoc group of lenders under the First Lien Credit Agreement; (v) Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, NY 10019 (Attn: Brian S. Hermann, Esq. and Robert A. Britton, Esq.) and Young Conaway Stargatt & Taylor LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware, 19801 (Attn.: Pauline K. Morgan, Esq.), as counsel to an ad hoc group of certain holders of term loans under the Second Lien Term Loan, dated as of April 9, 2014; (vi) Davis Polk & Wardwell LLP, 450 Lexington Ave, New York, NY 10017 (Attn: Brian M. Resnick, Esq.) and Landis Rath & Cobb LLP, 919 Market Street, Wilmington, DE 19801 (Attn: Adam Landis, Esq. and Kerri Mumford, Esq.), as counsel to JPMorgan Chase Bank, N.A., as administrative agent under the First Lien Credit Agreement; (vii) Wilmer Cutler Pickering Hale and Dorr LLP, 7 World Trade Center, 250 Greenwich Street, New York, NY 10007 (Attn: Andrew N. Goldman, Esq.), as counsel to Wilmington Savings Fund Society, FSB, as administrative agent under the Second Lien Credit Agreement; (viii) Debevoise & Plimpton LLP, 919 Third Avenue, New York, NY 10022 (Attn: My Chi To, Esq.), as counsel to an ad hoc group of holders of the HoldCo PIK Toggle Notes of PDM Intermediate Holdings B Corporation; (ix) the Internal Revenue Service; (x) the United States Attorney's Office for the District of Delaware; (xi) the Banks; and (xii) any other party entitled to notice pursuant to Local Rule 9013-1(m) (collectively, the "**Notice Parties**").  As this Motion is seeking "first day" relief, the Debtors will serve copies of this Motion and any order entered in respect of the Motion as required by Local Rule 9013-1(m).  The Debtors submit that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

46.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request entry of the Proposed Interim Order and, following the Final Hearing (if one is required), the Proposed Final Order, in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively, granting the relief requested herein and such other and further relief as this Court may deem just and appropriate.

Dated: December 12, 2018
    Wilmington, Delaware

*/s/ Jason M. Madron*
Mark D. Collins (No. 2981)
Jason M. Madron (No. 4431)
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

-and-

Gary T. Holtzer (*pro hac vice* admission pending)
Ronit J. Berkovich (*pro hac vice* admission pending)
Jessica Liou (*pro hac vice* admission pending)
Kevin Bostel (*pro hac vice* admission pending)
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

