## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

---------------------------------------------------------- X

                  :

In re                    :          **Chapter 11**

                  :

**CHECKOUT HOLDING CORP.**, *et al.*,   :       **Case No. 18-[_____] (___)**

                  :

                  :          **(Joint Administration Pending)**

            **Debtors.**[1]   :

                  :

---------------------------------------------------------- X

## JOINT PREPACKAGED CHAPTER 11 PLAN OF
## CHECKOUT HOLDING CORP. AND ITS AFFILIATED DEBTORS

| | |
|---|---|
| WEIL, GOTSHAL & MANGES LLP | RICHARDS, LAYTON & FINGER, P.A. |
| Gary T. Holtzer | Mark D. Collins (No. 2981) |
| Ronit J. Berkovich | Jason M. Madron (No. 4431) |
| Jessica Liou | One Rodney Square |
| Kevin Bostel | 920 North King Street |
| 767 Fifth Avenue | Wilmington, Delaware 19801 |
| New York, New York  10153 | Telephone:  (302) 651-7700 |
| Telephone:  (212) 310-8000 | Facsimile:  (302) 651-7701 |
| Facsimile:  (212) 310-8007 | |

*Attorneys for Debtors and*          *Attorneys for Debtors and*
*Debtors in Possession*            *Debtors in Possession*

Dated:  December 11, 2018
Wilmington, Delaware

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Catalina Marketing Corporation (9007); Catalina Marketing Procurement, LLC (9333); Catalina Marketing Technology Solutions, Inc. (8728); Catalina Marketing Worldwide, LLC (9687); CellFire Inc. (5599); Checkout Holding Corp. (4651); Modiv Media, Inc. (3507); PDM Group Holdings Corporation; PDM Holdings Corporation; PDM Intermediate Holdings A Corporation; and PDM Intermediate Holdings B Corporation.  The Debtors' principal offices are located at 200 Carillon Parkway, St. Petersburg, FL 33716.

## Table of Contents

ARTICLE I.      **Definitions and Interpretation.** ........................................................1

    1.1      Definitions. ..............................................................................1

    1.2      Interpretation; Application of Definitions; Rules of Construction. ...............15

    1.3      Reference to Monetary Figures......................................................16

    1.4      Consent Rights of Restructuring Support Parties. ........................................16

    1.5      Controlling Document....................................................................16

ARTICLE II.      **Administrative Expense Claims, Fee Claims, DIP Facility Claims, and Priority Tax Claims.**....................................................................16

    2.1      Treatment of Administrative Expense Claims................................................16

    2.2      Treatment of Fee Claims. .............................................................17

    2.3      Treatment of DIP Facility Claims. ................................................17

    2.4      Payment of Fees and Expenses under DIP Facility Order...............................18

    2.5      Treatment of Priority Tax Claims. ................................................18

ARTICLE III.      **Classification of Claims and Interests.** ........................................18

    3.1      Classification in General. .............................................................18

    3.2      Formation of Debtor Groups for Convenience Only. ....................................18

    3.3      Summary of Classification of Claims and Interests......................................19

    3.4      Separate Classification of Other Secured Claims. .......................................19

    3.5      Elimination of Vacant Classes. ....................................................19

    3.6      Voting; Presumptions; Solicitation. .............................................20

    3.7      Cramdown...................................................................................20

    3.8      No Waiver....................................................................................20

ARTICLE IV.      **Treatment of Claims and Interests.** ............................................20

    4.1      Class 1:  Priority Non-Tax Claims. ..............................................20

    4.2      Class 2:  Other Secured Claims. ..................................................21

| 4.3 | Class 3:  First Lien Debt Claims. | .................................................................21 |
|-----|-----------------------------------|---|
| 4.4 | Class 4:  Second Lien Debt Claims. | ..........................................................21 |
| 4.5 | Class 5:  General Unsecured Claims. | ........................................................22 |
| 4.6 | Class 6:  NCS Rejection Claims. | .............................................................22 |
| 4.7 | Class 7:  General Unsecured PDM Claims. | ..............................................22 |
| 4.8 | Class 8:  Intercompany Claims. | ..............................................................23 |
| 4.9 | Class 9:  Subordinated Claims. | ...............................................................23 |
| 4.10 | Class 10:  Existing Equity Interests. | .......................................................23 |
| 4.11 | Class 11: Intercompany Interests. | ...........................................................23 |
| 4.12 | Debtors' Rights in Respect of Unimpaired Claims. | ..................................24 |
| 4.13 | Treatment of Vacant Classes. | ..................................................................24 |
| **ARTICLE V.** | **Means for Implementation** | **..........................................................24** |
| 5.1 | Continued Corporate Existence; Dissolution | ...........................................24 |
| 5.2 | Plan Funding. | .........................................................................................25 |
| 5.3 | Cancellation of Existing Securities and Agreements. | ...............................25 |
| 5.4 | Cancellation of Certain Existing Security Interests. | .................................26 |
| 5.5 | Officers and Boards of Directors. | ............................................................26 |
| 5.6 | Management Incentive Plan. | ...................................................................27 |
| 5.7 | Authorization, Issuance, and Delivery of New Common Stock. | ...................27 |
| 5.8 | Amended and Restated First Lien Credit Agreement. | ................................27 |
| 5.9 | Intercompany Interests; Corporate Reorganization. | ..................................28 |
| 5.10 | Restructuring Transactions. | .....................................................................28 |
| 5.11 | Separability. | ..........................................................................................29 |
| 5.13 | Determination of Tax Filings and Taxes. | .................................................30 |

WEIL:\96767752\18\34225.0004

**ARTICLE VI.     Distributions. .............................................................................31**

6.1          Distributions Generally. ..................................................31

6.2          Postpetition Interest on Claims. ........................................31

6.3          Date of Distributions. ......................................................31

6.4          Distribution Record Date. .................................................31

6.5          Disbursing Agent. ............................................................32

6.6          Delivery of Distributions. .................................................32

6.7          Unclaimed Property. .........................................................33

6.8          Satisfaction of Claims. .....................................................33

6.9          Manner of Payment under Plan. ........................................33

6.10        Fractional Shares and De Minimis Cash Distributions. .....33

6.11        No Distribution in Excess of Amount of Allowed Claim. ...34

6.12        Allocation of Distributions between Principal and Interest. ...34

6.13        Exemption from Securities Laws. ......................................34

6.14        Setoffs and Recoupments. ................................................34

6.15        Rights and Powers of Disbursing Agent. ...........................35

6.16        Withholding and Reporting Requirements. ........................35

6.17        Hart-Scott-Rodino Antitrust Improvements Act. ..............36

**ARTICLE VII.    Procedures for Resolving Claims. ...............................................37**

7.1          Disputed Claims Process. .................................................37

7.2          Estimation of Claims. .......................................................38

7.3          Claim Resolution Procedures Cumulative. ........................38

7.4          No Distributions Pending Allowance. ...............................38

7.5          Distributions after Allowance. ..........................................38

WEIL:\96767752\18\34225.0004

**ARTICLE VIII.  Executory Contracts and Unexpired Leases. ............................................39**

    8.1          General Treatment. ......................................................................................39

    8.2          Determination of Cure Disputes and Deemed Consent. ..............................39

    8.3          Rejection Damages Claims. .........................................................................40

    8.4          Survival of the Debtors' Indemnification Obligations. ................................40

    8.5          Compensation and Benefit Plans. ................................................................40

    8.6          Insurance Policies. .......................................................................................40

    8.9          Reservation of Rights. .................................................................................41

**ARTICLE IX.  Conditions Precedent .............................................................................42**

    9.1          Conditions Precedent to Confirmation of the Plan. .....................................42

    9.2          Conditions Precedent to the Effective Date. ................................................42

    9.3          Waiver of Conditions Precedent. .................................................................43

    9.4          Effect of Failure of a Condition. .................................................................44

**ARTICLE X.  Effect of Confirmation. .............................................................................44**

    10.1        Binding Effect. .............................................................................................44

    10.2        Vesting of Assets. ........................................................................................44

    10.3        Discharge of Claims against and Interests in the Debtors. ...........................44

    10.4        Pre-Confirmation Injunctions and Stays. ....................................................45

    10.5        Injunction against Interference with Plan. ....................................................45

    10.6        Plan Injunction. ............................................................................................45

    10.7        Releases. .......................................................................................................46

    10.8        Exculpation. .................................................................................................47

    10.9        Injunction Related to Releases and Exculpation. .........................................48

    10.10      Subordinated Claims. ...................................................................................48

    10.11      Retention of Causes of Action and Reservation of Rights. ..........................48

| | | |
|---|---|---|
| 10.12 | Ipso Facto and Similar Provisions Ineffective. | 49 |
| 10.15 | Indemnification. | 49 |
| **ARTICLE XI.** | **Retention of Jurisdiction.** | **50** |
| 11.1 | Retention of Jurisdiction. | 50 |
| **ARTICLE XII.** | **Miscellaneous Provisions** | **51** |
| 12.1 | Exemption from Certain Transfer Taxes. | 51 |
| 12.2 | Dates of Actions to Implement This Plan. | 52 |
| 12.3 | Amendments. | 52 |
| 12.4 | Revocation or Withdrawal of Plan. | 52 |
| 12.5 | Non-Severability. | 53 |
| 12.6 | Governing Law. | 53 |
| 12.8 | Immediate Binding Effect | 54 |
| 12.9 | Successors and Assigns. | 54 |
| 12.10 | Entire Agreement. | 54 |
| 12.11 | Computing Time. | 54 |
| 12.12 | Exhibits to Plan. | 54 |
| 12.14 | Notices. | 54 |
| 12.15 | Reservation of Rights. | 57 |

WEIL:\96767752\18\34225.0004

Each of Checkout Holding Corp., Catalina Marketing Corporation, Catalina Marketing Procurement, LLC, Catalina Marketing Technology Solutions, Inc., Catalina Marketing Worldwide, LLC, CellFire Inc., Modiv Media, Inc., PDM Group Holdings Corporation, PDM Holdings Corporation, PDM Intermediate Holdings A Corporation, and PDM Intermediate Holdings B Corporation (each, a "***Debtor***" and collectively, the "***Debtors***") proposes the following joint prepackaged chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code.  Capitalized terms used herein shall have the meanings set forth in Section 1.1 below.

## ARTICLE I.        DEFINITIONS AND INTERPRETATION.

### 1.1    *Definitions.*

The following terms shall have the respective meanings specified below:

***A&R Agent*** means the Person selected by the Ad Hoc First Lien Group to serve as administrative agent under the Amended and Restated First Lien Credit Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the Amended and Restated First Lien Credit Agreement.

***A&R Exit Facility*** means the exit financing facility under that certain Amended and Restated First Lien Credit Facility, consisting of the A&R First-Out Tranche and the A&R Last-Out Tranche, which shall have an aggregate principal amount of $40 million.

***A&R Exit Facility Backstop Payment*** means the payment made to the Backstop Parties (as defined in the Amended & Restated First Lien Credit Agreement) to the A&R Exit Facility.

***A&R Exit Facility Commitment Payment*** means the payment made to the Commitment Parties (as defined in the Amended & Restated First Lien Credit Agreement) to the A&R Exit Facility.

***A&R First-Out Tranche*** means the first lien first-out tranche of loans under that certain Amended and Restated First Lien Credit Facility, which shall have an aggregate principal amount equal to the sum of (a) the amount of the DIP Facility New Money Loan Claims and (b) the amount of the A&R Exit Facility.

***A&R Last-Out Tranche*** means the first lien last-out tranche of loans under that certain Amended and Restated First Lien Credit Facility, which shall have an aggregate principal amount equal to the DIP Facility Roll-Up Claims.

***A&R First Lien Lenders*** means the lenders party to the Amended and Restated First Lien Credit Agreement.

***Acquisition Agreement*** means that certain acquisition agreement, to be entered into on or prior to the Effective Date, among CMC (as defined below), CHC (as defined below),

and the Acquisition Company (as defined below) in the event the Acquisition Transactions (as defined below) are to occur, to acquire by merger or transfer the stock or substantially all of the assets of CMC, in accordance with the terms therein and this Plan.

**Acquisition Company** means a newly-formed corporate subsidiary, indirectly wholly-owned by PacificCo. that, in the event the Acquisition Transactions occur, shall acquire by merger or transfer the stock or substantially all of the assets of CMC in accordance with the Acquisition Transactions.

**Acquisition Transactions** means the CMC Acquisition and any other transactions that will be undertaken in connection with the CMC Acquisition pursuant to section 1123 of the Bankruptcy Code, which shall be described in the Plan Supplement.

**Acquisition Transactions Exhibit** means a description of some or all of the Restructuring Transactions, including any Acquisition Transactions, which will be included in the Plan Supplement.

**Ad Hoc First Lien Group** means the group of First Lien Lenders represented by Jones Day and Evercore Group, L.L.C. ("**Evercore**").

**Adequate Protection Claims** means any Allowed superpriority administrative expense claims of the First Lien Lenders pursuant to section 507(b) of the Bankruptcy Code and the DIP Orders.

**Administrative Expense Claim** means any Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 327, 328, 330, 365, 503(b), 507(a)(2), or 507(b) of the Bankruptcy Code (other than DIP Facility Claims but including Adequate Protection Claims), including, (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Fee Claims; (c) Restructuring Expenses; and (d) all fees and charges assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code.

**Allowed** means, with respect to any Claim or Interest (i) as to which the Debtors and the holder of the Claim agree to the amount of the Claim or a court of competent jurisdiction has determined the amount of the Claim by Final Order; (ii) any Claim or Interest that is compromised, settled, or otherwise resolved pursuant to the authority of the Debtors or Reorganized Debtors, as applicable, in a Final Order of the Bankruptcy Court; (iii) any Claim that is listed in the Schedules, if any are filed, as liquidated, non-contingent and undisputed; or (iv) any Claim or Interest expressly allowed hereunder; *provided* that the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are reinstated or otherwise Unimpaired pursuant to this Plan.

**Amended and Restated First Lien Credit Agreement** means that certain Amended and Restated First Lien Credit Agreement, to be dated as of the Effective Date, by and among the Reorganized Debtors, the A&R Agent, and the A&R First Lien Lenders, substantially in the form thereof contained in the Plan Supplement.

2

**Amended and Restated First Lien Credit Facility** means that certain Amended and Restated First Lien Credit Facility comprised of (a) the A&R First-Out Tranche and (b) the A&R Last-Out Tranche, each as set forth in the Amended and Restated First Lien Credit Agreement.

**Amended By-Laws** means, with respect to a Reorganized Debtor, such Reorganized Debtor's amended or amended and restated by-laws or operating agreement, as applicable, substantially in the form thereof contained in the Plan Supplement to the extent it contains material changes to the existing by-laws or operating agreement of such Debtor.

**Amended Certificate of Incorporation** means, with respect to each Reorganized Debtor, such Reorganized Debtor's amended or amended and restated certificate of incorporation or certificate of formation, as applicable, substantially in the form thereof contained in the Plan Supplement.

