## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

----------------------------------------------------------- X

|  |  |  |
|---|---|---|
| In re | : | **Chapter 11** |
|  | : |  |
| **CHECKOUT HOLDING CORP., et al.,** | : | **Case No. 18-[_____] (___)** |
|  | : |  |
| Debtors.[1] | : | **(Joint Administration Pending)** |
|  | : |  |

----------------------------------------------------------- X

## DISCLOSURE STATEMENT FOR JOINT PREPACKAGED
## CHAPTER 11 PLAN OF CHECKOUT HOLDING CORP. AND ITS AFFILIATED DEBTORS

WEIL, GOTSHAL & MANGES LLP
Gary T. Holtzer
Ronit J. Berkovich
Jessica Liou
Kevin Bostel
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Debtors and
Debtors in Possession*

RICHARDS, LAYTON & FINGER,
P.A.
Mark D. Collins (No. 2981)
Jason M. Madron (No. 4431)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

*Attorneys for Debtors and
Debtors in Possession*

Dated: December 11, 2018
Wilmington, Delaware

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Catalina Marketing Corporation (9007); Catalina Marketing Procurement, LLC (9333); Catalina Marketing Technology Solutions, Inc. (8728); Catalina Marketing Worldwide, LLC (9687); Cellfire Inc. (5599); Checkout Holding Corp. (4651); Modiv Media, Inc. (3507); PDM Group Holdings Corporation (9148); PDM Holdings Corporation (5025); PDM Intermediate Holdings A Corporation (6409); and PDM Intermediate Holdings B Corporation (3278). The Debtors' principal offices are located at 200 Carillon Parkway, St. Petersburg, FL 33716.

THIS SOLICITATION OF VOTES (THE "SOLICITATION") IS BEING CONDUCTED TO OBTAIN SUFFICIENT VOTES TO ACCEPT THE PLAN BEFORE THE FILING OF VOLUNTARY REORGANIZATION CASES UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE (THE "BANKRUPTCY CODE"). BECAUSE THE CHAPTER 11 CASES HAVE NOT YET BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE. FOLLOWING THE COMMENCEMENT OF THE CHAPTER 11 CASES, THE DEBTORS EXPECT TO PROMPTLY SEEK ORDERS OF THE BANKRUPTCY COURT (I) APPROVING THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION, (II) APPROVING THE SOLICITATION OF VOTES AS BEING IN COMPLIANCE WITH SECTIONS 1125 AND 1126(b) OF THE BANKRUPTCY CODE, AND (III) CONFIRMING THE PLAN.

## DISCLOSURE STATEMENT, DATED DECEMBER 11, 2018

Solicitation of Votes
on the Plan of Reorganization of

### CHECKOUT HOLDING CORP., *ET AL.*

from the holders of outstanding

### FIRST LIEN DEBT CLAIMS
### SECOND LIEN DEBT CLAIMS

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M. (PREVAILING EASTERN TIME) ON JANUARY 23, 2019, UNLESS EXTENDED BY THE DEBTORS. THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS MAY VOTE ON THE PLAN IS DECEMBER 10, 2018 (THE "RECORD DATE").

---

**RECOMMENDATION BY THE DEBTORS**

The Board of Directors of Checkout Holding Corp. and the board of directors, managers, members, or partners, as applicable, of each of its affiliated Debtors (as of the date hereof) have unanimously approved the transactions contemplated by the Solicitation and the Plan and recommend that all creditors whose votes are being solicited submit ballots to accept the Plan. Holders of over 66.67% in outstanding principal amount of the First Lien Debt Claims (as defined herein) entitled to vote on the Plan (the "**Consenting First Lien Lenders**"), and holders of over 66.67% in outstanding principal amount of the Second Lien Debt Claims (as defined herein) entitled to vote on the Plan (the "**Consenting Second Lien Lenders**") have already agreed, subject to the terms and conditions of the Restructuring Support Agreement, to vote in favor of the Plan.

---

**HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISERS BEFORE CASTING A VOTE WITH RESPECT TO THE PLAN.**

**THE ISSUANCE OF AND THE DISTRIBUTION UNDER THE PLAN OF THE NEW COMMON STOCK WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "*SECURITIES ACT*") AND ANY OTHER APPLICABLE SECURITIES LAWS PURSUANT TO SECTION 1145 OF THE BANKRUPTCY CODE. THESE SECURITIES MAY BE RESOLD WITHOUT REGISTRATION UNDER THE SECURITIES ACT OR OTHER FEDERAL SECURITIES LAWS PURSUANT TO THE EXEMPTION PROVIDED BY SECTION 4(A)(1) OF THE SECURITIES ACT, UNLESS THE HOLDER IS AN "UNDERWRITER" WITH RESPECT TO SUCH SECURITIES, AS THAT TERM IS DEFINED IN SECTION 1145(b) OF THE BANKRUPTCY CODE. IN ADDITION, SUCH SECTION 1145 EXEMPT SECURITIES GENERALLY MAY BE RESOLD WITHOUT REGISTRATION UNDER STATE SECURITIES LAWS PURSUANT TO VARIOUS EXEMPTIONS PROVIDED BY THE RESPECTIVE LAWS OF THE SEVERAL STATES.**

**THE NEW COMMON STOCK AND THE SUBSCRIPTION RIGHTS HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "*SEC*") OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY SUCH AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

**CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE, PROJECTED FINANCIAL INFORMATION, AND OTHER FORWARD-LOOKING STATEMENTS,**

ARE BASED ON ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

FURTHER, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE, BUT ARE SUBJECT TO A WIDE RANGE OF RISKS IDENTIFIED IN THIS DISCLOSURE STATEMENT. DUE TO THESE UNCERTAINTIES, READERS CANNOT BE ASSURED THAT ANY FORWARD-LOOKING STATEMENTS WILL PROVE TO BE CORRECT. THE DEBTORS ARE UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIM ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.

HOLDERS OF ALLOWED GENERAL UNSECURED CLAIMS (OTHER THAN NCS REJECTION CLAIMS AND GENERAL UNSECURED PDM CLAIMS) WILL NOT BE IMPAIRED BY THE PLAN AND, AS A RESULT, THE RIGHT TO RECEIVE PAYMENT IN FULL ON ACCOUNT OF EXISTING OBLIGATIONS IN RESPECT OF SUCH CLAIMS IS NOT ALTERED BY THE PLAN. DURING THE CHAPTER 11 CASES, THE DEBTORS INTEND TO OPERATE THEIR BUSINESSES IN THE ORDINARY COURSE AND WILL SEEK AUTHORIZATION FROM THE BANKRUPTCY COURT TO MAKE PAYMENT IN FULL ON A TIMELY BASIS TO TRADE CREDITORS, CUSTOMERS, AND EMPLOYEES OF AMOUNTS DUE PRIOR TO AND DURING THE CHAPTER 11 CASES.

THE PLAN PROVIDES THAT HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE WHO DO NOT SUBMIT A BALLOT VOTING TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO ACCEPT THE PLAN, OR WHO VOTE TO REJECT THE PLAN BUT DO NOT OPT OUT OF THE RELEASE PROVISIONS OF THE PLAN ARE DEEMED TO HAVE GRANTED THE RELEASES THEREIN.

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE FINANCIAL PROJECTIONS OR THE LIQUIDATION ANALYSIS HEREIN.

THE DEBTORS HAVE NOT AUTHORIZED ANY PERSON TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, IN CONNECTION WITH THE PLAN OR THIS DISCLOSURE STATEMENT.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. THE TERMS OF THE

**PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT.**

**THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN OR OBJECTING TO CONFIRMATION. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.  ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.**

# TABLE OF CONTENTS

I.      INTRODUCTION ....................................................................................................1

    A.      Background and Overview of Plan ...............................................................1

    B.      Summary of Plan Classification and Treatment of Claims.............................3

    C.      Inquiries ....................................................................................................6

II.     OVERVIEW OF THE DEBTORS' OPERATIONS ...................................................7

    A.      The Debtors' Corporate Structure................................................................7

    B.      The Debtors' Current Business Operations ...................................................7

    C.      Directors and Officers...............................................................................10

    D.      Debtors' Capital Structure .........................................................................10

III.    Events Leading to Commencement of the Chapter 11 Cases ...........................................12

    A.      Industrywide Shift to Digital .....................................................................13

    B.      Shrinking Retailer Footprint .....................................................................13

    C.      Aging Infrastructure Has Bottlenecked Growth ..........................................14

    D.      Prepetition Restructuring Efforts ...............................................................14

    E.      Forbearance..............................................................................................15

    F.      Interest Payment Under the First Lien Credit Agreement and the Second Lien Credit Agreement ...............................................................................15

    G.      Restructuring Support Agreement ..............................................................15

IV.     ANTICIPATED EVENTS DURING THE CHAPTER 11 CASES.................................16

    A.      Commencement of Chapter 11 Cases .........................................................17

    B.      First Day Motions .....................................................................................17

    C.      Procedural Motions...................................................................................18

    D.      Debtor-in-Possession Financing .................................................................18

    E.      Confirmation Hearing ...............................................................................18

    F.      Timetable for the Chapter 11 Cases ...........................................................19

V.      SUMMARY OF THE PLAN .................................................................................19

    A.      General.....................................................................................................19

    B.      Administrative Expense Claims, Fee Claims, DIP Facility Claims, and Priority Tax Claims...................................................................................19

    C.      Classification of Claims and Interests.........................................................21

    D.      Treatment of Claims and Interests .............................................................23

    E.      Means for Implementation .........................................................................27

F.      Provisions Governing Distributions.........................................................34

G.      Procedures for Resolving Claims............................................................40

H.      Executory Contracts and Unexpired Leases ...........................................42

I.      Conditions Precedent ..............................................................................44

J.      Effect of Confirmation ...........................................................................47

K.      Miscellaneous Provisions........................................................................54

VI.     ALTERNATIVES TO CONFIRMATION
        AND CONSUMMATION OF THE PLAN .......................................................58

A.      Continuation of the Chapter 11 Cases ....................................................59

B.      Liquidation under Chapter 7 ...................................................................59

VII.    TRANSFER RESTRICTIONS AND
        CONSEQUENCES UNDER FEDERAL SECURITIES LAW ........................60

VIII.   CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ..........61

IX.     VOTING PROCEDURES AND REQUIREMENTS.......................................69

A.      Voting Deadline ......................................................................................69

B.      Voting Procedures ...................................................................................70

C.      Parties Entitled to Vote ...........................................................................70

D.      Miscellaneous .........................................................................................71

E.      Agreements upon Furnishing Ballots......................................................71

F.      Change of Vote .......................................................................................71

G.      Waivers of Defects, Irregularities, etc ...................................................71

H.      Further Information, Additional Copies ..................................................72

X.      FACTORS TO CONSIDER BEFORE VOTING .........................................72

A.      Certain Bankruptcy Law Considerations.................................................72

B.      Additional Factors Affecting Value of Reorganized Debtors or
        Distributions to Creditors........................................................................74

C.      Risks Relating to the Debtors' Business and Financial Condition ........75

D.      Factors Relating to Securities to Be Issued.............................................76

E.      Risks Related to Amended and Restated First Lien Credit Facility .....................78

F.      Additional Factors...................................................................................78

XI.     CONFIRMATION OF THE PLAN..............................................................79

A.      Confirmation Hearing .............................................................................79

B.      Objections to Confirmation.....................................................................80

C.      Requirements for Confirmation of the Plan ........................................................... 81

XII.   VALUATION ANALYSIS ........................................................................................ 89

A.      Disclaimer ............................................................................................................. 89

B.      Valuation Estimate ............................................................................................... 90

C.      Valuation Considerations ..................................................................................... 91

XIII.  CONCLUSION AND RECOMMENDATION ................................................................ 92

EXHIBIT A:  Plan
EXHIBIT B:  Restructuring Support Agreement
EXHIBIT C:  Liquidation Analysis
EXHIBIT D:  Financial Projections
EXHIBIT E:  Organizational Structure

# I.
# INTRODUCTION

### A.    Background and Overview of Plan

Checkout Holding Corp. and its debtor affiliates (each, a "**Debtor**," and collectively, the "**Debtors**," "**Checkout**" or the "**Company**") submit this Disclosure Statement in connection with the solicitation of votes (the "**Solicitation**") on the Joint Prepackaged Chapter 11 Plan of Checkout Holding Corp. and its Affiliated Debtors, dated December 11, 2018 (the "**Plan**"),[1] a copy of which is annexed to this Disclosure Statement as **Exhibit A**.  Subject to the approval of the board of directors of Checkout (the "**Board**"), the Debtors anticipate filing voluntary petitions for relief under chapter 11 in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") on or about December 12, 2018, which is during the solicitation period.

The Debtors are commencing this Solicitation to implement a comprehensive financial restructuring to deleverage the Company's balance sheet to ensure the long-term viability of the Debtors' enterprise.  As a result of extensive negotiations, the Debtors, First Lien Lenders that hold in aggregate over 66.67% of the first lien indebtedness (the "**Consenting First Lien Lenders**") and, Second Lien Lenders that hold in aggregate over 66.67% of the second lien indebtedness (the "**Consenting Second Lien Lenders**"), entered into a restructuring support agreement (the "**Restructuring Support Agreement**"), a copy of which is attached hereto as **Exhibit B**.   Under the terms of the Restructuring Support Agreement, the Consenting First Lien Lenders and the Consenting Second Lien Lenders have agreed, subject to the terms and conditions of the Restructuring Support Agreement, to support a restructuring of the Debtors' existing debt obligations in chapter 11 (the "**Restructuring**").

The Restructuring will leave the Debtors' businesses intact and will substantially deleverage the Debtors' capital structure.   The Debtors' balance sheet liabilities will be reduced from approximately $1.9 billion in secured and unsecured debt to approximately $281 million in secured debt, which represents a reduction of debt on the Effective Date of over 85% relative to the Petition Date. This deleveraging will enhance the Debtors' long-term growth prospects and competitive position and allow the Debtors to emerge from the Chapter 11 Cases as a stronger company, better positioned to deliver value to its customers.

The Plan contemplates the distribution of New Common Stock to the Debtors' prepetition secured lenders (90% on account of Allowed First Lien Debt Claims and 10% on account of Allowed Second Lien Debt Claims, each subject to dilution by the Management Incentive Plan) and no impairment to the Debtors' other creditors, except the NCS Rejection Claims and the General Unsecured PDM Claims.  Further below is a short summary of the treatment of various creditor groups under the Plan.  Greater detail on such treatment is provided later on in this Disclosure Statement.

---

[1] Capitalized terms used in this Disclosure Statement, but not defined herein, have the meanings ascribed to them in the Prepackaged Plan.  To the extent any inconsistencies exist between this Disclosure Statement and the Prepackaged Plan, the Prepackaged Plan shall govern.

The Consenting First Lien Lenders and the Consenting Second Lien Lenders have played a critically important role in formulating the restructuring of the Company.  Prior to the Petition Date, the Debtors approached  a group of First Lien Lenders (the "**Ad Hoc First Lien Group**") and a group of Second Lien Lenders (the "**Ad Hoc Second Lien Group**" and together with the Ad Hoc First Lien Group, the "**Ad Hoc Groups**") regarding a possible restructuring.  The Debtors were successful in reaching an agreement with the Ad Hoc First Lien Group and the Ad Hoc Second Lien Group on the terms of the Plan.  The Plan is the product of good-faith arm's-length negotiations and is consistent with the objectives of chapter 11.  The Debtors have worked closely and in coordination with their key stakeholders, including the Consenting First Lien Lenders and the Consenting Second Lien Lenders.  These parties actively participated in the development and negotiation of the Plan and support confirmation of the Plan.

In addition to supporting the Plan, the Consenting First Lien Lenders have agreed to support the Debtors by providing postpetition financing to the Debtors (such lenders and other First Lien Lenders that agree to provide financing under the DIP Credit Agreement, the "**DIP Facility Lenders**"), converting those DIP loans into exit financing under the Plan, and making $40 million in new money exit financing available to the Reorganized Debtors.  The converted DIP loans and the new money will both be governed by the Amended and Restated First Lien Credit Facility. Specifically, on the Effective Date, the DIP Lenders will receive (a) on account of their DIP Facility (i) New Money Loan Claims, and (ii) their pro rata share of the A&R First-Out Tranche under the Amended and Restated First Lien Credit Facility, and (b) on account of their Allowed DIP Facility, Roll-Up Loan Claims, their pro rata share of the A&R Last-Out Tranche of the Amended and Restated First Lien Credit Facility.  In addition, on the Effective Date, the A&R Exit Facility will be established as part of the A&R First-Out Tranche under the Amended and Restated First Lien Credit Facility.

The Consenting First Lien Lenders and the Consenting Second Lien Lenders are further supporting the Debtors by agreeing that the Plan will provide for the unimpairment or recovery in full for Allowed General Unsecured Claims (excluding, for the avoidance of doubt, NCS Rejection Claims and General Unsecured PDM Claims).

Among the milestones in the Restructuring Support Agreement are deadlines relating to NCS (as defined below), a joint venture between Catalina and The Nielsen Company (US), LLC ("**Nielsen**").  As described more fully below, the Debtors believe that certain amendments need to be made to the NCS Agreement (as defined below) to bolster Catalina's competitiveness.  Catalina is currently in negotiations with Nielsen over the terms of such amendments and believes that it may be able to reach a consensual resolution with Nielsen during the Chapter 11 Cases.  In the event that no resolution is reached in the next few weeks, Catalina will have no choice but to seek to reject the NCS Agreement while negotiations continue.  If the NCS Agreement is ultimately rejected, given the nature and value of Catalina's assets, Nielsen will receive no recovery on its claims under the Plan.

The effect of the Restructuring on the Debtors' capital structure is summarized as follows:

| Pre-Petition Capital Structure | | Reorganized Capital Structure | |
|---|---|---|---|
| First Lien Revolver | $56 million | A&R First-Out Tranche | $125 million |
| First Lien Term Loan | $1.02 billion | A&R Last-Out Tranche | $156 million |
| Second Lien Term Loan | $472 million | | |
| Unsecured Holdco Notes | $384 million | | |
| Total: | Approx. $1.9 billion | Total: | Approx. $281 million |

## B. Summary of Plan Classification and Treatment of Claims

Under the Bankruptcy Code, only holders of claims or interests in "impaired" Classes are entitled to vote on the Plan (unless, for reasons discussed in more detail below, such holders are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code). Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" unless (i) the Plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the Plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

Holders of Claims in the following Classes are being solicited under and are entitled to vote on the Plan:

- Class 3 – First Lien Debt Claims; and

- Class 4 – Second Lien Debt Claims.

The following table summarizes (i) the treatment of Claims and Interests under the Plan, (ii) which Classes are impaired by the Plan, (iii) which Classes are entitled to vote on the Plan, and (iv) the estimated recoveries for holders of Claims and Interests to the extent calculable. The table is qualified in its entirety by reference to the full text of the Plan. For a more detailed summary of the terms and provisions of the Plan, see Section V—Summary of the Plan below.

| Class and Designation | Impairment and Entitlement to Vote | Treatment under the Plan | Approx. Percentage Recovery |
|---|---|---|---|
| 1 (Priority Non-Tax Claims) | Unimpaired **(Not entitled** to vote because deemed to accept) | The legal, equitable, and contractual rights of the holders of Allowed Priority Non-Tax Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Priority Non-Tax Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Priority Non-Tax Claim shall receive, on account of such Allowed Claim, at the option of the Reorganized Debtors: (i) Cash in an amount equal to the Allowed amount of such Claim or (ii) other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | Estimated Percentage Recovery: 100% |
| 2 (Other Secured Claims) | Unimpaired **(Not entitled** to vote because deemed to accept) | The legal, equitable, and contractual rights of the holders of Allowed Other Secured Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Secured Claim shall receive, on account of such Allowed Claim, at the option of the Reorganized Debtors:  (i) Cash in an amount equal to the Allowed amount of such Claim, (ii) reinstatement or such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code, or (iii) return of the applicable Collateral in satisfaction of the Allowed amount of such Other Secured Claim. | Estimated Percentage Recovery: 100% |
| 3 (First Lien Debt Claims) | Impaired **(Entitled** to vote) | Each holder of an Allowed First Lien Debt Claim shall be entitled to receive, in full and final satisfaction of such Claim, its Pro Rata share of 90% of the New Common Stock issued | Estimated Percentage |

| Class and Designation | Impairment and Entitlement to Vote | Treatment under the Plan | Approx. Percentage Recovery |
|---|---|---|---|
| | | on the Effective Date (subject to dilution by the Management Incentive Plan). | Recovery: 17.4%-43.6% |
| 4 (Second Lien Debt Claims) | Impaired (**Entitled** to vote) | each holder of an Allowed Second Lien Debt Claim shall be entitled to receive from (and on behalf of) CHC, in full and final satisfaction of such Claim, its Pro Rata share of 10% of the New Common Stock issued on the Effective Date (subject to dilution by the Management Incentive Plan). | Estimated Percentage Recovery: 3.8%-9.5% |
| 5 (General Unsecured Claims) | Unimpaired (**Not entitled** to vote because deemed to accept) | The legal, equitable, and contractual rights of the holders of General Unsecured Claims are unaltered by the Plan. Except to the extent that a holder of a General Unsecured Claim agrees to different treatment, on and after the Effective Date, the Debtors shall continue to pay (if Allowed) or dispute each General Unsecured Claim in the ordinary course of business as if the Chapter 11 Cases had never been commenced. | Estimated Percentage Recovery: 100% |
| 6 (NCS Rejection Claims) | Impaired (**Not entitled** to vote because deemed to reject) | The holders of NCS Rejection Claims shall not receive or retain any property under the Plan on account of such Claims, and the obligations of the Debtors and the Reorganized Debtors on account of the NCS Rejection Claims shall be discharged. | Estimated Percentage Recovery: 0% |
| 7 (General Unsecured PDM Claims) | Impaired (**Not entitled** to vote because deemed to reject) | The holders of General Unsecured PDM Claims shall not receive or retain any property under the Plan on account of such Claims, and the obligations of the Debtors and the Reorganized Debtors on account of the General Unsecured PDM Claims shall be discharged. | Estimated Percentage Recovery: 0% |
| 8 (Intercompany Claims) | Unimpaired (**Not entitled** to vote because | All Intercompany Claims shall be paid, adjusted, continued, settled, reinstated, discharged, or eliminated, in each case to the extent determined to be appropriate by the Debtors or Reorganized Debtors with the consent of the Ad Hoc First Lien Group (such consent not to be unreasonably withheld), as | Estimated Percentage Recovery: 100% |

| Class and Designation | Impairment and Entitlement to Vote | Treatment under the Plan | Approx. Percentage Recovery |
|---|---|---|---|
| | deemed to accept) | applicable. All Intercompany Claims between any Debtor and a non-Debtor affiliate shall be Unimpaired under the Plan. | |
| 9 (Subordinated Claims) | Impaired **(Not entitled** to vote because deemed to reject) | Subordinated Claims are subordinated pursuant to the Plan and section 510 of the Bankruptcy Code. The holders of Subordinated Claims shall not receive or retain any property under the Plan on account of such Claims, and the obligations of the Debtors and the Reorganized Debtors on account of Subordinated Claims shall be discharged. | Estimated Percentage Recovery: 0% |
| 10 (Existing Equity Interests) | Impaired **(Not entitled** to vote because deemed to reject) | The Existing Equity Interests shall be cancelled without further action by or order of the Bankruptcy Court. | Estimated Percentage Recovery: 0% |
| 11 (Intercompany Interests) | Unimpaired **(Not entitled** to vote because deemed to accept) | All Intercompany Interests shall be treated as set forth in Section 5.9 of the Plan. | Estimated Percentage Recovery: 100% |

## C.    Inquiries

If you have any questions about the packet of materials you have received, please contact Prime Clerk, the Debtors' voting agent (the "**Voting Agent**"), at 844-205-4337 (domestic toll-free) or 1-917-460-0912 (international). Additional copies of this Disclosure Statement, the Plan, or the Plan Supplement are available upon written request made to the Voting Agent at the following address:

CatalinaBallots@primeclerk.com

Copies of this Disclosure Statement, which includes the Plan and the Plan Supplement (when filed) are also available on the Voting Agent's website, https://cases.primeclerk.com/CatalinaMarketing. PLEASE DO NOT DIRECT INQUIRIES TO THE BANKRUPTCY COURT.

# II.
# OVERVIEW OF THE DEBTORS' OPERATIONS

### A.     The Debtors' Corporate Structure

Catalina Marketing Corporation ("**CMC**") was formed in 1983.  By 1983, point-of-sale checkout scanner technology was nearly ubiquitous in grocery stores and CMC's founders, who had extensive experience in the consumer packaged goods industry, saw in it the potential to collect consumer purchase information and use such information to drive sales more efficiently than traditional retail promotional vehicles.  As described in more detail below, this approach to data-driven marketing remains central to Catalina's core business philosophy.  Since its inception in 1983, Catalina has grown through both the strategic acquisition of other businesses and the organic expansion of its core businesses.

CMC expanded into European and Asian markets beginning with the United Kingdom in 1992, France in 1994, Japan in 1996, Italy in 1999, Germany in 2003, and Belgium and the Netherlands in 2006 (collectively the "**Foreign Subsidiaries**").  In 1994, CMC created a health business segment ("**Catalina Health Resource**") that expanded its marketing services to pharmaceutical manufacturers and retail pharmacies.  CMC sold Catalina Health Resource to inVentiv Health, Inc. in 2013.

Until 2007, CMC was publicly traded on the New York Stock Exchange.  In 2007, entities affiliated with Hellman & Friedman LLC ("**Hellman & Friedman**"), a private equity firm with a focus on information services and media, through its wholly owned subsidiary, Checkout Holding Corp. ("**CHC**"), acquired CMC and established CMC as the businesses' primary operating entity.

In 2014, funds affiliated with Berkshire Partners LLC ("**Berkshire**"), a Boston-based investment firm and certain third-party co-investors, acquired a controlling interest in Catalina.  PDM Group Holdings (the ultimate parent of all the Debtors), PDM Intermediate Holdings A, PDM Intermediate Holdings B, and PDM Holdings Corp were formed as part of the 2014 transaction (the "**2014 Transaction**").  Catalina's current capital structure, as described in more detail below, arose as part of the 2014 Transaction to pay down existing debt and to finance the buyout of a majority of Hellman & Friedman's equity interests in Catalina.  Berkshire currently holds 40.71% of all the outstanding common stock of PDM Group Holdings.  None of the Company's equity securities are publicly-traded.

The Company's organizational structure as of the date of this Disclosure Statement is attached hereto as **Exhibit E**.

### B.     The Debtors' Current Business Operations

### 1.     The Catalina Retailer Network

The backbone of Catalina's business is its extensive network of in-store, point-of-sale ("**POS**") data collection and promotional delivery systems, present in approximately 24,000 retail locations in the U.S. and over 20,000 retail locations internationally (the "**Retailer Network**").  Catalina is currently party to agreements (the "**Retailer Agreements**") with approximately 61 retailer partners (the "**Retailers**"), which collectively represent approximately 60% of the grocery and drug retail

footprint in the United States to install Catalina's networked servers and high-speed printers ("**Networked Printers**") at multiple POS locations in each of the Retailers' stores. When a Retailer's customers (the "**Shoppers**") purchase any item in a store, the product's Universal Product Code is scanned into the Retailer's POS checkout system and simultaneously uploaded to Catalina's data centers located in Orlando, Florida. The unique combination of items purchased during each shopping trip, along with other key data points, including the time, and date of the purchase, and geographical location of the purchase, aggregated over millions of purchases every day, (the "**Retailer Data**"), is analyzed against Catalina's historical shopper purchase database (the "**Shopper Database**"), which itself is ultimately derived from Catalina's analysis of the Retailer Data.

Through the application of its proprietary analytics systems (the "**Analytics Platform**"), Catalina uses the Shopper Database and real-time Retailer Data to make accurate predictions about Shoppers' future purchasing behaviors based on not only historical purchasing behaviors, but also on emerging trends in consumer behavior. Additionally, many of the Retailers offer Shoppers customer reward or loyalty cards (the "**Loyalty Cards**") that track Shopper purchases on an individual basis. Catalina's agreements with the Retailers provide it access to each Shopper's personal purchase history with each particular Retailer on an anonymized basis where each Shopper is assigned a unique Shopper identification (a "**Shopper ID**"). Thus, when a Shopper uses a Loyalty Card at the POS, Catalina can use the historical purchase data of that particular Shopper in conjunction with the historical purchasing data in the Catalina Shopper Database, as well as any demographic data associated with Shopper ID, to further enhance the accuracy of its predictive models.

To give a sense of the scale and breadth of the data being fed into the Catalina Shopper Database, in 2017 alone, the U.S. Shopper Database tracked over 7.5 billion unique shopping trips associated with approximately 100 million households and over 500 million Shopper IDs, and representing $277 billion in direct sales to the Retailers.

Catalina employs over 125 analytics and data science professionals to support its core capabilities and enable new data driven solutions for Retailers and CPGs.

Under the Retailer Agreements, Catalina is granted a royalty-free, non-exclusive limited license to utilize the Retailer Data. Catalina generates revenue by using the Retailer Data in conjunction with its Shopper Database to design and execute marketing campaigns for CPGs (as defined below), and, in some cases, the Retailers themselves.

## 2.    Catalina's Customers

Consumer packaged goods, which include non-durable goods such as cosmetics, household products, non-prescription drugs, packaged foods, and beverages, make up the vast majority of the products that are sold at the Retailers' stores. The manufacturers and distributors that manufacture these types of products (the "**CPGs**") encompass a wide range of companies and brands that include both CPGs with global reach as well as less established CPGs.

Catalina contracts with the CPGs to execute highly targeted marketing campaigns (the "**Campaigns**") designed to drive products sales and build brand loyalty effectively and efficiently

by leveraging Catalina's Shopper Database to deliver highly personalized promotional materials to Shoppers at the POS.  At "checkout," such promotional materials, which include coupons, rebates, product advertising and other incentives, are "triggered" either by the unique combination of items purchased by a Shopper (the "**Basket**"), or if a Shopper uses a Loyalty Card, by the Shopper ID in concert with a Shopper's Basket.  Promotional materials are instantaneously delivered to Shoppers in the form of coupons and personalized circulars printed by the Networked Printers at checkout as well as coupons and incentives that are directly "loaded" onto Loyalty Cards.  In-store promotions, however, are only one "channel" for delivering promotional content, as Catalina also distributes promotional materials and/or places ads through various digital channels as well.  Digital promotions take the form of digital coupons and personalized digital circulars that are delivered directly to mobile devices and digital wallets.  The wide reach and on-demand nature of Catalina's content delivery system allows Catalina to design and execute highly customized Campaigns that can scale from national to regional, long-term to short-term, on an as-needed basis.  Catalina's access to real-time purchase data at the Retailers' stores allows it to accurately measure the effectiveness of a particular Campaign in driving product sales.

The Retailers are also Catalina's customers in much the same way as CPGs.  Retailers will contract with Catalina to design and execute Campaigns to drive not only sales of their own private label products as well as CPG Brands, but also overall sales by targeting Shoppers identified as more likely to purchase a variety of products beyond those that may be the focus of the Campaign.

### 3.    The Foreign Subsidiaries

As discussed above, the Foreign Subsidiaries operate in Japan and across Europe.  The Foreign Subsidiaries' business operations largely mirror those of the Debtors.  The Foreign Subsidiaries enter into their own contracts with CPGs and local retail partners (the "**Foreign Retailers**") to provide in-store and digital marketing solutions primarily driven by data licensed from the Foreign Retailers to the Foreign Subsidiaries.  Catalina contracts with the Foreign Subsidiaries to (a) license certain of its intellectual property and (b) provide general corporate business support and data and technology services in exchange for a negotiated fee based on arm's length operating margin.

### 4.    Catalina Marketing Costa Rica

On April 23, 2018, Catalina established a Costa Rican subsidiary, Catalina Marketing Costa Rica, s.r.l. ("CMCR").  CMCR provides various post-sale campaign management, operational, and creative roles that benefit Catalina's U.S. customers by enhancing employee retention and by effecting a number of material cost reductions in the areas of campaign set-up, execution, and optimization.

### 5.    Nielsen Catalina Services

In 2009, CMC and Nielsen formed NC Ventures, LLC d/b/a Nielsen NCS (the "**NCS Agreement**").  Using Retailer Data sublicensed by Catalina and television and digital audience measurement data licensed by Nielsen, NCS provides a variety of analytics services related to the measurement and effectiveness of digital, television, and radio marketing campaigns.  Catalina and Nielsen receive quarterly dividend payments from NCS according to the terms of that certain

Limited Liability Company Agreement dated June 29, 2009 (as amended on October 15, 2015). In 2015, CMC sold 13.5% of its membership interest in NCS to Nielsen for a current interest of 36.5%.

### C.    Directors and Officers

The Debtors' senior management team consists of the following individuals:

| Name | Position |
| --- | --- |
| Gerald Sokol Jr. | President and Chief Executive Officer of Catalina Marketing Corporation |
| Aaron Miller | Chief Operating Officer |
| Tom Corley | Executive Vice President, Chief Revenue Officer |
| Shelly Schaffer | Executive Vice President, Chief Financial Officer |
| David Glogoff | Executive Vice President, Chief Legal Officer, Chief Administrative Officer and Secretary |
| William Faivre | President of Catalina Europe |
| Shigeharu Hanazaki | President of Catalina Japan |
| Wes Chaar | Chief Data and Analytics Officer |
| Marta Cyhan | Chief Marketing Officer |
| Marshall Stanton | Executive Vice President, Global Operations |

### D.    Debtors' Capital Structure

### 1.    Prepetition Indebtedness

As set forth below, as of the date of this Disclosure Statement, the Debtors have outstanding funded debt obligations consisting of approximately $1.9 billion.

   (a)  Secured Debt – First Lien Credit Agreement and Second Lien Credit Agreement

Checkout Holding Corp., as borrower (the "**Borrower**"), and certain of the other Debtors, as guarantors (the "**Guarantors**"), JPMorgan Chase Bank, N.A., as administrative and collateral agent (the "**First Lien Agent**"), L/C Issuer and Swing Line Lender, and the other lender parties thereto (collectively, the "**First Lien Lenders**") are parties to the First Lien Credit Agreement, dated as of April 9, 2014, (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**First Lien Credit Agreement**"), under which the First Lien Lenders agreed to provide to the Borrower a $1.05 billion term loan facility (the "**First Lien Term Loan**") and a $100 million revolving credit facility with a swing line sublimit of up to $20 million and a letter of credit sublimit of $35 million (the "**First Lien Revolving Facility**"). The First Lien Term Loan matures on April 9, 2021. The First Lien Revolving Facility matures on April 9, 2019. The lenders with respect to the First Lien Term Loan are not the same lenders as those with respect to the First Lien Revolving Facility, but all of the First Lien Lenders are party to the First Lien Credit Agreement.

The First Lien Term Loan and the First Lien Revolving Facility are secured on a pari passu basis by a first-priority interest in the Senior Collateral.[2]  The Senior Collateral includes, among other things, the Debtors' right, title, and interest in all accounts, chattel paper, equipment, goods, inventory, fixtures, intellectual property, and other property and the proceeds thereof. The Senior Collateral excludes, among other things, 35% of the stock of the Debtors' first tier foreign subsidiaries and 100% of the stock of the Debtors' lower tier foreign subsidiaries, all assets of the foreign subsidiaries, fee-owned real property assets with a fair market value below $10 million, certain bank accounts, and membership interests in NCS, but includes the proceeds thereof.

Under the prepetition First Lien Revolving Facility, JPMorgan Chase Bank, N.A., in its capacity as L/C Issuer, issued a letter of credit for the benefit of Epson America, Inc., a contract counterparty, in the amount of $5 million (the "**JPM Letter of Credit**").  The JPM Letter of Credit is a Secured Obligation under the Prepetition First Lien Credit Agreement and is also secured by a separate first lien security interest in a cash collateral account maintained by Checkout Holding Corp. at JPMorgan Chase Bank, N.A. and all monies and funds deposited therein (as well as the proceeds thereof and investments and instruments related thereto).

As of the date of this Disclosure Statement, approximately $1.020 billion of principal, plus interest, fees, and expenses is outstanding under the First Lien Term Loan.  Letters of credit with an aggregate face amount of approximately $5 million have been issued and approximately $56 million of principal, plus interest, fees and expenses is outstanding under the First Lien Revolving Facility.

The Borrower, the Guarantors, Wilmington Savings Fund Society, FSB, as successor administrative agent and collateral agent (the "**Second Lien Agent**"), and the other lender parties thereto (collectively, the "**Second Lien Lenders**") are parties to the Second Lien Credit Agreement, dated as of April 9, 2014 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Second Lien Credit Agreement**"), under which the Second Lien Lenders provided a $460 million term loan (the "**Second Lien Term Loan**") to the Borrower.  The Second Lien Term Loan matures on April 9, 2022.  The Second Lien Credit Agreement is secured by a second-priority security interest in the Senior Collateral. Approximately $472 million of principal, plus interest, fees and expenses is outstanding under the Second Lien Term Loan.

The rights of the First Lien Lenders and the Second Lien Lenders with respect to their shared collateral are governed by that certain Second Lien Intercreditor Agreement, dated as of April 9, 2014, by and among the Borrower, the Guarantors, JPMorgan Chase Bank, N.A., as senior representative for the First Lien Lenders and Wilmington Savings Fund Society, FSB, as the second priority representative for the Second Lien Lenders (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Intercreditor Agreement**"). The Intercreditor Agreement governs, among other things, the priority of distribution of the Senior Collateral and the respective rights of the First Lien Lenders and the Second Lien Lenders and

---

[2] "Senior Collateral" means (x) any "Collateral" as defined in any Senior Debt Document (y) any other assets of the Borrower or any other Grantor with respect to which a Lien is granted or purported to be granted pursuant to a Senior Collateral Document as security for any Senior Obligations or deemed to be granted pursuant to Section 2.04. *First Lien Credit Agreement, Section 1.01*.

their respective representatives in connection with certain bankruptcy matters, such as the provision of postpetition financing.  In accordance with the Intercreditor Agreement: (i) the First Lien Lenders are afforded first priority with respect to Senior Collateral; and (ii) the Second Lien Lenders are afforded second priority with respect to the Senior Collateral.

(b)    Unsecured HoldCo Notes

PDM Intermediate Holdings B Corporation, as issuer (the "**Issuer**"), and certain purchasers (the "**Note Holders**") are party to that certain Note Purchase Agreement, dated as of April 9, 2014 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Unsecured PDM Note Purchase Agreement**"), pursuant to which $230 million in aggregate principal amount of unsecured notes (the "**Unsecured HoldCo Notes**") were issued by the Issuer. The Unsecured HoldCo Notes are unsecured and are not guaranteed by any affiliates of the Issuer. The Issuer is a holding company, the only asset of which is the stock in its wholly owned subsidiary.  As such, the Unsecured HoldCo Notes are structurally subordinated to the operating Debtors' creditors with respect to all of the assets of such Debtors.  The Unsecured HoldCo Notes mature on April 9, 2022.[3]

As of the date of this Disclosure Statement, approximately $384 million of principal, plus interest, fees and expenses is outstanding under the Unsecured HoldCo Notes.

(c)    Other Indebtedness

As of the date of this Disclosure Statement, the Debtors owe approximately $8.5 million in respect of prepetition trade debt.

**2.    Equity Ownership**

As of the date hereof, Berkshire holds 40.64% of all the outstanding common stock of PDM Group Holdings.

### III.
### EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11 CASES

Three primary factors have contributed to Catalina's recent struggles:  (a) technology-driven shifts in marketing approaches and related business practices; (b) a reduction in the size of Catalina's Retailer Network; and (c) limits imposed on current operations and product innovation due to aging hardware and software platform.

---

[3] Prior to April 9, 2016, the Unsecured HoldCo Notes were accruing payment-in-kind ("*PIK*") interest of 11.25% per annum.  From April 9, 2016, the Unsecured HoldCo Notes were accruing interest of 10.50% per annum, all of which was payable in cash, except that for any interest period commencing after April 9, 2016, and ending on or prior to April 9, 2019, the Issuer had the option to elect to pay the following combinations of cash interest and PIK interest: (i) 10.875% per annum, of which 5.4375% was payable in cash and 5.4375% was payable in PIK interest, or (ii) 11.25% per annum, all of which was payable quarterly in PIK interest.  The Issuer has been electing to pay PIK interest up until the Petition Date.

A.      **Industrywide Shift to Digital**

From 1983 through 2014, Catalina experienced relatively steady growth and healthy margins, enabling it to grow its Retailer Network to over 30,000 retail locations in the U.S.  Starting in 2017, however, Catalina's revenues and margins began to contract as a result of competitive pressures in the retail sector and a change in overall media consumption with engagement largely driven by an industrywide shift to digital.

The growing market share of online consumer purchasing, and the cost pressure it has put on both Retailers and CPGs, has forced them to become more cost-conscious and judicious in the deployment of their marketing budgets.  As a result, Retailers and CPGs have increasingly focused on digital promotions, with their wide reach and relatively low cost per impression, disrupting Catalina's traditional business model.  Catalina attempted to counteract the digital disruption to its promotions-delivery business by expanding into the digital coupon space and acquiring Cellfire Inc. ("**Cellfire**") in October of 2014.  Cellfire's technology allows Catalina to deliver paperless, untargeted promotions (*i.e.,* digital coupons) by loading them directly onto Shoppers' Loyalty Cards.  In recent years, however, retailers have come to favor the acquisition of digital coupons through a number of online digital-coupon "aggregators" whereby consumers search these sites (either through mobile or desktop applications) for various promotions.  As a consequence of the rise of these promotional delivery channels, rather than generating revenue through the delivery of digital coupons, when executing digital Campaigns for customers, Catalina must typically pay a fee to such aggregator sites to have its digital promotions available to consumers.

While advertising and marketing have become increasingly focused on the digital delivery channels over the past twenty years, until fairly recently, the actual buying and selling of promotional media across digital, broadcast, and print channels continued to follow a relatively traditional approach: marketing firms and agencies, retailers, and vendors developed marketing campaigns and negotiated contracts with publishers (the operators of various delivery channels) to deliver commercial messaging.

The last five years, however, have seen exponential growth in "programmatic" advertising ("**Programmatic Advertising**"), largely fueled by the increasing prevalence of digital distribution channels.  Programmatic Advertising connects brands and advertisers with publishers through a software based platform that effectively automates the buying and selling of promotional media.  Programmatic Advertising allows brands and retailers to control the parameters of their campaigns while targeting wide audiences across key demographics on an *ad hoc* basis, all at a relatively low cost.  Although Catalina has the capability to provide digital audiences to its customers through Programmatic Advertising platforms, its legacy data and media platforms have prevented it from fully harnessing the commercial potential of the Retailer Data to execute digital advertising campaigns.  Furthermore, in many instances, Catalina's business relationship with NCS has negatively impacted its growth and caused it to incur additional expenses as it relates to digital audiences.

B.      **Shrinking Retailer Footprint**

Since the end of December of 2017, the total number of stores in Catalina's U.S. Retailer Network has shrunk by approximately 7%.   The reduction in store count has reduced Catalina's

opportunities to deliver fee-generating communications.  Part of this reduction can be attributed to the departure of a large retail partner from the Retailer Network.  Additionally, certain of the Retailers have initiated store closures as a consequence of their own financial distress.  Finally, from 2011 through 2014, as part of a cost-rationalization initiative that sought to increase focus on larger, more established Retailers, Catalina effected a reduction in store count by negotiating the departure of certain smaller retailers from the Retailer Network.

### C.    Aging Infrastructure Has Bottlenecked Growth

Catalina's ability to innovate, tap new revenue streams, and monetize existing revenue streams more efficiently has been severely hampered by its legacy hardware and software platforms.  The Company's current capital structure, however, does not provide sufficient financial flexibility to carry out the wholesale upgrades necessary to compete effectively in the current business climate.

Although Catalina provides its customers with reporting and analytics in connection with the effectiveness of Campaigns, its legacy data processing platforms do not allow for direct (real-time) third-party access, limiting its ability to develop new services and revenue streams.  Catalina is in the process of redesigning and re-engineering its data management platform to provide its customers with direct, real-time access to Campaign data and buyer insights.  Catalina has built a customer-facing portal (the "**Catalyst HUB**") to run on top of the more robust data platform through which customers can customize reporting and analytics to effectively monitor the execution and performance of a Campaign.  Customers that use the Catalyst HUB are significantly more likely to increase media purchase commitments to maintain ongoing access.  Hardware limitations, however, have prevented Catalina from scaling up the Catalyst HUB and opening the service up to all of Catalina's customers.  Infrastructure limitations have also hindered Catalina's ability to monetize one of its most valuable assets:  the power to measure the effectiveness of Campaigns by tracking real-time purchase behavior.  Catalina has updated its platform to provide multi-touch attribution ("**MTA**") services to CPGs.  MTA allows Retailers and CPGs to track consumer engagement with digital media across a variety of digital channels and ultimately measure such consumer engagement with actual purchases at the POS.  Just as with the Catalyst HUB, Catalina cannot deploy its MTA service without upgrading legacy hardware systems.

### D.    Prepetition Restructuring Efforts

As noted above, the continuing weakness and challenges in the retail sector have not only caused material compression in many of Catalina's customers' marketing budgets (both on the Retailer and CPG side), but have also pushed Catalina's retail partners to reassess the terms of their respective business relationships with Catalina.

By late 2017, these sustained downward pressures on Catalina's revenue had become material, just as Catalina was in the midst of long-term, capital-intensive project to upgrade its software and hardware platforms.  In late 2017, Catalina engaged Weil, Gotshal & Manges LLP ("**Weil**") and Centerview Partners LLC ("**Centerview**") as restructuring counsel and financial restructuring advisors, respectively, to assist Catalina in exploring, in partnership with its creditors, and consensual modifications to Catalina's capital structure that would allow it to continue modernizing its platform to reverse the revenue losses, and ultimately, return to sustainable revenue growth.  In early Spring of 2018, certain lenders under Catalina's First Lien Credit

Agreement and certain lenders under Catalina's Second Lien Credit Agreement formed Ad Hoc Groups, hired their own legal and financial advisors, and began discussing potential restructuring transactions with Catalina's advisors.

For several months, Catalina and the Ad Hoc Groups discussed the potential contours of an out-of-court restructuring; however, during the course of these discussions, through further refinement and adjustment of revenue projections driven by the continued erosion in Catalina's revenue base, it became clear that Catalina's existing debt was unsustainable, and that a broader balance sheet restructuring would most effectively be accomplished through an in-court transaction.

Accordingly, beginning in early summer of 2018, the Debtors and the Ad Hoc Groups shifted the focus of the discussions to the terms of a chapter 11 restructuring, with a fully consensual restructuring as the ultimate goal.

After intense negotiations, the Debtors reached a deal with the Ad Hoc First Lien Group and the Ad Hoc Second Lien Group and executed the Restructuring Support Agreement.

### E.      Forbearance

On November 16, 2018, to provide Catalina with additional flexibility to continue discussions with all of its stakeholders, Catalina and the lenders under the First Lien Revolving Facility entered into a forbearance agreement (the "**Forbearance Agreement**") with respect to certain defaults under the First Lien Credit Agreement.  Specifically, under the Forbearance Agreement, the lenders under the First Lien Revolving Facility agreed to forbear (the "**Forbearance Period**") from exercising their rights and remedies, including the right to accelerate any indebtedness, through December 7, 2018 arising out of defaults from a failure to comply with the consolidated first lien net leverage ratio test in the First Lien Credit Agreement and from a failure to timely deliver required financial statements and compliance certificates.

The purpose of the Forbearance Agreement was to provide the Company with additional flexibility to continue discussions with all of their stakeholders and to pursue a consensual restructuring.  In connection with the forbearance, the Company delivered notices of default to the First Lien Agent on November 14, 2018.

### F.      Interest Payment Under the First Lien Credit Agreement and the Second Lien Credit Agreement

Given the state of ongoing negotiations to address Catalina's burdensome debt structure and the need to preserve liquidity, Catalina elected not to make interest payments of $15,542,000 under its first lien credit facility and $10,538,000 under its second lien credit facility due on November 30, 2018 and took advantage of the 5-business day "grace period" provided for under its first and second lien credit agreements.  Faced with an impending default on December 7, 2018, Catalina increased its negotiating efforts to reach a fully consensual transaction that would maximize value

for all stakeholders while minimizing damage to the enterprise as a consequence of the Restructuring.

### G.    Restructuring Support Agreement.[4]

The Debtors used the time afforded by the Forbearance Agreement and the grace period to negotiate a comprehensive, consensual restructuring with the Ad Hoc Groups, which is ultimately supported by more than 66.67% of the First Lien Lenders (the "**Consenting First Lien Lenders**") and more than 66.7% of the Second Lien Lenders (the "**Consenting Second Lien Lenders**," together with the Consenting First Lien Lenders, the "**Consenting Creditors**"). On December 11, 2018, Catalina and the Consenting Creditors entered into the RSA whereby the Consenting Parties have committed, subject to the terms and conditions of the RSA, to support the Debtors in their efforts to confirm the Prepackaged Plan, as well as to provide additional liquidity to the Debtors both during the Chapter 11 Cases and upon emergence (as described herein in more detail). The terms of the Restructuring are reflected in the Prepackaged Plan.

Upon its full implementation, the Plan will effect a significant deleveraging of the Debtors' capital structure by wiping out approximately $1.625 billion or approximately 85.5% in principal amount of prepetition funded debt. The reduced debt burden will provide the Debtors with sufficient liquidity not only to continue funding their operations, but to make the necessary capital expenditures and investments to ensure that the Debtors will not only be competitive, but will remain an industry leader going forward.

Under the terms of the Plan, in full and final satisfaction of their prepetition claims, the First Lien Lenders will receive their *pro rata* share of 90% of the New Common Stock in the reorganized Debtors and the Second Lien Lenders will receive their *pro rata* share of 10% of the New Common Stock, in each case subject to dilution by a contemplated management incentive plan that will be adopted following the effective date of the Plan. Allowed general unsecured claims will be paid in the ordinary course and will be otherwise unimpaired, subject to all of the Debtors' rights, defenses, or any other entitlements with respect thereto. Holders of claims arising under the Unsecured HoldCo Notes will not receive a recovery under the Plan. Additionally, if Catalina is unable to renegotiate the terms of the NCS Agreement to the satisfaction of its prepetition secured lenders, Catalina has agreed with its lenders to file a motion to reject the NCS Agreement, and holders of the resulting NCS Rejection Claims will not receive a recovery under the Plan. Any holder of claims arising out of such rejection will not receive a recovery under the Plan.

The RSA, among other things, commits the Consenting Parties to support the Plan and the Restructuring by:

- Voting to accept the Plan;
- Agreeing to provide the releases set forth in the Plan;
- Supporting and taking all commercially reasonable steps to consummate the Plan and the Restructuring;

---

[4] This summary is qualified in its entirety by the Restructuring Support Agreement. To the extent that any provision of this summary is inconsistent with the Restructuring Support Agreement, the Restructuring Support Agreement will control.

- Refraining from taking any action that would delay or impede consummation of the Plan or the Restructuring;
- Agreeing to certain procedures governing the transfer of the indebtedness held by the Consenting Parties; and
- Agreeing to forbear the exercise of their rights or remedies under the prepetition loan documents.

Of key importance, the RSA provides that the Consenting Parties will support the Prepackaged Plan. The Plan provides for a comprehensive restructuring of the Debtors' prepetition obligations, preserves the going-concern value of the Debtors' businesses, maximizes creditor recoveries, provides for an equitable distribution to the Debtors' stakeholders and protects the jobs of employees.

## IV.
## ANTICIPATED EVENTS DURING THE CHAPTER 11 CASES

### A.    Commencement of Chapter 11 Cases

In accordance with the Restructuring Support Agreement, the Debtors anticipate filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code on or about December 12, 2018. The filing of the petitions will commence the Chapter 11 Cases, at which time the Debtors will be afforded the benefits and become subject to the limitations of the Bankruptcy Code.

The Debtors intend to continue their operations in the ordinary course during the pendency of the Chapter 11 Cases. To facilitate the efficient and expeditious implementation of the Plan through the Chapter 11 Cases, and to minimize disruptions to the Debtors' operations on the Petition Date, the Debtors intend to seek to have the Chapter 11 Cases assigned to the same bankruptcy judge and administered jointly and to file various motions seeking important and urgent relief from the Bankruptcy Court. Such relief, if granted, will assist in the administration of the Chapter 11 Cases; however, there can be no assurance that the requested relief will be granted by the Bankruptcy Court.

### B.    First Day Motions

On the Petition Date, the Debtors intend to file multiple motions seeking various relief from the Bankruptcy Court and authorizing the Debtors to maintain their operations in the ordinary course. Such relief is designed to ensure a seamless transition between the Debtors' prepetition and postpetition business operations, facilitate a smooth reorganization through the Chapter 11 Cases, and minimize any disruptions to the Debtors' operations. The Debtors intend to seek the following relief on the Petition Date to maintain their operations in the ordinary course:

- Continue paying employee wages and benefits;

- Continue the use of the Debtors' cash management system, bank accounts, and business forms;

- Continue insurance programs and the processing of workers' compensation Claims;

- Continue the Debtors' customer programs and promotions;

- Pay certain prepetition taxes and assessments;

- Pay all trade claims;

- Establish procedures to protect certain tax attributes;

- Establish procedures for utility companies to request adequate assurance of payment and to prohibit utility companies from altering or discontinuing service; and

- Obtain senior secured superpriority financing and use cash collateral.

### C.    Procedural Motions

The Debtors intend to file various motions that are common to chapter 11 proceedings of similar size and complexity as the Chapter 11 Cases, including applications to retain various professionals to assist the Debtors in the Chapter 11 Cases.

### D.    Debtor-in-Possession Financing

The Debtors intend to file a motion (the "**DIP Motion**") to obtain senior secured debtor-in-possession financing ("**DIP Financing**"), use cash collateral, and provide adequate protection to the prepetition First Lien Lenders.

The Debtors will be entering chapter 11 with minimal cash on hand. Access to DIP Financing and the use of Cash Collateral (as such term is defined in section 363(a) of the Bankruptcy Code) is critical to ensure that the Debtors have sufficient liquidity to operate their business and administer their estates during these chapter 11 cases. To address their working capital needs and fund their reorganization efforts, in the weeks leading up to the Petition Date, the Debtors solicited interest in providing DIP Financing from various parties.  The Debtors received one proposal for DIP Financing from certain of their First Lien Lenders (the "**DIP Facility**") and determined that it was the best option reasonably available under the totality of the circumstances. The Debtors and their advisors negotiated the terms of the proposed DIP Facility with such First Lien Lenders in good faith and at arm's-length.

The Debtors will seek authority from the Bankruptcy Court for approval of the DIP Motion on an interim basis (the "**Interim DIP Order**") which will provide the Debtors with $60 million under the DIP Facility.

### E.    Confirmation Hearing

Contemporaneously with the filing of the Petition, the Debtors will seek an order of the Bankruptcy Court scheduling the Confirmation Hearing to consider (i) the adequacy of this Disclosure Statement and the Solicitation in connection herewith and (ii) confirmation of the Plan. The Debtors anticipate that notice of these hearings will be published and mailed to all known holders of Claims and Interests at least 28 days before the date by which objections must be filed with the Bankruptcy Court.

F.      **Timetable for the Chapter 11 Cases**

In accordance with the Restructuring Support Agreement, the Debtors have agreed to proceed with the implementation of the Plan through the Chapter 11 Cases. Among the milestones contained in the Restructuring Support Agreement is the requirement that the Bankruptcy Court enter the order approving this Disclosure Statement within eighty-five (85) calendar days after the Petition Date and an order confirming the Plan within one hundred twenty-five (125) calendar days after the Petition Date.  The Restructuring Support Agreement also requires that the Effective Date occur within one hundred forty (140) calendar days after the Petition Date. The Debtors believe they can achieve the various milestones under the Restructuring Support Agreement, the occurrence of which is crucial to reorganizing the Debtors successfully.

**V.**
**SUMMARY OF THE PLAN**

A.      **General**

This section of the Disclosure Statement summarizes the Plan, a copy of which is annexed hereto as **Exhibit A**.  This summary is qualified in its entirety by reference to the Plan.  **YOU SHOULD READ THE PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

In general, a chapter 11 plan (1) divides claims and equity interests into separate classes, (2) specifies the consideration that each class is to receive under the plan and (3) contains other provisions necessary to implement the plan.  Under the Bankruptcy Code, "claims" and "equity interests," rather than "creditors" and "shareholders," are classified because creditors and shareholders may hold claims and equity interests in more than one class.  Under section 1124 of the Bankruptcy Code, a class of claims is "impaired" under a plan unless the plan (1) leaves unaltered the legal, equitable, and contractual rights of each holder of a claim in such class or (2) provides, among other things, for the cure of certain existing defaults and reinstatement of the maturity of claims in such class.  Classes 3, 4, 6, 7, 9, and 10 are impaired under the Plan, and holders of Claims or Interests in such Classes are entitled to vote to accept or reject the Plan unless such Classes of Claims or Interests are deemed to reject the Plan or subject to an objection filed by the Debtors.  Ballots are being furnished herewith to all holders of Claims in Classes 3, and 4 that are entitled to vote to facilitate their voting to accept or reject the Plan.  Classes 6, 7, 9, and 10 are deemed to reject the Plan and, therefore, Claims or Interests in such Classes will not vote on the Plan.

B.      **Administrative Expense Claims, Fee Claims, DIP Facility Claims, and Priority Tax Claims**

1.      **Treatment of Administrative Expense Claims**

Except to the extent that a holder of an Allowed Administrative Expense Claim other than a Fee Claim agrees to a different treatment, on the Effective Date or as soon thereafter as is reasonably practicable (but in no event later than thirty (30) days after the Effective Date), the holder of such Allowed Administrative Expense Claim shall receive, on account of such Allowed Claim, Cash in an amount equal to the Allowed amount of such Claim; *provided*, that Allowed Administrative

Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors (which, for the avoidance of doubt, do not include Restructuring Expenses, which shall be paid in accordance with the DIP Facility Order, as applicable), as Debtors in Possession, shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities.

## 2.    Treatment of Fee Claims.

All Professional Persons seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 1103 of the Bankruptcy Code shall (a) file, on or before the date that is forty-five (45) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (b) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court or authorized to be paid in accordance with the order(s) relating to or allowing any such Fee Claim. On the Effective Date, the Debtors shall establish and fund the Fee Escrow Account. The Debtors shall fund the Fee Escrow Account with Cash equal to the Professional Persons' good faith estimates of the Fee Claims. Funds held in the Fee Escrow Account shall not be considered property of the Debtors' Estates or property of the Reorganized Debtors, but shall revert to the Reorganized Debtors only after all Fee Claims allowed by the Bankruptcy Court have been irrevocably paid in full. The Fee Escrow Account shall be held in trust for Professional Persons retained by the Debtors and for no other parties until all Fee Claims Allowed by the Bankruptcy Court have been paid in full. Fees owing to the applicable Professional Persons shall be paid in Cash to such Professional Persons from funds held in the Fee Escrow Account when such Claims are Allowed by an order of the Bankruptcy Court or authorized to be paid under the Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals; provided, however, that the Reorganized Debtors' obligations with respect to Fee Claims shall not be limited by nor deemed limited to the balance of funds held in the Fee Escrow Account. To the extent that funds held in the Fee Escrow Account are insufficient to satisfy the amount of accrued Fee Claims owing to the Professional Persons, such Professional Persons shall have an Allowed Administrative Expense Claim for any such deficiency, which shall be satisfied in accordance with Section 2.1 of the Plan. No Liens, claims, or interests shall encumber the Professional Fee Escrow in any way.

Any objections to Fee Claims shall be served and filed (a) no later than twenty one (21) days after the filing of the final applications for compensation or reimbursement or (b) such later date as ordered by the Bankruptcy Court upon a motion of the Reorganized Debtors.

## 3.    Treatment of DIP Facility Claims.

On the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed DIP Facility Claim, each holder of an Allowed DIP Facility Claim shall receive (i) on account of its Allowed DIP Facility New Money Loan Claims, its Pro Rata share of the loans under the A&R First-Out Tranche, and (ii) on account of its Allowed DIP Facility Roll-Up Loan Claims, its Pro Rata share of the loans under the A&R Last-Out Tranche.

On the Effective Date, all liens and security interests granted to secure the obligations arising under the DIP Facility Loan Agreement shall continue, remain in effect, and be deemed to secure the obligations under the Amended and Restated First Lien Credit Agreement, subject to the terms and conditions thereof.

### 4.    Payment of Fees and Expenses under DIP Facility Order.

On the earlier of (i) the Effective Date and (ii) the date on which any accrued and unpaid fees, expenses or disbursements in respect of the DIP Facility and the Exit Facility would be required to be paid under the terms of the applicable DIP Facility Order, the Restructuring Support Agreement or any other order of the Bankruptcy Court, the Debtors or Reorganized Debtors (as applicable) shall pay all fees, expenses and disbursements of the DIP Facility Agent and the DIP Facility Lenders, in each case, that have accrued and are unpaid as of the Effective Date and are required to be paid under or pursuant to the DIP Facility Order, the Restructuring Support Agreement or any other order of the Bankruptcy Court, including, for the avoidance of doubt, professional fees required to be paid as adequate protection for the First Lien Lenders and the A&R Exit Backstop Payment and A&R Exit Commitment Payment.

### 5.    Treatment of Priority Tax Claims.

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, on the Effective Date or as soon thereafter as is reasonably practicable, the holder of such Allowed Priority Tax Claim shall receive, on account of such Allowed Priority Tax Claim, Cash in an amount equal to the Allowed amount of such Claim; *provided*, that Allowed Priority Tax Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities.

### C.    Classification of Claims and Interests

### 1.    Classification in General.

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided*, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

### 2.    Formation of Debtor Groups for Convenience Only.

The Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, confirmation of the Plan, and making Plan Distributions in respect of Claims against and Interests in the Debtors under the Plan.  Such groupings shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal

entities, or cause the transfer of any Assets; and, except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities.

### 3.    Summary of Classification of Claims and Interests.

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are: (i) Impaired and Unimpaired under the Plan; (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; and (iii) deemed to accept or reject the Plan:

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 1 | Priority Non-Tax Claims | Unimpaired | No (Deemed to accept) |
| Class 2 | Other Secured Claims | Unimpaired | No (Deemed to accept) |
| Class 3 | First Lien Debt Claims | Impaired | Yes |
| Class 4 | Second Lien Debt Claims | Impaired | Yes |
| Class 5 | General Unsecured Claims | Unimpaired | No (Deemed to accept) |
| Class 6 | NCS Rejection Claims | Impaired | No (Deemed to reject) |
| Class 7 | General Unsecured PDM Claims | Impaired | No (Deemed to reject) |
| Class 8 | Intercompany Claims | Unimpaired | No (Deemed to accept) |
| Class 9 | Subordinated Claims | Impaired | No (Deemed to reject) |
| Class 10 | Existing Equity Interests | Impaired | No (Deemed to reject) |
| Class 11 | Intercompany Interests | Unimpaired | No (Deemed to accept) |

### 4.    Separate Classification of Other Secured Claims.

Although all Other Secured Claims have been placed in one Class for purposes of nomenclature within the Plan, each Other Secured Claim, to the extent secured by a Lien on Collateral different from the Collateral securing a different Other Secured Claim, shall be treated as being in a separate sub-Class for the purposes of voting to accept or reject the Plan and receiving Plan Distributions.

### 5.    Elimination of Vacant Classes.

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or

reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

### 6.    Voting; Presumptions; Solicitation.

Acceptance by Certain Impaired Classes.  Only holders of Allowed Claims in Classes 3 and 4 are entitled to vote to accept or reject the Plan.  An Impaired Class of Claims shall have accepted the Plan if (i) the holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (ii) the holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.  Holders of Claims in Classes 3 and 4 shall receive ballots containing detailed voting instructions.

Deemed Acceptance by Unimpaired Classes.  Holders of Claims and Interests in Classes 1, 2, 5, 8, and 11 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Accordingly, such holders are not entitled to vote to accept or reject the Plan.

Deemed Rejection by Certain Impaired Classes.  Holders of Claims and Interests in Classes 6, 7, 9, and 10 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Accordingly, such holders are not entitled to vote to accept or reject the Plan.

### 7.    Cramdown.

If any Class of Claims is deemed to reject the Plan or is entitled to vote on the Plan and does not vote to accept the Plan, the Debtors may (i) seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify the Plan in accordance with the terms of the Plan and the Bankruptcy Code.  If a controversy arises as to whether any Claims or Interests are impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### 8.    No Waiver.

Nothing contained in the Plan shall be construed to waive a Debtor's or other entity's right to object on any basis to any Claim.

### D.    Treatment of Claims and Interests.

### 1.    Class 1: Priority Non-Tax Claims.

Treatment:  The legal, equitable, and contractual rights of the holders of Allowed Priority Non-Tax Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Priority Non-Tax Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Priority Non-Tax Claim shall receive, on account of such Allowed Claim, at the option of the Reorganized Debtors: (i) Cash in an amount equal to the Allowed amount of such Claim or (ii) other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

Impairment and Voting: Allowed Priority Non-Tax Claims are Unimpaired. In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Priority Non-Tax Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Priority Non-Tax Claims.

### 2.    Class 2: Other Secured Claims.

Treatment: The legal, equitable, and contractual rights of the holders of Allowed Other Secured Claims are unaltered by the Plan. Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Secured Claim shall receive, on account of such Allowed Claim, at the option of the Reorganized Debtors: (i) Cash in an amount equal to the Allowed amount of such Claim, (ii) reinstatement or such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code, or (iii) return of the applicable Collateral in satisfaction of the Allowed amount of such Other Secured Claim.

Impairment and Voting: Allowed Other Secured Claims are Unimpaired. In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Secured Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Other Secured Claims.

### 3.    Class 3: First Lien Debt Claims.

Treatment: On the Effective Date, each holder of an Allowed First Lien Debt Claim shall be entitled to receive from (and on behalf of) CHC, in full and final satisfaction of such Claim, its Pro Rata share of 90% of the New Common Stock issued on the Effective Date (subject to dilution by the Management Incentive Plan).

Impairment and Voting: The First Lien Debt Claims are Impaired. Holders of Allowed First Lien Debt Claims are entitled to vote on the Plan.

Allowance: The First Lien Debt Claims shall be deemed Allowed on the Effective Date in the aggregate amount of $1,075,545,556.48, minus the aggregate amount of the DIP Facility Roll-Up Loans.

### 4.    Class 4: Second Lien Debt Claims.

Treatment: On the Effective Date, each holder of an Allowed Second Lien Debt Claim shall be entitled to receive from (and on behalf of) CHC, in full and final satisfaction of such Claim, its Pro Rata share of 10% of the New Common Stock issued on the Effective Date (subject to dilution by the Management Incentive Plan).

Impairment and Voting: The Second Lien Debt Claims are Impaired. Holders of Allowed Second Lien Debt Claims are entitled to vote on the Plan.

Allowance:  The Second Lien Debt Claims shall be deemed Allowed on the Effective Date in the aggregate amount of $471,987,841.37.

### 5.    Class 5: General Unsecured Claims.

Treatment:  The legal, equitable, and contractual rights of the holders of General Unsecured Claims are unaltered by the Plan.  Except to the extent that a holder of a General Unsecured Claim agrees to different treatment, on and after the Effective Date, the Debtors shall continue to pay (if Allowed) or dispute each General Unsecured Claim in the ordinary course of business as if the Chapter 11 Cases had never been commenced.

Impairment and Voting:  All Allowed General Unsecured Claims are deemed Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed General Unsecured Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed General Unsecured Claims.

### 6.    Class 6: NCS Rejection Claims.

Treatment:  The holders of NCS Rejection Claims shall not receive or retain any property under the Plan on account of such Claims, and the obligations of the Debtors and the Reorganized Debtors on account of the NCS Rejection Claims shall be discharged.

Impairment and Voting:  NCS Rejection Claims are Impaired.  In accordance with section 1126(g) of the Bankruptcy Code, holders of NCS Rejection Claims are conclusively presumed to reject the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to NCS Rejection Claims.

### 7.    Class 7: General Unsecured PDM Claims.

Treatment:  The holders of General Unsecured PDM Claims shall not receive or retain any property under the Plan on account of such Claims, and the obligations of the Debtors and the Reorganized Debtors on account of the General Unsecured PDM Claims shall be discharged.

Impairment and Voting:  General Unsecured PDM Claims are Impaired.  In accordance with section 1126(g) of the Bankruptcy Code, holders of General Unsecured PDM Claims are conclusively presumed to reject the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to General Unsecured PDM Claims.

### 8.    Class 8: Intercompany Claims.

Treatment:   On or after the Effective Date, all Intercompany Claims shall be paid, adjusted, continued, settled, reinstated, discharged, or eliminated, in each case to the extent determined to be appropriate by the Debtors or Reorganized Debtors, with the consent of the Ad Hoc First Lien Group and the Second Lien Ad Hoc Groups (such consents not to be unreasonably withheld), as applicable.  All Claims between any Debtor and a non-Debtor affiliate shall be Unimpaired under the Plan.

Impairment and Voting:  All Allowed Intercompany Claims are deemed Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Intercompany Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Intercompany Claims.

### 9.    Class 9: Subordinated Claims.

Treatment:  Subordinated Claims are subordinated pursuant to the Plan and section 510 of the Bankruptcy Code.  The holders of Subordinated Claims shall not receive or retain any property under the Plan on account of such Claims, and the obligations of the Debtors and the Reorganized Debtors on account of Subordinated Claims shall be discharged.

Impairment and Voting:  Subordinated Claims are Impaired.  In accordance with section 1126(g) of the Bankruptcy Code, holders of Subordinated Claims are conclusively presumed to reject the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to Subordinated Claims.

### 10.    Class 10: Existing Equity Interests.

Treatment:  On the Effective Date, the Existing Equity Interests shall be cancelled without further action by or order of the Bankruptcy Court.

Impairment and Voting:  Existing Equity Interests are Impaired.  In accordance with section 1126(g) of the Bankruptcy Code, holders of Existing Equity Interests are conclusively presumed to reject the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to Existing Equity Interests.

### 11.    Class 11: Intercompany Interests.

Treatment:  Intercompany Interests are Unimpaired.  On the Effective Date, all Intercompany Interests shall be treated as set forth in Section 5.9 of the Plan.

Impairment and Voting:  Intercompany Interests are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Intercompany Interests are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Intercompany Interests.

### 12.    Debtors' Rights in Respect of Unimpaired Claims.

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Reorganized Debtors in respect of any Unimpaired Claim, including, without limitation, all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claim.

### 13.    Treatment of Vacant Classes.

Any Claim or Interest in a Class that is considered vacant under Section 3.5 of the Plan shall receive no Plan Distribution.

### E.    Means for Implementation.

### 1.    Continued Corporate Existence; Dissolution.

(a) Except as otherwise provided in the Plan, the Debtors shall continue to exist after the Effective Date as Reorganized Debtors in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to their respective Amended Certificate of Incorporation and Amended By-Laws.  On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Reorganized Debtor, each Reorganized Debtor may, in its sole discretion, take such action as permitted by applicable law, and such Reorganized Debtor's organizational documents, as such Reorganized Debtor may determine is reasonable and appropriate, including, without limitation, causing:  (i) a Reorganized Debtor to be merged into another Reorganized Debtor or an affiliate of a Reorganized Debtor and to engage in the Restructuring Transactions described in the Acquisition Transactions Exhibit; (ii) a Reorganized Debtor to be dissolved; (iii) the legal name of a Reorganized Debtor to be changed; or (iv) the closure of a Reorganized Debtor's Chapter 11 Case on the Effective Date or any time thereafter.

(b) On the Effective Date or as soon thereafter as is reasonably practicable, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate the Plan, including, without limitation:  (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and the Plan Documents and that satisfy the requirements of applicable law and any other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation and amendments thereto, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable law, including the applicable Amended Certificates of Incorporation and Amended By-Laws; (iv) the Restructuring Transactions; and (v) all other actions that the applicable entities determine to be necessary or appropriate, including, without limitation, making filings or recordings that may be required by applicable law.

(c) After the Effective Date, the Reorganized Debtors shall be authorized to dissolve the Debtors or the Reorganized Debtors (other than Reorganized CMC) in accordance with applicable law.  As promptly as practicable after the Effective Date, Catalina Parent, PDM Intermediate Holdings A Corporation, PDM Intermediate Holdings B Corporation, and CHC shall be dissolved.

## 2.    Plan Funding.

Plan Distributions of Cash shall be funded from the Debtors' Cash on hand as of the applicable date of such Plan Distribution and from proceeds of the A&R Exit Facility.

## 3.    Cancellation of Existing Securities and Agreements.

(a)  Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan, or in any Plan Document, on the Effective Date, all agreements, instruments, and other documents evidencing any prepetition Claim or Interest (other than certain Intercompany Interests that are not modified by the Plan pursuant to Section 5.9 of the Plan) and any rights of any holder in respect thereof shall be deemed cancelled and of no force or effect.  The holders of or parties to such cancelled instruments, Securities, and other documentation shall have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan.  For the avoidance of doubt, Section 5.3 of the Plan shall not apply to the DIP Facility Loan Agreement or the Amended and Restated First Lien Credit Agreement.

(b)  Notwithstanding such cancellation and discharge, the First Lien Credit Agreement and the Second Lien Credit Agreement shall continue in effect solely to the extent necessary to (i) allow the holders of Allowed First Lien Debt Claims and Allowed Second Lien Debt Claims to receive distributions under the Plan, (ii) allow the Debtors, the Reorganized Debtors, the First Lien Agent, the Second Lien Agent, and the Disbursing Agent to make post-Effective Date distributions or take such other action, if any, pursuant to the Plan on account of the Allowed First Lien Debt Claims and Allowed Second Lien Debt Claims, and to otherwise exercise their rights and discharge their obligations relating to the interests of the holders of such Claims in accordance with this Plan, and (iii) permit the First Lien Agent and the Second Lien Agent to appear in these Chapter 11 Cases; *provided* that nothing in Section 5.3 of the Plan shall affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any liability or expense to the Reorganized Debtors.  The First Lien Agent and The Second Lien Agent shall be entitled to reimbursement of reasonable and documented fees and expenses (including reasonable and documented fees and expenses of its professionals) incurred in connection with the matters set forth in Section 5.3(b) of the Plan.

(c)  Notwithstanding anything to the contrary in the Plan, any and all indemnification and reimbursement provisions in the First Lien Credit Agreement and Second Lien Credit Agreement and the other Loan Documents (as defined in the First Lien Credit Agreement and Second Lien Credit Agreement, as applicable) shall survive the occurrence of the Effective Date to the extent such indemnification and reimbursement provisions would survive the satisfaction and discharge of all other Obligations (as defined in the First Lien Credit Agreement and Second  Lien Credit Agreement, as applicable).

(d)  Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors of their interests, as a result

of the cancellations, terminations, satisfaction, releases, or discharges provided for in Section 5.3 of the Plan shall be deemed null and void and shall be of no force and effect. Nothing contained in the Plan shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtors or any of their counterparties under any executory contract or unexpired lease to the extent such executory contract or unexpired lease has been assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court or hereunder.

(e) Nothing in this Plan shall be deemed to limit or otherwise affect any rights of, or liens or security interests in favor of, JPM under or in connection with the L/C Cash Collateral Agreement, the Cash Collateral Account (as defined in the L/C Cash Collateral Agreement) or any contents or proceeds thereof, and the L/C Cash Collateral Agreement shall remain in effect in accordance with its terms for so long as any obligations remain outstanding thereunder (including any obligations of the Debtors to pay fronting fees or other costs pursuant to Section 2.03(i) of the First Lien Credit Agreement, which obligations shall survive the occurrence of the Effective Date and continue to accrue for so long as the JPM Letter of Credit remains outstanding).

### 4.    Cancellation of Certain Existing Security Interests.

Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Debtors or Reorganized Debtors, as applicable, any Collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

### 5.    Officers and Boards of Directors.

(a) On the Effective Date, and if the CMC Acquisition occurs, in accordance with the Acquisition Agreement, the board of directors of Reorganized Catalina Topco shall consist of [●] directors, each of whom shall be designated by the Ad Hoc First Lien Group.  The composition of the boards of directors of each Reorganized Debtor shall be disclosed prior to the entry of the Confirmation Order.

(b) Except to the extent that a member of the board of directors of a Debtor continues to serve as a director of such Reorganized Debtor on the Effective Date, the members of the board of directors of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date and each such director shall be deemed to have resigned or shall otherwise cease to be a director of the applicable Debtor on the Effective Date.  Commencing on the Effective Date, each of the directors of each of the Reorganized Debtors shall serve pursuant to the terms of the applicable organizational documents of such Reorganized Debtor and may be replaced or removed in accordance with such organizational documents.

6.    **Management Incentive Plan.**

(a) After the Effective Date, and if the CMC Acquisition occurs, in accordance with the Acquisition Agreement, the New Board shall adopt the Management Incentive Plan. The participants and the amounts allocated under the Management Incentive Plan and other terms and conditions thereof shall be determined in the sole discretion of the New Board; *provided, however*, that the Management Incentive Plan shall consist only of common stock, preferred stock, warrants, options, restricted stock units, or other instruments or securities exercisable or convertible into New Common Stock, the amount of which shall not exceed ten percent (10%) of the New Common Stock authorized to be issued pursuant to the Plan.

(b) Any Catalina Parent Interests granted prior to the Effective Date to a current or former employee, officer, director or contractor pursuant to an employee compensation plan, benefit plan, employment agreement, offer letter, award letter or otherwise shall be deemed cancelled on the Effective Date.

7.    **Authorization, Issuance, and Delivery of New Common Stock.**

(a) On the Effective Date, all existing interests in Catalina Parent shall be cancelled and (i) Reorganized CMC is authorized to issue or cause to be issued and, in the event the CMC Acquisition does not occur, shall issue the New Common Stock for distribution in accordance with the terms of this Plan without the need for any further corporate, shareholder, or other equityholder action, and (ii) the event the CMC Acquisition does occur, and in accordance with (and subject to the terms of) the Acquisition Agreement, the Acquisition Company shall transfer (or cause to be transferred) to CHC the New Common Stock, as partial consideration for the acquisition of Reorganized CMC, for distribution in accordance with the terms of the Plan, in each case, CHC shall direct the Disbursing Agent to distribute the New Common Stock in accordance with Section 6.1 of the Plan.

(b) All of the New Common Stock issuable under the Plan, when so issued, shall be duly authorized, validly issued, fully paid, and nonassessable, and the holders of New Common Stock shall be deemed to have accepted the terms of the New Stockholders' Agreement (solely in their capacity as shareholders of Reorganized Catalina Topco) and to be parties thereto without further action or signature. The New Stockholders' Agreement shall be effective as of the Effective Date.

(c) Upon the Effective Date, unless otherwise consented to by the Required Restructuring Support Parties, (i) the New Common Stock shall not be registered under the Securities Act of 1933, and shall not be listed for public trading on any securities exchange, and (ii) none of the Reorganized Debtors shall be a reporting company under the Exchange Act.

8.    **Amended and Restated First Lien Credit Agreement.**

On the Effective Date and, if applicable, prior to the CMC Acquisition, the Amended and Restated First Lien Credit Agreement shall be executed, delivered and all fees and expenses required thereunder (including the A&R Exit Facility Backstop Payment and the A&R Exit Facility Commitment Payment) shall be paid, and the Reorganized Debtors (other than the Acquisition

Company) shall be authorized to execute, deliver, enter into, and make any payments required by the Amended and Restated First Lien Credit Agreement without the need for any further corporate action and without further action by the holders of Claims or Interests. The form of the Amended and Restated First Lien Credit Agreement will be filed as part of the Plan Supplement.

All Liens and security interests granted pursuant to the Amended and Restated First Lien Credit Agreement are intended to be (a) valid, binding, perfected and enforceable Liens and security interests in the personal and real property described in and subject to such documents, with the priorities established in respect thereof under applicable non-bankruptcy law and (b) not subject to avoidance, recharacterization or subordination under any applicable law.

All Liens, mortgages and security interests securing the obligations arising under the Amended and Restated First Lien Credit Agreement that were shared collateral securing the DIP Facility Loan Agreement are unaltered by the Plan, and all such Liens, mortgages and security interests are created and perfected with respect to the Amended and Restated First Lien Credit Facility to the same extent, in the same manner and on the same terms and priorities as they were with respect to the DIP Facility. For purposes of all mortgages, pledges, and deposit account control agreements that secured the obligations arising under the DIP Facility Loan Agreement, the Amended and Restated First Lien Credit Agreement is deemed an amendment and restatement of the DIP Facility Loan Agreement, and such mortgages, pledges, and control agreements shall survive the Effective Date, shall not be cancelled, and shall continue to secure the Amended and Restated First Lien Credit Facility.

For the avoidance of doubt, Section 5.8 of the Plan shall apply to the Amended and Restated First Lien Credit Facility in its entirety, including the A&R First-Out Tranche and the A&R Last-Out Tranche/

## 9.    Intercompany Interests; Corporate Reorganization.

Subject to the consent of the Required Restructuring Support Parties, on the Effective Date, except as otherwise provided in the Plan, and without the need for any further corporate action or any other approval of any board of directors, management, shareholders, or other equityholders of any Debtor or Reorganized Debtor, as applicable, the certificates and all other documents representing the Intercompany Interests shall be deemed to be in full force and effect.

## 10.    Restructuring Transactions.

(a)    On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or Reorganized Debtors, as applicable, may take all actions consistent with the Plan and the Restructuring Support Agreement as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with the Plan.

(b)    On or before the CMC Acquisition Election Date, the Debtors (with the consent of the Ad Hoc First Lien Group and the Ad Hoc Second Lien Group) shall elect whether or not to consummate the CMC Acquisition.

(c) The following transactions shall occur on or prior to the Effective Date (and in all events, prior to any distributions pursuant to Article VI of the Plan and, if applicable, prior to the CMC Acquisition):

    (i)    each Modiv Media Inc. and Cellfire Inc, and any other subsidiary as determined by the Debtors, shall be converted into a limited liability company that, for U.S. federal income tax purposes, is treated as a disregarded entity;

    (ii)    in accordance with Section 4.8 of the Plan, all Intercompany Claims shall be paid, adjusted, continued, settled, reinstated, discharged, or eliminated; and

    (iii)    the Intercompany Interests in CMC shall be recapitalized into the New Common Stock, unless the CMC Acquisition occurs.

(d) The transactions described in Section 5.10(a)-(c) are subject to the Acquisition Transactions Exhibit. In addition, notwithstanding anything to the contrary in this Plan, the Debtors shall consult with the Ad Hoc First Lien Group and the Ad Hoc Second Lien Group to determine whether, and provide the Ad Hoc First Lien Group and the Ad Hoc Second Lien Group with reasonable access to materials in its (or its agents') possession reasonably necessary to evaluate whether, to engage in the Acquisition Transactions (or other related, similar or alternative Restructuring Transactions), and the Debtors or Reorganized Debtors may not engage in the Acquisition Transactions (or other related, similar or alternative Restructuring Transactions) without the prior consent of the Ad Hoc First Lien Group and the Ad Hoc Second Lien Group. The Debtors shall cooperate on a reasonable basis with the Ad Hoc First Lien Group and the Ad Hoc Second Lien Group in connection with proposals by the Ad Hoc First Lien Group and/or the Ad Hoc Second Lien Group. In the event that the Debtors, the Ad Hoc First Lien Group and the Ad Hoc Second Lien Group agree to effectuate the Acquisition Transactions or other Restructuring Transactions in a manner that the Ad Hoc First Lien Group and the Ad Hoc Second Lien Group reasonably believe could qualify as a "qualified stock purchase" or "qualified stock disposition" within the meaning of Sections 338 and 336, respectively, of the Tax Code (and the Treasury Regulations promulgated thereunder), then the Debtors or Reorganized Debtors shall deliver to the Ad Hoc First Lien Group, the Ad Hoc Second Lien Group and Reorganized Catalina Topco a properly completed IRS Form 8023 (and/or such other forms or documentation as required by applicable Law to make elections pursuant to Sections 338 or 336 of the Tax Code and the Treasury Regulations promulgated thereunder (and any similar elections under state or local law)) on or prior to the Effective Date duly executed by the common parent of the Catalina Parent Group (or other applicable signatory).

(e) Notwithstanding anything to the contrary in this Plan, the Plan will be consummated in the manner set forth in the Acquisition Transactions Exhibit.

## 11.    Separability.

If the Bankruptcy Court does not confirm the Plan with respect to one or more Debtors, it may still confirm the Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

### 12. Closing of Chapter 11 Cases.

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases; *provided*, as of the Effective Date, the Reorganized Debtors may submit separate orders to the Bankruptcy Court under certification of counsel closing certain individual Chapter 11 Cases and changing the caption of the Chapter 11 Cases accordingly; *provided further* that matters concerning Claims may be heard and adjudicated in one of the Debtors' chapter 11 cases that remains open regardless of whether the applicable Claim is against a Debtor in a chapter 11 case that is closed. Nothing in the Plan shall authorize the closing of any case *nunc pro tunc* to a date that precedes the date any such order is entered. Any request for *nunc pro tunc* relief shall be made on motion served on the United States Trustee, and the Bankruptcy Court shall rule on such request after notice and a hearing. Upon the filing of a motion to close the last Chapter 11 Case remaining open, the Reorganized Debtors shall file a final report with respect to all of the Chapter 11 Cases pursuant to Local Rule 3022-1(c).

### 13. Determination of Tax Filings and Taxes.

(a) Prior to the dissolution of Catalina Parent, Catalina Parent shall designate Reorganized CMC as the agent (the "**Tax Agent**") for the Catalina Parent Group in accordance with Treasury Regulations Section 1.1502-77(c)(5), as amended and supplemented, and any comparable provision under state or local law, with respect to all taxable periods ending on or before, or including, the dissolution of Catalina Parent.

(b) Catalina Parent shall forward to the Tax Agent copies of all notices and communications relating to tax matters that it receives and shall promptly provide to the Tax Agent any information and documents with respect to tax matters reasonably requested by the Tax Agent. Without limiting the foregoing, prior to the dissolution of Catalina Parent, a power of attorney authorizing the Tax Agent to correspond with any taxing authority on behalf of the Debtors and to sign, negotiate, settle and administer any Group Tax Returns (as defined below) or other tax filings shall be provided to the Tax Agent.

(c) For all taxable periods ending on or prior to, or including, the Effective Date, the Tax Agent shall prepare and file (or cause to be prepared and filed) on behalf of the Catalina Parent Group, all group tax returns, reports, certificates, forms or similar statements or other documents (collectively, "**Group Tax Returns**") required to be filed or that the Tax Agent otherwise deems appropriate, including the filing of amended Group Tax Returns. If requested by the Tax Agent, Catalina Parent shall promptly execute and file, or cause to be executed and filed, any Group Tax Returns of the Catalina Parent Group submitted by the Tax Agent to Catalina Parent for execution or filing. Catalina Parent shall not file or amend any Group Tax Return for any taxable periods (or portions thereof) described in the first sentence of this clause (c) without the Tax Agent's prior written consent.

(d) If Catalina Parent receives written notice from a taxing authority of any pending examination, claim, settlement, proposed adjustment or related matters with respect to taxes that could affect any other member of the Catalina Parent Group it shall so notify the Tax Agent in writing within ten (10) business days thereafter. The Tax Agent shall have

the sole right, at its expense, to control, conduct, compromise and settle any tax contest, audit or administrative or court proceeding relating to any liability for taxes of the Catalina Parent Group. With respect to any such proceeding and with respect to the preparation and filing of any Group Tax Returns, the Tax Agent may act in its own self-interest and in the of its subsidiaries and affiliates, without regard to any adverse consequences to Catalina Parent.

(e)  The Reorganized Debtors shall have the right to request an expedited determination of their tax liability, if any, under section 505(b) of the Bankruptcy Code with respect to any tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

### 14.    Notice of Effective Date.

On the Effective Date, the Debtors shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

### F.    Provisions Governing Distributions

### 1.    Distributions Generally.

The Disbursing Agent shall make all Plan Distributions to the appropriate holders of Allowed Claims and Allowed Interests in accordance with the terms of the Plan; *provided*, in each case, that the Debtors shall provide the applicable Disbursing Agent with written instructions for the allocation of any distributions among the applicable holders of Allowed Claims and Allowed Interests; *provided, further,* that any distributions with respect to the First Lien Credit Facility shall be made in accordance with the First Lien Credit Agreement, and any distributions with respect to the Second Lien Facility shall be made in accordance with the Second Lien Credit Agreement.

### 2.    Postpetition Interest on Claims.

Except as otherwise set forth in the Plan, the Plan Documents, or the Confirmation Order, postpetition interest shall accrue, and shall be paid, on any Claims (except for First Lien Debt Claims, Second Lien Debt Claims, or any other prepetition funded indebtedness borrowed or issued by a Debtor) in the ordinary course of business in accordance with any applicable law, agreement, document, or Final Order, as the case may be, as if the Chapter 11 Cases had never been commenced.

### 3.    Date of Distributions.

Unless otherwise provided in the Plan, any distributions and deliveries to be made under the Plan shall be made on the Effective Date or as soon thereafter as is practicable.

### 4.    Distribution Record Date.

(a)  As of the close of business on the Distribution Record Date, the various lists of holders of Claims in each Class, as maintained by the Debtors or their agents, shall be deemed closed, and there shall be no further changes in the record holders of any Claims after the

Distribution Record Date.  Neither the Debtors nor the Disbursing Agent shall have any obligation to recognize any transfer of a Claim occurring after the close of business on the Distribution Record Date.  In addition, with respect to payment of any Cure Amounts or disputes over any Cure Amounts, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount

(b)  Notwithstanding anything in the Plan to the contrary, in connection with any distribution under the Plan to be effected through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise), the Debtors and the Reorganized Debtors, as applicable, shall be entitled to recognize and deal for all purposes under the Plan with holders of New Common Stock to the extent consistent with the customary practices of DTC used in connection with such distributions.  All New Common Stock to be distributed under the Plan shall be issued in the names of such holders or their nominees in accordance with DTC's book-entry exchange procedures; *provided*, that such New Common Stock is permitted to be held through DTC's book-entry system; and *provided*, *further*, that to the extent the New Common Stock is not eligible for distribution in accordance with DTC's customary practices, Reorganized Catalina Topco shall take all such reasonable actions as may be required to cause the distributions of the New Common Stock under the Plan.  No distributions will be made other than through DTC if the New Common Stock is permitted to be held through DTC's book entry system. Any distribution that otherwise would be made to any holder eligible to receive a distribution of a security available solely through DTC who does not own or hold an account eligible to receive a distribution through DTC on a relevant distribution date or reasonably promptly thereafter (and in any event no more than two weeks thereafter) shall be forfeited.

### 5.    Disbursing Agent.

All distributions under the Plan shall be made by the Disbursing Agent on and after the Effective Date as provided herein.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.  The Reorganized Debtors shall use commercially reasonable efforts to provide the Disbursing Agent (if other than the Reorganized Debtors) with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtors' or Reorganized Debtors' books and records.  The Reorganized Debtors shall cooperate in good faith with the applicable Disbursing Agent (if other than the Reorganized Debtors) to comply with the reporting and withholding requirements outlined in Section 6.16 of the Plan.

### 6.    Delivery of Distributions.

Subject to Section V.F.4(a) of the Plan, the Disbursing Agent shall issue or cause to be issued, the applicable consideration under the Plan and, subject to Bankruptcy Rule 9010, shall make all distributions to any holder of an Allowed Claim as and when required by the Plan at:  (a) the address of such holder on the books and records of the Debtors or their agents; or (b) at the address in any written notice of address change delivered to the Debtors or the Disbursing Agent, including any addresses included on any transfers of Claim filed pursuant to Bankruptcy Rule 3001.  In the

event that any distribution to any holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the Disbursing Agent has been notified of the then-current address of such holder, at which time or as soon thereafter as reasonably practicable such distribution shall be made to such holder without interest.

### 7.    Unclaimed Property.

One year from the later of:  (i) the Effective Date and (ii) the date that is ten (10) Business Days after the date a Claim is first Allowed, all distributions payable on account of such Claim shall be deemed unclaimed property under section 374(b) of the Bankruptcy Code and shall revert to Reorganized CMC or its successors or assigns, and all claims of any other Person (including the holder of a Claim in the same Class) to such distribution shall be discharged and forever barred. The Reorganized Debtors and the Disbursing Agent shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

### 8.    Satisfaction of Claims.

Unless otherwise provided herein, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

### 9.    Manner of Payment under Plan.

Except as specifically provided herein, at the option of the Debtors or the Reorganized Debtors, as applicable, any Cash payment to be made under the Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

### 10.    Fractional Shares and De Minimis Cash Distributions.

No fractional shares of New Common Stock shall be distributed.  When any distribution would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the New Common Stock subject to such distribution shall be rounded to the next higher or lower whole number as follows:  (i) fractions equal to or greater than 1/2 shall be rounded to the next higher whole number, and (ii) fractions less than 1/2 shall be rounded to the next lower whole number.  The total number of shares of New Common Stock to be distributed on account of Allowed Claims shall be adjusted as necessary to account for the rounding provided for herein. No consideration shall be provided in lieu of fractional shares that are rounded down.  Neither the Reorganized Debtors nor the Disbursing Agent shall have any obligation to make a distribution that is less than one (1) share of New Common Stock or $50.00 in Cash.  Fractional shares of New Common Stock that are not distributed in accordance with Section 6.10 of the Plan shall be returned to, and ownership thereof shall vest in, Reorganized Catalina Topco.

### 11.    No Distribution in Excess of Amount of Allowed Claim.

Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, Plan Distributions in excess of the Allowed amount of such

Claim (plus any postpetition interest on such Claim solely to the extent permitted by Section 6.2 of the Plan).

### 12.    Allocation of Distributions between Principal and Interest.

Except as otherwise provided in the Plan and subject to Section V.F.2 of the Plan, to the extent that any Allowed First Lien Debt Claim or any Allowed Second Lien Debt Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated first to the principal amount (as determined for federal income tax purposes) of the Claim and then to accrued but unpaid interest.

### 13.    Exemption from Securities Laws.

(a)    The issuance of and the distribution under the Plan of the New Common Stock shall be exempt, without further act or actions by any entity, from registration under the Securities Act, and all rules and regulations promulgated thereunder, and any other applicable securities laws to the fullest extent permitted by section 1145 of the Bankruptcy Code.  The New Common Stock may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to the New Common Stock, as that term is defined in section 1145(b) of the Bankruptcy Code.  In addition, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

(b)    Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the New Common Stock through the facilities of the DTC, the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Common Stock under applicable securities laws.

(c)    Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Stock is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.  The Confirmation Order shall provide that DTC shall be required to accept and conclusively rely upon the Plan or Confirmation Order in lieu of a legal opinion regarding whether the New Common Stock is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

### 14.    Setoffs and Recoupments.

Each Reorganized Debtor, or such entity's designee as instructed by such Reorganized Debtor, may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, offset or recoup against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim any and all claims, rights, and Causes of Action that a Reorganized Debtor or its successors may hold against the holder of such Allowed Claim after the Effective Date to

the extent such setoff or recoupment is either (1) agreed in amount among the relevant Reorganized Debtor(s) and holder of the Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided*, that neither the failure to effect a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any claims, rights, or Causes of Action that a Reorganized Debtor or its successor or assign may possess against such holder. For the avoidance of doubt, in no event shall the Debtors or the Reorganized Debtors be authorized or permitted to offset or recoup against the First Lien Debt Claim, DIP Facility Claim, or Second Lien Debt Claim.

### 15.    Rights and Powers of Disbursing Agent.

(a) Powers of Disbursing Agent.  The Disbursing Agent shall be empowered to:  (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all applicable distributions or payments provided for under the Plan; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers (A) as may be vested in the Disbursing Agent by order of the Bankruptcy Court (including any Final Order issued after the Effective Date) or pursuant to the Plan or (B) as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

(b) Expenses Incurred on or After the Effective Date.  Except as otherwise ordered by the Bankruptcy Court and subject to the written agreement of the Reorganized Debtors, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including, without limitation, taxes) and any reasonable compensation and expense reimbursement Claims (including, without limitation, for reasonable attorneys' and other professional fees and expenses) made by the Disbursing Agent shall be indefeasibly paid in Cash by the Reorganized Debtors.

### 16.    Withholding and Reporting Requirements.

In connection with this Plan and all instruments issued in connection therewith and distributed thereon, the Reorganized Debtors and any other distributing party shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all Plan Distributions under this Plan shall be subject to any such withholding or reporting requirements.  In the case of a non-Cash Plan Distribution that is subject to withholding, the distributing party may request a holder of an Allowed Claim to complete and return a Form W-9 or Form W-8BEN, W-8BEN-E or other appropriate Form W-8, as applicable to each such holder. If such Form is requested and not submitted to the distributing party within thirty (30) days of the request, the distributing party may, in its discretion, either (i) withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax, or (ii) require the intended recipient of such distribution to provide the withholding agent with an amount of Cash sufficient to satisfy such withholding tax as a condition to receiving such distribution; provided that, if the applicable holder provides the appropriate Form prior to the distributing party selling such property pursuant to clause (i) or the receipt of cash pursuant to clause (ii), such Form shall be deemed timely provided.  If such Form is requested and submitted to the distributing party pursuant to the immediately preceding sentence, the distributing party may withhold an appropriate portion of such distributed property and sell such withheld

property to generate Cash necessary to pay over the withholding tax; provided that, the distributing party shall first notify the intended recipient of such contemplated withholding (including the basis for such withholding) and sale, shall cooperate in good faith with the applicable holder to eliminate or reduce such withholding and, if after such good faith cooperation, the distributing parties still believes withholding is required, offer the intended recipient the opportunity to provide sufficient Cash to satisfy such withholding tax in lieu of such sale.  The distributing party shall have the right, but not the obligation, not to make a Plan Distribution until its withholding obligation is satisfied pursuant to the preceding sentences.  Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable recipient for all purposes of this Plan.  The distributing party may require a holder of an Allowed Claim or Existing Equity Interest to complete and return a Form W-9 or Form W-8BEN, W-8BEN-E or other appropriate Form W-8, as applicable to each such holder.

Notwithstanding the above, each holder of an Allowed Claim that is to receive a Plan Distribution under this Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any governmental unit, including income, withholding, and other tax obligations, on account of such Plan Distribution

In the event that any amounts are withheld from any Plan Distribution, as soon as practicable after payment of the taxes to the applicable governmental unit, the Reorganized Debtors shall deliver or cause to be delivered to the holder from which such amounts were withheld the original or a certified copy of a receipt issued by such governmental unit evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the applicable holder, and the Reorganized Debtors shall use commercially reasonably efforts to cooperate in the prosecution of any refund claim made by the applicable holder.

### 17.    Hart-Scott-Rodino Antitrust Improvements Act.

Any New Common Stock to be distributed under the Plan to an entity required to file a notification and report form under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, shall not be distributed until the notification and waiting periods applicable under such Act to such entity have expired or been terminated.

### 18.    Claims Paid or Payable by Third Parties.

(a) **Claims Paid by Third Parties.** A Claim shall be correspondingly reduced, and the applicable portion of such Claim shall be disallowed without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives a payment on account of such Claim from a party that is not a Debtor or Reorganized Debtor; *provided* that the Debtors shall provide 21 days' notice to the holder prior to any disallowance of such Claim during which period the holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court. Subject to the last sentence of this paragraph, to the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the Reorganized

Debtors to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such holder to timely repay or return such distribution shall result in the holder owing the Reorganized Debtors annualized interest at the federal judgment rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

(b) **Claims Payable by Insurance Carriers.** No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that the Debtors shall provide 21 days' notice to the holder of such Claim prior to any disallowance of such Claim during which period the holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court.

(c) **Applicability of Insurance Policies.** Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Notwithstanding anything to the contrary herein, nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Person may hold against any other Person, including insurers, under any policies of insurance or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

### G.    Procedures for Resolving Claims

#### 1.    Disputed Claims Process.

Notwithstanding section 502(a) of the Bankruptcy Code, and except as otherwise set forth in the Plan, holders of Claims need not file proofs of Claim with the Bankruptcy Court, and the Reorganized Debtors and holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Chapter 11 Cases had not been commenced. For the avoidance of doubt, the Reorganized Debtors shall retain all rights, claims, defenses, counterclaims, crossclaims, or rights of setoff or recoupment with respect to any Claims, including General Unsecured Claims, in the ordinary course of business after the Effective Date. Notwithstanding any other provision of the Plan, the fact that a Claim, including General Unsecured Claims, remains unaltered by the Plan shall in no way effect whether such Claim is Allowed. Unless otherwise ordered by the Bankruptcy Court, the holders of Claims shall not be subject to any claims resolution process in the Bankruptcy Court in connection with their Claims and shall retain all their rights under applicable non-bankruptcy law to pursue their Claims against the Debtors or Reorganized Debtors in any forum with jurisdiction over the parties. Except for (i) proofs of Claim asserting damages arising out of the rejection of

an executory contract or unexpired lease by any of the Debtors pursuant to Section 8.3 of the Plan and (ii) proofs of Claim that have been objected to by the Debtors before the Effective Date, upon the Effective Date, any filed Claim, regardless of the time of filing, and including Claims filed after the Effective Date, shall be deemed withdrawn. To the extent not otherwise provided in the Plan, the deemed withdrawal of a proof of Claim is without prejudice to such claimant's rights under Section 7.1 of the Plan to assert its Claims in any forum as though the Debtors' Chapter 11 Cases had not been commenced. From and after the Effective Date, the Reorganized Debtors may satisfy, dispute, settle, or otherwise compromise any Claim without approval of the Bankruptcy Court.

## 2.      Estimation of Claims.

The Reorganized Debtors may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors had previously objected to or otherwise disputed such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Reorganized Debtors, may pursue supplementary proceedings to object to the allowance of such Claim.

## 3.      Claim Resolution Procedures Cumulative.

All of the objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan by any mechanism approved by the Bankruptcy Court.

## 4.      No Distributions Pending Allowance.

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

## 5.      Distributions after Allowance.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date on which the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required by the Bankruptcy Code.

### H.    Executory Contracts and Unexpired Leases

#### 1.    General Treatment.

As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount, all executory contracts and unexpired leases shall be deemed assumed, unless such contract or lease (i) was previously assumed or rejected by the Debtors, pursuant to Final Order of the Bankruptcy Court, (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, or (iii) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date.  Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each executory contract and unexpired lease assumed pursuant to the Plan shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, any Final Order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

#### 2.    Determination of Cure Disputes and Deemed Consent.

Any monetary amounts by which any executory contract or unexpired lease to be assumed hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtors or Reorganized Debtors, as applicable, upon assumption thereof.  Following the Petition Date, the Debtors shall have served a notice on parties to executory contracts and unexpired leases to be assumed reflecting the Debtors' intention to assume the contract or lease in connection with the Plan and setting forth the proposed Cure Amount (if any).  If a counterparty to any executory contract or unexpired lease that the Debtors or Reorganized Debtors intend to assume does not receive such a notice, the proposed Cure Amount for such executory contract or unexpired lease shall be deemed to be zero dollars ($0).

If there is a dispute regarding (a) any Cure Amount, (b) the ability of the Debtors to provide adequate assurance of future performance (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (c) any other matter pertaining to assumption, such dispute shall be heard by the Bankruptcy Court prior to such assumption being effective.  The Debtors reserve the right to reject any executory contract or unexpired lease not later than thirty (30) days after the entry of a Final Order resolving any such dispute.  Any counterparty to an executory contract or unexpired lease that fails to object timely to the notice of the proposed assumption and assignment of such executory contract or unexpired lease on which such executory contract or unexpired lease first appears or any subsequent notice in which the proposed Cure Amount for such executory contract or unexpired lease is reduced or the relevant Cure Amount within fourteen (14) days of the filing thereof, shall be deemed to have assented to such assumption and/or Cure Amount and shall be forever barred, estopped, and enjoined from challenging the validity of such assumption or the amount of such Cure Amount thereafter.

#### 3.    Rejection Damages Claims.

Any counterparty to a contract or lease that is rejected by the Debtors must file and serve a proof of claim on the applicable Debtor that is party to the contract or lease to be rejected no later than

thirty (30) days after the later of (a) the Confirmation Date or (b) the effective date of rejection of such executory contract or unexpired lease.

### 4.    Survival of the Debtors' Indemnification Obligations.

Any obligations of the Debtors pursuant to their corporate charters, by-laws, limited liability company agreements, memorandum and articles of association, or other organizational documents to indemnify current and former officers, directors, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such officers, directors, agents, or employees based upon any act or omission for or on behalf of the Debtors shall not be discharged, impaired, or otherwise affected by the Plan; *provided*, that the Reorganized Debtors shall not indemnify directors of the Debtors for any claims or Causes of Action arising out of or relating to any act or omission that is a criminal act or constitutes gross negligence or intentional fraud.  All such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors under the Plan and shall continue as obligations of the Reorganized Debtors.  Any claim based on the Debtors' obligations herein shall not be a Disputed Claim or subject to any objection, in either case, by reason of section 502(e)(1)(B) of the Bankruptcy Code.

### 5.    Compensation and Benefit Plans.

All employment and severance policies, and all compensation and benefits plans, policies, and programs of the Debtors applicable to their respective employees, retirees, and non-employee directors, including, without limitation, all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life and accidental death and dismemberment insurance plans, are deemed to be, and shall be treated as, executory contracts under the Plan and, on the Effective Date, shall be assumed pursuant to sections 365 and 1123 of the Bankruptcy Code.

### 6.    Insurance Policies.

All insurance policies to which any Debtor is a party as of the Effective Date shall be deemed to be and treated as executory contracts and shall be assumed by the applicable Debtor or Reorganized Debtor and shall continue in full force and effect thereafter in accordance with their respective terms.  All other insurance policies shall vest in the Reorganized Debtors.

### 7.    Intellectual Property Licenses and Agreements.

All intellectual property contracts, licenses, royalties, or other similar agreements to which the Debtors have any rights or obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the respective Debtors and shall continue in full force and effect unless any such intellectual property contract, license, royalty, or other similar agreement otherwise is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Debtors (with the consent of the Required Restructuring Support Parties) in accordance with Section 8.1 of the Plan. Unless otherwise noted hereunder, all other intellectual property contracts, licenses, royalties, or other similar agreements shall vest in the Reorganized Debtors and the Reorganized Debtors may take all actions as may be necessary or appropriate to ensure such vesting as contemplated herein.

8. **Modifications, Amendments, Supplements, Restatements, or Other Agreements.**

Unless otherwise provided herein or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is listed in any notice of assumed contracts.

9. **Reservation of Rights.**

(a) Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not an executory contract or unexpired lease or that the Debtors or the Reorganized Debtors or their respective affiliates has any liability thereunder.

(b) Except as explicitly provided in the Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors or the Reorganized Debtors under any executory or non-executory contract or unexpired or expired lease.

(c) Nothing in the Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors, as applicable, under any executory or non-executory contract or unexpired or expired lease.

(d) If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under the Plan, the Debtors or Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

I. **Conditions Precedent.**

1. **Conditions Precedent to Confirmation of the Plan.**

The following are conditions precedent to confirmation of the Plan:

(a) an order finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code shall have been entered by the Court (which, for the avoidance of doubt, may be the same order as the order confirming the Plan);

(b) the Plan, the Plan Supplement (including the applicable Plan Documents), and any and all of the schedules, documents, and exhibits contained therein shall have been filed and shall be consistent in all material respects with this Plan and the Restructuring Support Agreement;

(c) the Restructuring Support Agreement shall not have been terminated and shall be in full force and effect; and

(d) any Restructuring Expenses due and payable in accordance with their terms on or before the relevant date shall have been paid in full and in Cash.

**2.    Conditions Precedent to the Effective Date.**

The Effective Date shall not occur unless all of the following conditions precedent have been satisfied:

(a) the Plan Supplement, including the applicable Plan Documents, has been filed;

(b) the Plan Documents contain terms and conditions consistent in all material respects with the Plan and the Restructuring Support Agreement;

(c) the Bankruptcy Court has entered the Confirmation Order in form and substance reasonably satisfactory to the Debtors and the Required Restructuring Support Parties and such Confirmation Order has not been stayed, modified, or vacated;

(d) the Restructuring Support Agreement has not been terminated and remains in full force and effect and binding on all parties thereto;

(e) the Debtors shall not be in default under the DIP Facility or any of the DIP Facility Orders (or, to the extent that the Debtors are in default on the proposed Effective Date, such default shall have been waived by the required DIP Facility Lenders or cured by the Debtors in a manner consistent with the DIP Facility Loan Agreement or the applicable DIP Facility Orders);

(f) each of the Definitive Documents shall have satisfied the consent requirements of the applicable Restructuring Support Parties in accordance with the Restructuring Support Agreement;

(g) all conditions precedent to the issuance of the New Common Stock, other than any conditions related to the occurrence of the Effective Date, shall have occurred;

(h) all unpaid Restructuring Expenses and all amounts payable by the Debtors pursuant to the DIP Facility Orders and Restructuring Support Agreement (including the A&R Exit Facility Backstop Payment and the A&R Exit Facility Commitment Payment) shall have been paid in Cash;

(i) the NCS Agreement is amended on terms or rejected pursuant to an order providing relief, in each case, consistent with the Restructuring Support Agreement;

(j) the conditions to effectiveness of the Amended and Restated First Lien Credit Agreement have been satisfied or waived in accordance with the terms thereof, and the Amended and Restated First Lien Credit Agreement is in full force and effect and binding on all parties thereto;

(k) all governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions provided for in the Plan have been obtained, are not subject to unfulfilled conditions, and are in full force and effect, and all applicable waiting periods have expired without any action having been taken by any competent authority that restrains, prevents, or enjoins the Restructuring Transactions; and

(l) the Amended Certificate of Incorporation of Reorganized Catalina Topco has been filed with the appropriate governmental authority.

### 3.    Waiver of Conditions Precedent.

(a) Each of the conditions precedent set forth in Sections 9.1 and 9.2 of the Plan to the occurrence of the Effective Date may be waived in writing by the Debtors and the Required Restructuring Support Parties; *provided, that* the conditions precedent to the occurrence of the Effective Date in Sections 9.2(i), and (j) of the Plan may be waived by the Debtors and the Ad Hoc First Lien Group.  If any such condition precedent is waived pursuant to Section 9.3 of the Plan and the Effective Date occurs, each party agreeing to waive such condition precedent shall be estopped from withdrawing such waiver after the Effective Date or otherwise challenging the occurrence of the Effective Date on the basis that such condition was not satisfied, the waiver of such condition precedent shall benefit from the "equitable mootness" doctrine, and the occurrence of the Effective Date shall foreclose any ability to challenge the Plan in any court.  If the Plan is confirmed for fewer than all of the Debtors as provided for in Section E.111 of the Plan, only the conditions applicable to the Debtor or Debtors for which the Plan is confirmed must be satisfied or waived for the Effective Date to occur.

(b) The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

### 4.    Effect of Failure of a Condition.

If the conditions listed in Section 9.2 of the Plan are not satisfied or waived in accordance with Section 9.3 of the Plan on or before the first Business Day that is more than seventy-five (75) days after the date on which the Confirmation Order is entered or by such later date reasonably acceptable to the Required Restructuring Support Parties and as set forth by the Debtors in a notice filed with the Bankruptcy Court prior to the expiration of such period, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims by or against or any Interests in the Debtors, (b) prejudice in any manner the rights of any Person, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtors, any of the other Restructuring Support Parties, or any other Person.

J.     **Effect of Confirmation.**

1.     **Binding Effect.**

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of the Plan shall bind every holder of a Claim against or Interest in any Debtor and inure to the benefit of and be binding on such holder's respective successors and assigns, regardless of whether the Claim or Interest of such holder is Impaired under the Plan and whether such holder has accepted the Plan.

2.     **Vesting of Assets.**

Except as otherwise provided in the Plan, or any Plan Document, on and after the Effective Date, all Assets of the Estates, including all claims, rights, and Causes of Action and any property acquired by the Debtors under or in connection with the Plan, shall vest in each respective Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances, and Interests.  Subject to the terms of the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Expense Claims) and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for Professional Persons' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

3.     **Discharge of Claims against and Interests in the Debtors.**

Effective as of the Effective Date: (a) the rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors, the Debtors' Estates, or the Reorganized Debtors; (b) the Plan shall bind all holders of Claims and Interests, notwithstanding whether any such holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all Claims and Interests shall be satisfied, discharged, and released in full, and the liability of the Debtors and the Reorganized Debtors with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all entities shall be precluded from asserting against the Debtors, the Debtors' Estates, or the Reorganized Debtors, any other Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

4.     **Pre-Confirmation Injunctions and Stays.**

Unless otherwise provided in the Plan, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the date of entry of the Confirmation Order, shall remain in full force and effect until

the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### 5.    Injunction against Interference with Plan.

Upon the entry of the Confirmation Order, all holders of Claims and Interests and all other parties in interest, along with their respective present and former affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or the occurrence of the Effective Date.

### 6.    Plan Injunction.

(a) Except as otherwise provided in the Plan, in the Plan Documents, or in the Confirmation Order, as of the entry of the Confirmation Order but subject to the occurrence of the Effective Date, all Persons who have held, hold, or may hold Claims or Interests are, with respect to any such Claim or Interest, permanently enjoined after the entry of the Confirmation Order from: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, a Debtor, a Reorganized Debtor, or an Estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against a Debtor, a Reorganized Debtor, or an Estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (ii) or any property of any such transferee or successor; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor, a Reorganized Debtor, or an Estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this subsection (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan, and the Plan Documents, to the full extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan and the Plan Documents; *provided*, that nothing contained herein shall preclude such Persons who have held, hold, or may hold Claims against, or Interests in, a Debtor, a Reorganized Debtor, or an Estate from exercising their rights and remedies, or obtaining benefits, pursuant to and consistent with the terms of the Plan and the Plan Documents.

(b) By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth in this Section.

7.    **Releases.**

(a)  Releases by the Debtors.  As of the Effective Date, except for the rights and remedies that remain in effect from and after the Effective Date to enforce the Plan and the Plan Documents, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service and contributions of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the Restructuring, the Released Parties are deemed forever released and discharged by the Debtors, the Reorganized Debtors, and the Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives and any and all other entities that may purport to assert any Cause of Action derivatively, by or through the foregoing entities, from any and all claims, interests, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, remedies, or liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Restructuring, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Restructuring Transactions, the DIP Facility, the Amended and Restated First Lien Credit Facility, the negotiation, formulation, or preparation of the Disclosure Statement, the Restructuring Support Agreement, and any exhibits or documents relating thereto, and the Plan and related agreements, instruments, and other documents (including the Plan Documents), the solicitation of votes with respect to the Plan, or any other act or omission, transaction, agreement, event, or other occurrence, or any other relief obtained by the Debtors in the Chapter 11 Case, other than Claims or Causes of Action arising out of or related to any act or omission of a Released Party that is a criminal act or constitutes intentional fraud.

(b)  Releases by Holders of Claims and Interests.  As of the Effective Date, except for the rights and remedies that remain in effect from and after the Effective Date to enforce the Plan and the Plan Documents, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of and contribution of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the Restructuring, the Released Parties are deemed forever released and discharged by the (i) holders of all Claims and Interests who vote to accept the Plan, (ii) holders of Claims or Interests that are Unimpaired under the Plan, where the applicable Claims or Interests have been fully paid or otherwise satisfied in accordance with the Plan, (iii)  holders of Claims or Interests whose vote to accept or reject the Plan was solicited but who did not vote either to accept or to reject the Plan, (iv) holders of Claims or Interests who voted to reject the Plan but did not opt out of granting the releases set forth herein, (v) the Restructuring Support Parties, (vi) the First Lien Agent, (vii) the Second Lien Agent, (viii) the DIP

Facility Agent, and (ix) the DIP Facility Lenders, from any and all claims, interests, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such holders or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Restructuring, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Restructuring Transactions, the DIP Facility, the Amended and Restated First Lien Credit Facility, the negotiation, formulation, or preparation of the Disclosure Statement, the Restructuring Support Agreement and any exhibits or documents relating thereto, the Plan and related agreements, instruments, and other documents (including the Plan Documents), the solicitation of votes with respect to the Plan, or any other act or omission, or any other relief obtained by the Debtors in the Chapter 11 Case, other than Claims or Causes of Action arising out of or related to any act or omission of a Released Party that is a criminal act or constitutes intentional fraud, gross negligence, or willful misconduct; provided, that solely for purposes of Section 10.7(b) of the Plan, the Berkshire Funds shall be excluded from the definition of Released Party if they have not executed the Restructuring Support Agreement on or before the deadline established in the Plan for filing the Plan Supplement and become a Consenting Sponsor.

## 8.    Exculpation.

To the extent permitted by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Claim, Interest, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, loss, remedy, or liability for any claim in connection with or arising out of the administration of the Chapter 11 Cases; the negotiation and pursuit of the DIP Facility, the Amended and Restated First Lien Credit Facility, the Management Incentive Plan, the Disclosure Statement, the Restructuring Support Agreement, the Restructuring Transactions, and the Plan (including the Plan Documents), or the solicitation of votes for, or confirmation of, the Plan; the funding of the Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; the issuance of Securities under or in connection with the Plan; or the transactions in furtherance of any of the foregoing; except for intentional fraud, gross negligence, or willful misconduct, but in all respects such entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties and each of their respective affiliates, agents, directors, officers, employees, advisors, and attorneys have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of Securities pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of Securities thereunder.  This exculpation shall

be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.

### 9.      Injunction Related to Releases and Exculpation.

From and after the Effective Date, all entities are permanently enjoined from commencing or continuing in any manner, any suit, action, or other proceeding, on account of or respecting any Claim, demand, liability, obligation, debt, right, Cause of Action, Interest, or remedy released or to be released pursuant to the Plan or the Confirmation Order.

### 10.      Subordinated Claims.

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments thereof under the Plan take into account and conform to the relative priority and rights of the Claims and Interest in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto (including, the Intercreditor Agreement), whether arising under general principles of equitable subordination, sections 510(a), 510(b), or 510(c) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### 11.      Retention of Causes of Action and Reservation of Rights.

Except as otherwise provided in the Plan, including, without limitation, Sections 10.5, 10.6, 10.7, 10.8 and 10.9 of the Plan nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, but not limited to, rights, claims, Causes of Action, rights of setoff, offset, recoupment or other legal or equitable defenses against any holder of Existing Equity Interests that arise on account of such holders' objection to, or support of, and objection to the Plan.  The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses, including any actions specifically enumerated in the Plan Supplement, as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

### 12.      Ipso Facto and Similar Provisions Ineffective.

Except as otherwise agreed by the Required Restructuring Support Parties, any term of any prepetition policy, prepetition contract, or other prepetition obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtor as a result of, or gives rise to a right of any entity based on any of the following: (a) the insolvency or financial condition of a Debtor or (b) the commencement of the Chapter 11 Cases.

### 13.      Reimbursement or Contribution.

Subject to Section 10.15 of the Plan, if the Bankruptcy Court disallows a Claim for reimbursement or contribution of a Person pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (a) such Claim has been adjudicated as noncontingent, or (b) the relevant holder of a Claim has filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

### 14.      Recoupment.

In no event shall any holder of a Claim be entitled to recoup such Claim against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

### 15.      Indemnification.

For purposes of the Plan, (a) the obligations of the Debtors to indemnify and reimburse their directors or officers that were directors or officers, respectively, on or subsequent to the Petition Date shall be assumed by the Reorganized Debtors and (b) indemnification obligations of the Debtors arising from services as officers and directors during the period from and after the Petition Date shall be Administrative Expense Claims.   In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect as of the Petition Date, and all members, managers, directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date.

### 16.      Retention of Jurisdiction.

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in or related to the Chapter 11 Cases for, among other things, the following purposes:

   (a) to hear and determine applications for the assumption or rejection of executory contracts or unexpired leases and any disputes over Cure Amounts resulting therefrom;

   (b) to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the entry of the Confirmation Order;

(c) to hear and resolve any disputes arising from or related to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004 or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(d) to ensure that distributions to holders of Allowed Claims are accomplished as provided in the Plan and the Confirmation Order;

(e) to consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expense Claim;

(f) to enter, implement, or enforce such orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(g) to issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person or other entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(h) to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i) to hear and determine all Fee Claims;

(j) to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

(k) to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments in furtherance of either, or any agreement, instrument, or other document governing or related to any of the foregoing;

(l) to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the Effective Date, as may be necessary to construe, enforce, implement, execute, and consummate the Plan, including any release, exculpation, or injunction provisions set forth in the Plan, or to maintain the integrity of the Plan following the occurrence of the Effective Date;

(m) to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n) to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(o) to hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

(p) to resolve any disputes concerning whether a Person or entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose for determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(q) to recover all Assets of the Debtors and property of the Estates, wherever located; and

(r) to enter a final decree closing each of the Chapter 11 Cases; *provided* that, on and after the Effective Date and after the consummation of the following agreements or documents, the Bankruptcy Court shall not retain jurisdiction over matters arising out of or related to each of the A&R Exit Facility, the Amended and Restated First Lien Credit Agreement, Amended By-Laws, and Amended Certificate of Incorporation and the A&R Exit Facility, the Amended and Restated First Lien Credit Agreement, Amended By-Laws, Amended Certificate of Incorporation, and New Stockholders' Agreement shall be governed by the respective jurisdictional provisions therein.

## K.    Miscellaneous Provisions

### 1.    Exemption from Certain Transfer Taxes.

Pursuant to section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any Lien, mortgage, deed of trust or other security interest, (c) all sale transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Effective Date, including any transfers effectuated under the Plan, (d) any assumption, assignment, or sale by the Debtors of their interests in unexpired leases of nonresidential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, (e) the grant of collateral under the Amended and Restated First Lien Credit Agreement, and (f) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

### 2.    Dates of Actions to Implement the Plan.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day but shall be deemed to have been completed as of the required date.

3.      **Amendments.**

(a) Plan Modifications.  The Plan may be amended, modified, or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to the Plan, the Debtors, with the consent of the Required Restructuring Support Parties, may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes of effects of the Plan, and any holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented.

(b) Certain Technical Amendments.  Consistent with the Restructuring Support Agreement and the consent rights granted thereunder, prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court; *provided*, that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Interests under the Plan.

4.      **Revocation or Withdrawal of Plan.**

The Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date as to any or all of the Debtors.  If, with respect to a Debtor, the Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date as to such Debtor does not occur on the Effective Date, then, with respect to such Debtor: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, such Debtor or any other Person; (ii) prejudice in any manner the rights of such Debtor or any other Person; or (iii) constitute an admission of any sort by any Debtor or any other Person. For the avoidance of doubt, Section 12.4 of the Plan shall not impact or abridge any of the rights of the Restructuring Support Parties pursuant to or set forth in the Restructuring Support Agreement.

5.      **Non-Severability.**

Subject to Section 5.11 of the Plan, if, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation by the Bankruptcy Court, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired,

or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with this Section, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Reorganized Debtors (as the case may be), and (c) nonseverable and mutually dependent.

### 6.    Governing Law.

Except to the extent that the Bankruptcy Code or other federal law is applicable or to the extent that a Plan Document provides otherwise, the rights, duties, and obligations arising under the Plan and the Plan Documents shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflicts of laws thereof (other than section 5-1401 and section 5-1402 of the New York General Obligations Law); *provided, however*, that corporate or limited liability company governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor or Reorganized Debtor.

### 7.    Substantial Consummation of the Plan.

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 8.    Immediate Binding Effect.

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Documents shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, the holders of Claims and Interests, the Released Parties, and each of their respective successors and assigns.

### 9.    Successors and Assigns.

The rights, benefits, and obligations of any entity named or referred to in the Plan shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each such entity.

### 10.    Entire Agreement.

On the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

**11.    Computing Time.**

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth in the Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

**12.    Exhibits to Plan.**

All exhibits, schedules, supplements, and appendices to the Plan (including the Plan Supplement) are incorporated into and are a part of the Plan as if set forth in full herein.

**13.    Deemed Act.**

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

**14.    Notices.**

All notices, requests, and demands to or upon the Debtors or Reorganized Debtors, as applicable, shall be in writing (including by facsimile transmission) and, unless otherwise provided herein, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

> Catalina Marketing Corporation
> 200 Carillon Pkwy
> St. Petersburg, FL 33716
> Telephone: (877) 210-1917
> Facsimile: (727) 556-2700
> Attn: David Glogoff, Esq.
>
> – and –
>
> Richards, Layton & Finger, P.A.
> One Rodney Square
> 920 North King Street
> Wilmington, Delaware 19801
> Attn: Mark D. Collins, Esq. and Jason M. Madron, Esq.
> Telephone: (302) 651-7700
> Facsimile: (302) 651-7701
>
> *Attorneys for the Debtors*
>
> – and –
>
> Weil, Gotshal & Manges LLP

> 767 Fifth Avenue
> New York, New York 10153
> Attn:  Gary T. Holtzer, Esq. and Ronit J. Berkovich, Esq.
> Telephone:  (212) 310-8000
> Facsimile:  (212) 310-8007
>
> *Attorneys for the Debtors*

Any pleading, notice or other document required by this Plan to be served on or delivered shall be served by first class or overnight mail:

If to the Ad Hoc First Lien Group:

> Jones Day
> 250 Vesey Street
> New York, New York 10281
> Attn: Scott Greenberg
> Telephone: (212) 326-3939
> Facsimile: (212) 755-7306
> E-mail:  sgreenberg@jonesday.com

If to the Ad Hoc Second Lien Group:

> Paul, Weiss, Rifkind, Wharton & Garrison LLP
> 1285 Avenue of the Americas
> New York, NY 10019-6064
> Attention: Brian S. Hermann, Robert A. Britton, and Dan Youngblut
> Telephone: (212) 373-3000
> Fax: (212) 492-0545
> E-mail:bhermann@paulweiss.com
>       rbritton@paulweiss.com
>       dyoungblut@paulweiss.com

After the occurrence of the Effective Date, the Reorganized Debtors have authority to send a notice to entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002; *provided*, that the U.S. Trustee need not file such a renewed request and shall continue to receive documents without any further action being necessary.  After the occurrence of the Effective Date, the Reorganized Debtors are authorized to limit the list of entities receiving documents pursuant to Bankruptcy Rule 2002 to the U.S. Trustee and those entities that have filed such renewed requests.

# VI.
## ALTERNATIVES TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

The Plan reflects a consensus among the Debtors, the Consenting First Lien Lenders, and the Consenting Second Lien Lenders.  The Debtors have determined that the Plan is the best alternative available for their successful emergence from chapter 11.  If the Plan is not confirmed and

consummated, the alternatives to the Plan are (A) continuation of the Chapter 11 Cases, which could lead to the filing of an alternative plan of reorganization, or a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, or (B) a liquidation under chapter 7 of the Bankruptcy Code.

### A.    Continuation of the Chapter 11 Cases

If the Plan is not confirmed, the Debtors (or, if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan.  Such a plan might involve either a reorganization and continuation of the Debtors' business, or an orderly liquidation of their assets.  In addition if the Plan is not confirmed under the terms of the Restructuring Support Agreement, the Restructuring Support Parties have the right to terminate the RSA and all obligations thereunder.

Alternatively, if the Plan is not confirmed, the Debtors could seek from the Bankruptcy Court, after notice and a hearing, authorization to sell all of their assets under section 363 of the Bankruptcy Code.  Holders of Claims in Class 3 (First Lien Debt Claims) and Class 4 (Second Lien Debt Claims) would be entitled to credit bid on any property to which their security interest attaches to the extent of the value of such security interest, and to offset their Claims against the purchase price of the property, subject to the Second Lien Intercreditor Agreement.  In addition, the security interests in the Debtors' assets held by holders of Secured Claims would attach to the proceeds of any sale of the Debtors' assets to the extent of their secured interests therein.  Upon analysis and consideration of this alternative, the Debtors do not believe a sale of their assets under section 363 of the Bankruptcy Code would yield a higher recovery for holders of Claims than what they would receive under the Plan.

### B.    Liquidation under Chapter 7

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code.  The effect a chapter 7 liquidation would have on the recovery of holders of allowed Claims and Interests is set forth in the Liquidation Analysis attached hereto as **Exhibit C**.

As demonstrated in the Liquidation Analysis, the Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of, among other things, the delay resulting from the conversion of the Chapter 11 Cases to cases under chapter 7, the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals, and the loss in value attributable to an expeditious liquidation of the Debtors' assets as required by chapter 7.  As set forth in the Liquidation Analysis, in a liquidation scenario under chapter 7 the General Unsecured Creditors would receive no distribution on account of their Claims.

## VII.
## TRANSFER RESTRICTIONS AND
## CONSEQUENCES UNDER FEDERAL SECURITIES LAW

The Solicitation is being made before the Petition Date only to holders of First Lien Debt Claims and Second Lien Debt Claims who are "accredited investors" within the meaning of Rule 501(a) of Regulation D of the Securities Act or to "Qualified Institutional Buyers" (as defined in rule 144(a) of the Securities Act), "Institutional Accredited Investors" (within the meaning of rule 501(a) of Regulation D of the Securities Act), or non "U.S. Persons" (as defined in Regulation S of the Securities Act), in each case, under Section 4(a)(2) of the Securities Act.

The issuance and the distribution under the Plan of the New Common Stock issued to holders of Class 3 and Class 4 Claims shall be exempt from registration under the Securities Act and any other applicable securities laws pursuant to section 1145 of the Bankruptcy Code.

Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale pursuant to a chapter 11 plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under a plan, if such securities are offered or sold in exchange for a claim (including a claim for an administrative expense) against, or an interest in, the debtor or such affiliate, or principally in such exchange and partly for cash. Section 1145 of the Bankruptcy Code also exempts from registration the offer of a security through any right to subscribe sold in the manner provided in the prior sentence, and the sale of a security upon the exercise of such right. In reliance upon this exemption, the New Common Stock issued to holders of Class 3 and Class 4 Claims generally will be exempt from the registration requirements of the Securities Act, and state and local securities laws. These securities may be resold without registration under the Securities Act or other federal or state securities laws pursuant to the exemption provided by Section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

Under Section 1145(b) of the Bankruptcy Code an "underwriter" for purposes of the Securities Act is one who, except with respect to ordinary trading transactions, (a) purchases a claim against the debtor with a view to distribution of any security to be received in exchange for the claim, (b) offers to sell securities issued under a chapter 11 plan for the holders of such securities, (c) offers to buy securities issued under a chapter 11 plan from persons receiving such securities, if the offer to buy is made with a view to distribution or (d) is an issuer, as used in Section 2(a)(11) of the Securities Act, with respect to such securities, which includes control persons of the issuer.

Resales of New Common Stock by holders deemed to be "underwriters" (which includes controlling persons of the issuer) are not exempted by Section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law, even though such securities are not "restricted" securities. Under certain circumstances, holders of New Common Stock who are deemed to be "underwriters" may be entitled to resell their New Common Stock pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such person if the required

holding period has been met and, under certain circumstances, current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met. Whether any particular person would be deemed to be an "underwriter" (including whether the person is a control person of the issuer) with respect to the New Common Stock would depend upon various facts and circumstances applicable to that person. Parties who believe they may be statutory "underwriters" as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisors as to the availability of the exemption provided by Rule 144.

In any case, recipients of New Common Stock issued under the Plan are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

Upon the Effective Date of the Plan, the New Common Stock will not be publicly traded or listed on any national securities exchange. Accordingly, no assurance can be given that a holder of such securities will be able to sell such securities in the future or as to the price at which any sale may occur.

*Legends.* To the extent certificated, certificates evidencing the New Common Stock held by holders of 10% or more of the outstanding New Common Stock, or who are otherwise underwriters as defined in Section 1145(b) of the Bankruptcy Code, will bear a legend substantially in the form below:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED IN ACCORDANCE WITH THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER AND, IN EACH CASE, IN COMPLIANCE WITH APPLICABLE FEDERAL AND STATE SECURITIES LAWS.

## VIII.
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to certain holders of Allowed First Lien Debt Claims and Allowed Second Lien Debt Claims. This discussion does not address the U.S. federal income tax consequences to holders of Claims or Interests who are Unimpaired or otherwise entitled to payment in full in Cash under the Plan or who are deemed to reject the Plan.

The discussion of U.S. federal income tax consequences below is based on the U.S. Internal Revenue Code of 1986, as amended (the "**Tax Code**"), Treasury Regulations, judicial authorities, published positions of the Internal Revenue Service ("**IRS**"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect). The U.S. federal income tax

consequences of the contemplated transactions are complex and subject to significant uncertainties. The Debtors have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the contemplated transactions.

This summary does not address foreign, state, or local tax consequences of the contemplated transactions, nor does it purport to address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (*e.g.*, foreign taxpayers, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, holders that are, or hold Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the alternative minimum tax or the "Medicare" tax on unearned income, persons who use the accrual method of accounting and report income on an "applicable financial statement," and persons holding Claims that are part of a straddle, hedging, constructive sale, or conversion transaction). In addition, this discussion does not address U.S. federal taxes other than income taxes.

This discussion assumes that Allowed First Lien Debt Claims and Allowed Second Lien Debt Claims are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code and that the various debt and other arrangements to which the Debtors are parties will be respected for U.S. federal income tax purposes in accordance with their form.

***In addition, the Debtors continue to evaluate the manner in which to implement the Restructuring and, in the event the Restructuring Transactions differ from those described below, the U.S. federal income tax consequences could be materially different.***

***The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon your individual circumstances. Each holder of a Claim or Existing Equity Interest is urged to consult your own tax advisor for the U.S. federal, state, local and other tax consequences applicable under the Plan.***

### A.    Consequences to Debtors

For U.S. federal income tax purposes, the Debtors are members of an affiliated group of corporations (or are disregarded entities all of whose income, losses and deductions are taken into account by a member of the group) of which Catalina Parent is the common parent (the "**PDM Group**"), which files a single consolidated U.S. federal income tax return. The Debtors have estimated that, for U.S. federal income tax purposes, the PDM Group had consolidated net operating loss ("**NOL**") carryforwards of approximately $145 million as of the Petition Date (a substantial portion of which is subject to existing limitations) and a substantial amount of disallowed business interest under section 163(j) of the Tax Code. The amount of any such NOL carryforwards and other tax attributes, and the extent to which any limitations apply, remain subject to audit and adjustment by the IRS.

As discussed below, in connection with the implementation of the Plan, it is anticipated that the Debtors' NOL carryforwards and certain other tax attributes will be significantly reduced or eliminated. Pursuant to the Plan, either (i) the common stock of reorganized Catalina Marketing Corporation ("**CMC**") will be distributed by CHC directly to its creditors as provided in the Plan or (ii) as determined by the Debtors (with the consent of the Ad Hoc First Lien Group and the Ad Hoc Second Lien Group), CMC will be acquired by a newly formed, unrelated group of corporations in accordance with an Acquisition Agreement (between CHC and an indirect wholly-owned corporation within such group) and the Plan in consideration for all of the common stock of the holding company of the acquiring group (defined in the Plan as the "CMC Acquisition"), and the holding company stock will instead be distributed by CHC. If the CMC Acquisition occurs, such acquisition would be accomplished either by a straight transfer of the common stock of Reorganized CMC to or by a merger of CMC with an indirect subsidiary of the acquiring group, as determined by the Debtors with consent of the Ad Hoc First Lien Group and Ad Hoc Second Lien Group. Depending on the method chosen and possibly certain tax elections, the acquisition of CMC by the acquiring group may be treated as a taxable sale of the underlying assets of CMC and certain of its subsidiaries, subject to all of the liabilities of such companies as restructured pursuant to the Plan (herein referred to herein as an "**Asset Sale Transaction**"). Such treatment may, under certain circumstances, require the parties to make an election under section 338(h)(10) of the Tax Code in order to qualify as an Asset Sale Transaction. In such event, the acquiring group generally would have up to 8-1/2 months after the Effective Date of the Plan to determine if treatment of the acquisition as an Asset Sale Transaction is desirable. In the event an Asset Sale Transaction occurs, the Debtors expect that Reorganized CMC and certain of its subsidiaries will obtain a fair market value tax basis in their assets, but will not carryover any of the Debtors' NOLs or other tax attributes.

Regardless of whether the Debtors engage in an Asset Sale Transaction, Catalina Parent, PDM Intermediate Holdings A Corporation, PDM Intermediate Holdings B Corporation, PDM Holdings Corporation and CHC will be dissolved pursuant to the Plan after the Effective Date.

### 1.    Cancellation of Debt

In general, the Tax Code provides that a debtor in a bankruptcy case must reduce certain of its tax attributes — such as NOL carryforwards and current year NOLs, capital loss carryforwards, certain tax credits, and tax basis in assets — by the amount of any cancellation of debt ("**COD**") incurred pursuant to a confirmed chapter 11 plan. It is unclear whether carryover of disallowed business interest expense would be a tax attribute subject to such reduction. In applying the attribute reduction rule to the tax basis in assets, the tax law limits the reduction in tax basis to the amount by which the tax basis exceeds the debtor's post-emergence liabilities. The amount of COD incurred is generally the amount by which the indebtedness discharged exceeds the value of any consideration given in exchange therefor. Certain statutory or judicial exceptions may apply to limit the amount of COD incurred for U.S. federal income tax purposes. If advantageous, the debtor can elect to reduce the basis of depreciable property prior to any reduction in its NOL carryforwards or other tax attributes. Where the debtor joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury Regulations require, in certain circumstances, that the tax attributes of the consolidated subsidiaries of the debtor and other members of the group must also be reduced. Any reduction in tax attributes in respect of COD generally does not occur

until after the determination of the debtor's net income or loss for the taxable year in which the COD is incurred.

The Debtors expect to incur a substantial amount of COD as a result of the implementation of the Plan. The amount of such COD and resulting tax attribute reduction will depend primarily on the fair market value of the New Common Stock and the amount of Cash distributed to holders of Claims pursuant to the Plan. The Debtors expect that the consolidated NOL carryforwards will be significantly reduced or eliminated, but do not expect any material reduction (if any) in the tax basis of the assets of CMC and its subsidiaries. However, the aggregate amount of such tax basis is significantly less than the mid-point enterprise value of $595 million. See section XII, Valuation Analysis. In the event the Debtors engage in an Asset Sale Transaction, any gain or loss in respect of such transaction would be taken into account prior to the reduction in the Debtors' tax attributes as a result of any COD incurred. Any remaining NOLs or other tax attributes of dissolving Debtors (including any losses recognized as a result of the sale) will be eliminated by reason of the attribute reduction and the liquidation of such Debtors for U.S. federal income tax purposes.

### 2. Limitations on NOL Carryforwards and Other Tax Attributes

Under the Tax Code, any NOL carryforwards and certain other tax attributes, including carryover of disallowed interest and certain "built-in" losses, of a corporation (collectively, "**Pre-Change Losses**") may be subject to an annual limitation if the corporation undergoes an "ownership change" within the meaning of section 382 of the Tax Code. These limitations apply in addition to, and not in lieu of, the attribute reduction that may result from the COD arising in connection with the Plan, and in addition to any limitations to which the Debtors' Pre-Change Losses are already subject due to prior ownership changes. As discussed above, due in part to the resulting attribute reduction from the incurrence of COD, the Debtors do not expect to have significant tax attributes remaining following the implementation of the Plan to which section 382 would apply. Nevertheless, the following provides a description of the operation of section 382 in the event there are any Pre-Change Losses to which section 382 could apply.

Under section 382 of the Tax Code, if a corporation (or consolidated group) undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception in section 382(l)(5) of the Tax Code discussed below, the amount of its Pre-Change Losses that may be utilized to offset future taxable income or tax liability is subject to an annual limitation. Absent an Asset Sale Transaction, the issuance of the New Common Stock pursuant to the Plan will constitute an "ownership change" of Reorganized CMC and its subsidiaries for these purposes.

In general, the amount of the annual limitation to which a corporation that undergoes an ownership change will be subject is equal to the product of (i) the fair market value of the stock of the corporation immediately before the ownership change (with certain adjustments) multiplied by (ii) the "long term tax exempt rate" in effect for the month in which the ownership change occurs (e.g., 2.51% for ownership changes occurring in December 2018). As discussed below, this annual limitation potentially may be increased in the event the corporation (or consolidated group) has an overall "built-in" gain in its assets at the time of the ownership change. For a corporation (or consolidated group or subgroup) in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the fair market value of the stock of the corporation (or the parent of

the consolidated group or subgroup) is generally determined immediately after (rather than before) the ownership change after giving effect to the discharge of creditors' claims, but subject to certain adjustments; in no event; however, can the stock value for this purpose exceed the pre-change gross value of the corporation's assets.

If the loss corporation (or consolidated group or subgroup) has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized (or, according to an IRS notice, treated as recognized) during the following five (5) years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation (or consolidated group) would be permitted to use its Pre-Change Losses against such built-in gain income in addition to its regular annual allowance.  Conversely, if a loss corporation (or consolidated group or subgroup) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income, gain, loss and deduction), then any built-in losses recognized during the following five (5) years (up to the amount of the original net unrealized built-in loss) generally will be treated as Pre-Change Losses and similarly will be subject to the annual limitation.  Although the rule applicable to net unrealized built-in losses generally applies to consolidated groups on a consolidated basis, certain corporations that join the consolidated group within the preceding five (5) years may not be able to be taken into account in the group computation of net unrealized built-in loss.  Thus, a consolidated group (or subgroup) could have both a net unrealized built-in gain and a net unrealized built-in loss as a result of a single ownership change.  In such instance, the group would be able to take the net unrealized built-in gain into account for purposes of increasing its annual limitation other than as relates to any subsequently recognized built-in losses.

Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year.  However, if the corporation (or consolidated group) does not continue its historic business or use a significant portion of its historic assets in a new business for at least two (2) years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's Pre-Change Losses, absent any increases due to recognized built-in gains.

Under section 382(l)(5) of the Tax Code, an exception to the foregoing annual limitation rules generally applies where qualified creditors of a debtor corporation receive, in respect of their claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in bankruptcy) pursuant to a confirmed chapter 11 plan.  The Debtors have not determined whether or not they would qualify for the section 382(l)(5) exception.  As indicated above, the Debtors do not expect to have significant tax attributes remaining following the implementation of the Plan to which section 382 would apply (if any), whether or not the annual limitation rules apply.

### 3.    Potential Asset Sale Transaction

If the Debtors engage in the Asset Sale Transaction, the acquiring company will acquire in a taxable transaction (directly or indirectly) substantially all of the assets of Reorganized CMC and certain of its subsidiaries.  The consideration for the acquisition of the assets of Reorganized CMC (including the assets of any subsidiaries of CMC that, as of the time of the acquisition, are treated as disregarded entities for U.S. federal income tax purposes) would be all of the common stock of

the indirect holding company of the acquiring company and the assumption of all of the obligations of such entities that are not discharged or otherwise satisfied under the Plan.

The Debtors contemplate that, for U.S. federal income tax purposes, the Asset Sale Transaction would be treated as — and the discussion herein assumes treatment as — a taxable asset acquisition, such that the acquiring company would obtain a new cost basis in the assets acquired (or deemed acquired) from Reorganized CMC and its subsidiaries, based on the fair market value of such assets on the Effective Date.  The acquiring company would not succeed to any tax attributes of such entities (such as NOLs, tax credits or tax basis in assets).  The PDM Group generally would recognize gain or loss upon the transfer in an amount equal to the difference, if any, between (i) the sum of the fair market value of the New Common Stock, and the amount of any liabilities directly or indirectly assumed of Reorganized CMC (and any subsidiaries whose assets are deemed acquired), and (ii) the tax basis in the assets acquired (or deemed acquired).

Taking into account available NOL carryforwards and other tax attributes, the Debtors expect that no material U.S. federal, state or local income tax liability, if any, should be incurred upon the transfer if the enterprise value is approximately equal to or less than the mid-point enterprise value of $595 million. See section XII, Valuation Analysis.  However, the fair market value of the assets of the Debtors and tax basis may vary from current estimates, which could result in tax consequences different from those expected, and in any event, the amount of gain or loss and resulting tax liability will remain subject to audit and adjustment by the IRS or other applicable taxing authorities.

> ### B.    Consequences to Holders of Certain Claims and Interests.

As used in this section of the Disclosure Statement, the term "**U.S. holder**" means a beneficial owner of an Allowed First Lien Debt Claim or an Allowed Second Lien Debt Claim that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

If a partnership or other entity taxable as a partnership for U.S. federal income tax purposes holds an Allowed First Lien Debt Claim or an Allowed Second Lien Debt Claim, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partnership.  If

you are a partner in a partnership holding any of such Claims, you are urged to consult your own tax advisor.

**1.    Holders of Allowed First Lien Debt Claims and Allowed Second Lien Debt Claims.**

Pursuant to the Plan, and in complete and final satisfaction of their Claims, holders of Allowed First Lien Debt Claims and Allowed Second Lien Debt Claims will receive New Common Stock. The New Common Stock will either (i) first be issued by CMC to CHC in recapitalization of the common stock of CMC held by CHC, and then distributed by CHC in complete and final satisfaction of the Allowed First Lien Debt Claims and Allowed Second Lien Debt Claims or (ii) first be received by CHC in the Asset Sale Transaction, and then distributed by CHC in complete and final satisfaction of the Allowed First Lien Debt Claims and Allowed Second Lien Debt Claims.

A U.S. holder of an Allowed First Lien Debt Claim or Allowed Second Lien Debt Claim generally should recognize gain or loss in an amount equal to the difference, if any, between (i) the sum of the fair market value of the New Common Stock (other than to the extent received in respect of a Claim for accrued but unpaid interest and possibly accrued original issue discount ("**OID**")), and (ii) the U.S. holder's adjusted tax basis in the Claim exchanged therefor (other than any tax basis attributable to accrued but unpaid interest and possibly accrued OID).  See Section VIII.B.2, "Character of Gain or Loss," below.  For the treatment of distributions in respect of a Claim for accrued but unpaid interest or OID, see Section VIII.B.3, below.

A U.S. holder's tax basis in the New Common Stock received will equal the amount taken into account in computing its gain or loss, and the U.S. holder's holding period generally will begin on the day following the Effective Date.

**2.    Character of Gain or Loss**

Where gain or loss is recognized by a U.S. holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Allowed First Lien Debt Claim or Allowed Second Lien Debt Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the holder previously claimed a bad debt deduction.

A U.S. holder that purchased its Claims from a prior holder at a "market discount" (relative to the principal amount of the Claims at the time of acquisition) may be subject to the market discount rules of the Tax Code.  In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (i) its stated redemption price at maturity (which generally would be equal to the stated principal amount if all stated interest was required to be paid in cash at least annually) or (ii) in the case of a debt instrument issued with OID, its revised issue price, in each case, by at least a de minimis amount.

Under the market discount rules, any gain recognized on the exchange of Claims (other than in respect of a Claim for accrued but unpaid interest) generally will be treated as ordinary income to

the extent of the market discount accrued (on a straight line basis or, at the election of the holder, on a constant interest basis) during the holder's period of ownership, unless the holder elected to include the market discount in income as it accrued. If a holder of a Claim did not elect to include market discount in income as it accrued and thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Claim, such deferred amounts would become deductible at the time of the exchange.

### 3.    Distributions in Discharge of Accrued Interest or OID

In general, to the extent that any consideration received pursuant to the Plan by a U.S. holder of an Allowed First Lien Debt Claim or Allowed Second Lien Debt Claim is received in satisfaction of accrued interest during the holder's holding period, such amount will be taxable to the U.S. holder as interest income (if not previously included in the U.S. holder's gross income). Conversely, a U.S. holder may recognize a deductible loss to the extent any accrued interest or accrued OID was previously included in its gross income and is not paid in full. However, the IRS has privately ruled that a holder of a "security" (as determined for U.S. federal income tax purposes) in an otherwise tax-free exchange could not claim a current loss with respect to any accrued but unpaid OID. Accordingly, it is unclear whether, in similar circumstances or by analogy, any U.S. holder of an Allowed First Lien Debt Claim or Allowed Second Lien Debt Claim would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID with respect to such Claim that is not paid in full.

The Plan provides that consideration received in respect of an Allowed Claim is allocable first to the principal amount of the Claim (as determined for U.S. federal income tax purposes) and then, to the extent of any excess, to the remainder of the Claim, including any Claim for accrued but unpaid interest (in contrast, for example, to a pro rata allocation of a portion of the exchange consideration received between principal and interest, or an allocation first to accrued but unpaid interest). See Section 6.12 of the Plan. There is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes. You are urged to consult your own tax advisor regarding the allocation of consideration and the inclusion and deductibility of accrued but unpaid interest for U.S. federal income tax purposes.

### 4.    Withholding on Distributions and Information Reporting

All distributions to holders of Allowed Claims under the Plan are subject to any applicable tax withholding. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 24%). Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions. Holders of Allowed Claims are urged to consult their tax advisors regarding

the Treasury Regulations governing backup withholding and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations.

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayers claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these Treasury Regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the holder's tax returns.

***The foregoing summary has been provided for informational purposes only. All holders of Claims and Existing Equity Interests are urged to consult their tax advisors concerning the federal, state, local, and other tax consequences applicable under the Plan.***

## IX.
## VOTING PROCEDURES AND REQUIREMENTS

Before voting to accept or reject the Plan, each holder of a Claim entitled to vote (an "**Eligible Holder**") should carefully review the Plan attached hereto as **Exhibit A**. All descriptions of the Plan set forth in this Disclosure Statement are subject to the terms and provisions of the Plan.

### A.    Voting Deadline

All Eligible Holders have been sent a Ballot together with this Disclosure Statement. Such holders should read the Ballot carefully and follow the instructions contained therein. Please use only the Ballot that accompanies this Disclosure Statement to cast your vote.

The Debtors have engaged Prime Clerk LLC as their Voting Agent to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan. **FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE VOTING AGENT AT THE ADDRESS SET FORTH BELOW ON OR BEFORE THE VOTING DEADLINE OF 5:00 P.M. (EASTERN TIME) ON JANUARY 23, 2019, UNLESS EXTENDED BY THE DEBTORS**.

IF A BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE VOTING AGENT AT THE NUMBER SET FORTH BELOW TO RECEIVE A REPLACEMENT BALLOT. ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.

IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE VOTING AGENT AT:

**Prime Clerk**
**Telephone:  844-205-4337 (toll free) or +1 917-460-0912 (international)**
**E-mail:  CatalinaBallots@primeclerk.com with "Catalina" in the subject line**

Additional copies of this Disclosure Statement are available upon request made to the Voting Agent, at the telephone numbers or e-mail address set forth immediately above.

### B.     Voting Procedures

The Debtors are providing copies of this Disclosure Statement (including all exhibits and appendices) and related materials and a Ballot (collectively, a "**Solicitation Package**") to Eligible Holders.  Any Eligible Holder that has not received a Ballot should contact its Voting Agent.

Eligible Holders should provide all of the information requested by the Ballot and return all Ballots received in the enclosed, self-addressed, postage-paid envelope provided with each such Ballot either to the Voting Agent or their Nominee, as applicable.

The Record Date for determining which holders are entitled to vote on the Plan is December 10, 2019.  The applicable administrative agent under any debt documents will not vote on behalf of its respective holders.  Such holders must submit their own Ballot.

### C.     Parties Entitled to Vote

Under the Bankruptcy Code, only holders of Claims or Interests in "impaired" classes are entitled to vote on the Plan.  Under section 1124 of the Bankruptcy Code, a class of Claims or Interests is "impaired" under the Plan unless (1) the Plan leaves unaltered the legal, equitable, and contractual rights to which such Claim or Interest entitles the holder thereof or (2) notwithstanding any legal right to an accelerated payment of such Claim or Interest, the Plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired Claim or Interest will not receive or retain any distribution under the Plan on account of such Claim or Interest, the Bankruptcy Code deems such holder to have rejected the Plan, and, accordingly, holders of such Claims and Interests do not actually vote on the Plan and will not receive a Ballot.  If a Claim or Interest is not impaired by the Plan, the Bankruptcy Code presumes the holder of such Claim or Interest to have accepted the Plan and, accordingly, holders of such Claims and Interests are not entitled to vote on the Plan, and also will not receive a Ballot.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Bankruptcy Code defines "acceptance" of a chapter 11 plan by a class of: (1) Claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Claims that cast ballots for acceptance or rejection of the plan; and (2) Interests as acceptance by interest holders in that class that hold at least two-thirds (2/3) in amount of the Interests that cast ballots for acceptance or rejection of the plan.

The Claims in the following classes are impaired under the Plan and entitled to vote to accept or reject the Plan:

- Class 3 – First Lien Debt Claims; and

- Class 4 – Second Lien Debt Claims.

### D.    Miscellaneous

All Ballots must be signed by the Eligible Holder, or any person who has obtained a properly completed Ballot proxy from the Eligible Holder by the Record Date.  Unless otherwise ordered by the Bankruptcy Court, Ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted.  The Debtors, in their sole discretion, may request that the Voting Agent attempt to contact such voters to cure any such defects in the Ballots.  Any Ballot marked to both accept and reject the Plan shall not be counted.  If you return more than one Ballot voting different Claims, the Ballots are not voted in the same manner, and you do not correct this before the Voting Deadline, those Ballots will not be counted.  An otherwise properly executed Ballot that attempts to partially accept and partially reject the Plan will likewise not be counted.

The Ballots provided to Eligible Holders will reflect the principal amount of such Eligible Holder's Claim; however, when tabulating votes, the Voting Agent may adjust the amount of such Eligible Holder's Claim by multiplying the principal amount by a factor that reflects all amounts accrued between the Record Date and the Petition Date including interest.

Under the Bankruptcy Code, for purposes of determining whether the requisite acceptances have been received, only Eligible Holders that actually vote will be counted.  The failure of a holder to deliver a duly executed Ballot to the Voting Agent will be deemed to constitute an abstention by such holder with respect to voting on the Plan and such abstentions will not be counted as votes for or against the Plan.

Except as provided below, unless the Ballot is timely submitted to the Voting Agent before the Voting Deadline together with any other documents required by such Ballot, the Debtors may, in their sole discretion, reject such Ballot as invalid, and therefore decline to utilize it in connection with seeking confirmation of the Plan.

### E.    Agreements upon Furnishing Ballots

The delivery of an accepting Ballot pursuant to one of the procedures set forth above will constitute the agreement of the voter with respect to such Ballot to accept (a) all of the terms of, and conditions to, this solicitation; and (b) the terms of the Plan including the injunction, releases, and exculpations set forth in Sections 10.7, 10.8, and 10.9 therein.  All parties in interest retain their right to object to confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code.

### F.    Change of Vote

Subject to the Plan and the Restructuring Support Agreement, any party that has previously submitted a properly completed Ballot to the Voting Agent before the Voting Deadline may revoke such Ballot and change its vote by submitting to the Voting Agent a subsequent, properly completed Ballot for acceptance or rejection of the Plan before the Voting Deadline.

### G.    Waivers of Defects, Irregularities, etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will be

determined by the Voting Agent or the Debtors, as applicable, in their sole discretion, which determination will be final and binding.  The Debtors reserve the right to reject any and all Ballots submitted by any of their respective creditors not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful.  The Debtors further reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot by any of their creditors.  The interpretation (including the Ballot and the respective instructions thereto) by the applicable Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.  Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determines.  Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived.  Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

### H.    Further Information, Additional Copies

If you have any questions or require further information about the voting procedures for voting your Claim, or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits to such documents, please contact the Voting Agent.

**X.**
**FACTORS TO CONSIDER BEFORE VOTING**

Before voting to accept or reject the Plan, holders of Claims entitled to vote should read and carefully consider the risk factors set forth below, in addition to the information set forth in this Disclosure Statement together with any attachments, exhibits, or documents incorporated by reference hereto.  The factors below should not be regarded as the only risks associated with the Plan or its implementation.

### A.    Certain Bankruptcy Law Considerations.

### 1.    General.

While the Debtors believe that the Chapter 11 Cases will be of short duration and will not be materially disruptive to their businesses, the Debtors cannot be certain that this will be the case.  Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that one or more of the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed.  Even if confirmed on a timely basis, bankruptcy proceedings to confirm the Plan could have an adverse effect on the Debtors' business.  Among other things, it is possible that bankruptcy proceedings could adversely affect the Debtors' relationships with their key customers and employees.  The proceedings will also involve additional expense and may divert some of the attention of the Debtors' management away from business operations.

### 2.    Risk of Non-Confirmation of Plan.

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes. Moreover, the Debtors can make no assurances that they will receive the requisite acceptances to confirm the Plan, and even if all voting Classes voted in favor of the Plan or the requirements for "cramdown" are met with respect to any Class that rejects the Plan, the Bankruptcy Court, which may exercise substantial discretion as a court of equity, may choose not to confirm the Plan. If the Plan is not confirmed, it is unclear what distributions holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan of reorganization or otherwise.

### 3.    Risk of Failing to Satisfy the Vote Requirement.

In the event that the Debtors are unable to get sufficient votes from the Voting Classes, the Debtors may seek to accomplish an alternative chapter 11 plan or seek to cram down the Plan on non-accepting Classes. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to holders of Allowed Claims as those proposed in the Plan.

### 4.    Non-Consensual Confirmation.

If any impaired class of Claims or Interests does not accept or is deemed not to accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. Should any Class vote to reject the plan, then these requirements must be satisfied with respect to such rejecting Classes. The Debtors believe that the Plan satisfies these requirements.

### 5.    Risk Related to Parties in Interest Objecting to the Debtors' Classification of Claims and Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that a party in interest will not object or that the Bankruptcy Court will approve the classifications.

### 6.    Risks Related to Possible Objections to the Plan.

There is a risk that certain parties could oppose and object to either the entirety of the Plan or specific provisions of the Plan. Although the Debtors believe that the Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection.

7.    **Releases, Injunctions, and Exculpations Provisions May Not Be Approved.**

Sections 10.7, 10.8, and 10.9 of the Plan provides for certain releases, injunctions, and exculpations, for claims and Causes of Action that may otherwise be asserted against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases and exculpations are not approved, certain parties may not be considered Releasing Parties, Released Parties, or Exculpated Parties, and certain Released Parties or Exculpated Parties may withdraw their support for the Plan.

8.    **Risk of Non-Occurrence of Effective Date.**

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to the timing of the Effective Date.  If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article IX of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

9.    **Risk of Termination of the Restructuring Support Agreement.**

The Restructuring Support Agreement contains certain provisions that give the Requisite Creditors (as defined in the Restructuring Support Agreement) the ability to terminate the Restructuring Support Agreement if various conditions are satisfied.  Termination of the Restructuring Support Agreement could result in protracted Chapter 11 Cases, which could significantly and detrimentally impact the Debtors' relationships with vendors, suppliers, employees, and major customers.

10.    **Conversion into Chapter 7 Cases.**

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.  *See* Section XIII.C hereof, as well as the liquidation analysis (the "**Liquidation Analysis**") attached hereto as **Exhibit C**, for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Interests.

B.    **Additional Factors Affecting Value of Reorganized Debtors or Distributions to Creditors.**

1.    **Claims Could Be More than Projected.**

There can be no assurance that the estimated Allowed amount of Claims in certain Classes will not be significantly more than projected, which, in turn, could cause the value of distributions to be reduced substantially.  Inevitably, some assumptions will not materialize, and unanticipated

events and circumstances may affect the ultimate results. Therefore, the actual amount of Allowed Claims may vary from the Debtors' projections and feasibility analysis, and the variation may be material.

### 2. Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary.

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, and contains estimates and assumptions which might ultimately prove to be incorrect, and contains projections which may be materially different from actual future experiences. There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be Allowed.

The Debtors have prepared financial projections (the "**Financial Projections**") on a consolidated basis based on certain assumptions, as set forth in **Exhibit D** hereto. The Financial Projections have not been compiled, audited, or examined by independent accountants, and neither the Debtors nor their advisors make any representations or warranties regarding the accuracy of the Financial Projections or the ability to achieve forecasted results.

Many of the assumptions underlying the Financial Projections are subject to uncertainties that are beyond the control of the Debtors or Reorganized Debtors including the timing, confirmation, and consummation of the Plan, demand or price for services, inflation, and other unanticipated market and economic conditions. Some assumptions may not materialize, and unanticipated events and circumstances may affect the actual results. Projections are inherently subject to substantial and numerous uncertainties and to a wide variety of significant business, economic, and competitive risks, and the assumptions underlying the Financial Projections may be inaccurate in material respects. In addition, unanticipated events and circumstances occurring after the approval of this Disclosure Statement by the Bankruptcy Court including any natural disasters, terrorist attacks, or health epidemics may affect the actual financial results achieved. Such results may vary significantly from the forecasts and such variations may be material.

### C. Risks Relating to the Debtors' Business and Financial Condition.

### 1. DIP Facility.

The DIP Facility is intended to provide liquidity to the Debtors during the pendency of the Chapter 11 Cases. If the Chapter 11 Cases take longer than expected to conclude, or in the event of a breach of a milestone or another event of default under the DIP Facility, which could occur if the Plan is not confirmed on the proposed timeline, the Debtors may exhaust or lose access to their financing. There is no assurance that they will be able to obtain additional financing from their existing lenders or otherwise. In either such case, the liquidity necessary for the orderly functioning of the Debtors' business may be materially impaired.

### 2. Risks Associated with Debtors' Business and Industry.

If the Debtors or Reorganized Debtors fail to successfully respond to competitive pressures in this industry or to effectively implement their strategies to respond to these pressures, their operating

results may be negatively affected.  Some of the Debtors' principal competitors have greater financial resources than the Debtors and either have or may in the future use those resources to take steps that may have an adverse effect on the Debtors' competitive position and financial performance.

### 3.    Post-Effective Date Indebtedness.

Following the Effective Date, the Reorganized Debtors will have outstanding indebtedness under the Amended and Restated First Lien Credit Facility of $281 million.  The Reorganized Debtors' ability to service their debt obligations will depend on, among other things, the Reorganized Debtors' compliance with affirmative and negative covenants, as well as future operating performance, which depends partly on economic, financial, competitive, and other factors beyond the Reorganized Debtors' control.  The Reorganized Debtors may not be able to generate sufficient cash from operations to meet their debt service obligations as well as fund necessary capital expenditures and investments in sales and marketing.  In addition, if the Reorganized Debtors need to refinance their debt, obtain additional financing, or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

### D.    Factors Relating to Securities to Be Issued.

### 1.    Market for Securities.

There is currently no market for the New Common Stock and there can be no assurance as to the development or liquidity of any market for any such securities.  The Reorganized Debtors are under no obligation to list any securities on any national securities exchange.  Therefore, there can be no assurance that any of the foregoing securities will be tradable or liquid at any time after the Effective Date.  If a trading market does not develop or is not maintained, holders of the foregoing securities may experience difficulty in reselling such securities or may be unable to sell them at all.  Even if such a market were to exist, such securities could trade at prices higher or lower than the estimated value set forth in this Disclosure Statement depending upon many factors including, without limitation, prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for, the Reorganized Debtors.  In addition, holders of New Common Stock will be subject to certain restrictions contained in a shareholders agreement or limited liability company agreement (as applicable) which may include restrictions on the ability to transfer, as well as other limitations associated with, the New Common Stock.  Accordingly, holders of these securities may bear certain risks associated with holding securities for an indefinite period of time.

### 2.    Potential Dilution.

Subject to the terms of the Plan, the ownership percentage represented by the New Common Stock distributed on the Effective Date under the Plan will be subject to dilution from any other shares that may be issued post-emergence, and the conversion of any options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence, including pursuant to the Management Incentive Plan.

In the future, similar to all companies, additional equity financings or other share issuances by any of the Reorganized Debtors could adversely affect the value of the New Common Stock issuable upon such conversion. The amount and dilutive effect of any of the foregoing could be material.

### 3.      Significant Holders of New Common Stock.

Certain holders of Class 3 Claims are expected to acquire significant New Common Stock pursuant to the Plan. Such holders could be in a position to control the outcome of all actions of the Reorganized Debtors, as applicable, requiring stockholder approval, including the election of directors or managers, without the approval of other stockholders. This concentration of ownership could also facilitate or hinder a negotiated change of control of the Reorganized Debtors and, consequently, have an impact upon the value of the New Common Stock.

### 4.      New Common Stock Subordinated to Reorganized Debtors' Indebtedness.

In any subsequent liquidation, dissolution, or winding up of the Reorganized Debtors, the New Common Stock would rank below all debt claims against the Reorganized Debtors, including claims under the Amended and Restated First Lien Credit Facility. As a result, holders of the New Common Stock will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all the Reorganized Debtors' obligations to their debt holders have been satisfied, including under the Amended and Restated First Lien Credit Facility.

### 5.      Implied Valuation of New Common Stock Not Intended to Represent Trading Value of New Common Stock.

The valuation of the Reorganized Debtors is not intended to represent the trading value of New Common Stock in public or private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things: (a) prevailing interest rates; (b) conditions in the financial markets; (c) the anticipated initial securities holdings of prepetition creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis; and (d) other factors that generally influence the prices of securities. The actual market price of the New Common Stock is likely to be volatile. Many factors, including factors unrelated to the Reorganized Debtors' actual operating performance and other factors not possible to predict, could cause the market price of the New Common Stock to rise and fall. Accordingly, the implied value, stated herein and in the Plan, of the securities to be issued does not necessarily reflect, and should not be construed as reflecting, values that will be attained for the New Common Stock in the public or private markets.

### 6.      No Dividends.

Reorganized Catalina Topco might not pay any dividends on the New Common Stock and may instead retain any future cash flows for debt reduction and to support its operations. As a result, the success of an investment in the New Common Stock may depend entirely upon any future appreciation in the value of the New Common Stock. There is no guarantee that the New Common Stock will appreciate in value or even maintain their initial value.

E.       **Risks Related to Amended and Restated First Lien Credit Facility.**

1.       **Insufficient Cash Flow to Meet Debt Obligations.**

On the Effective Date, on a consolidated basis, it is expected that the Reorganized Debtors will have total outstanding secured indebtedness of approximately $281 million, which is expected to consist of the Amended and Restated First Lien Credit Facility.

The Reorganized Debtors' earnings and cash flow may vary significantly from year to year. Additionally, the Reorganized Debtors' future cash flow may be insufficient to meet their debt obligations and commitments.   Any insufficiency could negatively impact the Reorganized Debtors' business.  A range of economic, competitive, business, and industry factors will affect the Reorganized Debtors' future financial performance and, as a result, their ability to generate cash flow from operations and to pay their debt.  Many of these factors are beyond the Reorganized Debtors' control.

If the Reorganized Debtors do not generate enough cash flow from operations to satisfy their debt obligations, they may have to undertake alternative financing plans, such as refinancing or restructuring debt, selling assets, reducing or delaying capital investments, or seeking to raise additional capital.

It cannot be assured, however, that undertaking alternative financing plans, if necessary, would allow the Reorganized Debtors to meet their debt obligations.  An inability to generate sufficient cash flow to satisfy their debt obligations or to obtain alternative financing could materially and adversely affect the Reorganized Debtors' ability to make payments on the Amended and Restated First Lien Credit Facility and their business, financial condition, results of operations, and prospects.

F.       **Additional Factors.**

1.       **Debtors Could Withdraw the Plan.**

The Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtors.

2.       **Debtors Have No Duty to Update.**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

3.       **No Representations Outside this Disclosure Statement Are Authorized.**

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or

rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

### 4.        No Legal or Tax Advice is Provided by this Disclosure Statement.

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each holder of a Claim or Interest should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.

This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### 5.        No Admission Made.

Nothing contained herein or in the Plan shall constitute an admission of, or shall be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or holders of Claims or Interests.

### 6.        Failure to Identify Litigation Claims or Projected Objections.

No reliance should be placed on the fact that a particular litigation claim or a projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement.  The Debtors may seek to investigate, file, and prosecute Claims and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or objections to such Claims.

### 7.        Certain Tax Consequences.

For a discussion of certain U.S. Federal income tax consequences of the implementation of the Plan to the Debtors and certain holders of Claims and Interests, *see* Section VIII hereof.

### XI.
### CONFIRMATION OF THE PLAN

The Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.   Among the requirements for confirmation are that the Plan is (A) accepted by all impaired Classes of Claims and Interests entitled to vote or, if rejected or deemed rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (B) in the "best interests" of the holders of Claims and Interests impaired under the Plan; and (C) feasible.

### A.    Confirmation Hearing.

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties.  The Confirmation Hearing is scheduled for January 30, 2019 at 10:00 a.m. (Prevailing Eastern Time).  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the

announcement of the continuation date made at the Confirmation Hearing, at any subsequent continued Confirmation Hearing, or pursuant to a notice filed on the docket for the Chapter 11 Cases.

### B.    Objections to Confirmation.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a Plan.  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Rules, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the Debtors' estates or properties, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court, with a copy to the chambers of the United States Bankruptcy Judge appointed to the Chapter 11 Cases, together with proof of service thereof, and served upon all of the below parties.

| **To the Debtors, at:** | Weil, Gotshal & Manges LLP 767 Fifth Avenue New York, New York  10153 Attn: Gary Holtzer, Ronit Berkovich, Jessica Liou, and Kevin Bostel Telephone: (212) 310-8000 Facsimile: (212) 310-8007 E-mail:gary.holtzer@weil.com       ronit.berkovich@weil.com       jessica.liou@weil.com       kevin.bostel@weil.com |
|---|---|
| **To the First Lien Ad Hoc Group at:** Jones Day 250 Vesey Street New York, New York 10281 Attn: Scott Greenberg Telephone: (212) 326-3939 Facsimile: (212) 755-7306 E-mail: sgreenberg@jonesday.com | **To the DIP Agent, at:** Davis Polk & Wardwell LLP 450 Lexington Ave New York, NY 10017 Attn: Brian M. Resnick Telephone: (212) 450-4213 Facsimile: (212) 701-5213 E-mail: brian.resnick@davispolk.com |
| **To the Second Lien Ad Hoc Group at:** Paul, Weiss, Rifkind, Wharton & Garrison LLP 1285 Avenue of the Americas New York, New York 10019 Attn: Brian H. Hermann, Robert A. Britton, and Dan Youngblut Telephone: (212) 373-3000 Facsimile: (212) 492-0545 E-mail: bhermann@paulweiss.com       rbritton@paulweiss.com       dyoungblut@paulweiss.com | |

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

### C.    Requirements for Confirmation of the Plan.

#### 1.    Requirements of Section 1129(a) of the Bankruptcy Code.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied including, without limitation, whether:

(i)    the Plan complies with the applicable provisions of the Bankruptcy Code;

(ii)    the Debtors have complied with the applicable provisions of the Bankruptcy Code;

(iii)    the Plan has been proposed in good faith and not by any means forbidden by law;

(iv)    any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

(v)    the Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Reorganized Debtors, an affiliate of the Debtors participating in a Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests holders of Claims and Interests and with public policy, and the Debtors have disclosed the identity of any insider who will be employed or retained by the Reorganized Debtors, and the nature of any compensation for such insider;

(vi)    with respect to each Class of Claims or Interests, each holder of an impaired Claim has either accepted the Plan or will receive or retain under the Plan, on account of such holder's Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code;

(vii)    except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (as discussed further below), each Class of Claims either accepted the Plan or is not impaired under the Plan;

(viii)    except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that administrative expenses and Priority Claims, other than Priority Tax Claims, will be paid in full on the Effective Date,

and that Priority Tax Claims will receive either payment in full on the Effective Date or deferred cash payments over a period not exceeding five years after the Commencement Date, of a value, as of the Effective Date of the Plan, equal to the allowed amount of such Claims;

(ix)     at least one Class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class;

(x)      confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan; and

(xi)     all fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

As provided above, among the requirements for confirmation are that the Plan is (A) accepted by all impaired Classes of Claims and Interests entitled to vote or, if rejected or deemed rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (B) in the "best interests" of the holders of Claims and Interests impaired under the Plan; and (C) feasible.

(a)      Acceptance of the Plan.

Under the Bankruptcy Code, a Class accepts a chapter 11 plan if (1) holders of two-thirds (2/3) in amount and (2) with respect to holders of Claims, more than a majority in number of the allowed claims in such class (other than those designated under section 1126(e) of the Bankruptcy Code) vote to accept the Plan.  Holders of Claims or Interests that fail to vote are not counted in determining the thresholds for acceptance of the Plan.

If any impaired Class of Claims or Interests does not accept the Plan (or is deemed to reject the Plan), the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each impaired Class of Claims or Interests that has not accepted the Plan (or is deemed to reject the Plan), the Plan "does not discriminate unfairly" and is "fair and equitable" under the so-called "cram down" provisions set forth in section 1129(b) of the Bankruptcy Code.  The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan.  A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or interests receives more than it legally is entitled to receive for its claims or interests.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."  The "fair and equitable" test applies to classes of different priority and status (e.g., secured versus unsecured; claims versus interests) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class.  As to the dissenting class, the test sets different standards that must be satisfied in order for the Plan to be confirmed, depending on the type of claims or interests

in such class.  The following sets forth the "fair and equitable" test that must be satisfied as to each type of class for a Plan to be confirmed if such class rejects the Plan:

- **Secured Creditors**.  Each holder of an impaired secured claim either (a) retains its liens on the property, to the extent of the allowed amount of its secured claim, and receives deferred cash payments having a value, as of the Effective Date, of at least the allowed amount of such secured claim, (b) has the right to credit bid the amount of its claim if its property is sold and retains its lien on the proceeds of the sale, or (c) receives the "indubitable equivalent" of its allowed secured claim.

- **Unsecured Creditors**.  Either (a) each holder of an impaired unsecured claim receives or retains under the Plan, property of a value, as of the Effective Date, equal to the amount of its allowed claim or (b) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the Plan.

- **Interests**.  Either (a) each equity interest holder will receive or retain under the Plan property of a value equal to the greater of (i) the fixed liquidation preference or redemption price, if any, of such equity interest and (ii) the value of the equity interest or (b) the holders of interests that are junior to the interests of the dissenting class will not receive or retain any property under the Plan.

The Debtors believe the Plan satisfies the "fair and equitable" requirement with respect to any rejecting Class.

**IF ALL OTHER CONFIRMATION REQUIREMENTS ARE SATISFIED AT THE CONFIRMATION HEARING, THE DEBTORS WILL ASK THE BANKRUPTCY COURT TO RULE THAT THE PLAN MAY BE CONFIRMED ON THE GROUND THAT THE SECTION 1129(b) REQUIREMENTS HAVE BEEN SATISFIED.**

(b)    Best Interest Test.

The Bankruptcy Code requires that each holder of an impaired Claim or Interest either (1) accept the Plan or (2) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  This requirement is customarily referred to as the "best interest" test.

The first step in determining whether the Plan satisfies the best interest test is to determine the dollar amount that would be generated from the liquidation of the Debtors' assets in the context of a chapter 7 liquidation.  The gross amount of Cash that would be available for satisfaction of Claims and Interests would be the sum consisting of the proceeds resulting from the disposition of the assets of the Debtors, augmented by the unencumbered Cash held by the Debtors at the time of the commencement of the liquidation case.

The next step is to reduce that gross amount by the costs and expenses of liquidation, the proceeds received from the disposition of encumbered assets that would be distributed to the holders of the liens on such assets, and by the payment of such additional administrative expenses and priority

claims arising from the use of chapter 7 for the purposes of liquidation. Any remaining Cash would be allocated to unsecured creditors and equity interest holders in strict priority in accordance with section 726 of the Bankruptcy Code. Finally, the present value of such allocations (taking into account the time necessary to accomplish the liquidation) are compared to the value of the property that is proposed to be distributed under the Plan on the Effective Date.

The Debtors' costs of liquidation under chapter 7 would include the fees payable to a trustee in bankruptcy as well as those fees that might be payable to attorneys and other professionals that the trustee might engage. Other liquidation costs include the expenses incurred during the Chapter 11 Cases allowed in the chapter 7 cases, such as compensation for attorneys, financial advisors, appraisers, accountants, and other professionals for the Debtors and statutory committees appointed in the Chapter 11 Cases, and costs and expenses of members of such committees, as well as other compensation Claims. Furthermore, additional Claims would arise by reason of the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtors during the pendency of the Chapter 11 Cases. The foregoing types of Claims, costs, expenses, fees, and such other Claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay prepetition priority and unsecured Claims, or available for distribution to the holders of Interests.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of Claims and Interests in the Chapter 11 Cases, including (1) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (2) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail, and (3) the substantial increase in Claims that would be satisfied on a priority basis, the Debtors have determined that confirmation of the Plan will provide each holder of an Allowed Claim or Interest with a recovery that is not less than such holder would receive pursuant to liquidation of the Debtors under chapter 7. For purposes of the best interests test, distributions under a chapter 11 plan that substantively consolidates debtors are compared against distributions in a hypothetical chapter 7 that also substantively consolidates the debtors.

The Debtors also believe that the value of any distributions to holders of Allowed Claims and Interests in a chapter 7 case would be less than the value of distributions under the Plan because such distributions in a chapter 7 case would not occur for a substantial period of time. It is likely that distribution of the proceeds of the liquidation could be delayed for at least one year after the completion of such liquidation to resolve Claims and prepare for distributions. In the likely event litigation was necessary to resolve Claims asserted in a chapter 7 case, the delay could be prolonged and Administrative Expenses increased.

The Liquidation Analysis annexed hereto as **Exhibit C** provides a summary of the liquidation values of the Debtors' assets, assuming a chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate the assets of the Debtors' estates and confirms the conclusions set forth above. Reference should be made to the Liquidation Analysis for a complete discussion and presentation of the Liquidation Analysis. The Liquidation Analysis was prepared by FTI, with the assistance of the Debtors' management and other advisors.

Underlying the Liquidation Analysis are a number of estimates and assumptions which, although developed and considered reasonable by the Debtors' management and their financial advisors, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. The Liquidation Analysis is also based on assumptions with regard to liquidation decisions that are subject to change. Accordingly, the values reflected might not be realized if the Debtors were, in fact, to undergo such a liquidation. The chapter 7 liquidation period is assumed to be a period of at least six (6) months, allowing for, among other things, the discontinuation and wind-down of operations within the first few months, compliance with applicable regulatory requirements, the sale of assets, and the collection of receivables.

(c)    Feasibility

The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Reorganized Debtors or any successor under the Plan. In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies the feasibility standard, the Debtors analyzed the ability of the Reorganized Debtors to satisfy their financial obligations while maintaining sufficient liquidity and capital resources. The Debtors prepared the Financial Projections attached hereto as **Exhibit D** based on, among other things, the anticipated future financial condition and results of operations of the Debtors. In conjunction with the Debtors' advisors, the Debtors' management team developed and refined the business plan and prepared consolidated financial projections of the Debtors for the post-emergence period from June 15, 2019 through December 31, 2022 (the "**Projection Period**"). Based upon such projections, the Debtors believe that all payments required to be made by the Reorganized Debtors pursuant to the Plan will be made and, therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization.

The Financial Projections assume that the Plan will be consummated in accordance with its terms and that all transactions contemplated by the Plan will be consummated on or prior to June 15, 2019 (the "**Assumed Effective Date**"). Any significant delay in the Assumed Effective Date may have a significant negative impact on the operations and financial performance of the Debtors including, but not limited to, an increased risk or inability to meet forecasts and the incurrence of higher reorganization expenses.

Although the Financial Projections represent the Debtors' best estimates and good faith judgment (for which the Debtors' management team believes it has a reasonable basis) of the results of future operations, financial position, and cash flows of the Debtors, they are only estimates and actual results may vary considerably from such Financial Projections. Consequently, the inclusion of the Financial Projections herein should not be regarded as a representation by the Debtors, the Debtors' advisors, or any other person that the projected results of operations, financial position, and cash flows of the Debtors will be achieved.

The Debtors do not intend to further update or otherwise revise the Financial Projections to reflect circumstances that may occur after their preparation, or to reflect the occurrence of unanticipated events, even in the event that any or all of the underlying assumptions are shown to be in error.

Additional information relating to the principal assumptions used in preparing the Financial Projections are set forth below.

THE FINANCIAL PROJECTIONS HAVE BEEN PREPARED BY THE MANAGEMENT OF THE DEBTORS, IN CONJUNCTION WITH THE DEBTORS' ADVISORS, FTI CONSULTING, INC.  THE FINANCIAL PROJECTIONS WERE NOT PREPARED TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS OR THE RULES AND REGULATIONS OF THE SEC, AND BY THEIR NATURE ARE NOT FINANCIAL STATEMENTS PREPARED IN ACCORDANCE WITH ACCOUNTING PRINCIPLES GENERALLY ACCEPTED IN THE UNITED STATES OF AMERICA.  THE DEBTORS' INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE ACCOMPANYING FINANCIAL PROJECTIONS AND ACCORDINGLY DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE FINANCIAL PROJECTIONS, ASSUME NO RESPONSIBILITY FOR THE FINANCIAL PROJECTIONS AND DISCLAIM ANY ASSOCIATION WITH THE FINANCIAL PROJECTIONS.
THE FINANCIAL PROJECTIONS DO NOT REFLECT THE IMPACT OF FRESH START REPORTING IN ACCORDANCE WITH AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS STATEMENT OF POSITION 90-7 "FINANCIAL REPORTING BY ENTITIES IN REORGANIZATION UNDER THE BANKRUPTCY CODE." THE IMPACT OF FRESH START REPORTING AT THE EFFECTIVE DATE MAY HAVE AN IMPACT ON ASSETS, LIABILITIES AND SHAREHOLDER EQUITY AS REFLECTED ON THE REORGANIZED DEBTORS CONSOLIDATED BALANCE SHEETS AND PROSPECTIVE RESULTS OF OPERATIONS.

General Assumptions and Methodology

The Financial Projections for the Debtors are based on the Debtors' 2019 – 2021 business plan as informed by current and projected conditions in each of the Debtors' markets and businesses.  The Financial Projections include regional and corporate operations and are presented on a consolidated basis.  The Financial Projections consist of the following unaudited pro forma financial statements for each year in the Projection Period: (i) projected consolidated statements of operations, (ii) projected consolidated balance sheets, and (iii) projected consolidated statements of cash flows.

The Financial Projections, which are presented on a consolidated basis, include the operations of the Company's three reporting segments: Domestic, Europe, and Japan.  The Financial Projections are presented prior to any impact on the business from platform risk, which would impact both revenue and EBITDA in 2019.  The Financial Projections do not assume the impact of movements in global foreign exchange rates.  The Financial Projections also assume no changes to the NCS joint venture.  Changes in Catalina's business relationship with NCS, including as it relates to the NCS Agreement, could have a material impact on the Financial Projections.

Projected Consolidated Income Statement Assumptions

*Net Revenue*:  Net revenue is comprised of sales to customers through the Company's in-store operations, BuyerVision, and Digital Promotions in addition to revenue generated through the NCS joint-venture and expected new business. The net revenue forecast is based primarily on the Debtors' perspective on historical and expected regional sales trends in each of the Company's operating segments.

*Cost of Sales*:  Cost of sales is directly related to revenue generated by operating segment and consists primarily of direct costs to support the in-store operations and the costs to target and measure digital operations. Cost of sales for in-store operations consist of ink, paper, retailer fees, and services.  Cost of sales for the Debtors' digital operations consists of traffic acquisition, targeting, measurement, media and other direct costs. Cost of sales has been forecasted based on Debtors' expectations with regards to each of the direct line items by segment as outlined above.

*SG&A*:  Selling, general and administrative ("**SG&A**") costs consist of the global sales team, operations and corporate costs.  Each of the SG&A items is modeled separately and include potential cost savings or impacts based on the Debtors' expectations. The Financial Projections reflect ongoing SG&A savings from cost reduction efforts enacted prior to emergence.

*Other*:  Other consists primarily of the Debtors' estimation of costs that are one-time in nature.

*Depreciation and Amortization*:  Depreciation and Amortization ("**D&A**") expense is based on Management's expectation of D&A for existing assets and five-year straight-line depreciation on projected capex in the business plan.

*Interest Expense*:  Interest expense is modeled on the latest lender term sheet dated December 7, 2019.

*Income Tax Expense*:  Income tax expense is forecasted separately for the Domestic, Europe, and Japan operations and includes the Debtors' estimation of the impact of tax reform.  The Debtors do not assume any tax attributes will be applied after the Effective Date.

Projected Consolidated Cash Flow Statement and Balance Sheet Assumptions

*Changes in Working Capital*:  Changes in working capital are forecasted separately for the Domestic, Europe, and Japan operations.  Working capital, and the resulting changes in working capital, are forecasted by-line item and are based on days sales outstanding, days payables outstanding, percent of revenue, and percent of cost of sales plus SG&A and utilizing historic analysis and trends.

*Capex*:  Capital expenditures ("**Capex**") include the Debtors' forecasts on both maintenance and growth capex.  The maintenance capex includes spending to maintain and update the Debtors' global printer network and stabilize the platform.  Growth capex is expected for product development, retail network expansion, and retail data fees.

*Proceeds/(Repayments) on Debt*:  Proceeds and repayments on debt is modeled on the latest lender term sheet dated December 7, 2019 and includes proceeds from the exit facility and mandatory amortization.

*Long-Term Debt*:  Long-term debt is modeled on the latest lender term sheet dated December 7, 2019 and includes the A&R First-Out Tranche, the A&R Last-Out Tranche, and the A&R Exit Facility.  The A&R First-Out Tranche and A&R Exit Facility are presented net of mandatory amortization and the A&R Last-Out Tranche includes interest payments in kind.

(d)     Equitable Distribution of Voting Power.

On or before the Effective Date, pursuant to and only to the extent required by section 1123(a)(6)

of the Bankruptcy Code, the organizational documents for the Debtors will be amended as necessary to satisfy the provisions of the Bankruptcy Code and will include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, (i) a provision prohibiting the issuance of non-voting equity securities, and (ii) a provision setting forth an appropriate distribution of voting power among classes of equity securities possessing voting power.

## 2.     Additional Requirements for Non-Consensual Confirmation.

Under the Bankruptcy Code, a Class accepts a chapter 11 plan if (i) holders of two-thirds (2/3) in amount and (ii) with respect to holders of Claims, more than a majority in number of the allowed claims in such class (other than those designated under section 1126(e) of the Bankruptcy Code) vote to accept the plan. Holders of Claims or Interests that fail to vote are not counted in determining the thresholds for acceptance of the Plan.

In the event that any Impaired Class of Claims does not accept or is deemed to reject the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each impaired Class of Claims or Interests that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Classes of Claims or Interests, pursuant to section 1129(b) of the Bankruptcy Code. Both of these requirements are in addition to other requirements established by case law interpreting the statutory requirements.

Pursuant to the Plan, holders of Claims in Class 6 (NCS Rejection Claims), Class 7 (General Unsecured PDM Claims), Class 9 (Subordinated Claims), and Class 10 (Existing Equity Interests) will not receive a distribution and are thereby deemed to reject the Plan. However, the Debtors submit that they satisfy the "unfair discrimination" and "fair and equitable" tests, as discussed in further detail below.

(a)     Unfair Discrimination Test.

The "unfair discrimination" test applies to Classes of Claims that are of equal priority and are receiving different treatment under the Plan.  A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting Class are treated in a manner consistent with the treatment of other Classes whose legal rights are substantially similar to those of the dissenting Class and if no Class of Claims receives more than it legally is entitled

to receive for its Claims.  This test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

The Debtors believe the Plan satisfies the "unfair discrimination" test. Claims of equal priority are receiving comparable treatment and such treatment is fair under the circumstances.

(b)    Fair and Equitable Test.

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. As to dissenting classes, the test sets different standards depending on the type of claims in such class.  The Debtors believe that the Plan satisfies the "fair and equitable" test with respect to any dissenting Classes, as further explained below.

(i)    Secured Creditors.

The Bankruptcy Code requires that each holder of an impaired secured claim either (a) retain its liens on the property to the extent of the allowed amount of its secured claim and receive deferred cash payments having a value, as of the Effective Date, of at least the allowed amount of such claim, (b) have the right to credit bid the amount of its claim if its property is sold and retain its liens on the proceeds of the sale (or if sold, on the proceeds thereof), or (c) receive the "indubitable equivalent" of its allowed secured claim.

(ii)    Unsecured Creditors.

The Bankruptcy Code requires that either (a) each holder of an impaired unsecured claim receive or retain under the Plan property of a value equal to the amount of its allowed claim or (b) the holders of claims and equity interests that are junior to the claims of the dissenting class not receive any property under the Plan. The Plan provides that each holder of an Impaired unsecured Claim shall receive the treatment summarized above in Article V of this Disclosure Statement.

(iii)    Equity Interests.

The Bankruptcy Code requires that either (a) each holder of an equity interest receive or retain under the Plan property of a value equal to the greater of (i) the fixed liquidation preference or redemption price, if any, of such stock and (ii) the value of the stock, or (b) the holders of equity interests that are junior to any dissenting class of equity interests not receive any property under the Plan.  Pursuant to the Plan, all Existing Equity Interests will be cancelled and the holders of Existing Equity Interests will neither receive nor retain any property on account of such interests.

## XII.
## VALUATION ANALYSIS

A.    **Disclaimer.**

**THE VALUATIONS SET FORTH HEREIN REPRESENT ESTIMATED DISTRIBUTABLE VALUE FOR THE DEBTORS AND DO NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN THE PUBLIC OR PRIVATE**

**MARKETS.  THE VALUE OF THE NEW COMMON STOCK DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET VALUE OF THE REORGANIZED DEBTORS.**

**B.      Valuation Estimate.**

In connection with developing the Plan, the Debtors directed their investment banker, Centerview, to estimate the going-concern value of the Reorganized Debtors.  This analysis has been prepared for the Debtors' sole use and is based on information provided to Centerview by the Debtors.

Based on the Financial Projections set forth in Exhibit D and subject to the disclaimers and the descriptions of Centerview's methodology set forth herein, and solely for purposes of the Plan, Centerview estimates the total enterprise value of the Reorganized Debtors to be within the range of approximately $460 million to $730 million as of December 31, 2018 with an estimated midpoint of $595 million.[5]  The range of total equity value, which takes into account the total enterprise value less the estimated net debt outstanding as of the Effective Date, was estimated by Centerview to be between approximately $179 million and $449 million with an estimated midpoint of $314 million. The implied total enterprise value should be considered as a whole, and the underlying analyses should not be considered indicative of the values of any individual operation of the Reorganized Debtors.

In preparing the estimated total enterprise value range for the Reorganized Debtors, Centerview: (1) reviewed certain historical financial information of the Debtors for recent years and interim periods; (2) met with certain members of the Debtors' senior management to discuss the Debtors' operations and future prospects; (3) reviewed publicly available financial data and considered the market values of public companies deemed generally comparable to the operating businesses of the Debtors; (4) considered certain economic and industry information relevant to the Debtors' operating businesses; (5) prepared discounted cash flow analyses based on the Financial Projections, utilizing various discount rates and assumptions in the calculation of terminal values; (6) considered the value assigned to certain precedent change-of-control transactions for businesses similar to those of the Debtors; and (7) conducted such other analyses as Centerview deemed appropriate.

Although Centerview conducted a review and analysis of the Debtors' businesses, operating assets and liabilities, and business plans, Centerview relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors and by other firms retained by the Debtors and on certain publicly available information as to which Centerview does not have independent knowledge.

The projections provided by the Debtors to Centerview are for fiscal years 2018 – 2022. Centerview has relied on the Debtors' representation and warranty that the Financial Projections provided by the Debtors to Centerview (1) have been prepared in good faith, (2) are based on fully disclosed assumptions which, in light of the circumstances under which they were made, are reasonable, (3) reflect the Debtors' best currently available estimates, and (4) reflect the good faith

---

[5] The endpoints of the range of estimated total enterprise value represent the arithmetic means of the endpoints of the ranges that Centerview calculated using the three valuation methodologies described herein.

judgments of the Debtors. Centerview does not offer an opinion as to the attainability of the Financial Projections. The future results of the Reorganized Debtors are dependent upon various factors, many of which are beyond the control or knowledge of the Debtors, and consequently are inherently difficult to project. The Reorganized Debtors' actual future results may differ materially (positively or negatively) from the Financial Projections and as a result, the actual total enterprise value of the Reorganized Debtors may be significantly higher or lower than the estimated range herein.

No independent evaluations or appraisals of the Debtors' assets were sought or obtained in connection with Centerview's valuation. Centerview did not conduct an independent investigation into any of the legal, tax, pension or accounting matters affecting the Debtors, and therefore makes no representations as to their impact on the Debtors' financial statements.

### C. Valuation Considerations.

This valuation is based upon information available to, and analyses undertaken by, Centerview as of December 2018, and reflects, among other factors discussed below, the current financial market conditions and the inherent uncertainty today as to the achievement of the Financial Projections. The value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial conditions and prospects of such a business. For purposes of this valuation, Centerview has assumed that no material changes that would affect value will occur between the date of this Disclosure Statement and the assumed Effective Date. Events and conditions subsequent to this date, including but not limited to updated projections, as well as other factors, could have a substantial impact upon the Reorganized Debtors' value. Neither Centerview nor the Debtors has any obligation to update, revise or reaffirm the valuation.

This valuation also reflects a number of assumptions, including a successful reorganization of the Debtors' businesses and finances in a timely manner, achieving the forecasts reflected in the Financial Projections, the minimum amount of cash required to operate the Debtors' businesses, market conditions and the Plan becoming effective in accordance with its terms on a basis consistent with the estimates and other assumptions discussed herein. Among other things, failure to consummate the Plan in a timely manner may have a materially negative impact on the enterprise value of the Reorganized Debtors.

Further, the valuation of newly issued securities is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things: (i) prevailing interest rates; (ii) conditions in the financial markets; (iii) the anticipated initial securities holdings of prepetition creditors, some of which may prefer to liquidate their investment rather than hold it on a long-term basis; and (iv) other factors that generally influence the prices of securities. Actual market prices of such securities also may be affected by the Chapter 11 Cases or by other factors not possible to predict. Accordingly, the total enterprise value ascribed in the analysis does not purport to be an estimate of the post-reorganization market trading value of the Reorganized Debtors or their securities. Such trading value may be materially different from the total enterprise value ranges associated with Centerview's valuation analysis. As further described in the Disclosure Statement, the Reorganized Debtors are anticipated to be a private Company that will not be obligated to file

public reports or disclosures.  There can be no assurance that any trading market will develop for the New Common Stock.  The estimates of value for the Reorganized Debtors do not necessarily reflect the values that may be attainable in public or private markets.  Furthermore, in the event that the actual distributions in the Chapter 11 Cases differ from those the Debtors assumed in their recovery analysis, the actual recovery of holders of Claims in Impaired Classes could be significantly higher or lower than estimated by the Debtors.

The estimate of total enterprise value set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein depending on the results of the Debtors' operations or changes in the financial markets.  Additionally, these estimates of value represent hypothetical enterprise and equity values of the Reorganized Debtors as the continuing operator of the Debtors' businesses and assets, and do not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein.  Such estimates were developed solely for purposes of formulation and negotiation of the Plan and analysis of implied relative recoveries to creditors thereunder.  The value of an operating business such as the Debtors' businesses is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such businesses.

Centerview's estimated valuation range of the Reorganized Debtors does not constitute a recommendation to any holder of Allowed Claims or Equity Interests as to how such person should vote or otherwise act with respect to the Plan.  The estimated value of the Reorganized Debtors set forth herein does not constitute an opinion as to the fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan.  Because valuation estimates are inherently subject to uncertainties, none of the Debtors, Centerview or any other person assumes responsibility for their accuracy or any differences between the estimated valuation ranges herein and any actual outcome.

**XIII.**
**<u>CONCLUSION AND RECOMMENDATION</u>**

The Debtors believe the Plan is in the best interests of all stakeholders and urge the holders of Claims in Classes 3 and 4 to vote in favor thereof.

Dated: December 11, 2018


**CATALINA MARKETING CORPORATION**
**CATALINA MARKETING PROCUREMENT, LLC**
**CATALINA MARKETING TECHNOLOGY SOLUTIONS, INC.**
**CATALINA MARKETING WORLDWIDE, LLC**
**CELLFIRE INC.**
**CHECKOUT HOLDING CORP.**
**MODIV MEDIA, INC.**
**PDM GROUP HOLDINGS CORPORATION**
**PDM HOLDINGS CORPORATION**
**PDM INTERMEDIATE HOLDINGS A CORPORATION**
**PDM INTERMEDIATE HOLDINGS B CORPORATION**



By:    _/s/ Shelly Schaffer_____
Name:  Shelly Schaffer
Title:  Chief Financial Officer and
        Authorized Representative

**Exhibit A**

**Plan**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

------------------------------------------------------------- X
                                 :
In re                             :       **Chapter 11**
                                   :
**CHECKOUT HOLDING CORP.,** *et al.,*    :       **Case No. 18-[_____] (___)**
                                   :
                                   :       **(Joint Administration Pending)**
                **Debtors.**[1]        :
                                   :
------------------------------------------------------------- X

**JOINT PREPACKAGED CHAPTER 11 PLAN OF**
**CHECKOUT HOLDING CORP. AND ITS AFFILIATED DEBTORS**

| | |
|---|---|
| WEIL, GOTSHAL & MANGES LLP | RICHARDS, LAYTON & FINGER, P.A. |
| Gary T. Holtzer | Mark D. Collins (No. 2981) |
| Ronit J. Berkovich | Jason M. Madron (No. 4431) |
| Jessica Liou | One Rodney Square |
| Kevin Bostel | 920 North King Street |
| 767 Fifth Avenue | Wilmington, Delaware 19801 |
| New York, New York  10153 | Telephone:  (302) 651-7700 |
| Telephone:  (212) 310-8000 | Facsimile:  (302) 651-7701 |
| Facsimile:  (212) 310-8007 | |
| | *Attorneys for Debtors and* |
| *Attorneys for Debtors and* | *Debtors in Possession* |
| *Debtors in Possession* | |

Dated:  December 11, 2018
Wilmington, Delaware

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Catalina Marketing Corporation (9007); Catalina Marketing Procurement, LLC (9333); Catalina Marketing Technology Solutions, Inc. (8728); Catalina Marketing Worldwide, LLC (9687); CellFire Inc. (5599); Checkout Holding Corp. (4651); Modiv Media, Inc. (3507); PDM Group Holdings Corporation; PDM Holdings Corporation; PDM Intermediate Holdings A Corporation; and PDM Intermediate Holdings B Corporation.  The Debtors' principal offices are located at 200 Carillon Parkway, St. Petersburg, FL 33716.

**Table of Contents**

ARTICLE I.    Definitions and Interpretation. .........................................................................1

    1.1    Definitions. .................................................................................................1

    1.2    Interpretation; Application of Definitions; Rules of Construction. ...............15

    1.3    Reference to Monetary Figures.....................................................................16

    1.4    Consent Rights of Restructuring Support Parties. .........................................16

    1.5    Controlling Document...................................................................................16

ARTICLE II.    Administrative Expense Claims, Fee Claims, DIP Facility Claims, and
    Priority Tax Claims....................................................................................16

    2.1    Treatment of Administrative Expense Claims................................................16

    2.2    Treatment of Fee Claims. .............................................................................17

    2.3    Treatment of DIP Facility Claims. ................................................................17

    2.4    Payment of Fees and Expenses under DIP Facility Order..............................18

    2.5    Treatment of Priority Tax Claims. ................................................................18

ARTICLE III.    Classification of Claims and Interests. .......................................................18

    3.1    Classification in General. .............................................................................18

    3.2    Formation of Debtor Groups for Convenience Only. ....................................18

    3.3    Summary of Classification of Claims and Interests.......................................19

    3.4    Separate Classification of Other Secured Claims. .........................................19

    3.5    Elimination of Vacant Classes. ....................................................................19

    3.6    Voting; Presumptions; Solicitation. ..............................................................20

    3.7    Cramdown....................................................................................................20

    3.8    No Waiver....................................................................................................20

ARTICLE IV.    Treatment of Claims and Interests. .............................................................20

    4.1    Class 1:  Priority Non-Tax Claims. ..............................................................20

    4.2    Class 2:  Other Secured Claims. ...................................................................21

| 4.3 | Class 3: First Lien Debt Claims. ............................................................21 |
|------|-------------------------------------------------------------------------------|
| 4.4 | Class 4: Second Lien Debt Claims. ..........................................................21 |
| 4.5 | Class 5: General Unsecured Claims. .........................................................22 |
| 4.6 | Class 6: NCS Rejection Claims. ...............................................................22 |
| 4.7 | Class 7: General Unsecured PDM Claims. ...............................................22 |
| 4.8 | Class 8: Intercompany Claims. .................................................................23 |
| 4.9 | Class 9: Subordinated Claims. .................................................................23 |
| 4.10 | Class 10: Existing Equity Interests. .......................................................23 |
| 4.11 | Class 11: Intercompany Interests. ...........................................................23 |
| 4.12 | Debtors' Rights in Respect of Unimpaired Claims. ................................24 |
| 4.13 | Treatment of Vacant Classes. ..................................................................24 |
| **ARTICLE V.** | **Means for Implementation.........................................................24** |
| 5.1 | Continued Corporate Existence; Dissolution ...........................................24 |
| 5.2 | Plan Funding. ...........................................................................................25 |
| 5.3 | Cancellation of Existing Securities and Agreements. ..............................25 |
| 5.4 | Cancellation of Certain Existing Security Interests. ...............................26 |
| 5.5 | Officers and Boards of Directors. ............................................................26 |
| 5.6 | Management Incentive Plan......................................................................27 |
| 5.7 | Authorization, Issuance, and Delivery of New Common Stock................27 |
| 5.8 | Amended and Restated First Lien Credit Agreement. ..............................27 |
| 5.9 | Intercompany Interests; Corporate Reorganization. ................................28 |
| 5.10 | Restructuring Transactions. .....................................................................28 |
| 5.11 | Separability. .............................................................................................29 |
| 5.13 | Determination of Tax Filings and Taxes. ................................................30 |

WEIL:\96767752\18\34225.0004

**ARTICLE VI.    Distributions.** ....................................................................................**31**

6.1          Distributions Generally. ........................................................................31

6.2          Postpetition Interest on Claims. ...........................................................31

6.3          Date of Distributions. ...........................................................................31

6.4          Distribution Record Date. .....................................................................31

6.5          Disbursing Agent. .................................................................................32

6.6          Delivery of Distributions. .....................................................................32

6.7          Unclaimed Property...............................................................................33

6.8          Satisfaction of Claims. ..........................................................................33

6.9          Manner of Payment under Plan..............................................................33

6.10         Fractional Shares and De Minimis Cash Distributions. ........................33

6.11         No Distribution in Excess of Amount of Allowed Claim. .....................34

6.12         Allocation of Distributions between Principal and Interest....................34

6.13         Exemption from Securities Laws. ..........................................................34

6.14         Setoffs and Recoupments. .....................................................................34

6.15         Rights and Powers of Disbursing Agent. ...............................................35

6.16         Withholding and Reporting Requirements. ............................................35

6.17         Hart-Scott-Rodino Antitrust Improvements Act....................................36

**ARTICLE VII.    Procedures for Resolving Claims.**........................................................**37**

7.1          Disputed Claims Process. ......................................................................37

7.2          Estimation of Claims. ............................................................................38

7.3          Claim Resolution Procedures Cumulative..............................................38

7.4          No Distributions Pending Allowance.....................................................38

7.5          Distributions after Allowance. ...............................................................38

iv

**ARTICLE VIII.   Executory Contracts and Unexpired Leases. ............................39**

8.1        General Treatment. ...................................................................39

8.2        Determination of Cure Disputes and Deemed Consent. ...............39

8.3        Rejection Damages Claims. .......................................................40

8.4        Survival of the Debtors' Indemnification Obligations. ................40

8.5        Compensation and Benefit Plans. ...............................................40

8.6        Insurance Policies. ....................................................................40

8.9        Reservation of Rights. ...............................................................41

**ARTICLE IX.    Conditions Precedent ...............................................................42**

9.1        Conditions Precedent to Confirmation of the Plan. .....................42

9.2        Conditions Precedent to the Effective Date. ................................42

9.3        Waiver of Conditions Precedent. ................................................43

9.4        Effect of Failure of a Condition. ................................................44

**ARTICLE X.     Effect of Confirmation. ...........................................................44**

10.1       Binding Effect. .........................................................................44

10.2       Vesting of Assets. .....................................................................44

10.3       Discharge of Claims against and Interests in the Debtors. ............44

10.4       Pre-Confirmation Injunctions and Stays. ....................................45

10.5       Injunction against Interference with Plan. ...................................45

10.6       Plan Injunction. ........................................................................45

10.7       Releases. ..................................................................................46

10.8       Exculpation. .............................................................................47

10.9       Injunction Related to Releases and Exculpation. .........................48

10.10      Subordinated Claims. ................................................................48

10.11      Retention of Causes of Action and Reservation of Rights. ...........48

v

10.12       Ipso Facto and Similar Provisions Ineffective. ...............................................49

10.15       Indemnification. ...............................................................................................49

**ARTICLE XI.    Retention of Jurisdiction.** ..........................................................................**50**

11.1        Retention of Jurisdiction. ................................................................................50

**ARTICLE XII.    Miscellaneous Provisions** .........................................................................**51**

12.1        Exemption from Certain Transfer Taxes. .......................................................51

12.2        Dates of Actions to Implement This Plan. ......................................................52

12.3        Amendments. ....................................................................................................52

12.4        Revocation or Withdrawal of Plan. .................................................................52

12.5        Non-Severability. .............................................................................................53

12.6        Governing Law. ................................................................................................53

12.8        Immediate Binding Effect. ...............................................................................54

12.9        Successors and Assigns. ..................................................................................54

12.10       Entire Agreement. ............................................................................................54

12.11       Computing Time. ..............................................................................................54

12.12       Exhibits to Plan. ...............................................................................................54

12.14       Notices. .............................................................................................................54

12.15       Reservation of Rights. ......................................................................................57

WEIL:\96767752\18\34225.0004

Each of Checkout Holding Corp., Catalina Marketing Corporation, Catalina Marketing Procurement, LLC, Catalina Marketing Technology Solutions, Inc., Catalina Marketing Worldwide, LLC, CellFire Inc., Modiv Media, Inc., PDM Group Holdings Corporation, PDM Holdings Corporation, PDM Intermediate Holdings A Corporation, and PDM Intermediate Holdings B Corporation (each, a "***Debtor***" and collectively, the "***Debtors***") proposes the following joint prepackaged chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code.  Capitalized terms used herein shall have the meanings set forth in Section 1.1 below.

# ARTICLE I.          DEFINITIONS AND INTERPRETATION.

### 1.1    *Definitions.*

The following terms shall have the respective meanings specified below:

***A&R Agent*** means the Person selected by the Ad Hoc First Lien Group to serve as administrative agent under the Amended and Restated First Lien Credit Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the Amended and Restated First Lien Credit Agreement.

***A&R Exit Facility*** means the exit financing facility under that certain Amended and Restated First Lien Credit Facility, consisting of the A&R First-Out Tranche and the A&R Last-Out Tranche, which shall have an aggregate principal amount of $40 million.

***A&R Exit Facility Backstop Payment*** means the payment made to the Backstop Parties (as defined in the Amended & Restated First Lien Credit Agreement) to the A&R Exit Facility.

***A&R Exit Facility Commitment Payment*** means the payment made to the Commitment Parties (as defined in the Amended & Restated First Lien Credit Agreement) to the A&R Exit Facility.

***A&R First-Out Tranche*** means the first lien first-out tranche of loans under that certain Amended and Restated First Lien Credit Facility, which shall have an aggregate principal amount equal to the sum of (a) the amount of the DIP Facility New Money Loan Claims and (b) the amount of the A&R Exit Facility.

***A&R Last-Out Tranche*** means the first lien last-out tranche of loans under that certain Amended and Restated First Lien Credit Facility, which shall have an aggregate principal amount equal to the DIP Facility Roll-Up Claims.

***A&R First Lien Lenders*** means the lenders party to the Amended and Restated First Lien Credit Agreement.

***Acquisition Agreement*** means that certain acquisition agreement, to be entered into on or prior to the Effective Date, among CMC (as defined below), CHC (as defined below),

and the Acquisition Company (as defined below) in the event the Acquisition Transactions (as defined below) are to occur, to acquire by merger or transfer the stock or substantially all of the assets of CMC, in accordance with the terms therein and this Plan.

**Acquisition Company** means a newly-formed corporate subsidiary, indirectly wholly-owned by PacificCo. that, in the event the Acquisition Transactions occur, shall acquire by merger or transfer the stock or substantially all of the assets of CMC in accordance with the Acquisition Transactions.

**Acquisition Transactions** means the CMC Acquisition and any other transactions that will be undertaken in connection with the CMC Acquisition pursuant to section 1123 of the Bankruptcy Code, which shall be described in the Plan Supplement.

**Acquisition Transactions Exhibit** means a description of some or all of the Restructuring Transactions, including any Acquisition Transactions, which will be included in the Plan Supplement.

**Ad Hoc First Lien Group** means the group of First Lien Lenders represented by Jones Day and Evercore Group, L.L.C. ("**Evercore**").

**Adequate Protection Claims** means any Allowed superpriority administrative expense claims of the First Lien Lenders pursuant to section 507(b) of the Bankruptcy Code and the DIP Orders.

**Administrative Expense Claim** means any Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 327, 328, 330, 365, 503(b), 507(a)(2), or 507(b) of the Bankruptcy Code (other than DIP Facility Claims but including Adequate Protection Claims), including, (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Fee Claims; (c) Restructuring Expenses; and (d) all fees and charges assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code.

**Allowed** means, with respect to any Claim or Interest (i) as to which the Debtors and the holder of the Claim agree to the amount of the Claim or a court of competent jurisdiction has determined the amount of the Claim by Final Order; (ii) any Claim or Interest that is compromised, settled, or otherwise resolved pursuant to the authority of the Debtors or Reorganized Debtors, as applicable, in a Final Order of the Bankruptcy Court; (iii) any Claim that is listed in the Schedules, if any are filed, as liquidated, non-contingent and undisputed; or (iv) any Claim or Interest expressly allowed hereunder; *provided* that the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are reinstated or otherwise Unimpaired pursuant to this Plan.

**Amended and Restated First Lien Credit Agreement** means that certain Amended and Restated First Lien Credit Agreement, to be dated as of the Effective Date, by and among the Reorganized Debtors, the A&R Agent, and the A&R First Lien Lenders, substantially in the form thereof contained in the Plan Supplement.

**Amended and Restated First Lien Credit Facility** means that certain Amended and Restated First Lien Credit Facility comprised of (a) the A&R First-Out Tranche and (b) the A&R Last-Out Tranche, each as set forth in the Amended and Restated First Lien Credit Agreement.

**Amended By-Laws** means, with respect to a Reorganized Debtor, such Reorganized Debtor's amended or amended and restated by-laws or operating agreement, as applicable, substantially in the form thereof contained in the Plan Supplement to the extent it contains material changes to the existing by-laws or operating agreement of such Debtor.

**Amended Certificate of Incorporation** means, with respect to each Reorganized Debtor, such Reorganized Debtor's amended or amended and restated certificate of incorporation or certificate of formation, as applicable, substantially in the form thereof contained in the Plan Supplement.

**Asset** means all of the right, title, and interest of a Debtor or any Estate in and to property of whatever type or nature (including, without limitation, real, personal, mixed, intellectual, tangible, and intangible property).

**Bankruptcy Code** means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as amended from time to time.

**Bankruptcy Court** means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code or the Bankruptcy Court is determined not to have authority to enter a Final Order on an issue, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

**Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Chapter 11 Cases, and any local and chamber rules of the Bankruptcy Court.

**Berkshire Funds** means Berkshire Fund VIII, L.P., a Delaware limited partnership, Berkshire Fund VIII-A, L.P., a Delaware limited partnership, Berkshire Investors III LLC, a Delaware limited liability corporation, and Berkshire Investors IV LLC, a Delaware limited liability corporation.

**Business Day** means any day other than a Saturday, a Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

**Cash** means legal tender of the United States of America.

**Catalina Parent** means PDM Group Holdings Corporation, a Delaware corporation.

WEIL:\96767752\18\34225.0004

**Catalina Parent Group** means the consolidated group as defined in Section 1504 of the Internal Revenue Code of 1986, as amended, of which Catalina Parent is the common parent.

**Cause of Action** means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including, without limitation, under alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.  For the avoidance of doubt, Cause of Action includes: (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to sections 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any claims under any state or foreign law, including, without limitation, any fraudulent transfer or similar claims.

**Chapter 11 Case** means (a) with respect to a Debtor, such Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Bankruptcy Court and (b) when used with reference to all of the Debtors, the procedurally consolidated and jointly administered chapter 11 cases styled *In re Checkout Holding Corp., et al.*, Ch. 11 Case No. 18-[●] ([●]).

**CHC** means Checkout Holding Corp., a Delaware corporation.

**Claim** means a "claim," as defined in section 101(5) of the Bankruptcy Code, against any Debtor.

**Class** means any group of Claims or Interests classified under this Plan pursuant to section 1122(a) of the Bankruptcy Code.

**CMC** means Catalina Marketing Corporation, a Delaware corporation.

**CMC Acquisition** means, as determined by the Debtors (with the consent of the Ad Hoc First Lien Group and the Ad Hoc Second Lien Group) no later than the CMC Acquisition Election Date, either (i) the merger of Acquisition Company or a subsidiary of Acquisition Company with CMC (with CMC surviving or, in the event the Debtors so determine no later than five (5) days prior to the Effective Date, with Acquisition Company surviving) in accordance with the Acquisition Agreement or (ii) the transfer of all the stock of CMC to the Acquisition Company in accordance with the Acquisition Agreement.

**CMC Acquisition Election Date** means the date that is seven (7) days prior to the Voting Deadline.

4

**Collateral** means any Asset of a Debtor or an Estate that is subject to a Lien securing the payment or performance of a Claim, which Lien is not invalid and has not been avoided under the Bankruptcy Code or applicable nonbankruptcy law.

**Confirmation Date** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rule 5003 and 9021.

**Confirmation Hearing** means the hearing to be held by the Bankruptcy Court regarding confirmation of this Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

**Confirmation Order** means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code and approving the Disclosure Statement and related solicitation materials.

**Consenting Sponsor** means the Berkshire Funds, to the extent they are a party to the Restructuring Support Agreement on or before the deadline established in the Plan for filing the Plan Supplement and are at such time and on the Effective Date each in compliance with all of the representations, agreements, and obligations set forth in the Restructuring Support Agreement with respect to the Consenting Sponsor as if they had each executed the Restructuring Support Agreement on the Support Effective Date (as defined in the Restructuring Support Agreement).

**Cure Amount** means the payment of Cash or the distribution of other property (as the parties may agree or the Bankruptcy Court may order) as necessary to (a) cure a monetary default by the Debtors in accordance with the terms of an executory contract or unexpired lease of the Debtors and (b) permit the Debtors to assume such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

**Debtor** has the meaning set forth in the introductory paragraph of this Plan.

**Debtor in Possession** means, with respect to a Debtor, that Debtor in its capacity as a debtor in possession pursuant to sections 1101, 1107(a), and 1108 of the Bankruptcy Code.

**Definitive Documents** has the meaning ascribed to such term in the Restructuring Support Agreement.

**DIP Facility** means the senior secured superpriority term loan facility in the amount of $275 million consisting of the DIP Facility New Money Loans and the DIP Facility Roll-Up Loans, on the terms and conditions set forth in the DIP Facility Loan Agreement, as approved by the DIP Facility Order.

**DIP Facility Agent** means JPM, solely in its capacity as administrative agent under the DIP Facility Loan Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Facility Loan Agreement.

WEIL:\96767752\18\34225.0004

*DIP Facility Claim* means a Claim held by the DIP Facility Lenders or the DIP Facility Agent arising under or relating to the DIP Facility Loan Agreement or the DIP Facility Order, including any and all fees, interests, and accrued but unpaid interest and fees arising under the DIP Facility Loan Agreement.

*DIP Facility Lenders* means the lenders party to the DIP Facility Loan Agreement.

*DIP Facility Loan Agreement* means that certain Senior Secured Super-Priority Debtor-in-Possession Credit Agreement to be dated after the Petition Date, by and among CHC, as borrower, certain affiliates and subsidiaries of CHC, as guarantors, the DIP Facility Agent, and the DIP Facility Lenders, on terms mutually acceptable to the Debtors and the DIP Facility Lenders, with any amendments, modifications or supplements thereto as permitted by the DIP Facility Order.

*DIP Facility New Money Loans* means the new money loans in the principal amount of $125 million provided by the DIP Facility Lenders under the DIP Facility Loan Agreement.

*DIP Facility New Money Loan Claim* means a Claim held by the DIP Facility Lenders or the DIP Facility Agent arising from or related to the DIP Facility New Money Loans.

*DIP Facility Order* means (i) the *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 and Bankruptcy Rules 2002, 4001 and 9014 (I) Authorizing the Debtors to Obtain Senior Secured, Superpriority, Post-Petition Financing (II) Authorizing the Use of Cash Collateral, (III) Granting Priming Liens, Priority Liens and Superpriority Claims and (IV) Granting Adequate Protection to Prepetition Secured Parties*, and (ii) a Final Order entered by the Bankruptcy Court authorizing the Debtors to enter into the DIP Facility Loan Agreement and access the DIP Facility.

*DIP Facility Roll-Up Loan Claim* means a Claim held by the DIP Facility Lenders or the DIP Facility Agent arising from or related to the DIP Facility Roll-Up Loans.

*DIP Facility Roll-Up Loans* means the roll-up loans in the principal amount of $150 million provided by the DIP Facility Lenders under the DIP Facility Loan Agreement.

*Disbursing Agent* means any entity in its capacity as a disbursing agent under Section 6.5 hereof, including any Debtor or Reorganized Debtor, as applicable, that acts in such a capacity.

*Disclosure Statement* means the disclosure statement for this Plan, as supplemented from time to time, which is prepared and distributed in accordance with sections 1125, 1126(b), or 1145 of the Bankruptcy Code, Bankruptcy Rules 3016 and 3018, or other applicable law, including all exhibits and schedules thereto.

*Disputed* means, with respect to a Claim, (a) any Claim, which Claim is disputed under Section 7 of this Plan or as to which the Debtors have interposed and not withdrawn an objection or request for estimation that has not been determined by a Final Order; (b) any Claim,

proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof of claim was not timely or properly filed; (c) any Claim that is listed in the Schedules, if they are filed, as unliquidated, contingent or disputed, and as to which no request for payment or proof of claim has been filed; or (d) any Claim that is otherwise disputed by any of the Debtors or Reorganized Debtors in accordance with applicable law or contract, which dispute has not been withdrawn, resolved or overruled by a Final Order.  To the extent the Debtors dispute only the amount of a Claim, such Claim shall be deemed Allowed in the amount the Debtors do not dispute, if any, and Disputed as to the balance of such Claim.

*Distribution Record Date* means, except as otherwise provided in this Plan, the Effective Date.

*DTC* means the Depository Trust Company, a limited-purpose trust company organized under the New York State Banking Law.

*Effective Date* means the date which is the first Business Day selected by the Debtors, with the consent of the Required Restructuring Support Parties, which consent may not be unreasonably withheld, after which (a) all conditions to the effectiveness of this Plan set forth in Sections 9.1 and 9.2 hereof have been satisfied or waived in accordance with the terms of this Plan (other than those conditions that can only be satisfied immediately prior to or concurrent with the effectiveness of this Plan) and (b) no stay of the Confirmation Order is in effect.

*Estate or Estates* means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

*Exchange Act* means the Securities Exchange Act of 1934, as amended.

*Exculpated Parties* means collectively, and in each case in their capacities as such during the Chapter 11 Cases: (i) the Debtors, (ii) the Reorganized Debtors, and (iii) with respect to each of the foregoing entities, such entities' subsidiaries, affiliates, current and former officers and directors, principals, shareholders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and all other retained estate professionals.

*Existing Equity Interests* means all common stock of Catalina Parent issued and outstanding as of the Effective Date, whether or not transferable or fully vested.

*Fee Claim* means a Claim for professional services rendered or costs incurred on or after the Petition Date through the Effective Date by Professional Persons.

*Fee Escrow Account* means a segregated interest-bearing account in an amount equal to the total estimated amount of Fee Claims and funded by the Debtors on the Effective Date, subject to the consent of the Required DIP Facility Lenders.

*Final Order* means an order, ruling or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Cases (or by the clerk of such other court of competent jurisdiction on

7

the docket of such court), which has not been reversed, stayed, modified, amended or vacated, and as to which (a) the time to appeal, petition for certiorari or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such order or judgment of the Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, stay, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Bankruptcy Rules; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed relating to such order, shall not cause an order not to be a Final Order.

*First Lien Agent* means JPM, solely in its capacity as administrative agent under the First Lien Credit Agreement.

*First Lien Debt Claim* means any Claims arising under the First Lien Credit Agreement.

*First Lien Credit Agreement* means that certain amended and restated Credit Agreement, dated as of April 9, 2014 (as amended), by and among PDM Holdings Corporation, as holdings, CHC, as borrower, the guarantors party thereto, the First Lien Agent, the First Lien Lenders party thereto, including all guaranties, security agreements, instruments, and any other documents delivered pursuant thereto or in connection therewith (in each case, as amended from time to time).

*First Lien Credit Facility* means the credit facility set forth in the First Lien Credit Agreement.

*First Lien Lenders* means the lenders party to the First Lien Credit Agreement, which, for the avoidance of doubt, includes both Revolving Credit Lenders and Term Lenders (as such terms are defined in the First Lien Credit Agreement).

*General Unsecured Claim* means any Claim, other than an Administrative Expense Claim, DIP Facility Claim, First Lien Debt Claim, General Unsecured PDM Claim, Intercompany Claim, NCS Rejection Claim, Other Secured Claim, Priority Non-Tax Claim, Priority Tax Claim, Second Lien Debt Claim, or Subordinated Claim that is not entitled to priority under the Bankruptcy Code or any Final Order of the Bankruptcy Court.

*General Unsecured PDM Claim* means any Unsecured Claim against PDM Intermediate Holdings B Corporation, including any Unsecured Claim arising under the Unsecured PDM Notes or the Unsecured PDM Note Purchase Agreement.

*Impaired* means, with respect to a Claim, Interest, or a Class of Claims or Interests, "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

WEIL:\96767752\18\34225.0004

**Intercompany Claim** means any Claim against a Debtor held by another Debtor.

**Intercompany Interest** means an Interest in a Debtor other than Catalina Parent held by another Debtor or an affiliate of a Debtor.

**Intercreditor Agreement** means that certain Second Lien Intercreditor Agreement, dated as of April 9, 2014, by and among PDM Holdings Corporation, as holdings, CHC, as borrower, the guarantors party thereto, the First Lien Agent, and the Second Lien Agent (as amended from time to time).

**Interest** means any equity security (as defined in section 101(16) of the Bankruptcy Code) of a Debtor, including all common stock, preferred stock, membership or partnership interests, or other instrument evidencing any fixed or contingent ownership interest in any Debtor, including any option, warrant, or other right or instrument, contractual or otherwise, to acquire any such interest in a Debtor, whether or not transferable and whether fully vested or vesting in the future, that existed immediately before the Effective Date.

**JPM** means JPMorgan Chase Bank, N.A. in all of its capacities under the First Lien Credit Facility and the DIP Facility (as applicable, each of the documents related thereto, and the L/C Cash Collateral Agreement).

**JPM Letter of Credit** means that certain letter of credit, dated as of October 20, 2017, by and among JPM, as issuer, Epson America, Inc., as beneficiary, and CMC, as applicant.

**JPM Letter of Credit Secured Claim** means any Claim arising out of or relating to (i) the JPM Letter of Credit and (ii) the L/C Cash Collateral Agreement, in the principal amount of $5,000,000 (plus all fees, expenses and other obligations owing pursuant to the terms of the First Lien Credit Agreement and the L/C Cash Collateral Agreement), for which the reimbursement obligations are secured by a Lien on Collateral.

**L/C Cash Collateral Agreement** means that certain Cash Collateral Agreement, dated as of July 5, 2018, between JPM and CHC in respect of the Collateral securing the Cash Collateral securing the JPM Letter of Credit Secured Claim, as amended, restated, amended and restated, supplemented or otherwise modified from time to time

**Lien** has the meaning set forth in section 101(37) of the Bankruptcy Code.

**Management Incentive Plan** means the post-restructuring management incentive plan to be adopted by the New Board as further described in Section 5.6 of this Plan.

**New Board** means the initial board of directors of Reorganized Catalina Topco, which shall be appointed by the Ad Hoc First Lien Group.

**New Common Stock** means either the shares of common stock of Reorganized CMC issued pursuant to the Plan or, in the event the CMC Acquisition occurs, the common stock of PacificCo received pursuant to the Acquisition Agreement.

WEIL:\96767752\18\34225.0004

**New Stockholders' Agreement** means that certain shareholders' agreement, substantially in the form thereof contained in the Plan Supplement, which form shall be reasonably acceptable to the Required Restructuring Support Parties and the Debtors, effective as of the Effective Date, to which all parties receiving New Common Stock (and all persons to whom such parties may sell or transfer their New Common Stock in the future and all persons who purchase or acquire the New Common Stock in future transactions) shall be required to become parties.

**NCS Rejection Claims** means any and all Claims arising out of or in any way relating to that certain NC Ventures, LLC Limited Liability Company Agreement dated as of June 29, 2009 (as amended, modified, or supplemented from time to time), by and among The Nielsen Company (US), LLC ("**Nielsen**") and CMC, including any contract, license agreement, or any other agreement or arrangement of any kind whatsoever, between the Debtors and any of NC Ventures, LLC, Nielsen, or an affiliate of Nielsen (the "**NCS Agreement**").

**Other Secured Claim** means any Secured Claim (including the JPM Letter of Credit Secured Claims) against a Debtor other than a First Lien Debt Claim or a DIP Facility Claim.  For the avoidance of doubt, Other Secured Claim does not include any Claim arising out of or relating to the Second Lien Credit Agreement.

**PacificCo** means a newly-formed corporation (or limited liability company that elects to be taxable as a corporation) that indirectly owns all of the outstanding stock of the Acquisition Company.

**Person** means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code), or other entity (as defined in section 101(15) of the Bankruptcy Code).

**Petition Date** means, with respect to a Debtor, the date on which such Debtor commenced its Chapter 11 Case.

**Plan** means this joint prepackaged chapter 11 plan, including all appendices, exhibits, schedules, and supplements hereto (including, without limitation, any appendices, schedules, and supplements to this Plan contained in the Plan Supplement), as may be modified from time to time in accordance with the Bankruptcy Code, the terms hereof, and the terms of the Restructuring Support Agreement.

**Plan Distribution** means the payment or distribution of consideration to holders of Allowed Claims and Interests under this Plan.

**Plan Document** means any of the documents, other than this Plan, to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date, including, without limitation, the documents to be included in the Plan Supplement, the Amended and Restated First Lien Credit Agreement, the Amended Certificates of Incorporation of the applicable Reorganized Debtors, and the Amended By-Laws of the applicable Reorganized Debtors, subject to the consent rights set forth in the Restructuring Support Agreement and as may be modified consistent with the Restructuring Support Agreement.

**Plan Supplement** means a supplemental appendix to this Plan containing, among other things, substantially final forms (in each case, subject to the consent rights set forth in the Restructuring Support Agreement and as may be modified consistent with the Restructuring Support Agreement) of the Amended and Restated First Lien Credit Agreement (exclusive of all ancillary documents), the applicable Amended Certificates of Incorporation of the applicable Reorganized Debtors, the applicable Amended By-Laws of the applicable Reorganized Debtors, and the slate of directors to be appointed to the New Board to the extent known and determined, a schedule of retained Causes of Action, the Acquisition Agreement, Acquisition Transactions Exhibit, and, with respect to the members of the New Board, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; *provided*, that, through the Effective Date, the Debtors, with the consent of the Restructuring Support Parties, shall have the right to amend documents contained in, and exhibits to, the Plan Supplement in accordance with the terms of this Plan and the Restructuring Support Agreement.  The Plan Supplement shall be filed with the Bankruptcy Court not later than seven (7) calendar days before the Voting Deadline, or such later date as may be approved by the Bankruptcy Court.

**Priority Non-Tax Claim** means any Claim (other than a DIP Facility Claim, an Administrative Expense Claim, or a Priority Tax Claim) that is entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

**Priority Tax Claim** means any Claim of a governmental unit (as defined in section 101(27) of the Bankruptcy Code) of the kind entitled to priority in payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code.

**Professional Person** means any Person retained by order of the Bankruptcy Court in connection with these Chapter 11 Cases pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code, excluding any ordinary course professional retained pursuant to an order of the Bankruptcy Court.

**Pro Rata** means the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interests in that Class.

**Released Parties** means, collectively, and in each case in their capacities as such: (i) the Debtors and the Reorganized Debtors; (ii) the Debtors' non-Debtor affiliates; (iii) the Berkshire Funds; (iv) the Restructuring Support Parties; (v) JPM; (vi) the Second Lien Agent; and (vii) the DIP Facility Lenders; and with respect to each of the foregoing entities, such entities' affiliates, and with respect to each of the foregoing entities and their affiliates, their predecessors, successors, assigns, subsidiaries, affiliates, managed accounts and funds, current and former officers and directors, principals, stockholders, shareholders, members, partners, managers, employees, subcontractors, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such entities' respective heirs, executors, estates, servants, and nominees.

**Reorganized Catalina Topco** means, if the Acquisition Transactions do not occur, Reorganized CMC, and if the Acquisition Transactions occur, PacificCo.

*Reorganized CMC* means CMC, as reorganized on the Effective Date in accordance with this Plan.

*Reorganized Debtors* means the Debtors, as reorganized as of the Effective Date in accordance with this Plan, including any transferee or successor thereto by merger, transfer or otherwise, on or after the Effective Date, including the Acquisition Company.

*Required DIP Facility Lenders* means the Required Lenders under the DIP Facility Loan Agreement.

*Required Restructuring Support Parties* means the Requisite Creditors, as defined in the Restructuring Support Agreement.

*Restructuring* means the financial restructuring of the Debtors, the principal terms of which are set forth in this Plan and the Plan Supplement.

*Restructuring Expenses* means the reasonable and documented fees and expenses incurred by (a) the Restructuring Support Parties in connection with the Restructuring, subject to the Debtors' obligations to reimburse applicable expenses, as provided in the Restructuring Support Agreement, the DIP Facility Order, and applicable engagement letters, including, without limitation, the fees and expenses of Jones Day and Evercore (as counsel and financial advisor, respectively, to the Ad Hoc First Lien Group) and the fees and expenses of Paul Weiss, Young Conway, and PJT (as counsel, local counsel, and financial advisor, respectively, to the Second Lien Ad Hoc Group), (b) the First Lien Agent, the L/C Issuer (as defined in the First Lien Credit Agreement), the DIP Facility Agent, the A&R Agent, the arranger under the DIP Facility and the A&R Exit Facility, all as provided under the DIP Facility Order and any related fee letters or engagement letters to which any Debtor is a party, including, without limitation, the fees and expenses of Davis Polk & Wardwell LLP, Landis Rath & Cobb LLP and Ankura Consulting Group, LLC (as counsel, local counsel, and financial advisor, respectively, to the First Lien Agent and DIP Facility Agent), and (c) the Second Lien Agent, including, without limitation, the fees and expenses of Wilmer Cutler Pickering Hale and Dorr LLP (as counsel to the Second Lien Agent), one local counsel, and any other advisers, consultants, appraisers and professionals retained by or on behalf of the Second Lien Agent in connection with any litigation or contested matter commenced by or against the Second Lien Agent, in each case payable without the requirement for the filing of retention applications, fee applications, or any other applications in the Chapter 11 Cases, which shall be Allowed in full as Administrative Expense Claims upon incurrence and shall not be subject to any offset, defense, counterclaim, reduction, or credit. For the avoidance of doubt, the fees and expenses of Evercore and PJT shall include any success, restructuring or transaction fees payable to Evercore or PJT, as the case may be, in accordance with their respective engagement letters with CHC.

*Restructuring Support Agreement* means (a) that certain Restructuring Support Agreement, dated as of December 11, 2018, by and among Catalina Parent, certain other affiliates of Catalina Parent specified therein, and the Restructuring Support Parties, as the same may be amended, restated, or otherwise modified in accordance with its terms and (b) that certain Plan Term Sheet (as defined in, and attached as an exhibit to, the Restructuring Support Agreement).

     ***Restructuring Support Parties*** means the Consenting Sponsor (if applicable), and the holders of First Lien Debt Claims and Second Lien Debt Claims that are signatories to the Restructuring Support Agreement.

     ***Restructuring Transactions*** means one or more transactions pursuant to section 1123(a)(5)(D) of the Bankruptcy Code to occur on or prior to the Effective Date or as soon as reasonably practicable thereafter, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan, including (a) the consummation of the transactions provided for under, contemplated by, or described in the Restructuring Support Agreement or the Acquisition Transactions Exhibit; (b) the execution and delivery of appropriate agreements or other documents (including the Plan Documents) containing terms that are consistent with or reasonably necessary to implement the terms of this Plan and the Restructuring Support Agreement and that satisfy the requirements of applicable law; (c) the execution and delivery of appropriate instruments (including the Plan Documents) of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of this Plan and the Restructuring Support Agreements; (d) the transactions described in Section 5.10 of the Plan; (e) the Acquisition Transactions; and (f) all other actions that the Debtors or Reorganized Debtors, as applicable, determine are necessary or appropriate and consistent with the Restructuring Support Agreement.

     ***Schedules*** means, collectively, the schedules of assets and liabilities, schedules of executory contracts and unexpired leases and statements of financial affairs filed by the Debtors with the Bankruptcy Court and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified or supplemented from time to time, to the extent such filing is not waived pursuant to an order of the Bankruptcy Court.

     ***Second Lien Ad Hoc Group*** means the group of Second Lien Lenders and First Lien Lenders that own or manage with the authority to act on behalf of the beneficial owners of the Second Lien Credit Facility and the First Lien Credit Facility, as applicable, who have executed the Restructuring Support Agreement, represented by Paul Weiss and PJT.

     ***Second Lien Advisor Engagement Letters*** means that (a) certain engagement letter dated as of September 11, 2018, by and between CHC, Paul, Weiss, Rifkind, Wharton & Garrison LLP ("***Paul Weiss***"), and PJT Partners, LP ("***PJT***"); (b) certain reimbursement agreement dated as of August 23, 2018, by and between CHC and Paul Weiss; (c) certain fee letter dated as of November 16, 2018, by and between the Second Lien Agent and CHC; and (d) certain engagement letter dated as of December 11, 2018, by and between CHC and Young Conaway Stargatt & Taylor, LLP ("***Young Conaway***").

     ***Second Lien Agent*** means Wilmington Savings Funds Society, FSB, and any successor agent, as administrative agent, solely in its capacity as administrative agent under the Second Lien Credit Agreement.

     ***Second Lien Credit Agreement*** means that certain amended and restated Credit Agreement, dated as of April 9, 2014 (as amended), by and among PDM Holdings Corporation, as holdings, CHC, as borrower, the guarantors party thereto, the Second Lien Agent, the Second Lien Lenders party thereto, including all guaranties, security agreements, instruments, and any

WEIL:\96767752\18\34225.0004

other documents delivered pursuant thereto or in connection therewith (in each case, as amended from time to time).

*Second Lien Credit Facility* means the credit facility set forth in the Second Lien Credit Agreement.

*Second Lien Debt Claim* means any Claims arising under the Second Lien Credit Agreement.

*Second Lien Lenders* means the lenders party to the Second Lien Credit Agreement.

*Secured Claim* means a Claim to the extent (i) secured by a Lien on property of a Debtor's Estate, the amount of which is equal to or less than the value of such property (A) as set forth in this Plan, (B) as agreed to by the holder of such Claim and the Debtors, or (C) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code or (ii) subject to any setoff right of the holder of such Claim under section 553 of the Bankruptcy Code.

*Securities Act* means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended.

*Security* means any "security" as such term is defined in section 101(49) of the Bankruptcy Code.

*Subordinated Claim* means any Claim that is subject to (i) subordination under section 510(b) of the Bankruptcy Code or (ii) equitable subordination as determined by the Bankruptcy Court in a Final Order, including, without limitation, any Claim for or arising from the rescission of a purchase, sale, issuance, or offer of a Security of any Debtor; for damages arising from the purchase or sale of such a Security; or for reimbursement, indemnification, or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim.

*Tax Code* means the Internal Revenue Code of 1986, as amended from time to time.

*Unimpaired* means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code. Notwithstanding anything to the contrary in this Plan, the Plan Documents, or in the Confirmation Order, until an Allowed Claim that arises prior to the Effective Date has been (v) paid in full in accordance with applicable law, (w) paid in full or otherwise satisfied under the governing documents giving rise to the Claim, (x) paid in full or otherwise satisfied pursuant to terms agreed to between the holder of such Claim and the Debtor or Reorganized Debtor or in accordance with the terms and conditions of the particular transaction giving rise to such Claim, (y) paid in full or otherwise satisfied pursuant to this Plan, Plan Documents, or the Confirmation Order, or (z) otherwise satisfied or disposed of as determined by a court of competent jurisdiction. For the avoidance of doubt, (i) the provisions of Sections 10.3, 10.4, 10.6, 10.7(b), 10.8, and 10.9 of this Plan shall not apply or take effect with respect to such Claim, (ii) such Claim shall not be deemed settled, satisfied, resolved, released, discharged, or enjoined by any

provision of this Plan or the Plan Documents, and (iii) the property of each of the Debtors' Estates that vests in the applicable Reorganized Debtor pursuant to Section 10.2 of this Plan shall not be free and clear of such Claim.

**Unsecured** means, with respect to any Claim, any Claim that is not a Secured Claim.

**Unsecured PDM Note Purchase Agreement** means that certain Note Purchase Agreement, dated as of April 9, 2014, by and among PDM Intermediate Holdings B Corporation, as issuer, and the purchasers party thereto, including all agreements, notes, instruments, and any other documents delivered pursuant thereto or in connection therewith (in each case, as amended, modified, or supplemented from time to time).

**Unsecured PDM Notes** means the PIK Notes due April 9, 2022 issued pursuant to the Unsecured PDM Note Purchase Agreement in the aggregate principal amount outstanding of $230,000,000 plus all accrued prepetition interest, fees, and other expenses due as of the Petition Date under the Unsecured PDM Note Purchase Agreement.

**U.S. Trustee** means the United States Trustee for Region 3.

**Voting Deadline** means January 23, 2019 at 5:00 p.m. prevailing Eastern Time, or such date and time as may be set by the Bankruptcy Court.

### 1.2    *Interpretation; Application of Definitions; Rules of Construction.*

Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in or exhibit to this Plan, as the same may be amended, waived, or modified from time to time in accordance with the terms hereof and the Restructuring Support Agreement. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein and have the same meaning as "in this Plan," "of this Plan," "to this Plan," and "under this Plan," respectively. The words "includes" and "including" are not limiting and shall mean "including, without limitation" unless otherwise specified. The headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. For purposes herein: (i) in the appropriate context, each term, whether stated in the singular or plural, shall include both the singular and plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the reference document shall be substantially in that form or substantially on those terms and conditions; (iii) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (iv) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

15

### 1.3    *Reference to Monetary Figures.*

All references in this Plan to monetary figures shall refer to the legal tender of the United States of America unless otherwise expressly provided.

### 1.4    *Consent Rights of Restructuring Support Parties.*

Notwithstanding anything herein to the contrary, any and all consent rights of the Restructuring Support Parties set forth in the Restructuring Support Agreement (or otherwise) with respect to the form and substance of this Plan, the Plan Supplement, the other Plan Documents, including any amendments, restatements, supplements, or other modifications to such documents, or with respect to any other document, actions, or anything else referred to herein, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Section 1.1 hereof) and fully enforceable as if stated in full herein.

### 1.5    *Controlling Document.*

In the event of an inconsistency between this Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control unless otherwise specified in such Plan Supplement document.  In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, other than documents contained in the Plan Supplement, or between this Plan and the Disclosure Statement, this Plan shall control.  The provisions of this Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided*, that if there is determined to be any inconsistency between any provision of this Plan and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan.

## ARTICLE II.    ADMINISTRATIVE EXPENSE CLAIMS, FEE CLAIMS, DIP FACILITY CLAIMS, AND PRIORITY TAX CLAIMS.

### 2.1    *Treatment of Administrative Expense Claims.*

Except to the extent that a holder of an Allowed Administrative Expense Claim other than a Fee Claim agrees to a different treatment, on the Effective Date or as soon thereafter as is reasonably practicable (but in no event later than thirty (30) days after the Effective Date), the holder of such Allowed Administrative Expense Claim shall receive, on account of such Allowed Claim, Cash in an amount equal to the Allowed amount of such Claim; *provided*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors (which, for the avoidance of doubt, do not include Restructuring Expenses, which shall be paid in accordance with the DIP Facility Order, as applicable), as Debtors in Possession, shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities.

16

### 2.2    *Treatment of Fee Claims.*

All Professional Persons seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 1103 of the Bankruptcy Code shall (a) file, on or before the date that is forty-five (45) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (b) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court or authorized to be paid in accordance with the order(s) relating to or allowing any such Fee Claim. On the Effective Date, the Debtors shall establish and fund the Fee Escrow Account. The Debtors shall fund the Fee Escrow Account with Cash equal to the Professional Persons' good faith estimates of the Fee Claims. Funds held in the Fee Escrow Account shall not be considered property of the Debtors' Estates or property of the Reorganized Debtors, but shall revert to the Reorganized Debtors only after all Fee Claims allowed by the Bankruptcy Court have been irrevocably paid in full. The Fee Escrow Account shall be held in trust for Professional Persons retained by the Debtors and for no other parties until all Fee Claims Allowed by the Bankruptcy Court have been paid in full. Fees owing to the applicable Professional Persons shall be paid in Cash to such Professional Persons from funds held in the Fee Escrow Account when such Claims are Allowed by an order of the Bankruptcy Court or authorized to be paid under the Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals; provided, however, that the Reorganized Debtors' obligations with respect to Fee Claims shall not be limited by nor deemed limited to the balance of funds held in the Fee Escrow Account. To the extent that funds held in the Fee Escrow Account are insufficient to satisfy the amount of accrued Fee Claims owing to the Professional Persons, such Professional Persons shall have an Allowed Administrative Expense Claim for any such deficiency, which shall be satisfied in accordance with Section 2.1 of this Plan. No Liens, claims, or interests shall encumber the Professional Fee Escrow in any way.

Any objections to Fee Claims shall be served and filed (a) no later than twenty one (21) days after the filing of the final applications for compensation or reimbursement or (b) such later date as ordered by the Bankruptcy Court upon a motion of the Reorganized Debtors.

### 2.3    *Treatment of DIP Facility Claims.*

On the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed DIP Facility Claim, each holder of an Allowed DIP Facility Claim shall receive (i) on account of its Allowed DIP Facility New Money Loan Claims, its Pro Rata share of the loans under the A&R First-Out Tranche, and (ii) on account of its Allowed DIP Facility Roll-Up Loan Claims, its Pro Rata share of the loans under the A&R Last-Out Tranche. On the Effective Date, all liens and security interests granted to secure the obligations arising under the DIP Facility Loan Agreement shall continue, remain in effect, and be deemed to secure the obligations under the Amended and Restated First Lien Credit Agreement, subject to the terms and conditions thereof.

**2.4**    *Payment of Fees and Expenses under DIP Facility Order.*

On the earlier of (i) the Effective Date and (ii) the date on which any accrued and unpaid fees, expenses or disbursements in respect of the DIP Facility and the Exit Facility would be required to be paid under the terms of the applicable DIP Facility Order, the Restructuring Support Agreement or any other order of the Bankruptcy Court, the Debtors or Reorganized Debtors (as applicable) shall pay all fees, expenses and disbursements of the DIP Facility Agent and the DIP Facility Lenders, in each case, that have accrued and are unpaid as of the Effective Date and are required to be paid under or pursuant to the DIP Facility Order the Restructuring Support Agreement or any other order of the Bankruptcy Court, including, for the avoidance of doubt, professional fees required to be paid as adequate protection for the First Lien Lenders and the A&R Exit Backstop Payment and A&R Exit Commitment Payment.

**2.5**    *Treatment of Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, on the Effective Date or as soon thereafter as is reasonably practicable, the holder of such Allowed Priority Tax Claim shall receive, on account of such Allowed Priority Tax Claim, Cash in an amount equal to the Allowed amount of such Claim; *provided*, that Allowed Priority Tax Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities.

**ARTICLE III.    CLASSIFICATION OF CLAIMS AND INTERESTS.**

**3.1**    *Classification in General.*

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided*, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

**3.2**    *Formation of Debtor Groups for Convenience Only.*

This Plan groups the Debtors together solely for the purpose of describing treatment under this Plan, confirmation of this Plan, and making Plan Distributions in respect of Claims against and Interests in the Debtors under this Plan.  Such groupings shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal entities, or cause the transfer of any Assets; and, except as otherwise provided by or permitted under this Plan, all Debtors shall continue to exist as separate legal entities.

### 3.3    *Summary of Classification of Claims and Interests.*

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are: (i) Impaired and Unimpaired under this Plan; (ii) entitled to vote to accept or reject this Plan in accordance with section 1126 of the Bankruptcy Code; and (iii) deemed to accept or reject this Plan:

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|-------|---------------------------|------------|------------------|
| Class 1 | Priority Non-Tax Claims | Unimpaired | No (Deemed to accept) |
| Class 2 | Other Secured Claims | Unimpaired | No (Deemed to accept) |
| Class 3 | First Lien Debt Claims | Impaired | Yes |
| Class 4 | Second Lien Debt Claims | Impaired | Yes |
| Class 5 | General Unsecured Claims | Unimpaired | No (Deemed to accept) |
| Class 6 | NCS Rejection Claims | Impaired | No (Deemed to reject) |
| Class 7 | General Unsecured PDM Claims | Impaired | No (Deemed to reject) |
| Class 8 | Intercompany Claims | Unimpaired | No (Deemed to accept) |
| Class 9 | Subordinated Claims | Impaired | No (Deemed to reject) |
| Class 10 | Existing Equity Interests | Impaired | No (Deemed to reject) |
| Class 11 | Intercompany Interests | Unimpaired | No (Deemed to accept) |

### 3.4    *Separate Classification of Other Secured Claims.*

Although all Other Secured Claims have been placed in one Class for purposes of nomenclature within this Plan, each Other Secured Claim, to the extent secured by a Lien on Collateral different from the Collateral securing a different Other Secured Claim, shall be treated as being in a separate sub-Class for the purposes of voting to accept or reject this Plan and receiving Plan Distributions.

### 3.5    *Elimination of Vacant Classes.*

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from this Plan for purposes of voting to accept or reject this Plan, and disregarded for purposes of determining whether this Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

WEIL:\96767752\18\34225.0004

### 3.6    *Voting; Presumptions; Solicitation.*

(a)    Acceptance by Certain Impaired Classes.  Only holders of Allowed Claims in Classes 3 and 4 are entitled to vote to accept or reject this Plan.  An Impaired Class of Claims shall have accepted this Plan if (i) the holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept this Plan and (ii) the holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept this Plan.  Holders of Claims in Classes 3 and 4 will receive ballots containing detailed voting instructions.

(b)    Deemed Acceptance by Unimpaired Classes.  Holders of Claims and Interests in Classes 1, 2, 5, 8, and 11 are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Accordingly, such holders are not entitled to vote to accept or reject this Plan.

(c)    Deemed Rejection by Certain Impaired Classes.  Holders of Claims and Interests in Classes 6, 7, 9, and 10 are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Accordingly, such holders are not entitled to vote to accept or reject this Plan.

### 3.7    *Cramdown.*

If any Class of Claims is deemed to reject this Plan or is entitled to vote on this Plan and does not vote to accept this Plan, the Debtors may (i) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify this Plan in accordance with the terms hereof and the Bankruptcy Code.  If a controversy arises as to whether any Claims or Interests are impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### 3.8    *No Waiver.*

Nothing contained in this Plan shall be construed to waive a Debtor's or other entity's right to object on any basis to any Claim.

## ARTICLE IV.    TREATMENT OF CLAIMS AND INTERESTS.

### 4.1    *Class 1:  Priority Non-Tax Claims.*

(a)    Treatment:  The legal, equitable, and contractual rights of the holders of Allowed Priority Non-Tax Claims are unaltered by this Plan.  Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Priority Non-Tax Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Priority Non-Tax Claim shall receive, on account of such Allowed Claim, at the option of the Reorganized Debtors: (i) Cash in an amount equal to the Allowed amount of such

WEIL:\96767752\18\34225.0004

Claim or (ii) other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(b)    Impairment and Voting:  Allowed Priority Non-Tax Claims are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Priority Non-Tax Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to such Allowed Priority Non-Tax Claims.

### 4.2    *Class 2:  Other Secured Claims.*

(a)    Treatment:  The legal, equitable, and contractual rights of the holders of Allowed Other Secured Claims are unaltered by this Plan.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Secured Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other Secured Claim shall receive, on account of such Allowed Claim, at the option of the Reorganized Debtors:  (i) Cash in an amount equal to the Allowed amount of such Claim, (ii) reinstatement or such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code, or (iii) return of the applicable Collateral in satisfaction of the Allowed amount of such Other Secured Claim.

(b)    Impairment and Voting:  Allowed Other Secured Claims are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Secured Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to such Allowed Other Secured Claims.

### 4.3    *Class 3:  First Lien Debt Claims.*

(a)    Treatment:  On the Effective Date, each holder of an Allowed First Lien Debt Claim shall be entitled to receive from (and on behalf of) CHC, in full and final satisfaction of such Claim, its Pro Rata share of 90% of the New Common Stock issued on the Effective Date (subject to dilution by the Management Incentive Plan).

(b)    Impairment and Voting:  The First Lien Debt Claims are Impaired.  Holders of Allowed First Lien Debt Claims are entitled to vote on this Plan.

(c)    Allowance:  The First Lien Debt Claims shall be deemed Allowed on the Effective Date in the aggregate amount of $1,075,545,556.48, minus the aggregate amount of the DIP Facility Roll-Up Loans.

### 4.4    *Class 4:  Second Lien Debt Claims.*

(a)    Treatment:  On the Effective Date, each holder of an Allowed Second Lien Debt Claim shall be entitled to receive from (and on behalf of) CHC, in full and final satisfaction of such Claim, its Pro Rata share of 10% of the New Common Stock issued on the Effective Date (subject to dilution by the Management Incentive Plan).

(b)     Impairment and Voting:  The Second Lien Debt Claims are Impaired.  Holders of Allowed Second Lien Debt Claims are entitled to vote on this Plan.

(c)     Allowance:  The Second Lien Debt Claims shall be deemed Allowed on the Effective Date in the aggregate amount of $471,987,841.37.

### 4.5     *Class 5:  General Unsecured Claims.*

(a)     Treatment:  The legal, equitable, and contractual rights of the holders of General Unsecured Claims are unaltered by this Plan.  Except to the extent that a holder of a General Unsecured Claim agrees to different treatment, on and after the Effective Date, the Debtors shall continue to pay (if Allowed) or dispute each General Unsecured Claim in the ordinary course of business as if the Chapter 11 Cases had never been commenced.

(b)     Impairment and Voting:  All Allowed General Unsecured Claims are deemed Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed General Unsecured Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to such Allowed General Unsecured Claims.

### 4.6     *Class 6:  NCS Rejection Claims.*

(a)     Treatment:  The holders of NCS Rejection Claims shall not receive or retain any property under this Plan on account of such Claims, and the obligations of the Debtors and the Reorganized Debtors on account of the NCS Rejection Claims shall be discharged.

(b)     Impairment and Voting:  NCS Rejection Claims are Impaired.  In accordance with section 1126(g) of the Bankruptcy Code, holders of NCS Rejection Claims are conclusively presumed to reject this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to NCS Rejection Claims.

### 4.7     *Class 7:  General Unsecured PDM Claims.*

(a)     Treatment:  The holders of General Unsecured PDM Claims shall not receive or retain any property under this Plan on account of such Claims, and the obligations of the Debtors and the Reorganized Debtors on account of the General Unsecured PDM Claims shall be discharged.

(b)     Impairment and Voting:  General Unsecured PDM Claims are Impaired.  In accordance with section 1126(g) of the Bankruptcy Code, holders of General Unsecured PDM Claims are conclusively presumed to reject this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to General Unsecured PDM Claims.

### 4.8    *Class 8:  Intercompany Claims.*

(a)    Treatment:  On or after the Effective Date, all Intercompany Claims shall be paid, adjusted, continued, settled, reinstated, discharged, or eliminated, in each case to the extent determined to be appropriate by the Debtors or Reorganized Debtors with the consent of the Ad Hoc First Lien Group and the Second Lien Ad Hoc Groups (such consents not to be unreasonably withheld), as applicable.  All Claims between any Debtor and a non-Debtor affiliate shall be Unimpaired under this Plan.

(b)    Impairment and Voting:  All Allowed Intercompany Claims are deemed Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Intercompany Claims are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to such Allowed Intercompany Claims.

### 4.9    *Class 9:  Subordinated Claims.*

(a)    Treatment:  Subordinated Claims are subordinated pursuant to this Plan and section 510 of the Bankruptcy Code.  The holders of Subordinated Claims shall not receive or retain any property under this Plan on account of such Claims, and the obligations of the Debtors and the Reorganized Debtors on account of Subordinated Claims shall be discharged.

(b)    Impairment and Voting:  Subordinated Claims are Impaired.  In accordance with section 1126(g) of the Bankruptcy Code, holders of Subordinated Claims are conclusively presumed to reject this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to Subordinated Claims.

### 4.10    *Class 10:  Existing Equity Interests.*

(a)    Treatment:  On the Effective Date, the Existing Equity Interests shall be cancelled without further action by or order of the Bankruptcy Court.

(b)    Impairment and Voting:  Existing Equity Interests are Impaired.  In accordance with section 1126(g) of the Bankruptcy Code, holders of Existing Equity Interests are conclusively presumed to reject this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to Existing Equity Interests.

### 4.11    *Class 11: Intercompany Interests.*

(a)    Treatment:  Intercompany Interests are Unimpaired.  On the Effective Date, all Intercompany Interests shall be treated as set forth in Section 5.9 hereof.

(b)    Impairment and Voting:  Intercompany Interests are Unimpaired. In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Intercompany Interests are conclusively presumed to accept this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to such Allowed Intercompany Interests.

WEIL:\96767752\18\34225.0004

### 4.12 *Debtors' Rights in Respect of Unimpaired Claims.*

Except as otherwise provided in this Plan, nothing under this Plan shall affect the rights of the Reorganized Debtors in respect of any Unimpaired Claim, including, without limitation, all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claim.

### 4.13 *Treatment of Vacant Classes.*

Any Claim or Interest in a Class that is considered vacant under Section 3.5 of this Plan shall receive no Plan Distribution.

## ARTICLE V.    MEANS FOR IMPLEMENTATION.

### 5.1 *Continued Corporate Existence; Dissolution*

(a)    Except as otherwise provided in this Plan, the Debtors shall continue to exist after the Effective Date as Reorganized Debtors in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to their respective Amended Certificate of Incorporation and Amended By-Laws.  On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Reorganized Debtor, each Reorganized Debtor may, in its sole discretion, take such action as permitted by applicable law, and such Reorganized Debtor's organizational documents, as such Reorganized Debtor may determine is reasonable and appropriate, including, without limitation, causing:  (i) a Reorganized Debtor to be merged into another Reorganized Debtor or an affiliate of a Reorganized Debtor and to engage in the Restructuring Transactions described in the Acquisition Transactions Exhibit; (ii) a Reorganized Debtor to be dissolved; (iii) the legal name of a Reorganized Debtor to be changed; or (iv) the closure of a Reorganized Debtor's Chapter 11 Case on the Effective Date or any time thereafter.

(b)    On the Effective Date or as soon thereafter as is reasonably practicable, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate this Plan, including, without limitation:  (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of this Plan and the Plan Documents and that satisfy the requirements of applicable law and any other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of this Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation and amendments thereto, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable law, including the applicable Amended Certificates of Incorporation and Amended By-Laws; (iv) the Restructuring Transactions; and (v) all other actions that the applicable entities determine to be necessary or appropriate, including, without limitation, making filings or recordings that may be required by applicable law.

(c)      After the Effective Date, the Reorganized Debtors shall be authorized to dissolve the Debtors or the Reorganized Debtors (other than Reorganized CMC) in accordance with applicable law.  As promptly as practicable after the Effective Date, Catalina Parent, PDM Intermediate Holdings A Corporation, PDM Intermediate Holdings B Corporation and CHC shall be dissolved.

### 5.2      *Plan Funding.*

Plan Distributions of Cash shall be funded from the Debtors' Cash on hand as of the applicable date of such Plan Distribution and from proceeds of the A&R Exit Facility.

### 5.3      *Cancellation of Existing Securities and Agreements.*

(a)      Except for the purpose of evidencing a right to a distribution under this Plan and except as otherwise set forth in this Plan, or in any Plan Document, on the Effective Date, all agreements, instruments, and other documents evidencing any prepetition Claim or Interest (other than certain Intercompany Interests that are not modified by this Plan pursuant to Section 5.9 hereof) and any rights of any holder in respect thereof shall be deemed cancelled and of no force or effect.  The holders of or parties to such cancelled instruments, Securities, and other documentation shall have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan.  For the avoidance of doubt, this Section 5.3 shall not apply to the DIP Facility Loan Agreement or the Amended and Restated First Lien Credit Agreement.

(b)      Notwithstanding such cancellation and discharge, the First Lien Credit Agreement and the Second Lien Credit Agreement shall continue in effect solely to the extent necessary to (i) allow the holders of Allowed First Lien Debt Claims and Allowed Second Lien Debt Claims to receive distributions under the Plan, (ii) allow the Debtors, the Reorganized Debtors, the First Lien Agent, the Second Lien Agent, and the Disbursing Agent to make post-Effective Date distributions or take such other action, if any, pursuant to the Plan on account of the Allowed First Lien Debt Claims and Allowed Second Lien Debt Claims, and to otherwise exercise their rights and discharge their obligations relating to the interests of the holders of such Claims in accordance with this Plan, and (iii) permit the First Lien Agent and the Second Lien Agent to appear in these Chapter 11 Cases; *provided* that nothing in this Section 5.3 shall affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order, or this Plan or result in any liability or expense to the Reorganized Debtors.  The First Lien Agent and The Second Lien Agent shall be entitled to reimbursement of reasonable and documented fees and expenses (including reasonable and documented fees and expenses of its professionals) incurred in connection with the matters set forth in this Section 5.3(b).

(c)      Notwithstanding anything to the contrary herein, any and all indemnification and reimbursement provisions in the First Lien Credit Agreement and Second Lien Credit Agreement and the other Loan Documents (as defined in the First Lien Credit Agreement and Second  Lien Credit Agreement, as applicable) shall survive the occurrence of the Effective Date to the extent such indemnification and reimbursement provisions would survive the satisfaction and discharge of all other Obligations (as defined in the First Lien Credit Agreement and Second  Lien Credit Agreement, as applicable).

(d)      Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors of their interests, as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in this Section 5.3 shall be deemed null and void and shall be of no force and effect. Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtors or any of their counterparties under any executory contract or unexpired lease to the extent such executory contract or unexpired lease has been assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court or hereunder.

(e)      Nothing in this Plan shall be deemed to limit or otherwise affect any rights of, or liens or security interests in favor of, JPM under or in connection with the L/C Cash Collateral Agreement, the Cash Collateral Account (as defined in the L/C Cash Collateral Agreement) or any contents or proceeds thereof, and the L/C Cash Collateral Agreement shall remain in effect in accordance with its terms for so long as any obligations remain outstanding thereunder (including any obligations of the Debtors to pay fronting fees or other costs pursuant to Section 2.03(i) of the First Lien Credit Agreement, which obligations shall survive the occurrence of the Effective Date and continue to accrue for so long as the JPM Letter of Credit remains outstanding).

### 5.4     *Cancellation of Certain Existing Security Interests.*

Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Debtors or Reorganized Debtors, as applicable, any Collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

### 5.5     *Officers and Boards of Directors.*

(a)      On the Effective Date, and if the CMC Acquisition occurs, in accordance with the Acquisition Agreement, the board of directors of Reorganized Catalina Topco shall consist of [●] directors, each of whom shall be designated by the Ad Hoc First Lien Group.  The composition of the boards of directors of each Reorganized Debtor shall be disclosed prior to the entry of the Confirmation Order.

(b)      Except to the extent that a member of the board of directors of a Debtor continues to serve as a director of such Reorganized Debtor on the Effective Date, the members of the board of directors of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date and each such director will be deemed to have resigned or shall otherwise cease to be a director of the applicable Debtor on the Effective Date.  Commencing on the Effective Date, each of the directors of each of the Reorganized Debtors shall serve pursuant to the terms of the applicable organizational documents of such Reorganized Debtor and may be replaced or removed in accordance with such organizational documents.

26

### 5.6    *Management Incentive Plan.*

(a)    After the Effective Date, and if the CMC Acquisition occurs, in accordance with the Acquisition Agreement, the New Board shall adopt the Management Incentive Plan.  The participants and the amounts allocated under the Management Incentive Plan and other terms and conditions thereof shall be determined in the sole discretion of the New Board; *provided, however*, that the Management Incentive Plan shall consist only of common stock, preferred stock, warrants, options, restricted stock units, or other instruments or securities exercisable or convertible into New Common Stock, the amount of which shall not exceed ten percent (10%) of the New Common Stock authorized to be issued pursuant to this Plan.

(b)    Any Catalina Parent Interests granted prior to the Effective Date to a current or former employee, officer, director or contractor pursuant to an employee compensation plan, benefit plan, employment agreement, offer letter, award letter or otherwise shall be deemed cancelled on the Effective Date.

### 5.7    *Authorization, Issuance, and Delivery of New Common Stock.*

(a)    On the Effective Date, all existing interests in Catalina Parent shall be cancelled and (i) Reorganized CMC is authorized to issue or cause to be issued and, in the event the CMC Acquisition does not occur, shall issue the New Common Stock for distribution in accordance with the terms of this Plan without the need for any further corporate, shareholder, or other equityholder action, and (ii) the event the CMC Acquisition does occur, and in accordance with (and subject to the terms of) the Acquisition Agreement, the Acquisition Company shall transfer (or cause to be transferred) to CHC the New Common Stock, as partial consideration for the acquisition of Reorganized CMC, for distribution in accordance with the terms of this Plan, in each case, CHC shall direct the Disbursing Agent to distribute the New Common Stock in accordance with Section 6.1 of this Plan.

(b)    All of the New Common Stock issuable under the Plan, when so issued, shall be duly authorized, validly issued, fully paid, and nonassessable, and the holders of New Common Stock shall be deemed to have accepted the terms of the New Stockholders' Agreement (solely in their capacity as shareholders of Reorganized Catalina Topco) and to be parties thereto without further action or signature.  The New Stockholders' Agreement shall be effective as of the Effective Date.

(c)    Upon the Effective Date, unless otherwise consented to by the Required Restructuring Support Parties, (i) the New Common Stock shall not be registered under the Securities Act of 1933, and shall not be listed for public trading on any securities exchange, and (ii) none of the Reorganized Debtors shall be a reporting company under the Exchange Act.

### 5.8    *Amended and Restated First Lien Credit Agreement.*

On the Effective Date and, if applicable, prior to the CMC Acquisition, the Amended and Restated First Lien Credit Agreement shall be executed, delivered, and all fees and expenses required thereunder (including the A&R Exit Facility Backstop Payment and the A&R Exit Facility Commitment Payment) shall be paid, and the Reorganized Debtors (other than the Acquisition Company) shall be authorized to execute, deliver, enter into, and make any payments

27

required by the Amended and Restated First Lien Credit Agreement without the need for any further corporate action and without further action by the holders of Claims or Interests. The form of the Amended and Restated First Lien Credit Agreement will be filed as part of the Plan Supplement.

All Liens and security interests granted pursuant to the Amended and Restated First Lien Credit Agreement shall be (a) valid, binding, perfected and enforceable Liens and security interests in the personal and real property described in and subject to such documents, with the priorities established in respect thereof under applicable non-bankruptcy law and (b) not subject to avoidance, recharacterization or subordination under any applicable law.

All Liens, mortgages and security interests securing the obligations arising under the Amended and Restated First Lien Credit Agreement that were shared collateral securing the DIP Facility Loan Agreement are unaltered by this Plan, and all such Liens, mortgages and security interests are created and perfected with respect to the Amended and Restated First Lien Credit Facility to the same extent, in the same manner and on the same terms and priorities as they were with respect to the DIP Facility. For purposes of all mortgages, pledges, and deposit account control agreements that secured the obligations arising under the DIP Facility Loan Agreement, the Amended and Restated First Lien Credit Agreement is deemed an amendment and restatement of the DIP Facility Loan Agreement, and such mortgages, pledges, and control agreements shall survive the Effective Date, shall not be cancelled, and shall continue to secure the Amended and Restated First Lien Credit Facility.

For the avoidance of doubt, this Section 5.8 shall apply to the Amended and Restated First Lien Credit Facility in its entirety, including the A&R First-Out Tranche and the A&R Last-Out Tranche.

### 5.9 *Intercompany Interests; Corporate Reorganization.*

Subject to the consent of the Required Restructuring Support Parties, on the Effective Date, except as otherwise provided in the Plan, and without the need for any further corporate action or any other approval of any board of directors, management, shareholders, or other equityholders of any Debtor or Reorganized Debtor, as applicable, the certificates and all other documents representing the Intercompany Interests shall be deemed to be in full force and effect.

### 5.10 *Restructuring Transactions.*

(a)    On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or Reorganized Debtors, as applicable, may take all actions consistent with this Plan and the Restructuring Support Agreement as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with this Plan.

(b)    On or before the CMC Acquisition Election Date, the Debtors (with the consent of the Ad Hoc First Lien Group and the Ad Hoc Second Lien Group) shall elect whether or not to consummate the CMC Acquisition.

28

(c)　　The following transactions shall occur on or prior to the Effective Date (and in all events, prior to any distributions pursuant to Article VI of the Plan and, if applicable, prior to the CMC Acquisition):

(i)  each Modiv Media Inc. and Cellfire Inc, and any other subsidiary as determined by the Debtors, shall be converted into a limited liability company that, for U.S. federal income tax purposes, is treated as a disregarded entity;

(ii) in accordance with Section 4.8, all Intercompany Claims  shall be paid, adjusted, continued, settled, reinstated, discharged, or eliminated; and

(iii) the Intercompany Interests in CMC shall be recapitalized into the New Common Stock, unless the CMC Acquisition occurs.

(d)　　The transactions described in Section 5.10(a)-(c) are subject to the Acquisition Transactions Exhibit.  In addition, notwithstanding anything to the contrary in this Plan, the Debtors shall consult with the Ad Hoc First Lien Group and the Ad Hoc Second Lien Group to determine whether, and provide the Ad Hoc First Lien Group and the Ad Hoc Second Lien Group with reasonable access to materials in its (or its agents') possession reasonably necessary to evaluate whether, to engage in the Acquisition Transactions (or other related, similar or alternative Restructuring Transactions), and the Debtors or Reorganized Debtors may not engage in the Acquisition Transactions (or other related, similar or alternative Restructuring Transactions) without the prior consent of the Ad Hoc First Lien Group and the Ad Hoc Second Lien Group.  The Debtors shall cooperate on a reasonable basis with the Ad Hoc First Lien Group and the Ad Hoc Second Lien Group in connection with proposals by the Ad Hoc First Lien Group and/or the Ad Hoc Second Lien Group.  In the event that the Debtors, the Ad Hoc First Lien Group and the Ad Hoc Second Lien Group agree to effectuate the Acquisition Transactions or other Restructuring Transactions in a manner that the Ad Hoc First Lien Group and the Ad Hoc Second Lien Group reasonably believe could qualify as a "qualified stock purchase" or "qualified stock disposition" within the meaning of Sections 338 and 336, respectively, of the Tax Code (and the Treasury Regulations promulgated thereunder), then the Debtors or Reorganized Debtors shall deliver to the Ad Hoc First Lien Group, the Ad Hoc Second Lien Group and Reorganized Catalina Topco a properly completed IRS Form 8023 (and/or such other forms or documentation as required by applicable Law to make elections pursuant to Sections 338 or 336 of the Tax Code and the Treasury Regulations promulgated thereunder (and any similar elections under state or local law)) on or prior to the Effective Date duly executed by the common parent of the Catalina Parent Group (or other applicable signatory).

(e)　　Notwithstanding anything to the contrary in this Plan, the Plan will be consummated in the manner set forth in the Acquisition Transactions Exhibit

### 5.11　*Separability.*

If the Bankruptcy Court does not confirm this Plan with respect to one or more Debtors, it may still confirm this Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

29

### 5.12    *Closing of Chapter 11 Cases.*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases; *provided*, as of the Effective Date, the Reorganized Debtors may submit separate orders to the Bankruptcy Court under certification of counsel closing certain individual Chapter 11 Cases and changing the caption of the Chapter 11 Cases accordingly; *provided further* that matters concerning Claims may be heard and adjudicated in one of the Debtors' chapter 11 cases that remains open regardless of whether the applicable Claim is against a Debtor in a chapter 11 case that is closed. Nothing in this Plan shall authorize the closing of any case *nunc pro tunc* to a date that precedes the date any such order is entered. Any request for *nunc pro tunc* relief shall be made on motion served on the United States Trustee, and the Bankruptcy Court shall rule on such request after notice and a hearing. Upon the filing of a motion to close the last Chapter 11 Case remaining open, the Reorganized Debtors shall file a final report with respect to all of the Chapter 11 Cases pursuant to Local Rule 3022-1(c).

### 5.13    *Determination of Tax Filings and Taxes.*

(a)    Prior to the dissolution of Catalina Parent, Catalina Parent shall designate Reorganized CMC as the agent (the "***Tax Agent***") for the Catalina Parent Group in accordance with Treasury Regulations Section 1.1502-77(c)(5), as amended and supplemented, and any comparable provision under state or local law, with respect to all taxable periods ending on or before, or including, the dissolution of Catalina Parent.

(b)    Catalina Parent shall forward to the Tax Agent copies of all notices and communications relating to tax matters that it receives and shall promptly provide to the Tax Agent any information and documents with respect to tax matters reasonably requested by the Tax Agent. Without limiting the foregoing, prior to the dissolution of Catalina Parent, a power of attorney authorizing the Tax Agent to correspond with any taxing authority on behalf of the Debtors and to sign, negotiate, settle and administer any Group Tax Returns (as defined below) or other tax filings shall be provided to the Tax Agent.

(c)    For all taxable periods ending on or prior to, or including, the Effective Date, the Tax Agent shall prepare and file (or cause to be prepared and filed) on behalf of the Catalina Parent Group, all group tax returns, reports, certificates, forms or similar statements or other documents (collectively, "***Group Tax Returns***") required to be filed or that the Tax Agent otherwise deems appropriate, including the filing of amended Group Tax Returns. If requested by the Tax Agent, Catalina Parent shall promptly execute and file, or cause to be executed and filed, any Group Tax Returns of the Catalina Parent Group submitted by the Tax Agent to Catalina Parent for execution or filing. Catalina Parent shall not file or amend any Group Tax Return for any taxable periods (or portions thereof) described in the first sentence of this clause (c) without the Tax Agent's prior written consent.

(d)    If Catalina Parent receives written notice from a taxing authority of any pending examination, claim, settlement, proposed adjustment or related matters with respect to taxes that could affect any other member of the Catalina Parent Group it shall so notify the

WEIL:\96767752\18\34225.0004

Tax Agent in writing within ten (10) business days thereafter. The Tax Agent shall have the sole right, at its expense, to control, conduct, compromise and settle any tax contest, audit or administrative or court proceeding relating to any liability for taxes of the Catalina Parent Group. With respect to any such proceeding and with respect to the preparation and filing of any Group Tax Returns, the Tax Agent may act in its own self-interest and in the of its subsidiaries and affiliates, without regard to any adverse consequences to Catalina Parent.

(e)     The Reorganized Debtors shall have the right to request an expedited determination of their tax liability, if any, under section 505(b) of the Bankruptcy Code with respect to any tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

### 5.14    *Notice of Effective Date.*

On the Effective Date, the Debtors shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

## ARTICLE VI.        DISTRIBUTIONS.

### 6.1    *Distributions Generally.*

The Disbursing Agent shall make all Plan Distributions to the appropriate holders of Allowed Claims and Allowed Interests in accordance with the terms of this Plan; *provided*, in each case, that the Debtors shall provide the applicable Disbursing Agent with written instructions for the allocation of any distributions among the applicable holders of Allowed Claims and Allowed Interests; *provided*, *further*, that any distributions with respect to the First Lien Credit Facility shall be made in accordance with the First Lien Credit Agreement, and any distributions with respect to the Second Lien Facility shall be made in accordance with the Second Lien Credit Agreement.

### 6.2    *Postpetition Interest on Claims.*

Except as otherwise set forth in this Plan, the Plan Documents, or the Confirmation Order, postpetition interest shall accrue, and shall be paid, on any Claims (except for First Lien Debt Claims, Second Lien Debt Claims or any other prepetition funded indebtedness borrowed or issued by a Debtor) in the ordinary course of business in accordance with any applicable law, agreement, document, or Final Order, as the case may be, as if the Chapter 11 Cases had never been commenced.

### 6.3    *Date of Distributions.*

Unless otherwise provided in this Plan, any distributions and deliveries to be made under this Plan shall be made on the Effective Date or as soon thereafter as is practicable.

### 6.4    *Distribution Record Date.*

(a)     As of the close of business on the Distribution Record Date, the various lists of holders of Claims in each Class, as maintained by the Debtors or their agents,

31

shall be deemed closed, and there shall be no further changes in the record holders of any Claims after the Distribution Record Date. Neither the Debtors nor the Disbursing Agent shall have any obligation to recognize any transfer of a Claim occurring after the close of business on the Distribution Record Date. In addition, with respect to payment of any Cure Amounts or disputes over any Cure Amounts, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.

(b)     Notwithstanding anything in this Plan to the contrary, in connection with any distribution under this Plan to be effected through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise), the Debtors and the Reorganized Debtors, as applicable, will be entitled to recognize and deal for all purposes under this Plan with holders of New Common Stock to the extent consistent with the customary practices of DTC used in connection with such distributions. All New Common Stock to be distributed under this Plan shall be issued in the names of such holders or their nominees in accordance with DTC's book-entry exchange procedures; *provided*, that such New Common Stock is permitted to be held through DTC's book-entry system; and *provided*, *further*, that to the extent the New Common Stock is not eligible for distribution in accordance with DTC's customary practices, Reorganized Catalina Topco will take all such reasonable actions as may be required to cause the distributions of the New Common Stock under this Plan. No distributions will be made other than through DTC if the New Common Stock is permitted to be held through DTC's book entry system. Any distribution that otherwise would be made to any holder eligible to receive a distribution of a security available solely through DTC who does not own or hold an account eligible to receive a distribution through DTC on a relevant distribution date or reasonably promptly thereafter (and in any event no more than two weeks thereafter) shall be forfeited.

### 6.5     *Disbursing Agent.*

All distributions under this Plan shall be made by the Disbursing Agent on and after the Effective Date as provided herein. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties. The Reorganized Debtors shall use commercially reasonable efforts to provide the Disbursing Agent (if other than the Reorganized Debtors) with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtors' or Reorganized Debtors' books and records. The Reorganized Debtors shall cooperate in good faith with the applicable Disbursing Agent (if other than the Reorganized Debtors) to comply with the reporting and withholding requirements outlined in Section 6.16 of the Plan.

### 6.6     *Delivery of Distributions.*

Subject to Section 6.4(b) of this Plan, the Disbursing Agent will issue or cause to be issued, the applicable consideration under this Plan and, subject to Bankruptcy Rule 9010, will make all distributions to any holder of an Allowed Claim as and when required by this Plan at:  (a) the address of such holder on the books and records of the Debtors or their agents; or (b) at the address in any written notice of address change delivered to the Debtors or the

Disbursing Agent, including any addresses included on any transfers of Claim filed pursuant to Bankruptcy Rule 3001.  In the event that any distribution to any holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the Disbursing Agent has been notified of the then-current address of such holder, at which time or as soon thereafter as reasonably practicable such distribution shall be made to such holder without interest.

### 6.7    *Unclaimed Property.*

One year from the later of:  (i) the Effective Date and (ii) the date that is ten (10) Business Days after the date a Claim is first Allowed, all distributions payable on account of such Claim shall be deemed unclaimed property under section 374(b) of the Bankruptcy Code and shall revert to Reorganized CMC or their successors or assigns, and all claims of any other Person (including the holder of a Claim in the same Class) to such distribution shall be discharged and forever barred.  The Reorganized Debtors and the Disbursing Agent shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

### 6.8    *Satisfaction of Claims.*

Unless otherwise provided herein, any distributions and deliveries to be made on account of Allowed Claims under this Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

### 6.9    *Manner of Payment under Plan.*

Except as specifically provided herein, at the option of the Debtors or the Reorganized Debtors, as applicable, any Cash payment to be made under this Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

### 6.10    *Fractional Shares and De Minimis Cash Distributions.*

No fractional shares of New Common Stock shall be distributed.  When any distribution would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the New Common Stock subject to such distribution shall be rounded to the next higher or lower whole number as follows:  (i) fractions equal to or greater than 1/2 shall be rounded to the next higher whole number, and (ii) fractions less than 1/2 shall be rounded to the next lower whole number.  The total number of shares of New Common Stock to be distributed on account of Allowed Claims will be adjusted as necessary to account for the rounding provided for herein.  No consideration will be provided in lieu of fractional shares that are rounded down.  Neither the Reorganized Debtors nor the Disbursing Agent shall have any obligation to make a distribution that is less than one (1) share of New Common Stock or $50.00 in Cash.  Fractional shares of New Common Stock that are not distributed in accordance with this Section shall be returned to, and ownership thereof shall vest in, Reorganized Catalina Topco.

WEIL:\96767752\18\34225.0004

**6.11** *No Distribution in Excess of Amount of Allowed Claim.*

Notwithstanding anything to the contrary in this Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, Plan Distributions in excess of the Allowed amount of such Claim (plus any postpetition interest on such Claim solely to the extent permitted by Section 6.2 hereof).

**6.12** *Allocation of Distributions between Principal and Interest.*

Except as otherwise provided in this Plan and subject to Section 6.2 of this Plan, to the extent that any Allowed First Lien Debt Claim or Any Allowed Second Lien Debt Claim entitled to a distribution under this Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated first to the principal amount (as determined for federal income tax purposes) of the Claim and then to accrued but unpaid interest.

**6.13** *Exemption from Securities Laws.*

(a) The issuance of and the distribution under this Plan of the New Common Stock shall be exempt, without further act or actions by any entity, from registration under the Securities Act, and all rules and regulations promulgated thereunder, and any other applicable securities laws to the fullest extent permitted by section 1145 of the Bankruptcy Code. The New Common Stock may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to the New Common Stock, as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

(b) Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the New Common Stock through the facilities of the DTC, the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Common Stock under applicable securities laws.

(c) Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Stock is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. The Confirmation Order shall provide that DTC shall be required to accept and conclusively rely upon the Plan or Confirmation Order in lieu of a legal opinion regarding whether the New Common Stock is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

**6.14** *Setoffs and Recoupments.*

Each Reorganized Debtor, or such entity's designee as instructed by such Reorganized Debtor, may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, offset or recoup against any Allowed Claim and the distributions to be made

34

pursuant to this Plan on account of such Allowed Claim any and all claims, rights, and Causes of Action that a Reorganized Debtor or its successors may hold against the holder of such Allowed Claim after the Effective Date to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Reorganized Debtor(s) and holder of the Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided*, that neither the failure to effect a setoff or recoupment nor the allowance of any Claim hereunder will constitute a waiver or release by a Reorganized Debtor or its successor of any claims, rights, or Causes of Action that a Reorganized Debtor or its successor or assign may possess against such holder.  For the avoidance of doubt, in no event shall the Debtors or Reorganized Debtors be authorized or permitted to offset or recoup against the First Lien Debt Claim, DIP Facility Claim, or Second Lien Debt Claim.

### 6.15    *Rights and Powers of Disbursing Agent.*

(a)    Powers of Disbursing Agent.  The Disbursing Agent shall be empowered to:  (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (ii) make all applicable distributions or payments provided for under this Plan; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers (A) as may be vested in the Disbursing Agent by order of the Bankruptcy Court (including any Final Order issued after the Effective Date) or pursuant to this Plan or (B) as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of this Plan.

(b)    Expenses Incurred on or After the Effective Date.  Except as otherwise ordered by the Bankruptcy Court and subject to the written agreement of the Reorganized Debtors, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including, without limitation, taxes) and any reasonable compensation and expense reimbursement Claims (including, without limitation, for reasonable attorneys' and other professional fees and expenses) made by the Disbursing Agent shall be indefeasibly paid in full in Cash by the Reorganized Debtors.

### 6.16    *Withholding and Reporting Requirements.*

In connection with this Plan and all instruments issued in connection therewith and distributed thereon, the Reorganized Debtors and any other distributing party shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all Plan Distributions under this Plan shall be subject to any such withholding or reporting requirements.  In the case of a non-Cash Plan Distribution that is subject to withholding, the distributing party may request a holder of an Allowed Claim to complete and return a Form W-9 or Form W-8BEN, W-8BEN-E or other appropriate Form W-8, as applicable to each such holder.  If such Form is requested and not submitted to the distributing party within thirty (30) days of the request, the distributing party may, in its discretion, either (i) withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax, or (ii) require the intended recipient of such distribution to provide the withholding agent with an amount of Cash sufficient to satisfy such withholding tax as a condition to receiving such distribution; provided that, if the applicable holder provides the appropriate Form prior to the distributing party selling such property

35

pursuant to clause (i) or the receipt of cash pursuant to clause (ii), such Form shall be deemed timely provided. If such Form is requested and submitted to the distributing party pursuant to the immediately preceding sentence, the distributing party may withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax; provided that, the distributing party shall first notify the intended recipient of such contemplated withholding (including the basis for such withholding) and sale, shall cooperate in good faith with the applicable holder to eliminate or reduce such withholding and, if after such good faith cooperation, the distributing parties still believes withholding is required, offer the intended recipient the opportunity to provide sufficient Cash to satisfy such withholding tax in lieu of such sale. The distributing party shall have the right, but not the obligation, not to make a Plan Distribution until its withholding obligation is satisfied pursuant to the preceding sentences. Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable recipient for all purposes of this Plan. The distributing party may require a holder of an Allowed Claim or Existing Equity Interest to complete and return a Form W-9 or Form W-8BEN, W-8BEN-E or other appropriate Form W-8, as applicable to each such holder.

Notwithstanding the above, each holder of an Allowed Claim that is to receive a Plan Distribution under this Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any governmental unit, including income, withholding, and other tax obligations, on account of such Plan Distribution.

In the event that any amounts are withheld from any Plan Distribution, as soon as practicable after payment of the taxes to the applicable governmental unit, the Reorganized Debtors shall deliver or cause to be delivered to the holder from which such amounts were withheld the original or a certified copy of a receipt issued by such governmental unit evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the applicable holder, and the Reorganized Debtors shall use commercially reasonably efforts to cooperate in the prosecution of any refund claim made by the applicable holder.

### 6.17    *Hart-Scott-Rodino Antitrust Improvements Act.*

Any New Common Stock to be distributed under this Plan to an entity required to file a notification and report form under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, shall not be distributed until the notification and waiting periods applicable under such Act to such entity have expired or been terminated.

### 6.18    *Claims Paid or Payable by Third Parties.*

(a)    **Claims Paid by Third Parties.** A Claim shall be correspondingly reduced, and the applicable portion of such Claim shall be disallowed without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives a payment on account of such Claim from a party that is not a Debtor or Reorganized Debtor; *provided* that the Debtors shall provide 21 days' notice to the holder prior to any disallowance of such Claim during which

WEIL:\96767752\18\34225.0004

period the holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court. Subject to the last sentence of this paragraph, to the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the Reorganized Debtors to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such holder to timely repay or return such distribution shall result in the holder owing the Reorganized Debtors annualized interest at the federal judgment rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

(b)     **Claims Payable by Insurance Carriers.** No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that the Debtors shall provide 21 days' notice to the holder of such Claim prior to any disallowance of such Claim during which period the holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court.

(c)     **Applicability of Insurance Policies.** Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Notwithstanding anything to the contrary herein, nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Person may hold against any other Person, including insurers, under any policies of insurance or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII.    PROCEDURES FOR RESOLVING CLAIMS.

### 7.1    *Disputed Claims Process.*

Notwithstanding section 502(a) of the Bankruptcy Code, and except as otherwise set forth in this Plan, holders of Claims need not file proofs of Claim with the Bankruptcy Court, and the Reorganized Debtors and holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Chapter 11 Cases had not been commenced.  For the avoidance of doubt, the Reorganized Debtors shall retain all rights, claims, defenses, counterclaims, crossclaims, or rights of setoff or recoupment with respect to any Claims, including General Unsecured Claims, in the ordinary course of business after the Effective Date.  Notwithstanding any other provision of the Plan, the

WEIL:\96767752\18\34225.0004

fact that a Claim, including General Unsecured Claims, remains unaltered by the Plan shall in no way effect whether such Claim is Allowed.  Unless otherwise ordered by the Bankruptcy Court, the holders of Claims shall not be subject to any claims resolution process in the Bankruptcy Court in connection with their Claims and shall retain all their rights under applicable non-bankruptcy law to pursue their Claims against the Debtors or Reorganized Debtors in any forum with jurisdiction over the parties.  Except for (i) proofs of Claim asserting damages arising out of the rejection of an executory contract or unexpired lease by any of the Debtors pursuant to Section 8.3 of this Plan and (ii) proofs of Claim that have been objected to by the Debtors before the Effective Date, upon the Effective Date, any filed Claim, regardless of the time of filing, and including Claims filed after the Effective Date, shall be deemed withdrawn.  To the extent not otherwise provided in this Plan, the deemed withdrawal of a proof of Claim is without prejudice to such claimant's rights under this Section 7.1 of this Plan to assert its Claims in any forum as though the Debtors' Chapter 11 Cases had not been commenced.  From and after the Effective Date, the Reorganized Debtors may satisfy, dispute, settle, or otherwise compromise any Claim without approval of the Bankruptcy Court.

### 7.2    *Estimation of Claims.*

The Reorganized Debtors may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors had previously objected to or otherwise disputed such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim.

### 7.3    *Claim Resolution Procedures Cumulative.*

All of the objection, estimation, and resolution procedures in this Plan are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with this Plan by any mechanism approved by the Bankruptcy Court.

### 7.4    *No Distributions Pending Allowance.*

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under this Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

### 7.5    *Distributions after Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the

WEIL:\96767752\18\34225.0004

provisions of this Plan.  As soon as practicable after the date on which the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under this Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required by the Bankruptcy Code.

## ARTICLE VIII.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

### 8.1    *General Treatment.*

As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount, all executory contracts and unexpired leases shall be deemed assumed, unless such contract or lease (i) was previously assumed or rejected by the Debtors, pursuant to Final Order of the Bankruptcy Court, (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, or (iii) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date.  Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions or rejections provided for in this Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Each executory contract and unexpired lease assumed pursuant to this Plan shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of this Plan, any Final Order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

### 8.2    *Determination of Cure Disputes and Deemed Consent.*

Any monetary amounts by which any executory contract or unexpired lease to be assumed hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtors or Reorganized Debtors, as applicable, upon assumption thereof.  Following the Petition Date, the Debtors shall have served a notice on parties to executory contracts and unexpired leases to be assumed reflecting the Debtors' intention to assume the contract or lease in connection with this Plan and setting forth the proposed Cure Amount (if any).  If a counterparty to any executory contract or unexpired lease that the Debtors or Reorganized Debtors intend to assume does not receive such a notice, the proposed Cure Amount for such executory contract or unexpired lease shall be deemed to be zero dollars ($0).

If there is a dispute regarding (a) any Cure Amount, (b) the ability of the Debtors to provide adequate assurance of future performance (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (c) any other matter pertaining to assumption, such dispute shall be heard by the Bankruptcy Court prior to such assumption being effective.  The Debtors reserve the right to reject any executory contract or unexpired lease not later than thirty (30) days after the entry of a Final Order resolving any such dispute.  Any counterparty to an executory contract or unexpired lease that fails to object timely to the notice of the proposed assumption and assignment of such executory contract or unexpired lease on which such executory contract or unexpired lease first appears or any subsequent notice in which the proposed Cure Amount for such executory contract or unexpired lease is reduced or the relevant Cure Amount within fourteen (14) days of the filing thereof, shall be deemed to have

assented to such assumption and/or Cure Amount and shall be forever barred, estopped, and enjoined from challenging the validity of such assumption or the amount of such Cure Amount thereafter.

### 8.3    *Rejection Damages Claims.*

Any counterparty to a contract or lease that is rejected by the Debtors must file and serve a proof of claim on the applicable Debtor that is party to the contract or lease to be rejected no later than thirty (30) days after the later of (a) the Confirmation Date or (b) the effective date of rejection of such executory contract or unexpired lease.

### 8.4    *Survival of the Debtors' Indemnification Obligations.*

Any obligations of the Debtors pursuant to their corporate charters, by-laws, limited liability company agreements, memorandum and articles of association, or other organizational documents to indemnify current and former officers, directors, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such officers, directors, agents, or employees based upon any act or omission for or on behalf of the Debtors shall not be discharged, impaired, or otherwise affected by this Plan; *provided*, that the Reorganized Debtors shall not indemnify directors of the Debtors for any claims or Causes of Action arising out of or relating to any act or omission that is a criminal act or constitutes gross negligence or intentional fraud.  All such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors under this Plan and shall continue as obligations of the Reorganized Debtors.  Any claim based on the Debtors' obligations herein shall not be a Disputed Claim or subject to any objection, in either case, by reason of section 502(e)(1)(B) of the Bankruptcy Code.

### 8.5    *Compensation and Benefit Plans.*

All employment and severance policies, and all compensation and benefits plans, policies, and programs of the Debtors applicable to their respective employees, retirees, and non-employee directors, including, without limitation, all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life and accidental death and dismemberment insurance plans, are deemed to be, and shall be treated as, executory contracts under this Plan and, on the Effective Date, will be assumed pursuant to sections 365 and 1123 of the Bankruptcy Code.

### 8.6    *Insurance Policies.*

All insurance policies to which any Debtor is a party as of the Effective Date shall be deemed to be and treated as executory contracts and shall be assumed by the applicable Debtor or Reorganized Debtor and shall continue in full force and effect thereafter in accordance with their respective terms.  All other insurance policies shall vest in the Reorganized Debtors.

### 8.7    *Intellectual Property Licenses and Agreements.*

All intellectual property contracts, licenses, royalties, or other similar agreements to which the Debtors have any rights or obligations in effect as of the date of the Confirmation

Order shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the respective Debtors and shall continue in full force and effect unless any such intellectual property contract, license, royalty, or other similar agreement otherwise is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Debtors (with the consent of the Required Restructuring Support Parties) in accordance with Section 8.1 of the Plan. Unless otherwise noted hereunder, all other intellectual property contracts, licenses, royalties, or other similar agreements shall vest in the Reorganized Debtors and the Reorganized Debtors may take all actions as may be necessary or appropriate to ensure such vesting as contemplated herein.

**8.8** _**Modifications, Amendments, Supplements, Restatements, or Other Agreements.**_

Unless otherwise provided herein or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is listed in any notice of assumed contracts.

**8.9** _**Reservation of Rights.**_

(a)    Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Supplement, nor anything contained in this Plan, will constitute an admission by the Debtors that any such contract or lease is or is not an executory contract or unexpired lease or that the Debtors or the Reorganized Debtors or their respective affiliates has any liability thereunder.

(b)    Except as explicitly provided in this Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors or the Reorganized Debtors under any executory or non-executory contract or unexpired or expired lease.

(c)    Nothing in this Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors, as applicable, under any executory or non-executory contract or unexpired or expired lease.

(d)    If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under this Plan, the Debtors or Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

WEIL:\96767752\18\34225.0004

## ARTICLE IX.    CONDITIONS PRECEDENT

### 9.1    *Conditions Precedent to Confirmation of the Plan.*

The following are conditions precedent to confirmation of the Plan:

(a)    an order finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code shall have been entered by the Court (which, for the avoidance of doubt, may be the same order as the order confirming the Plan);

(b)    the Plan, the Plan Supplement (including the applicable Plan Documents), and any and all of the schedules, documents, and exhibits contained therein shall have been filed and shall be consistent in all material respects with this Plan and the Restructuring Support Agreement;

(c)    the Restructuring Support Agreement shall not have been terminated and shall be in full force and effect; and

(d)    any Restructuring Expenses due and payable in accordance with their terms on or before the relevant date shall have been paid in full and in Cash.

### 9.2    *Conditions Precedent to the Effective Date.*

The Effective Date shall not occur unless all of the following conditions precedent have been satisfied:

(a)    the Plan Supplement, including the applicable Plan Documents, has been filed;

(b)    the Plan Documents contain terms and conditions consistent in all material respects with this Plan and the Restructuring Support Agreement;

(c)    the Bankruptcy Court has entered the Confirmation Order in form and substance reasonably satisfactory to the Debtors and the Required Restructuring Support Parties and such Confirmation Order has not been stayed, modified, or vacated;

(d)    the Restructuring Support Agreement has not been terminated and remains in full force and effect and binding on all parties thereto;

(e)    the Debtors shall not be in default under the DIP Facility or any of the DIP Facility Orders (or, to the extent that the Debtors are in default on the proposed Effective Date, such default shall have been waived by the required DIP Facility Lenders or cured by the Debtors in a manner consistent with the DIP Facility Loan Agreement or the applicable DIP Facility Orders);

42

(f)      each of the Definitive Documents shall have satisfied the consent requirements of the applicable Restructuring Support Parties in accordance with the Restructuring Support Agreement;

(g)      all conditions precedent to the issuance of the New Common Stock, other than any conditions related to the occurrence of the Effective Date, shall have occurred;

(h)      all unpaid Restructuring Expenses and all amounts payable by the Debtors pursuant to the DIP Facility Orders and Restructuring Support Agreement (including the A&R Exit Facility Backstop Payment and the A&R Exit Facility Commitment Payment) shall have been paid in Cash;

(i)      the NCS Agreement is amended on terms or rejected pursuant to an order providing relief, in each case, consistent with the Restructuring Support Agreement;

(j)      the conditions to effectiveness of the Amended and Restated First Lien Credit Agreement have been satisfied or waived in accordance with the terms thereof, and the Amended and Restated First Lien Credit Agreement is in full force and effect and binding on all parties thereto;

(k)      all governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions provided for in this Plan have been obtained, are not subject to unfulfilled conditions, and are in full force and effect, and all applicable waiting periods have expired without any action having been taken by any competent authority that restrains, prevents, or enjoins the Restructuring Transactions; and

(l)      the Amended Certificate of Incorporation of Reorganized Catalina Topco has been filed with the appropriate governmental authority.

### 9.3    *Waiver of Conditions Precedent.*

(a)      Each of the conditions precedent  set forth in Sections 9.1 and 9.2 to the occurrence of the Effective Date may be waived in writing by the Debtors and the Required Restructuring Support Parties; *provided that* the conditions precedent to the occurrence of the Effective Date in Sections 9.2(i) and (j) of the Plan may be waived by the Debtors and the Ad Hoc First Lien Group.  If any such condition precedent is waived pursuant to this Section and the Effective Date occurs, each party agreeing to waive such condition precedent shall be estopped from withdrawing such waiver after the Effective Date or otherwise challenging the occurrence of the Effective Date on the basis that such condition was not satisfied, the waiver of such condition precedent shall benefit from the "equitable mootness" doctrine, and the occurrence of the Effective Date shall foreclose any ability to challenge this Plan in any court.  If this Plan is confirmed for fewer than all of the Debtors as provided for in Section 5.11 of this Plan, only the conditions applicable to the Debtor or Debtors for which this Plan is confirmed must be satisfied or waived for the Effective Date to occur.

(b)    The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

### 9.4    *Effect of Failure of a Condition.*

If the conditions listed in Section 9.2 hereof are not satisfied or waived in accordance with Section 9.3 hereof on or before the first Business Day that is more than seventy-five (75) days after the date on which the Confirmation Order is entered or by such later date reasonably acceptable to the Required Restructuring Support Parties and as set forth by the Debtors in a notice filed with the Bankruptcy Court prior to the expiration of such period, this Plan shall be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims by or against or any Interests in the Debtors, (b) prejudice in any manner the rights of any Person, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtors, any of the other Restructuring Support Parties, or any other Person.

## ARTICLE X.        EFFECT OF CONFIRMATION.

### 10.1    *Binding Effect.*

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of this Plan shall bind every holder of a Claim against or Interest in any Debtor and inure to the benefit of and be binding on such holder's respective successors and assigns, regardless of whether the Claim or Interest of such holder is Impaired under this Plan and whether such holder has accepted this Plan.

### 10.2    *Vesting of Assets.*

Except as otherwise provided in this Plan, or any Plan Document, on and after the Effective Date, all Assets of the Estates, including all claims, rights, and Causes of Action and any property acquired by the Debtors under or in connection with this Plan, shall vest in each respective Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances, and Interests.  Subject to the terms of this Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Expense Claims) and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by this Plan or the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for Professional Persons' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

### 10.3    *Discharge of Claims against and Interests in the Debtors.*

Effective as of the Effective Date: (a) the rights afforded in this Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction,

discharge, and release of all Claims and Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors, the Debtors' Estates, or the Reorganized Debtors; (b) this Plan shall bind all holders of Claims and Interests, notwithstanding whether any such holders failed to vote to accept or reject this Plan or voted to reject this Plan; (c) all Claims and Interests shall be satisfied, discharged, and released in full, and the liability of the Debtors and the Reorganized Debtors with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all entities shall be precluded from asserting against the Debtors, the Debtors' Estates, or the Reorganized Debtors, any other Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

### 10.4    *Pre-Confirmation Injunctions and Stays.*

Unless otherwise provided in this Plan, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the date of entry of the Confirmation Order, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### 10.5    *Injunction against Interference with Plan.*

Upon the entry of the Confirmation Order, all holders of Claims and Interests and all other parties in interest, along with their respective present and former affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or the occurrence of the Effective Date.

### 10.6    *Plan Injunction.*

(a)    Except as otherwise provided in this Plan, in the Plan Documents, or in the Confirmation Order, as of the entry of the Confirmation Order but subject to the occurrence of the Effective Date, all Persons who have held, hold, or may hold Claims or Interests are, with respect to any such Claim or Interest, permanently enjoined after the entry of the Confirmation Order from: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, a Debtor, a Reorganized Debtor, or an Estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against a Debtor, a Reorganized Debtor, or an Estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (ii) or any property of any such transferee or successor; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor, a Reorganized Debtor, or an Estate or any of its property, or any direct or

WEIL:\96767752\18\34225.0004

indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this subsection (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Plan, and the Plan Documents, to the full extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of this Plan and the Plan Documents; *provided*, that nothing contained herein shall preclude such Persons who have held, hold, or may hold Claims against, or Interests in, a Debtor, a Reorganized Debtor, or an Estate from exercising their rights and remedies, or obtaining benefits, pursuant to and consistent with the terms of this Plan and the Plan Documents.

(b)    By accepting distributions pursuant to this Plan, each holder of an Allowed Claim or Interest will be deemed to have affirmatively and specifically consented to be bound by this Plan, including, without limitation, the injunctions set forth in this Section.

### 10.7    *Releases.*

(a)    Releases by the Debtors.  As of the Effective Date, except for the rights and remedies that remain in effect from and after the Effective Date to enforce this Plan and the Plan Documents, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service and contributions of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the Restructuring, the Released Parties are deemed forever released and discharged by the Debtors, the Reorganized Debtors, and the Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives and any and all other entities that may purport to assert any Cause of Action derivatively, by or through the foregoing entities, from any and all claims, interests, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, remedies, or liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between any Debtor and any Released Party, the Restructuring, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Restructuring Transactions, the DIP Facility, the Amended and Restated First Lien Credit Facility, the negotiation, formulation, or preparation of the Disclosure Statement, the Restructuring Support Agreement and any exhibits or documents relating thereto, and this Plan and related agreements, instruments, and other documents (including the Plan Documents), the solicitation of votes with respect to this Plan, any other act or omission, transaction, agreement, event, or other occurrence, or any other relief obtained by the Debtors in the Chapter 11 Case, other than Claims or Causes of Action arising out of or related to any act or omission of a Released Party that is a criminal act or constitutes intentional fraud.

46

(b)    Releases by Holders of Claims and Interests.  As of the Effective Date, except for the rights and remedies that remain in effect from and after the Effective Date to enforce this Plan and the Plan Documents, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the service of and contribution of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the Restructuring, the Released Parties are deemed forever released and discharged by the (i) the holders of all Claims and Interests who vote to accept this Plan, (ii) holders of Claims or Interests that are Unimpaired under this Plan, where the applicable Claims or Interests have been fully paid or otherwise satisfied in accordance with this Plan, (iii)  holders of Claims or Interests whose vote to accept or reject this Plan was solicited but who did not vote either to accept or to reject this Plan, (iv) holders of Claims or Interests who voted to reject this Plan but did not opt out of granting the releases set forth herein, (v) the Restructuring Support Parties, (vi) the First Lien Agent, (vii) the Second Lien Agent, (viii) the DIP Facility Agent, and (ix) the DIP Facility Lenders, from any and all claims, interests, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such holders or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between any Debtor and any Released Party, the Restructuring, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Restructuring Transactions, the DIP Facility, the Amended and Restated First Lien Credit Facility, the negotiation, formulation, or preparation of the Disclosure Statement, the Restructuring Support Agreement and any exhibits or documents relating thereto, this Plan and related agreements, instruments, and other documents (including the Plan Documents), the solicitation of votes with respect to this Plan, any other act or omission, or any other relief obtained by the Debtors in the Chapter 11 Case, other than Claims or Causes of Action arising out of or related to any act or omission of a Released Party that is a criminal act or constitutes intentional fraud, gross negligence, or willful misconduct; *provided*, that solely for purposes of this section 10.7(b), the Berkshire Funds shall be excluded from the definition of Released Party if they have not executed the Restructuring Support Agreement on or before the deadline established in the Plan for filing the Plan Supplement and become a Consenting Sponsor.

## 10.8    *Exculpation.*

To the extent permitted by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Claim, Interest, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, loss, remedy, or liability for any claim in connection with or arising out of the administration of the Chapter 11 Cases; the negotiation and pursuit of the DIP Facility, the Amended and Restated First Lien Credit Facility, the Management Incentive Plan, the Disclosure Statement, the Restructuring Support Agreement, the Restructuring Transactions, and this Plan (including the Plan Documents), or the solicitation of votes for, or confirmation of, this Plan; the funding of this

Plan; the occurrence of the Effective Date; the administration of this Plan or the property to be distributed under this Plan; the issuance of Securities under or in connection with this Plan; or the transactions in furtherance of any of the foregoing; except for intentional fraud, gross negligence, or willful misconduct, but in all respects such entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan. The Exculpated Parties and each of their respective affiliates, agents, directors, officers, employees, advisors, and attorneys have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of Securities pursuant to this Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan, including the issuance of Securities thereunder. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.

### 10.9    *Injunction Related to Releases and Exculpation.*

From and after the Effective Date, all entities are permanently enjoined from commencing or continuing in any manner, any suit, action, or other proceeding, on account of or respecting any Claim, demand, liability, obligation, debt, right, Cause of Action, Interest, or remedy released or to be released pursuant to this Plan or the Confirmation Order.

### 10.10    *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments thereof under this Plan take into account and conform to the relative priority and rights of the Claims and Interest in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto (including, the Intercreditor Agreement), whether arising under general principles of equitable subordination, sections 510(a), 510(b), or 510(c) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### 10.11    *Retention of Causes of Action and Reservation of Rights.*

Except as otherwise provided herein, including, without limitation, Sections 10.5, 10.6, 10.7, 10.8 and 10.9 nothing contained in this Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, but not limited to, rights, claims, Causes of Action, rights of setoff, offset, recoupment or other legal or equitable defenses against any holder of Existing Equity Interests that arise on account of such holders' objection to, or support of, and objection to this Plan. The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses, including any actions specifically enumerated in the Plan Supplement, as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors'

legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

### 10.12   *Ipso Facto and Similar Provisions Ineffective.*

Except as otherwise agreed by the Required Restructuring Support Parties, any term of any prepetition policy, prepetition contract, or other prepetition obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtor as a result of, or gives rise to a right of any entity based on any of the following: (a) the insolvency or financial condition of a Debtor or (b) the commencement of the Chapter 11 Cases.

### 10.13   *Reimbursement or Contribution.*

Subject to Section 10.15 of the Plan, if the Bankruptcy Court disallows a Claim for reimbursement or contribution of a Person pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (a) such Claim has been adjudicated as noncontingent, or (b) the relevant holder of a Claim has filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

### 10.14   *Recoupment.*

In no event shall any holder of a Claim be entitled to recoup such Claim against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

### 10.15   *Indemnification.*

For purposes of this Plan, (a) the obligations of the Debtors to indemnify and reimburse their directors or officers that were directors or officers, respectively, on or subsequent to the Petition Date shall be assumed by the Reorganized Debtors and (b) indemnification obligations of the Debtors arising from services as officers and directors during the period from and after the Petition Date shall be Administrative Expense Claims.  In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect as of the Petition Date, and all members, managers, directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date will be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date.

49

**ARTICLE XI.    RETENTION OF JURISDICTION.**

**11.1    _Retention of Jurisdiction._**

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in or related to the Chapter 11 Cases for, among other things, the following purposes:

(a)    to hear and determine applications for the assumption or rejection of executory contracts or unexpired leases and any disputes over Cure Amounts resulting therefrom;

(b)    to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the entry of the Confirmation Order;

(c)    to hear and resolve any disputes arising from or related to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004 or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(d)    to ensure that distributions to holders of Allowed Claims are accomplished as provided in this Plan and the Confirmation Order;

(e)    to consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expense Claim;

(f)    to enter, implement, or enforce such orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(g)    to issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person or other entity with the consummation, implementation, or enforcement of this Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(h)    to hear and determine any application to modify this Plan in accordance with section 1127 of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistency in this Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)    to hear and determine all Fee Claims;

(j)    to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

WEIL:\96767752\18\34225.0004

(k)     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan, the Confirmation Order, any transactions or payments in furtherance of either, or any agreement, instrument, or other document governing or related to any of the foregoing;

(l)     to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the Effective Date, as may be necessary to construe, enforce, implement, execute, and consummate this Plan, including any release, exculpation, or injunction provisions set forth in this Plan, or to maintain the integrity of this Plan following the occurrence of the Effective Date;

(m)     to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)     to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(o)     to hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

(p)     to resolve any disputes concerning whether a Person or entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose for determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(q)     to recover all Assets of the Debtors and property of the Estates, wherever located; and

(r)     to enter a final decree closing each of the Chapter 11 Cases; *provided* that, on and after the Effective Date and after the consummation of the following agreements or documents, the Bankruptcy Court shall not retain jurisdiction over matters arising out of or related to each of the A&R Exit Facility, the Amended and Restated First Lien Credit Agreement, Amended By-Laws, and Amended Certificate of Incorporation and the A&R Exit Facility, the Amended and Restated First Lien Credit Agreement, Amended By-Laws, Amended Certificate of Incorporation, and New Stockholders' Agreement shall be governed by the respective jurisdictional provisions therein.

## ARTICLE XII.     MISCELLANEOUS PROVISIONS.

### 12.1     *Exemption from Certain Transfer Taxes.*

Pursuant to section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any Lien, mortgage, deed of trust or other security interest, (c) all sale transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Effective Date, including any transfers effectuated under this Plan, (d) any assumption, assignment, or sale by the Debtors of their interests in unexpired leases of nonresidential real

property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, (e) the grant of collateral under the Amended and Restated First Lien Credit Agreement, and (f) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including, without limitation, the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

### 12.2    _Dates of Actions to Implement This Plan._

In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day but shall be deemed to have been completed as of the required date.

### 12.3    _Amendments._

(a)    Plan Modifications.  This Plan may be amended, modified, or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to this Plan, the Debtors, with the consent of the Required Restructuring Support Parties, may remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes of effects of this Plan, and any holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan as amended, modified, or supplemented.

(b)    Certain Technical Amendments.  Consistent with the Restructuring Support Agreement and the consent rights granted thereunder, prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to this Plan without further order or approval of the Bankruptcy Court; _provided_, that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Interests under this Plan.

### 12.4    _Revocation or Withdrawal of Plan._

The Debtors reserve the right to revoke or withdraw this Plan prior to the Effective Date as to any or all of the Debtors.  If, with respect to a Debtor, this Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the

WEIL:\96767752\18\34225.0004

Effective Date as to such Debtor does not occur on the Effective Date, then, with respect to such Debtor: (a) this Plan shall be null and void in all respects; (b) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases affected by this Plan, and any document or agreement executed pursuant to this Plan shall be deemed null and void; and (c) nothing contained in this Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, such Debtor or any other Person; (ii) prejudice in any manner the rights of such Debtor or any other Person; or (iii) constitute an admission of any sort by any Debtor or any other Person.  For the avoidance of doubt, this Section 12.4 shall not impact or abridge any of the rights of the Restructuring Support Parties pursuant to or set forth in the Restructuring Support Agreement.

### 12.5    *Non-Severability.*

Subject to Section 5.11 of this Plan, if, prior to the entry of the Confirmation Order, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation by the Bankruptcy Court, the remainder of the terms and provisions of this Plan shall remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with this Section, is: (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Reorganized Debtors (as the case may be), and (c) nonseverable and mutually dependent.

### 12.6    *Governing Law.*

Except to the extent that the Bankruptcy Code or other federal law is applicable or to the extent that a Plan Document provides otherwise, the rights, duties, and obligations arising under this Plan and the Plan Documents shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflicts of laws thereof (other than section 5-1401 and section 5-1402 of the New York General Obligations Law);  *provided, however*, that corporate or limited liability company governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor or Reorganized Debtor.

### 12.7    *Substantial Consummation of the Plan.*

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

WEIL:\96767752\18\34225.0004

### 12.8    *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of this Plan and the Plan Documents shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, the holders of Claims and Interests, the Released Parties, and each of their respective successors and assigns.

### 12.9    *Successors and Assigns.*

The rights, benefits, and obligations of any entity named or referred to in this Plan shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each such entity.

### 12.10    *Entire Agreement.*

On the Effective Date, this Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

### 12.11    *Computing Time.*

In computing any period of time prescribed or allowed by this Plan, unless otherwise set forth in this Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 12.12    *Exhibits to Plan.*

All exhibits, schedules, supplements, and appendices to this Plan (including the Plan Supplement) are incorporated into and are a part of this Plan as if set forth in full herein.

### 12.13    *Deemed Acts.*

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

### 12.14    *Notices.*

All notices, requests, and demands to or upon the Debtors or Reorganized Debtors, as applicable, shall be in writing (including by facsimile transmission) and, unless otherwise provided herein, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

WEIL:\96767752\18\34225.0004

Catalina Marketing Corporation
200 Carillon Pkwy
St. Petersburg, FL 33716
Telephone: (877) 210-1917
Attn:  David Glogoff, Esq.

– and –

Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Attn: Mark D. Collins, Esq. and Jason M. Madron, Esq.
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

*Attorneys for the Debtors*

– and –

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Attn:  Gary T. Holtzer, Esq. and Ronit J. Berkovich, Esq.
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Attorneys for the Debtors*

Any pleading, notice or other document required by this Plan to be served on or delivered shall be served by first class or overnight mail:

If to the First Lien Ad Hoc Group:

Jones Day LLP
250 Vesey Street
New York, New York 10281
Attn: Scott Greenberg
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
E-mail: sgreenberg@jonesday.com

WEIL:\96767752\18\34225.0004

If to the Second Lien Ad Hoc Group:

> Paul, Weiss, Rifkind, Wharton & Garrison LLP
> 1285 Avenue of the Americas
> New York, NY 10019-6064
> Attention: Brian S. Hermann, Robert A. Britton, and Dan Youngblut
> Telephone: (212) 373-3000
> Fax: (212) 492-0545
> E-mail:bhermann@paulweiss.com
>         rbritton@paulweiss.com
>         dyoungblut@paulweiss.com

After the occurrence of the Effective Date, the Reorganized Debtors have authority to send a notice to entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002; *provided*, that the U.S. Trustee need not file such a renewed request and shall continue to receive documents without any further action being necessary.  After the occurrence of the Effective Date, the Reorganized Debtors are authorized to limit the list of entities receiving documents pursuant to Bankruptcy Rule 2002 to the U.S. Trustee and those entities that have filed such renewed requests.

*[The remainder of this page has been intentionally left blank.]*

WEIL:\96767752\18\34225.0004

**12.15** _**Reservation of Rights.**_

Except as otherwise provided herein, this Plan shall be of no force or effect unless the Bankruptcy Court enters the Confirmation Order.  None of the filing of this Plan, any statement or provision of this Plan, or the taking of any action by the Debtors with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to any Claims or Interests prior to the Effective Date.

Dated:  December 11, 2018

**CATALINA PARTIES**

**CHECKOUT HOLDING CORP.**

By: _____

Name:  Shelly Schaffer

Title:  CFO

**PDM GROUP HOLDINGS CORPORATION**
**CATALINA MARKETING CORPORATION**
**CATALINA MARKETING PROCUREMENT**
**CATALINA MARKETING TECHNOLOGY SOLUTIONS, INC.**
**CATALINA MARKETING WORLDWIDE, LLC**
**CELLFIRE INC.**
**MODIV MEDIA, INC.**
**PDM HOLDINGS CORPORATION**
**PDM INTERMEDIATE HOLDINGS A CORPORATION**
**PDM INTERMEDIATE HOLDINGS B CORPORATION**

By: _____

Name:  Shelly Schaffer

Title:  CFO

WEIL:\96767752\18\34225.0004

**<u>Exhibit B</u>**

**Restructuring Support Agreement**

*Execution Version*

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "**Agreement**"), dated as of December 11, 2018, is entered into by and among:

(i) PDM Group Holdings Corporation ("**Catalina Parent**"), a Delaware corporation;

(ii) Catalina Marketing Corporation, Catalina Marketing Procurement, LLC, Catalina Marketing Technology Solutions, Inc., Catalina Marketing Worldwide, LLC, CellFire Inc., Modiv Media, Inc., Checkout Holding Corp., PDM Holdings Corporation, PDM Intermediate Holdings A Corporation, and PDM Intermediate Holdings B Corporation (together with Catalina Parent, each a "**Catalina Party**" or "**Catalina Entity**" and collectively, the "**Company**");

(iii) the undersigned lenders, or investment advisors or managers for the account of lenders, party to that certain senior secured first lien credit facility (the "**First Lien Credit Facility**" and, the indebtedness incurred by the Company thereunder, the "**First Lien Indebtedness**") pursuant to that certain First Lien Credit Agreement, dated as of April 9, 2014 (as amended from time to time, the "**First Lien Credit Agreement**"), among PDM Holdings Corporation, as holdings, Checkout Holding Corp., as borrower, JPMorgan Chase Bank, N.A., as administrative agent (the "**First Lien Agent**"), the lenders party thereto from time to time (the "**First Lien Lenders**" and, the undersigned First Lien Lenders (to the extent identified as "Consenting First Lien Lenders" on the signature pages hereto), together with their respective successors and permitted assigns and any subsequent First Lien Lender that becomes party hereto in accordance with the terms hereof, the "**Consenting First Lien Lenders**") and the other agents party thereto from time to time; and

(iv) the undersigned lenders, or investment advisors or managers for the account of lenders, party to that certain senior secured second lien credit facility (the "**Second Lien Credit Facility**" and, the indebtedness incurred by the Company thereunder, the "**Second Lien Indebtedness**" and, together with the First Lien Indebtedness and any other indebtedness issued by any of the Catalina Entities ("**Other Indebtedness**"), the "**Indebtedness**") pursuant to that certain Second Lien Credit Agreement dated as of April 9, 2014 (as amended from time to time, the "**Second Lien Credit Agreement**"), among PDM Holdings Corporation, as holdings, Checkout Holding Corp., as borrower, Wilmington Savings Funds Society, FSV, as successor administrative agent (the "**Second Lien Agent**"), the lenders party thereto from time to time (the "**Second Lien Lenders**" and, the undersigned Second Lien Lenders (to the extent identified as "Consenting Second Lien Lenders" on the signature pages hereto), together with their respective successors and permitted assigns and any subsequent Second Lien Lender that becomes party hereto in accordance with the terms hereof, the "**Consenting Second Lien Lenders**") and together with the Consenting First Lien Lenders, the "**Consenting Creditors**")[1] and the other agents party thereto from time to time.

---

[1] For the avoidance of doubt, any Consenting Creditor that is a Qualified Marketmaker shall be considered a Consenting Creditor and required to comply with the terms and obligations of this Agreement solely to the extent provided in Section 3(g).

The Company, each Consenting Creditor, and any subsequent person or entity that becomes a party hereto in accordance with the terms hereof are referred herein as the "***Parties***" and individually as a "***Party***."

When a reference is made in this Agreement to a Section, Exhibit or Schedule, such reference shall be to a Section, Exhibit or Schedule, respectively, of or attached to this Agreement unless otherwise indicated.  Unless the context of this Agreement otherwise requires, (a) words using the singular or plural also include the plural or singular , respectively, (b) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement, (c) the words "include," "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation," (d) the word "or" shall not be exclusive and shall be read to mean "and/or" and (e) any reference to dollars or "$" shall be to United States dollars.  The Parties agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

## RECITALS

**WHEREAS,** the Parties have engaged in good faith, arm's length negotiations and have agreed to enter into certain transactions (the "***Restructuring Transactions***") in furtherance of a global restructuring of the Company (the "***Restructuring***") which is anticipated to be effected through a plan of reorganization (as may be amended from time to time in accordance with the terms hereof, the "***Plan***"), a solicitation of votes therefor (the "***Solicitation***") pursuant to the Bankruptcy Code (as defined below), and the commencement by the Company of voluntary cases (the "***Chapter 11 Cases***") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "***Bankruptcy Code***"), in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***");

**WHEREAS**, the Restructuring Transactions include those transactions described in the Plan Term Sheet attached hereto as **Exhibit A** (the "***Plan Term Sheet***");

**WHEREAS,** as of the date hereof, the Consenting First Lien Lenders hold, in the aggregate, approximately 93% of the aggregate outstanding principal amount of the First Lien Indebtedness, and approximately [•]% of the aggregate outstanding principal amount of the Second Lien Indebtedness;

**WHEREAS,** as of the date hereof, the Consenting Second Lien Lenders hold, in the aggregate, approximately 78% of the aggregate outstanding principal amount of the First Lien Indebtedness, and approximately [•]% of the aggregate outstanding principal amount of the Second Lien Indebtedness;

**WHEREAS**, the Company and the Consenting Creditors have reached an agreement for the consensual use of Cash Collateral (as defined in the Bankruptcy Code) and the Company's entry into the DIP Facility (as defined below) pursuant to the terms and conditions consistent with the Plan Term Sheet (the "***DIP Credit Agreement***") and the interim and final orders approving, among other things, the Company's entry into the DIP Facility, to be entered by the Bankruptcy

Court (the "*Interim DIP Order*" and the "*Final DIP Order*," respectively, and together the "*DIP Orders*") in form and substance acceptable to the Company and the DIP Lenders (as defined below) and consistent with the terms of this Agreement, including the Plan Term Sheet; and

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment in respect of the matters discussed in the Plan Term Sheet and hereunder.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    **Certain Definitions.**

As used in this Agreement, the following terms have the following meanings:

(a)    "*Capital Stock*" means the issued and outstanding shares of capital stock of Catalina Parent or any option thereon or any right or interest therein.

(b)    "*Claims*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

(c)    "*Closing*" means the consummation of the transactions contemplated by the Plan on the Effective Date.

(d)    "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan in the Chapter 11 Cases, which order will be in form and substance reasonably satisfactory to the Requisite Creditors and the Company.

(e)    "*Consenting Class*" means either the First Lien Lenders or the Second Lien Lenders, as applicable.

(f)    "*Consenting Creditor Advisors*" means Creditor Counsel, Evercore Group, L.L.C., as financial advisor to the First Lien Lenders and PJT Partners, LP, as financial advisor to the Second Lien Lenders.

(g)    "*Creditor Counsel*" means Jones Day, as counsel to the First Lien Lenders, and Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel to the Second Lien Lenders.

(h)    "*Definitive Documents*" means (i) this Agreement (including the Plan Term Sheet), (ii) the Plan (including any ballots, supplements, or other material documents directly relating thereto not specified herein), (iii) the Disclosure Statement, (iv) the DIP Orders, (v) the motion seeking approval of the DIP Orders, (vi) the motion seeking approval by the Bankruptcy Court of the Disclosure Statement and the Solicitation procedures, and the orders of the Bankruptcy Court approving the Disclosure Statement and confirming the Plan, (vii) the DIP Credit Agreement and related financing documents (the "DIP Documents"), (vii) all exit financing documents (the "Exit Documents"), (viii) all first day pleadings or papers, and (ix) all second day pleadings or papers, in each case, which are reasonably satisfactory in form and substance to the Requisite Creditors, subject to the Second Lien Lender Consent Right.

(i)      "*DIP Facility*" means the debtor-in-possession facility to be provided to the Company in accordance with the terms, and subject in all respects to the conditions, set forth in the DIP Credit Agreement and pursuant to the terms and conditions of the DIP Orders.

(j)      "*DIP Lenders*" means those Consenting Creditors that are providing the DIP Facility in their capacities as First Lien Lenders.

(k)      "*Disclosure Statement*" means the disclosure statement in respect of the Plan, including, without limitation, all exhibits and schedules thereto, as supplemented from time to time.

(l)      "*Effective Date*" means the date upon which all conditions to the effectiveness of the Plan have been satisfied or waived in accordance with the terms thereof and the Plan becomes effective.

(m)      "*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) of a Catalina Party, including all shares, common stock, preferred stock, or other instrument evidencing any fixed or contingent ownership interest in any Catalina Party, including any option, warrant, or other right, contractual or otherwise, to acquire any such interest in a Catalina Party, whether or not transferable and whether fully vested or vesting in the future, that existed immediately before the Effective Date.

(n)      "*NCS JV Agreements*" means the NC Ventures, LLC Limited Liability Company Agreement dated October 1, 2015 and all related agreements, including, without limitation, (i) the NC Ventures, LLC Catalina Data and Intellectual Property License Agreement dated October 6, 2009 and (ii) that certain side letter agreement dated June 29, 2009 by and between Catalina Marketing Corporation and The Nielsen Company (US) LLC.

(o)      "*New Board*" means the initial board of directors of Reorganized Catalina Parent.

(p)      "*New Common Stock*" means the shares of common stock of Reorganized Catalina Parent issued pursuant to the Plan.

(q)      "*Prepetition Loan Documents*" means the First Lien Credit Agreement and the Second Lien Credit Agreement and, in each case, all "Loan Documents" as defined therein.

(r)      "*Reorganized Catalina Parent*" means Catalina Parent, as reorganized as of the Effective Date.

(s)      "*Reorganized Debtors*" means Catalina Parent and the other Debtors, as reorganized on the Effective Date.

(t)      "*Requisite Creditors*" means the Requisite First Lien Lenders and the Requisite Second Lien Lenders.

(u)      "*Required DIP Lenders*" means, as of the date of determination, DIP Lenders holding at least a majority of the aggregate principal amount outstanding of the DIP Facility and any unused or unfunded commitments thereunder.

(v)     "*Requisite First Lien Lenders*" means, as of the date of determination, Consenting First Lien Lenders holding at least a majority of the aggregate principal amount outstanding of the First Lien Indebtedness held by all Consenting First Lien Lenders.

(w)     "*Requisite Second Lien Lenders*" means, as of the date of determination, Consenting Second Lien Lenders holding at least a majority of the aggregate principal amount outstanding of the Second Lien Indebtedness held by all Consenting Second Lien Lenders.

(x)     "*Second Lien Lender Consent Right*" means the Requisite Consenting Second Lien Lenders' right to consent or approve the Definitive Documents, which right shall be as follows: (i) this Agreement (including the Plan Term Sheet), the Plan (including any ballots, supplements, or other documents relating thereto not specified herein), the Disclosure Statement, the motion seeking approval by the Bankruptcy Court of the Disclosure Statement and the Solicitation procedures, and the Confirmation Order shall be reasonably acceptable in form and substance to the Requisite Second Lien Lenders and (ii) all other Second Lien Lender consent rights shall apply solely to the extent the Definitive Document (A) is not consistent in any material respects with this Agreement or the  Plan Term Sheet; (B) adversely affects, directly or indirectly, in any respect the economic rights, waivers, or releases proposed to be granted to, or received by, the Consenting Second Lien Lenders pursuant to this Agreement and the Plan (including, but not limited to, through the treatment (or change to the treatment) under the Plan of any claim or interest), other than such different treatment that may be consented to by the affected Second Lien Lenders, or (C) adversely affects, directly or indirectly, the obligations the Consenting Second Lien Lenders may have pursuant to this Agreement or the Plan; *provided*, *however*, that any Consenting Second Lien Lender that is (I) a DIP Lender (in its capacity as a holder of First Lien Indebtedness) shall have all rights (including consent rights) afforded to a DIP Lender under the DIP Credit Agreement and, before the DIP Credit Agreement becomes effective, all First Lien Indebtedness held by such Second Lien Lender shall be included in the calculation of "Requisite First Lien Lenders" with respect to consent rights over the DIP Orders, DIP Credit Agreement, and other DIP Documents and (II) a participant in any exit financing facility shall have all rights (including consent rights) of a lender with respect thereto and all First Lien Indebtedness held by such Second Lien Lender shall be included in the calculation of "Requisite First Lien Lenders" with respect to consent rights over the Exit Documents.

(y)     "*Securities Act*" means the Securities Act of 1933, as amended.

(z)     "*Support Effective Date*" means the date on which (i) counterpart signature pages to this Agreement shall have been executed and delivered by (A) the Company and (B) Consenting Creditors holding at least 66⅔% in aggregate principal amount outstanding of the First Lien Indebtedness and at least 66⅔% in aggregate principal amount outstanding of the Second Lien Indebtedness, and (ii) all of the reasonable and documented fees and expenses of the Consenting Creditor Advisors (including any applicable local counsel) incurred and outstanding as of the day immediately prior to the Support Effective Date shall have been paid in full in cash (except as otherwise agreed by the applicable Consenting Creditor Advisor).

(aa)     "*Support Period*" means the period commencing on the Support Effective Date and ending on the earlier of the (i) date on which this Agreement is terminated in accordance with Section 6 hereof and (ii) Effective Date.

2.    **Bankruptcy Process; Plan of Reorganization.**

(a)    The Plan.  The Plan Term Sheet is expressly incorporated herein and made a part of this Agreement.  All references to this Agreement shall be deemed to include the Plan Term Sheet.  The material terms and conditions of the Restructuring are set forth in the Plan Term Sheet; *provided* that the Plan Term Sheet is supplemented by the terms and conditions of this Agreement. In the event of any inconsistencies between the terms of this Agreement and the Plan Term Sheet, the terms of this Agreement shall govern.

(b)    Commencement of the Chapter 11 Cases.  The Company hereby agrees that, as soon as reasonably practicable, but in no event later than three (3) calendar days after the Support Effective Date (the "*Outside Petition Date*") (the date on which such filing occurs, the "*Petition Date*"), the Company shall file with the Bankruptcy Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code and any and all other documents necessary to commence the Chapter 11 Cases of the Company.

(c)    Filing of the Plan and Disclosure Statement.  The Company shall file the Plan along with the Disclosure Statement, each in form and substance reasonably satisfactory to the Requisite Creditors on the date no later than the date necessary to obtain entry of an order approving the Disclosure Statement in accordance with this Agreement.

(d)    Confirmation of the Plan.  The Company shall use its commercially reasonable efforts to obtain confirmation of the Plan as soon as reasonably practicable following the Petition Date in accordance with the Bankruptcy Code and on terms consistent with this Agreement, and each Consenting Creditor shall use its commercially reasonable efforts to cooperate fully in connection therewith.

(e)    DIP Financing and Cash Collateral.  No later than one (1) business day after the Petition Date, the Company shall file a motion with the Bankruptcy Court seeking interim and final authority to use Cash Collateral and enter into the DIP Facility in accordance with the DIP Orders.

(f)    Assumption of this Agreement.  No later than 7 calendar days after the Petition Date, the Company shall file a motion with the Bankruptcy Court seeking the assumption of this Agreement.

3.    **Agreements of the Consenting Creditors.**

(a)    Voting; Support.  Each Consenting Creditor agrees that, during the Support Period, such Consenting Creditor shall:

(i)    (A) timely vote or cause to be voted its Claims (including, without limitation, all claims arising under the First Lien Credit Agreement and the Second Lien Credit Agreement, as applicable) to accept the Plan by delivering its duly executed and completed ballot or ballots, as applicable, accepting the Plan on a timely basis, (B) not change or withdraw such vote (or cause or direct such vote to be changed or withdrawn); *provided, however*, that such vote may, upon written notice to the Company and the other

Parties, be revoked (and, upon such revocation, deemed void *ab initio*) by any Consenting Creditor at any time following the expiration of the Support Period;

(ii)    timely vote (or cause to be voted) its Claims against any plan, plan proposal, restructuring proposal, offer of dissolution, assignment for the benefit of creditors, winding up, liquidation, sale or disposition, reorganization, merger, business combination, joint venture, debt or equity financing or re-financing, recapitalization or other restructuring of the Company (including, for the avoidance of doubt, a transaction premised on an asset sale under section 363 of the Bankruptcy Code) other than the Plan (each, an "***Alternative Restructuring***");

(iii)    not directly or indirectly, through any person or entity (including, without limitation, any administrative agent or collateral agent), seek, solicit, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing or prosecution of any Alternative Restructuring or object to or take any other action that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay or impede the Solicitation, approval of the Disclosure Statement, or the confirmation and consummation of the Plan and the consummation of the Restructuring;

(iv)    agree to provide, and to not opt out of, the releases of the Company, the Reorganized Debtors and the Released Parties substantially in the form set forth in the Plan Term Sheet;

(v)    not direct any administrative agent or collateral agent (as applicable) to take any action inconsistent with such Consenting Creditor's obligations under this Agreement, and, if any applicable administrative agent or collateral agent takes any action inconsistent with such Consenting Creditor's obligations under this Agreement, such Consenting Creditor shall use its commercially reasonable efforts to direct and cause such administrative agent or collateral agent to cease and refrain from taking any such action;

(vi)    support and take all commercially reasonable actions reasonably requested by the Company to facilitate the Solicitation of the Plan, obtain approval of the Disclosure Statement, and obtain confirmation and consummation of the Plan and the Restructuring; and

(vii)    to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring, negotiate in good faith appropriate additional or alternative provisions to address any such impediment.

(b)    Transfers.  Each Consenting Creditor agrees that, during the Support Period, such Consenting Creditor shall not sell, transfer, loan, issue, pledge, hypothecate, assign or otherwise dispose of (each, a "***Transfer***"), directly or indirectly, in whole or in part, any of its Claims or any option thereon or any right or interest therein or any other claims against or interests in the Company (including the grant of any proxy or the deposit of any Claims against or interests in the Company into a voting trust or the entry into a voting agreement with respect thereto), unless the transferee thereof either (i) is a Consenting Creditor or (ii) prior to such Transfer, agrees in writing

for the benefit of the Parties to become a Consenting Creditor and to be bound by all of the terms of this Agreement applicable to Consenting Creditors (including with respect to any and all claims or interests it already may hold against or in the Company prior to such Transfer) by executing a joinder agreement, a form of which is attached hereto as **Exhibit B** (a "***Joinder Agreement***"), and delivering an executed copy thereof within two (2) business days of such execution, to (A) Weil, Gotshal & Manges LLP ("***Weil***"), as counsel to the Company, and (B) Creditor Counsel, in which event (x) the transferee (including the Consenting Creditor transferee, if applicable) shall be deemed to be a Consenting Creditor hereunder and (y) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such Transferred rights and obligations; *provided* that a Consenting Creditor may Transfer its Claims to an entity that is acting in its capacity as a Qualified Marketmaker[2] without the requirement that the Qualified Marketmaker execute a Joinder Agreement, *provided* that (I) any subsequent Transfer by such Qualified Marketmaker of the right, title, or interest in such Claims is to a transferee that is or becomes a Consenting Creditor at the time of such Transfer and (II) the Qualified Marketmaker complies with Section (d) hereof. To the extent that a Consenting Creditor is acting in its capacity as a Qualified Marketmaker, it may Transfer any right, title, or interest in such Claims that the Qualified Marketmaker acquires from a holder of the Claims who is not a Consenting Creditor without the requirement that the transferee be or became a Consenting Creditor.

(c)  Additional Claims or Interests. To the extent any Consenting Creditor (i) acquires additional Claims, (ii) holds or acquires any other claims against the Company entitled to vote on the Plan, (iii) holds or acquires any Interests in the Company entitled to vote on the Plan or (iv) Transfers any Claims, then, in each case, each such Consenting Creditor shall promptly (in no event less than three (3) business days following such acquisition or transaction) notify Weil and applicable Creditor Counsel for the Consenting Class of which such Consenting Creditor is a member of such transaction in writing and each such Consenting Creditor agrees with respect to (i) through (iii) above that such additional Claims or other claims or Interests shall be subject to this Agreement, and that, for the duration of the Support Period, it shall vote (or cause to be voted) any such additional Claims or other claims or Interests entitled to vote on the Plan in a manner consistent with Section 3(a) hereof (and in the event the Solicitation has already commenced, no later than two (2) business days following the acquisition of such Claim, claims or Interests).

(d)  Obligations of Qualified Marketmaker. If at the time of a proposed Transfer of Claims to a Qualified Marketmaker, such Claims (i) may be voted on the Plan, the proposed transferor Consenting Creditor must first vote such Claims in accordance with Section 3(a) or (ii) have not yet been and may not yet be voted on the Plan and such Qualified Marketmaker does not Transfer such Claims or Interests to a subsequent transferee prior to the third (3rd) Business Day prior to the expiration of the applicable voting deadline (such date, the "***Qualified Marketmaker Joinder Date***"), such Qualified Marketmaker shall be required to (and the transfer documentation to the Qualified Marketmaker shall have provided that it shall), on the first (1st) Business Day immediately following the Qualified Marketmaker Joinder Date, become a Consenting Creditor

_____

[2]  As used herein, the term "***Qualified Marketmaker***" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers claims against the Company (or enter with customers into long and short positions in claims against the Company), in its capacity as a dealer or marketmaker in claims against the Company and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

with respect to such Claims in accordance with the terms hereof (including the obligation to vote in favor of the Plan) and shall vote in favor of the Plan in accordance with the terms hereof; *provided*, that, the Qualified Marketmaker shall automatically, and without further notice or action, no longer be a Consenting Creditor with respect to such Claims at such time that the transferee of such Claims becomes a Consenting Creditor, with respect to such Claims.

(e)     Forbearance.  Each Consenting Creditor agrees to forbear until 9:00 a.m. prevailing Eastern Time on December 13, 2018 from the exercise of its rights (including any right of set-off) or remedies it may have under the Prepetition Loan Documents, as applicable, and under applicable U.S. or foreign law or otherwise, in each case, solely with respect to the Company's (i) failure to make the interest payment due to First Lien Agent for the benefit of the First Lien Lenders on November 30, 2018, (ii) failure to make the interest payment due to Second Lien Agent for the benefit of the Second Lien Lenders on November 30, 2018, (iii) failure to deliver the quarterly financial statements and related Compliance Certificate (as defined in the Prepetition Loan Document for the fiscal quarter ended September 30, 2018, as required by Sections 6.01(b) and 6.02(a) of the First Lien Credit Agreement and Second Lien Credit Agreement, respectively, (iv) failure to participate in a conference call with the First Lien Agent and First Lien Lenders and the Second Lien Agent and Second Lien Lenders to discuss the financial condition and results of operations of the Company for the fiscal quarter ended September 30, 2018, as required by Section 6.17 of the First Lien Credit Agreement and the Second Lien Credit Agreement, respectively; (v) failure to comply with the Financial Covenant (as defined in the First Lien Credit Agreement) as of the Compliance Date (as defined in the First Lien Credit Agreement) occurring on September 30, 2018, as required by Section 7.11 of the First Lien Credit Agreement, (vi) failure to deliver the quarterly financial statements and related compliance certificate for the fiscal quarter ended September 30, 2018, as required by Sections 6.01(b) and 6.02(a) of the Note Purchase Agreement dated as of April 9, 2014 among PDM Intermediate Holdings B Corporation, as issuer and the investors party thereto from time to time as purchasers, and (vii) entry into this Agreement or the other documents related to this Agreement and the transactions contemplated by this Agreement and the implementation thereof (the defaults listed in (i)-(vii) collectively, the "***Specified Defaults***") and on no other basis.  Each Consenting Creditor further agrees that if any applicable administrative agent or collateral agent takes any action inconsistent with any such Consenting Creditor's obligations under this Agreement, such Consenting Creditor shall direct and use commercially reasonable efforts to cause such administrative agent or collateral agent to cease and refrain from taking such actions.  For the avoidance of doubt, the forbearance set forth in this Section 3(d) shall not constitute a waiver with respect to any default or event of default under the First Lien Credit Agreement or Second Lien Credit Agreement and shall not bar any Consenting Creditor from filing a proof of claim or taking action to establish the amount of such claim.  Upon the termination of this Agreement, the agreement of the Consenting Creditors to forbear from exercising rights and remedies in accordance with this Section 3(e) shall immediately terminate without requirement of any demand, presentment or protest of any kind, all of which the Catalina Parties hereby waive.

(f)     Notwithstanding anything to the contrary herein, nothing in this Agreement shall limit, condition or restrict, in any way, any Consenting Creditor, in its capacity as a DIP Lender, from (i) exercising any rights and remedies under the DIP Credit Agreement (and any related credit documents, including the DIP Orders), (ii) waiving or forbearing with respect to any Default or Event of Default under and as defined in the DIP Credit Agreement and DIP Orders, (iii) amending,

modifying or supplementing the DIP Credit Agreement (or any related credit documents), or (iv) refusing to make additional advances under the DIP Credit Agreement, in each case, in their sole and absolute discretion and in accordance with the terms of the DIP Credit Agreement (or related credit documents and the DIP Orders).

(g)     The Company understands that the Consenting Creditors are engaged in a wide range of financial services and businesses, and, in furtherance of the foregoing, the Company acknowledges and agrees that the obligations set forth in this Agreement shall only apply to the trading desk(s) and/or business group(s) of the Consenting Creditor that principally manage and/or supervise the Consenting Creditor's investment in the Company, and shall not apply to any other trading desk or business group of the Consenting Creditor so long as they are not acting at the direction or for the benefit of such Consenting Creditor. Further, notwithstanding anything in this Agreement to the contrary, the Parties agree that, in connection with the delivery of signature pages to this Agreement by a Consenting Creditor that is a Qualified Marketmaker before the occurrence of conditions giving rise to the Support Effective Date, such Consenting Creditor shall be a Consenting Creditor hereunder solely with respect to the Claims listed on such signature pages and shall not be required to comply with this Agreement for any other Claims it may hold.

**4.      [Reserved]**

**5.      Agreements of the Company**.

(a)     <u>Covenants</u>.  The Company agrees that, during the Support Period, the Company shall:

(i)     (A) use commercially reasonable efforts to obtain any and all required regulatory approvals for the Restructuring set forth in the Plan, if any; and (B) not take any action that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay or impede the Solicitation, approval of the Disclosure Statement, or the confirmation and consummation of the Plan and the consummation of the Restructuring, in each case, to the extent consistent with, upon the advice of counsel, the fiduciary duties of the boards of directors, managers, members or partners, as applicable, of each Catalina Party; *provided* that the Company shall not be obligated to agree to any modification of any document that is inconsistent with the Plan Term Sheet;

(ii)     deliver draft copies of all material motions or applications and other material documents related to the Restructuring (including the Plan, the Disclosure Statement, ballots and other Solicitation materials in respect of the Plan and any proposed amended version of the Plan or the Disclosure Statement, and a proposed confirmation order) the Company intends to file with the Bankruptcy Court to Creditor Counsel, at least two (2) business days prior to the date when the Company intends to file any such document (provided that if delivery of such document at least two (2) business days in advance is not reasonably practicable under the circumstances, such document shall be delivered as soon as otherwise practicable prior to filing) and shall consult in good faith with Creditor Counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court;

(iii)    not, directly or indirectly, through any person or entity, take any action that is inconsistent with, or that would reasonably be expected to prevent, interfere with, delay or impede, consummation of the Restructuring, including the Solicitation, approval of the Disclosure Statement, and the confirmation and consummation of the Plan;

(iv)    to the extent that any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the transactions contemplated in this Agreement or the Plan, negotiate in good faith appropriate additional or alternative provisions to address any such impediment, in consultation with the Requisite Consenting Creditors;

(v)    maintain its good standing under the laws of the state or other jurisdiction in which they are incorporated or organized;

(vi)    as soon as reasonably practicable, notify the Consenting Creditors in writing of any governmental or third party complaints, litigations, investigations, or hearings (or communications indicating that the same may be contemplated or threatened);

(vii)    if the Catalina Parties know of a material breach by any Catalina Party or any Consenting Creditor of the obligations, representations, warranties, or covenants of the Catalina Parties or Consenting Creditors (as applicable) set forth in this Agreement, furnish prompt written notice (and in any event within three (3) business days of such actual knowledge) to the non-breaching Consenting Creditors and promptly take all reasonable and practicable remedial action necessary to cure such material breach by any such Catalina Party or the Consenting Creditor, as applicable;

(viii)    pay in cash (A) prior to the Petition Date, all reasonable and documented fees and out-of-pocket expenses accrued prior to the Petition Date for which invoices or receipts are furnished by Consenting Creditor Advisors, (B) after the Petition Date, all reasonable and documented fees and out-of-pocket expenses of the Consenting Creditor Advisors (including any applicable local counsel) incurred on and after the Petition Date from time to time, but in any event within seven (7) days of delivery to the Catalina Parties of any applicable invoice or receipt, and (C) on the Effective Date, all reasonable and documented fees and out-of-pocket expenses of the Consenting Creditor Advisors (including any applicable local counsel) incurred and outstanding in connection with the Restructuring (including any success or transaction fees payable to Evercore Group, L.L.C. and PJT Partners, LP, which shall be deemed to include all success, restructuring or transaction fees payable to Evercore Group, L.L.C. and PJT Partners, LP in accordance with their respective engagement letters with the Catalina Entities);

(ix)    timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (A) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), (B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing the Chapter 11 Cases, (D) modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable; or (E) challenging the validity, enforceability, perfection, or priority of, or

11

seeking avoidance or subordination of, any portion of the First Lien Indebtedness, or asserting any other cause of action against and/or with respect or relating to such Claims or the prepetition liens securing such Claims; and

(x)     not seek, solicit, or support any Alternative Restructuring, other than the Restructuring, or cause or allow any of their agents or representatives to solicit any Alternative Restructuring, unless the board of directors of any Catalina Party determines, based on the advice of outside legal counsel, in good faith, and consistent with its fiduciary duties, that proceeding with the Restructuring would be inconsistent with the applicable fiduciary duties of such board of directors. Prior to the earlier of (x) making a public announcement regarding their intention to accept an Alternative Restructuring or (y) entering into a definitive agreement with respect to an Alternative Restructuring, the Debtors shall have terminated this Agreement pursuant to Section 6(c). The Debtors shall, to the extent practicable and consistent with their fiduciary duties, give Creditor Counsel not less than four (4) Business Days' prior written notice before exercising such termination right in accordance with this Agreement. At all times prior to the date on which the Debtors enter into a definitive agreement in respect of such an Alternative Restructuring or make a public announcement regarding their intention to do so, the Debtors shall provide to Creditor Counsel a copy of any written offer or proposal (and notice and a description of any oral offer or proposal) for such Alternative Restructuring within five (5) business days of the Debtors' or their advisors' receipt of such offer or proposal.

(b)     New Common Stock. The Company agrees that issuance of and any resale of the New Common Stock pursuant to the Plan is intended to be exempt from registration under the Securities Act pursuant to Regulation D thereunder or pursuant to section 1145 of the Bankruptcy Code.

(c)     Automatic Stay. The Company acknowledges and agrees and shall not dispute that after the commencement of the Chapter 11 Cases, the giving of notice of termination of this Agreement by any Party pursuant to this Agreement shall not be a violation of the automatic stay under section 362 of the Bankruptcy Code (and the Company hereby waives, to the fullest extent permitted by law, the applicability of the automatic stay to the giving of such notice); *provided* that nothing herein shall prejudice any Party's rights to argue that the giving of notice of default or termination was not proper under the terms of this Agreement.

**6.     Termination of Agreement**.

(a)     This Agreement shall terminate three (3) business days following the delivery of notice, delivered in accordance with Section 22 hereof, from the Requisite First Lien Lenders or the Requisite Second Lien Lenders, as applicable, to the other Parties at any time after and during the continuance of any Creditor Termination Event; *provided*, that termination by the Requisite First Lien Lenders or Requisite Second Lien Lenders, as applicable, shall only be effective as to the applicable Consenting Class. In addition, this Agreement shall terminate in respect of the applicable Consenting Class three (3) business days following the delivery of notice, delivered in accordance with Section 22 hereof, from Catalina Parent to the other Parties at any time after the occurrence and during the continuance of any Company Termination Event (defined below). No Party may exercise any of its respective termination rights as set forth herein if (i) such Party is in

12

breach of this Agreement (unless such failure to perform or comply arises as a result of another Party's actions or inactions), (ii) such breach has caused, or resulted in, the occurrence of a Creditor Termination Event or Company Termination Event (as applicable), and (iii) such breach is continuing when such Party seeks to exercise any of its respective termination rights. In addition, this Agreement shall terminate automatically on the Effective Date.

(b)    A "Creditor Termination Event" shall mean any of the following:

(i)    the breach by the Company of any of the undertakings, representations, warranties or covenants of the Company set forth herein in any material respect which remains uncured for a period of five (5) business days after the receipt of written notice of such breach pursuant to Sections 6(a) and 22 hereof (as applicable);

(ii)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and such ruling, judgment or order has not been stayed, reversed or vacated within ten (10) business days after such issuance;

(iii)    in accordance with this Agreement, any Definitive Document not being satisfactory or reasonably satisfactory (as applicable) to the Requisite First Lien Lenders and, subject to the Second Lien Lender Consent Right, the Requisite Second Lien Lenders;

(iv)    any Catalina Party (A) amending, or modifying, or filing a pleading seeking authority to amend or modify, any Definitive Document in a manner that is materially inconsistent with this Agreement; (B) suspending or revoking the Restructuring Transactions; or (C) publicly announcing its intention to take any such action listed in the foregoing clauses (A) and (B) of this subsection;

(v)    any Catalina Party (A) filing any chapter 11 plan other than the Plan or (B) withdrawing the Plan or its support for the Plan;

(vi)    any Catalina Party filing any motion or application seeking authority to sell any assets having a fair market value in excess of $500,000.00 without the prior written consent of the Requisite Creditors;

(vii)    the entry of any order authorizing the use of cash collateral or postpetition financing that is not in the form of the DIP Orders or otherwise consented to by the Requisite First Lien Lenders or, subject to the Second Lien Lender Consent Right, the Requisite Second Lien Lenders;

(viii)    either (A) any Catalina Party filing a motion, application, or adversary proceeding (or any Catalina Party supports any such motion, application, or adversary proceeding filed or commenced by any third party) (I) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the First Lien Indebtedness (including the amount thereof) or the liens securing such First Lien Indebtedness or asserting any other cause of action against the Consenting First Lien Lenders, or (II) challenging the validity, enforceability, perfection, or priority

of, or seeking avoidance or subordination of, any portion of the Second Lien Indebtedness or asserting any other cause of action against the Consenting Second Lien Lenders and/or with respect or relating to such Second Lien Indebtedness or the prepetition liens securing such claims; *provided* that the Creditor Termination Event set forth in the immediately preceding clause (b)(viii)(I) shall only be assertable by the Requisite First Lien Lenders and the Creditor Termination Event set forth in the immediately preceding clause (b)(viii)(II) shall only be assertable by the Requisite Second Lien Lenders, or (B) entry of an order that is inconsistent with this Agreement or the Plan Term Sheet in any material respect;

(ix)    the occurrence of any Event of Default under the DIP Orders or the DIP Credit Agreement, as applicable, that has not been cured (if capable of being cured) or waived by the applicable percentage of DIP Lenders in accordance with the terms of the DIP Credit Agreement;

(x)    the occurrence of any default or Event of Default arising before the Petition Date under the Prepetition Loan Documents other than the Specified Defaults; *provided*, that such Creditor Termination Event in this Section 6(b)(x) may only be exercised prior to the Petition Date;

(xi)    any Catalina Party terminating its obligations under and in accordance with Section 6(c) of this Agreement;

(xii)    entry of an order granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code authorizing any party to proceed against any material asset of any of the Catalina Entities or that would materially and adversely affect any of the Catalina Entities' ability to operate their businesses in the ordinary course;

(xiii)    entry of an order assuming or rejecting any NCS JV Agreement that is not satisfactory to the Requisite First Lien Lenders and, solely to the extent such order reduces the percentage of New Common Stock to be provided to, or otherwise materially adversely affects recoveries of, the Second Lien Lenders under the Plan as set forth in the Plan Term Sheet, the Requisite Second Lien Lenders; *provided that*, a loss of revenue or a reduction in total enterprise value resulting from the rejection of any such NCS JV Agreements shall not be deemed to materially adversely affect the recoveries of the Second Lien Lenders under the Plan as set forth in the Plan Term Sheet;

(xiv)    the commencement of an involuntary case against any Catalina Party or any material foreign subsidiary or material foreign affiliate of a Catalina Party or the filing of an involuntary petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization or other relief in respect of such Catalina Party or such Catalina Party's foreign subsidiaries and affiliates, or their debts, or of a substantial part of their assets, under any federal, state or foreign bankruptcy, insolvency, administrative receivership or similar law now or hereafter in effect, provided, that such involuntary proceeding is not dismissed within a period of forty-five (45) days after the filing thereof, or if any court grants the relief sought in such involuntary proceeding;

(xv)    any Catalina Party or any material foreign subsidiary or material foreign affiliate of a Catalina Party, without the prior consent of the Requisite Creditors, (A) voluntarily commencing any case or filing any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization or other relief under any federal, state, or foreign bankruptcy, insolvency, administrative receivership or similar law now or hereafter in effect except as provided in this Agreement, (B) consenting to the institution of, or failing to contest in a timely and appropriate manner, any involuntary proceeding or petition described above, (C) filing an answer admitting the material allegations of a petition filed against it in any such proceeding, (D) applying for or consenting to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator or similar official, (E) making a general assignment or arrangement for the benefit of creditors, or (F) taking any formal corporate action (as implemented or authorized by the applicable board of directors, board of managers, managers, members, managing members or partners) authorizing any of the foregoing;

(xvi)    if (A) any of the DIP Orders are reversed, stayed, dismissed, vacated, reconsidered, modified, or amended without the consent of the Requisite First Lien Lenders, or, subject to Second Lien Lender Consent Right, the Requisite Second Lien Lenders or (B) a motion for reconsideration, reargument, or rehearing with respect to any such order has been filed and the Catalina Entities have failed to object timely to such motion;

(xvii)    if (A) the Confirmation Order is reversed, stayed, dismissed, vacated, reconsidered, modified, or amended without the consent of the Requisite Creditors (subject to the Second Lien Lender Consent Right) or (B) a motion for reconsideration, reargument, or rehearing with respect to any such order has been filed and the Catalina Entities have failed to timely object to such motion;

(xviii)    the occurrence of the Maturity Date (as defined in the DIP Credit Agreement) without the Plan having been substantially consummated; *provided* that this Creditor Termination Event shall only be assertable by the Required DIP Lenders;

(xix)    if, as of 11:59 p.m. prevailing Eastern Time on December 12, 2018, as such date may be extended with the consent of the Requisite Creditors, the Company shall not have commenced the Solicitation in accordance with section 1126(b) of the Bankruptcy Code;

(xx)    if, as of 11:59 p.m. prevailing Eastern Time on the Outside Petition Date, as such date may be extended with the consent of the Requisite Creditors, the Chapter 11 Cases shall not have been filed;

(xxi)    if, as of 11:59 p.m. prevailing Eastern Time on that date that is five (5) calendar days after the Petition Date, as such date may be extended with the consent of the Required DIP Lenders, the Interim DIP Order shall not have been entered;

(xxii)  if, as of 11:59 p.m. prevailing Eastern Time on the date that is thirty (30) calendar days after the Petition Date, as such date may be extended with the consent of the Requisite First Lien Lenders and, if applicable, the Requisite Second Lien Lenders, (A) the NCS JV Agreements have not been amended to the satisfaction of the Requisite First Lien Lenders or (B) a motion to reject the NCS JV Agreements is not pending before the Bankruptcy Court;

(xxiii)  if, as of 11:59 p.m. prevailing Eastern Time on the date that is forty-five (45) calendar days after the Petition Date, as such date may be extended with the consent of the Requisite Creditors, the Bankruptcy Court shall not have entered an order authorizing the assumption of this Agreement;

(xxiv)  if, as of 11:59 p.m. prevailing Eastern Time on the date that is forty (40) calendar days after the Petition Date, as such date may be extended with the consent of the Required DIP Lenders, the Final DIP Order shall not have been entered;

(xxv)  if, as of 11:59 p.m. prevailing Eastern Time on the date that is eighty-five (85) calendar days after the Petition Date, as such date may be extended with the consent of the Requisite First Lien Lenders and, if applicable, the Requisite Second Lien Lenders, (A) the NCS JV Agreements have not been amended to the satisfaction of the Requisite First Lien Lenders and (B) the Bankruptcy Court has not entered an order rejecting the NCS JV Agreements;

(xxvi)  if, as of 11:59 p.m. prevailing Eastern Time on the date that is eighty-five (85) calendar days after the Petition Date, as such date may be extended with the consent of the Requisite Creditors, the Bankruptcy Court shall not have entered an order approving the Disclosure Statement;

(xxvii) if, as of 11:59 p.m. prevailing Eastern Time on the date that is one hundred twenty-five (125) calendar days after the Petition Date, as such date may be extended with the consent of the Requisite Creditors, the Bankruptcy Court shall not have entered an order confirming the Plan;

(xxviii)if, as of 11:59 p.m. prevailing Eastern Time on the date that is one hundred forty (140) calendar days after the Petition Date, as such date may be extended with the consent of the Requisite Creditors, the Effective Date shall not have occurred (the "*Outside Date*"); or

(xxix)  the Bankruptcy Court enters an order (A) directing the appointment of an examiner with expanded powers or a trustee in the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Chapter 11 Cases.

(c)  A "Company Termination Event" shall mean any of the following:

(i)  the breach by one or more of the Consenting Creditors of any of the undertakings, representations, warranties or covenants of the applicable Consenting Creditors set forth herein in any material respect which remains uncured for a period of

five (5) business days after the receipt of written notice of such breach pursuant to <u>Sections 6(a)</u> and <u>22</u> hereof (as applicable), but only if the remaining non-breaching Consenting Creditors do not hold at least 66⅔% of the aggregate principal amount of Claims in the applicable Consenting Class;

(ii)     the board of directors, managers, members or partners (or comparable governing body), as applicable, of any Catalina Party reasonably determines in good faith based upon the advice of outside counsel that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law; *provided* that the Company provides notice of such determination to the Consenting Creditors within five (5) business days after the date thereof;

(iii)     if, as of 11:59 p.m. prevailing Eastern Time on December 12, 2018, the Support Effective Date shall not have occurred;

(iv)     if, as of 11:59 p.m. prevailing Eastern Time on the Outside Date, the Effective Date shall not have occurred;

(v)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and such ruling, judgment or order has not been stayed, reversed or vacated within ten (10) business days after such issuance;

(vi)     any Consenting Creditor terminating its obligations under and in accordance with <u>Section 6(b)</u> of this Agreement, but only if the remaining Consenting Creditors do not hold more than 66⅔% of the aggregate principal amount of Claims in the Consenting Class; or

(vii)     the Bankruptcy Court enters an order (A) directing the appointment of an examiner with expanded powers or a trustee in the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Chapter 11 Cases.

(d)     <u>Mutual Termination</u>.  This Agreement may be terminated by mutual agreement of Catalina Parent and the Requisite Creditors upon the receipt of written notice delivered in accordance with <u>Section 22</u> hereof.

(e)     <u>Effect of Termination</u>.  Subject to the proviso contained in <u>Section 6(a)</u> hereof, upon the termination of this Agreement in accordance with this <u>Section 6</u>, and except as provided in <u>Section 14</u> hereof, this Agreement shall forthwith become void and of no further force or effect and each Party shall, except as provided otherwise in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable law; *provided*, *however*, that in no event shall any such termination relieve

17

(i) a Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination or (ii) the Company from its obligation to pay the reasonable and documented fees and expenses of the Consenting Creditor Advisors and the DIP Lender advisors (including counsel to the First and Second Lien Agents and any applicable local counsel) through and including the date of such termination in accordance with Section 5(a)(viii) hereof or the Plan Term Sheet.  Upon a termination of this Agreement, each Consenting Creditor may, upon written notice to the Company and the other Parties, revoke its vote or any consents given prior to such termination, whereupon any such vote or consent shall be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement.  If this Agreement has been terminated as to any Consenting Creditor in accordance with Section 6 hereof at a time when permission of the Bankruptcy Court shall be required for a change or withdrawal (or cause to change or withdraw) of its vote to accept the Plan, the Company shall not oppose any attempt by such Consenting Creditor to change or withdraw (or cause to change or withdraw) such vote at such time.

(f)     Termination by Consenting Second Lien Lenders.  Notwithstanding anything in this Agreement, in the event any Consenting Second Lien Lender terminates this Agreement as a result of the occurrence of a Creditor Termination Event, (i) the Requisite First Lien Lenders shall have the option (which shall be delivered in writing to the Catalina Parties, including via e-mail) to (A) determine that the Consenting First Lien Lenders will continue remaining Parties to this Agreement in pursuit and in support of the Plan or (B) terminate this Agreement in accordance with this Section 6; (ii) this Agreement shall be deemed terminated with respect to such Consenting Second Lien Lender and the Consenting Second Lien Lender shall no longer be a Party to this Agreement and shall be relieved of any obligations hereunder; (iii) such other Parties shall be permitted to take further actions otherwise permitted hereunder with respect to any Definitive Document or other document or matter or any Restructuring Transaction without any liability hereunder, except the rights and obligations of such other Parties under this Agreement shall remain in full force and effect; (iv) the remaining Parties (other than any Party that has breached this Agreement and such breach caused the occurrence of a Creditor Termination Event pursuant to which the Consenting Second Lien Lender terminated this Agreement) shall no longer be obligated to not "opt out" of any releases proposed to be granted to such Consenting Second Lien Lender under the Plan; (v) such other Parties shall not be obligated to grant or support the grant of any releases to such Consenting Second Lien Lender under the Plan; and (vi) all of the applicable rights and remedies of the remaining Parties under this Agreement, the Prepetition Loan Documents and applicable law shall be reserved in all respects.

(g)     Individual Termination.  Any Consenting Creditor may terminate this Agreement as to itself only, upon written notice to the other Parties in accordance with Section 22 hereof, in the event that: (i) such Consenting Creditor has transferred all (but not less than all) of its First Lien Indebtedness Claims and Second Lien Indebtedness Claims, as applicable, in accordance with Section 3(b) of this Agreement (such termination shall be effective on the date on which such Consenting Creditor has effected such transfer, satisfied the requirements of Section 3(b) and provided the written notice required), or (ii) this Agreement or the Plan Term Sheet is amended without its consent in such a way as to alter any of the material terms hereof in a manner that is disproportionately adverse to such Consenting Creditor as compared to similarly situated Consenting Creditors by giving ten (10) business days' written notice to the other Parties in

accordance with Section 21; *provided*, that such written notice shall be given by the applicable Consenting Creditor within five (5) business days of such amendment, filing, or execution.

(h)     If the Restructuring Transactions are not consummated, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights and the Parties expressly reserve any and all of their respective rights.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

### 7.     Definitive Documents; Good Faith Cooperation; Further Assurances.

(a)     Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and shall exercise commercially reasonable efforts with respect to the pursuit, approval, negotiation, execution, delivery, implementation and consummation of the Plan and the Restructuring, as well as the negotiation, drafting, execution and delivery of the Definitive Documents, which will, after the Support Effective Date, remain subject to negotiation and shall, upon completion, contain terms, conditions, representations, warranties, and covenants consistent in all material respects with the terms of this Agreement (including the Exhibits and Schedules) and be (a) in form and substance reasonably satisfactory to the Catalina Entities and the Requisite First Lien Lenders (except the DIP Orders, DIP Documents, and Exit Documents shall be acceptable to the Requisite First Lien Lenders and the Required DIP Lenders, as applicable) and (b) with respect to the Requisite Second Lien Lenders, subject to the applicable consent right set forth in the definition "Second Lien Lender Consent Right."

(b)     Subject to the terms hereof, each of the Parties shall take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, including making and filing any required regulatory filings, and shall, subject to the Company's "fiduciary out" pursuant to Section 6(c)(ii) of this Agreement, refrain from taking any action that would frustrate the purposes and intent of this Agreement.

(c)     The Parties agree, consistent with clause (a) of this Section 7, to negotiate in good faith the Definitive Documents that are subject to negotiation and completion on the Support Effective Date and that, notwithstanding anything herein to the contrary, the Definitive Documents, including any motions or orders related thereto, shall not be inconsistent with this Agreement and otherwise subject to the applicable consent rights of the Parties set forth herein. The Catalina Parties shall provide to the Consenting Creditor Advisors, and shall direct its employees, officers, advisors, and other representatives to provide the Consenting Creditor Advisors, (i) reasonable access (without any material disruption to the conduct of the Catalina Parties' businesses) during normal business hours to the Catalina Parties' books and records; (ii) reasonable access during normal business hours to the management and advisors of the Catalina Parties; and (iii) reasonable responses to all reasonable diligence requests, in each case, for the purposes of evaluating the Catalina Parties' assets, liabilities, operations, businesses, finances, strategies, prospects, and affairs or entry into any of the Restructuring Transactions.

8.      **Representations and Warranties**.

(a)      Each Party, severally and not jointly, represents and warrants to the other Parties that the following statements are true and correct as of the date hereof (or as of the date a Consenting Creditor becomes a party hereto):

(i)      such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(ii)      the execution, delivery and performance by such Party of this Agreement does not and will not (A) violate any material provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries, or (B) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party except, in the case of the Company, for the filing of the Chapter 11 Cases;

(iii)      the execution, delivery and performance by such Party of this Agreement does not and will not require any material registration or filing with, consent or approval of, or notice to, or other action, with or by, any federal, state or governmental authority or regulatory body, except such filings as may be necessary and/or required by the U.S. Securities and Exchange Commission or other securities regulatory authorities under applicable securities laws; and

(iv)      this Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(b)      Each Consenting Creditor severally (and not jointly) represents and warrants to the Company that, as of the date hereof (or as of the date such Consenting Creditor becomes a party hereto), such Consenting Creditor (i) is the beneficial owner of the principal amount of the Indebtedness set forth on its signature page hereto (or below its name on the signature page of a Joinder Agreement for any Consenting Creditor that becomes a party hereto after the date hereof) and does not beneficially own any other indebtedness, and/or (ii) has, with respect to the beneficial owners of such Indebtedness, (A) sole investment or voting discretion with respect thereto, (B) full power and authority to vote on and consent to matters concerning such Indebtedness or to exchange, assign and transfer such Indebtedness, and (C) full power and authority to bind or act on the behalf of, such beneficial owners.

(c)       Each Consenting Creditor severally (and not jointly) makes the representations and warranties set forth in Section 23(c) hereof, in each case, to the other Parties.

**9.       Disclosure; Publicity**.

The Company shall deliver drafts to Creditor Counsel of any press releases that constitute disclosure of the existence or terms of the Restructuring, this Agreement or any amendment to the terms of the Restructuring or this Agreement at least thirty-six (36) hours prior to making any such disclosure.  Except as required by applicable law or otherwise permitted under the terms of any other agreement between the Company and any Consenting Creditor, no Party or its advisors shall disclose to any person (including, for the avoidance of doubt, any other Party), other than advisors to the Company, the principal amount or percentage of any Indebtedness or any other Claims against, or Interests in, the Company held by any Consenting Creditor, in each case, without such Consenting Creditor's consent; *provided*, *however*, that (i) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall afford the relevant Consenting Creditor a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure (the expense of which, if any, shall be borne by the relevant Consenting Creditor) and (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of First Lien Indebtedness or Second Lien Indebtedness held by all the Consenting Creditors, collectively, on a facility by facility basis.  Any public filing of this Agreement, with the Bankruptcy Court or otherwise, and any version of this Agreement shared with Consenting Creditors generally, shall omit the Indebtedness holdings of each individual Consenting Creditor as set forth on such Consenting Creditor's signature page hereto or shall include such signature page only in redacted form with respect to the Indebtedness holdings of each Consenting Creditor (provided that the Indebtedness holdings on such signature page(s) may be filed in unredacted form with the Bankruptcy Court under seal).

**10.       Amendments and Waivers**.

(a)       Other than as set forth in Section 10(b), this Agreement, including any exhibits or schedules hereto, may not be modified, amended or supplemented or the performance of any obligation thereunder waived except with the written consent of Catalina Parent and the Requisite Creditors (in the case of the Requisite Creditors, such consent not to be unreasonably withheld, conditioned or delayed);

(b)       Notwithstanding Section 10(a):

(i)       any waiver, modification, amendment or supplement to this Section 10 shall require the written consent of all of the Parties;

(ii)       any modification, amendment or change to the definition of "Requisite First Lien Lenders" or "Requisite Second Lien Lender" shall require the written consent of each Consenting Creditor included in such definition; and

(iii)       any change, modification or amendment to this Agreement or the Plan that treats or affects any Consenting Creditor in a manner that is materially and adversely disproportionate, on an economic basis, to the manner in which any of the other Consenting

Creditors are treated (after taking into account each of the Consenting Creditors' respective Claims and Interests and the recoveries contemplated by the Plan (as in effect on the date hereof)) shall require the written consent of such materially adversely and disproportionately affected Consenting Creditor.

(c)    In the event that a materially adversely and disproportionately affected Consenting Creditor ("***Non-Consenting Creditor***") does not consent to a waiver, change, modification or amendment to this Agreement requiring the consent of such Non-Consenting Creditor, but such waiver, change, modification or amendment receives the consent of Consenting Creditors owning at least 66⅔% of the outstanding First Lien Indebtedness or Second Lien Indebtedness (as applicable), this Agreement shall be deemed to have been terminated only as to such Non-Consenting Creditors, but this Agreement shall continue in full force and effect in respect to all other Consenting Creditors.

## 11.    **Effectiveness**.

This Agreement shall become effective and binding upon each Party on the Support Effective Date; *provided*, *however*, that (A) signature pages executed by Consenting Creditors shall be delivered to other Consenting Creditors in a form that does not contain the details of the Consenting Creditors' holdings and (B) the amount of First Lien Indebtedness and Second Lien Indebtedness held by each Consenting Creditor shall be as set forth on such Consenting Creditor's signature page hereto, which shall be delivered to Weil on behalf of the Company and kept strictly confidential by the Company (and to be held by Weil and Creditor Counsel on a professionals' eyes only basis); *provided*, *however*, that the Company may disclose publicly the aggregate principal amounts of First Lien Indebtedness and Second Lien Indebtedness set forth on the signature pages hereto.

## 12.    **GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL**.

(a)    This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York, without giving effect to the conflict of laws principles thereof.

(b)    Each of the Parties irrevocably agrees that any legal action, suit or proceeding arising out of or relating to this Agreement brought by any party or its successors or assigns shall be brought and determined in any federal or state court in the Borough of Manhattan in the City of New York ("***NY Courts***") and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Agreement or the Restructuring Transactions.  Each of the Parties agrees not to commence any proceeding relating hereto or thereto except in the NY Courts other than proceedings in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any NY Courts.  Each of the Parties further agrees that notice as provided herein shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient.  Each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any proceeding arising out of or relating to this Agreement or the Restructuring, (i) any claim that it is not personally subject to the jurisdiction of the NY

Courts for any reason, (ii) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (iii) that (A) the proceeding in any such court is brought in an inconvenient forum, (B) the venue of such proceeding is improper or (C) this Agreement, or the subject matter hereof, may not be enforced in or by such courts. Notwithstanding the foregoing, during the pendency of the Chapter 11 Cases, all proceedings contemplated by this Section 12(b) shall be brought in the Bankruptcy Court.

(c)    EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

### 13.    **Specific Performance/Remedies**.

It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (including attorneys' fees and costs) as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy, including an order of the Bankruptcy Court requiring any Party to comply promptly with any of its obligations hereunder. Each Party also agrees that it will not seek, and will waive any requirement for, the securing or posting of a bond in connection with any Party seeking or obtaining such relief.

### 14.    **Survival**.

Notwithstanding the termination of this Agreement pursuant to Section 6 hereof, the agreements and obligations of the Parties in this Section 14, and Sections 5(a)(viii) (with respect to any fees and expenses described in such clause that are accrued and unpaid through the end of the Support Period), 6(f), 6(i), 9, 12, 13, 16, 17, 18, 19, 20, 21, 22, and 23 hereof (and any defined terms used in any such Sections) shall survive such termination and shall continue in full force and effect in accordance with the terms hereof; *provided*, however, that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

### 15.    **Headings**.

The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

16.    **Successors and Assigns; Severability; Several Obligations**.

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives; *provided*, *however*, that, during the Support Period, nothing contained in this Section 16 shall be deemed to permit Transfers of the Indebtedness or claims arising under the Indebtedness other than in accordance with the express terms of this Agreement. If any provision of this Agreement, or the application of any such provision to any person or entity or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

17.    **Relationship Among Parties**.

Notwithstanding anything herein to the contrary, (i) the duties and obligations of the Parties under this Agreement shall be several, not joint and several; (ii) no Party shall have any responsibility by virtue of this Agreement for any trading by any other entity; (iii) no prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this Agreement; (iv) the Parties hereto acknowledge that this Agreement does not constitute an agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting, or disposing of any equity securities of the Catalina Entities and the Parties do not constitute a "group" within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended; (v) none of the Consenting Creditors shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities in any kind or form to each other, the Catalina Entities or any of the Catalina Entities' other lenders or stakeholders, including as a result of this Agreement or the transactions contemplated herein or in any exhibit hereto; and (vi) no action taken by any Party pursuant to this Agreement shall be deemed to constitute or to create a presumption by any of the Parties that the Parties are in any way acting in concert or as a "group."

18.    **No Third-Party Beneficiaries**.

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary hereof.

19.    **Prior Negotiations; Entire Agreement**.

This Agreement, including the exhibits and schedules hereto (including the Plan Term Sheet), constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof and thereof, except that the Parties acknowledge that any confidentiality agreements (if any) heretofore executed between the Company and each

Consenting Creditor shall continue in full force and effect solely with respect to any then-continuing obligations thereunder.

**20.    Reservation of Rights.**

(a)    Except as expressly provided in this Agreement or the Plan Term Sheet, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of any Party to protect and preserve its rights, remedies and interests, including, without limitation, its claims against any of the other Parties.

(b)    Without limiting clause (a) of this Section 20 in any way, if this Agreement is terminated for any reason, nothing shall be construed herein as a waiver by any Party of any or all of such Party's rights, remedies, claims, and defenses and the Parties expressly reserve any and all of their respective rights, remedies, claims and defenses.  This Agreement, the Plan, and any related document shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever.  Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

(c)    Except as otherwise set forth in this Agreement, the Plan, and any related document, this Agreement, the Plan, and any related document shall in no event be construed to amend, alter, or waive or override any rights, remedies, obligations, claims, or defenses under that certain Second Lien Intercreditor Agreement dated April 4, 2014 by and among PDM Holding Corporation, Checkout Holding Corp., the other Grantors party thereto, JPMorgan Chase Bank N.A., as Senior Representatives for the First Lien Credit Agreement Secured Parties, Bank of America N.A., as the Second Priority Representative for the Second Lien Credit Agreement Secured Parties, and each additional Representative from time to time party thereto.

**21.    Counterparts.**

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Agreement may be delivered by electronic mail or otherwise, which shall be deemed to be an original for the purposes of this paragraph.

**22.    Notices.**

All notices hereunder shall be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, courier or by registered or certified mail (return receipt requested) to the following addresses:

(1)    If to the Company, to:

Catalina Marketing Corporation
200 Carillon Pkwy
St. Petersburg, FL 33716
Attention:   David Glogoff, Esq.
           (david.glogoff@catalina.com)

With a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attention:  Gary T. Holtzer, Esq.
           (gary.holtzer@weil.com)
           Ronit J. Berkovich, Esq.
           (ronit.berkovich@weil.com)
           - and -
           Mariel Cruz, Esq.
           (mariel.cruz@weil.com)


(2)    If to a Consenting First Lien Lender, or a transferee thereof, to the addresses set forth below following the Consenting First Lien Lender's signature (or as directed by any transferee thereof), as the case may be, with copies to:

Jones Day
250 Vesey Street
New York, NY 10281
Attention:  Scott J. Greenberg, Esq.
           (sgreenberg@jonesday.com)


2)    If to a Consenting Second Lien Lender, or a transferee thereof, to the addresses or facsimile numbers set forth below following the Consenting Second Lien Lender's signature (or as directed by any transferee thereof), as the case may be, with copies to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Attention:  Brian S. Hermann, Esq.
           (bhermann@paulweiss.com)
           Robert A. Britton, Esq.
           (rbritton@paulweiss.com)
           - and -
           Dan Youngblut, Esq.
           (dyoungblut@paulweiss.com


    Any notice given by delivery, mail or courier shall be effective when received.  Any notice given by electronic mail shall be effective upon oral, machine or electronic mail (as applicable) confirmation of transmission.

26

23.    **No Solicitation; Representation by Counsel; Adequate Information**.

(a)    This Agreement is not and shall not be deemed to be a solicitation for votes in favor of the Plan in the Chapter 11 Cases from the Consenting Creditors. The acceptances of the Consenting Creditors with respect to the Plan will not be solicited until such Consenting Creditors have received the Disclosure Statement and related ballots and solicitation materials.

(b)    Each Party acknowledges that it has had an opportunity to receive information from the Company and that it has been represented by counsel in connection with this Agreement and the transactions contemplated hereby. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

(c)    Each Consenting Creditor acknowledges, agrees and represents to the other Parties that it (i) is a "qualified institutional buyer" as such term is defined in Rule 144A of the Securities Act or a non-US person participating in the offering outside the United States in reliance on Regulation S under the Securities Act, (ii) is an "accredited investor" as such term is defined in Rule 501 of Regulation D of the Securities Act, (iii) understands that if it is to acquire any securities, as defined in the Securities Act, pursuant to the Restructuring, such securities have not been registered under the Securities Act and that such securities are, to the extent not acquired pursuant to section 1145 of the Bankruptcy Code, being offered and sold pursuant to an exemption from registration contained in the Securities Act, based in part upon such Consenting Creditor's representations contained in this Agreement and cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available and (iv) has such knowledge and experience in financial and business matters that such Consenting Creditor is capable of evaluating the merits and risks of the securities to be acquired by it (if any) pursuant to the Restructuring and understands and is able to bear any economic risks with such investment.

24.    **Other Support Agreements.**

During the Support Period, no Catalina Party shall enter into any other restructuring support agreement related to a partial or total restructuring of the Catalina Entities unless such support agreement is consistent in all respects with the Plan Term Sheet and is reasonably acceptable to the Requisite Creditors.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

## CATALINA PARTIES

PDM Group Holdings Corporation


By:_____
    Name:
    Title:


Catalina Marketing Corporation

By:_____
    Name:
    Title:


Catalina Marketing Procurement

By:_____
    Name:
    Title:


Catalina Marketing Technology Solutions, Inc.

By:_____
    Name:
    Title:


Catalina Marketing Worldwide, LLC

By:_____
    Name:
    Title:

Cellfire Inc.

By:_____
    Name:
    Title:


Modiv Media, Inc.

By:_____
    Name:
    Title:


Checkout Holding Corp.

By:_____
    Name:
    Title:


PDM Holdings Corporation

By:_____
    Name:
    Title:


PDM Intermediate Holdings A Corporation

By:_____
    Name:
    Title:


PDM Intermediate Holdings B Corporation

By:_____
    Name:
    Title:

**<u>CONSENTING FIRST LIEN LENDER</u>**

[•]

By: [•]

Name: [•]

Title: [•]


Principal Amount of First Lien Indebtedness:  $_____

Principal Amount of Second Lien Indebtedness:  $_____

Principal Amount of Other Indebtedness:  $_____


<u>Notice Address</u>:
[•]



Attention: [•]
Email: [•]

**CONSENTING SECOND LIEN LENDER**

[•]

By: [•]

Name: [•]

Title: [•]


Principal Amount of First Lien Indebtedness:  $_____

Principal Amount of Second Lien Indebtedness:  $_____

Principal Amount of Other Indebtedness:  $_____


Notice Address:
[•]



Attention: [•]
Email: [•]

## EXHIBIT A

**Plan Term Sheet**

*Execution Version*

# PROJECT CARMEL
**Restructuring Term Sheet[1]**

| Key Terms | |
|---|---|
| **DIP and Exit Financing** | |
| DIP Facility | • $125mm new money DIP commitment to be provided by the Ad Hoc First Lien Group and other participating First Lien Lenders (or affiliates thereof) plus $150mm roll-up of prepetition RCF and 1L Term Loan<br>• New money portion of the DIP secured by first-priority lien on unencumbered assets and priming first-priority lien on assets encumbered by 1L Term Loan<br>   ○ To include (i) a pledge of (x) the NCS JV (prior to entry of the final DIP order) and (y) the unencumbered equity of first-tier foreign subsidiaries, and (ii) a negative pledge of the equity and/or assets of downstream foreign subsidiaries<br>• Roll-up portion of the DIP Facility secured by priming first-priority lien on assets encumbered by the RCF and 1L Term Loan, and subject to entry of the final DIP Order<br>• DIP Facility to roll into exit facility upon emergence from bankruptcy pursuant to the Plan (and all exhibits thereto and plan supplements) and Confirmation Order acceptable to DIP Lenders (see below) |
| Exit Facility | • Incremental $40mm new money delayed draw Exit Facility ("New Money Exit Facility") to be provided by the Ad Hoc First Lien Group and the other First Lien Lenders participating as DIP Lenders under the DIP Facility, which New Money Exit Facility shall be part of (and on the same terms as) the FLFO (see below). This Exit Facility, along with the DIP Facility that will roll into an Exit Facility, will be the reorganized Company's only funded or take-back debt on the Effective Date. |
| **Treatment of Claims** | |
| DIP Claims (New Money) | • New money portion of the DIP Facility to roll into a first lien first-out exit facility ("FLFO") upon the Effective Date. FLFO terms:<br>   ○ Interest Rate: L + 750 bps cash pay (100 bps LIBOR floor)<br>   ○ Tenor: 4.0 years from emergence<br>   ○ Amortization: 1.0% per annum<br>   ○ Collateral: First lien first-out on existing RCF and 1L Term Loan collateral, plus additional collateral subject to legal, tax, and other diligence<br>   ○ Maintenance Covenants: Maximum Leverage and Maximum Capital Expenditures at levels TBD; Minimum Liquidity of $25mm[2]<br>   ○ Negative Covenants: To be negotiated; to include debt and lien covenants<br>   ○ Mandatory Prepayments: Customary, including for asset sales and excess cash flow<br>   ○ Call Protection: NC1 / 103 / 101 |
| DIP Claims (Roll-Up) | • DIP claims attributable to the roll-up portion of the DIP Facility to roll into a first lien last-out exit facility ("FLLO") upon emergence from bankruptcy. FLLO terms:<br>   ○ Size: $150mm, plus accrued PIK interest capitalized on the Effective Date<br>   ○ Interest Rate: L+100 bps cash pay, plus 950 bps PIK (100 bps LIBOR floor)<br>   ○ Tenor: 4.5 years from emergence<br>   ○ Amortization: None<br>   ○ Collateral: First lien last-out on existing RCF and 1L Term Loan collateral, plus additional collateral subject to legal, tax, and other diligence<br>   ○ Maintenance Covenants: TBD<br>   ○ Call Protection: NC1.5 / 104 / 102 |
| 1L Claims | • Remaining prepetition RCF and 1L Term Loan to receive 90% of the equity in the reorganized Company (the "New Common Stock"), subject to dilution from the MIP (as defined below) |

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Restructuring Support Agreement ("RSA") to which this term sheet is appended to the extent so defined therein.

[2] Liquidity to be calculated as the sum of domestic and foreign cash balances (excludes undrawn commitments under the Exit Facility).

| 2L Claims | • Holders of 2L Claims shall receive 10% of the New Common Stock, subject to dilution from the MIP, on account of their structurally senior claims at CellFire Inc., Modiv Media, Inc., Catalina Marketing Procurement, LLC, Catalina Electronic Clearing Services, Inc., Catalina Marketing Loyalty Holdings Inc., Catalina Digital Holdings, LLC, Catalina Marketing Technology Solutions, Inc., and Catalina Marketing Worldwide, LLC. |
|---|---|
| OpCo GUCs | • If the Restructuring is consummated pursuant to a prepackaged chapter 11 plan of reorganization, holders of general unsecured claims against Catalina Marketing Corporation, other than OpCo rejection damages claims, shall receive payment in full in cash, reinstatement of such Claims, or such other treatment that leaves such Claims unimpaired<br>• If the Restructuring is not consummated pursuant to a prepackaged plan of reorganization, holders of general unsecured claims against Catalina Marketing Corporation shall receive distributions with a value not to exceed the amount required by Section 1129(a)(7)(A)(ii) of the Bankruptcy Code[3] |
| OpCo Rejection Damages Claims | • Rejection damage claims (including any claims resulting from the rejection of the NCS JV Agreements) shall receive no distribution under the plan |
| HoldCo GUCs | • Allowed general unsecured claims (including notes issued by PDM Intermediate Holdings B Corporation) against PDM Intermediate Holdings B Corporation to receive no recovery |
| Existing Equity Claims | • Equity interests extinguished; no recovery |
| **Other Restructuring Terms** | |
| New Money Exit Facility | • Incremental $40mm new money delayed draw Exit Facility commitment to be provided by the Ad Hoc First Lien Group and the other First Lien Lenders participating as DIP lenders under the DIP Facility, which New Money Exit Facility shall be part of (and on the same terms as) the FLFO<br>• Facility available to be drawn up to 18 months following the emergence date, subject to TBD draw conditions<br>• The incremental delayed draw Exit Facility commitment shall be subject to the following fees:<br>  o 4.0% of commitment amount payable to the Backstop Parties at closing (expected to be simultaneous with DIP), in cash<br>  o 2.0% of commitment amount payable to funding parties at funding, in cash<br>  o 500 bps per annum ticking fee payable monthly from closing through funding, in cash |
| Management Incentive Plan | • Up to an amount of New Common Stock to be determined by the Ad Hoc First Lien Group (which shall not exceed 10% of the New Common Stock) will be reserved for awards of fully diluted equity, options or other instruments at plan value for a management incentive plan ("MIP") (including any such equity, options or other instruments granted to the new Board of Directors) on terms TBD by the new Board of Directors |
| Releases | • Customary, including in favor of the Company, the Company's management, the Board, the First Lien Lenders and Second Lien Lenders party to the RSA, the DIP Lenders, and the Agents, and each of their affiliates and each of their and their affiliates' lawyers, investment bankers, officers, directors, employees, representatives, other professionals, and agents; *provided* that the Consenting Creditors shall not be required to grant a release to the owners of equity interests in the ultimate parent of the Catalina Entities. |
| Governance | • Number and identity of new directors of Board of Directors of reorganized Catalina to be determined by the Ad Hoc First Lien Group<br>• Other terms TBD |
| Treatment of NCS | • NCS JV Agreements amended on terms or rejected pursuant to an order providing relief, in each case, satisfactory to the DIP Lenders/Ad Hoc First Lien Group and the Company and, solely to the extent such amendment or order reduces the percentage of New Common Stock to be provided to, or otherwise materially adversely affects recoveries of, the Second Lien Lenders under the Plan as set forth in this Plan Term Sheet, the Requisite Second Lien Lenders; *provided that*, a loss of revenue or a reduction in total enterprise value resulting from the rejection of any such NCS JV Agreements shall not be deemed to materially adversely affect the recoveries of the Second Lien Lenders under the Plan as set forth in this Plan Term Sheet; timing in accordance with Case Milestones (see below) |
| Executory Contracts | • The Plan will provide for the assumption of certain executory contracts (as determined by the Ad Hoc First Lien Group) and payment of undisputed cure amounts in respect thereof in full upon the Effective Date |
| Conditions | • Company to emerge with a minimum of $40mm of liquidity[4] |

---

[3] NTD: To be deleted in the event prepackaged plan is solicited.

| | |
|---|---|
| Precedent to Emergence | • Other conditions TBD, including satisfactory amendment of NCS JV Agreements |
| Professional Fees | • The Plan shall provide for the payment in full of all professional fees of PW, PJT, Jones Day, Evercore, WilmerHale, Davis Polk, and local counsel for each of the First Lien Ad Hoc Group, Second Lien Ad Hoc Group, and the Agents (if any) |
| Limitations on Equity | • Except as specifically set forth herein and in the MIP (with respect to the New Common Stock reserved for the MIP in accordance with the terms of this Plan Term Sheet), the Plan shall not provide for the issuance of any New Common Stock, any other classes of common stock, preferred stock, warrants, options, restricted stock units, or other instruments or securities exercisable or convertible into New Common Stock |
| **DIP Financing Terms** | |
| Borrower | • Checkout Holding Corp. |
| Guarantors | • All existing loan parties other than the Borrower, and any other debtors (collectively, the "Debtors") in the chapter 11 case filed in the U.S. Bankruptcy Court for the District of Delaware (the "Chapter 11 Case") |
| Administrative Agent | • [JPMorgan Chase Bank, N.A.] |
| Lenders | • Members of the Ad Hoc First Lien Group and other First Lien Lenders (including RCF lenders) party to RSA (or affiliates thereof) |
| Backstop Parties | • Members of the Ad Hoc First Lien Group (or affiliates thereof) |
| Amount | • Up to $125mm DIP financing available<br>  ○ $[40]mm funded at closing for filing-related costs and cash to the balance sheet<br>  ○ Incremental $[85]mm funded upon entry of a final DIP order<br>  ○ $150mm of 1L Loans of DIP Lenders (or affiliates thereof) that have executed the RSA and committed to fund the new money portion of the Exit Facility shall be rolled up into the DIP roll-up tranche upon entry of a final DIP order<br>  ○ Joint and several superpriority administrative claim against the Borrower and each Guarantor |
| Security | • New money portion of the DIP Facility secured by first-priority lien on unencumbered assets and priming first-priority lien on assets encumbered by 1L Term Loan<br>  ○ To include (i) a pledge of (x) the NCS JV (prior to entry of the final DIP order) and (y) the unencumbered equity of first-tier foreign subsidiaries, and (ii) a negative pledge of the equity and/or assets of downstream foreign subsidiaries<br>  ○ To include customary carve-out for professional fees and UST fees<br>• Roll-up portion of the DIP Facility secured by priming first-priority lien on assets encumbered by the RCF and 1L Term Loan |
| Use of Proceeds | • Incremental liquidity purposes during the Chapter 11 Case, subject to the budget agreed to by DIP Lenders |
| Maturity | • Earlier of six months post-petition, conversion / dismissal of cases, closing of sale of substantially all assets, acceleration of loan, and the Effective Date |
| Interest Rate | • New money drawn amounts: L + 1,000 bps, in cash (100 bps LIBOR floor)<br>• New money undrawn amounts: 500 bps per annum ticking fee, in cash<br>• Roll-up amounts: L + 550 bps PIK (100 bps LIBOR floor)<br>• Interest and fees payable monthly |
| Payments (New Money) | • 4.0% of commitment amount payable to the backstop parties at closing, in cash<br>• 2.0% of commitment amount payable to funding parties at funding, in cash |
| Lender Protections | • To include waiver of section 506(c) surcharge and section 552(b) "equities of case" exception for benefit of DIP and 1L secured parties; no marshaling |
| Waterfall | • DIP loans to be repaid first from unencumbered collateral and then from encumbered collateral; for the avoidance of doubt, in the event the Debtors propose or pursue an alternative chapter 11 plan other than the Plan (as defined in the RSA) that is not supported by the Ad Hoc Second Lien Group, the |

---

4 Liquidity to be calculated as the sum of domestic and foreign cash balances (excludes undrawn commitments under the Exit Facility)

| | |
|---|---|
| | respective rights of the DIP Lenders, Ad Hoc First Lien Group, and Ad Hoc Second Lien Group in connection with value allocation and distribution issues under such alternative chapter 11 plan shall be fully preserved notwithstanding anything herein, in the RSA, or in any order of the Bankruptcy Court |
| 1L Adequate Protection | • Replacement liens on unencumbered assets and existing 1L pre- and post-petition collateral, superpriority claim and payment of fees and expenses of the Ad Hoc First Lien Group |
| Covenants | • Minimum liquidity of $25mm at all times[5]<br>• Cumulative operating cash flow variance of TBD%, tested on a rolling two-week basis with a new budget issued every two weeks<br>• Minimum rolling LTM EBITDA of $TBD, tested monthly[6]<br>• Usual and other customary covenants |
| Reporting | • Bi-weekly update call with Company management<br>• Weekly 13-week cash flow forecast<br>• Weekly DIP budget variance report<br>• Monthly management package consistent with the monthly performance updates included in the blowout materials |
| Case Milestones | • Compliance with milestones and related documents and orders shall be in form and substance acceptable to the DIP Lenders, including, but not limited to:<br>  ○ Entry of an interim DIP order no later than 5 days after the Petition Date<br>  ○ Entry of the final DIP order no later than 40 days after the Petition Date<br>  ○ Amendment of the NCS JV Agreements or the Debtors' filing of a motion seeking entry of an order rejecting the NCS JV Agreements no later than 30 days after the Petition Date<br>  ○ Approval of a Disclosure Statement no later than 85 days after the Petition Date<br>  ○ Amendment of the NCS JV Agreements or entry of an order rejecting the NCS JV Agreements no later than 85 days after the Petition Date<br>  ○ Confirmation of a Plan no later than 125 days after the Petition Date |
| Conditions Precedent for DIP Facility | • Usual and customary for DIP facilities of this type, including, but not limited to:<br>  ○ Receipt of an acceptable DIP budget<br>  ○ Receipt of latest 13-week cash flow forecast<br>  ○ Before entry of final order, rating of the facility by both Moody's and S&P (the ratings need not be publicly announced)<br>  ○ Entry of an interim order by the Bankruptcy Court authorizing the DIP Facility to be followed by a final order by the Bankruptcy Court in substantially the same form, in each case, in form and substance acceptable to the DIP Lenders<br>• Second and final draw under the DIP Facility shall be conditioned upon, among other things, (i) amendment of the NCS JV Agreements in form and substance acceptable to the DIP Lenders or (ii) if the NCS JV Agreements are not amended in form and substance acceptable to the DIP Lenders, the Debtors' filing of a motion to reject the NCS JV Agreements pursuant to an order satisfactory to the DIP Lenders |
| DIP Party Fees | • Payment of all reasonable and documented fees and expenses of Jones Day, Evercore, and local counsel as advisors to the DIP Lenders and Paul Weiss, PJT, and applicable local counsel as advisors to certain DIP Lenders |
| **Exit Facility Financing Terms** | |
| Borrower | • Checkout Holding Corp. and/or any entity formed to hold any newly issued equity in respect of the Debtors or any assets transferred therefrom upon its emergence from the Chapter 11 Case |
| Guarantors | • All existing loan parties other than the Borrower, and any other Debtors (which shall include reorganized entities of the foregoing, and each existing and future direct and indirect domestic subsidiary of the Borrower) |
| Administrative Agent | • [JPMorgan Chase Bank, N.A.] |
| Lenders | • Members of the Ad Hoc First Lien Group and other First Lien Lenders (including RCF lenders) party to RSA and to the DIP Facility as DIP Lenders |

---

[5] Liquidity to be calculated as the sum of domestic and foreign cash balances (excludes undrawn commitments under the Exit Facility)
[6] Company to provide monthly EBITDA actuals for covenant calculation

| Backstop Parties | • Members of the Ad Hoc First Lien Group |
|---|---|
| Amount | • Exit Facility comprised of up to (x) $125mm in respect of the FLFO financing, (y) up to $40mm of New Money Exit Facility available to be drawn up to 18 months following the emergence date and (z) up to $150mm plus accrued PIK interest under the roll-up portion of the DIP Facility. |
| Security | • Subject to the waterfall below, to be secured by a first-priority lien on substantially all assets of Borrower and each Guarantor subject to legal, tax, and other diligence<br>   o To include (i) a pledge of (x) the NCS JV (to the extent such JV interest is owned by the Reorganized Debtors) and (y) the unencumbered equity of first-tier foreign subsidiaries, and (ii) a negative pledge of the equity and/or assets of downstream foreign subsidiaries |
| Waterfall | • FLFO and New Money Exit Facility loans to be repaid first from collateral on a pro rata basis until paid in full and then FLLO loans will be repaid from collateral |
| Use of Proceeds | • Ongoing liquidity and other general corporate purposes |
| Maturity | • FLFO and New Money Exit Facility: Four years after the date of emergence from the Chapter 11 Case<br>• FLLO: 4.5 years after the date of emergence from the Chapter 11 Case |
| Interest Rate | • FLFO and New Money Exit Facility: L + 750 bps cash pay (100 bps LIBOR floor)<br>• FLLO amounts: L+100 bps cash pay, plus 950 bps PIK (100 bps LIBOR floor) |
| Amortization | • FLFO and New Money Exit Facility: 1.0% per annum<br>• FLLO: none |
| Mandatory Prepayments | • Customary, including for asset sales and excess cash flow |
| Call Protection | • FLFO and New Money Exit Facility: NC1 / 103 / 101<br>• FLLO: NC1.5 / 104 / 102 |
| Payments (Exit New Money) | • 4.0% of commitment amount payable to the backstop parties at closing (expected to be simultaneous with DIP), in cash<br>• 2.0% of commitment amount payable to funding parties at funding, in cash<br>• 500 bps per annum ticking fee payable monthly from closing through funding, in cash |
| Covenants | • FLFO and New Money Exit Facility: Maximum Leverage and Maximum Capital Expenditures at levels TBD<br>• FLFO and New Money Exit Facility: Minimum Liquidity of $25mm<br>• FLLO: maintenance covenants TBD<br>• Usual and other customary covenants<br>• Negative Covenants: To be negotiated; to include debt and lien covenants |
| Reporting | • Usual and other customary reporting to be negotiated |
| Conditions Precedent for Exit Facility | • Usual and customary for exit facilities of this type, including, but not limited to:<br>• Confirmation of a Plan and emergence from the Chapter 11 Case with a minimum of $40mm of liquidity[7]<br>• Other conditions TBD, including satisfactory amendment, or entry of order approving rejection (which may be the Confirmation Order), as applicable, of NCS JV Agreements |

---

[7] Liquidity to be calculated as the sum of domestic and foreign cash balances (excludes undrawn commitments under the Exit Facility)

## EXHIBIT B

### FORM OF JOINDER AGREEMENT FOR CONSENTING CREDITORS

This Joinder Agreement to the Restructuring Support Agreement, dated as of December 11, 2018 (as amended, supplemented or otherwise modified from time to time, the "***Agreement***"), by and among the Company and the Consenting Creditors is executed and delivered by [●] (the "***Joining Party***") as of [●]. Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1. <u>Agreement to be Bound</u>. The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as **Annex I** (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions thereof). The Joining Party shall hereafter be deemed to be a "Consenting Creditor" and a "Party" for all purposes under the Agreement and with respect to any and all Claims held by such Joining Party.

2. <u>Representations and Warranties</u>. With respect to the aggregate principal amount of First Lien Indebtedness and Second Lien Indebtedness, in each case, set forth below its name on the signature page hereto, the Joining Party hereby makes the representations and warranties of the Consenting Creditors set forth in <u>Section 8</u> of the Agreement to each other Party to the Agreement.

3. <u>Governing Law</u>. This Joinder Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflict of laws provisions which would require the application of the law of any other jurisdiction.

[Signature Page Follows]

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

**CONSENTING CREDITOR**


By:_____
Name:
Title:


Principal Amount of First Lien Indebtedness:  $_____

Principal Amount of Second Lien Indebtedness:  $_____

Principal Amount of Other Indebtedness:  $_____


Notice Address:
[•]



Attention: [•]
Email: [•]


Acknowledged:

**[•]**

By:_____
Name:
Title:

**<u>Exhibit C</u>**

**Liquidation Analysis**

## LIQUIDATION ANALYSIS FOR CHECKOUT HOLDING CORP.

### I.  Best Interests Test

Under the "best interests" of creditors test set forth in section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court may not confirm a chapter 11 plan  unless each holder of a claim or interest either (i) accepts the plan,  or (ii) receives or retains under the plan property of a value, as of the effective date, that is not less than the value such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on the effective date.  *See* 11 U.S.C. § 1129(a)(7).  Accordingly, to demonstrate that the Plan satisfies the "best interests" of creditors test, the Debtors have prepared the following hypothetical liquidation analysis (the "**Liquidation Analysis**") based upon certain assumptions discussed in the Disclosure Statement and in the accompanying notes to the Liquidation Analysis (the "**Notes**"). Capitalized terms not defined in the Notes shall have the meanings ascribed to them in the Plan and the Disclosure Statement, as applicable.

The Liquidation Analysis estimates potential cash distributions to holders of Allowed Claims in a hypothetical chapter 7 liquidation of the Debtors' assets (the "**Assets**").  Asset values discussed in the Liquidation Analysis may differ materially from values referred to in the Plan and Disclosure Statement. The Debtors prepared the Liquidation Analysis with the assistance of their financial and legal advisors.

The Debtors believe that their creditors will receive at least as much, and likely significantly more, under the Plan than they would receive in a chapter 7 liquidation of the Assets for the following reasons, among others:  (i) the likely discounts that would be realized on the value of the Assets in a chapter 7 liquidation, (ii) the incremental claims that would be triggered in a chapter 7 bankruptcy, and (iii) the fees payable to a chapter 7 trustee and newly appointed estate professionals.

### II.  Approach and Purpose of the Liquidation Analysis

The determination of the costs of, and proceeds from, the hypothetical liquidation of the Assets in a chapter 7 case is an uncertain process involving significant estimates and assumptions that, although considered reasonable by the Debtors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management and their advisors.  The Liquidation Analysis is also based on the Debtors' best judgment of how numerous decisions in the liquidation process would be resolved.  Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could materially affect the ultimate results in an actual chapter 7 liquidation.  In addition, the Debtors' management cannot judge with any degree of certainty the recovery that may result from asset sales in a chapter 7 liquidation.  The Liquidation Analysis was prepared for the sole purpose of generating a reasonable good faith estimate of the proceeds that would be generated if the Debtors were liquidated in accordance with chapter 7 of the Bankruptcy Code. The Liquidation Analysis is not intended, and should not be used, for any other purpose.

All of the limitations and risk factors set forth in the Disclosure Statement are applicable to this Liquidation Analysis and are incorporated by reference herein.  In particular, the underlying financial information in the Liquidation Analysis was not compiled or examined by any independent accountants in accordance with the standards promulgated by the American Institute of Certified Public Accountants. No independent appraisals were conducted in preparing the Liquidation Analysis. NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATIONS OR WARRANTIES THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS.  ACTUAL RESULTS COULD VARY MATERIALLY.

In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims based upon the Debtors' latest financial projections and review of liabilities in the Debtors' books and records. The Liquidation Analysis includes estimates for Claims that could be asserted and Allowed in a chapter 7 liquidation, including equipment recovery and disposal, wind down costs, trustee and professional fees required to facilitate disposition of certain assets in a value maximizing manner. The Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied upon for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims under the Plan. NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM BY THE DEBTORS. THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THE LIQUIDATION ANALYSIS. THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE ANALYSIS SET FORTH HEREIN.

## III. Global Assumptions

The Liquidation Analysis should be read in conjunction with the following global notes and assumptions:

### a) Conversion Date and Appointment of a Chapter 7 Trustee

The Liquidation Analysis assumes conversion of the Debtors' Chapter 11 Cases to chapter 7 liquidation cases on or about January 30, 2019 (the "**Conversion Date**"). On the Conversion Date, it is assumed that the Bankruptcy Court would appoint one chapter 7 trustee (the "**Trustee**") to oversee the liquidation of the Estates. Should multiple Trustees be appointed to administer the Estates, lower recoveries and higher administrative costs could result and distributions to creditors could be delayed. The basis of the Liquidation Analysis is the Debtors' projected cash balance and assets as of the Conversion Date and the net costs to execute the administration of the wind down of the Estates. The Liquidation Analysis reflects the wind down and liquidation of substantially all of the Debtors' remaining assets and the distribution of available proceeds to Holders of Allowed Claims during the period after the Conversion Date. The European and Japanese businesses cannot be sold as going-concern companies and are assumed to be liquidated as of the Conversion Date. All local obligations are assumed to be satisfied prior to cash distributions for Intercompany notes or any equity flow to the Domestic entity.

### b) Chapter 7 Process

On the Conversion Date, it is assumed that the Trustee would conduct the liquidation of the Estates, during which time all of the Debtors' assets would be sold or surrendered to the respective lien holders, and the cash proceeds, net of liquidation-related costs, would then be distributed to creditors in accordance with the priority scheme under section 726 of the Bankruptcy Code. Under section 704 of the Bankruptcy Code, a Trustee must, among other duties, collect and convert property of the Estates as expeditiously as is compatible with the best interests of parties in interest, which could result in potentially distressed recoveries.

The liquidation of the Debtors' U.S. assets is assumed to be completed over a six-month period. To maximize value of the Estates, the Trustee is assumed to maintain the staff required to support the sale and transition of assets over a 6-month period, including the processing and management of documentation requirements to maximize recovery of proceeds held back from asset sales. Non-essential employees are assumed to be terminated immediately with only the minimum staff required to conduct the liquidation remaining. An expedited process is expected to result in materially less recovery to the Estates.

**c)  Claims Estimates**

In preparing the Liquidation Analysis, the Debtors have preliminarily estimated an amount of Allowed Claims for each Class based upon a review of the Debtors' consolidating balance sheets.  Additional Claims were estimated to include certain chapter 7 administrative obligations incurred after the Conversion Date.  No order or finding has been entered or made by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the Liquidation Analysis.  The estimate of the amount of Allowed Claims set forth in the Liquidation Analysis should not be relied upon for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims under the Plan.  The actual amount of Allowed Claims could be materially different from the amount of Claims estimated in the Liquidation Analysis.

**d)  Avoidance Actions**

No recovery or related litigation costs attributable to any potential avoidance actions under the Bankruptcy Code, including potential preference or fraudulent transfer actions, are assumed within the Liquidation Analysis.

**e)  Litigation**

The Liquidation Analysis does not consider any recovery or claims that may arise from the outcome of current or potential actions by or against the Debtors.

**IV.  Conclusion**

The Debtors have determined that confirmation of the Plan will provide creditors and interest holders with a recovery that is not less than what they would otherwise receive in connection with a hypothetical liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

**Catalina Marketing**
**Illustrative Liquidation Analysis - Domestic**

| ($ millions USD) | Balance | Recovery Estimate, % Low | Recovery Estimate, % High | Recovery Estimate, $ Low | Recovery Estimate, $ High |
|---|---|---|---|---|---|
| **Local Assets** | | | | | |
| Cash and Cash Equivalents | $ 98.4 | | | | |
| Less: Post-Carve Out Trigger Notice Account | (7.0) | | | | |
| Less: Restricted Cash | (5.3) | | | | |
| **Distributable Cash** | $ 86.1 | 100.0% | 100.0% | $ 86.1 | $ 86.1 |
| Accounts Receivable, net | 92.2 | 37.7% | 50.2% | 34.8 | 46.3 |
| Less: Deferred Revenue | (9.5) | | | (9.5) | (9.5) |
| **Accounts Receivable** | $ 82.8 | 30.6% | 44.5% | $ 25.3 | $ 36.8 |
| Deferred Tax Asset | (1.3) | 0.0% | 0.0% | - | - |
| Other Current Assets | 14.4 | 2.0% | 5.0% | 0.3 | 0.7 |
| **Total Other Current Assets** | $ 13.2 | | | $ 0.3 | $ 0.7 |
| Store Equipment | 33.0 | 0.0% | 3.0% | - | 1.0 |
| Furniture and Office Equipment | 9.4 | 5.0% | 15.0% | 0.5 | 1.4 |
| Building | 39.7 | 40.0% | 60.0% | 15.9 | 23.8 |
| Building and Other Improvements | 3.8 | 0.0% | 0.0% | - | - |
| Software | 31.2 | 0.0% | 0.0% | - | - |
| Land | 2.9 | 50.0% | 100.0% | 1.5 | 2.9 |
| Property and Equipment, net of D&A | $ 120.0 | | | $ 17.8 | $ 29.1 |
| Long Term Deferred Tax Asset | 0.8 | 0.0% | 0.0% | - | - |
| Intangibles- Net | 821.2 | 0.3% | 0.8% | 2.1 | 6.2 |
| Goodwill | 575.7 | 0.0% | 0.0% | - | - |
| Prepaid - Financing Fees - Long Term | 0.0 | 0.0% | 0.0% | - | - |
| Deposits | 0.8 | 0.0% | 0.0% | - | - |
| Other Long Term Assets | - | 0.0% | 0.0% | - | - |
| Investments In Subsidiaries | 0.0 | 0.0% | 0.0% | - | - |
| Investments In Joint Ventures | 117.2 | 0.0% | 0.0% | - | - |
| **Total Other** | $ 1,515.8 | | | $ 2.1 | $ 6.2 |
| Domestic Distributable Assets | | | | $ 131.5 | $ 158.9 |
| Plus: Inflow from Intercompany Notes | | | | - | - |
| Plus: Equity Inflow from Europe/Japan | | | | - | - |
| **Total Distributable Assets** | | | | $ 131.5 | $ 158.9 |

| Liquidation Costs | % of Proceeds Low | % of Proceeds High | Cost, $ Low | Cost, $ High | Remaining Value Low | Remaining Value High |
|---|---|---|---|---|---|---|
| Accrued Employee Claims & WARN Impact | | | 10.6 | 10.6 | $ 131.5 | $ 158.9 |
| 503(b)(9) Claims | | | 0.5 | 0.5 | | |
| Chapter 7 Wind Down Team Costs | | | 1.3 | 1.3 | | |
| Non-Payroll Overhead | | | 3.4 | 3.4 | | |
| Equipment Recovery & Disposal | | | 10.0 | 5.0 | | |
| Transaction Costs and Brokerage Fees | 10.0% | 5.0% | 2.0 | 1.8 | | |
| Professional Fees | | | 14.7 | 14.7 | | |
| Less: Post-Carve Out Trigger Notice Account | | | (7.0) | (7.0) | | |
| **Total Liquidation Costs** | | | $ 35.5 | $ 30.2 | | |
| Recovery, $ | | | $ 35.5 | 30.2 | (35.5) | (30.2) |
| Recovery, % | | | 100.0% | 100.0% | $ 96.1 | $ 128.7 |
| **Secured Debt** | | | | | | |
| DIP Claim | | | $ 275.0 | $ 275.0 | | |
| Recovery, $ | | | $ 96.1 | $ 128.7 | (96.1) | (128.7) |
| Recovery, % | | | 34.9% | 46.8% | $ - | $ - |
| First Lien Debt Claim | | | $ 925.4 | $ 925.4 | | |
| Recovery, $ | | | $ - | $ - | - | - |
| Recovery, % | | | 0.0% | 0.0% | $ - | $ - |
| Second Lien Debt Claim | | | $ 471.9 | $ 471.9 | | |
| Recovery, $ | | | $ - | $ - | - | - |
| Recovery, % | | | 0.0% | 0.0% | $ - | $ - |
| **General Unsecured Claims** | | | | | | |
| DIP Claim | | | $ 178.9 | $ 146.3 | | |
| First Lien Debt Claim | | | 925.4 | 925.4 | | |
| Second Lien Debt Claim | | | 471.9 | 471.9 | | |
| Contract Rejection Claims | | | - | - | | |
| Trade & Other General Unsecured | | | 9.5 | 9.5 | | |
| **Total General Unsecured Claims** | | | $ 1,585.7 | $ 1,553.1 | | |
| Recovery, $ | | | $ - | $ - | - | - |
| Recovery, % | | | 0.0% | 0.0% | $ - | $ - |
| **PDM Holdings Claim** | | | | | | |
| HoldCo Notes | | | $ 383.9 | $ 383.9 | | |
| Recovery, $ | | | $ - | $ - | - | - |
| Recovery, % | | | 0.0% | 0.0% | $ - | $ - |
| **Equity** | | | | | | |
| **Total Equity Recovery, $** | | | $ - | $ - | | |

**Catalina Marketing**
**Illustrative Liquidation Analysis - Europe**

| ($ millions USD) | Balance | Recovery Estimate, % Low | Recovery Estimate, % High | Recovery Estimate, $ Low | Recovery Estimate, $ High |
|---|---|---|---|---|---|
| **Local Assets** | | | | | |
| Cash and Cash Equivalents | $ 10.7 | | | | |
| Less: Restricted Cash | (1.2) | | | | |
| **Distributable Cash** | $ 9.5 | 100.0% | 100.0% | $ 9.5 | $ 9.5 |
| Accounts Receivable, net | 34.0 | 45.2% | 59.7% | 15.3 | 20.3 |
| Less: Deferred Revenue | (1.6) | | | (1.6) | (1.6) |
| **Accounts Receivable** | $ 32.4 | 42.5% | 57.7% | $ 13.7 | $ 18.7 |
| Deferred Tax Asset | 1.2 | 0.0% | 0.0% | - | - |
| Other Current Assets | 2.7 | 2.0% | 5.0% | 0.1 | 0.1 |
| **Total Other Current Assets** | $ 3.9 | | | $ 0.1 | $ 0.1 |
| Store Equipment | 16.3 | 0.0% | 3.0% | - | 0.5 |
| Furniture and Office Equipment | 1.2 | 5.0% | 15.0% | 0.1 | 0.2 |
| Building | - | 40.0% | 60.0% | - | - |
| Building and Other Improvements | 0.8 | 0.0% | 0.0% | - | - |
| Software | 1.6 | 0.0% | 0.0% | - | - |
| Land | - | 50.0% | 100.0% | - | - |
| **Property and Equipment, net of D&A** | $ 19.9 | | | $ 0.1 | $ 0.7 |
| Long Term Deferred Tax Asset | - | 0.0% | 0.0% | - | - |
| Intangibles- Net | - | 0.0% | 0.0% | - | - |
| Goodwill | (11.3) | 0.0% | 0.0% | - | - |
| Prepaid - Financing Fees - Long Term | - | 0.0% | 0.0% | - | - |
| Deposits | 0.8 | 0.0% | 0.0% | - | - |
| Other Long Term Assets | - | 0.0% | 0.0% | - | - |
| Investments In Subsidiaries | 0.0 | 0.0% | 0.0% | - | - |
| Investments In Joint Ventures | - | 0.0% | 0.0% | - | - |
| **Total Other** | $ (10.4) | | | $ - | $ - |
| **Europe Distributable Assets** | | | | $ 23.4 | $ 29.0 |

| Liquidation Costs | | Recovery Estimate, % Low | Recovery Estimate, % High | Recovery Estimate, $ Low | Recovery Estimate, $ High | Remaining Value Low | Remaining Value High |
|---|---|---|---|---|---|---|---|
| Chapter 7 Wind Down Team Costs | | | | $ 0.7 | $ 0.7 | $ 23.4 | $ 29.0 |
| Other Overhead | | | | 5.2 | 5.2 | | |
| Equipment Recovery & Disposal | | | | 5.2 | 2.6 | | |
| **Total Liquidation Costs** | | | | $ 11.0 | $ 8.4 | | |
| Distributions for Liquidation Costs | | | | 11.0 | 8.4 | (11.0) | (8.4) |
| Liquidation Costs Recovery, % | | | | 100.0% | 100.0% | $ 12.4 | $ 20.6 |
| **Local Liabilities** | | | | | | | |
| Accounts Payable | $ 5.1 | 100.0% | 100.0% | $ 5.1 | $ 5.1 | | |
| Income Taxes Payable | (3.3) | 0.0% | 0.0% | - | - | | |
| Accrued Expenses | 14.7 | 100.0% | 100.0% | 14.7 | 14.7 | | |
| Deferred Revenue | 1.6 | 0.0% | 0.0% | - | - | | |
| Long Term Deferred Tax Liability | 4.3 | 100.0% | 100.0% | 4.3 | 4.3 | | |
| Other Long Term Liabilities | 3.0 | 100.0% | 100.0% | 3.0 | 3.0 | | |
| **Total Local Liabilities** | $ 25.4 | | | $ 27.1 | $ 27.1 | | |
| Distribution to Local Liabilities, $ | | | | 12.4 | 20.6 | (12.4) | (20.6) |
| Local Liability Recovery, % | | | | 45.9% | 76.1% | $ - | $ - |
| **Intercompany Liabilities** | | | | | | | |
| Intercompany Payables | $ 35.3 | 100.0% | 100.0% | $ 35.3 | $ 35.3 | | |
| Intercompany Notes Payable | 0.5 | 100.0% | 100.0% | 0.5 | 0.5 | | |
| **Total Intercompany** | $ 35.9 | | | $ 35.9 | $ 35.9 | | |
| Distribution to Local Intercompanies | | | | - | - | - | - |
| Local Intercompany Recovery | | | | 0.0% | 0.0% | $ - | $ - |
| **Remaining Distributable Value for Equity** | | | | - | - | | |

**Catalina Marketing**
**Illustrative Liquidation Analysis - Japan**

| ($ millions USD) | Balance | Recovery Estimate, % | | Recovery Estimate, $ | | Remaining Value | |
|---|---|---|---|---|---|---|---|
| | | Low | High | Low | High | Low | High |
| **Local Assets** | | | | | | | |
| Cash and Cash Equivalents | $ 12.6 | | | | | | |
| Less: Restricted Cash | - | | | | | | |
| **Distributable Cash** | $ 12.6 | 100.0% | 100.0% | $ 12.6 | $ 12.6 | | |
| Accounts Receivable, net | 6.3 | 31.1% | 43.2% | 2.0 | 2.7 | | |
| Less: Deferred Revenue | (4.4) | | | (4.4) | (4.4) | | |
| **Accounts Receivable** | $ 1.9 | 0.0% | 0.0% | $ - | $ - | | |
| Deferred Tax Asset | - | 0.0% | 0.0% | - | - | | |
| Other Current Assets | 2.2 | 2.0% | 5.0% | 0.0 | 0.1 | | |
| **Total Other Current Assets** | $ 2.2 | | | $ 0.0 | $ 0.1 | | |
| Store Equipment | 26.6 | 0.0% | 3.0% | - | 0.8 | | |
| Furniture and Office Equipment | 0.5 | 5.0% | 15.0% | 0.0 | 0.1 | | |
| Building | - | 40.0% | 60.0% | - | - | | |
| Building and Other Improvements | 0.1 | 0.0% | 0.0% | - | - | | |
| Software | 2.0 | 0.0% | 0.0% | - | - | | |
| Land | - | 50.0% | 100.0% | - | - | | |
| **Property and Equipment, net of D&A** | $ 29.1 | | | $ 0.0 | $ 0.9 | | |
| Long Term Deferred Tax Asset | - | 0.0% | 0.0% | - | - | | |
| Intangibles- Net | - | 0.0% | 0.0% | - | - | | |
| Goodwill | (8.6) | 0.0% | 0.0% | - | - | | |
| Prepaid - Financing Fees - Long Term | - | 0.0% | 0.0% | - | - | | |
| Deposits | 1.1 | 0.0% | 0.0% | - | - | | |
| Other Long Term Assets | - | 0.0% | 0.0% | - | - | | |
| Investments In Subsidiaries | - | 0.0% | 0.0% | - | - | | |
| Investments In Joint Ventures | - | 0.0% | 0.0% | - | - | | |
| **Total Other** | $ (7.5) | | | $ - | $ - | | |
| **Japan Distributable Assets** | | | | $ 12.6 | $ 13.5 | | |

| **Liquidation Costs** | | Recovery Estimate, % | | Recovery Estimate, $ | | Remaining Value | |
|---|---|---|---|---|---|---|---|
| | | Low | High | Low | High | Low | High |
| Chapter 7 Wind Down Team Costs | | | | $ 0.7 | $ 0.7 | $ 12.6 | $ 13.5 |
| Other Overhead | | | | 4.7 | 4.7 | | |
| Equipment Recovery & Disposal | | | | 5.0 | 2.5 | | |
| **Total Liquidation Costs** | | | | $ 10.4 | $ 7.9 | | |
| Distributions for Liquidation Costs | | | | 10.4 | 7.9 | (10.4) | (7.9) |
| Liquidation Costs Recovery, % | | | | 100.0% | 100.0% | $ 2.3 | $ 5.7 |
| **Local Liabilities** | | | | | | | |
| Accounts Payable | $ 2.5 | 100.0% | 100.0% | $ 2.5 | $ 2.5 | | |
| Income Taxes Payable | 0.2 | 0.0% | 0.0% | - | - | | |
| Accrued Expenses | 5.6 | 100.0% | 100.0% | 5.6 | 5.6 | | |
| Deferred Revenue | 4.4 | 0.0% | 0.0% | - | - | | |
| Long Term Deferred Tax Liability | - | 100.0% | 100.0% | - | - | | |
| Other Long Term Liabilities | 0.5 | 100.0% | 100.0% | 0.5 | 0.5 | | |
| **Total Local Liabilities** | $ 13.3 | | | $ 8.7 | $ 8.7 | | |
| Distribution to Local Liabilities, $ | | | | 2.3 | 5.7 | (2.3) | (5.7) |
| Local Liability Recovery, % | | | | 26.0% | 65.1% | $ - | $ - |
| **Intercompany Liabilities** | | | | | | | |
| Intercompany Payables | $ 9.3 | 100.0% | 100.0% | $ 9.3 | $ 9.3 | | |
| Intercompany Notes Payable | - | 100.0% | 100.0% | - | - | | |
| **Total Intercompany** | $ 9.3 | | | $ 9.3 | $ 9.3 | | |
| Distribution to Local Intercompanies | | | | - | - | - | - |
| Local Intercompany Recovery | | | | 0.0% | 0.0% | $ - | $ - |
| **Remaining Distributable Value for Equity** | | | | - | - | | |

### V.    Notes to the U.S. Liquidation Analysis

All recoveries and recovery percentages cited in the notes below are presented on a consolidated basis and represent a blended average percentage of the following entities: Catalina Costa Rica S.R.L., Catalina Marketing Procurement, LLC, Catalina Marketing Technology Solutions, Inc., Catalina Marketing Worldwide, Catalina Pacific Media, LLC, Checkout Holding Corporation, Cellfire, Inc., and CMJ Investments, LLC. The mix of asset and claims recoveries may vary between Debtors on an unconsolidated basis.

**Note 1 – Distributable Cash.**    The Debtors' estimated balance as of the Conversion Date is approximately $86.1 million.  Distributable Cash reflects the estimated Cash and Cash Equivalents less the Restricted Cash and Post-Carve Out Trigger Notice Amount based on the Debtors' financial projections.  The DIP is assumed to have the full $125 million drawn as of the Chapter 7 conversion date.  The Cash is presented following the removal of the $3.5 million Post Carve-Out Trigger Notice Cap (as defined in the DIP Order), which is reserved for the payment of the Debtors' professional fees following the delivery of the Post Carve-Out Trigger Notice (as defined in the DIP Order).  Restricted Cash includes $5.25 million held for the Epson letter of credit. The analysis assumes Epson will draw on the letter of credit and the cash will not be distributed to other creditors.  The estimated recovery for this asset category is 100%.

**Note 2 – Accounts Receivable.**    The Debtors' estimated balance as of the Conversion Date is approximately $82.8 million.  Accounts receivable are primarily comprised of consumer packaged goods and retail customers.   Accounts Receivable reflects the Net Accounts Receivable less the Deferred Revenue.  The estimated recovery for this asset category is assumed to be between 30.6% and 44.5%.

**Note 3 – Total Other Current Assets.**    The Debtors' estimated balance as of the Conversion Date is approximately $13.2 million.  Total Other Current Assets reflects the Other Current Assets and the Deferred Tax Asset.  Data is assumed to have a zero recovery as the data is licensed and customer data cannot be sold.  The NCS Joint Venture is assumed to have a zero recovery as the Debtors will not be contributing data and the data rights cannot be sold.  The estimated recovery for this asset category is assumed to be between $300,000 and $700,000.

**Note 4 – Property and Equipment.**    The Debtors' estimated balance as of the Conversion Date is approximately $120 million net amortization and depreciation.  Property and Equipment is primarily comprised of Store Equipment, Furniture and Office Equipment, Building, Building and Other Improvements, Software, and Land.  The primary source of recovery is from the sale of the owned headquarters in St. Petersburg, Florida.  The estimated recovery for this asset category is assumed to be between $17.8 million and $29.1 million.

**Note 5 – Total Other.**    The Debtors' estimated balance as of the Conversion Date is approximately $1.516 billion.  Total Other is primarily comprised of Long Term Deferred Tax Asset, Net Intangibles, Goodwill, Deposits, and Investments in Joint Ventures.  The estimated recovery for this asset category is assumed to be between $2.1 million and $6.2 million.

**Note 6 – Accrued Employee Claims & WARN Impact.** The analysis assumes a WARN trigger will occur for Florida and Illinois. The result is 60 days of fully-loaded employee costs for employees that are not part of the Wind Down Team. The estimated cost for this category is assumed to be $10.6 million.

**Note 7 – 503(b)(9) Claims.**    503(b)(9) claims consist primarily of the cost of ink, paper, printer supplies, and printer hardware.  The estimated cost for this category is assumed to be $500,000.

**Note 8 – Wind Down Expenses.**  Chapter 7 Wind Down Team Costs are primarily comprised of Accounting and Finance, General Administration, Human Resources & Payroll, Information Technology and Operations.  Domestic legal expenses are included in Wind Down Team, which includes the Chief Legal and Administrative Officer.  The estimated cost for this category is assumed to be $1.3 million.

**Note 9 – Non-Payroll Overhead.**  Non-payroll overhead includes Insurance on Headquarters, Utilities, Software, Insurance Premiums, and Accounting and Tax Services and Third Party Service providers for six months. Non-payroll overhead also includes Rent on Other Facilities.  The Rent on Other Facilities is assumed to continue for one month to allow the Debtors to remove valuable equipment and servers. Domestic insurance on Headquarters is the current monthly insurance premium on the building, land and equipment.  Utilities are assumed to continue at current monthly rates for the Domestic Headquarters. Utilities on rented property are assumed to exist for one month at current monthly rates.  Software expenses are assumed to be primarily in the Debtors, which is consistent with historical practices, with minor expenses in the foreign entities for domestic software licenses.  Insurance premiums represent the current premiums paid.  Domestic Accounting and Tax Services are expected to continue at reduced rates in order to comply with tax and other accounting requirements. Foreign Accounting and Tax services are assumed to be at a 50% premium to Domestic rates in order to account for tax complexity in the various countries.  Third Party Service Providers represent estimated Mindtree expenses to handle the global network throughout the liquidation period.  The estimated cost for this category is assumed to be $3.4 million.

**Note 10 – Equipment Recovery & Disposal.**  Equipment Recovery & Disposal includes the cost of removing the printers from in-store locations. In order to dispose of the printers and ink in an environmentally friendly and ethical manner, significant costs will need to be incurred to remove and dispose of printers and ink. Based on cost of removing printers from previous in-store locations, the model assumes removal and disposal cost will be approximately $250 - $500 per store depending on the Low/High case across 20,000 stores. The estimated cost for this category is assumed to be between $5 million and $10 million.

**Note 11 – Transaction Costs and Brokerage Fees.**  Transaction Costs and Brokerage Fees includes liquidator fees.  Transaction Costs and Brokerage Fees are assumed to be 5% - 10% of the proceeds of the recovery of Property, Plant & Equipment in addition to Intangibles. The estimated cost for this category is assumed to be between $1.8 million and $2 million.

**Note 12 – Liquidation Professional Fees.**  Debtor professionals are assumed to be involved throughout the six-month liquidation with lender professionals only needing to be involved for three months. The model assumes local counsel will be shared between the first lien lenders. The estimated cost for this category is assumed to be $14.7 million. The total of estimated costs for this category includes approximately $3.2 million of accrued but unpaid Debtor Professional Fees, $250,000 of allowed administrative expenses pursuant to 28 U.S.C. § 1930(a)(6) and 28 U.S.C. § 156(c) for fees required to be paid to the Clerk of this Court, and $50,000 of fees and expenses incurred by the Trustee under section 726(b) of the Bankruptcy Code, all of which shall be paid from the Post-Carve Out Trigger Notice Account (as defined in the DIP Interim Order).

Paragraph 7 of the DIP Interim Order provides that certain fees and expenses described above shall be entitled to priority above DIP Liens, Superpriority Claims, Prepetition Liens, Adequate Protection Liens, and Adequate Protection Claims (all as defined in the DIP Order). All such fees and expenses shall be funded by the Debtors into the Post Carve-Out Trigger Notice Account, which will include the funding of the Carve-Out Trigger Notice Cap of $3.5 million for a total of approximately $7.05 million to be funded into the Post Carve-Out Trigger Notice Account.

**Note 13 – Secured Debt Claims.**  This Liquidation Analysis assumes that the aggregate principal amount of the DIP Claim is approximately $275 million.  The DIP claim is calculated as $125 million of new liquidity plus $150 million of first lien debt that is rolled into the DIP. The First Lien Debt Claim is reduced by the $150 million first lien rollup.  The First Lien Debt Claim is approximately $925.4 million and the Second Lien Debt Claim is $471.9 million. The Professional Fee Carve-Out is assumed to reduce the outstanding DIP claim by $3.5 million.  The Liquidation Analysis concludes the holders of the DIP Claim will receive between approximately 36.4% and 48.3%, the First Lien Debt Claim will receive approximately 0.0% and the Second Lien Debt Claim will receive approximately 0.0% in a chapter 7 liquidation.

**Note 14 – General Unsecured Claims.**  This Liquidation Analysis assumes that the aggregate principal amount of the deficiency claim on account of the DIP Claim is approximately between $146.3 million and $178.9 million, the deficiency claim on account of the First Lien Debt Claim is approximately $925.4 million, the deficiency claim on account of the Second Lien Debt Claim is approximately $471.9 million, and the Trade and Other General Unsecured Claim is $9.5 million.  The Liquidation Analysis concludes the General Unsecured Claims will receive 0.0% in a chapter 7 liquidation.

**Note 15 – PDM Holdings Claim.**  This Liquidation Analysis assumes that the aggregate principal amount of the Holdco Notes Claim is approximately $383.9 million.  The HoldCo Notes are issued by PDM Intermediate Holdings B Corporation and are structurally subordinate to claims against Checkout Holding Corporation and its subsidiaries.  The Liquidation Analysis concludes the PDM Holdings Claim will receive 0.0% in a chapter 7 liquidation.

## VI.    Notes to the Europe Liquidation Analysis

All recoveries and recovery percentages cited in the notes below are presented on a consolidated basis and represent a blended average percentage of the following entities: Catalina Marketing Bermuda, Ltd., Catalina Marketing Cooperatief U.A., Catalina Marketing Deutschland GmbH, Catalina Marketing France, S.A.S., Catalina Marketing International B.V., Catalina Marketing Italia, S.R.L., Catalina Marketing UK, Ltd., and CM International C.V. (together the "**European Entities**"). The mix of asset and claims recoveries may vary between European Entities on an unconsolidated basis.

**Note 1 – Distributable Cash.**  The European Entities' estimated balance as of the Conversion Date is approximately $9.5 million. Distributable Cash reflects the estimated Cash and Cash Equivalents less the Restricted Cash based on the Debtors' financial projections.  Europe restricted cash includes $1.2 million held in escrow in France. The analysis assumes the funds held in escrow will be distributed to the escrow beneficiary and will not be distributed to other creditors.  The estimated recovery for this asset category is 100%.

**Note 2 – Accounts Receivable.**  The European Entities' estimated balance as of the Conversion Date is approximately $32.4 million.  Accounts Receivable are primarily comprised of consumer packaged goods and retail customers.   Accounts receivable reflects the Net Accounts Receivable less the Deferred Revenue.  The estimated recovery for this asset category is assumed to be between 42.5% and 57.7%.

**Note 3 – Total Other Current Assets.**  The European Entities' estimated balance as of the Conversion Date is approximately $3.9 million.  Total Other Current Assets reflects the Other Current Assets and the Deferred Tax Asset.  The estimated recovery for this category is assumed to be $100,000.

**Note 4 – Property and Equipment.**  The European Entities' estimated balance as of the Conversion Date is approximately $19.9 million net amortization and depreciation.  Property and Equipment is primarily comprised of Store Equipment, Furniture and Office Equipment, Building and Other Improvements, and Software.   The estimated recovery for this asset category is assumed to be between $100,000 and $700,000.

**Note 5 – Total Other.**   The European Entities' estimated balance as of the Conversion Date is approximately negative $10.4 million.  Total Other is primarily comprised of negative Goodwill and Deposits. The estimated recovery for this class is assumed to be 0%.

**Note 6 – Wind Down Expenses.**  Wind Down expenses reflect a 6-month budget.  Wind Down Expenses are mainly comprised of Accounting of Finance, General Administration, Human Resources and Payroll, Information Technology and Operations, and Supporting Expenses.   The legal expenses include an estimated cost for third party firms to legally unwind the various European Entities.  The cost associated with the Europe wind down team is assumed to be 50% of the Domestic wind down team.  The estimated cost for this category is assumed to be $700,000.

**Note 7 – Other Overhead.**  Other Overhead is primarily comprised of rent, utilities, legal services, software, insurance premiums, accounting and tax services.  The estimated cost for this category is assumed to be $5.2 million.

**Note 8 – Equipment Recovery & Disposal.**  Europe disposal costs are assumed to be 50% of the Domestic Disposal Cost. The estimated recovery cost for this category is assumed to be between $2.6 million and $5.2 million.

**Note 9 – Local Liabilities.**   The European Entities' estimated balance as of the Conversion Date is approximately $25.4 million.   Local Liabilities are primarily comprised of Accounts Payable, Income Taxes Payable, Accrued Expenses, Deferred Revenue, and Long Term Deferred Tax Liability.   Local liabilities are assumed to be satisfied prior to any distribution to the Domestic entities.   The total recovery estimate is assumed to be between 45.9% and 76.1%.

**Note 10 – Intercompany Liabilities.**   The European Entities' estimated balance as of the Conversion Date is approximately $35.9 million.   Intercompany Liabilities are primarily comprised of Intercompany Payable and Intercompany Notes Payable.   The total recovery estimate is assumed to be 0%.   It is assumed that the Intercompany Liabilities are subordinate to the payment of all Local Liabilities.

## VII.    Notes to the Japan Liquidation Analysis

For the purposes of this analysis, all recoveries and recovery percentages are based on the liquidation costs of Catalina Marketing Japan KK (hereafter "**Catalina Japan**").

**Note 1 – Distributable Cash.**    Catalina Japan's estimated balance as of the Conversion Date is approximately $12.6 million.  Distributable Cash reflects the estimated Cash and Cash Equivalents less the Restricted Cash based on the Debtors' financial projections.  The estimated recovery for this asset category is 100%.

**Note 2 – Accounts Receivable.**    Catalina Japan's estimated balance as of the Conversion Date is approximately $1.9 million.  Accounts Receivable are primarily comprised of consumer packaged goods and retail customers.   Accounts Receivable reflects the Net Accounts Receivable less the Deferred Revenue.  The estimated recovery for this asset category is assumed to be 0%

**Note 3 – Total Other Current Assets.**    Catalina Japan's estimated balance as of the Conversion Date is approximately $2.2 million.  Total Other Current Assets reflects only the Other Current Assets.  The estimated recovery for this category is assumed to be between $0 and $100,000.

**Note 4 – Property and Equipment.**    Catalina Japan's estimated balance as of the Conversion Date is approximately $29.1 million net amortization and depreciation.  Property and Equipment is primarily comprised of Store Equipment, Furniture and Office Equipment, Building and Other Improvements, and Software.  The estimated recovery for this asset category is assumed to be between $0 and $900,000.

**Note 5 – Total Other.**    Catalina Japan's estimated balance as of the Conversion Date is approximately negative $7.5 million.   Total Other is primarily comprised of negative Goodwill and Deposits. The estimated recovery for this class is assumed to be 0%.

**Note 6 – Wind Down Expenses.**    Wind Down Expenses reflect a 6-month budget.   Wind Down Expenses are mainly comprised of Accounting of Finance, General Administration, Human Resources and Payroll, Information Technology and Operations, and Supporting Expenses.  The legal expenses include an estimated cost for third party firms to legally unwind Catalina Japan  The cost associated with Catalina Japan's wind down team is assumed to be 50% of the Domestic wind down team.  The estimated cost for this category is assumed to be $700,000.

**Note 7 – Other Overhead.**    Other Overhead primarily comprised of rent, utilities, legal services, software, insurance premiums, accounting and tax services.  The estimated recovery for this category is $4.7 million.

**Note 8 – Equipment Recovery & Disposal.**    Catalina Japan's disposal costs are assumed to be 50% of the Domestic Disposal Cost. The estimated recovery cost for this category is assumed to be between $2.5 million and $5 million.

**Note 9 – Local Liabilities.**    Catalina Japan's estimated balance as of the Conversion Date is approximately $13.3 million.  Local Liabilities are primarily comprised of Accounts Payable, Income Taxes Payable, Accrued Expenses, and Deferred Revenue.  Local liabilities are assumed to be satisfied prior to any distribution to the Domestic entities.  The total recovery estimate is assumed to be between 26.0% and 65.1%.

**Note 10 – Intercompany Liabilities.**  Catalina Japan's estimated balance as of the Conversion Date is approximately $9.3 million.  Intercompany Liabilities is comprised of Intercompany Payables.  The total

recovery estimate is assumed to be 0%.  It is assumed that the Intercompany Liabilities are subordinate to the payment of all Local Liabilities

## Exhibit D

### Financial Projections

| Projected Consolidated Income Statement | | | | |
|---|---|---|---|---|
| ($ millions USD) | Stub 2019[1] | 2020 | 2021 | 2022 |
| Net Revenue | $ 233 | $ 446 | $ 476 | $ 500 |
| Cost of Sales | (97) | (194) | (213) | (224) |
| **Gross Profit** | **136** | **252** | **263** | **276** |
| SG&A | (92) | (170) | (173) | (177) |
| **Management EBITDA** | **44** | **82** | **90** | **100** |
| Other | (18) | (10) | (10) | (8) |
| **Adjusted EBITDA** | **26** | **72** | **80** | **92** |
| Depreciation and Amortization | (29) | (60) | (62) | (65) |
| Interest Expense | (22) | (40) | (43) | (45) |
| Income Tax Expense | (3) | (6) | (6) | (11) |
| **Net Income** | **$ (28)** | **$ (34)** | **$ (30)** | **$ (29)** |

| Projected Consolidated Cash Flow Statement | | | | |
|---|---|---|---|---|
| ($ millions USD) | Stub 2019[1] | 2020 | 2021 | 2022 |
| Net Income | $ (28) | $ (34) | $ (30) | $ (29) |
| Depreciation and Amortization | 29 | 60 | 62 | 65 |
| Changes in Working Capital | 4 | (4) | (6) | (5) |
| Other Adjustments | 8 | 16 | 18 | 20 |
| **Operating Cash Flows** | **13** | **38** | **44** | **51** |
| Capex | (28) | (62) | (58) | (58) |
| Other Investing | - | - | - | - |
| **Investing Cash Flows** | **(28)** | **(62)** | **(58)** | **(58)** |
| Proceeds/(Repayments) on Debt | 14 | 23 | (2) | (2) |
| Other Financing | - | - | - | - |
| **Financing Cash Flows** | **14** | **23** | **(2)** | **(2)** |
| Net Increase/(Decrease) in Cash | $ (1) | $ (1) | $ (15) | $ (9) |

| Projected Consolidated Balance Sheet | | | | |
|---|---|---|---|---|
| ($ millions USD) | Stub 2019[1] | 2020 | 2021 | 2022 |
| Cash & Cash Equivalents | $ 48 | $ 47 | $ 32 | $ 23 |
| Accounts Receivable, net | 106 | 110 | 117 | 123 |
| Prepaid Expenses & Other Current Assets | 28 | 28 | 30 | 31 |
| **Total Current Assets** | **181** | **185** | **178** | **177** |
| Property & Equipment, net | 193 | 195 | 191 | 184 |
| Other Long-Term Assets | 120 | 120 | 120 | 120 |
| **Total Assets** | **495** | **500** | **490** | **481** |
| Accounts Payable | 18 | 20 | 21 | 23 |
| Accrued Expenses | 49 | 48 | 49 | 50 |
| Other Current Assets | 3 | 3 | 3 | 3 |
| **Total Current Liabilities** | **70** | **70** | **73** | **75** |
| Long-Term Debt[2] | 304 | 344 | 360 | 378 |
| Other Long-Term Liabilities | 6 | 6 | 6 | 6 |
| **Total Liabilities** | **380** | **420** | **439** | **460** |
| **Shareholder's Equity** | **115** | **81** | **51** | **22** |
| **Total Liabilities and Shareholder's Equity** | **$ 495** | **$ 500** | **$ 490** | **$ 481** |

(1) Represents the post-emergence period from June 15, 2019 - December 31, 2019
(2) Includes the FLFO and FLLO exit facilities per the 1L term sheet dated December 7, 2018

## Exhibit E

**Organizational Structure**