25

## Exhibit A

## Proposed Interim Order

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------- X
                                          :
In re                                     :          Chapter 11
                                          :
CHECKOUT HOLDING CORP., et al.,           :          Case No. 18-[_____] (___)
                                          :
                    Debtors.[1]           :          Joint Administration Requested
                                          :
------------------------------------------------------------- X
```

### INTERIM ORDER PURSUANT TO
### 11 U.S.C. §§ 105, 363, AND 503 AND FED. R. BANKR. P. 6003
### AND 6004 AUTHORIZING DEBTORS TO PAY PREPETITION
### TRADE CLAIMS IN ORDINARY COURSE OF BUSINESS

Upon the motion (the "**Motion**")[2] of Checkout Holding Corp. and its affiliated

debtors in the above-captioned chapter 11 cases, as debtors and debtors in possession

(collectively, the "**Debtors**"), pursuant to sections 105(a), 363(b), and 503(b)(9) of title 11 of the

United States Code (the "**Bankruptcy Code**") and rules 6003 and 6004 of the Federal Rules of

Bankruptcy Procedure (the "**Bankruptcy Rules**"), for an order authorizing the Debtors to pay

the prepetition Trade Claims in the ordinary course of business, all as more fully set forth in the

Motion; and this Court having jurisdiction to consider the Motion and the relief requested therein

in accordance with 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference*

from the United States District Court for the District of Delaware dated February 29, 2012; and

consideration of the Motion and the relief requested therein being a core proceeding pursuant to

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Catalina Marketing Corporation (9007); Catalina Marketing Procurement, LLC (9333); Catalina Marketing Technology Solutions, Inc. (8728); Catalina Marketing Worldwide, LLC (9687); Cellfire Inc. (5599); Checkout Holding Corp. (4651); Modiv Media, Inc. (3507); PDM Group Holdings Corporation (9148); PDM Holdings Corporation (5025); PDM Intermediate Holdings A Corporation (6509); and PDM Intermediate Holdings B Corporation (3278). The Debtors' principal offices are located at 200 Carillon Parkway, St. Petersburg, FL 33716.

[2] Capitalized terms used, but not otherwise defined, herein shall have the same meanings ascribed to such terms in the Motion.

28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and notice of the Motion having been given as provided in the Motion, and such notice having been adequate and appropriate under the circumstances; and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion; and a hearing having been held to consider the relief requested in the Motion (the "**Hearing**"); and upon the Del Genio Declaration filed contemporaneously with the Motion, the record of the Hearing, and all of the proceedings had before this Court; and this Court having found and determined that the relief sought in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates as contemplated by Bankruptcy Rule 6003; and this Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates, creditors, and all parties in interest, and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted on an interim basis as set forth herein.

2.      The Debtors are authorized, but not directed, pursuant to sections 105(a), 363(b), and 503(b)(9) of the Bankruptcy Code, in the reasonable exercise of their business judgment, to pay, in the ordinary course of business, some or all of the prepetition Trade Claims of Trade Creditors in full; provided that the Debtors are authorized, but not directed, to pay only amounts due and payable as of the Petition Date and amounts that are or become due and payable between the Petition Date and the date that a final order on the Motion is entered, unless otherwise ordered by this Court; and in all cases subject to the following:

(a)     The Debtors, in their sole discretion, subject to the limitations set forth below, shall determine which Trade Claims, if any, will be paid pursuant to this Interim

2

Order.

(b)     If a creditor accepts payment under this Interim Order, such creditor is deemed to have agreed to continue to provide goods or services to the Debtors on terms that are as good as or better than the terms and conditions, including credit terms, that existed 180 days before the Petition Date (before any unilateral acceleration), or on other terms satisfactory to the Debtors in the reasonable exercise of their sound business judgment (the "**Customary Trade Terms**"), during the pendency of and after these chapter 11 cases.

(c)     In the event that the relationship between a creditor accepting payment under this Interim Order and the Debtors does not extend to 180 days before the Petition Date, the Customary Trade Terms shall mean the terms that the creditor generally extends to its customers or such terms as are acceptable to the Debtors in the reasonable exercise of their sound business judgment.

(d)     If a creditor accepts payment under this Interim Order and thereafter does not continue to provide goods or services on at least the Customary Trade Terms during the pendency of and after these chapter 11 cases, then (i) any payment on a prepetition claim received by such creditor shall be deemed to be an unauthorized voidable postpetition transfer under section 549 of the Bankruptcy Code and, therefore, recoverable by the Debtors in cash upon written request and (ii) upon recovery by the Debtors, any such prepetition claim shall be reinstated as if the payment had not been made.

(e)     If the Debtors seek to recover a payment from a creditor because the creditor does not continue to provide goods or services to the Debtors on at least the Customary Trade Terms during the pendency of and after these chapter 11 cases, the creditor may contest such action by making a written request (a "**Request**") to the Debtors to schedule a hearing before this Court.  If such a Request is made, the Debtors shall provide notice of a hearing on such Request to the creditor making the Request and other interested parties in accordance with the Bankruptcy Code and the orders of this Court.