**Asset** means all of the right, title, and interest of a Debtor or any Estate in and to property of whatever type or nature (including, without limitation, real, personal, mixed, intellectual, tangible, and intangible property).

**Bankruptcy Code** means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as amended from time to time.

**Bankruptcy Court** means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code or the Bankruptcy Court is determined not to have authority to enter a Final Order on an issue, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

**Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Chapter 11 Cases, and any local and chamber rules of the Bankruptcy Court.

**Berkshire Funds** means Berkshire Fund VIII, L.P., a Delaware limited partnership, Berkshire Fund VIII-A, L.P., a Delaware limited partnership, Berkshire Investors III LLC, a Delaware limited liability corporation, and Berkshire Investors IV LLC, a Delaware limited liability corporation.

**Business Day** means any day other than a Saturday, a Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

**Cash** means legal tender of the United States of America.

**Catalina Parent** means PDM Group Holdings Corporation, a Delaware corporation.

3

**Catalina Parent Group** means the consolidated group as defined in Section 1504 of the Internal Revenue Code of 1986, as amended, of which Catalina Parent is the common parent.

**Cause of Action** means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including, without limitation, under alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.  For the avoidance of doubt, Cause of Action includes: (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to sections 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any claims under any state or foreign law, including, without limitation, any fraudulent transfer or similar claims.

**Chapter 11 Case** means (a) with respect to a Debtor, such Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Bankruptcy Court and (b) when used with reference to all of the Debtors, the procedurally consolidated and jointly administered chapter 11 cases styled *In re Checkout Holding Corp., et al.*, Ch. 11 Case No. 18-[●] ([●]).

**CHC** means Checkout Holding Corp., a Delaware corporation.

**Claim** means a "claim," as defined in section 101(5) of the Bankruptcy Code, against any Debtor.

**Class** means any group of Claims or Interests classified under this Plan pursuant to section 1122(a) of the Bankruptcy Code.

**CMC** means Catalina Marketing Corporation, a Delaware corporation.

**CMC Acquisition** means, as determined by the Debtors (with the consent of the Ad Hoc First Lien Group and the Ad Hoc Second Lien Group) no later than the CMC Acquisition Election Date, either (i) the merger of Acquisition Company or a subsidiary of Acquisition Company with CMC (with CMC surviving or, in the event the Debtors so determine no later than five (5) days prior to the Effective Date, with Acquisition Company surviving) in accordance with the Acquisition Agreement or (ii) the transfer of all the stock of CMC to the Acquisition Company in accordance with the Acquisition Agreement.

**CMC Acquisition Election Date** means the date that is seven (7) days prior to the Voting Deadline.

4

**Collateral** means any Asset of a Debtor or an Estate that is subject to a Lien securing the payment or performance of a Claim, which Lien is not invalid and has not been avoided under the Bankruptcy Code or applicable nonbankruptcy law.

**Confirmation Date** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rule 5003 and 9021.

**Confirmation Hearing** means the hearing to be held by the Bankruptcy Court regarding confirmation of this Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

**Confirmation Order** means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code and approving the Disclosure Statement and related solicitation materials.

**Consenting Sponsor** means the Berkshire Funds, to the extent they are a party to the Restructuring Support Agreement on or before the deadline established in the Plan for filing the Plan Supplement and are at such time and on the Effective Date each in compliance with all of the representations, agreements, and obligations set forth in the Restructuring Support Agreement with respect to the Consenting Sponsor as if they had each executed the Restructuring Support Agreement on the Support Effective Date (as defined in the Restructuring Support Agreement).

**Cure Amount** means the payment of Cash or the distribution of other property (as the parties may agree or the Bankruptcy Court may order) as necessary to (a) cure a monetary default by the Debtors in accordance with the terms of an executory contract or unexpired lease of the Debtors and (b) permit the Debtors to assume such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

**Debtor** has the meaning set forth in the introductory paragraph of this Plan.

**Debtor in Possession** means, with respect to a Debtor, that Debtor in its capacity as a debtor in possession pursuant to sections 1101, 1107(a), and 1108 of the Bankruptcy Code.

**Definitive Documents** has the meaning ascribed to such term in the Restructuring Support Agreement.

**DIP Facility** means the senior secured superpriority term loan facility in the amount of $275 million consisting of the DIP Facility New Money Loans and the DIP Facility Roll-Up Loans, on the terms and conditions set forth in the DIP Facility Loan Agreement, as approved by the DIP Facility Order.

**DIP Facility Agent** means JPM, solely in its capacity as administrative agent under the DIP Facility Loan Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Facility Loan Agreement.

WEIL:\96767752\18\34225.0004

*DIP Facility Claim* means a Claim held by the DIP Facility Lenders or the DIP Facility Agent arising under or relating to the DIP Facility Loan Agreement or the DIP Facility Order, including any and all fees, interests, and accrued but unpaid interest and fees arising under the DIP Facility Loan Agreement.

*DIP Facility Lenders* means the lenders party to the DIP Facility Loan Agreement.

*DIP Facility Loan Agreement* means that certain Senior Secured Super-Priority Debtor-in-Possession Credit Agreement to be dated after the Petition Date, by and among CHC, as borrower, certain affiliates and subsidiaries of CHC, as guarantors, the DIP Facility Agent, and the DIP Facility Lenders, on terms mutually acceptable to the Debtors and the DIP Facility Lenders, with any amendments, modifications or supplements thereto as permitted by the DIP Facility Order.

*DIP Facility New Money Loans* means the new money loans in the principal amount of $125 million provided by the DIP Facility Lenders under the DIP Facility Loan Agreement.

*DIP Facility New Money Loan Claim* means a Claim held by the DIP Facility Lenders or the DIP Facility Agent arising from or related to the DIP Facility New Money Loans.

*DIP Facility Order* means (i) the *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 and Bankruptcy Rules 2002, 4001 and 9014 (I) Authorizing the Debtors to Obtain Senior Secured, Superpriority, Post-Petition Financing (II) Authorizing the Use of Cash Collateral, (III) Granting Priming Liens, Priority Liens and Superpriority Claims and (IV) Granting Adequate Protection to Prepetition Secured Parties*, and (ii) a Final Order entered by the Bankruptcy Court authorizing the Debtors to enter into the DIP Facility Loan Agreement and access the DIP Facility.

*DIP Facility Roll-Up Loan Claim* means a Claim held by the DIP Facility Lenders or the DIP Facility Agent arising from or related to the DIP Facility Roll-Up Loans.

*DIP Facility Roll-Up Loans* means the roll-up loans in the principal amount of $150 million provided by the DIP Facility Lenders under the DIP Facility Loan Agreement.

*Disbursing Agent* means any entity in its capacity as a disbursing agent under Section 6.5 hereof, including any Debtor or Reorganized Debtor, as applicable, that acts in such a capacity.

*Disclosure Statement* means the disclosure statement for this Plan, as supplemented from time to time, which is prepared and distributed in accordance with sections 1125, 1126(b), or 1145 of the Bankruptcy Code, Bankruptcy Rules 3016 and 3018, or other applicable law, including all exhibits and schedules thereto.

*Disputed* means, with respect to a Claim, (a) any Claim, which Claim is disputed under Section 7 of this Plan or as to which the Debtors have interposed and not withdrawn an objection or request for estimation that has not been determined by a Final Order; (b) any Claim,

WEIL:\96767752\18\34225.0004

proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof of claim was not timely or properly filed; (c) any Claim that is listed in the Schedules, if they are filed, as unliquidated, contingent or disputed, and as to which no request for payment or proof of claim has been filed; or (d) any Claim that is otherwise disputed by any of the Debtors or Reorganized Debtors in accordance with applicable law or contract, which dispute has not been withdrawn, resolved or overruled by a Final Order.  To the extent the Debtors dispute only the amount of a Claim, such Claim shall be deemed Allowed in the amount the Debtors do not dispute, if any, and Disputed as to the balance of such Claim.

*Distribution Record Date* means, except as otherwise provided in this Plan, the Effective Date.

*DTC* means the Depository Trust Company, a limited-purpose trust company organized under the New York State Banking Law.

*Effective Date* means the date which is the first Business Day selected by the Debtors, with the consent of the Required Restructuring Support Parties, which consent may not be unreasonably withheld, after which (a) all conditions to the effectiveness of this Plan set forth in Sections 9.1 and 9.2 hereof have been satisfied or waived in accordance with the terms of this Plan (other than those conditions that can only be satisfied immediately prior to or concurrent with the effectiveness of this Plan) and (b) no stay of the Confirmation Order is in effect.

*Estate or Estates* means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

*Exchange Act* means the Securities Exchange Act of 1934, as amended.

*Exculpated Parties* means collectively, and in each case in their capacities as such during the Chapter 11 Cases: (i) the Debtors, (ii) the Reorganized Debtors, and (iii) with respect to each of the foregoing entities, such entities' subsidiaries, affiliates, current and former officers and directors, principals, shareholders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and all other retained estate professionals.

*Existing Equity Interests* means all common stock of Catalina Parent issued and outstanding as of the Effective Date, whether or not transferable or fully vested.

*Fee Claim* means a Claim for professional services rendered or costs incurred on or after the Petition Date through the Effective Date by Professional Persons.

*Fee Escrow Account* means a segregated interest-bearing account in an amount equal to the total estimated amount of Fee Claims and funded by the Debtors on the Effective Date, subject to the consent of the Required DIP Facility Lenders.

*Final Order* means an order, ruling or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Cases (or by the clerk of such other court of competent jurisdiction on

7

the docket of such court), which has not been reversed, stayed, modified, amended or vacated, and as to which (a) the time to appeal, petition for certiorari or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such order or judgment of the Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, stay, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Bankruptcy Rules; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed relating to such order, shall not cause an order not to be a Final Order.

*First Lien Agent* means JPM, solely in its capacity as administrative agent under the First Lien Credit Agreement.

*First Lien Debt Claim* means any Claims arising under the First Lien Credit Agreement.

*First Lien Credit Agreement* means that certain amended and restated Credit Agreement, dated as of April 9, 2014 (as amended), by and among PDM Holdings Corporation, as holdings, CHC, as borrower, the guarantors party thereto, the First Lien Agent, the First Lien Lenders party thereto, including all guaranties, security agreements, instruments, and any other documents delivered pursuant thereto or in connection therewith (in each case, as amended from time to time).

*First Lien Credit Facility* means the credit facility set forth in the First Lien Credit Agreement.

*First Lien Lenders* means the lenders party to the First Lien Credit Agreement, which, for the avoidance of doubt, includes both Revolving Credit Lenders and Term Lenders (as such terms are defined in the First Lien Credit Agreement).

*General Unsecured Claim* means any Claim, other than an Administrative Expense Claim, DIP Facility Claim, First Lien Debt Claim, General Unsecured PDM Claim, Intercompany Claim, NCS Rejection Claim, Other Secured Claim, Priority Non-Tax Claim, Priority Tax Claim, Second Lien Debt Claim, or Subordinated Claim that is not entitled to priority under the Bankruptcy Code or any Final Order of the Bankruptcy Court.

*General Unsecured PDM Claim* means any Unsecured Claim against PDM Intermediate Holdings B Corporation, including any Unsecured Claim arising under the Unsecured PDM Notes or the Unsecured PDM Note Purchase Agreement.

*Impaired* means, with respect to a Claim, Interest, or a Class of Claims or Interests, "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

WEIL:\96767752\18\34225.0004

**Intercompany Claim** means any Claim against a Debtor held by another Debtor.

**Intercompany Interest** means an Interest in a Debtor other than Catalina Parent held by another Debtor or an affiliate of a Debtor.

**Intercreditor Agreement** means that certain Second Lien Intercreditor Agreement, dated as of April 9, 2014, by and among PDM Holdings Corporation, as holdings, CHC, as borrower, the guarantors party thereto, the First Lien Agent, and the Second Lien Agent (as amended from time to time).

**Interest** means any equity security (as defined in section 101(16) of the Bankruptcy Code) of a Debtor, including all common stock, preferred stock, membership or partnership interests, or other instrument evidencing any fixed or contingent ownership interest in any Debtor, including any option, warrant, or other right or instrument, contractual or otherwise, to acquire any such interest in a Debtor, whether or not transferable and whether fully vested or vesting in the future, that existed immediately before the Effective Date.

**JPM** means JPMorgan Chase Bank, N.A. in all of its capacities under the First Lien Credit Facility and the DIP Facility (as applicable, each of the documents related thereto, and the L/C Cash Collateral Agreement).

**JPM Letter of Credit** means that certain letter of credit, dated as of October 20, 2017, by and among JPM, as issuer, Epson America, Inc., as beneficiary, and CMC, as applicant.

**JPM Letter of Credit Secured Claim** means any Claim arising out of or relating to (i) the JPM Letter of Credit and (ii) the L/C Cash Collateral Agreement, in the principal amount of $5,000,000 (plus all fees, expenses and other obligations owing pursuant to the terms of the First Lien Credit Agreement and the L/C Cash Collateral Agreement), for which the reimbursement obligations are secured by a Lien on Collateral.

**L/C Cash Collateral Agreement** means that certain Cash Collateral Agreement, dated as of July 5, 2018, between JPM and CHC in respect of the Collateral securing the Cash Collateral securing the JPM Letter of Credit Secured Claim, as amended, restated, amended and restated, supplemented or otherwise modified from time to time

**Lien** has the meaning set forth in section 101(37) of the Bankruptcy Code.

**Management Incentive Plan** means the post-restructuring management incentive plan to be adopted by the New Board as further described in Section 5.6 of this Plan.

**New Board** means the initial board of directors of Reorganized Catalina Topco, which shall be appointed by the Ad Hoc First Lien Group.

**New Common Stock** means either the shares of common stock of Reorganized CMC issued pursuant to the Plan or, in the event the CMC Acquisition occurs, the common stock of PacificCo received pursuant to the Acquisition Agreement.

WEIL:\96767752\18\34225.0004

*New Stockholders' Agreement* means that certain shareholders' agreement, substantially in the form thereof contained in the Plan Supplement, which form shall be reasonably acceptable to the Required Restructuring Support Parties and the Debtors, effective as of the Effective Date, to which all parties receiving New Common Stock (and all persons to whom such parties may sell or transfer their New Common Stock in the future and all persons who purchase or acquire the New Common Stock in future transactions) shall be required to become parties.

*NCS Rejection Claims* means any and all Claims arising out of or in any way relating to that certain NC Ventures, LLC Limited Liability Company Agreement dated as of June 29, 2009 (as amended, modified, or supplemented from time to time), by and among The Nielsen Company (US), LLC ("*Nielsen*") and CMC, including any contract, license agreement, or any other agreement or arrangement of any kind whatsoever, between the Debtors and any of NC Ventures, LLC, Nielsen, or an affiliate of Nielsen (the "*NCS Agreement*").