(f)     Before making a payment to a creditor under this Interim Order, the Debtors may, in their discretion, settle all or some of the prepetition claims of such creditor for less than their face amount without further notice or hearing.

3.     The undisputed obligations of the Debtors arising under the Prepetition Purchase Orders shall be afforded administrative expense priority status pursuant to section 503(b)(1)(A) of the Bankruptcy Code.

4.     The Debtors are authorized, but not directed, in their sole discretion, pursuant to section 363(c)(1) of the Bankruptcy Code, to pay in the ordinary course of their

businesses all undisputed obligations arising from the postpetition delivery or shipment of goods or provision of services under the Prepetition Purchase Orders consistent with their customary past practice.

5.     Nothing in the Motion or this Interim Order shall be deemed to authorize the Debtors to accelerate any payments not otherwise due prior to the date of the hearing to consider entry of an order granting the relief requested in the Motion on a final basis (the "**Final Hearing**").

6.     The Banks are authorized to receive, process, honor, and pay any and all checks issued, or to be issued, and electronic funds transfers requested, or to be requested, by the Debtors relating to the obligations, to the extent that sufficient funds are on deposit and standing in the Debtors' credit in the applicable bank accounts to cover such payments.  The Banks are authorized to accept and rely on all representations made by the Debtors with respect to which checks, drafts, wires, or automated clearing house transfers should be honored or dishonored in accordance with this or any other order of this Court, whether such checks, drafts, wires, or transfers are dated prior to, on, or subsequent to the Petition Date, without any duty to inquire otherwise and without liability for following the Debtors' instructions.

7.     The Debtors are further authorized, but not directed, to issue postpetition checks, or to effect postpetition funds transfer requests, in replacement of any checks or funds transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to any prepetition amounts that are authorized to be paid pursuant to this Interim Order.

8.     Notwithstanding anything contained in the Motion or this Interim Order, any payment made, and any authorization of the Debtors contained herein shall be subject to the terms and conditions contained in any orders entered by this Court authorizing the Debtors to

obtain debtor-in-possession financing and/or authorizing the use of cash collateral (each such order, a "**DIP Order**"), the documentation in respect of any such debtor-in-possession financing or use of cash collateral, and any budget in connection with any such debtor-in-possession financing and/or use of cash collateral.  To the extent there is any inconsistency between the terms of any DIP Order and any action taken or proposed to be taken by the Debtors hereunder, the terms of the DIP Order shall control.

9.      Nothing contained in the Motion or this Interim Order or any payment made pursuant to the authority granted by this Interim Order is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors, (ii) an agreement or obligation to pay any claims, (iii) an admission as to the validity of any liens satisfied pursuant to this Motion, (iv) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, or (v) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code.

10.     Notwithstanding entry of this Interim Order, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by, any party.

11.     The requirements of Bankruptcy Rule 6003(b) have been satisfied.

12.     Under the circumstances of these chapter 11 cases, notice of the Motion is adequate under Bankruptcy Rule 6004(a).

13.     Notwithstanding any applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order shall be immediately effective and enforceable upon its entry.

14.     The Final Hearing on the Motion shall be held on _____, 201__,

at _____ (**Eastern Standard Time**) and any objections or responses to the Motion shall be made in writing, filed with this Court, and served upon (i) the proposed attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153 (Attn: Gary T. Holtzer, Esq., Ronit J. Berkovich, Esq., and Kevin Bostel, Esq.) and Richards, Layton & Finger, P.A., 920 North King Street, Wilmington, DE 19801 (Attn: Mark D. Collins, Esq. and Jason M. Madron, Esq.); and (ii) the Notice Parties, in each case so as to be received no later than **4:00 p.m. (Eastern Standard Time) on _____, 201__**.

15.    This Interim Order is effective only from the date of entry through this Court's disposition of the Motion on a final basis; <u>provided</u> that this Court's ultimate disposition of the Motion on a final basis shall not impair or otherwise affect any action taken pursuant to this Interim Order.

16.    The Debtors are authorized to take all action necessary to implement the relief granted in this Interim Order.

17.    This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Interim Order.

Dated: _____, 2018
       Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

RLF1 20430309V.1

**<u>Exhibit B</u>**

**Proposed Final Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------ X
                                             :
In re                                        :        Chapter 11
                                             :
CHECKOUT HOLDING CORP., et al.,              :        Case No. 18-[_____] (___)
                                             :
                    Debtors.[1]              :        Joint Administration Requested
                                             :
------------------------------------------------------------ X
```