*Other Secured Claim* means any Secured Claim (including the JPM Letter of Credit Secured Claims) against a Debtor other than a First Lien Debt Claim or a DIP Facility Claim.  For the avoidance of doubt, Other Secured Claim does not include any Claim arising out of or relating to the Second Lien Credit Agreement.

*PacificCo* means a newly-formed corporation (or limited liability company that elects to be taxable as a corporation) that indirectly owns all of the outstanding stock of the Acquisition Company.

*Person* means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code), or other entity (as defined in section 101(15) of the Bankruptcy Code).

*Petition Date* means, with respect to a Debtor, the date on which such Debtor commenced its Chapter 11 Case.

*Plan* means this joint prepackaged chapter 11 plan, including all appendices, exhibits, schedules, and supplements hereto (including, without limitation, any appendices, schedules, and supplements to this Plan contained in the Plan Supplement), as may be modified from time to time in accordance with the Bankruptcy Code, the terms hereof, and the terms of the Restructuring Support Agreement.

*Plan Distribution* means the payment or distribution of consideration to holders of Allowed Claims and Interests under this Plan.

*Plan Document* means any of the documents, other than this Plan, to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date, including, without limitation, the documents to be included in the Plan Supplement, the Amended and Restated First Lien Credit Agreement, the Amended Certificates of Incorporation of the applicable Reorganized Debtors, and the Amended By-Laws of the applicable Reorganized Debtors, subject to the consent rights set forth in the Restructuring Support Agreement and as may be modified consistent with the Restructuring Support Agreement.

*Plan Supplement* means a supplemental appendix to this Plan containing, among other things, substantially final forms (in each case, subject to the consent rights set forth in the Restructuring Support Agreement and as may be modified consistent with the Restructuring Support Agreement) of the Amended and Restated First Lien Credit Agreement (exclusive of all ancillary documents), the applicable Amended Certificates of Incorporation of the applicable Reorganized Debtors, the applicable Amended By-Laws of the applicable Reorganized Debtors, and the slate of directors to be appointed to the New Board to the extent known and determined, a schedule of retained Causes of Action, the Acquisition Agreement, Acquisition Transactions Exhibit, and, with respect to the members of the New Board, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; *provided*, that, through the Effective Date, the Debtors, with the consent of the Restructuring Support Parties, shall have the right to amend documents contained in, and exhibits to, the Plan Supplement in accordance with the terms of this Plan and the Restructuring Support Agreement. The Plan Supplement shall be filed with the Bankruptcy Court not later than seven (7) calendar days before the Voting Deadline, or such later date as may be approved by the Bankruptcy Court.

*Priority Non-Tax Claim* means any Claim (other than a DIP Facility Claim, an Administrative Expense Claim, or a Priority Tax Claim) that is entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

*Priority Tax Claim* means any Claim of a governmental unit (as defined in section 101(27) of the Bankruptcy Code) of the kind entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

*Professional Person* means any Person retained by order of the Bankruptcy Court in connection with these Chapter 11 Cases pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code, excluding any ordinary course professional retained pursuant to an order of the Bankruptcy Court.

*Pro Rata* means the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interests in that Class.

*Released Parties* means, collectively, and in each case in their capacities as such: (i) the Debtors and the Reorganized Debtors; (ii) the Debtors' non-Debtor affiliates; (iii) the Berkshire Funds; (iv) the Restructuring Support Parties; (v) JPM; (vi) the Second Lien Agent; and (vii) the DIP Facility Lenders; and with respect to each of the foregoing entities, such entities' affiliates, and with respect to each of the foregoing entities and their affiliates, their predecessors, successors, assigns, subsidiaries, affiliates, managed accounts and funds, current and former officers and directors, principals, stockholders, shareholders, members, partners, managers, employees, subcontractors, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such entities' respective heirs, executors, estates, servants, and nominees.

*Reorganized Catalina Topco* means, if the Acquisition Transactions do not occur, Reorganized CMC, and if the Acquisition Transactions occur, PacificCo.

*Reorganized CMC* means CMC, as reorganized on the Effective Date in accordance with this Plan.

*Reorganized Debtors* means the Debtors, as reorganized as of the Effective Date in accordance with this Plan, including any transferee or successor thereto by merger, transfer or otherwise, on or after the Effective Date, including the Acquisition Company.

*Required DIP Facility Lenders* means the Required Lenders under the DIP Facility Loan Agreement.

*Required Restructuring Support Parties* means the Requisite Creditors, as defined in the Restructuring Support Agreement.

*Restructuring* means the financial restructuring of the Debtors, the principal terms of which are set forth in this Plan and the Plan Supplement.

*Restructuring Expenses* means the reasonable and documented fees and expenses incurred by (a) the Restructuring Support Parties in connection with the Restructuring, subject to the Debtors' obligations to reimburse applicable expenses, as provided in the Restructuring Support Agreement, the DIP Facility Order, and applicable engagement letters, including, without limitation, the fees and expenses of Jones Day and Evercore (as counsel and financial advisor, respectively, to the Ad Hoc First Lien Group) and the fees and expenses of Paul Weiss, Young Conway, and PJT (as counsel, local counsel, and financial advisor, respectively, to the Second Lien Ad Hoc Group), (b) the First Lien Agent, the L/C Issuer (as defined in the First Lien Credit Agreement), the DIP Facility Agent, the A&R Agent, the arranger under the DIP Facility and the A&R Exit Facility, all as provided under the DIP Facility Order and any related fee letters or engagement letters to which any Debtor is a party, including, without limitation, the fees and expenses of Davis Polk & Wardwell LLP, Landis Rath & Cobb LLP and Ankura Consulting Group, LLC (as counsel, local counsel, and financial advisor, respectively, to the First Lien Agent and DIP Facility Agent), and (c) the Second Lien Agent, including, without limitation, the fees and expenses of Wilmer Cutler Pickering Hale and Dorr LLP (as counsel to the Second Lien Agent), one local counsel, and any other advisers, consultants, appraisers and professionals retained by or on behalf of the Second Lien Agent in connection with any litigation or contested matter commenced by or against the Second Lien Agent, in each case payable without the requirement for the filing of retention applications, fee applications, or any other applications in the Chapter 11 Cases, which shall be Allowed in full as Administrative Expense Claims upon incurrence and shall not be subject to any offset, defense, counterclaim, reduction, or credit.  For the avoidance of doubt, the fees and expenses of Evercore and PJT shall include any success, restructuring or transaction fees payable to Evercore or PJT, as the case may be, in accordance with their respective engagement letters with CHC.

*Restructuring Support Agreement* means (a) that certain Restructuring Support Agreement, dated as of December 11, 2018, by and among Catalina Parent, certain other affiliates of Catalina Parent specified therein, and the Restructuring Support Parties, as the same may be amended, restated, or otherwise modified in accordance with its terms and (b) that certain Plan Term Sheet (as defined in, and attached as an exhibit to, the Restructuring Support Agreement).

*Restructuring Support Parties* means the Consenting Sponsor (if applicable), and the holders of First Lien Debt Claims and Second Lien Debt Claims that are signatories to the Restructuring Support Agreement.

*Restructuring Transactions* means one or more transactions pursuant to section 1123(a)(5)(D) of the Bankruptcy Code to occur on or prior to the Effective Date or as soon as reasonably practicable thereafter, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan, including (a) the consummation of the transactions provided for under, contemplated by, or described in the Restructuring Support Agreement or the Acquisition Transactions Exhibit; (b) the execution and delivery of appropriate agreements or other documents (including the Plan Documents) containing terms that are consistent with or reasonably necessary to implement the terms of this Plan and the Restructuring Support Agreement and that satisfy the requirements of applicable law; (c) the execution and delivery of appropriate instruments (including the Plan Documents) of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of this Plan and the Restructuring Support Agreements; (d) the transactions described in Section 5.10 of the Plan; (e) the Acquisition Transactions; and (f) all other actions that the Debtors or Reorganized Debtors, as applicable, determine are necessary or appropriate and consistent with the Restructuring Support Agreement.

*Schedules* means, collectively, the schedules of assets and liabilities, schedules of executory contracts and unexpired leases and statements of financial affairs filed by the Debtors with the Bankruptcy Court and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified or supplemented from time to time, to the extent such filing is not waived pursuant to an order of the Bankruptcy Court.

*Second Lien Ad Hoc Group* means the group of Second Lien Lenders and First Lien Lenders that own or manage with the authority to act on behalf of the beneficial owners of the Second Lien Credit Facility and the First Lien Credit Facility, as applicable, who have executed the Restructuring Support Agreement, represented by Paul Weiss and PJT.

*Second Lien Advisor Engagement Letters* means that (a) certain engagement letter dated as of September 11, 2018, by and between CHC, Paul, Weiss, Rifkind, Wharton & Garrison LLP ("*Paul Weiss*"), and PJT Partners, LP ("*PJT*"); (b) certain reimbursement agreement dated as of August 23, 2018, by and between CHC and Paul Weiss; (c) certain fee letter dated as of November 16, 2018, by and between the Second Lien Agent and CHC; and (d) certain engagement letter dated as of December 11, 2018, by and between CHC and Young Conaway Stargatt & Taylor, LLP ("*Young Conaway*").

*Second Lien Agent* means Wilmington Savings Funds Society, FSB, and any successor agent, as administrative agent, solely in its capacity as administrative agent under the Second Lien Credit Agreement.

*Second Lien Credit Agreement* means that certain amended and restated Credit Agreement, dated as of April 9, 2014 (as amended), by and among PDM Holdings Corporation, as holdings, CHC, as borrower, the guarantors party thereto, the Second Lien Agent, the Second Lien Lenders party thereto, including all guaranties, security agreements, instruments, and any

13

other documents delivered pursuant thereto or in connection therewith (in each case, as amended from time to time).

*Second Lien Credit Facility* means the credit facility set forth in the Second Lien Credit Agreement.

*Second Lien Debt Claim* means any Claims arising under the Second Lien Credit Agreement.

*Second Lien Lenders* means the lenders party to the Second Lien Credit Agreement.

*Secured Claim* means a Claim to the extent (i) secured by a Lien on property of a Debtor's Estate, the amount of which is equal to or less than the value of such property (A) as set forth in this Plan, (B) as agreed to by the holder of such Claim and the Debtors, or (C) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code or (ii) subject to any setoff right of the holder of such Claim under section 553 of the Bankruptcy Code.

*Securities Act* means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended.

*Security* means any "security" as such term is defined in section 101(49) of the Bankruptcy Code.

*Subordinated Claim* means any Claim that is subject to (i) subordination under section 510(b) of the Bankruptcy Code or (ii) equitable subordination as determined by the Bankruptcy Court in a Final Order, including, without limitation, any Claim for or arising from the rescission of a purchase, sale, issuance, or offer of a Security of any Debtor; for damages arising from the purchase or sale of such a Security; or for reimbursement, indemnification, or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim.

*Tax Code* means the Internal Revenue Code of 1986, as amended from time to time.

*Unimpaired* means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.  Notwithstanding anything to the contrary in this Plan, the Plan Documents, or in the Confirmation Order, until an Allowed Claim that arises prior to the Effective Date has been (v) paid in full in accordance with applicable law, (w) paid in full or otherwise satisfied under the governing documents giving rise to the Claim, (x) paid in full or otherwise satisfied pursuant to terms agreed to between the holder of such Claim and the Debtor or Reorganized Debtor or in accordance with the terms and conditions of the particular transaction giving rise to such Claim, (y) paid in full or otherwise satisfied pursuant to this Plan, Plan Documents, or the Confirmation Order, or (z) otherwise satisfied or disposed of as determined by a court of competent jurisdiction.  For the avoidance of doubt, (i) the provisions of Sections 10.3, 10.4, 10.6, 10.7(b), 10.8, and 10.9 of this Plan shall not apply or take effect with respect to such Claim, (ii) such Claim shall not be deemed settled, satisfied, resolved, released, discharged, or enjoined by any

14

provision of this Plan or the Plan Documents, and (iii) the property of each of the Debtors' Estates that vests in the applicable Reorganized Debtor pursuant to Section 10.2 of this Plan shall not be free and clear of such Claim.

**Unsecured** means, with respect to any Claim, any Claim that is not a Secured Claim.

**Unsecured PDM Note Purchase Agreement** means that certain Note Purchase Agreement, dated as of April 9, 2014, by and among PDM Intermediate Holdings B Corporation, as issuer, and the purchasers party thereto, including all agreements, notes, instruments, and any other documents delivered pursuant thereto or in connection therewith (in each case, as amended, modified, or supplemented from time to time).

**Unsecured PDM Notes** means the PIK Notes due April 9, 2022 issued pursuant to the Unsecured PDM Note Purchase Agreement in the aggregate principal amount outstanding of $230,000,000 plus all accrued prepetition interest, fees, and other expenses due as of the Petition Date under the Unsecured PDM Note Purchase Agreement.

**U.S. Trustee** means the United States Trustee for Region 3.

**Voting Deadline** means January 23, 2019 at 5:00 p.m. prevailing Eastern Time, or such date and time as may be set by the Bankruptcy Court.

### 1.2    _Interpretation; Application of Definitions; Rules of Construction._

Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in or exhibit to this Plan, as the same may be amended, waived, or modified from time to time in accordance with the terms hereof and the Restructuring Support Agreement. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein and have the same meaning as "in this Plan," "of this Plan," "to this Plan," and "under this Plan," respectively.  The words "includes" and "including" are not limiting and shall mean "including, without limitation" unless otherwise specified.  The headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  For purposes herein: (i) in the appropriate context, each term, whether stated in the singular or plural, shall include both the singular and plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the reference document shall be substantially in that form or substantially on those terms and conditions; (iii) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (iv) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

WEIL:\96767752\18\34225.0004

### 1.3 *Reference to Monetary Figures.*

All references in this Plan to monetary figures shall refer to the legal tender of the United States of America unless otherwise expressly provided.

### 1.4 *Consent Rights of Restructuring Support Parties.*

Notwithstanding anything herein to the contrary, any and all consent rights of the Restructuring Support Parties set forth in the Restructuring Support Agreement (or otherwise) with respect to the form and substance of this Plan, the Plan Supplement, the other Plan Documents, including any amendments, restatements, supplements, or other modifications to such documents, or with respect to any other document, actions, or anything else referred to herein, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Section 1.1 hereof) and fully enforceable as if stated in full herein.

### 1.5 *Controlling Document.*

In the event of an inconsistency between this Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control unless otherwise specified in such Plan Supplement document. In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, other than documents contained in the Plan Supplement, or between this Plan and the Disclosure Statement, this Plan shall control. The provisions of this Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided*, that if there is determined to be any inconsistency between any provision of this Plan and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan.