## FINAL ORDER PURSUANT TO
## 11 U.S.C. §§ 105, 363, AND 503 AND FED. R. BANKR. P. 6003
## AND 6004 AUTHORIZING DEBTORS TO PAY PREPETITION
## TRADE CLAIMS IN ORDINARY COURSE OF BUSINESS

Upon the Motion (the "**Motion**")[2] of Checkout Holding Corp. and its affiliated

debtors in the above-captioned chapter 11 cases, as debtors and debtors in possession

(collectively, the "**Debtors**"), pursuant to sections 105(a), 363(b), and 503(b)(9) of title 11 of the

United States Code (the "**Bankruptcy Code**") and rules 6003 and 6004 of the Federal Rules of

Bankruptcy Procedure (the "**Bankruptcy Rules**"), for an order authorizing the Debtors to pay

the prepetition Trade Claims in the ordinary course of business, all as more fully set forth in the

Motion; and this Court having jurisdiction to consider the Motion and the relief requested therein

in accordance with 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference*

from the United States District Court for the District of Delaware dated February 29, 2012; and

consideration of the Motion and the relief requested therein being a core proceeding pursuant to

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: Catalina Marketing Corporation (9007); Catalina Marketing Procurement, LLC (9333); Catalina Marketing Technology Solutions, Inc. (8728); Catalina Marketing Worldwide, LLC (9687); Cellfire Inc. (5599); Checkout Holding Corp. (4651); Modiv Media, Inc. (3507); PDM Group Holdings Corporation (9148); PDM Holdings Corporation (5025); PDM Intermediate Holdings A Corporation (6409); and PDM Intermediate Holdings B Corporation (3278). The Debtors' principal offices are located at 200 Carillon Parkway, St. Petersburg, FL 33716.

[2] Capitalized terms used, but not otherwise defined, herein shall have the same meanings ascribed to such terms in the Motion.

28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and

1409; and notice of the Motion having been given as provided in the Motion, and such notice

having been adequate and appropriate under the circumstances; and it appearing that no other or

further notice need be provided; and this Court having reviewed the Motion; and this Court

having held hearings to consider the relief requested in the Motion on an interim (the "**Interim**

**Hearing**") and final basis (the "**Final Hearing**"); and this Court having entered an order

granting the relief requested in the Motion on an interim basis; and upon the Del Genio

Declaration, filed contemporaneously with the Motion, the record of the Interim Hearing, the

Final Hearing, and all of the proceedings had before this Court; and this Court having found and

determined that the relief sought in the Motion is in the best interests of the Debtors, their

estates, creditors, and all parties in interest, and that the legal and factual bases set forth in the

Motion establish just cause for the relief granted herein; and after due deliberation and sufficient

cause appearing therefor,

### IT IS HEREBY ORDERED THAT:

1.      The Motion is granted on a final basis as set forth herein.

2.      The Debtors are authorized, but not directed, pursuant to sections 105(a),

363(b), and 503(b)(9) of the Bankruptcy Code, in the reasonable exercise of their business

judgment, to pay, in the ordinary course of business, some or all of the prepetition Trade Claims

of Trade Creditors in full, subject to the following:

    (a)    The Debtors, in their sole discretion, subject to the limitations set forth below, shall determine which Trade Claims, if any, will be paid pursuant to this Final Order.

    (b)    If a creditor accepts payment under this Final Order, such creditor is deemed to have agreed to continue to provide goods or services to the Debtors on terms that are as good as or better than the terms and conditions, including credit terms, that existed 180 days before the Petition Date (before any unilateral acceleration), or on other terms satisfactory to the Debtors in the reasonable exercise of their sound

RLF1 20430309V.1

business judgment (the "**Customary Trade Terms**"), during the pendency of and after these chapter 11 cases.

(c)     In the event that the relationship between a creditor accepting payment under this Final Order and the Debtors does not extend to 180 days before the Petition Date, the Customary Trade Terms shall mean the terms that the creditor generally extends to its customers or such terms as are acceptable to the Debtors in the reasonable exercise of their sound business judgment.