## ARTICLE II. ADMINISTRATIVE EXPENSE CLAIMS, FEE CLAIMS, DIP FACILITY CLAIMS, AND PRIORITY TAX CLAIMS.

### 2.1 *Treatment of Administrative Expense Claims.*

Except to the extent that a holder of an Allowed Administrative Expense Claim other than a Fee Claim agrees to a different treatment, on the Effective Date or as soon thereafter as is reasonably practicable (but in no event later than thirty (30) days after the Effective Date), the holder of such Allowed Administrative Expense Claim shall receive, on account of such Allowed Claim, Cash in an amount equal to the Allowed amount of such Claim; *provided*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors (which, for the avoidance of doubt, do not include Restructuring Expenses, which shall be paid in accordance with the DIP Facility Order, as applicable), as Debtors in Possession, shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities.

16

## 2.2    *Treatment of Fee Claims.*

All Professional Persons seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 1103 of the Bankruptcy Code shall (a) file, on or before the date that is forty-five (45) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (b) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court or authorized to be paid in accordance with the order(s) relating to or allowing any such Fee Claim. On the Effective Date, the Debtors shall establish and fund the Fee Escrow Account. The Debtors shall fund the Fee Escrow Account with Cash equal to the Professional Persons' good faith estimates of the Fee Claims. Funds held in the Fee Escrow Account shall not be considered property of the Debtors' Estates or property of the Reorganized Debtors, but shall revert to the Reorganized Debtors only after all Fee Claims allowed by the Bankruptcy Court have been irrevocably paid in full. The Fee Escrow Account shall be held in trust for Professional Persons retained by the Debtors and for no other parties until all Fee Claims Allowed by the Bankruptcy Court have been paid in full. Fees owing to the applicable Professional Persons shall be paid in Cash to such Professional Persons from funds held in the Fee Escrow Account when such Claims are Allowed by an order of the Bankruptcy Court or authorized to be paid under the Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals; provided, however, that the Reorganized Debtors' obligations with respect to Fee Claims shall not be limited by nor deemed limited to the balance of funds held in the Fee Escrow Account. To the extent that funds held in the Fee Escrow Account are insufficient to satisfy the amount of accrued Fee Claims owing to the Professional Persons, such Professional Persons shall have an Allowed Administrative Expense Claim for any such deficiency, which shall be satisfied in accordance with Section 2.1 of this Plan. No Liens, claims, or interests shall encumber the Professional Fee Escrow in any way.

Any objections to Fee Claims shall be served and filed (a) no later than twenty one (21) days after the filing of the final applications for compensation or reimbursement or (b) such later date as ordered by the Bankruptcy Court upon a motion of the Reorganized Debtors.

## 2.3    *Treatment of DIP Facility Claims.*

On the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed DIP Facility Claim, each holder of an Allowed DIP Facility Claim shall receive (i) on account of its Allowed DIP Facility New Money Loan Claims, its Pro Rata share of the loans under the A&R First-Out Tranche, and (ii) on account of its Allowed DIP Facility Roll-Up Loan Claims, its Pro Rata share of the loans under the A&R Last-Out Tranche. On the Effective Date, all liens and security interests granted to secure the obligations arising under the DIP Facility Loan Agreement shall continue, remain in effect, and be deemed to secure the obligations under the Amended and Restated First Lien Credit Agreement, subject to the terms and conditions thereof.

WEIL:\96767752\18\34225.0004

### 2.4    *Payment of Fees and Expenses under DIP Facility Order.*

On the earlier of (i) the Effective Date and (ii) the date on which any accrued and unpaid fees, expenses or disbursements in respect of the DIP Facility and the Exit Facility would be required to be paid under the terms of the applicable DIP Facility Order, the Restructuring Support Agreement or any other order of the Bankruptcy Court, the Debtors or Reorganized Debtors (as applicable) shall pay all fees, expenses and disbursements of the DIP Facility Agent and the DIP Facility Lenders, in each case, that have accrued and are unpaid as of the Effective Date and are required to be paid under or pursuant to the DIP Facility Order the Restructuring Support Agreement or any other order of the Bankruptcy Court, including, for the avoidance of doubt, professional fees required to be paid as adequate protection for the First Lien Lenders and the A&R Exit Backstop Payment and A&R Exit Commitment Payment.

### 2.5    *Treatment of Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, on the Effective Date or as soon thereafter as is reasonably practicable, the holder of such Allowed Priority Tax Claim shall receive, on account of such Allowed Priority Tax Claim, Cash in an amount equal to the Allowed amount of such Claim; *provided*, that Allowed Priority Tax Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities.

## ARTICLE III.    CLASSIFICATION OF CLAIMS AND INTERESTS.

### 3.1    *Classification in General.*

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided*, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

### 3.2    *Formation of Debtor Groups for Convenience Only.*

This Plan groups the Debtors together solely for the purpose of describing treatment under this Plan, confirmation of this Plan, and making Plan Distributions in respect of Claims against and Interests in the Debtors under this Plan.  Such groupings shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal entities, or cause the transfer of any Assets; and, except as otherwise provided by or permitted under this Plan, all Debtors shall continue to exist as separate legal entities.

### 3.3 *Summary of Classification of Claims and Interests.*

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are: (i) Impaired and Unimpaired under this Plan; (ii) entitled to vote to accept or reject this Plan in accordance with section 1126 of the Bankruptcy Code; and (iii) deemed to accept or reject this Plan:

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 1 | Priority Non-Tax Claims | Unimpaired | No (Deemed to accept) |
| Class 2 | Other Secured Claims | Unimpaired | No (Deemed to accept) |
| Class 3 | First Lien Debt Claims | Impaired | Yes |
| Class 4 | Second Lien Debt Claims | Impaired | Yes |
| Class 5 | General Unsecured Claims | Unimpaired | No (Deemed to accept) |
| Class 6 | NCS Rejection Claims | Impaired | No (Deemed to reject) |
| Class 7 | General Unsecured PDM Claims | Impaired | No (Deemed to reject) |
| Class 8 | Intercompany Claims | Unimpaired | No (Deemed to accept) |
| Class 9 | Subordinated Claims | Impaired | No (Deemed to reject) |
| Class 10 | Existing Equity Interests | Impaired | No (Deemed to reject) |
| Class 11 | Intercompany Interests | Unimpaired | No (Deemed to accept) |

### 3.4 *Separate Classification of Other Secured Claims.*

Although all Other Secured Claims have been placed in one Class for purposes of nomenclature within this Plan, each Other Secured Claim, to the extent secured by a Lien on Collateral different from the Collateral securing a different Other Secured Claim, shall be treated as being in a separate sub-Class for the purposes of voting to accept or reject this Plan and receiving Plan Distributions.

### 3.5 *Elimination of Vacant Classes.*

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from this Plan for purposes of voting to accept or reject this Plan, and disregarded for purposes of determining whether this Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

19

3.6    *Voting; Presumptions; Solicitation.*

(a)    Acceptance by Certain Impaired Classes.  Only holders of Allowed Claims in Classes 3 and 4 are entitled to vote to accept or reject this Plan.  An Impaired Class of Claims shall have accepted this Plan if (i) the holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept this Plan and (ii) the holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept this Plan.  Holders of Claims in Classes 3 and 4 will receive ballots containing detailed voting instructions.

(b)    Deemed Acceptance by Unimpaired Classes.  Holders of Claims and Interests in Classes 1, 2, 5, 8, and 11 are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Accordingly, such holders are not entitled to vote to accept or reject this Plan.

(c)    Deemed Rejection by Certain Impaired Classes.  Holders of Claims and Interests in Classes 6, 7, 9, and 10 are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Accordingly, such holders are not entitled to vote to accept or reject this Plan.

3.7    *Cramdown.*

If any Class of Claims is deemed to reject this Plan or is entitled to vote on this Plan and does not vote to accept this Plan, the Debtors may (i) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify this Plan in accordance with the terms hereof and the Bankruptcy Code.  If a controversy arises as to whether any Claims or Interests are impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

3.8    *No Waiver.*

Nothing contained in this Plan shall be construed to waive a Debtor's or other entity's right to object on any basis to any Claim.


**ARTICLE IV.    TREATMENT OF CLAIMS AND INTERESTS.**

4.1    *Class 1:  Priority Non-Tax Claims.*

(a)    Treatment:  The legal, equitable, and contractual rights of the holders of Allowed Priority Non-Tax Claims are unaltered by this Plan.  Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Priority Non-Tax Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Priority Non-Tax Claim shall receive, on account of such Allowed Claim, at the option of the Reorganized Debtors: (i) Cash in an amount equal to the Allowed amount of such

Claim or (ii) other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(b)     Impairment and Voting:  Allowed Priority Non-Tax Claims are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Priority Non-Tax Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to such Allowed Priority Non-Tax Claims.

### 4.2     *Class 2:  Other Secured Claims.*

(a)     Treatment:  The legal, equitable, and contractual rights of the holders of Allowed Other Secured Claims are unaltered by this Plan.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Secured Claim shall receive, on account of such Allowed Claim, at the option of the Reorganized Debtors:  (i) Cash in an amount equal to the Allowed amount of such Claim, (ii) reinstatement or such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code, or (iii) return of the applicable Collateral in satisfaction of the Allowed amount of such Other Secured Claim.

(b)     Impairment and Voting:  Allowed Other Secured Claims are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Secured Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to such Allowed Other Secured Claims.

### 4.3     *Class 3:  First Lien Debt Claims.*

(a)     Treatment:  On the Effective Date, each holder of an Allowed First Lien Debt Claim shall be entitled to receive from (and on behalf of) CHC, in full and final satisfaction of such Claim, its Pro Rata share of 90% of the New Common Stock issued on the Effective Date (subject to dilution by the Management Incentive Plan).

(b)     Impairment and Voting:  The First Lien Debt Claims are Impaired. Holders of Allowed First Lien Debt Claims are entitled to vote on this Plan.

(c)     Allowance:  The First Lien Debt Claims shall be deemed Allowed on the Effective Date in the aggregate amount of $1,075,545,556.48, minus the aggregate amount of the DIP Facility Roll-Up Loans.

### 4.4     *Class 4:  Second Lien Debt Claims.*

(a)     Treatment:  On the Effective Date, each holder of an Allowed Second Lien Debt Claim shall be entitled to receive from (and on behalf of) CHC, in full and final satisfaction of such Claim, its Pro Rata share of 10% of the New Common Stock issued on the Effective Date (subject to dilution by the Management Incentive Plan).

(b)      Impairment and Voting:  The Second Lien Debt Claims are Impaired.  Holders of Allowed Second Lien Debt Claims are entitled to vote on this Plan.

(c)      Allowance:  The Second Lien Debt Claims shall be deemed Allowed on the Effective Date in the aggregate amount of $471,987,841.37.

### 4.5      *Class 5:  General Unsecured Claims.*

(a)      Treatment:  The legal, equitable, and contractual rights of the holders of General Unsecured Claims are unaltered by this Plan.  Except to the extent that a holder of a General Unsecured Claim agrees to different treatment, on and after the Effective Date, the Debtors shall continue to pay (if Allowed) or dispute each General Unsecured Claim in the ordinary course of business as if the Chapter 11 Cases had never been commenced.

(b)      Impairment and Voting:  All Allowed General Unsecured Claims are deemed Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed General Unsecured Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to such Allowed General Unsecured Claims.

### 4.6      *Class 6:  NCS Rejection Claims.*

(a)      Treatment:  The holders of NCS Rejection Claims shall not receive or retain any property under this Plan on account of such Claims, and the obligations of the Debtors and the Reorganized Debtors on account of the NCS Rejection Claims shall be discharged.

(b)      Impairment and Voting:  NCS Rejection Claims are Impaired.  In accordance with section 1126(g) of the Bankruptcy Code, holders of NCS Rejection Claims are conclusively presumed to reject this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to NCS Rejection Claims.

### 4.7      *Class 7:  General Unsecured PDM Claims.*

(a)      Treatment:  The holders of General Unsecured PDM Claims shall not receive or retain any property under this Plan on account of such Claims, and the obligations of the Debtors and the Reorganized Debtors on account of the General Unsecured PDM Claims shall be discharged.

(b)      Impairment and Voting:  General Unsecured PDM Claims are Impaired.  In accordance with section 1126(g) of the Bankruptcy Code, holders of General Unsecured PDM Claims are conclusively presumed to reject this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to General Unsecured PDM Claims.

WEIL:\96767752\18\34225.0004

**4.8**     *Class 8:  Intercompany Claims.*

(a)     Treatment:  On or after the Effective Date, all Intercompany Claims shall be paid, adjusted, continued, settled, reinstated, discharged, or eliminated, in each case to the extent determined to be appropriate by the Debtors or Reorganized Debtors with the consent of the Ad Hoc First Lien Group and the Second Lien Ad Hoc Groups (such consents not to be unreasonably withheld), as applicable.  All Claims between any Debtor and a non-Debtor affiliate shall be Unimpaired under this Plan.

(b)     Impairment and Voting:  All Allowed Intercompany Claims are deemed Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Intercompany Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to such Allowed Intercompany Claims.

**4.9**     *Class 9:  Subordinated Claims.*

(a)     Treatment:  Subordinated Claims are subordinated pursuant to this Plan and section 510 of the Bankruptcy Code.  The holders of Subordinated Claims shall not receive or retain any property under this Plan on account of such Claims, and the obligations of the Debtors and the Reorganized Debtors on account of Subordinated Claims shall be discharged.

(b)     Impairment and Voting:  Subordinated Claims are Impaired.  In accordance with section 1126(g) of the Bankruptcy Code, holders of Subordinated Claims are conclusively presumed to reject this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to Subordinated Claims.

**4.10**     *Class 10:  Existing Equity Interests.*

(a)     Treatment:  On the Effective Date, the Existing Equity Interests shall be cancelled without further action by or order of the Bankruptcy Court.

(b)     Impairment and Voting:  Existing Equity Interests are Impaired.  In accordance with section 1126(g) of the Bankruptcy Code, holders of Existing Equity Interests are conclusively presumed to reject this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to Existing Equity Interests.

**4.11**     *Class 11: Intercompany Interests.*

(a)     Treatment:  Intercompany Interests are Unimpaired.  On the Effective Date, all Intercompany Interests shall be treated as set forth in Section 5.9 hereof.

(b)     Impairment and Voting:  Intercompany Interests are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Intercompany Interests are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to such Allowed Intercompany Interests.

23

### 4.12    *Debtors' Rights in Respect of Unimpaired Claims.*

Except as otherwise provided in this Plan, nothing under this Plan shall affect the rights of the Reorganized Debtors in respect of any Unimpaired Claim, including, without limitation, all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claim.

### 4.13    *Treatment of Vacant Classes.*

Any Claim or Interest in a Class that is considered vacant under Section 3.5 of this Plan shall receive no Plan Distribution.