(d)     If a creditor accepts payment under this Final Order and thereafter does not continue to provide goods or services on at least the Customary Trade Terms during the pendency of and after these chapter 11 cases, then (i) any payment on a prepetition claim received by such creditor shall be deemed to be an unauthorized voidable postpetition transfer under section 549 of the Bankruptcy Code and, therefore, recoverable by the Debtors in cash upon written request and (ii) upon recovery by the Debtors, any such prepetition claim shall be reinstated as if the payment had not been made.

(e)     If the Debtors seek to recover a payment from a creditor because the creditor does not continue to provide goods or services to the Debtors on at least the Customary Trade Terms during the pendency of and after these chapter 11 cases, the creditor may contest such action by making a written request (a "**Request**") to the Debtors to schedule a hearing before this Court.  If such a Request is made, the Debtors shall provide notice of a hearing on such Request to the creditor making the Request and other interested parties in accordance with the Bankruptcy Code and the orders of this Court.

(f)     Before making a payment to a creditor under this Final Order, the Debtors may, in their discretion, settle all or some of the prepetition claims of such creditor for less than their face amount without further notice or hearing.

3.     The undisputed obligations of the Debtors arising under the Prepetition Purchase Orders shall be afforded administrative expense priority status pursuant to section 503(b)(1)(A) of the Bankruptcy Code.

4.     The Debtors are authorized, but not directed, in their sole discretion, pursuant to section 363(c)(1) of the Bankruptcy Code, to pay in the ordinary course of their businesses all undisputed obligations arising from the postpetition delivery or shipment of goods or provision of services under the Prepetition Purchase Orders consistent with their customary past practice.

5.     The Banks are authorized to receive, process, honor, and pay any and all checks issued, or to be issued, and electronic funds transfers requested, or to be requested, by the Debtors relating to the obligations, to the extent that sufficient funds are on deposit and standing in the Debtors' credit in the applicable bank accounts to cover such payments.  The Banks are authorized to accept and rely on all representations made by the Debtors with respect to which checks, drafts, wires, or automated clearing house transfers should be honored or dishonored in accordance with this or any other order of this Court, whether such checks, drafts, wires, or transfers are dated prior to, on, or subsequent to the Petition Date, without any duty to inquire otherwise and without liability for following the Debtors' instructions.

6.     The Debtors are further authorized, but not directed, to issue postpetition checks, or to effect postpetition funds transfer requests, in replacement of any checks or funds transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to any prepetition amounts that are authorized to be paid pursuant to this Final Order.

7.     Notwithstanding anything contained in the Motion, the Interim Order, or this Final Order, any payment made, and any authorization of the Debtors contained herein shall be subject to the terms and conditions contained in any orders entered by this Court authorizing the Debtors to obtain debtor-in-possession financing and/or authorizing the use of cash collateral (each such order, a "**DIP Order**"), the documentation in respect of any such debtor-in-possession financing or use of cash collateral, and any budget in connection with any such debtor-in-possession financing and/or use of cash collateral.  To the extent there is any inconsistency between the terms of any DIP Order and any action taken or proposed to be taken by the Debtors hereunder, the terms of the DIP Order shall control.

8.      Nothing contained in the Motion or this Final Order or any payment made pursuant to the authority granted by this Final Order is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors, (ii) an agreement or obligation to pay any claims, (iii) an admission as to the validity of any liens satisfied pursuant to this Motion, (iv) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, or (v) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code.

9.      Notwithstanding entry of this Final Order, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by, any party.

10.      Under the circumstances of these chapter 11 cases, notice of the Motion is adequate under Bankruptcy Rule 6004(a).

11.      Notwithstanding any applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Final Order shall be immediately effective and enforceable upon its entry.

12.      The Debtors are authorized to take all action necessary to carry out this Final Order.

13.      This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Final Order.

Dated: _____, 201__
          Wilmington, Delaware

                                          _____
                                          UNITED STATES BANKRUPTCY JUDGE