## ARTICLE V.    MEANS FOR IMPLEMENTATION.

### 5.1    *Continued Corporate Existence; Dissolution*

(a)    Except as otherwise provided in this Plan, the Debtors shall continue to exist after the Effective Date as Reorganized Debtors in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to their respective Amended Certificate of Incorporation and Amended By-Laws.  On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Reorganized Debtor, each Reorganized Debtor may, in its sole discretion, take such action as permitted by applicable law, and such Reorganized Debtor's organizational documents, as such Reorganized Debtor may determine is reasonable and appropriate, including, without limitation, causing:  (i) a Reorganized Debtor to be merged into another Reorganized Debtor or an affiliate of a Reorganized Debtor and to engage in the Restructuring Transactions described in the Acquisition Transactions Exhibit; (ii) a Reorganized Debtor to be dissolved; (iii) the legal name of a Reorganized Debtor to be changed; or (iv) the closure of a Reorganized Debtor's Chapter 11 Case on the Effective Date or any time thereafter.

(b)    On the Effective Date or as soon thereafter as is reasonably practicable, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate this Plan, including, without limitation:  (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of this Plan and the Plan Documents and that satisfy the requirements of applicable law and any other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of this Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation and amendments thereto, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable law, including the applicable Amended Certificates of Incorporation and Amended By-Laws; (iv) the Restructuring Transactions; and (v) all other actions that the applicable entities determine to be necessary or appropriate, including, without limitation, making filings or recordings that may be required by applicable law.

24

(c)    After the Effective Date, the Reorganized Debtors shall be authorized to dissolve the Debtors or the Reorganized Debtors (other than Reorganized CMC) in accordance with applicable law.  As promptly as practicable after the Effective Date, Catalina Parent, PDM Intermediate Holdings A Corporation, PDM Intermediate Holdings B Corporation and CHC shall be dissolved.

### 5.2    *Plan Funding.*

Plan Distributions of Cash shall be funded from the Debtors' Cash on hand as of the applicable date of such Plan Distribution and from proceeds of the A&R Exit Facility.

### 5.3    *Cancellation of Existing Securities and Agreements.*

(a)    Except for the purpose of evidencing a right to a distribution under this Plan and except as otherwise set forth in this Plan, or in any Plan Document, on the Effective Date, all agreements, instruments, and other documents evidencing any prepetition Claim or Interest (other than certain Intercompany Interests that are not modified by this Plan pursuant to Section 5.9 hereof) and any rights of any holder in respect thereof shall be deemed cancelled and of no force or effect.  The holders of or parties to such cancelled instruments, Securities, and other documentation shall have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan.  For the avoidance of doubt, this Section 5.3 shall not apply to the DIP Facility Loan Agreement or the Amended and Restated First Lien Credit Agreement.

(b)    Notwithstanding such cancellation and discharge, the First Lien Credit Agreement and the Second Lien Credit Agreement shall continue in effect solely to the extent necessary to (i) allow the holders of Allowed First Lien Debt Claims and Allowed Second Lien Debt Claims to receive distributions under the Plan, (ii) allow the Debtors, the Reorganized Debtors, the First Lien Agent, the Second Lien Agent, and the Disbursing Agent to make post-Effective Date distributions or take such other action, if any, pursuant to the Plan on account of the Allowed First Lien Debt Claims and Allowed Second Lien Debt Claims, and to otherwise exercise their rights and discharge their obligations relating to the interests of the holders of such Claims in accordance with this Plan, and (iii) permit the First Lien Agent and the Second Lien Agent to appear in these Chapter 11 Cases; *provided* that nothing in this Section 5.3 shall affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order, or this Plan or result in any liability or expense to the Reorganized Debtors.  The First Lien Agent and The Second Lien Agent shall be entitled to reimbursement of reasonable and documented fees and expenses (including reasonable and documented fees and expenses of its professionals) incurred in connection with the matters set forth in this Section 5.3(b).

(c)    Notwithstanding anything to the contrary herein, any and all indemnification and reimbursement provisions in the First Lien Credit Agreement and Second Lien Credit Agreement and the other Loan Documents (as defined in the First Lien Credit Agreement and Second  Lien Credit Agreement, as applicable) shall survive the occurrence of the Effective Date to the extent such indemnification and reimbursement provisions would survive the satisfaction and discharge of all other Obligations (as defined in the First Lien Credit Agreement and Second  Lien Credit Agreement, as applicable).

(d)      Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors of their interests, as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in this Section 5.3 shall be deemed null and void and shall be of no force and effect. Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtors or any of their counterparties under any executory contract or unexpired lease to the extent such executory contract or unexpired lease has been assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court or hereunder.

(e)      Nothing in this Plan shall be deemed to limit or otherwise affect any rights of, or liens or security interests in favor of, JPM under or in connection with the L/C Cash Collateral Agreement, the Cash Collateral Account (as defined in the L/C Cash Collateral Agreement) or any contents or proceeds thereof, and the L/C Cash Collateral Agreement shall remain in effect in accordance with its terms for so long as any obligations remain outstanding thereunder (including any obligations of the Debtors to pay fronting fees or other costs pursuant to Section 2.03(i) of the First Lien Credit Agreement, which obligations shall survive the occurrence of the Effective Date and continue to accrue for so long as the JPM Letter of Credit remains outstanding).

### 5.4      *Cancellation of Certain Existing Security Interests.*

Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Debtors or Reorganized Debtors, as applicable, any Collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

### 5.5      *Officers and Boards of Directors.*

(a)      On the Effective Date, and if the CMC Acquisition occurs, in accordance with the Acquisition Agreement, the board of directors of Reorganized Catalina Topco shall consist of [●] directors, each of whom shall be designated by the Ad Hoc First Lien Group. The composition of the boards of directors of each Reorganized Debtor shall be disclosed prior to the entry of the Confirmation Order.

(b)      Except to the extent that a member of the board of directors of a Debtor continues to serve as a director of such Reorganized Debtor on the Effective Date, the members of the board of directors of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date and each such director will be deemed to have resigned or shall otherwise cease to be a director of the applicable Debtor on the Effective Date. Commencing on the Effective Date, each of the directors of each of the Reorganized Debtors shall serve pursuant to the terms of the applicable organizational documents of such Reorganized Debtor and may be replaced or removed in accordance with such organizational documents.

WEIL:\96767752\18\34225.0004

### 5.6    *Management Incentive Plan.*

(a)    After the Effective Date, and if the CMC Acquisition occurs, in accordance with the Acquisition Agreement, the New Board shall adopt the Management Incentive Plan.  The participants and the amounts allocated under the Management Incentive Plan and other terms and conditions thereof shall be determined in the sole discretion of the New Board; *provided, however*, that the Management Incentive Plan shall consist only of common stock, preferred stock, warrants, options, restricted stock units, or other instruments or securities exercisable or convertible into New Common Stock, the amount of which shall not exceed ten percent (10%) of the New Common Stock authorized to be issued pursuant to this Plan.

(b)    Any Catalina Parent Interests granted prior to the Effective Date to a current or former employee, officer, director or contractor pursuant to an employee compensation plan, benefit plan, employment agreement, offer letter, award letter or otherwise shall be deemed cancelled on the Effective Date.

### 5.7    *Authorization, Issuance, and Delivery of New Common Stock.*

(a)    On the Effective Date, all existing interests in Catalina Parent shall be cancelled and (i) Reorganized CMC is authorized to issue or cause to be issued and, in the event the CMC Acquisition does not occur, shall issue the New Common Stock for distribution in accordance with the terms of this Plan without the need for any further corporate, shareholder, or other equityholder action, and (ii) the event the CMC Acquisition does occur, and in accordance with (and subject to the terms of) the Acquisition Agreement, the Acquisition Company shall transfer (or cause to be transferred) to CHC the New Common Stock, as partial consideration for the acquisition of Reorganized CMC, for distribution in accordance with the terms of this Plan, in each case, CHC shall direct the Disbursing Agent to distribute the New Common Stock in accordance with Section 6.1 of this Plan.

(b)    All of the New Common Stock issuable under the Plan, when so issued, shall be duly authorized, validly issued, fully paid, and nonassessable, and the holders of New Common Stock shall be deemed to have accepted the terms of the New Stockholders' Agreement (solely in their capacity as shareholders of Reorganized Catalina Topco) and to be parties thereto without further action or signature.  The New Stockholders' Agreement shall be effective as of the Effective Date.

(c)    Upon the Effective Date, unless otherwise consented to by the Required Restructuring Support Parties, (i) the New Common Stock shall not be registered under the Securities Act of 1933, and shall not be listed for public trading on any securities exchange, and (ii) none of the Reorganized Debtors shall be a reporting company under the Exchange Act.

### 5.8    *Amended and Restated First Lien Credit Agreement.*

On the Effective Date and, if applicable, prior to the CMC Acquisition, the Amended and Restated First Lien Credit Agreement shall be executed, delivered, and all fees and expenses required thereunder (including the A&R Exit Facility Backstop Payment and the A&R Exit Facility Commitment Payment) shall be paid, and the Reorganized Debtors (other than the Acquisition Company) shall be authorized to execute, deliver, enter into, and make any payments

27

required by the Amended and Restated First Lien Credit Agreement without the need for any further corporate action and without further action by the holders of Claims or Interests. The form of the Amended and Restated First Lien Credit Agreement will be filed as part of the Plan Supplement.

All Liens and security interests granted pursuant to the Amended and Restated First Lien Credit Agreement shall be (a) valid, binding, perfected and enforceable Liens and security interests in the personal and real property described in and subject to such documents, with the priorities established in respect thereof under applicable non-bankruptcy law and (b) not subject to avoidance, recharacterization or subordination under any applicable law.

All Liens, mortgages and security interests securing the obligations arising under the Amended and Restated First Lien Credit Agreement that were shared collateral securing the DIP Facility Loan Agreement are unaltered by this Plan, and all such Liens, mortgages and security interests are created and perfected with respect to the Amended and Restated First Lien Credit Facility to the same extent, in the same manner and on the same terms and priorities as they were with respect to the DIP Facility. For purposes of all mortgages, pledges, and deposit account control agreements that secured the obligations arising under the DIP Facility Loan Agreement, the Amended and Restated First Lien Credit Agreement is deemed an amendment and restatement of the DIP Facility Loan Agreement, and such mortgages, pledges, and control agreements shall survive the Effective Date, shall not be cancelled, and shall continue to secure the Amended and Restated First Lien Credit Facility.

For the avoidance of doubt, this Section 5.8 shall apply to the Amended and Restated First Lien Credit Facility in its entirety, including the A&R First-Out Tranche and the A&R Last-Out Tranche.

### 5.9    *Intercompany Interests; Corporate Reorganization.*

Subject to the consent of the Required Restructuring Support Parties, on the Effective Date, except as otherwise provided in the Plan, and without the need for any further corporate action or any other approval of any board of directors, management, shareholders, or other equityholders of any Debtor or Reorganized Debtor, as applicable, the certificates and all other documents representing the Intercompany Interests shall be deemed to be in full force and effect.

### 5.10    *Restructuring Transactions.*

(a)    On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or Reorganized Debtors, as applicable, may take all actions consistent with this Plan and the Restructuring Support Agreement as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with this Plan.

(b)    On or before the CMC Acquisition Election Date, the Debtors (with the consent of the Ad Hoc First Lien Group and the Ad Hoc Second Lien Group) shall elect whether or not to consummate the CMC Acquisition.

28

(c)    The following transactions shall occur on or prior to the Effective Date (and in all events, prior to any distributions pursuant to Article VI of the Plan and, if applicable, prior to the CMC Acquisition):

(i)  each Modiv Media Inc. and Cellfire Inc, and any other subsidiary as determined by the Debtors, shall be converted into a limited liability company that, for U.S. federal income tax purposes, is treated as a disregarded entity;

(ii) in accordance with Section 4.8, all Intercompany Claims  shall be paid, adjusted, continued, settled, reinstated, discharged, or eliminated; and

(iii) the Intercompany Interests in CMC shall be recapitalized into the New Common Stock, unless the CMC Acquisition occurs.

(d)    The transactions described in Section 5.10(a)-(c) are subject to the Acquisition Transactions Exhibit.  In addition, notwithstanding anything to the contrary in this Plan, the Debtors shall consult with the Ad Hoc First Lien Group and the Ad Hoc Second Lien Group to determine whether, and provide the Ad Hoc First Lien Group and the Ad Hoc Second Lien Group with reasonable access to materials in its (or its agents') possession reasonably necessary to evaluate whether, to engage in the Acquisition Transactions (or other related, similar or alternative Restructuring Transactions), and the Debtors or Reorganized Debtors may not engage in the Acquisition Transactions (or other related, similar or alternative Restructuring Transactions) without the prior consent of the Ad Hoc First Lien Group and the Ad Hoc Second Lien Group.  The Debtors shall cooperate on a reasonable basis with the Ad Hoc First Lien Group and the Ad Hoc Second Lien Group in connection with proposals by the Ad Hoc First Lien Group and/or the Ad Hoc Second Lien Group.  In the event that the Debtors, the Ad Hoc First Lien Group and the Ad Hoc Second Lien Group agree to effectuate the Acquisition Transactions or other Restructuring Transactions in a manner that the Ad Hoc First Lien Group and the Ad Hoc Second Lien Group reasonably believe could qualify as a "qualified stock purchase" or "qualified stock disposition" within the meaning of Sections 338 and 336, respectively, of the Tax Code (and the Treasury Regulations promulgated thereunder), then the Debtors or Reorganized Debtors shall deliver to the Ad Hoc First Lien Group, the Ad Hoc Second Lien Group and Reorganized Catalina Topco a properly completed IRS Form 8023 (and/or such other forms or documentation as required by applicable Law to make elections pursuant to Sections 338 or 336 of the Tax Code and the Treasury Regulations promulgated thereunder (and any similar elections under state or local law)) on or prior to the Effective Date duly executed by the common parent of the Catalina Parent Group (or other applicable signatory).

(e)    Notwithstanding anything to the contrary in this Plan, the Plan will be consummated in the manner set forth in the Acquisition Transactions Exhibit

### 5.11    *Separability.*

If the Bankruptcy Court does not confirm this Plan with respect to one or more Debtors, it may still confirm this Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

WEIL:\96767752\18\34225.0004

### 5.12    *Closing of Chapter 11 Cases.*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases; *provided*, as of the Effective Date, the Reorganized Debtors may submit separate orders to the Bankruptcy Court under certification of counsel closing certain individual Chapter 11 Cases and changing the caption of the Chapter 11 Cases accordingly; *provided further* that matters concerning Claims may be heard and adjudicated in one of the Debtors' chapter 11 cases that remains open regardless of whether the applicable Claim is against a Debtor in a chapter 11 case that is closed. Nothing in this Plan shall authorize the closing of any case *nunc pro tunc* to a date that precedes the date any such order is entered. Any request for *nunc pro tunc* relief shall be made on motion served on the United States Trustee, and the Bankruptcy Court shall rule on such request after notice and a hearing. Upon the filing of a motion to close the last Chapter 11 Case remaining open, the Reorganized Debtors shall file a final report with respect to all of the Chapter 11 Cases pursuant to Local Rule 3022-1(c).

### 5.13    *Determination of Tax Filings and Taxes.*

(a)    Prior to the dissolution of Catalina Parent, Catalina Parent shall designate Reorganized CMC as the agent (the "***Tax Agent***") for the Catalina Parent Group in accordance with Treasury Regulations Section 1.1502-77(c)(5), as amended and supplemented, and any comparable provision under state or local law, with respect to all taxable periods ending on or before, or including, the dissolution of Catalina Parent.

(b)    Catalina Parent shall forward to the Tax Agent copies of all notices and communications relating to tax matters that it receives and shall promptly provide to the Tax Agent any information and documents with respect to tax matters reasonably requested by the Tax Agent. Without limiting the foregoing, prior to the dissolution of Catalina Parent, a power of attorney authorizing the Tax Agent to correspond with any taxing authority on behalf of the Debtors and to sign, negotiate, settle and administer any Group Tax Returns (as defined below) or other tax filings shall be provided to the Tax Agent.

(c)    For all taxable periods ending on or prior to, or including, the Effective Date, the Tax Agent shall prepare and file (or cause to be prepared and filed) on behalf of the Catalina Parent Group, all group tax returns, reports, certificates, forms or similar statements or other documents (collectively, "***Group Tax Returns***") required to be filed or that the Tax Agent otherwise deems appropriate, including the filing of amended Group Tax Returns. If requested by the Tax Agent, Catalina Parent shall promptly execute and file, or cause to be executed and filed, any Group Tax Returns of the Catalina Parent Group submitted by the Tax Agent to Catalina Parent for execution or filing. Catalina Parent shall not file or amend any Group Tax Return for any taxable periods (or portions thereof) described in the first sentence of this clause (c) without the Tax Agent's prior written consent.

(d)    If Catalina Parent receives written notice from a taxing authority of any pending examination, claim, settlement, proposed adjustment or related matters with respect to taxes that could affect any other member of the Catalina Parent Group it shall so notify the

30

Tax Agent in writing within ten (10) business days thereafter. The Tax Agent shall have the sole right, at its expense, to control, conduct, compromise and settle any tax contest, audit or administrative or court proceeding relating to any liability for taxes of the Catalina Parent Group. With respect to any such proceeding and with respect to the preparation and filing of any Group Tax Returns, the Tax Agent may act in its own self-interest and in the of its subsidiaries and affiliates, without regard to any adverse consequences to Catalina Parent.

(e)    The Reorganized Debtors shall have the right to request an expedited determination of their tax liability, if any, under section 505(b) of the Bankruptcy Code with respect to any tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

### 5.14    *Notice of Effective Date.*

On the Effective Date, the Debtors shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

## ARTICLE VI.    DISTRIBUTIONS.

### 6.1    *Distributions Generally.*

The Disbursing Agent shall make all Plan Distributions to the appropriate holders of Allowed Claims and Allowed Interests in accordance with the terms of this Plan; *provided*, in each case, that the Debtors shall provide the applicable Disbursing Agent with written instructions for the allocation of any distributions among the applicable holders of Allowed Claims and Allowed Interests; *provided*, *further*, that any distributions with respect to the First Lien Credit Facility shall be made in accordance with the First Lien Credit Agreement, and any distributions with respect to the Second Lien Facility shall be made in accordance with the Second Lien Credit Agreement.

### 6.2    *Postpetition Interest on Claims.*

Except as otherwise set forth in this Plan, the Plan Documents, or the Confirmation Order, postpetition interest shall accrue, and shall be paid, on any Claims (except for First Lien Debt Claims, Second Lien Debt Claims or any other prepetition funded indebtedness borrowed or issued by a Debtor) in the ordinary course of business in accordance with any applicable law, agreement, document, or Final Order, as the case may be, as if the Chapter 11 Cases had never been commenced.

### 6.3    *Date of Distributions.*

Unless otherwise provided in this Plan, any distributions and deliveries to be made under this Plan shall be made on the Effective Date or as soon thereafter as is practicable.

### 6.4    *Distribution Record Date.*

(a)    As of the close of business on the Distribution Record Date, the various lists of holders of Claims in each Class, as maintained by the Debtors or their agents,

shall be deemed closed, and there shall be no further changes in the record holders of any Claims after the Distribution Record Date.  Neither the Debtors nor the Disbursing Agent shall have any obligation to recognize any transfer of a Claim occurring after the close of business on the Distribution Record Date.  In addition, with respect to payment of any Cure Amounts or disputes over any Cure Amounts, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.

(b)     Notwithstanding anything in this Plan to the contrary, in connection with any distribution under this Plan to be effected through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise), the Debtors and the Reorganized Debtors, as applicable, will be entitled to recognize and deal for all purposes under this Plan with holders of New Common Stock to the extent consistent with the customary practices of DTC used in connection with such distributions.  All New Common Stock to be distributed under this Plan shall be issued in the names of such holders or their nominees in accordance with DTC's book-entry exchange procedures; *provided*, that such New Common Stock is permitted to be held through DTC's book-entry system; and *provided*, *further*, that to the extent the New Common Stock is not eligible for distribution in accordance with DTC's customary practices, Reorganized Catalina Topco will take all such reasonable actions as may be required to cause the distributions of the New Common Stock under this Plan.  No distributions will be made other than through DTC if the New Common Stock is permitted to be held through DTC's book entry system.  Any distribution that otherwise would be made to any holder eligible to receive a distribution of a security available solely through DTC who does not own or hold an account eligible to receive a distribution through DTC on a relevant distribution date or reasonably promptly thereafter (and in any event no more than two weeks thereafter) shall be forfeited.

### 6.5    *Disbursing Agent.*

All distributions under this Plan shall be made by the Disbursing Agent on and after the Effective Date as provided herein.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.  The Reorganized Debtors shall use commercially reasonable efforts to provide the Disbursing Agent (if other than the Reorganized Debtors) with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtors' or Reorganized Debtors' books and records.  The Reorganized Debtors shall cooperate in good faith with the applicable Disbursing Agent (if other than the Reorganized Debtors) to comply with the reporting and withholding requirements outlined in Section 6.16 of the Plan.

### 6.6    *Delivery of Distributions.*

Subject to Section 6.4(b) of this Plan, the Disbursing Agent will issue or cause to be issued, the applicable consideration under this Plan and, subject to Bankruptcy Rule 9010, will make all distributions to any holder of an Allowed Claim as and when required by this Plan at:  (a) the address of such holder on the books and records of the Debtors or their agents; or (b) at the address in any written notice of address change delivered to the Debtors or the

Disbursing Agent, including any addresses included on any transfers of Claim filed pursuant to Bankruptcy Rule 3001.  In the event that any distribution to any holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the Disbursing Agent has been notified of the then-current address of such holder, at which time or as soon thereafter as reasonably practicable such distribution shall be made to such holder without interest.

### 6.7    *Unclaimed Property.*

One year from the later of:  (i) the Effective Date and (ii) the date that is ten (10) Business Days after the date a Claim is first Allowed, all distributions payable on account of such Claim shall be deemed unclaimed property under section 374(b) of the Bankruptcy Code and shall revert to Reorganized CMC or their successors or assigns, and all claims of any other Person (including the holder of a Claim in the same Class) to such distribution shall be discharged and forever barred.  The Reorganized Debtors and the Disbursing Agent shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

### 6.8    *Satisfaction of Claims.*

Unless otherwise provided herein, any distributions and deliveries to be made on account of Allowed Claims under this Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

### 6.9    *Manner of Payment under Plan.*

Except as specifically provided herein, at the option of the Debtors or the Reorganized Debtors, as applicable, any Cash payment to be made under this Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

### 6.10    *Fractional Shares and De Minimis Cash Distributions.*

No fractional shares of New Common Stock shall be distributed.  When any distribution would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the New Common Stock subject to such distribution shall be rounded to the next higher or lower whole number as follows:  (i) fractions equal to or greater than 1/2 shall be rounded to the next higher whole number, and (ii) fractions less than 1/2 shall be rounded to the next lower whole number.  The total number of shares of New Common Stock to be distributed on account of Allowed Claims will be adjusted as necessary to account for the rounding provided for herein.  No consideration will be provided in lieu of fractional shares that are rounded down.  Neither the Reorganized Debtors nor the Disbursing Agent shall have any obligation to make a distribution that is less than one (1) share of New Common Stock or $50.00 in Cash.  Fractional shares of New Common Stock that are not distributed in accordance with this Section shall be returned to, and ownership thereof shall vest in, Reorganized Catalina Topco.

WEIL:\96767752\18\34225.0004

**6.11** *No Distribution in Excess of Amount of Allowed Claim.*

Notwithstanding anything to the contrary in this Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, Plan Distributions in excess of the Allowed amount of such Claim (plus any postpetition interest on such Claim solely to the extent permitted by Section 6.2 hereof).

**6.12** *Allocation of Distributions between Principal and Interest.*

Except as otherwise provided in this Plan and subject to Section 6.2 of this Plan, to the extent that any Allowed First Lien Debt Claim or Any Allowed Second Lien Debt Claim entitled to a distribution under this Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated first to the principal amount (as determined for federal income tax purposes) of the Claim and then to accrued but unpaid interest.

**6.13** *Exemption from Securities Laws.*

(a)     The issuance of and the distribution under this Plan of the New Common Stock shall be exempt, without further act or actions by any entity, from registration under the Securities Act, and all rules and regulations promulgated thereunder, and any other applicable securities laws to the fullest extent permitted by section 1145 of the Bankruptcy Code. The New Common Stock may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to the New Common Stock, as that term is defined in section 1145(b) of the Bankruptcy Code.  In addition, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

(b)     Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the New Common Stock through the facilities of the DTC, the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Common Stock under applicable securities laws.

(c)     Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Stock is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.  The Confirmation Order shall provide that DTC shall be required to accept and conclusively rely upon the Plan or Confirmation Order in lieu of a legal opinion regarding whether the New Common Stock is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

**6.14** *Setoffs and Recoupments.*

Each Reorganized Debtor, or such entity's designee as instructed by such Reorganized Debtor, may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, offset or recoup against any Allowed Claim and the distributions to be made

34

pursuant to this Plan on account of such Allowed Claim any and all claims, rights, and Causes of Action that a Reorganized Debtor or its successors may hold against the holder of such Allowed Claim after the Effective Date to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Reorganized Debtor(s) and holder of the Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided*, that neither the failure to effect a setoff or recoupment nor the allowance of any Claim hereunder will constitute a waiver or release by a Reorganized Debtor or its successor of any claims, rights, or Causes of Action that a Reorganized Debtor or its successor or assign may possess against such holder.  For the avoidance of doubt, in no event shall the Debtors or Reorganized Debtors be authorized or permitted to offset or recoup against the First Lien Debt Claim, DIP Facility Claim, or Second Lien Debt Claim.

### 6.15    *Rights and Powers of Disbursing Agent.*

(a)    Powers of Disbursing Agent.  The Disbursing Agent shall be empowered to:  (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (ii) make all applicable distributions or payments provided for under this Plan; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers (A) as may be vested in the Disbursing Agent by order of the Bankruptcy Court (including any Final Order issued after the Effective Date) or pursuant to this Plan or (B) as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of this Plan.

(b)    Expenses Incurred on or After the Effective Date.  Except as otherwise ordered by the Bankruptcy Court and subject to the written agreement of the Reorganized Debtors, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including, without limitation, taxes) and any reasonable compensation and expense reimbursement Claims (including, without limitation, for reasonable attorneys' and other professional fees and expenses) made by the Disbursing Agent shall be indefeasibly paid in full in Cash by the Reorganized Debtors.

### 6.16    *Withholding and Reporting Requirements.*

In connection with this Plan and all instruments issued in connection therewith and distributed thereon, the Reorganized Debtors and any other distributing party shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all Plan Distributions under this Plan shall be subject to any such withholding or reporting requirements.  In the case of a non-Cash Plan Distribution that is subject to withholding, the distributing party may request a holder of an Allowed Claim to complete and return a Form W-9 or Form W-8BEN, W-8BEN-E or other appropriate Form W-8, as applicable to each such holder.  If such Form is requested and not submitted to the distributing party within thirty (30) days of the request, the distributing party may, in its discretion, either (i) withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax, or (ii) require the intended recipient of such distribution to provide the withholding agent with an amount of Cash sufficient to satisfy such withholding tax as a condition to receiving such distribution; provided that, if the applicable holder provides the appropriate Form prior to the distributing party selling such property

35

pursuant to clause (i) or the receipt of cash pursuant to clause (ii), such Form shall be deemed timely provided. If such Form is requested and submitted to the distributing party pursuant to the immediately preceding sentence, the distributing party may withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax; provided that, the distributing party shall first notify the intended recipient of such contemplated withholding (including the basis for such withholding) and sale, shall cooperate in good faith with the applicable holder to eliminate or reduce such withholding and, if after such good faith cooperation, the distributing parties still believes withholding is required, offer the intended recipient the opportunity to provide sufficient Cash to satisfy such withholding tax in lieu of such sale. The distributing party shall have the right, but not the obligation, not to make a Plan Distribution until its withholding obligation is satisfied pursuant to the preceding sentences. Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable recipient for all purposes of this Plan. The distributing party may require a holder of an Allowed Claim or Existing Equity Interest to complete and return a Form W-9 or Form W-8BEN, W-8BEN-E or other appropriate Form W-8, as applicable to each such holder.

Notwithstanding the above, each holder of an Allowed Claim that is to receive a Plan Distribution under this Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any governmental unit, including income, withholding, and other tax obligations, on account of such Plan Distribution.

In the event that any amounts are withheld from any Plan Distribution, as soon as practicable after payment of the taxes to the applicable governmental unit, the Reorganized Debtors shall deliver or cause to be delivered to the holder from which such amounts were withheld the original or a certified copy of a receipt issued by such governmental unit evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the applicable holder, and the Reorganized Debtors shall use commercially reasonably efforts to cooperate in the prosecution of any refund claim made by the applicable holder.

### 6.17    *Hart-Scott-Rodino Antitrust Improvements Act.*

Any New Common Stock to be distributed under this Plan to an entity required to file a notification and report form under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, shall not be distributed until the notification and waiting periods applicable under such Act to such entity have expired or been terminated.

### 6.18    *Claims Paid or Payable by Third Parties.*

(a)    **Claims Paid by Third Parties.** A Claim shall be correspondingly reduced, and the applicable portion of such Claim shall be disallowed without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives a payment on account of such Claim from a party that is not a Debtor or Reorganized Debtor; *provided* that the Debtors shall provide 21 days' notice to the holder prior to any disallowance of such Claim during which

WEIL:\96767752\18\34225.0004

period the holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court. Subject to the last sentence of this paragraph, to the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the Reorganized Debtors to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such holder to timely repay or return such distribution shall result in the holder owing the Reorganized Debtors annualized interest at the federal judgment rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

(b)    **Claims Payable by Insurance Carriers.** No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that the Debtors shall provide 21 days' notice to the holder of such Claim prior to any disallowance of such Claim during which period the holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court.

(c)    **Applicability of Insurance Policies.** Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Notwithstanding anything to the contrary herein, nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Person may hold against any other Person, including insurers, under any policies of insurance or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

# ARTICLE VII.    PROCEDURES FOR RESOLVING CLAIMS.

## 7.1    *Disputed Claims Process.*

Notwithstanding section 502(a) of the Bankruptcy Code, and except as otherwise set forth in this Plan, holders of Claims need not file proofs of Claim with the Bankruptcy Court, and the Reorganized Debtors and holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Chapter 11 Cases had not been commenced. For the avoidance of doubt, the Reorganized Debtors shall retain all rights, claims, defenses, counterclaims, crossclaims, or rights of setoff or recoupment with respect to any Claims, including General Unsecured Claims, in the ordinary course of business after the Effective Date. Notwithstanding any other provision of the Plan, the

WEIL:\96767752\18\34225.0004

fact that a Claim, including General Unsecured Claims, remains unaltered by the Plan shall in no way effect whether such Claim is Allowed. Unless otherwise ordered by the Bankruptcy Court, the holders of Claims shall not be subject to any claims resolution process in the Bankruptcy Court in connection with their Claims and shall retain all their rights under applicable non-bankruptcy law to pursue their Claims against the Debtors or Reorganized Debtors in any forum with jurisdiction over the parties. Except for (i) proofs of Claim asserting damages arising out of the rejection of an executory contract or unexpired lease by any of the Debtors pursuant to Section 8.3 of this Plan and (ii) proofs of Claim that have been objected to by the Debtors before the Effective Date, upon the Effective Date, any filed Claim, regardless of the time of filing, and including Claims filed after the Effective Date, shall be deemed withdrawn. To the extent not otherwise provided in this Plan, the deemed withdrawal of a proof of Claim is without prejudice to such claimant's rights under this Section 7.1 of this Plan to assert its Claims in any forum as though the Debtors' Chapter 11 Cases had not been commenced. From and after the Effective Date, the Reorganized Debtors may satisfy, dispute, settle, or otherwise compromise any Claim without approval of the Bankruptcy Court.

### 7.2    *Estimation of Claims.*

The Reorganized Debtors may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors had previously objected to or otherwise disputed such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim.

### 7.3    *Claim Resolution Procedures Cumulative.*

All of the objection, estimation, and resolution procedures in this Plan are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with this Plan by any mechanism approved by the Bankruptcy Court.

### 7.4    *No Distributions Pending Allowance.*

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under this Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

### 7.5    *Distributions after Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the

WEIL:\96767752\18\34225.0004

provisions of this Plan.  As soon as practicable after the date on which the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under this Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required by the Bankruptcy Code.

## ARTICLE VIII.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

### 8.1    *General Treatment.*

As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount, all executory contracts and unexpired leases shall be deemed assumed, unless such contract or lease (i) was previously assumed or rejected by the Debtors, pursuant to Final Order of the Bankruptcy Court, (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, or (iii) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date.  Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions or rejections provided for in this Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Each executory contract and unexpired lease assumed pursuant to this Plan shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of this Plan, any Final Order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

### 8.2    *Determination of Cure Disputes and Deemed Consent.*

Any monetary amounts by which any executory contract or unexpired lease to be assumed hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtors or Reorganized Debtors, as applicable, upon assumption thereof. Following the Petition Date, the Debtors shall have served a notice on parties to executory contracts and unexpired leases to be assumed reflecting the Debtors' intention to assume the contract or lease in connection with this Plan and setting forth the proposed Cure Amount (if any).  If a counterparty to any executory contract or unexpired lease that the Debtors or Reorganized Debtors intend to assume does not receive such a notice, the proposed Cure Amount for such executory contract or unexpired lease shall be deemed to be zero dollars ($0).

If there is a dispute regarding (a) any Cure Amount, (b) the ability of the Debtors to provide adequate assurance of future performance (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (c) any other matter pertaining to assumption, such dispute shall be heard by the Bankruptcy Court prior to such assumption being effective.  The Debtors reserve the right to reject any executory contract or unexpired lease not later than thirty (30) days after the entry of a Final Order resolving any such dispute.  Any counterparty to an executory contract or unexpired lease that fails to object timely to the notice of the proposed assumption and assignment of such executory contract or unexpired lease on which such executory contract or unexpired lease first appears or any subsequent notice in which the proposed Cure Amount for such executory contract or unexpired lease is reduced or the relevant Cure Amount within fourteen (14) days of the filing thereof, shall be deemed to have

assented to such assumption and/or Cure Amount and shall be forever barred, estopped, and enjoined from challenging the validity of such assumption or the amount of such Cure Amount thereafter.

### 8.3    *Rejection Damages Claims.*

Any counterparty to a contract or lease that is rejected by the Debtors must file and serve a proof of claim on the applicable Debtor that is party to the contract or lease to be rejected no later than thirty (30) days after the later of (a) the Confirmation Date or (b) the effective date of rejection of such executory contract or unexpired lease.

### 8.4    *Survival of the Debtors' Indemnification Obligations.*

Any obligations of the Debtors pursuant to their corporate charters, by-laws, limited liability company agreements, memorandum and articles of association, or other organizational documents to indemnify current and former officers, directors, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such officers, directors, agents, or employees based upon any act or omission for or on behalf of the Debtors shall not be discharged, impaired, or otherwise affected by this Plan; *provided*, that the Reorganized Debtors shall not indemnify directors of the Debtors for any claims or Causes of Action arising out of or relating to any act or omission that is a criminal act or constitutes gross negligence or intentional fraud. All such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors under this Plan and shall continue as obligations of the Reorganized Debtors. Any claim based on the Debtors' obligations herein shall not be a Disputed Claim or subject to any objection, in either case, by reason of section 502(e)(1)(B) of the Bankruptcy Code.

### 8.5    *Compensation and Benefit Plans.*

All employment and severance policies, and all compensation and benefits plans, policies, and programs of the Debtors applicable to their respective employees, retirees, and non-employee directors, including, without limitation, all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life and accidental death and dismemberment insurance plans, are deemed to be, and shall be treated as, executory contracts under this Plan and, on the Effective Date, will be assumed pursuant to sections 365 and 1123 of the Bankruptcy Code.

### 8.6    *Insurance Policies.*

All insurance policies to which any Debtor is a party as of the Effective Date shall be deemed to be and treated as executory contracts and shall be assumed by the applicable Debtor or Reorganized Debtor and shall continue in full force and effect thereafter in accordance with their respective terms. All other insurance policies shall vest in the Reorganized Debtors.

### 8.7    *Intellectual Property Licenses and Agreements.*

All intellectual property contracts, licenses, royalties, or other similar agreements to which the Debtors have any rights or obligations in effect as of the date of the Confirmation

Order shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the respective Debtors and shall continue in full force and effect unless any such intellectual property contract, license, royalty, or other similar agreement otherwise is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Debtors (with the consent of the Required Restructuring Support Parties) in accordance with Section 8.1 of the Plan. Unless otherwise noted hereunder, all other intellectual property contracts, licenses, royalties, or other similar agreements shall vest in the Reorganized Debtors and the Reorganized Debtors may take all actions as may be necessary or appropriate to ensure such vesting as contemplated herein.

**8.8** _Modifications, Amendments, Supplements, Restatements, or Other Agreements._

Unless otherwise provided herein or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is listed in any notice of assumed contracts.

**8.9** _Reservation of Rights._

(a)  Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Supplement, nor anything contained in this Plan, will constitute an admission by the Debtors that any such contract or lease is or is not an executory contract or unexpired lease or that the Debtors or the Reorganized Debtors or their respective affiliates has any liability thereunder.

(b)  Except as explicitly provided in this Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors or the Reorganized Debtors under any executory or non-executory contract or unexpired or expired lease.

(c)  Nothing in this Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors, as applicable, under any executory or non-executory contract or unexpired or expired lease.

(d)  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under this Plan, the Debtors or Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

41

## ARTICLE IX.     CONDITIONS PRECEDENT

### 9.1    *Conditions Precedent to Confirmation of the Plan.*

The following are conditions precedent to confirmation of the Plan:

(a)     an order finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code shall have been entered by the Court (which, for the avoidance of doubt, may be the same order as the order confirming the Plan);

(b)     the Plan, the Plan Supplement (including the applicable Plan Documents), and any and all of the schedules, documents, and exhibits contained therein shall have been filed and shall be consistent in all material respects with this Plan and the Restructuring Support Agreement;

(c)     the Restructuring Support Agreement shall not have been terminated and shall be in full force and effect; and

(d)     any Restructuring Expenses due and payable in accordance with their terms on or before the relevant date shall have been paid in full and in Cash.

### 9.2    *Conditions Precedent to the Effective Date.*

The Effective Date shall not occur unless all of the following conditions precedent have been satisfied:

(a)     the Plan Supplement, including the applicable Plan Documents, has been filed;

(b)     the Plan Documents contain terms and conditions consistent in all material respects with this Plan and the Restructuring Support Agreement;

(c)     the Bankruptcy Court has entered the Confirmation Order in form and substance reasonably satisfactory to the Debtors and the Required Restructuring Support Parties and such Confirmation Order has not been stayed, modified, or vacated;

(d)     the Restructuring Support Agreement has not been terminated and remains in full force and effect and binding on all parties thereto;

(e)     the Debtors shall not be in default under the DIP Facility or any of the DIP Facility Orders (or, to the extent that the Debtors are in default on the proposed Effective Date, such default shall have been waived by the required DIP Facility Lenders or cured by the Debtors in a manner consistent with the DIP Facility Loan Agreement or the applicable DIP Facility Orders);

42

(f)        each of the Definitive Documents shall have satisfied the consent requirements of the applicable Restructuring Support Parties in accordance with the Restructuring Support Agreement;

(g)        all conditions precedent to the issuance of the New Common Stock, other than any conditions related to the occurrence of the Effective Date, shall have occurred;

(h)        all unpaid Restructuring Expenses and all amounts payable by the Debtors pursuant to the DIP Facility Orders and Restructuring Support Agreement (including the A&R Exit Facility Backstop Payment and the A&R Exit Facility Commitment Payment) shall have been paid in Cash;

(i)        the NCS Agreement is amended on terms or rejected pursuant to an order providing relief, in each case, consistent with the Restructuring Support Agreement;

(j)        the conditions to effectiveness of the Amended and Restated First Lien Credit Agreement have been satisfied or waived in accordance with the terms thereof, and the Amended and Restated First Lien Credit Agreement is in full force and effect and binding on all parties thereto;

(k)        all governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions provided for in this Plan have been obtained, are not subject to unfulfilled conditions, and are in full force and effect, and all applicable waiting periods have expired without any action having been taken by any competent authority that restrains, prevents, or enjoins the Restructuring Transactions; and

(l)        the Amended Certificate of Incorporation of Reorganized Catalina Topco has been filed with the appropriate governmental authority.

### 9.3    *Waiver of Conditions Precedent.*

(a)        Each of the conditions precedent  set forth in Sections 9.1 and 9.2 to the occurrence of the Effective Date may be waived in writing by the Debtors and the Required Restructuring Support Parties; *provided that* the conditions precedent to the occurrence of the Effective Date in Sections 9.2(i) and (j) of the Plan may be waived by the Debtors and the Ad Hoc First Lien Group.  If any such condition precedent is waived pursuant to this Section and the Effective Date occurs, each party agreeing to waive such condition precedent shall be estopped from withdrawing such waiver after the Effective Date or otherwise challenging the occurrence of the Effective Date on the basis that such condition was not satisfied, the waiver of such condition precedent shall benefit from the "equitable mootness" doctrine, and the occurrence of the Effective Date shall foreclose any ability to challenge this Plan in any court.  If this Plan is confirmed for fewer than all of the Debtors as provided for in Section 5.11 of this Plan, only the conditions applicable to the Debtor or Debtors for which this Plan is confirmed must be satisfied or waived for the Effective Date to occur.

WEIL:\96767752\18\34225.0004

(b)    The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

### 9.4    *Effect of Failure of a Condition.*

If the conditions listed in Section 9.2 hereof are not satisfied or waived in accordance with Section 9.3 hereof on or before the first Business Day that is more than seventy-five (75) days after the date on which the Confirmation Order is entered or by such later date reasonably acceptable to the Required Restructuring Support Parties and as set forth by the Debtors in a notice filed with the Bankruptcy Court prior to the expiration of such period, this Plan shall be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims by or against or any Interests in the Debtors, (b) prejudice in any manner the rights of any Person, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtors, any of the other Restructuring Support Parties, or any other Person.

## ARTICLE X.    EFFECT OF CONFIRMATION.

### 10.1    *Binding Effect.*

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of this Plan shall bind every holder of a Claim against or Interest in any Debtor and inure to the benefit of and be binding on such holder's respective successors and assigns, regardless of whether the Claim or Interest of such holder is Impaired under this Plan and whether such holder has accepted this Plan.

### 10.2    *Vesting of Assets.*

Except as otherwise provided in this Plan, or any Plan Document, on and after the Effective Date, all Assets of the Estates, including all claims, rights, and Causes of Action and any property acquired by the Debtors under or in connection with this Plan, shall vest in each respective Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances, and Interests.  Subject to the terms of this Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Expense Claims) and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by this Plan or the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for Professional Persons' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

### 10.3    *Discharge of Claims against and Interests in the Debtors.*

Effective as of the Effective Date: (a) the rights afforded in this Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction,

discharge, and release of all Claims and Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors, the Debtors' Estates, or the Reorganized Debtors; (b) this Plan shall bind all holders of Claims and Interests, notwithstanding whether any such holders failed to vote to accept or reject this Plan or voted to reject this Plan; (c) all Claims and Interests shall be satisfied, discharged, and released in full, and the liability of the Debtors and the Reorganized Debtors with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all entities shall be precluded from asserting against the Debtors, the Debtors' Estates, or the Reorganized Debtors, any other Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

### 10.4    *Pre-Confirmation Injunctions and Stays.*

Unless otherwise provided in this Plan, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the date of entry of the Confirmation Order, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### 10.5    *Injunction against Interference with Plan.*

Upon the entry of the Confirmation Order, all holders of Claims and Interests and all other parties in interest, along with their respective present and former affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or the occurrence of the Effective Date.

### 10.6    *Plan Injunction.*

(a)    Except as otherwise provided in this Plan, in the Plan Documents, or in the Confirmation Order, as of the entry of the Confirmation Order but subject to the occurrence of the Effective Date, all Persons who have held, hold, or may hold Claims or Interests are, with respect to any such Claim or Interest, permanently enjoined after the entry of the Confirmation Order from: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, a Debtor, a Reorganized Debtor, or an Estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against a Debtor, a Reorganized Debtor, or an Estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (ii) or any property of any such transferee or successor; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor, a Reorganized Debtor, or an Estate or any of its property, or any direct or

indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this subsection (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Plan, and the Plan Documents, to the full extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of this Plan and the Plan Documents; *provided*, that nothing contained herein shall preclude such Persons who have held, hold, or may hold Claims against, or Interests in, a Debtor, a Reorganized Debtor, or an Estate from exercising their rights and remedies, or obtaining benefits, pursuant to and consistent with the terms of this Plan and the Plan Documents.

(b)     By accepting distributions pursuant to this Plan, each holder of an Allowed Claim or Interest will be deemed to have affirmatively and specifically consented to be bound by this Plan, including, without limitation, the injunctions set forth in this Section.

**10.7**     ***Releases.***

(a)     Releases by the Debtors.  As of the Effective Date, except for the rights and remedies that remain in effect from and after the Effective Date to enforce this Plan and the Plan Documents, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service and contributions of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the Restructuring, the Released Parties are deemed forever released and discharged by the Debtors, the Reorganized Debtors, and the Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives and any and all other entities that may purport to assert any Cause of Action derivatively, by or through the foregoing entities, from any and all claims, interests, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, remedies, or liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between any Debtor and any Released Party, the Restructuring, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Restructuring Transactions, the DIP Facility, the Amended and Restated First Lien Credit Facility, the negotiation, formulation, or preparation of the Disclosure Statement, the Restructuring Support Agreement and any exhibits or documents relating thereto, and this Plan and related agreements, instruments, and other documents (including the Plan Documents), the solicitation of votes with respect to this Plan, any other act or omission, transaction, agreement, event, or other occurrence, or any other relief obtained by the Debtors in the Chapter 11 Case, other than Claims or Causes of Action arising out of or related to any act or omission of a Released Party that is a criminal act or constitutes intentional fraud.

46

(b)       Releases by Holders of Claims and Interests.  As of the Effective Date, except for the rights and remedies that remain in effect from and after the Effective Date to enforce this Plan and the Plan Documents, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of and contribution of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the Restructuring, the Released Parties are deemed forever released and discharged by the (i) the holders of all Claims and Interests who vote to accept this Plan, (ii) holders of Claims or Interests that are Unimpaired under this Plan, where the applicable Claims or Interests have been fully paid or otherwise satisfied in accordance with this Plan, (iii)  holders of Claims or Interests whose vote to accept or reject this Plan was solicited but who did not vote either to accept or to reject this Plan, (iv) holders of Claims or Interests who voted to reject this Plan but did not opt out of granting the releases set forth herein, (v) the Restructuring Support Parties, (vi) the First Lien Agent, (vii) the Second Lien Agent, (viii) the DIP Facility Agent, and (ix) the DIP Facility Lenders, from any and all claims, interests, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such holders or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between any Debtor and any Released Party, the Restructuring, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Restructuring Transactions, the DIP Facility, the Amended and Restated First Lien Credit Facility, the negotiation, formulation, or preparation of the Disclosure Statement, the Restructuring Support Agreement and any exhibits or documents relating thereto, this Plan and related agreements, instruments, and other documents (including the Plan Documents), the solicitation of votes with respect to this Plan, any other act or omission, or any other relief obtained by the Debtors in the Chapter 11 Case, other than Claims or Causes of Action arising out of or related to any act or omission of a Released Party that is a criminal act or constitutes intentional fraud, gross negligence, or willful misconduct; *provided*, that solely for purposes of this section 10.7(b), the Berkshire Funds shall be excluded from the definition of Released Party if they have not executed the Restructuring Support Agreement on or before the deadline established in the Plan for filing the Plan Supplement and become a Consenting Sponsor.

## 10.8     *Exculpation.*

To the extent permitted by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Claim, Interest, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, loss, remedy, or liability for any claim in connection with or arising out of the administration of the Chapter 11 Cases; the negotiation and pursuit of the DIP Facility, the Amended and Restated First Lien Credit Facility, the Management Incentive Plan, the Disclosure Statement, the Restructuring Support Agreement, the Restructuring Transactions, and this Plan (including the Plan Documents), or the solicitation of votes for, or confirmation of, this Plan; the funding of this

WEIL:\96767752\18\34225.0004

Plan; the occurrence of the Effective Date; the administration of this Plan or the property to be distributed under this Plan; the issuance of Securities under or in connection with this Plan; or the transactions in furtherance of any of the foregoing; except for intentional fraud, gross negligence, or willful misconduct, but in all respects such entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan. The Exculpated Parties and each of their respective affiliates, agents, directors, officers, employees, advisors, and attorneys have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of Securities pursuant to this Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan, including the issuance of Securities thereunder. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.

### 10.9    *Injunction Related to Releases and Exculpation.*

From and after the Effective Date, all entities are permanently enjoined from commencing or continuing in any manner, any suit, action, or other proceeding, on account of or respecting any Claim, demand, liability, obligation, debt, right, Cause of Action, Interest, or remedy released or to be released pursuant to this Plan or the Confirmation Order.

### 10.10    *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments thereof under this Plan take into account and conform to the relative priority and rights of the Claims and Interest in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto (including, the Intercreditor Agreement), whether arising under general principles of equitable subordination, sections 510(a), 510(b), or 510(c) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### 10.11    *Retention of Causes of Action and Reservation of Rights.*

Except as otherwise provided herein, including, without limitation, Sections 10.5, 10.6, 10.7, 10.8 and 10.9 nothing contained in this Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, but not limited to, rights, claims, Causes of Action, rights of setoff, offset, recoupment or other legal or equitable defenses against any holder of Existing Equity Interests that arise on account of such holders' objection to, or support of, and objection to this Plan. The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses, including any actions specifically enumerated in the Plan Supplement, as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors'

legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

### 10.12   *Ipso Facto and Similar Provisions Ineffective.*

Except as otherwise agreed by the Required Restructuring Support Parties, any term of any prepetition policy, prepetition contract, or other prepetition obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtor as a result of, or gives rise to a right of any entity based on any of the following: (a) the insolvency or financial condition of a Debtor or (b) the commencement of the Chapter 11 Cases.

### 10.13   *Reimbursement or Contribution.*

Subject to Section 10.15 of the Plan, if the Bankruptcy Court disallows a Claim for reimbursement or contribution of a Person pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (a) such Claim has been adjudicated as noncontingent, or (b) the relevant holder of a Claim has filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

### 10.14   *Recoupment.*

In no event shall any holder of a Claim be entitled to recoup such Claim against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

### 10.15   *Indemnification.*

For purposes of this Plan, (a) the obligations of the Debtors to indemnify and reimburse their directors or officers that were directors or officers, respectively, on or subsequent to the Petition Date shall be assumed by the Reorganized Debtors and (b) indemnification obligations of the Debtors arising from services as officers and directors during the period from and after the Petition Date shall be Administrative Expense Claims.  In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect as of the Petition Date, and all members, managers, directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date will be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date.

## ARTICLE XI.    RETENTION OF JURISDICTION.

### 11.1    *Retention of Jurisdiction.*

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in or related to the Chapter 11 Cases for, among other things, the following purposes:

(a)      to hear and determine applications for the assumption or rejection of executory contracts or unexpired leases and any disputes over Cure Amounts resulting therefrom;

(b)      to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the entry of the Confirmation Order;

(c)      to hear and resolve any disputes arising from or related to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004 or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(d)      to ensure that distributions to holders of Allowed Claims are accomplished as provided in this Plan and the Confirmation Order;

(e)      to consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expense Claim;

(f)      to enter, implement, or enforce such orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(g)      to issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person or other entity with the consummation, implementation, or enforcement of this Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(h)      to hear and determine any application to modify this Plan in accordance with section 1127 of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistency in this Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)      to hear and determine all Fee Claims;

(j)      to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

50

(k)　　to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan, the Confirmation Order, any transactions or payments in furtherance of either, or any agreement, instrument, or other document governing or related to any of the foregoing;

(l)　　to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the Effective Date, as may be necessary to construe, enforce, implement, execute, and consummate this Plan, including any release, exculpation, or injunction provisions set forth in this Plan, or to maintain the integrity of this Plan following the occurrence of the Effective Date;

(m)　　to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)　　to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(o)　　to hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

(p)　　to resolve any disputes concerning whether a Person or entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose for determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(q)　　to recover all Assets of the Debtors and property of the Estates, wherever located; and

(r)　　to enter a final decree closing each of the Chapter 11 Cases; *provided* that, on and after the Effective Date and after the consummation of the following agreements or documents, the Bankruptcy Court shall not retain jurisdiction over matters arising out of or related to each of the A&R Exit Facility, the Amended and Restated First Lien Credit Agreement, Amended By-Laws, and Amended Certificate of Incorporation and the A&R Exit Facility, the Amended and Restated First Lien Credit Agreement, Amended By-Laws, Amended Certificate of Incorporation, and New Stockholders' Agreement shall be governed by the respective jurisdictional provisions therein.

## ARTICLE XII.　　MISCELLANEOUS PROVISIONS.

### 12.1　　*Exemption from Certain Transfer Taxes.*

Pursuant to section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any Lien, mortgage, deed of trust or other security interest, (c) all sale transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Effective Date, including any transfers effectuated under this Plan, (d) any assumption, assignment, or sale by the Debtors of their interests in unexpired leases of nonresidential real

51

property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, (e) the grant of collateral under the Amended and Restated First Lien Credit Agreement, and (f) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including, without limitation, the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

### 12.2    _Dates of Actions to Implement This Plan._

In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day but shall be deemed to have been completed as of the required date.

### 12.3    _Amendments._

(a)    Plan Modifications.  This Plan may be amended, modified, or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to this Plan, the Debtors, with the consent of the Required Restructuring Support Parties, may remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes of effects of this Plan, and any holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan as amended, modified, or supplemented.

(b)    Certain Technical Amendments.  Consistent with the Restructuring Support Agreement and the consent rights granted thereunder, prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to this Plan without further order or approval of the Bankruptcy Court; _provided_, that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Interests under this Plan.

### 12.4    _Revocation or Withdrawal of Plan._

The Debtors reserve the right to revoke or withdraw this Plan prior to the Effective Date as to any or all of the Debtors.  If, with respect to a Debtor, this Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the

Effective Date as to such Debtor does not occur on the Effective Date, then, with respect to such Debtor: (a) this Plan shall be null and void in all respects; (b) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases affected by this Plan, and any document or agreement executed pursuant to this Plan shall be deemed null and void; and (c) nothing contained in this Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, such Debtor or any other Person; (ii) prejudice in any manner the rights of such Debtor or any other Person; or (iii) constitute an admission of any sort by any Debtor or any other Person.  For the avoidance of doubt, this Section 12.4 shall not impact or abridge any of the rights of the Restructuring Support Parties pursuant to or set forth in the Restructuring Support Agreement.

### 12.5    *Non-Severability.*

Subject to Section 5.11 of this Plan, if, prior to the entry of the Confirmation Order, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation by the Bankruptcy Court, the remainder of the terms and provisions of this Plan shall remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with this Section, is: (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Reorganized Debtors (as the case may be), and (c) nonseverable and mutually dependent.

### 12.6    *Governing Law.*

Except to the extent that the Bankruptcy Code or other federal law is applicable or to the extent that a Plan Document provides otherwise, the rights, duties, and obligations arising under this Plan and the Plan Documents shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflicts of laws thereof (other than section 5-1401 and section 5-1402 of the New York General Obligations Law); *provided, however*, that corporate or limited liability company governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor or Reorganized Debtor.

### 12.7    *Substantial Consummation of the Plan.*

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

WEIL:\96767752\18\34225.0004

### 12.8 *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of this Plan and the Plan Documents shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, the holders of Claims and Interests, the Released Parties, and each of their respective successors and assigns.

### 12.9 *Successors and Assigns.*

The rights, benefits, and obligations of any entity named or referred to in this Plan shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each such entity.

### 12.10 *Entire Agreement.*

On the Effective Date, this Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

### 12.11 *Computing Time.*

In computing any period of time prescribed or allowed by this Plan, unless otherwise set forth in this Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 12.12 *Exhibits to Plan.*

All exhibits, schedules, supplements, and appendices to this Plan (including the Plan Supplement) are incorporated into and are a part of this Plan as if set forth in full herein.

### 12.13 *Deemed Acts.*

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

### 12.14 *Notices.*

All notices, requests, and demands to or upon the Debtors or Reorganized Debtors, as applicable, shall be in writing (including by facsimile transmission) and, unless otherwise provided herein, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

Catalina Marketing Corporation
200 Carillon Pkwy
St. Petersburg, FL 33716
Telephone: (877) 210-1917
Attn: David Glogoff, Esq.

– and –

Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Attn: Mark D. Collins, Esq. and Jason M. Madron, Esq.
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

*Attorneys for the Debtors*

– and –

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Attn: Gary T. Holtzer, Esq. and Ronit J. Berkovich, Esq.
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for the Debtors*

Any pleading, notice or other document required by this Plan to be served on or delivered shall be served by first class or overnight mail:

If to the First Lien Ad Hoc Group:

Jones Day LLP
250 Vesey Street
New York, New York 10281
Attn: Scott Greenberg
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
E-mail: sgreenberg@jonesday.com

55

If to the Second Lien Ad Hoc Group:

> Paul, Weiss, Rifkind, Wharton & Garrison LLP
> 1285 Avenue of the Americas
> New York, NY 10019-6064
> Attention: Brian S. Hermann, Robert A. Britton, and Dan Youngblut
> Telephone: (212) 373-3000
> Fax: (212) 492-0545
> E-mail:bhermann@paulweiss.com
>         rbritton@paulweiss.com
>         dyoungblut@paulweiss.com

After the occurrence of the Effective Date, the Reorganized Debtors have authority to send a notice to entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002; *provided*, that the U.S. Trustee need not file such a renewed request and shall continue to receive documents without any further action being necessary. After the occurrence of the Effective Date, the Reorganized Debtors are authorized to limit the list of entities receiving documents pursuant to Bankruptcy Rule 2002 to the U.S. Trustee and those entities that have filed such renewed requests.

*[The remainder of this page has been intentionally left blank.]*

56

**12.15** *Reservation of Rights.*

Except as otherwise provided herein, this Plan shall be of no force or effect unless the Bankruptcy Court enters the Confirmation Order. None of the filing of this Plan, any statement or provision of this Plan, or the taking of any action by the Debtors with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to any Claims or Interests prior to the Effective Date.

Dated: December 11, 2018

**CATALINA PARTIES**

**CHECKOUT HOLDING CORP.**

By: _____
Name: Shelly Schatter
Title: CFO

**PDM GROUP HOLDINGS CORPORATION**
**CATALINA MARKETING CORPORATION**
**CATALINA MARKETING PROCUREMENT**
**CATALINA MARKETING TECHNOLOGY SOLUTIONS, INC.**
**CATALINA MARKETING WORLDWIDE, LLC**
**CELLFIRE INC.**
**MODIV MEDIA, INC.**
**PDM HOLDINGS CORPORATION**
**PDM INTERMEDIATE HOLDINGS A CORPORATION**
**PDM INTERMEDIATE HOLDINGS B CORPORATION**

By: _____
Name: Shelly Schatter
Title: CFO

57