## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------- X
                                          :
In re                                     :        Chapter 11
                                          :
CHECKOUT HOLDING CORP., et al.,           :        Case No. 18-[_____] (___)
                                          :
                Debtors.¹                 :        Joint Administration Requested
                                          :
                                          :
------------------------------------------------------- X
```

## DECLARATION OF ROBERT A. DEL GENIO IN
## SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF

I, Robert A. Del Genio, make this declaration (the "**Declaration**")[2] under 28

U.S.C. § 1746:

1.      I am a Senior Managing Director for Corporate Finance and Restructuring

at FTI Consulting, Inc. ("**FTI**").  I have more than 30 years of experience in restructuring and

mergers and acquisitions and have advised companies, lenders, creditors, corporate boards, and

equity sponsors across a diverse range of industries both domestically and internationally.  I have

assisted clients both in and outside of chapter 11, designed and evaluated financing packages and

presentations to various types of lenders and equity investors, and acted as financial advisor to

boards of directors and/or principal shareholders in the purchase or sale of numerous businesses.

I have advised companies, lenders, and investors in a variety of industries and acted as the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Catalina Marketing Corporation (9007); Catalina Marketing Procurement, LLC (9333); Catalina Marketing Technology Solutions, Inc. (8728); Catalina Marketing Worldwide, LLC (9687); Cellfire Inc. (5599); Checkout Holding Corp. (4651); Modiv Media, Inc. (3507); PDM Group Holdings Corporation (9148); PDM Holdings Corporation (5025); PDM Intermediate Holdings A Corporation (6409); and PDM Intermediate Holdings B Corporation (3278).  The Debtors' principal offices are located at 200 Carillon Parkway, St. Petersburg, FL 33716.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such term in the Prepackaged Plan (as defined below) or the Disclosure Statement (as defined below), or as the context otherwise requires.

financial advisor to Reichhold Holdings US, Inc. Milacron, Inc., Caraustar Industries, Inc., MicroAge, Inc., CST Industries, Dan River, Inc., Wheeling-Pittsburgh Steel Corp., US Internetworking, Factory Card Outlet, Malden Mills and Metal Forming Technologies during their chapter 11 cases, Strategic Planning Officer of RHI Entertainment, Inc., the Chief Restructuring Officer of The Weinstein Company Holdings LLC during its chapter 11 proceedings, and the Chief Restructuring Officer of CHC Group Ltd. during its chapter 11 proceedings.  I currently serve on the board of directors of Panavision, Inc., after having served as an interim Chief Executive Officer, and have previously served on the board of Washington Group International, Inc., Lazare Kaplan International, Inc., and Buffets, Inc.

2.       On August 20, 2018, FTI was retained by Catalina (as defined below) to assist Weil, Gotshal & Manges LLP ("**Weil**") on behalf of PDM Group Holdings Corporation and each of the other affiliated debtors (collectively, the "**Debtors**" and, together with certain of their non-debtor affiliates, "**Catalina**," or the "**Company**") in advising Catalina in its negotiations with its creditors and to provide Catalina and its other professionals financial advisory services in connection with Catalina's evaluation and development of strategic alternatives to address its capital structure and restructure its operations.

3.       On the date hereof (the "**Petition Date**"), the Debtors each commenced with this court (the "**Court**") a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  Since FTI's retention, I have worked extensively and closely with Catalina on various aspects of its business and have become knowledgeable and familiar with the Debtors' day-to-day operations, business, and financial affairs and the circumstances leading to the commencement of the chapter 11 cases (the "**Chapter 11 Cases**").

2

4.      Except as otherwise indicated herein, this Declaration is based upon my personal knowledge, my review of relevant documents, information provided to me by employees of the Debtors or the Debtors' legal and financial advisors, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

5.      This Declaration is submitted for the purpose of apprising the Court and parties in interest of the circumstances that compelled the commencement of the Chapter 11 Cases and in support of the motions and applications that the Debtors have filed with the Court, including the "first-day motions" (the "**First-Day Pleadings**").  I am authorized to submit this Declaration on behalf of the Debtors.

6.      Section I provides an overview of the Debtors and the Chapter 11 Cases, including the terms of the proposed restructuring transaction.  Section II describes the Debtors' corporate and capital structure.  Section III describes the Debtors' businesses.  Section IV describes the circumstances that leading to the commencement of the Chapter 11 Cases.  Section V describes the proposed debtor-in-possession financing.  Section VI provides a summary of the First-Day Pleadings and factual bases for the relief requested therein.

## I.  Overview

7.      Catalina is a personalized digital media and marketing company that owns and operates a proprietary dual function in-store data-gathering network and promotion-publishing channel.  Catalina's customers are some of the world's largest retailers and manufacturers of consumer-packaged goods.  Catalina's unique database of purchase transactions and hyper-targeted personalized messaging capabilities allow it to design and execute marketing campaigns at scale for its customers by targeting shoppers with a level of

precision and effectiveness that offers its customers return on advertising spend and return on investment that consistently ranks in the top tier of the industry.

8.      Over the past thirty-five years, Catalina has pioneered the field of data-driven marketing to drive in-store sales through its unique offline promotion channels, and although the headlines may be dominated by the likes of Google and Facebook, those companies' ability to leverage vast amounts of information to predict and drive consumer behavior still does not match Catalina's.  Catalina was "big data" before the rest of the world had recognized the value of information as a resource in driving consumer behavior. Notwithstanding the strength of its publishing and analytics capabilities, the overall weakness and fragmentation of the retail sector, where Catalina's customers operate, and investment in digital media (internet advertising) has continued to rise, which has led to a precipitous decline in Catalina's customers' non-digital marketing budgets.  As a result, and due to Catalina's substantial indebtedness, Catalina, like many other businesses that operate in or otherwise rely on the retail and CPG sectors, is seeking to restructure its obligations to ensure its long-term survival and competitiveness.

9.      Today, Catalina has commenced the Chapter 11 Cases to implement a negotiated, comprehensive, consensual restructuring (the "**Restructuring**") of its balance sheet with its primary lenders that will position it to survive the current cycle of marketing-spend allocation, shore up its existing network infrastructure and upgrade its software and hardware platforms, execute on growth initiatives to leverage its network across digitally active consumers, and continue to provide its customers with the uniquely efficient services that are its hallmark.

4

10.     Under the terms of the Restructuring, which are set forth in greater detail in the *Joint Prepackaged Chapter 11 Plan of Reorganization of Checkout Holding, Corp. and its Affiliated Debtors* (the "**Prepackaged Plan**"),[3] which was filed contemporaneously herewith, Catalina will meaningfully deleverage its balance sheet by over $1.9 billion in debt, which, upon occurrence of the effective date of the Plan, will represent an 85% reduction in principal amount of prepetition funded debt relative to the Petition Date.   Additionally, certain of Catalina's prepetition first lien lenders have also agreed, subject to the Court's approval, to provide a $281 million debtor-in-possession credit facility (the "**DIP Financing**"), of which $125 million provides additional incremental liquidity to help fund the costs of the Restructuring, as well as an additional $40 million of incremental liquidity in the form of an exit facility.

11.     The effect of the restructuring on the Debtors' capital structure is summarized as follows:

| Pre-Petition Capital Structure | | Reorganized Capital Structure | |
|---|---|---|---|
| First Lien Revolver | $55 million | A&R First-Out Tranche | $125 million |
| First Lien Term Loan | $1.02 billion | A&R Last-Out Tranche | $156 million |
| Second Lien Term Loan | $460 million | | |
| Unsecured Holdco Notes | $384 million | | |
| **Total:** | **Approx. $1.9 billion** | **Total:** | **Approx. $281 million** |

---

[3] This is a prepackaged chapter 11 plan because the Debtors began solicitation of votes on the Prepackaged Plan prior to commencing these cases pursuant to section 1125(b) of the Bankruptcy Code, and the Debtors are entering chapter 11 with the commitment of sufficient percentages of the impaired classes of claims entitled to vote on the Prepackaged Plan to ensure acceptances of such classes.  It should be noted, however, that because the Debtors have one or two classes of unsecured creditors that are deemed to reject the Prepackaged Plan, the Debtors will be relying on the cramdown provisions of section 1129(b) of the Bankruptcy Code to confirm the Prepackaged Plan.  The Debtors believe that they can satisfy those provisions.

12.     Catalina's creditors throughout its capital structure overwhelmingly support the Restructuring.  Pursuant to the *Restructuring Support Agreement* annexed hereto as **Exhibit A** (as amended from time to time and including all exhibits thereto, the "**RSA**"), the holders of over 90% of Catalina's prepetition first lien debt and the holders of over 75% of Catalina's second lien debt have agreed, subject to the terms and conditions of the RSA, to vote in favor of the Prepackaged Plan.

13.     To reap the full benefits of the Restructuring, the Debtors must exit the Chapter 11 Cases quickly.  The Debtors have agreed under the RSA to use reasonable best efforts to meet certain milestones for the restructuring process set forth in the RSA, including (i) confirmation of the Prepackaged Plan by no later than 125 days after the Petition Date and (ii) the Prepackaged Plan becoming effective no later than 140 days after the Petition Date.

14.     To minimize the impact of the Chapter 11 Cases on their businesses, the Debtors began soliciting votes on the Prepackaged Plan before filing their chapter 11 petitions for relief.  On December 11, 2018, the Debtors served the *Disclosure Statement for Joint Prepackaged Chapter 11 Plan of Checkout Holding Corp. and Its Affiliated Debtors* (the "**Disclosure Statement**") pursuant to sections 1125 and 1126(b) of the Bankruptcy Code on holders of impaired claims entitled to vote and have requested the voting creditors to submit their ballots by January 23, 2019 (Prevailing Eastern Time).  Further, the Debtors have requested that the Bankruptcy Court schedule a combined hearing to approve the Disclosure Statement and confirm the Prepackaged Plan on January 30, 2019, at 10:00 a.m. (Prevailing Eastern Time).  The Debtors expect that the votes tabulated and received from the voting creditors will, consistent with the RSA, overwhelmingly support confirmation of the Prepackaged Plan.

6

15.     Among the milestones in the RSA are deadlines relating to NCS (as defined below), a joint venture between Catalina and The Nielsen Company (US), LLC ("**Nielsen**").  As described below in more detail, the Debtors believe that certain amendments are needed to the NCS Agreement (as defined below) to bolster Catalina's competitiveness.  Catalina is currently in negotiations with Nielsen over the terms of such amendments and believes that the parties can reach a consensual resolution with Nielsen during the Chapter 11 Cases.  In the event that no resolution is reached, Catalina will have no choice but to reject the NCS Agreement while negotiations continue.  If the NCS Agreement is ultimately rejected, given the nature and value of Catalina's assets, Nielsen will receive no recovery on its claims under the Plan.

## II.  Capital and Corporate Structure

### A.     Capital Structure

16.     As set forth below, as of the Petition Date, the Debtors have outstanding funded debt obligations consisting of approximately $1.9 billion.

### a.     *Secured Debt − First Lien Credit Agreement and Second Lien Credit Agreement*

17.     Checkout Holding Corp., as borrower (the "**Borrower**"), and certain of the other Debtors, as guarantors (the "**Guarantors**"), JPMorgan Chase Bank, N.A., as administrative and collateral agent (the "**First Lien Agent**"), L/C Issuer and Swing Line Lender, and the other lender parties thereto (collectively, the "**First Lien Lenders**") are parties to the First Lien Credit Agreement, dated as of April 9, 2014 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**First Lien Credit Agreement**"), under which the First Lien Lenders agreed to provide to the Borrower a $1.03 billion term loan facility (the "**First Lien Term Loan**") and a $100 million revolving credit facility with a swing line sublimit of up to $20 million and a letter of credit sublimit of $35 million (the "**First Lien Revolving Facility**").  The First Lien Term Loan matures on April 9,

7

2021.  The First Lien Revolving Facility matures on April 9, 2019.  The lenders with respect to the First Lien Term Loan are not the same lenders as those with respect to the First Lien Revolving Facility, but all of the First Lien Lenders are party to the First Lien Credit Agreement.

18.      The First Lien Term Loan and the First Lien Revolving Facility are secured on a *pari passu* basis by a first-priority interest in the Senior Collateral.[4]  The Senior Collateral includes, among other things, the Debtors' right, title, and interest in all accounts, chattel paper, equipment, goods, inventory, fixtures, intellectual property, and other property and the proceeds thereof.  The Senior Collateral excludes, among other things, 35 percent of the stock of the Debtors' foreign subsidiaries, all assets of the foreign subsidiaries, fee-owned real property assets with a fair market value below $10 million, certain bank accounts, and the membership interests in NCS (as defined below), but includes the proceeds thereof.

19.      As of the Petition Date, approximately $1.019 billion is outstanding under the First Lien Term Loan (inclusive of principal, interest, fees, and expenses).  Letters of credit with an aggregate face amount of approximately $5 million have been issued and approximately $56 million is outstanding under the First Lien Revolving Facility (inclusive of principal, interest, fees, and expenses).

20.      The Borrower, the Guarantors, Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent (the "**Second Lien Agent**"), and the other lender parties thereto (collectively, the "**Second Lien Lenders**") are parties to the Second Lien Credit Agreement, dated as of April 9, 2014 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Second Lien Credit Agreement**"), under which

---

[4] "Senior Collateral" means (x) any "Collateral" as defined in any Senior Debt Document (y) any other assets of the Borrower or any other Grantor with respect to which a Lien is granted or purported to be granted pursuant to a Senior Collateral Document as security for any Senior Obligations or deemed to be granted pursuant to Section 2.04. *First Lien Credit Agreement, Section 1.01.*

the Second Lien Lenders provided a $460 million term loan (the "**Second Lien Term Loan**") to the Borrower.  The Second Lien Term Loan matures on April 9, 2022.  The Second Lien Credit Agreement is secured by a second-priority security interest in the Senior Collateral. Approximately $472 million of principal, plus interest, fees and expenses is outstanding under the Second Lien Term Loan.

21.     The rights of the First Lien Lenders and the Second Lien Lenders with respect to their shared collateral are governed by that certain Second Lien Intercreditor Agreement, dated as of April 9, 2014, by and among the Borrower, the Guarantors, JPMorgan Chase Bank, N.A., as senior representative for the First Lien Lenders and Bank of America, N.A., as the second priority representative for the Second Lien Lenders (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Second Lien Intercreditor Agreement**").  The Second Lien Intercreditor Agreement governs, among other things, the priority of distribution of the Senior Collateral and the respective rights of the First Lien Lenders and the Second Lien Lenders and their respective representatives in connection with certain bankruptcy matters, such as the provision of postpetition financing.  In accordance with the Second Lien Intercreditor Agreement: (i) the First Lien Lenders are afforded first priority with respect to Senior Collateral; and (ii) the Second Lien Lenders are afforded second priority with respect to the Senior Collateral.

*b.*     ***Unsecured Debt***

22.     PDM Intermediate Holdings B Corporation, as issuer (the "**Issuer**"), and certain purchasers (the "**Note Holders**") are party to that certain Note Purchase Agreement, dated as of April 9, 2014 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Note Purchase Agreement**"), pursuant to which

RLF1 20430319V.1

$230 million in aggregate principal amount of unsecured notes (the "**HoldCo Notes**") were issued.  The Holdco Notes are unsecured and are not guaranteed by any affiliates of the Issuer.  The Issuer is a holding company, the only asset of which is the stock in its wholly owned subsidiary.  As such, the Holdco Notes are structurally subordinated to the operating Debtors' creditors with respect to all of the assets of such Debtors.  The HoldCo Notes mature on April 9, 2022.[5]

23.    As of the Petition Date, approximately $384 million of principal, plus interest, fees and expenses is outstanding under the HoldCo Notes.

**B.    Corporate Structure**

24.    A diagram that reflects the Debtors' current corporate structure is annexed hereto as **Exhibit B**.

25.    Until 2007, CMC was publicly traded on the New York Stock Exchange.  In 2007, entities affiliated with Hellman & Friedman LLC ("**Hellman & Friedman**"), a private equity firm with a focus on information services and media, through its wholly owned subsidiary, Checkout Holding Corp. ("**CHC**"), acquired CMC and established CMC as the businesses' primary operating entity.

26.    In 2014, funds affiliated with Berkshire Partners LLC ("**Berkshire**"), a Boston-based investment firm and certain third-party co-investors, acquired a controlling interest in Catalina.  PDM Group Holdings (the ultimate parent of all the Debtors), PDM Intermediate Holdings A, PDM Intermediate Holdings B, and PDM Holdings Corp were formed as part of the

---

[5] Prior to April 9, 2016, the HoldCo Notes were accruing payment-in-kind ("*PIK*") interest of 11.25% per annum.  From April 9, 2016, the HoldCo Notes were accruing interest of 10.50% per annum, all of which was payable in cash, except that for any interest period commencing after April 9, 2016, and ending on or prior to April 9, 2019, the Issuer had the option to elect to pay the following combinations of cash interest and PIK interest: (i) 10.875% per annum, of which 5.4375% was payable in cash and 5.4375% was payable in PIK interest, or (ii) 11.25% per annum, all of which was payable quarterly in PIK interest.  The Issuer has been electing to pay PIK interest up until the Petition Date.

2014 transaction. Catalina's current capital structure, as described in more detail below, arose as part of the 2014 Transaction to pay down existing debt and to finance the buyout of a majority of Hellman & Friedman's equity interests in Catalina. Berkshire currently holds 40.71% of all the outstanding common stock of PDM Group Holdings.

27.     The Debtors' senior management team consists of the following individuals:

| Name | Position |
|------|----------|
| Gerald Sokol Jr. | President and Chief Executive Officer of Catalina Marketing Corporation |
| Aaron Miller | Chief Operating Officer |
| Tom Corley | Executive Vice President, Chief Revenue Officer |
| Shelly Schaffer | Executive Vice President, Chief Financial Officer |
| David Glogoff | Executive Vice President, Chief Legal Officer, Chief Administrative Officer and Secretary |
| William Faivre | President of Catalina Europe |
| Shigeharu Hanazaki | President of Catalina Japan |
| Wes Chaar | Chief Data and Analytics Officer |
| Marta Cyhan | Chief Marketing Officer |
| Marshall Stanton | Executive Vice President, Global Operations |

### III.  The Debtors' Business

A.      History and Formation

28.     Catalina Marketing Corporation ("**CMC**") was formed in 1983. By 1983, point-of-sale checkout scanner technology was nearly ubiquitous in grocery stores and CMC's founders, who had extensive experience in the consumer packaged goods industry, saw in it the potential to collect consumer purchase information and use such information to drive sales more efficiently than traditional retail promotional vehicles. As described in more detail below, this approach to data-driven marketing remains central to Catalina's core business philosophy. Since

11

its inception in 1983, Catalina has grown through both the strategic acquisition of other businesses and the organic expansion of its core businesses.

29.     CMC expanded into European and Asian markets beginning with the United Kingdom in 1992, France in 1994, Japan in 1996, Italy in 1999, Germany in 2003, and Belgium and the Netherlands in 2006 (collectively the "**Foreign Subsidiaries**").  In 1994, CMC created a health business segment ("**Catalina Health Resource**") that expanded its marketing services to pharmaceutical manufacturers and retail pharmacies.  CMC sold Catalina Health Resource to inVentiv Health, Inc. in 2013.

30.     In June 2009, Catalina partnered with Nielsen to form NC Ventures, LLC d/b/a Nielsen Catalina Solutions ("**NCS**" or the "**Joint Venture**"), which combined Catalina's shopper data with Nielsen's media consumption panels to provide a novel form of marketing analytics to customers.

31.     On April 23, 2018, Catalina established a Costa Rican subsidiary, Catalina Marketing Costa Rica, s.r.l. ("**CMCR**").   CMCR provides various post-sale campaign management, operational, and creative roles that benefit Catalina's U.S. customers by enhancing employee retention and by effecting a number of material cost reductions in the areas of campaign set-up, execution, and optimization.

**B.     The Debtors' Current Business Operations**

*a.     The Catalina Retailer Network*

32.     The backbone of Catalina's business is its extensive network of in-store, point-of-sale ("**POS**") data collection and promotional delivery systems, present in approximately 24,000 retail locations in the U.S. and over 20,000 retail locations internationally (the "**Retailer Network**").   Catalina is currently party to agreements (the "**Retailer Agreements**") with approximately 61 retailer partners (the "**Retailers**"), which collectively

12

represent approximately 60% of the grocery and drug retail footprint in the United States, to install Catalina's networked servers and high-speed printers ("**Networked Printers**") at multiple POS locations in each of the Retailers' stores.  When a Retailer's customers (the "**Shoppers**") purchase any item in a store, the product's Universal Product Code is scanned into the Retailer's POS checkout system and simultaneously uploaded to Catalina's data centers located in Orlando, Florida.  The unique combination of items purchased during each shopping trip, along with other key data points, including the time and date of the purchase and the geographical location of the purchase, aggregated over millions of purchases every day, (the "**Retailer Data**"), is analyzed against Catalina's historical shopper purchase database (the "**Shopper Database**"), which itself is ultimately derived from Catalina's analysis of the Retailer Data.

33.    Through the application of its proprietary analytics systems (the "**Analytics Platform**"), Catalina uses the Shopper Database and real-time Retailer Data to make accurate predictions about Shoppers' future purchasing behaviors based on not only historical purchasing behaviors, but also on emerging trends in consumer behavior. Additionally, many of the Retailers offer Shoppers customer reward or loyalty cards (the "**Loyalty Cards**") that track Shopper purchases on an individual basis.  Catalina's agreements with the Retailers provide it access to each Shopper's personal purchase history with each particular Retailer on an anonymized basis where each Shopper is assigned a unique Shopper identification (a "**Shopper ID**").  Thus, when a Shopper uses a Loyalty Card at the POS, Catalina can use the historical purchase data of that particular Shopper in conjunction with the historical purchasing data in the Catalina Shopper Database, as well as any demographic data associated with Shopper ID, to further enhance the accuracy of its predictive models.

34.     To give a sense of the scale and breadth of the data being fed into the Catalina Shopper Database, in 2017 alone, the U.S. Shopper Database tracked over 7.5 billion unique shopping trips associated with approximately 100 million households and over 500 million Shopper ID's, representing $277 billion in direct sales to the Retailers.

35.     Catalina employs over 125 analytics and data science that support its core capabilities and enable new data drive solutions for Retailers and CPGs.

36.     Under the Retailer Agreements, Catalina is granted a royalty-free, non-exclusive limited license to utilize the Retailer Data.  Catalina generates revenue by using the Retailer Data in conjunction with its Shopper Database to design and execute marketing campaigns for CPGs (as defined below), and, in some cases, the Retailers themselves.

### b.     *Catalina's Customers*

37.     Consumer packaged goods, which include non-durable goods such as cosmetics, household products, non-prescription drugs, packaged foods, and beverages, make up the vast majority of the products that are sold at the Retailers' stores.  The manufacturers and distributors that manufacture these types of products (the "**CPGs**") encompass a wide range of companies and brands that include both CPGs with global reach as well as less established CPGs.

38.     Catalina contracts with the CPGs to execute highly targeted marketing campaigns (the "**Campaigns**") designed to drive products sales and build brand loyalty effectively and efficiently by leveraging Catalina's Shopper Database to deliver highly personalized promotional materials to Shoppers at the POS.  At "checkout," such promotional materials, which include coupons, rebates, product advertising and other incentives, are "triggered" either by the unique combination of items purchased by a Shopper (the "**Basket**"), or

14

if a Shopper uses a Loyalty Card, by the Shopper ID in concert with a Shopper's Basket. Promotional materials are instantaneously delivered to Shoppers in the form of coupons and personalized circulars printed by the Networked Printers at checkout as well as coupons and incentives that are directly "loaded" onto Loyalty Cards.  In-store promotions, however, are only one "channel" for delivering promotional content, as Catalina also distributes promotional materials and/or places ads through various digital channels as well.  Digital promotions take the form of digital coupons and personalized digital circulars that are delivered directly to mobile devices and digital wallets.  The wide reach and on-demand nature of Catalina's content delivery system allows Catalina to design and execute highly customized Campaigns that can scale from national to regional, long-term to short-term, on an as-needed basis.  Catalina's access to real-time purchase data at the Retailers' stores allows it to accurately measure the effectiveness of a particular Campaign in driving product sales.

39.     The Retailers are also Catalina's customers in much the same way as CPGs.  Retailers will contract with Catalina to design and execute Campaigns to drive not only sales of their own private label products as well as CPG Brands, but also overall sales by targeting Shoppers identified as more likely to purchase a variety of products beyond those that may be the focus of the Campaign.

c.     ***The Foreign Subsidiaries***

40.     As discussed above, the Foreign Subsidiaries operate in Japan and across Europe.  The Foreign Subsidiaries' business operations largely mirror those of the Debtors.  The Foreign Subsidiaries enter into their own contracts with CPGs and local retail partners (the "**Foreign Retailers**") to provide in-store and digital marketing solutions primarily driven by data licensed from the Foreign Retailers to the Foreign Subsidiaries.  Catalina contracts with the

15

Foreign Subsidiaries to (a) license certain of its intellectual property and (b) provide general corporate business support and data and technology services in exchange for a negotiated fee. The negotiated fee is based on an arm's length operating margin.

       *d.*     ***Nielsen Catalina Services***

       41.      In 2009, CMC and Nielsen formed NC Ventures, LLC d/b/a NCS.  Using Retailer Data sublicensed by Catalina and television and digital audience measurement data licensed by Nielsen, NCS provides a variety of analytics services related to the measurement and effectiveness of digital, television, and radio marketing campaigns.  Catalina and Nielsen receive quarterly dividend payments from NCS according to the terms of that certain *Limited Liability Company Agreement* dated June 29, 2009 (as amended on October 15, 2015, the "**NCS Agreement**").  In 2015, CMC sold 13.5% of its membership interest in NCS to Nielsen, such that its current interest in NCS is 36.5%.

      **IV.**  **The Events Leading to the Commencement of The Chapter 11 Cases**

       42.      Several factors have contributed to Catalina's recent challenges.  First, consumers rapidly adopted technology that allows for digital content delivery and Catalina did not adequately differentiate and capitalize on the value proposition of its print and off-line promotional services.  Second, Catalina has been unable to fully capitalize on the explosion in demand for digital advertising due in large part to (a) lack of product innovation as a consequence of software and hardware-driven platform limitations and (b) its business relationship with NCS.  Finally, Catalina has seen a material reduction in the size of its Retailer Network.

**A.**     **Industrywide Shift to Digital**

       43.      From 1983 through 2014, Catalina experienced relatively steady growth and healthy margins, enabling it to grow its Retailer Network to over 30,000 retail locations in

16

the U.S.  Starting in 2017, however, Catalina's revenues and margins began to contract as a result of competitive pressures in the retail sector and a sea change in overall media consumption with engagement largely driven by an industrywide shift to digital.

44.    The growing market share of online consumer purchasing, and the cost pressure it has put on both Retailers and CPGs, has forced them to become more cost-conscious and judicious in the deployment of their marketing budgets.  As a result, Retailers and CPGs have increasingly focused on digital promotions, with their wide reach and relatively low cost per impression, disrupting Catalina's traditional business model.  Catalina attempted to counteract the digital disruption to its promotions-delivery business by expanding into the digital coupon space and acquiring Cellfire Inc. ("**Cellfire**") in October of 2014.  Cellfire's technology allows Catalina to deliver paperless, untargeted promotions (*i.e.,* digital coupons) by loading them directly onto Shoppers' Loyalty Cards.  In recent years, however, retailers have come to favor the acquisition of digital coupons through a number of online digital-coupon "aggregators" whereby consumers search these sites (either through mobile or desktop applications) for various promotions.  As a consequence of the rise of these promotional delivery channels, rather than generating revenue through the delivery of digital coupons, when executing digital Campaigns for customers, Catalina must typically pay a fee to such aggregator sites to have its digital promotions available to consumers.

45.    While advertising and marketing have become increasingly focused on the digital delivery channels over the past twenty years, until fairly recently, the actual buying and selling of promotional media across digital, broadcast, and print channels continued to follow a relatively traditional approach: marketing firms and agencies, retailers, and vendors developed

marketing campaigns and negotiated contracts with publishers (the operators of various delivery channels) to deliver commercial messaging.

46.    The last five years, however, have seen exponential growth in "programmatic" advertising ("**Programmatic Advertising**"), largely fueled by the increasing prevalence of digital distribution channels.  Programmatic Advertising connects brands and advertisers with publishers through a software based platform that effectively automates the buying and selling of promotional media.  Programmatic Advertising allows brands and retailers to control the parameters of their campaigns while targeting wide audiences across key demographics on an *ad hoc* basis, all at a relatively low cost.  Although Catalina has the capability to provide digital audiences to its customers through Programmatic Advertising platforms, its legacy data and media platforms have prevented it from fully harnessing the commercial potential of the Retailer Data to execute digital advertising campaigns.  Furthermore, in many instances, Catalina's business relationship with NCS has negatively impacted its growth and caused it to incur additional expenses as relates to digital audiences.

B.    **Shrinking Retailer Footprint**

47.    Since the end of December of 2017, the total number of stores in Catalina's U.S. Retailer Network has shrunk by approximately 7%.  The reduction in store count has reduced Catalina's opportunities to deliver fee-generating communications.  Part of this reduction can be attributed to the departure of a large retail partner from the Retailer Network.  Additionally, certain of the Retailers have initiated store closures as a consequence of their own financial distress.  Finally, from 2011 through 2014, as part of a cost-rationalization initiative that sought to increase focus on larger, more established Retailers, Catalina effected a reduction in store count by negotiating the departure of certain smaller retailers from the Retailer Network.

**C.      Aging Infrastructure Has Bottlenecked Growth**

48.      Catalina's ability to innovate, tap new revenue streams, and monetize existing revenue streams more efficiently has been severely hampered by its legacy hardware and software platforms.  Catalina's current capital structure, however, does not provide sufficient financial flexibility to carry out the wholesale upgrades necessary to compete effectively in the current business climate.

49.      Although Catalina provides its customers with reporting and analytics in connection with the effectiveness of Campaigns, its legacy data processing platforms do not allow for direct (real-time) third-party access, limiting its ability to develop new services and revenue streams.   Catalina is in the process of redesigning and re-engineering its data management platform to provide its customers with direct, real-time access to Campaign data and buyer insights.  Catalina has built a customer-facing portal (the "**Catalyst HUB**") to run on top of the more robust data platform through which customers can customize reporting and analytics to effectively monitor the execution and performance of a Campaign.  Customers that use the Catalyst HUB are significantly more likely to increase media purchase commitments to maintain ongoing access.  Hardware limitations, however, have prevented Catalina from scaling up the Catalyst HUB and opening the service up to all of Catalina's customers.  Infrastructure limitations have also hindered Catalina's ability to monetize one of its most valuable assets:  the power to measure the effectiveness of Campaigns by tracking real-time purchase behavior. Catalina has updated its platform to provide multi-touch attribution ("**MTA**") services to CPGs. MTA allows Retailers and CPGs to track consumer engagement with digital media across a variety of digital channels and ultimately measure such consumer engagement with actual purchases at the POS.  Just as with the Catalyst HUB, Catalina cannot deploy its MTA service without upgrading legacy hardware systems.

19

**D.      Prepetition Negotiations, Restructuring Support Agreement**

50.      As noted above, the continuing weakness and challenges in the retail sector have not only caused material compression in many of Catalina's customers' marketing budgets (both on the Retailer and CPG side), but have also pushed Catalina's retail partners to reassess the terms of their respective business relationships with Catalina.

51.      By late 2017, these sustained downward pressures on Catalina's revenue had become material, just as Catalina was in the midst of long-term, capital-intensive project to upgrade its software and hardware platforms.  In late 2017, Catalina engaged Weil, Gotshal & Manges LLP ("**Weil**") and Centerview Partners LLC ("**Centerview**") as restructuring counsel and financial restructuring advisors, respectively, to assist Catalina in exploring, in partnership with its creditors, various combinations of cost-rationalization processes and consensual modifications to Catalina's capital structure that would allow it to continue modernizing its platform to reverse the  revenue losses, and ultimately, return to sustainable revenue growth.  In early Spring of 2018, certain lenders under Catalina's First Lien Credit Agreement (the "**Ad Hoc First Lien Group**") and certain lenders under Catalina's Second Lien Credit Agreement (the "**Ad Hoc Second Lien Group**" and together with the Ad Hoc First Lien Group, the "**Ad Hoc Groups**") formed ad hoc groups, hired their own financial advisors, and began discussing potential restructuring transactions with Catalina's advisors.

52.      For several months, Catalina and the Ad Hoc Groups discussed the potential contours of an out-of-court restructuring; however, during the course of these discussions, through further refinement and adjustment of revenue projections driven by the continued erosion in Catalina's revenue base, it became clear that Catalina's existing debt was unsustainable, and that a broader balance sheet restructuring would most effectively be accomplished through an in-court transaction.  Accordingly, beginning in early summer of 2018,

the Debtors and the Ad Hoc Groups shifted the focus of the discussions to the terms of a chapter 11 restructuring, with a fully consensual restructuring as the ultimate goal.

53.     On November 16, 2018, to provide Catalina with additional flexibility to continue discussions with all of its stakeholders, Catalina and the lenders under the First Lien Revolving Facility (as defined below) entered into a forbearance agreement (the "**Forbearance Agreement**") with respect to certain defaults under the First Lien Credit Agreement. Specifically, under the Forbearance Agreement, the lenders under the First Lien Revolving Facility agreed to forbear (the "**Forbearance Period**") from exercising their rights and remedies, including the right to accelerate any indebtedness, through December 7, 2018 arising out of defaults from a failure to comply with the consolidated first lien net leverage ratio test in the First Lien Credit Agreement and failure to timely delivered required financial statements and compliance certificates.

54.     In addition, given the state of ongoing negotiations to address Catalina's burdensome debt structure and the need to preserve liquidity, Catalina elected not to make interest payments of $15,542,000 on the First Lien Term Loan and $10,538,000 on its Second Lien Term Loan due on November 30, 2018 and took advantage of the 5-business day "grace period" provided for under its First Lien Credit Agreement and Second Lien Credit Agreement. Faced with an impending default on December 7, 2018, Catalina increased its negotiating efforts to reach a fully consensual transaction that would maximize value for all stakeholders while minimizing damage to the enterprise as a consequence of the Restructuring.

55.     The Debtors used the time afforded by the Forbearance Agreement and the grace period to negotiate a comprehensive, consensual restructuring with the Ad Hoc Groups, which is ultimately supported by over 90% of the First Lien Lenders (the "**Consenting First**

Lien Lenders") and over 75% of the Second Lien Lenders (the "**Consenting Second Lien**

**Lenders**," together with the Consenting First Lien Lenders, the "**Consenting Creditors**").  On

December 11 2018, Catalina and the Consenting Creditors entered into the RSA whereby the

Consenting Parties have committed, subject to the terms and conditions of the RSA, to support

the Debtors in their efforts to confirm the Prepackaged Plan, as well as to provide additional

liquidity to the Debtors both during the Chapter 11 Cases and upon emergence (as described

herein in more detail).  The terms of the Restructuring are reflected in the Prepackaged Plan.

56.    Upon its full implementation, the Prepackaged Plan will effect a

significant deleveraging of the Debtors' capital structure by wiping out approximately $1.625

billion in principal amount of prepetition funded debt.  The reduced debt burden will provide the

Debtors with sufficient liquidity not only to continue funding their operations, but to make the

necessary capital expenditures and investments to ensure that the Debtors will not only be

competitive, but will remain an industry leader going forward.

57.    Under the terms of the Prepackaged Plan, in full and final satisfaction of

their prepetition claims, the First Lien Lenders will receive their *pro rata* share of 90% of the

equity (the "**New Common Stock**") in the reorganized Debtors and the Second Lien Lenders

will receive their *pro rata* share of 10% of the New Common Stock, in each case subject to

dilution by a contemplated management incentive plan that will be adopted following the

effective date of the Prepackaged Plan.  Allowed general unsecured claims will be paid in the

ordinary course and will be otherwise unimpaired, subject to all of Catalina's rights, defenses, or

any other entitlements with respect thereto.  Holders of claims arising under the HoldCo Notes

will not receive a recovery under the Prepackaged Plan.  Additionally, if Catalina is unable to

renegotiate the terms of the NCS Agreement to the satisfaction of the Consenting First Lien

Lenders, Catalina will reject the NCS Agreement. Any holder of claims arising out of such rejection will not receive a recovery under the Prepackaged Plan. The RSA, among other things, commits the Consenting Parties to support the Prepackaged Plan and the Restructuring by:

- Voting to accept the Prepackaged Plan;
- Agreeing to provide the releases set forth in the Prepackaged Plan;
- Supporting and taking all commercially reasonable steps to consummate the Prepackaged Plan and the Restructuring;
- Refraining from taking any action that would delay or impede consummation of the Prepackaged Plan or the Restructuring;
- Agreeing to certain procedures governing the transfer of the indebtedness held by the Consenting Creditors; and
- Agreeing to forbear the exercise of their rights or remedies under the prepetition loan documents.

58. Of key importance, the RSA provides that the Consenting Creditors will support the Prepackaged Plan. The Prepackaged Plan provides for a comprehensive restructuring of the Debtors' prepetition obligations, preserves the going-concern value of the Debtors' businesses, maximizes creditor recoveries, provides for an equitable distribution to the Debtors' stakeholders and protects the jobs of employees.

### V.  The Debtors' Need for DIP Financing and Use of Cash Collateral[6]

59. As discussed above, Catalina has significant liquidity issues and requires immediate access to debtor-in-possession financing and the authority to use cash collateral to ensure that they have sufficient liquidity to operate their businesses and administer their estates. The combination of the operating pressures described herein and a high level of interest expense

---

[6] Contemporaneously herewith the Debtors have filed the *Motion of Debtors for (I) Authority to (A) Obtain Postpetition Senior Secured Financing, (B) Use Cash Collateral, (C) Grant Adequate Protection to Prepetition Secured Parties, (D) Grant Liens and Superpriority Claims, (E) Modify the Automatic Stay, and (II) Related Relief* (the "**DIP Motion**").

resulting from an unsustainable capital structure has resulted in the rapid decline of Catalina's cash flow and has led to a severe liquidity strain on the business.  Catalina currently has negative cash flow, yet requires capital for ordinary course capital expenditures that are necessary to maintain existing systems and for the continued survival of Catalina's business.

60.    As of the Petition Date, the Debtors have approximately $7.805 million cash on hand and require immediate access to the DIP Financing and authority to use the Cash Collateral (as defined in the DIP Motion).  Prior to the Petition Date, Catalina, with its advisors, including FTI, reviewed and analyzed its projected cash needs and prepared a 13-week cash flow analysis to determine the need for and size of a DIP Financing.  The DIP Facility (as defined in the DIP Motion) will provide the Debtors with the liquidity necessary to, among other things, fund payroll and satisfy their other working capital and general corporate purposes, including payment of retailer fees necessary for data collection and ink charges necessary for the printing of coupons.  Access to sufficient working capital and liquidity is necessary and vital to avoid the liquidation of Catalina and for the preservation of the going concern value and successful reorganization of Catalina for the benefit of all stakeholders.

61.    Absent the authority to enter into and access the DIP Facility, even for a limited period of time, Catalina will be unable to continue operating its businesses, which will cause irreparable harm to Catalina and all of its stakeholders.  I believe that the current DIP Budget (as defined in the *Declaration of Marc Puntus* attached to the DIP Motion as Exhibit C) provides an accurate reflection of Catalina's funding needs over the identified period and is reasonable and appropriate given the circumstances.

62.    I believe it is imperative that Catalina sends a clear message to its business partners, employees, and customers that it will be well-capitalized during the Chapter 11 Cases.

24

Any market perception that Catalina will not be able to sustain itself through the bankruptcy process may result in the loss of key customers and business partners, especially considering the growing competitive market.  It is my belief that the proposed DIP Financing is in the best interests of Catalina and its stakeholders.

63.     It is my belief that Catalina exercised its business judgment in the selection and negotiation of the DIP Financing. Leading up to the Petition Date, as part of the broader restructuring process, Catalina, with the assistance of its professionals, searched for potential sources of postpetition financing that could provide Catalina with sufficient liquidity to fund their business operations during the restructuring process.  The vast majority of Catalina's assets are encumbered by liens to the First Lien Lenders and Second Lien Lenders, such that any potential third-party financing would have to be all or partially unsecured, on a junior basis, "prime" Catalina's existing secured lenders' prepetition liens, or be secured by Catalina's limited unencumbered assets.  Additionally, Catalina was informed by the First Lien Lenders that they would not consent to being primed by third-party DIP Financing, which, (i) given the value of Catalina's encumbered and unencumbered assets, and (ii) with respect to Catalina's encumbered assets, the lack of any equity cushion behind the first lien claims, would have made obtaining third-party financing difficult, if not impossible.

64.     Despite the challenges associated with obtaining third-party DIP Financing as described above, Centerview marketed the DIP Financing to determine whether a third party would be willing to provide Catalina with DIP Financing on better terms than those negotiated with the Ad Hoc Group of First Lien Lenders.  Centerview contacted nine financial institutions to solicit offers to provide the Debtors with postpetition debtor-in-possession financing on a junior lien basis, a priming basis, and/or collateralized only by unencumbered

collateral.  None of the third parties  contacted were willing to provide a DIP Financing proposal to Catalina.

65.     Having received only one DIP Financing proposal, Catalina, with guidance from its advisors, actively negotiated the terms of the DIP Financing proposal and was able to obtain concessions from the Ad Hoc Group of First Lien Lenders on a number of key provisions.  I believe that Catalina ultimately obtained a reasonable proposal from the Ad Hoc Group of First Lien Lenders that meets Catalina's liquidity needs at this critical juncture and should be approved.

## VI.  First-Day Pleadings

66.     As stated, the Debtors operate in a highly competitive industry.  It is imperative that they make a seamless transition into chapter 11 to preserve the reputation of their businesses and the loyalty and goodwill of their customers, suppliers, and employees.  Sales and operations must continue in the ordinary course of business to preserve the value of the Debtors' business.  Accordingly, the Debtors have filed a number of First-Day Pleadings designed to facilitate their transition into the Chapter 11 Cases.  The Debtors anticipate that the Court will conduct a hearing soon after the Petition Date at which the Court will hear and consider many of the First-Day Pleadings.[7]

67.     I have reviewed each of the First-Day Pleadings with the Debtors' counsel, and I believe that the relief sought in each of the First-Day Pleadings is tailored to meet the goals described above and will be necessary and critical to the Debtors' ability to successfully execute a restructuring and is in the best interests of the Debtors' estates and

---

[7] Capitalized terms used below in the descriptions of the First Day Pleadings and not otherwise defined shall have the meanings given to them in the applicable First Day Pleading.

creditors.  A description of the relief requested and the facts supporting each of the pleadings is set forth below.

## A.      Administrative Motions

        (i)      Motion of Debtors for Entry of Order Directing Joint Administration of Chapter 11 Cases (the "**Joint Administration Motion**")

        68.      The Debtors request entry of an order directing joint administration of the Chapter 11 Cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015–1 and that the Court maintain one file and one docket for all of the Chapter 11 Cases under the lead case, Checkout Holding Corp.

        69.      Joint administration of the Chapter 11 Cases will provide significant administrative efficiencies without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders that will be filed in the Chapter 11 Cases almost certainly will affect each of the Debtors.  The entry of an order directing joint administration of the Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings, objections, notices, and hearings, and will allow all parties in interest to monitor the Chapter 11 Cases with greater ease and efficiency.   The relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

        (ii)      Motion of Debtors for Order (I) Scheduling Combined Hearing  to Consider (A) Approval of Disclosure Statement,  (B) Approval of Solicitation Procedures and Forms of  Ballots, and (C) Confirmation of Prepackaged Plan; (II) Establishing an Objection Deadline to Object to Disclosure Statement and Plan; (III) Approving the Form and Manner of Notice of Combined Hearing, Objection Deadline, and Notice of Commencement; (IV) Conditionally   Waiving Requirement of Filing Statement of  Financial Affairs and Schedules of Assets and Liabilities; (V) Conditionally Waiving Requirement to Convene the Section 341 Meeting of Creditors; and (VI) Granting Related Relief Pursuant to Sections 105(a), 341, 521(a), 1125, 1126, and 1128 of the Bankruptcy Code and Bankruptcy Rules 1007, 2002, 3017, and 3018 (the "**Scheduling Motion**")

70.     The Debtors request that the Court enter an order (i) setting a combined hearing to (i) approve the Disclosure Statement, Solicitation Procedures, and confirm the Prepackaged Plan; (ii) approve objection procedures and deadlines in connection with the Prepackaged Plan and Disclosure Statement; (iii) approve the notice of the combined hearing, objection deadline, and notice of commencement; (iv) waive the requirement to file statement of financial affairs and schedules of assets and liabilities; and (v) waive the Section 431 Meeting.

71.     The holders of First Lien Debt Claims (Class 3) and Second Lien Debt Deficiency Claims (Class 4) are the only classes of claims entitled to vote on the Prepackaged Plan.   Accordingly, on December 11, 2018, following execution of the RSA, Prime Clerk transmitted a Solicitation Package (defined below) to the holders of First Lien Debt Claims (Class 3) and Second Lien Debt Deficiency Claims (Class 4).   The Solicitation Package included: the Proposed Order approving the relief sought in the Solicitation Motion, a notice of the hearing on the Proposed Disclosure Statement and confirmation of the Prepackaged Plan, a link to the Debtors' website page containing the Proposed Plan and Proposed Disclosure Statement, and ballots containing instructions on how to vote on the Prepackaged Plan (the "**Solicitation Package**").   Prime Clerk transmitted the Solicitation Package to the holders of First Lien Debt Claims (Class 3) and Second Lien Debt Deficiency Claims (Class 4) by first-class mail.   In addition, the holders of First Lien Debt Claims (Class 3) and Second Lien Debtor Deficiency Claims (Class 4) were also sent the Solicitation Package by email.   The Debtors have set a voting deadline of January 23, 2019.

72.     I   understand   from   counsel   that   the   Debtors'   solicitation   of   the Prepackaged Plan is in compliance with the Bankruptcy Code and the Bankruptcy Rules.   I also believe, based on discussion with counsel, that the proposed service of the Combined Notice will

28

provide sufficient notice to all parties in interest in the Debtors' Chapter 11 Cases of the commencement of such cases, the date, time, and place of the Combined Hearing, and the procedures for objecting to the adequacy of the Disclosure Statement and Solicitation Package, and the confirmation of the Prepackaged Plan (including the release contained therein).  Finally, I believe that setting a combined hearing on the Prepackaged Plan and Disclosure Statement, in combination with the aforementioned noticing and solicitation procedures, is necessary to allow the Debtors to prosecute the Chapter 11 Cases in an expeditious manner, thereby minimizing administrative costs and delays and avoiding operational disruption to the Debtors' business for the benefit of all parties in interest.

   (iii) Application of Debtors Pursuant to 11 U.S.C. § 105(a) and 28 U.S.C. § 156(c) for Appointment of Prime Clerk LLC as Claims and Noticing Agent Effective as of the Petition Date (the "**Claims and Noticing Agent Retention Application**")

  73. The Debtors request authority to appoint Prime Clerk, LLC ("**Prime Clerk**") as claims and noticing agent ("**Claims and Noticing Agent**") in accordance with the terms and conditions of that certain Standard Services Agreement dated November 7, 2018, by and between Catalina and Prime Clerk effective as of the Commencement Date.  Prime Clerk's duties will include assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Chapter 11 Cases.  I believe the Debtors' selection of Prime Clerk to serve as their Claims and Noticing Agent has satisfied the Court's Protocol for the Employment of Claims and Noticing Agents Under 28 U.S.C. § 156(c).  Specifically, the Debtors have solicited and reviewed engagement proposals from at least two other Court-approved claims and noticing agents to ensure selection through a competitive process.

<div align="center">29</div>

74. I believe that Prime Clerk's rates are competitive and reasonable given Prime Clerk's quality of services and expertise. The terms of Prime Clerk's retention are set forth in the Engagement Agreement attached to, and filed contemporaneously therewith, the Claims and Noticing Agent Retention Application. Appointing Prime Clerk as the Debtors' Claims and Noticing Agent will maximize the efficiency of the distribution of notices and the processing of claims, as well as relieve the Office of the Clerk of the Bankruptcy Court of related administrative burdens. Moreover, I am informed that Local Rule 2002-1(f) requires, in all cases with more than 200 creditors (such as the Chapter 11 Cases), absent leave of the Court, a debtor to file a motion to retain a noticing agent on the first day of the case or within seven (7) days thereafter.

**B.      Operational Motions Requesting Immediate Relief**

75. The Debtors intend to ask for immediate relief with respect to the following First-Day Pleadings and, therefore, will present these motions at the First Day Hearing.

> (i)      Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), 363(c), 364(a), And 503(b)(1) and Fed. R. Bankr. P. 6003 and 6004 for (I) Interim and Final Authority to (A) Continue Existing Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Maintain Business Forms and Existing Bank Accounts; and (II) Related Relief (the "**Cash Management Motion**")

76. The Debtors request: (i) authority to (a) continue to operate their existing cash management system (the "**Cash Management System**") including the continued maintenance of existing bank accounts (the "**Bank Accounts**") at the banks (the "**Banks**"), and continue transferring funds among the Debtors and their non-Debtor affiliates in the ordinary course of business, consistent with their prepetition practices; (b) honor certain prepetition

obligations related to the Cash Management System; and (c) maintain existing business forms; and (ii) related relief.

77.     I have been informed that, in the ordinary course of their business, the Debtors have historically used the Cash Management System to collect and transfer funds generated by their operations and to disburse funds to satisfy obligations efficiently.  The Cash Management System also facilitates the Debtors' cash forecasting and reporting, their monitoring of the enterprise-wide collection and disbursement of funds, and the overall administration of the Bank Accounts.  As detailed in the Cash Management Motion, the Cash Management System includes thirteen (13) Bank Accounts, which together facilitate four (4) principal cash functions (i) cash collection; (ii) cash concentration; (iii) disbursements to fund the Debtors' operations; and (iv) cash transfers among the Debtors and certain non-Debtor affiliates.

78.     With respect to cash transfers with the Debtors' foreign non-Debtor affiliates (the "**Foreign Affiliates**"), I understand that while the Foreign Affiliates maintain their own distinct bank accounts, the Debtors do cover certain of their Foreign Affiliates' overhead costs, such as insurance and advisor fees (the "**Shared Services**"), and that the Debtors are reimbursed for such payments in connection with certain agreements with their Foreign Affiliates (the "**Foreign Affiliate Agreements**").

79.     I do not believe that the Debtors require the Court's approval to continue, in the ordinary course of business, entering into and performing under the Foreign Affiliate Agreements.  Nevertheless, I believe that the Foreign Affiliate Agreements are integral to the Debtors' reorganization efforts because they facilitate increased efficiency and cost savings across the global Catalina enterprise.

31

80.    In addition, on April 23, 2018, the Debtors established a Costa Rican subsidiary, Catalina Marketing Costa Rica, s.r.l. ("**CMCR**"), which employs approximately ninety (90) Catalina employees in various post-sale campaign management, operational, and creative roles that benefit the Debtors' U.S. customers.  The Debtors have informed me they expect that establishing CMCR will yield significant benefits in terms of both employee retention and cost reduction.  With respect to employee retention, the Debtors expect that it will be significantly easier to recruit and retain highly-skilled, operations-focused employees in Costa Rica.  With respect to cost reduction, the Debtors anticipate material cost reductions in the areas of campaign set-up, execution, and optimization.  I understand that, in connection with the formation of CMCR, Catalina Marketing Worldwide, LLC ("**Catalina Worldwide**") and CMCR entered into an intercompany loan agreement pursuant to which Catalina Worldwide funded CMCR in the amount of $1,000,000, which was the approximate amount necessary to cover CMCR's initial operations and working capital requirements.  I further understand that since becoming operational on October 15, 2018, CMCR has charged the Debtors on a monthly basis for its services (the "**CMCR Payables**"). In addition, I believe payment of the CMCR Payables is warranted and justified by the facts and circumstances of the Chapter 11 Cases.  I understand that failing to pay the CMCR Payables would jeopardize CMCR's operations because without the CMCR Payables, CMCR would have no way to fund its operations or pay its employees, and, therefore, would not be able to continue to provide important support services to the Debtors.

81.    The Debtors also maintain corporate credit card programs with American Express and SunTrust in the ordinary course of business (the "**Employee Credit Card Program**").    The Employee Credit Card Program, which consists of approximately three

hundred (300) corporate credit cards (the "**Employee Credit Card Cards**"), provides a convenient way to allow the Debtors' employees to make purchases for the business where a wire, check, or automated clearinghouse transfer is not possible or is otherwise inconvenient.  I am told that each employee participating in the Employee Credit Card Program is personally responsible for the Employee Credit Card issued under his or her name, and that the Debtors pay the invoices on their employees' behalf, but only after the Debtors carefully review the invoices.

82.     I believe that payment of the liabilities that arise on account of the Employee Credit Card Program (the "**Employee Credit Card Program Fees**") is warranted and justified by the facts and circumstances of the Chapter 11 Cases because the Debtors' employees rely upon the Employee Credit Card Program to efficiently purchase goods and services that benefit the Debtors' business.  Honoring the Employee Credit Card Program Fees and continuing the Employee Credit Card Program will help maintain employee morale and avoid the highly inequitable result of employees being forced to personally bear the cost of expenses incurred in the course of their employment.

83.     The efficient and economical operation of the Debtors' businesses requires that the Cash Management System continue during the pendency of the Chapter 11 Cases.  As a practical matter, because of the Debtors' corporate and financial structure, it would be difficult and expensive to establish and maintain a separate cash management system for each Debtor. Further, requiring the Debtors to adopt new, segmented cash management systems at this early and critical stage of these cases would be expensive, create unnecessary administrative burdens, and be extraordinarily disruptive to their business operations.  I believe that any such disruption would have a severe and adverse impact upon the Debtors' reorganization efforts.

84.     For the foregoing reasons, I believe that granting the relief requested in the Cash Management Motion is appropriate and in the best interests of the Debtors' estates and creditors.

(ii)    Motion of Debtors for Authority, But Not Direction, to Pay Prepetition Wages, Salaries, Commissions, Employee Benefits, and Other Compensation and Maintain Employee Benefit Programs and to Pay Related Administrative Obligations (the "**Wages and Benefits Motion**")

85.     The Debtors request the entry of interim and final orders authorizing, but not directing, the Debtors to pay or honor certain prepetition claims and obligations, continue programs and maintain funding, in the exercise of their discretion, relating to, among other things:  (i) Unpaid Compensation, Unpaid Reimbursements, Deductions, and Payroll Taxes, (ii) Compensation for the Supplemental Workforce, (iii) Ordinary Course Expenses, (iv) Employee Benefit Programs, (v) the Non-Insider Severance Program, (vi) the 401(k) Savings Plan, and (vii) Other Employee Programs.

86.     The relief requested includes compensation for the Debtors' full-time, part-time, and temporary employees, and independent contractors and consultants that provide services related to various aspects of the Debtors' operations and are vital to the Debtors' businesses.  Authorizing the Debtors to pay prepetition wages, employee benefits, and similar items will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption.  Indeed, without the relief requested in the Wages and Benefits Motion being granted, the Debtors' Employees may seek alternative opportunities, perhaps with the Debtors' competitors.  The loss of valuable Employees, who are the lifeblood of the Debtors' operations, would deplete the Debtors' workforce, thereby hindering the Debtors' ability to meet their customer obligations and, likely, diminishing stakeholder confidence in the Debtors' ability to successfully carry out their chapter 11 strategy.

34

87.     Failure to satisfy certain prepetition obligations will likely lead to significant attrition and jeopardize Employee morale and loyalty at a time when Employee support is critical to the Debtors' businesses.  The majority of the Debtors' Employees rely exclusively on their compensation, benefits and reimbursement of expenses to satisfy their daily living expenses.  These Employees will be exposed to significant financial difficulties and other distractions if the Debtors are not permitted to honor their obligations for unpaid compensation, benefits and reimbursable expenses.  Furthermore, if the Court does not authorize the Debtors to honor their various obligations under the insurance programs, many Employees lose access to health coverage at a time when the Debtors need such Employees to perform their jobs at peak efficiency.  As set forth above, Employee attrition would cause the Debtors to incur additional expenses to find appropriate and experienced replacements, severely disrupting the Debtors' operations at a critical juncture.

      (iii)     Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a) and 363(b) for Interim and Final Authority to (I) Maintain and Administer Prepetition Customer Programs and (II) Pay and Honor Related Prepetition Obligations (the "**Customer Programs Motion**")

88.     The Debtors request authority to, in the ordinary course of business and consistent with past practice, (i) maintain and administer prepetition customer programs, promotions, and practices, as necessary and appropriate in the Debtors' business judgment, and (ii) to pay and otherwise honor their obligations to customers relating thereto, whether arising prior to or after the Petition Date.

89.     The Debtors' businesses depend upon the loyalty of their customers.  One of the Debtors' primary lines of business is the development and deployment of in-store targeted marketing campaigns to drive product sales, typically by generating coupons at a consumer's point of sale.  The Debtors' primary customers in connection with the Campaigns are the owners

35

and distributors of consumer packaged goods and retailers of consumer goods seeking to drive sales of their private label products or, in some cases, consumer packaged goods that are sold in their stores.

90.     To develop and maintain positive customer relationships and to maximize customer loyalty, in the ordinary course of business, the Debtors provide certain incentives, discounts, and other accommodation to Customers (collectively, the "**Customer Programs**" and the obligations incurred thereunder, the "**Customer Obligations**").   Without the ability to continue their Customer Programs and to satisfy prepetition obligations in connection therewith, the Debtors risk losing market share and value of their businesses.   The Customer Programs are described more fully in the Customer Programs Motion, and include: (i) the Make Good Program, (ii) the Rebate Program, and (iii) the Advanced Payment Campaign Obligations.

91.     The ability to continue administering the Customer Programs without interruption is essential to the Debtors' valuable Customer relationships and goodwill, which will inure to the benefit of all of the Debtors' stakeholders.   If the Debtors are unable to continue the Customer Programs postpetition or honor the Customer Program Obligations, the Debtors risk alienating certain Customer constituencies, which may then form relationships with the Debtors' competitors.

92.     The Customer Programs also are essential strategies for attracting new Customers and increasing sale volumes among existing Customers.   Failure to continue the Customer Programs will place the Debtors at a significant – and potentially insurmountable – competitive disadvantage in the marketplace, amplifying the negative effect of Customer uncertainty that may arise from the Chapter 11 Cases.   The relief requested in the Customer Programs Motion will pay dividends with respect to their businesses, both in terms of

36

profitability and the engendering of goodwill, especially at this critical time following the filing of the Chapter 11 Cases.

93.     Accordingly, I believe that the Debtors have shown cause sufficient to warrant the authority to continue administering the Customer Programs and to honor any Customer Obligations relating thereto.

(iv)     Motion of Debtors Pursuant for Authority to Pay Certain Prepetition Taxes and Fees (the "**Taxes Motion**")

94.     The Debtors request authorization to pay taxes, assessments, fees, and other related obligations (collectively, the "**Taxes and Fees**") in the ordinary course of business. In the course of operating their businesses, the Debtors collect, withhold, and incur an assortment of Taxes and Fees that they remit periodically to various federal, state, and local taxing and licensing (collectively, the "**Taxing Authorities**").

95.     The Debtors seek to pay certain Taxes and Fees, among other reasons, to prevent Taxing Authorities from taking actions that may interfere with the Debtors' administration of their Chapter 11 Cases. Such interference could include the assertion of liens against the Debtors' property or assessment of penalties or significant interest on past-due Taxes and Fees. Additionally, non-payment of the Taxes and Fees may give rise to priority claims pursuant to section 507(a)(8) of the Bankruptcy Code. Accordingly, the Debtors submit that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest, and will enable the Debtors to continue to operate their business with minimal disruptions.

(v)     Motion of Debtors For Authority, But Not Direction to Continue Their Insurance Policies and Programs, Pay All Obligations with Respect Thereto, and Related Relief (the "**Insurance Motion**")

96.     The Debtors request (i) authority to continue all Insurance Policies and Programs; (ii) authority to pay all Insurance Obligations, whether arising prepetition or postpetition; (iii) modification of the automatic stay solely and for the limited purpose of permitting employees with claims under the Workers' Compensation Policies to proceed with their claims in accordance with such program in the appropriate judicial or administrative forum; and (iv) related relief.

97.     In connection with the operation of their businesses, the Debtors maintain various liability and property-related insurance programs, which provide the Debtors with insurance coverage for liabilities including, but not limited to, general liability, umbrella and excess liability, property, automobile, crime, cyber liability, directors' and officers' liability, fiduciary liability, employment practices liability, and counsel liability.  Continuation of these policies is necessary to the ongoing operation of the Debtors' businesses.

98.     The Debtors are legally and contractually required to maintain certain Insurance Policies and the nature of the Debtors' businesses makes it essential for them to maintain all Insurance Policies on an ongoing and uninterrupted basis.  If any of the Debtors' Insurance Policies are terminated or lapse, the Debtors could be exposed to substantial liability to the detriment of all parties in interest and Debtor relationship with key contract counterparties could terminate contracts that are vital to the Debtors ongoing operations.

99.     The Debtors also maintain workers' compensation insurance in each of the states in which their businesses operate (collectively, the "**Workers' Compensation Program**") in accordance with the laws of such states which, in each case, require the Debtors to maintain workers' compensation policies and programs that provide their employees with workers' compensation benefits for claims arising from or related to their employment with the Debtors

38

(the "**Workers' Compensation Claims**").  The Debtors' annual premiums for the Workers' Compensation Program totaled approximately $194,092 which has been paid in full for the current coverage period subject to audit by the Workers' Compensation program carriers.

100.    The Debtors' failure to pay their obligations under the Workers' Compensation Program could jeopardize their coverage and expose the Debtors to significant liability in fines by state workers' compensation boards.  In addition, the risk that eligible workers' compensation claimants would not receive timely payments for prepetition employment-related injuries could negatively impact not only the financial well-being of those claimants, but also the morale of the Debtors' active employees.  This could result in employee departures, causing a significant disruption in the Debtors' business with a materially adverse impact on the Debtors' operations, the value of their estates, and the interests of all parties in the Chapter 11 Cases.

101.    Marsh USA Inc. ("**Marsh**") serves as the Debtors' insurance broker for the Insurance Policies and Programs.  To the extent any of the Insurance Policies and Programs discussed in this motion have an upcoming expiration date, the Debtors are working with Marsh to identify the most cost efficient means of ensuring uninterrupted coverage.

(vi)    Motion of Debtors Requesting Approval of (I) Debtors' Proposed Form Of Adequate Assurance Of Payment To Utility Providers, (II) Establishing Procedures Providing Adequate Assurance And Resolving Objections By Utility Providers, And (III) Prohibiting Utility Providers From Altering, Refusing, Or Discontinuing Utility Service (the "**Utilities Motion**")

102.    The Debtors request entry of interim and final orders (i) approving the Debtors' proposed form of adequate assurance of payment for postpetition utility services, (ii) establishing procedures for providing adequate assurance and resolving objections by Utility Providers (as defined in the Utilities Motion) relating to the adequacy of the proposed adequate

39

assurance, and (iii) prohibiting the Utility Providers from altering, refusing, or discontinuing service to, or discriminating against, the Debtors because of the Chapter 11 Cases or a debt that is owed by the Debtors for utility services rendered prior to the Petition Date.

103.    The relief requested will ensure that the Debtors' operations will not be disrupted, which would severely impact their business and prospects for a successful reorganization.    The Debtors' business operations require them to maintain constant communications with their offices, data centers, and retail partners, which requires, among other things, uninterrupted electricity and telecommunications services.   Any interruption in utility services—even for a brief period of time—would seriously disrupt the Debtors' ability to continue operations and service their customers.    Therefore, it is critical that utility services continue uninterrupted during the Chapter 11 Cases.

104.    The Debtors intend to pay both prepetition and postpetition obligations owed to the Utility Providers in the ordinary course of business.   The Debtors expect that cash flows from operations and the use of the Debtors' proposed DIP Financing will be sufficient to pay postpetition obligations related to their utility services in the ordinary course of business.   Furthermore, the Debtors propose to deposit into a segregated bank account (the "**Adequate Assurance Account**") a sum equal to the cost of two weeks' worth of the average utility cost for each Utility Provider (less any amounts already on deposit with any such Utility Provider that exceed outstanding prepetition amounts owed to such Utility Provider), based on the Debtors' average usage of such Utility Provider (collectively, the "**Adequate Assurance Deposit**").    The Debtors estimate that the Adequate Assurance Deposit would total approximately $120,000.  Such Adequate Assurance Deposit will further assure the Utility Providers of payment for postpetition services.

40

(vii)    Motion of Debtors Requesting Authority to Pay Prepetition Trade Claims in the Ordinary Course of Business (the "**All Trade Motion**")

105.    Through the All Trade Motion, the Debtors seek authority to pay in full, in the ordinary course of business, allowed prepetition claims of creditors (the "**Trade Creditors**") that provide goods or services related to the Debtors' operations (collectively, the "**Trade Claims**").    The Debtors estimate that total aggregate Trade Claims are approximately $23.0 million.    In addition, certain of the Trade Claims (a) are entitled to statutory priority under section 503(b)(9) of the Bankruptcy Code or (b) may give rise to shippers, warehouseman, mechanics, or other liens against the Debtors' property if unpaid (collectively, the "**Priority Trade Claims**").    The Debtors estimate the Priority Trade Claims total approximately $3.7 million.  In addition, approximately $7.7 million represent Critical Vendor Claims.  Excluding the Priority Trade Claims and the Critical Vendor Claims, the Debtors estimate that the total Trade Claims are approximately $11.6 million (the "**Non-Priority Trade Claims**).  The Debtors also seek that this Court confirm administrative priority status of all Prepetition Purchase Orders and authorize the Debtors to pay such obligations in the ordinary course of business..

106.    As discussed herein and in the All Trade Motion, the Trade Creditors provide the Debtors with the essential goods and services that facilitate these and other of their operations.    The Trade Claims include claims of the Debtors' (a) Retailers for fees owed on account of the shopper data provided by the Retailer Network; (b) third-party software engineering service providers and related support servicers; (c) providers of digital advertisement and promotional support and distribution services that reach shoppers through in-store, internet, and mobile device platforms; (d) providers of software warranty and maintenance and other IT support for the Debtors' software and related hardware; (e) providers of digital security for software vulnerability and malware protection; (f) other software servicers that provide critical

41

support necessary for the continuous, on-demand transmission of data and promotional messaging; (g) suppliers of ink, paper, replacement printer components, computers, and computer components all necessary to maintain consistent POS service at the various store locations in the Retailer Network and day-to-day business operations; (h) maintenance service providers for the consistent repair and maintenance of the Networked Printers across the Retailer Network; (i) utility service providers; and (j) other general operational expenses that are not addressed in other first day motions.

107.    I believe it is a sound exercise of the Debtors' business judgment to pay the Trade Claims as they become due in the ordinary course of business because doing so will avoid value-destructive business interruption and will not prejudice the Debtors' other stakeholders.  The Prepackaged Plan, which the Debtors' secured lenders have agreed to support and vote in favor of by the requisite voting majorities, provides for the full and uninterrupted payment of such claims.  The goods and services provided by Trade Creditors are necessary for the continued, uninterrupted operation of the Debtors' businesses.  I believe that failure to pay the Trade Claims as they become due is likely to result in many Trade Creditors refusing to provide essential goods and services or conditioning the delivery of such goods and services on compliance with onerous and commercially unreasonable terms.

108.    I further believe that nonperformance by numerous Trade Creditors could materially disrupt the Debtors' business operations and jeopardize the continued viability of the Debtors' business and these cases to the detriment of all of the Debtors' stakeholders.  In addition, because the Trade Creditors are already familiar with the Debtors' assets and business needs based on years of the Debtors' building relationships with such vendors, they are in the best position to provide goods and services on commercially reasonable terms.  If the Trade

42

Creditors refuse to perform on their obligations, the Debtors may find it very difficult to locate replacement vendors of geographic or logistical scope necessary to support their operations throughout their officers and the Retailer Network, and indeed, may make it difficult to maintain business operations and the Retailer Network.  Therefore, even if it were possible to obtain replacement goods and services, I believe that doing so would likely cause substantial delay and significant costs.

109.    Moreover, no party in interest will be prejudiced by the relief requested in the All Trade Motion because the Trade Claims are unimpaired and will be paid in full under the Prepackaged Plan and, as discussed in the All Trade Motion, many of the Trade Claims enjoy statutory or other priority and are otherwise entitled to be paid in full.  The relief requested in the All Trade Motion seeks to alter only the timing, not the amount or priority, of such payments. Furthermore, I believe that paying the modest amount of Trade Claims—approximately 1.0% of the total debt to be restructured in these cases—in the ordinary course is prudent when compared to the amount the Debtors' stakeholders stand to lose if the Debtors' business were interrupted.

110.    Furthermore, I understand that certain of the Trade Claims are entitled to administrative claim status under the Bankruptcy Code.  As discussed in the All Trade Motion, certain of the Trade Claims are entitled to the statutory priority for goods delivered to the Debtors in the ordinary course of business within 20 days before the Petition Date.  I believe that the failure to make payments on account of these Priority Trade Claims could have material, adverse effects on the Debtors' business, including a failure to maintain their network-related hardware and Networked Printers, thus harming their ability to distribute promotional impressions, generate revenue, and operate in the ordinary course of business.

111.    Certain of the Trade Claims are also held by Lien Claimants, who may hold on the Petition Date liens on certain of the Debtors' Goods and Networked Printers.  The Debtors rely heavily on the Lien Claimants, many of which currently hold property of the Debtors, to transport expeditiously their Goods and Networked Printers throughout the Retailer Network, and to otherwise provide essential ongoing maintenance and repair services to the Networked Printers.  If the Debtors are unable to access the Goods and Networked Printers held by (and the services provided by) the Lien Claimants, I believe that their operations will likely halt, derailing the Chapter 11 Cases.  Furthermore, the Debtors' ability to distribute promotional materials are compromised, the Debtors' revenue generation will be impaired.  Thus, I believe that the prompt payment to the Lien Claimants of their Priority Trade Claims and satisfaction of any purported asserted liens is an exercise of the Debtors' sound business judgment and crucial for the orderly and efficient operation of the Debtors' business.

112.    In addition, certain of the Trade Creditors are essential to maintaining the going concern value of the Debtors' enterprise.  These Critical Vendors include, among others, those Retailers which provide shopper data essential to maintain the continuity of the Shopper Database, those software servicers and support providers which assist in maintaining or protecting the integrity of the Debtors' software and data, and those vendors which provide necessary goods and support for the Networked Printers and the Debtors' network-related hardware.

113.    I believe that payment of Critical Vendors is necessary for the Debtors to maintain operations, to preserve the value of the Debtors' business, and moreover, to enable the Debtors to function in the ordinary course.  Many of the Critical Vendors are providers of operations-necessary data, specialized software support services, or printer repair, maintenance,

44

and supplies; none of which can be easily replaced in a feasible manner due to, among other things, the (a) need to maintain current a Shopper Database to provide seamless transmission to POS promotional impressions created with the Analytics' Platform, without any interruption or risks to the integrity of the Shopper Database and (b) sheer volume of goods or services that would be required to enable the Debtors to facilitate their impression printing ability across their Retailer Network and ensure the consistent maintenance of their Networked Printers.

114.    Failure to pay the Critical Vendor Claims would result in a loss of value to the Debtors' businesses, which would suffer from material disruptions without the continued support provided by the Critical Vendors.  Indeed, without ensuring payment to the Critical Vendors, I believe that at best, the integrity and seamless transmission of their data analysis could be materially inhibited, and at worst, the Debtors would be completely unable to generate a material portion of their revenue due to a disruption in their ability to distribute promotional impressions.  Without the ability to distribute promotional materials, which requires the seamless transmission of the Debtors' data, the Debtors' ability to generate revenue would be severely compromised.  This would not only restrain the Debtors' cash flow, but would harm the Debtors' relationships with their customers on a go-forward basis, and could cause the Debtors' customers to seek business from the Debtors' competitors, threatening to derail the Debtors' entire reorganizational efforts, including the success of the Prepackaged Plan.  Accordingly, I believe that if the Debtors do not make Critical Vendor payments, their value will be reduced by amounts well in excess of amounts that the Debtors seek authorization to pay.  In addition, I further believe that maintaining favorable trade terms with the Critical Vendors is in the best interests of all parties in interest in these cases.

115.     Finally, the Debtors have certain Prepetition Purchase Orders outstanding with various Trade Creditors for goods or services ordered by the Debtors that have not yet been delivered or provided to the Debtors.   I believe that confirmation of this Court of the administrative expense status of these Prepetition Purchase Orders is necessary for the Debtors' success in the Chapter 11 Cases, and will preserve the value of their estates and their relationships with their suppliers.

(viii)   Motion of Debtors Requesting Establishment of Notification of Provisions and Approval of Restrictions on (I) Certain Transfers of Interests in the Debtors and (II) Claims of Worthless Stock Deductions (the "NOL Motion")

116.     In the NOL Motion, pursuant to sections 105(a) and 362 of title 11 of the Bankruptcy Code, the Debtors request entry of interim and final orders authorizing the Debtors to establish procedures (the "**Procedures**") to protect the potential value of the Debtors' consolidated net operating loss carryforwards ("**NOLs**") for use in connection with the Debtors' reorganization.   The Procedures apply to the common stock of PDM Group Holdings Corporation (the "**Common Stock**") and any options or similar rights (within the meaning of applicable U.S. Treasury regulations) to acquire such stock ("**Options**").

117.     The Debtors have certain valuable tax attributes, which include, as of the Petition Date, estimated NOLs in excess of $145 million (the "**Tax Attributes**").   The Tax Code generally permits a corporation to carry forward its NOLs and disallowed business interest to reduce future taxable income, thereby reducing, along with available tax credits, such corporation's tax liability in future period.   Accordingly, the Tax Attributes are available to offset any income realized through the taxable year that includes the effective date of a chapter 11 plan, and potentially thereafter.   I believe the Tax Attributes could translate into future tax

savings over time and any such savings could enhance the Debtors' cash position for the benefit of all parties in interest and contribute to the Debtors' efforts toward a successful reorganization.

118.    The Debtors' ability to use the Tax Attributes to reduce future tax liability is subject to certain statutory limitations.   Sections 382 and 383 of the Tax Code limit a corporation's use of its tax attributes to offset future income after that corporation has undergone an "ownership change" within the meaning of section 382 of the Tax Code ("**Section 382**" and such ownership change, an "**Ownership Change**").   Pursuant to section 382(g)(4)(D) of the Tax Code, if (a) a 50-percent shareholder (which, for this purpose, includes a shareholder who owned at least fifty percent (50%) of the stock at any time during the applicable three-year period) in a corporation claims a worthless stock deduction (a "**Worthless Stock Deduction**") during any taxable year and (b) the stock with respect to which such Worthless Stock Deduction is taken is held by the shareholder at the end of such taxable year, then the shareholder is treated as having acquired such stock on the first day of the shareholder's next taxable year and is treated as never having owned such stock during any prior year for purposes of testing whether an Ownership Change has occurred.   In the case of the Debtors, an Ownership Change could occur as a result of the largest holder of Common Stock claiming a Worthless Stock Deduction with respect to such stock.

119.    I believe that the Debtors' Tax Attributes would be adversely affected (and could be effectively eliminated) by an Ownership Change and a claim of a Worthless Stock Deduction during the pendency of the Chapter 11 Cases.   If such an Ownership Change were to occur, the availability and value of such Tax Attributes would be adversely impacted.   Therefore, it is in the best interests of the Debtors and their stakeholders to restrict both the trading of Common Stock and any claim of a Worthless Stock Deduction that could result in an Ownership

47

Change occurring *before* the effective date of a chapter 11 plan or any applicable bankruptcy court order.  Such a restriction would protect the Debtors' ability to use the Tax Attributes during the pendency of the Chapter 11 Cases or, potentially, in the event of a future transaction, to offset gain or other income recognized in connection with the Debtors' sale or ownership of their assets, which may be significant in amount.

120.    By establishing the Procedures for monitoring the transfer of, and the claiming of a worthless stock deduction by any Majority Stockholder with respect to, Common Stock, the Debtors can preserve their ability to seek the necessary relief if it appears that any such transfer(s) may jeopardize the Debtors' ability to utilize their Tax Attributes.

121.    I believe the Procedures are necessary to preserve the Debtors' ability to use their Tax Attributes, while providing certain latitude for trading.  The Debtors' ability to preserve their Tax Attributes may be seriously jeopardized unless procedures are established immediately and *nunc pro tunc* to the Petition Date to ensure that trading in certain interests in is either precluded or closely monitored and made subject to Court approval.

## Conclusion

122.    This Declaration illustrates the factors that have precipitated the commencement of the Chapter 11 Cases and the critical need for the Debtors to implement their restructuring.

123.    I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

*[Remainder of Page Intentionally Left Blank.]*

48

Executed this 12th day of December, 2018

/s/ Robert A Del Genio
Robert A. Del Genio
on Behalf of the Debtors and Debtors-in-Possession

## Exhibit A

**Restructuring Support Agreement**

*Execution Version*

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "*Agreement*"), dated as of December 11, 2018, is entered into by and among:

(i) PDM Group Holdings Corporation ("*Catalina Parent*"), a Delaware corporation;

(ii) Catalina Marketing Corporation, Catalina Marketing Procurement, LLC, Catalina Marketing Technology Solutions, Inc., Catalina Marketing Worldwide, LLC, CellFire Inc., Modiv Media, Inc., Checkout Holding Corp., PDM Holdings Corporation, PDM Intermediate Holdings A Corporation, and PDM Intermediate Holdings B Corporation (together with Catalina Parent, each a "*Catalina Party*" or "*Catalina Entity*" and collectively, the "*Company*");

(iii) the undersigned lenders, or investment advisors or managers for the account of lenders, party to that certain senior secured first lien credit facility (the "*First Lien Credit Facility*" and, the indebtedness incurred by the Company thereunder, the "*First Lien Indebtedness*") pursuant to that certain First Lien Credit Agreement, dated as of April 9, 2014 (as amended from time to time, the "*First Lien Credit Agreement*"), among PDM Holdings Corporation, as holdings, Checkout Holding Corp., as borrower, JPMorgan Chase Bank, N.A., as administrative agent (the "*First Lien Agent*"), the lenders party thereto from time to time (the "*First Lien Lenders*" and, the undersigned First Lien Lenders (to the extent identified as "Consenting First Lien Lenders" on the signature pages hereto), together with their respective successors and permitted assigns and any subsequent First Lien Lender that becomes party hereto in accordance with the terms hereof, the "*Consenting First Lien Lenders*") and the other agents party thereto from time to time; and

(iv) the undersigned lenders, or investment advisors or managers for the account of lenders, party to that certain senior secured second lien credit facility (the "*Second Lien Credit Facility*" and, the indebtedness incurred by the Company thereunder, the "*Second Lien Indebtedness*" and, together with the First Lien Indebtedness and any other indebtedness issued by any of the Catalina Entities ("*Other Indebtedness*"), the "*Indebtedness*") pursuant to that certain Second Lien Credit Agreement dated as of April 9, 2014 (as amended from time to time, the "*Second Lien Credit Agreement*"), among PDM Holdings Corporation, as holdings, Checkout Holding Corp., as borrower, Wilmington Savings Funds Society, FSV, as successor administrative agent (the "*Second Lien Agent*"), the lenders party thereto from time to time (the "*Second Lien Lenders*" and, the undersigned Second Lien Lenders (to the extent identified as "Consenting Second Lien Lenders" on the signature pages hereto), together with their respective successors and permitted assigns and any subsequent Second Lien Lender that becomes party hereto in accordance with the terms hereof, the "*Consenting Second Lien Lenders*") and together with the Consenting First Lien Lenders, the "*Consenting Creditors*")[1] and the other agents party thereto from time to time.

---

[1] For the avoidance of doubt, any Consenting Creditor that is a Qualified Marketmaker shall be considered a Consenting Creditor and required to comply with the terms and obligations of this Agreement solely to the extent provided in Section 3(g).

The Company, each Consenting Creditor, and any subsequent person or entity that becomes a party hereto in accordance with the terms hereof are referred herein as the "***Parties***" and individually as a "***Party***."

When a reference is made in this Agreement to a Section, Exhibit or Schedule, such reference shall be to a Section, Exhibit or Schedule, respectively, of or attached to this Agreement unless otherwise indicated. Unless the context of this Agreement otherwise requires, (a) words using the singular or plural also include the plural or singular , respectively, (b) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement, (c) the words "include," "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation," (d) the word "or" shall not be exclusive and shall be read to mean "and/or" and (e) any reference to dollars or "$" shall be to United States dollars. The Parties agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

## RECITALS

**WHEREAS,** the Parties have engaged in good faith, arm's length negotiations and have agreed to enter into certain transactions (the "***Restructuring Transactions***") in furtherance of a global restructuring of the Company (the "***Restructuring***") which is anticipated to be effected through a plan of reorganization (as may be amended from time to time in accordance with the terms hereof, the "***Plan***"), a solicitation of votes therefor (the "***Solicitation***") pursuant to the Bankruptcy Code (as defined below), and the commencement by the Company of voluntary cases (the "***Chapter 11 Cases***") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "***Bankruptcy Code***"), in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***");

**WHEREAS**, the Restructuring Transactions include those transactions described in the Plan Term Sheet attached hereto as **Exhibit A** (the "***Plan Term Sheet***");

**WHEREAS,** as of the date hereof, the Consenting First Lien Lenders hold, in the aggregate, approximately 93% of the aggregate outstanding principal amount of the First Lien Indebtedness, and approximately [•]% of the aggregate outstanding principal amount of the Second Lien Indebtedness;

**WHEREAS,** as of the date hereof, the Consenting Second Lien Lenders hold, in the aggregate, approximately 78% of the aggregate outstanding principal amount of the First Lien Indebtedness, and approximately [•]% of the aggregate outstanding principal amount of the Second Lien Indebtedness;

**WHEREAS**, the Company and the Consenting Creditors have reached an agreement for the consensual use of Cash Collateral (as defined in the Bankruptcy Code) and the Company's entry into the DIP Facility (as defined below) pursuant to the terms and conditions consistent with the Plan Term Sheet (the "***DIP Credit Agreement***") and the interim and final orders approving, among other things, the Company's entry into the DIP Facility, to be entered by the Bankruptcy

Court (the "**_Interim DIP Order_**" and the "**_Final DIP Order_**," respectively, and together the "**_DIP Orders_**") in form and substance acceptable to the Company and the DIP Lenders (as defined below) and consistent with the terms of this Agreement, including the Plan Term Sheet; and

      **WHEREAS**, the Parties desire to express to each other their mutual support and commitment in respect of the matters discussed in the Plan Term Sheet and hereunder.

      **NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

      1.    <u>**Certain Definitions**</u>.

      As used in this Agreement, the following terms have the following meanings:

      (a)    "**_Capital Stock_**" means the issued and outstanding shares of capital stock of Catalina Parent or any option thereon or any right or interest therein.

      (b)    "**_Claims_**" has the meaning set forth in section 101(5) of the Bankruptcy Code.

      (c)    "**_Closing_**" means the consummation of the transactions contemplated by the Plan on the Effective Date.

      (d)    "**_Confirmation Order_**" means the order of the Bankruptcy Court confirming the Plan in the Chapter 11 Cases, which order will be in form and substance reasonably satisfactory to the Requisite Creditors and the Company.

      (e)    "**_Consenting Class_**" means either the First Lien Lenders or the Second Lien Lenders, as applicable.

      (f)    "**_Consenting Creditor Advisors_**" means Creditor Counsel, Evercore Group, L.L.C., as financial advisor to the First Lien Lenders and PJT Partners, LP, as financial advisor to the Second Lien Lenders.

      (g)    "**_Creditor Counsel_**" means Jones Day, as counsel to the First Lien Lenders, and Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel to the Second Lien Lenders.

      (h)    "**_Definitive Documents_**" means (i) this Agreement (including the Plan Term Sheet), (ii) the Plan (including any ballots, supplements, or other material documents directly relating thereto not specified herein), (iii) the Disclosure Statement, (iv) the DIP Orders, (v) the motion seeking approval of the DIP Orders, (vi) the motion seeking approval by the Bankruptcy Court of the Disclosure Statement and the Solicitation procedures, and the orders of the Bankruptcy Court approving the Disclosure Statement and confirming the Plan, (vii) the DIP Credit Agreement and related financing documents (the "D<u>IP Documents</u>"), (vii) all exit financing documents (the "<u>Exit Documents</u>"), (viii) all first day pleadings or papers, and (ix) all second day pleadings or papers, in each case, which are reasonably satisfactory in form and substance to the Requisite Creditors, subject to the Second Lien Lender Consent Right.

(i)    "*DIP Facility*" means the debtor-in-possession facility to be provided to the Company in accordance with the terms, and subject in all respects to the conditions, set forth in the DIP Credit Agreement and pursuant to the terms and conditions of the DIP Orders.

(j)    "*DIP Lenders*" means those Consenting Creditors that are providing the DIP Facility in their capacities as First Lien Lenders.

(k)    "*Disclosure Statement*" means the disclosure statement in respect of the Plan, including, without limitation, all exhibits and schedules thereto, as supplemented from time to time.

(l)    "*Effective Date*" means the date upon which all conditions to the effectiveness of the Plan have been satisfied or waived in accordance with the terms thereof and the Plan becomes effective.

(m)    "*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) of a Catalina Party, including all shares, common stock, preferred stock, or other instrument evidencing any fixed or contingent ownership interest in any Catalina Party, including any option, warrant, or other right, contractual or otherwise, to acquire any such interest in a Catalina Party, whether or not transferable and whether fully vested or vesting in the future, that existed immediately before the Effective Date.

(n)    "*NCS JV Agreements*" means the NC Ventures, LLC Limited Liability Company Agreement dated October 1, 2015 and all related agreements, including, without limitation, (i) the NC Ventures, LLC Catalina Data and Intellectual Property License Agreement dated October 6, 2009 and (ii) that certain side letter agreement dated June 29, 2009 by and between Catalina Marketing Corporation and The Nielsen Company (US) LLC.

(o)    "*New Board*" means the initial board of directors of Reorganized Catalina Parent.

(p)    "*New Common Stock*" means the shares of common stock of Reorganized Catalina Parent issued pursuant to the Plan.

(q)    "*Prepetition Loan Documents*" means the First Lien Credit Agreement and the Second Lien Credit Agreement and, in each case, all "Loan Documents" as defined therein.

(r)    "*Reorganized Catalina Parent*" means Catalina Parent, as reorganized as of the Effective Date.

(s)    "*Reorganized Debtors*" means Catalina Parent and the other Debtors, as reorganized on the Effective Date.

(t)    "*Requisite Creditors*" means the Requisite First Lien Lenders and the Requisite Second Lien Lenders.

(u)    "*Required DIP Lenders*" means, as of the date of determination, DIP Lenders holding at least a majority of the aggregate principal amount outstanding of the DIP Facility and any unused or unfunded commitments thereunder.

(v)      "***Requisite First Lien Lenders***" means, as of the date of determination, Consenting First Lien Lenders holding at least a majority of the aggregate principal amount outstanding of the First Lien Indebtedness held by all Consenting First Lien Lenders.

(w)      "***Requisite Second Lien Lenders***" means, as of the date of determination, Consenting Second Lien Lenders holding at least a majority of the aggregate principal amount outstanding of the Second Lien Indebtedness held by all Consenting Second Lien Lenders.

(x)      "***Second Lien Lender Consent Right***" means the Requisite Consenting Second Lien Lenders' right to consent or approve the Definitive Documents, which right shall be as follows: (i) this Agreement (including the Plan Term Sheet), the Plan (including any ballots, supplements, or other documents relating thereto not specified herein), the Disclosure Statement, the motion seeking approval by the Bankruptcy Court of the Disclosure Statement and the Solicitation procedures, and the Confirmation Order shall be reasonably acceptable in form and substance to the Requisite Second Lien Lenders and (ii) all other Second Lien Lender consent rights shall apply solely to the extent the Definitive Document (A) is not consistent in any material respects with this Agreement or the  Plan Term Sheet; (B) adversely affects, directly or indirectly, in any respect the economic rights, waivers, or releases proposed to be granted to, or received by, the Consenting Second Lien Lenders pursuant to this Agreement and the Plan (including, but not limited to, through the treatment (or change to the treatment) under the Plan of any claim or interest), other than such different treatment that may be consented to by the affected Second Lien Lenders, or (C) adversely affects, directly or indirectly, the obligations the Consenting Second Lien Lenders may have pursuant to this Agreement or the Plan; *provided*, *however*, that any Consenting Second Lien Lender that is (I) a DIP Lender (in its capacity as a holder of First Lien Indebtedness) shall have all rights (including consent rights) afforded to a DIP Lender under the DIP Credit Agreement and, before the DIP Credit Agreement becomes effective, all First Lien Indebtedness held by such Second Lien Lender shall be included in the calculation of "Requisite First Lien Lenders" with respect to consent rights over the DIP Orders, DIP Credit Agreement, and other DIP Documents and (II) a participant in any exit financing facility shall have all rights (including consent rights) of a lender with respect thereto and all First Lien Indebtedness held by such Second Lien Lender shall be included in the calculation of "Requisite First Lien Lenders" with respect to consent rights over the Exit Documents.

(y)      "***Securities Act***" means the Securities Act of 1933, as amended.

(z)      "***Support Effective Date***" means the date on which (i) counterpart signature pages to this Agreement shall have been executed and delivered by (A) the Company and (B) Consenting Creditors holding at least 66⅔% in aggregate principal amount outstanding of the First Lien Indebtedness and at least 66⅔% in aggregate principal amount outstanding of the Second Lien Indebtedness, and (ii) all of the reasonable and documented fees and expenses of the Consenting Creditor Advisors (including any applicable local counsel) incurred and outstanding as of the day immediately prior to the Support Effective Date shall have been paid in full in cash (except as otherwise agreed by the applicable Consenting Creditor Advisor).

(aa)      "***Support Period***" means the period commencing on the Support Effective Date and ending on the earlier of the (i) date on which this Agreement is terminated in accordance with <u>Section 6</u> hereof and (ii) Effective Date.

2. **Bankruptcy Process; Plan of Reorganization.**

(a)    The Plan.  The Plan Term Sheet is expressly incorporated herein and made a part of this Agreement.  All references to this Agreement shall be deemed to include the Plan Term Sheet.  The material terms and conditions of the Restructuring are set forth in the Plan Term Sheet; *provided* that the Plan Term Sheet is supplemented by the terms and conditions of this Agreement. In the event of any inconsistencies between the terms of this Agreement and the Plan Term Sheet, the terms of this Agreement shall govern.

(b)    Commencement of the Chapter 11 Cases.  The Company hereby agrees that, as soon as reasonably practicable, but in no event later than three (3) calendar days after the Support Effective Date (the "***Outside Petition Date***") (the date on which such filing occurs, the "***Petition Date***"), the Company shall file with the Bankruptcy Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code and any and all other documents necessary to commence the Chapter 11 Cases of the Company.

(c)    Filing of the Plan and Disclosure Statement.  The Company shall file the Plan along with the Disclosure Statement, each in form and substance reasonably satisfactory to the Requisite Creditors on the date no later than the date necessary to obtain entry of an order approving the Disclosure Statement in accordance with this Agreement.

(d)    Confirmation of the Plan.  The Company shall use its commercially reasonable efforts to obtain confirmation of the Plan as soon as reasonably practicable following the Petition Date in accordance with the Bankruptcy Code and on terms consistent with this Agreement, and each Consenting Creditor shall use its commercially reasonable efforts to cooperate fully in connection therewith.

(e)    DIP Financing and Cash Collateral.  No later than one (1) business day after the Petition Date, the Company shall file a motion with the Bankruptcy Court seeking interim and final authority to use Cash Collateral and enter into the DIP Facility in accordance with the DIP Orders.

(f)    Assumption of this Agreement.  No later than 7 calendar days after the Petition Date, the Company shall file a motion with the Bankruptcy Court seeking the assumption of this Agreement.

3. **Agreements of the Consenting Creditors.**

(a)    Voting; Support.  Each Consenting Creditor agrees that, during the Support Period, such Consenting Creditor shall:

(i)    (A) timely vote or cause to be voted its Claims (including, without limitation, all claims arising under the First Lien Credit Agreement and the Second Lien Credit Agreement, as applicable) to accept the Plan by delivering its duly executed and completed ballot or ballots, as applicable, accepting the Plan on a timely basis, (B) not change or withdraw such vote (or cause or direct such vote to be changed or withdrawn); *provided*, *however*, that such vote may, upon written notice to the Company and the other

Parties, be revoked (and, upon such revocation, deemed void *ab initio*) by any Consenting Creditor at any time following the expiration of the Support Period;

(ii)    timely vote (or cause to be voted) its Claims against any plan, plan proposal, restructuring proposal, offer of dissolution, assignment for the benefit of creditors, winding up, liquidation, sale or disposition, reorganization, merger, business combination, joint venture, debt or equity financing or re-financing, recapitalization or other restructuring of the Company (including, for the avoidance of doubt, a transaction premised on an asset sale under section 363 of the Bankruptcy Code) other than the Plan (each, an "***Alternative Restructuring***");

(iii)   not directly or indirectly, through any person or entity (including, without limitation, any administrative agent or collateral agent), seek, solicit, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing or prosecution of any Alternative Restructuring or object to or take any other action that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay or impede the Solicitation, approval of the Disclosure Statement, or the confirmation and consummation of the Plan and the consummation of the Restructuring;

(iv)    agree to provide, and to not opt out of, the releases of the Company, the Reorganized Debtors and the Released Parties substantially in the form set forth in the Plan Term Sheet;

(v)     not direct any administrative agent or collateral agent (as applicable) to take any action inconsistent with such Consenting Creditor's obligations under this Agreement, and, if any applicable administrative agent or collateral agent takes any action inconsistent with such Consenting Creditor's obligations under this Agreement, such Consenting Creditor shall use its commercially reasonable efforts to direct and cause such administrative agent or collateral agent to cease and refrain from taking any such action;

(vi)    support and take all commercially reasonable actions reasonably requested by the Company to facilitate the Solicitation of the Plan, obtain approval of the Disclosure Statement, and obtain confirmation and consummation of the Plan and the Restructuring; and

(vii)   to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring, negotiate in good faith appropriate additional or alternative provisions to address any such impediment.

(b)    Transfers.  Each Consenting Creditor agrees that, during the Support Period, such Consenting Creditor shall not sell, transfer, loan, issue, pledge, hypothecate, assign or otherwise dispose of (each, a "***Transfer***"), directly or indirectly, in whole or in part, any of its Claims or any option thereon or any right or interest therein or any other claims against or interests in the Company (including the grant of any proxy or the deposit of any Claims against or interests in the Company into a voting trust or the entry into a voting agreement with respect thereto), unless the transferee thereof either (i) is a Consenting Creditor or (ii) prior to such Transfer, agrees in writing

for the benefit of the Parties to become a Consenting Creditor and to be bound by all of the terms of this Agreement applicable to Consenting Creditors (including with respect to any and all claims or interests it already may hold against or in the Company prior to such Transfer) by executing a joinder agreement, a form of which is attached hereto as **Exhibit B** (a "*Joinder Agreement*"), and delivering an executed copy thereof within two (2) business days of such execution, to (A) Weil, Gotshal & Manges LLP ("*Weil*"), as counsel to the Company, and (B) Creditor Counsel, in which event (x) the transferee (including the Consenting Creditor transferee, if applicable) shall be deemed to be a Consenting Creditor hereunder and (y) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such Transferred rights and obligations; *provided* that a Consenting Creditor may Transfer its Claims to an entity that is acting in its capacity as a Qualified Marketmaker[2] without the requirement that the Qualified Marketmaker execute a Joinder Agreement, *provided* that (I) any subsequent Transfer by such Qualified Marketmaker of the right, title, or interest in such Claims is to a transferee that is or becomes a Consenting Creditor at the time of such Transfer and (II) the Qualified Marketmaker complies with Section (d) hereof. To the extent that a Consenting Creditor is acting in its capacity as a Qualified Marketmaker, it may Transfer any right, title, or interest in such Claims that the Qualified Marketmaker acquires from a holder of the Claims who is not a Consenting Creditor without the requirement that the transferee be or became a Consenting Creditor.

(c)     Additional Claims or Interests. To the extent any Consenting Creditor (i) acquires additional Claims, (ii) holds or acquires any other claims against the Company entitled to vote on the Plan, (iii) holds or acquires any Interests in the Company entitled to vote on the Plan or (iv) Transfers any Claims, then, in each case, each such Consenting Creditor shall promptly (in no event less than three (3) business days following such acquisition or transaction) notify Weil and applicable Creditor Counsel for the Consenting Class of which such Consenting Creditor is a member of such transaction in writing and each such Consenting Creditor agrees with respect to (i) through (iii) above that such additional Claims or other claims or Interests shall be subject to this Agreement, and that, for the duration of the Support Period, it shall vote (or cause to be voted) any such additional Claims or other claims or Interests entitled to vote on the Plan in a manner consistent with Section 3(a) hereof (and in the event the Solicitation has already commenced, no later than two (2) business days following the acquisition of such Claim, claims or Interests).

(d)     Obligations of Qualified Marketmaker. If at the time of a proposed Transfer of Claims to a Qualified Marketmaker, such Claims (i) may be voted on the Plan, the proposed transferor Consenting Creditor must first vote such Claims in accordance with Section 3(a) or (ii) have not yet been and may not yet be voted on the Plan and such Qualified Marketmaker does not Transfer such Claims or Interests to a subsequent transferee prior to the third (3rd) Business Day prior to the expiration of the applicable voting deadline (such date, the "*Qualified Marketmaker Joinder Date*"), such Qualified Marketmaker shall be required to (and the transfer documentation to the Qualified Marketmaker shall have provided that it shall), on the first (1st) Business Day immediately following the Qualified Marketmaker Joinder Date, become a Consenting Creditor

---

[2] As used herein, the term "*Qualified Marketmaker*" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers claims against the Company (or enter with customers into long and short positions in claims against the Company), in its capacity as a dealer or marketmaker in claims against the Company and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

with respect to such Claims in accordance with the terms hereof (including the obligation to vote in favor of the Plan) and shall vote in favor of the Plan in accordance with the terms hereof; *provided*, that, the Qualified Marketmaker shall automatically, and without further notice or action, no longer be a Consenting Creditor with respect to such Claims at such time that the transferee of such Claims becomes a Consenting Creditor, with respect to such Claims.

(e)    Forbearance.  Each Consenting Creditor agrees to forbear until 9:00 a.m. prevailing Eastern Time on December 13, 2018 from the exercise of its rights (including any right of set-off) or remedies it may have under the Prepetition Loan Documents, as applicable, and under applicable U.S. or foreign law or otherwise, in each case, solely with respect to the Company's (i) failure to make the interest payment due to First Lien Agent for the benefit of the First Lien Lenders on November 30, 2018, (ii) failure to make the interest payment due to Second Lien Agent for the benefit of the Second Lien Lenders on November 30, 2018, (iii) failure to deliver the quarterly financial statements and related Compliance Certificate (as defined in the Prepetition Loan Document for the fiscal quarter ended September 30, 2018, as required by Sections 6.01(b) and 6.02(a) of the First Lien Credit Agreement and Second Lien Credit Agreement, respectively, (iv) failure to participate in a conference call with the First Lien Agent and First Lien Lenders and the Second Lien Agent and Second Lien Lenders to discuss the financial condition and results of operations of the Company for the fiscal quarter ended September 30, 2018, as required by Section 6.17 of the First Lien Credit Agreement and the Second Lien Credit Agreement, respectively; (v) failure to comply with the Financial Covenant (as defined in the First Lien Credit Agreement) as of the Compliance Date (as defined in the First Lien Credit Agreement) occurring on September 30, 2018, as required by Section 7.11 of the First Lien Credit Agreement, (vi) failure to deliver the quarterly financial statements and related compliance certificate for the fiscal quarter ended September 30, 2018, as required by Sections 6.0l(b) and 6.02(a) of the Note Purchase Agreement dated as of April 9, 2014 among PDM Intermediate Holdings B Corporation, as issuer and the investors party thereto from time to time as purchasers, and (vii) entry into this Agreement or the other documents related to this Agreement and the transactions contemplated by this Agreement and the implementation thereof (the defaults listed in (i)-(vii) collectively, the "*Specified Defaults*") and on no other basis.  Each Consenting Creditor further agrees that if any applicable administrative agent or collateral agent takes any action inconsistent with any such Consenting Creditor's obligations under this Agreement, such Consenting Creditor shall direct and use commercially reasonable efforts to cause such administrative agent or collateral agent to cease and refrain from taking such actions.  For the avoidance of doubt, the forbearance set forth in this Section 3(d) shall not constitute a waiver with respect to any default or event of default under the First Lien Credit Agreement or Second Lien Credit Agreement and shall not bar any Consenting Creditor from filing a proof of claim or taking action to establish the amount of such claim.  Upon the termination of this Agreement, the agreement of the Consenting Creditors to forbear from exercising rights and remedies in accordance with this Section 3(e) shall immediately terminate without requirement of any demand, presentment or protest of any kind, all of which the Catalina Parties hereby waive.

(f)    Notwithstanding anything to the contrary herein, nothing in this Agreement shall limit, condition or restrict, in any way, any Consenting Creditor, in its capacity as a DIP Lender, from (i) exercising any rights and remedies under the DIP Credit Agreement (and any related credit documents, including the DIP Orders), (ii) waiving or forbearing with respect to any Default or Event of Default under and as defined in the DIP Credit Agreement and DIP Orders, (iii) amending,

modifying or supplementing the DIP Credit Agreement (or any related credit documents), or (iv) refusing to make additional advances under the DIP Credit Agreement, in each case, in their sole and absolute discretion and in accordance with the terms of the DIP Credit Agreement (or related credit documents and the DIP Orders).

(g)    The Company understands that the Consenting Creditors are engaged in a wide range of financial services and businesses, and, in furtherance of the foregoing, the Company acknowledges and agrees that the obligations set forth in this Agreement shall only apply to the trading desk(s) and/or business group(s) of the Consenting Creditor that principally manage and/or supervise the Consenting Creditor's investment in the Company, and shall not apply to any other trading desk or business group of the Consenting Creditor so long as they are not acting at the direction or for the benefit of such Consenting Creditor.  Further, notwithstanding anything in this Agreement to the contrary, the Parties agree that, in connection with the delivery of signature pages to this Agreement by a Consenting Creditor that is a Qualified Marketmaker before the occurrence of conditions giving rise to the Support Effective Date, such Consenting Creditor shall be a Consenting Creditor hereunder solely with respect to the Claims listed on such signature pages and shall not be required to comply with this Agreement for any other Claims it may hold.

**4.      [Reserved]**

**5.      Agreements of the Company**.

(a)    <u>Covenants</u>.  The Company agrees that, during the Support Period, the Company shall:

(i)    (A) use commercially reasonable efforts to obtain any and all required regulatory approvals for the Restructuring set forth in the Plan, if any; and (B) not take any action that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay or impede the Solicitation, approval of the Disclosure Statement, or the confirmation and consummation of the Plan and the consummation of the Restructuring, in each case, to the extent consistent with, upon the advice of counsel, the fiduciary duties of the boards of directors, managers, members or partners, as applicable, of each Catalina Party; *provided* that the Company shall not be obligated to agree to any modification of any document that is inconsistent with the Plan Term Sheet;

(ii)    deliver draft copies of all material motions or applications and other material documents related to the Restructuring (including the Plan, the Disclosure Statement, ballots and other Solicitation materials in respect of the Plan and any proposed amended version of the Plan or the Disclosure Statement, and a proposed confirmation order) the Company intends to file with the Bankruptcy Court to Creditor Counsel, at least two (2) business days prior to the date when the Company intends to file any such document (provided that if delivery of such document at least two (2) business days in advance is not reasonably practicable under the circumstances, such document shall be delivered as soon as otherwise practicable prior to filing) and shall consult in good faith with Creditor Counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court;

(iii)    not, directly or indirectly, through any person or entity, take any action that is inconsistent with, or that would reasonably be expected to prevent, interfere with, delay or impede, consummation of the Restructuring, including the Solicitation, approval of the Disclosure Statement, and the confirmation and consummation of the Plan;

(iv)    to the extent that any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the transactions contemplated in this Agreement or the Plan, negotiate in good faith appropriate additional or alternative provisions to address any such impediment, in consultation with the Requisite Consenting Creditors;

(v)    maintain its good standing under the laws of the state or other jurisdiction in which they are incorporated or organized;

(vi)    as soon as reasonably practicable, notify the Consenting Creditors in writing of any governmental or third party complaints, litigations, investigations, or hearings (or communications indicating that the same may be contemplated or threatened);

(vii)    if the Catalina Parties know of a material breach by any Catalina Party or any Consenting Creditor of the obligations, representations, warranties, or covenants of the Catalina Parties or Consenting Creditors (as applicable) set forth in this Agreement, furnish prompt written notice (and in any event within three (3) business days of such actual knowledge) to the non-breaching Consenting Creditors and promptly take all reasonable and practicable remedial action necessary to cure such material breach by any such Catalina Party or the Consenting Creditor, as applicable;

(viii)    pay in cash (A) prior to the Petition Date, all reasonable and documented fees and out-of-pocket expenses accrued prior to the Petition Date for which invoices or receipts are furnished by Consenting Creditor Advisors, (B) after the Petition Date, all reasonable and documented fees and out-of-pocket expenses of the Consenting Creditor Advisors (including any applicable local counsel) incurred on and after the Petition Date from time to time, but in any event within seven (7) days of delivery to the Catalina Parties of any applicable invoice or receipt, and (C) on the Effective Date, all reasonable and documented fees and out-of-pocket expenses of the Consenting Creditor Advisors (including any applicable local counsel) incurred and outstanding in connection with the Restructuring (including any success or transaction fees payable to Evercore Group, L.L.C. and PJT Partners, LP, which shall be deemed to include all success, restructuring or transaction fees payable to Evercore Group, L.L.C. and PJT Partners, LP in accordance with their respective engagement letters with the Catalina Entities);

(ix)    timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (A) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), (B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing the Chapter 11 Cases, (D) modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable; or (E) challenging the validity, enforceability, perfection, or priority of, or

11

seeking avoidance or subordination of, any portion of the First Lien Indebtedness, or asserting any other cause of action against and/or with respect or relating to such Claims or the prepetition liens securing such Claims; and

(x) not seek, solicit, or support any Alternative Restructuring, other than the Restructuring, or cause or allow any of their agents or representatives to solicit any Alternative Restructuring, unless the board of directors of any Catalina Party determines, based on the advice of outside legal counsel, in good faith, and consistent with its fiduciary duties, that proceeding with the Restructuring would be inconsistent with the applicable fiduciary duties of such board of directors. Prior to the earlier of (x) making a public announcement regarding their intention to accept an Alternative Restructuring or (y) entering into a definitive agreement with respect to an Alternative Restructuring, the Debtors shall have terminated this Agreement pursuant to Section 6(c). The Debtors shall, to the extent practicable and consistent with their fiduciary duties, give Creditor Counsel not less than four (4) Business Days' prior written notice before exercising such termination right in accordance with this Agreement. At all times prior to the date on which the Debtors enter into a definitive agreement in respect of such an Alternative Restructuring or make a public announcement regarding their intention to do so, the Debtors shall provide to Creditor Counsel a copy of any written offer or proposal (and notice and a description of any oral offer or proposal) for such Alternative Restructuring within five (5) business days of the Debtors' or their advisors' receipt of such offer or proposal.

(b)     New Common Stock. The Company agrees that issuance of and any resale of the New Common Stock pursuant to the Plan is intended to be exempt from registration under the Securities Act pursuant to Regulation D thereunder or pursuant to section 1145 of the Bankruptcy Code.

(c)     Automatic Stay. The Company acknowledges and agrees and shall not dispute that after the commencement of the Chapter 11 Cases, the giving of notice of termination of this Agreement by any Party pursuant to this Agreement shall not be a violation of the automatic stay under section 362 of the Bankruptcy Code (and the Company hereby waives, to the fullest extent permitted by law, the applicability of the automatic stay to the giving of such notice); *provided* that nothing herein shall prejudice any Party's rights to argue that the giving of notice of default or termination was not proper under the terms of this Agreement.

## 6.     Termination of Agreement.

(a)     This Agreement shall terminate three (3) business days following the delivery of notice, delivered in accordance with Section 22 hereof, from the Requisite First Lien Lenders or the Requisite Second Lien Lenders, as applicable, to the other Parties at any time after and during the continuance of any Creditor Termination Event; *provided*, that termination by the Requisite First Lien Lenders or Requisite Second Lien Lenders, as applicable, shall only be effective as to the applicable Consenting Class. In addition, this Agreement shall terminate in respect of the applicable Consenting Class three (3) business days following the delivery of notice, delivered in accordance with Section 22 hereof, from Catalina Parent to the other Parties at any time after the occurrence and during the continuance of any Company Termination Event (defined below). No Party may exercise any of its respective termination rights as set forth herein if (i) such Party is in

breach of this Agreement (unless such failure to perform or comply arises as a result of another Party's actions or inactions), (ii) such breach has caused, or resulted in, the occurrence of a Creditor Termination Event or Company Termination Event (as applicable), and (iii) such breach is continuing when such Party seeks to exercise any of its respective termination rights. In addition, this Agreement shall terminate automatically on the Effective Date.

(b)        A "Creditor Termination Event" shall mean any of the following:

(i)        the breach by the Company of any of the undertakings, representations, warranties or covenants of the Company set forth herein in any material respect which remains uncured for a period of five (5) business days after the receipt of written notice of such breach pursuant to Sections 6(a) and 22 hereof (as applicable);

(ii)        the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and such ruling, judgment or order has not been stayed, reversed or vacated within ten (10) business days after such issuance;

(iii)        in accordance with this Agreement, any Definitive Document not being satisfactory or reasonably satisfactory (as applicable) to the Requisite First Lien Lenders and, subject to the Second Lien Lender Consent Right, the Requisite Second Lien Lenders;

(iv)        any Catalina Party (A) amending, or modifying, or filing a pleading seeking authority to amend or modify, any Definitive Document in a manner that is materially inconsistent with this Agreement; (B) suspending or revoking the Restructuring Transactions; or (C) publicly announcing its intention to take any such action listed in the foregoing clauses (A) and (B) of this subsection;

(v)        any Catalina Party (A) filing any chapter 11 plan other than the Plan or (B) withdrawing the Plan or its support for the Plan;

(vi)        any Catalina Party filing any motion or application seeking authority to sell any assets having a fair market value in excess of $500,000.00 without the prior written consent of the Requisite Creditors;

(vii)        the entry of any order authorizing the use of cash collateral or postpetition financing that is not in the form of the DIP Orders or otherwise consented to by the Requisite First Lien Lenders or, subject to the Second Lien Lender Consent Right, the Requisite Second Lien Lenders;

(viii)        either (A) any Catalina Party filing a motion, application, or adversary proceeding (or any Catalina Party supports any such motion, application, or adversary proceeding filed or commenced by any third party) (I) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the First Lien Indebtedness (including the amount thereof) or the liens securing such First Lien Indebtedness or asserting any other cause of action against the Consenting First Lien Lenders, or (II) challenging the validity, enforceability, perfection, or priority

of, or seeking avoidance or subordination of, any portion of the Second Lien Indebtedness or asserting any other cause of action against the Consenting Second Lien Lenders and/or with respect or relating to such Second Lien Indebtedness or the prepetition liens securing such claims; *provided* that the Creditor Termination Event set forth in the immediately preceding clause (b)(viii)(I) shall only be assertable by the Requisite First Lien Lenders and the Creditor Termination Event set forth in the immediately preceding clause (b)(viii)(II) shall only be assertable by the Requisite Second Lien Lenders, or (B) entry of an order that is inconsistent with this Agreement or the Plan Term Sheet in any material respect;

(ix)    the occurrence of any Event of Default under the DIP Orders or the DIP Credit Agreement, as applicable, that has not been cured (if capable of being cured) or waived by the applicable percentage of DIP Lenders in accordance with the terms of the DIP Credit Agreement;

(x)    the occurrence of any default or Event of Default arising before the Petition Date under the Prepetition Loan Documents other than the Specified Defaults; *provided*, that such Creditor Termination Event in this Section 6(b)(x) may only be exercised prior to the Petition Date;

(xi)    any Catalina Party terminating its obligations under and in accordance with Section 6(c) of this Agreement;

(xii)    entry of an order granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code authorizing any party to proceed against any material asset of any of the Catalina Entities or that would materially and adversely affect any of the Catalina Entities' ability to operate their businesses in the ordinary course;

(xiii)    entry of an order assuming or rejecting any NCS JV Agreement that is not satisfactory to the Requisite First Lien Lenders and, solely to the extent such order reduces the percentage of New Common Stock to be provided to, or otherwise materially adversely affects recoveries of, the Second Lien Lenders under the Plan as set forth in the Plan Term Sheet, the Requisite Second Lien Lenders; *provided that*, a loss of revenue or a reduction in total enterprise value resulting from the rejection of any such NCS JV Agreements shall not be deemed to materially adversely affect the recoveries of the Second Lien Lenders under the Plan as set forth in the Plan Term Sheet;

(xiv)    the commencement of an involuntary case against any Catalina Party or any material foreign subsidiary or material foreign affiliate of a Catalina Party or the filing of an involuntary petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization or other relief in respect of such Catalina Party or such Catalina Party's foreign subsidiaries and affiliates, or their debts, or of a substantial part of their assets, under any federal, state or foreign bankruptcy, insolvency, administrative receivership or similar law now or hereafter in effect, provided, that such involuntary proceeding is not dismissed within a period of forty-five (45) days after the filing thereof, or if any court grants the relief sought in such involuntary proceeding;

(xv)    any Catalina Party or any material foreign subsidiary or material foreign affiliate of a Catalina Party, without the prior consent of the Requisite Creditors, (A) voluntarily commencing any case or filing any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization or other relief under any federal, state, or foreign bankruptcy, insolvency, administrative receivership or similar law now or hereafter in effect except as provided in this Agreement, (B) consenting to the institution of, or failing to contest in a timely and appropriate manner, any involuntary proceeding or petition described above, (C) filing an answer admitting the material allegations of a petition filed against it in any such proceeding, (D) applying for or consenting to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator or similar official, (E) making a general assignment or arrangement for the benefit of creditors, or (F) taking any formal corporate action (as implemented or authorized by the applicable board of directors, board of managers, managers, members, managing members or partners) authorizing any of the foregoing;

(xvi)    if (A) any of the DIP Orders are reversed, stayed, dismissed, vacated, reconsidered, modified, or amended without the consent of the Requisite First Lien Lenders, or, subject to Second Lien Lender Consent Right, the Requisite Second Lien Lenders or (B) a motion for reconsideration, reargument, or rehearing with respect to any such order has been filed and the Catalina Entities have failed to object timely to such motion;

(xvii)    if (A) the Confirmation Order is reversed, stayed, dismissed, vacated, reconsidered, modified, or amended without the consent of the Requisite Creditors (subject to the Second Lien Lender Consent Right) or (B) a motion for reconsideration, reargument, or rehearing with respect to any such order has been filed and the Catalina Entities have failed to timely object to such motion;

(xviii)   the occurrence of the Maturity Date (as defined in the DIP Credit Agreement) without the Plan having been substantially consummated; *provided* that this Creditor Termination Event shall only be assertable by the Required DIP Lenders;

(xix)    if, as of 11:59 p.m. prevailing Eastern Time on December 12, 2018, as such date may be extended with the consent of the Requisite Creditors, the Company shall not have commenced the Solicitation in accordance with section 1126(b) of the Bankruptcy Code;

(xx)    if, as of 11:59 p.m. prevailing Eastern Time on the Outside Petition Date, as such date may be extended with the consent of the Requisite Creditors, the Chapter 11 Cases shall not have been filed;

(xxi)    if, as of 11:59 p.m. prevailing Eastern Time on that date that is five (5) calendar days after the Petition Date, as such date may be extended with the consent of the Required DIP Lenders, the Interim DIP Order shall not have been entered;

(xxii)   if, as of 11:59 p.m. prevailing Eastern Time on the date that is thirty (30) calendar days after the Petition Date, as such date may be extended with the consent of the Requisite First Lien Lenders and, if applicable, the Requisite Second Lien Lenders, (A) the NCS JV Agreements have not been amended to the satisfaction of the Requisite First Lien Lenders or (B) a motion to reject the NCS JV Agreements is not pending before the Bankruptcy Court;

(xxiii)  if, as of 11:59 p.m. prevailing Eastern Time on the date that is forty-five (45) calendar days after the Petition Date, as such date may be extended with the consent of the Requisite Creditors, the Bankruptcy Court shall not have entered an order authorizing the assumption of this Agreement;

(xxiv)  if, as of 11:59 p.m. prevailing Eastern Time on the date that is forty (40) calendar days after the Petition Date, as such date may be extended with the consent of the Required DIP Lenders, the Final DIP Order shall not have been entered;

(xxv)   if, as of 11:59 p.m. prevailing Eastern Time on the date that is eighty-five (85) calendar days after the Petition Date, as such date may be extended with the consent of the Requisite First Lien Lenders and, if applicable, the Requisite Second Lien Lenders, (A) the NCS JV Agreements have not been amended to the satisfaction of the Requisite First Lien Lenders and (B) the Bankruptcy Court has not entered an order rejecting the NCS JV Agreements;

(xxvi)  if, as of 11:59 p.m. prevailing Eastern Time on the date that is eighty-five (85) calendar days after the Petition Date, as such date may be extended with the consent of the Requisite Creditors, the Bankruptcy Court shall not have entered an order approving the Disclosure Statement;

(xxvii) if, as of 11:59 p.m. prevailing Eastern Time on the date that is one hundred twenty-five (125) calendar days after the Petition Date, as such date may be extended with the consent of the Requisite Creditors, the Bankruptcy Court shall not have entered an order confirming the Plan;

(xxviii)if, as of 11:59 p.m. prevailing Eastern Time on the date that is one hundred forty (140) calendar days after the Petition Date, as such date may be extended with the consent of the Requisite Creditors, the Effective Date shall not have occurred (the "***Outside Date***"); or

(xxix)   the Bankruptcy Court enters an order (A) directing the appointment of an examiner with expanded powers or a trustee in the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Chapter 11 Cases.

(c)     A "Company Termination Event" shall mean any of the following:

(i)     the breach by one or more of the Consenting Creditors of any of the undertakings, representations, warranties or covenants of the applicable Consenting Creditors set forth herein in any material respect which remains uncured for a period of

five (5) business days after the receipt of written notice of such breach pursuant to <u>Sections 6(a)</u> and <u>22</u> hereof (as applicable), but only if the remaining non-breaching Consenting Creditors do not hold at least 66⅔% of the aggregate principal amount of Claims in the applicable Consenting Class;

(ii)     the board of directors, managers, members or partners (or comparable governing body), as applicable, of any Catalina Party reasonably determines in good faith based upon the advice of outside counsel that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law; *provided* that the Company provides notice of such determination to the Consenting Creditors within five (5) business days after the date thereof;

(iii)     if, as of 11:59 p.m. prevailing Eastern Time on December 12, 2018, the Support Effective Date shall not have occurred;

(iv)     if, as of 11:59 p.m. prevailing Eastern Time on the Outside Date, the Effective Date shall not have occurred;

(v)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and such ruling, judgment or order has not been stayed, reversed or vacated within ten (10) business days after such issuance;

(vi)     any Consenting Creditor terminating its obligations under and in accordance with <u>Section 6(b)</u> of this Agreement, but only if the remaining Consenting Creditors do not hold more than 66⅔% of the aggregate principal amount of Claims in the Consenting Class; or

(vii)     the Bankruptcy Court enters an order (A) directing the appointment of an examiner with expanded powers or a trustee in the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Chapter 11 Cases.

(d)     <u>Mutual Termination</u>.  This Agreement may be terminated by mutual agreement of Catalina Parent and the Requisite Creditors upon the receipt of written notice delivered in accordance with <u>Section 22</u> hereof.

(e)     <u>Effect of Termination</u>.  Subject to the proviso contained in <u>Section 6(a)</u> hereof, upon the termination of this Agreement in accordance with this <u>Section 6</u>, and except as provided in <u>Section 14</u> hereof, this Agreement shall forthwith become void and of no further force or effect and each Party shall, except as provided otherwise in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable law; *provided*, *however*, that in no event shall any such termination relieve

(i) a Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination or (ii) the Company from its obligation to pay the reasonable and documented fees and expenses of the Consenting Creditor Advisors and the DIP Lender advisors (including counsel to the First and Second Lien Agents and any applicable local counsel) through and including the date of such termination in accordance with Section 5(a)(viii) hereof or the Plan Term Sheet.  Upon a termination of this Agreement, each Consenting Creditor may, upon written notice to the Company and the other Parties, revoke its vote or any consents given prior to such termination, whereupon any such vote or consent shall be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement.  If this Agreement has been terminated as to any Consenting Creditor in accordance with Section 6 hereof at a time when permission of the Bankruptcy Court shall be required for a change or withdrawal (or cause to change or withdraw) of its vote to accept the Plan, the Company shall not oppose any attempt by such Consenting Creditor to change or withdraw (or cause to change or withdraw) such vote at such time.

(f)    Termination by Consenting Second Lien Lenders.  Notwithstanding anything in this Agreement, in the event any Consenting Second Lien Lender terminates this Agreement as a result of the occurrence of a Creditor Termination Event, (i) the Requisite First Lien Lenders shall have the option (which shall be delivered in writing to the Catalina Parties, including via e-mail) to (A) determine that the Consenting First Lien Lenders will continue remaining Parties to this Agreement in pursuit and in support of the Plan or (B) terminate this Agreement in accordance with this Section 6; (ii) this Agreement shall be deemed terminated with respect to such Consenting Second Lien Lender and the Consenting Second Lien Lender shall no longer be a Party to this Agreement and shall be relieved of any obligations hereunder; (iii) such other Parties shall be permitted to take further actions otherwise permitted hereunder with respect to any Definitive Document or other document or matter or any Restructuring Transaction without any liability hereunder, except the rights and obligations of such other Parties under this Agreement shall remain in full force and effect; (iv) the remaining Parties (other than any Party that has breached this Agreement and such breach caused the occurrence of a Creditor Termination Event pursuant to which the Consenting Second Lien Lender terminated this Agreement) shall no longer be obligated to not "opt out" of any releases proposed to be granted to such Consenting Second Lien Lender under the Plan; (v) such other Parties shall not be obligated to grant or support the grant of any releases to such Consenting Second Lien Lender under the Plan; and (vi) all of the applicable rights and remedies of the remaining Parties under this Agreement, the Prepetition Loan Documents and applicable law shall be reserved in all respects.

(g)    Individual Termination.  Any Consenting Creditor may terminate this Agreement as to itself only, upon written notice to the other Parties in accordance with Section 22 hereof, in the event that: (i) such Consenting Creditor has transferred all (but not less than all) of its First Lien Indebtedness Claims and Second Lien Indebtedness Claims, as applicable, in accordance with Section 3(b) of this Agreement (such termination shall be effective on the date on which such Consenting Creditor has effected such transfer, satisfied the requirements of Section 3(b) and provided the written notice required), or (ii) this Agreement or the Plan Term Sheet is amended without its consent in such a way as to alter any of the material terms hereof in a manner that is disproportionately adverse to such Consenting Creditor as compared to similarly situated Consenting Creditors by giving ten (10) business days' written notice to the other Parties in

accordance with <u>Section 21</u>; *provided*, that such written notice shall be given by the applicable Consenting Creditor within five (5) business days of such amendment, filing, or execution.

(h)    If the Restructuring Transactions are not consummated, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights and the Parties expressly reserve any and all of their respective rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

### 7.    <u>Definitive Documents; Good Faith Cooperation; Further Assurances</u>.

(a)    Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and shall exercise commercially reasonable efforts with respect to the pursuit, approval, negotiation, execution, delivery, implementation and consummation of the Plan and the Restructuring, as well as the negotiation, drafting, execution and delivery of the Definitive Documents, which will, after the Support Effective Date, remain subject to negotiation and shall, upon completion, contain terms, conditions, representations, warranties, and covenants consistent in all material respects with the terms of this Agreement (including the Exhibits and Schedules) and be (a) in form and substance reasonably satisfactory to the Catalina Entities and the Requisite First Lien Lenders (except the DIP Orders, DIP Documents, and Exit Documents shall be acceptable to the Requisite First Lien Lenders and the Required DIP Lenders, as applicable) and (b) with respect to the Requisite Second Lien Lenders, subject to the applicable consent right set forth in the definition "Second Lien Lender Consent Right."

(b)    Subject to the terms hereof, each of the Parties shall take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, including making and filing any required regulatory filings, and shall, subject to the Company's "fiduciary out" pursuant to <u>Section 6(c)(ii)</u> of this Agreement, refrain from taking any action that would frustrate the purposes and intent of this Agreement.

(c)    The Parties agree, consistent with clause (a) of this <u>Section 7</u>, to negotiate in good faith the Definitive Documents that are subject to negotiation and completion on the Support Effective Date and that, notwithstanding anything herein to the contrary, the Definitive Documents, including any motions or orders related thereto, shall not be inconsistent with this Agreement and otherwise subject to the applicable consent rights of the Parties set forth herein. The Catalina Parties shall provide to the Consenting Creditor Advisors, and shall direct its employees, officers, advisors, and other representatives to provide the Consenting Creditor Advisors, (i) reasonable access (without any material disruption to the conduct of the Catalina Parties' businesses) during normal business hours to the Catalina Parties' books and records; (ii) reasonable access during normal business hours to the management and advisors of the Catalina Parties; and (iii) reasonable responses to all reasonable diligence requests, in each case, for the purposes of evaluating the Catalina Parties' assets, liabilities, operations, businesses, finances, strategies, prospects, and affairs or entry into any of the Restructuring Transactions.

8.    **Representations and Warranties**.

(a)    Each Party, severally and not jointly, represents and warrants to the other Parties that the following statements are true and correct as of the date hereof (or as of the date a Consenting Creditor becomes a party hereto):

(i)    such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(ii)    the execution, delivery and performance by such Party of this Agreement does not and will not (A) violate any material provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries, or (B) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party except, in the case of the Company, for the filing of the Chapter 11 Cases;

(iii)    the execution, delivery and performance by such Party of this Agreement does not and will not require any material registration or filing with, consent or approval of, or notice to, or other action, with or by, any federal, state or governmental authority or regulatory body, except such filings as may be necessary and/or required by the U.S. Securities and Exchange Commission or other securities regulatory authorities under applicable securities laws; and

(iv)    this Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(b)    Each Consenting Creditor severally (and not jointly) represents and warrants to the Company that, as of the date hereof (or as of the date such Consenting Creditor becomes a party hereto), such Consenting Creditor (i) is the beneficial owner of the principal amount of the Indebtedness set forth on its signature page hereto (or below its name on the signature page of a Joinder Agreement for any Consenting Creditor that becomes a party hereto after the date hereof) and does not beneficially own any other indebtedness, and/or (ii) has, with respect to the beneficial owners of such Indebtedness, (A) sole investment or voting discretion with respect thereto, (B) full power and authority to vote on and consent to matters concerning such Indebtedness or to exchange, assign and transfer such Indebtedness, and (C) full power and authority to bind or act on the behalf of, such beneficial owners.

(c)      Each Consenting Creditor severally (and not jointly) makes the representations and warranties set forth in Section 23(c) hereof, in each case, to the other Parties.

**9.      Disclosure; Publicity**.

The Company shall deliver drafts to Creditor Counsel of any press releases that constitute disclosure of the existence or terms of the Restructuring, this Agreement or any amendment to the terms of the Restructuring or this Agreement at least thirty-six (36) hours prior to making any such disclosure.  Except as required by applicable law or otherwise permitted under the terms of any other agreement between the Company and any Consenting Creditor, no Party or its advisors shall disclose to any person (including, for the avoidance of doubt, any other Party), other than advisors to the Company, the principal amount or percentage of any Indebtedness or any other Claims against, or Interests in, the Company held by any Consenting Creditor, in each case, without such Consenting Creditor's consent; *provided*, *however*, that (i) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall afford the relevant Consenting Creditor a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure (the expense of which, if any, shall be borne by the relevant Consenting Creditor) and (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of First Lien Indebtedness or Second Lien Indebtedness held by all the Consenting Creditors, collectively, on a facility by facility basis.  Any public filing of this Agreement, with the Bankruptcy Court or otherwise, and any version of this Agreement shared with Consenting Creditors generally, shall omit the Indebtedness holdings of each individual Consenting Creditor as set forth on such Consenting Creditor's signature page hereto or shall include such signature page only in redacted form with respect to the Indebtedness holdings of each Consenting Creditor (provided that the Indebtedness holdings on such signature page(s) may be filed in unredacted form with the Bankruptcy Court under seal).

**10.      Amendments and Waivers**.

(a)      Other than as set forth in Section 10(b), this Agreement, including any exhibits or schedules hereto, may not be modified, amended or supplemented or the performance of any obligation thereunder waived except with the written consent of Catalina Parent and the Requisite Creditors (in the case of the Requisite Creditors, such consent not to be unreasonably withheld, conditioned or delayed);

(b)      Notwithstanding Section 10(a):

(i)      any waiver, modification, amendment or supplement to this Section 10 shall require the written consent of all of the Parties;

(ii)      any modification, amendment or change to the definition of "Requisite First Lien Lenders" or "Requisite Second Lien Lender" shall require the written consent of each Consenting Creditor included in such definition; and

(iii)      any change, modification or amendment to this Agreement or the Plan that treats or affects any Consenting Creditor in a manner that is materially and adversely disproportionate, on an economic basis, to the manner in which any of the other Consenting

Creditors are treated (after taking into account each of the Consenting Creditors' respective Claims and Interests and the recoveries contemplated by the Plan (as in effect on the date hereof)) shall require the written consent of such materially adversely and disproportionately affected Consenting Creditor.

(c)    In the event that a materially adversely and disproportionately affected Consenting Creditor ("***Non-Consenting Creditor***") does not consent to a waiver, change, modification or amendment to this Agreement requiring the consent of such Non-Consenting Creditor, but such waiver, change, modification or amendment receives the consent of Consenting Creditors owning at least 66⅔% of the outstanding First Lien Indebtedness or Second Lien Indebtedness (as applicable), this Agreement shall be deemed to have been terminated only as to such Non-Consenting Creditors, but this Agreement shall continue in full force and effect in respect to all other Consenting Creditors.

## 11.    **Effectiveness**.

This Agreement shall become effective and binding upon each Party on the Support Effective Date; *provided*, *however*, that (A) signature pages executed by Consenting Creditors shall be delivered to other Consenting Creditors in a form that does not contain the details of the Consenting Creditors' holdings and (B) the amount of First Lien Indebtedness and Second Lien Indebtedness held by each Consenting Creditor shall be as set forth on such Consenting Creditor's signature page hereto, which shall be delivered to Weil on behalf of the Company and kept strictly confidential by the Company (and to be held by Weil and Creditor Counsel on a professionals' eyes only basis); *provided*, *however*, that the Company may disclose publicly the aggregate principal amounts of First Lien Indebtedness and Second Lien Indebtedness set forth on the signature pages hereto.

## 12.    **GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL**.

(a)    This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York, without giving effect to the conflict of laws principles thereof.

(b)    Each of the Parties irrevocably agrees that any legal action, suit or proceeding arising out of or relating to this Agreement brought by any party or its successors or assigns shall be brought and determined in any federal or state court in the Borough of Manhattan in the City of New York ("***NY Courts***") and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Agreement or the Restructuring Transactions.  Each of the Parties agrees not to commence any proceeding relating hereto or thereto except in the NY Courts other than proceedings in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any NY Courts.  Each of the Parties further agrees that notice as provided herein shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient.  Each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any proceeding arising out of or relating to this Agreement or the Restructuring, (i) any claim that it is not personally subject to the jurisdiction of the NY

Courts for any reason, (ii) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (iii) that (A) the proceeding in any such court is brought in an inconvenient forum, (B) the venue of such proceeding is improper or (C) this Agreement, or the subject matter hereof, may not be enforced in or by such courts. Notwithstanding the foregoing, during the pendency of the Chapter 11 Cases, all proceedings contemplated by this <u>Section 12(b)</u> shall be brought in the Bankruptcy Court.

(c)    EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

## 13.    <u>Specific Performance/Remedies</u>.

It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (including attorneys' fees and costs) as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy, including an order of the Bankruptcy Court requiring any Party to comply promptly with any of its obligations hereunder. Each Party also agrees that it will not seek, and will waive any requirement for, the securing or posting of a bond in connection with any Party seeking or obtaining such relief.

## 14.    <u>Survival</u>.

Notwithstanding the termination of this Agreement pursuant to <u>Section 6</u> hereof, the agreements and obligations of the Parties in this <u>Section 14</u>, and <u>Sections 5(a)(viii)</u> (with respect to any fees and expenses described in such clause that are accrued and unpaid through the end of the Support Period), <u>6(f)</u>, <u>6(i)</u>, <u>9</u>, <u>12</u>, <u>13</u>, <u>16</u>, <u>17</u>, <u>18</u>, <u>19</u>, <u>20</u>, <u>21</u>, <u>22</u>, and <u>23</u> hereof (and any defined terms used in any such Sections) shall survive such termination and shall continue in full force and effect in accordance with the terms hereof; *provided*, however, that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

## 15.    <u>Headings</u>.

The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

16.    **Successors and Assigns; Severability; Several Obligations**.

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives; *provided*, *however*, that, during the Support Period, nothing contained in this Section 16 shall be deemed to permit Transfers of the Indebtedness or claims arising under the Indebtedness other than in accordance with the express terms of this Agreement.  If any provision of this Agreement, or the application of any such provision to any person or entity or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

17.    **Relationship Among Parties**.

Notwithstanding anything herein to the contrary, (i) the duties and obligations of the Parties under this Agreement shall be several, not joint and several; (ii) no Party shall have any responsibility by virtue of this Agreement for any trading by any other entity; (iii) no prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this Agreement; (iv) the Parties hereto acknowledge that this Agreement does not constitute an agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting, or disposing of any equity securities of the Catalina Entities and the Parties do not constitute a "group" within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended; (v) none of the Consenting Creditors shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities in any kind or form to each other, the Catalina Entities or any of the Catalina Entities' other lenders or stakeholders, including as a result of this Agreement or the transactions contemplated herein or in any exhibit hereto; and (vi) no action taken by any Party pursuant to this Agreement shall be deemed to constitute or to create a presumption by any of the Parties that the Parties are in any way acting in concert or as a "group."

18.    **No Third-Party Beneficiaries**.

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary hereof.

19.    **Prior Negotiations; Entire Agreement**.

This Agreement, including the exhibits and schedules hereto (including the Plan Term Sheet), constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof and thereof, except that the Parties acknowledge that any confidentiality agreements (if any) heretofore executed between the Company and each

Consenting Creditor shall continue in full force and effect solely with respect to any then-continuing obligations thereunder.

### 20.    Reservation of Rights.

(a)    Except as expressly provided in this Agreement or the Plan Term Sheet, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of any Party to protect and preserve its rights, remedies and interests, including, without limitation, its claims against any of the other Parties.

(b)    Without limiting clause (a) of this Section 20 in any way, if this Agreement is terminated for any reason, nothing shall be construed herein as a waiver by any Party of any or all of such Party's rights, remedies, claims, and defenses and the Parties expressly reserve any and all of their respective rights, remedies, claims and defenses. This Agreement, the Plan, and any related document shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever. Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

(c)    Except as otherwise set forth in this Agreement, the Plan, and any related document, this Agreement, the Plan, and any related document shall in no event be construed to amend, alter, or waive or override any rights, remedies, obligations, claims, or defenses under that certain Second Lien Intercreditor Agreement dated April 4, 2014 by and among PDM Holding Corporation, Checkout Holding Corp., the other Grantors party thereto, JPMorgan Chase Bank N.A., as Senior Representatives for the First Lien Credit Agreement Secured Parties, Bank of America N.A., as the Second Priority Representative for the Second Lien Credit Agreement Secured Parties, and each additional Representative from time to time party thereto.

### 21.    Counterparts.

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Agreement may be delivered by electronic mail or otherwise, which shall be deemed to be an original for the purposes of this paragraph.

### 22.    Notices.

All notices hereunder shall be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, courier or by registered or certified mail (return receipt requested) to the following addresses:

(1)    If to the Company, to:

Catalina Marketing Corporation
200 Carillon Pkwy
St. Petersburg, FL 33716
Attention:   David Glogoff, Esq.
               (david.glogoff@catalina.com)

With a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attention:   Gary T. Holtzer, Esq.
                    (gary.holtzer@weil.com)
                    Ronit J. Berkovich, Esq.
                    (ronit.berkovich@weil.com)
                    - and -
                    Mariel Cruz, Esq.
                    (mariel.cruz@weil.com)


(2)      If to a Consenting First Lien Lender, or a transferee thereof, to the addresses set forth below following the Consenting First Lien Lender's signature (or as directed by any transferee thereof), as the case may be, with copies to:

Jones Day
250 Vesey Street
New York, NY 10281
Attention:   Scott J. Greenberg, Esq.
                    (sgreenberg@jonesday.com)


2)       If to a Consenting Second Lien Lender, or a transferee thereof, to the addresses or facsimile numbers set forth below following the Consenting Second Lien Lender's signature (or as directed by any transferee thereof), as the case may be, with copies to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Attention:   Brian S. Hermann, Esq.
                    (bhermann@paulweiss.com)
                    Robert A. Britton, Esq.
                    (rbritton@paulweiss.com)
                    - and -
                    Dan Youngblut, Esq.
                    (dyoungblut@paulweiss.com


Any notice given by delivery, mail or courier shall be effective when received.  Any notice given by electronic mail shall be effective upon oral, machine or electronic mail (as applicable) confirmation of transmission.

23.    **No Solicitation; Representation by Counsel; Adequate Information**.

(a)    This Agreement is not and shall not be deemed to be a solicitation for votes in favor of the Plan in the Chapter 11 Cases from the Consenting Creditors. The acceptances of the Consenting Creditors with respect to the Plan will not be solicited until such Consenting Creditors have received the Disclosure Statement and related ballots and solicitation materials.

(b)    Each Party acknowledges that it has had an opportunity to receive information from the Company and that it has been represented by counsel in connection with this Agreement and the transactions contemplated hereby. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

(c)    Each Consenting Creditor acknowledges, agrees and represents to the other Parties that it (i) is a "qualified institutional buyer" as such term is defined in Rule 144A of the Securities Act or a non-US person participating in the offering outside the United States in reliance on Regulation S under the Securities Act, (ii) is an "accredited investor" as such term is defined in Rule 501 of Regulation D of the Securities Act, (iii) understands that if it is to acquire any securities, as defined in the Securities Act, pursuant to the Restructuring, such securities have not been registered under the Securities Act and that such securities are, to the extent not acquired pursuant to section 1145 of the Bankruptcy Code, being offered and sold pursuant to an exemption from registration contained in the Securities Act, based in part upon such Consenting Creditor's representations contained in this Agreement and cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available and (iv) has such knowledge and experience in financial and business matters that such Consenting Creditor is capable of evaluating the merits and risks of the securities to be acquired by it (if any) pursuant to the Restructuring and understands and is able to bear any economic risks with such investment.

24.    **Other Support Agreements.**

During the Support Period, no Catalina Party shall enter into any other restructuring support agreement related to a partial or total restructuring of the Catalina Entities unless such support agreement is consistent in all respects with the Plan Term Sheet and is reasonably acceptable to the Requisite Creditors.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

## <u>CATALINA PARTIES</u>

PDM Group Holdings Corporation

By:_____
    Name:
    Title:

Catalina Marketing Corporation

By:_____
    Name:
    Title:

Catalina Marketing Procurement

By:_____
    Name:
    Title:

Catalina Marketing Technology Solutions, Inc.

By:_____
    Name:
    Title:

Catalina Marketing Worldwide, LLC

By:_____
    Name:
    Title:

Cellfire Inc.

By:_____
    Name:
    Title:


Modiv Media, Inc.

By:_____
    Name:
    Title:


Checkout Holding Corp.

By:_____
    Name:
    Title:


PDM Holdings Corporation

By:_____
    Name:
    Title:


PDM Intermediate Holdings A Corporation

By:_____
    Name:
    Title:


PDM Intermediate Holdings B Corporation

By:_____
    Name:
    Title:

**CONSENTING FIRST LIEN LENDER**

[•]

By: [•]

Name: [•]

Title: [•]


Principal Amount of First Lien Indebtedness:  $_____

Principal Amount of Second Lien Indebtedness:  $_____

Principal Amount of Other Indebtedness:  $_____


<u>Notice Address</u>:
[•]



Attention: [•]
Email: [•]

**CONSENTING SECOND LIEN LENDER**

[•]

By: [•]

Name: [•]

Title: [•]

Principal Amount of First Lien Indebtedness:  $_____

Principal Amount of Second Lien Indebtedness:  $_____

Principal Amount of Other Indebtedness:  $_____

Notice Address:
[•]

Attention: [•]
Email: [•]

## EXHIBIT A

**Plan Term Sheet**

# PROJECT CARMEL
### Restructuring Term Sheet[1]

| Key Terms | |
|---|---|
| **DIP and Exit Financing** | |
| DIP Facility | • $125mm new money DIP commitment to be provided by the Ad Hoc First Lien Group and other participating First Lien Lenders (or affiliates thereof) plus $150mm roll-up of prepetition RCF and 1L Term Loan<br>• New money portion of the DIP secured by first-priority lien on unencumbered assets and priming first-priority lien on assets encumbered by 1L Term Loan<br>   o To include (i) a pledge of (x) the NCS JV (prior to entry of the final DIP order) and (y) the unencumbered equity of first-tier foreign subsidiaries, and (ii) a negative pledge of the equity and/or assets of downstream foreign subsidiaries<br>• Roll-up portion of the DIP Facility secured by priming first-priority lien on assets encumbered by the RCF and 1L Term Loan, and subject to entry of the final DIP Order<br>• DIP Facility to roll into exit facility upon emergence from bankruptcy pursuant to the Plan (and all exhibits thereto and plan supplements) and Confirmation Order acceptable to DIP Lenders (see below) |
| Exit Facility | • Incremental $40mm new money delayed draw Exit Facility ("New Money Exit Facility") to be provided by the Ad Hoc First Lien Group and the other First Lien Lenders participating as DIP Lenders under the DIP Facility, which New Money Exit Facility shall be part of (and on the same terms as) the FLFO (see below). This Exit Facility, along with the DIP Facility that will roll into an Exit Facility, will be the reorganized Company's only funded or take-back debt on the Effective Date. |
| **Treatment of Claims** | |
| DIP Claims (New Money) | • New money portion of the DIP Facility to roll into a first lien first-out exit facility ("FLFO") upon the Effective Date. FLFO terms:<br>   o Interest Rate: L + 750 bps cash pay (100 bps LIBOR floor)<br>   o Tenor: 4.0 years from emergence<br>   o Amortization: 1.0% per annum<br>   o Collateral: First lien first-out on existing RCF and 1L Term Loan collateral, plus additional collateral subject to legal, tax, and other diligence<br>   o Maintenance Covenants: Maximum Leverage and Maximum Capital Expenditures at levels TBD; Minimum Liquidity of $25mm[2]<br>   o Negative Covenants: To be negotiated; to include debt and lien covenants<br>   o Mandatory Prepayments: Customary, including for asset sales and excess cash flow<br>   o Call Protection: NC1 / 103 / 101 |
| DIP Claims (Roll-Up) | • DIP claims attributable to the roll-up portion of the DIP Facility to roll into a first lien last-out exit facility ("FLLO") upon emergence from bankruptcy. FLLO terms:<br>   o Size: $150mm, plus accrued PIK interest capitalized on the Effective Date<br>   o Interest Rate: L+100 bps cash pay, plus 950 bps PIK (100 bps LIBOR floor)<br>   o Tenor: 4.5 years from emergence<br>   o Amortization: None<br>   o Collateral: First lien last-out on existing RCF and 1L Term Loan collateral, plus additional collateral subject to legal, tax, and other diligence<br>   o Maintenance Covenants: TBD<br>   o Call Protection: NC1.5 / 104 / 102 |
| 1L Claims | • Remaining prepetition RCF and 1L Term Loan to receive 90% of the equity in the reorganized Company (the "New Common Stock"), subject to dilution from the MIP (as defined below) |

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Restructuring Support Agreement ("RSA") to which this term sheet is appended to the extent so defined therein.

[2] Liquidity to be calculated as the sum of domestic and foreign cash balances (excludes undrawn commitments under the Exit Facility).

| | |
|---|---|
| 2L Claims | • Holders of 2L Claims shall receive 10% of the New Common Stock, subject to dilution from the MIP, on account of their structurally senior claims at CellFire Inc., Modiv Media, Inc., Catalina Marketing Procurement, LLC, Catalina Electronic Clearing Services, Inc., Catalina Marketing Loyalty Holdings Inc., Catalina Digital Holdings, LLC, Catalina Marketing Technology Solutions, Inc., and Catalina Marketing Worldwide, LLC. |
| OpCo GUCs | • If the Restructuring is consummated pursuant to a prepackaged chapter 11 plan of reorganization, holders of general unsecured claims against Catalina Marketing Corporation, other than OpCo rejection damages claims, shall receive payment in full in cash, reinstatement of such Claims, or such other treatment that leaves such Claims unimpaired<br>• If the Restructuring is not consummated pursuant to a prepackaged plan of reorganization, holders of general unsecured claims against Catalina Marketing Corporation shall receive distributions with a value not to exceed the amount required by Section 1129(a)(7)(A)(ii) of the Bankruptcy Code[3] |
| OpCo Rejection Damages Claims | • Rejection damage claims (including any claims resulting from the rejection of the NCS JV Agreements) shall receive no distribution under the plan |
| HoldCo GUCs | • Allowed general unsecured claims (including notes issued by PDM Intermediate Holdings B Corporation) against PDM Intermediate Holdings B Corporation to receive no recovery |
| Existing Equity Claims | • Equity interests extinguished; no recovery |
| **Other Restructuring Terms** | |
| New Money Exit Facility | • Incremental $40mm new money delayed draw Exit Facility commitment to be provided by the Ad Hoc First Lien Group and the other First Lien Lenders participating as DIP lenders under the DIP Facility, which New Money Exit Facility shall be part of (and on the same terms as) the FLFO<br>• Facility available to be drawn up to 18 months following the emergence date, subject to TBD draw conditions<br>• The incremental delayed draw Exit Facility commitment shall be subject to the following fees:<br>  ○ 4.0% of commitment amount payable to the Backstop Parties at closing (expected to be simultaneous with DIP), in cash<br>  ○ 2.0% of commitment amount payable to funding parties at funding, in cash<br>  ○ 500 bps per annum ticking fee payable monthly from closing through funding, in cash |
| Management Incentive Plan | • Up to an amount of New Common Stock to be determined by the Ad Hoc First Lien Group (which shall not exceed 10% of the New Common Stock) will be reserved for awards of fully diluted equity, options or other instruments at plan value for a management incentive plan ("MIP") (including any such equity, options or other instruments granted to the new Board of Directors) on terms TBD by the new Board of Directors |
| Releases | • Customary, including in favor of the Company, the Company's management, the Board, the First Lien Lenders and Second Lien Lenders party to the RSA, the DIP Lenders, and the Agents, and each of their affiliates and each of their and their affiliates' lawyers, investment bankers, officers, directors, employees, representatives, other professionals, and agents; *provided* that the Consenting Creditors shall not be required to grant a release to the owners of equity interests in the ultimate parent of the Catalina Entities. |
| Governance | • Number and identity of new directors of Board of Directors of reorganized Catalina to be determined by the Ad Hoc First Lien Group<br>• Other terms TBD |
| Treatment of NCS | • NCS JV Agreements amended on terms or rejected pursuant to an order providing relief, in each case, satisfactory to the DIP Lenders/Ad Hoc First Lien Group and the Company and, solely to the extent such amendment or order reduces the percentage of New Common Stock to be provided to, or otherwise materially adversely affects recoveries of, the Second Lien Lenders under the Plan as set forth in this Plan Term Sheet, the Requisite Second Lien Lenders; *provided that*, a loss of revenue or a reduction in total enterprise value resulting from the rejection of any such NCS JV Agreements shall not be deemed to materially adversely affect the recoveries of the Second Lien Lenders under the Plan as set forth in this Plan Term Sheet; timing in accordance with Case Milestones (see below) |
| Executory Contracts | • The Plan will provide for the assumption of certain executory contracts (as determined by the Ad Hoc First Lien Group) and payment of undisputed cure amounts in respect thereof in full upon the Effective Date |
| Conditions | • Company to emerge with a minimum of $40mm of liquidity[4] |

---

[3] NTD: To be deleted in the event prepackaged plan is solicited.

| | |
|---|---|
| Precedent to Emergence | • Other conditions TBD, including satisfactory amendment of NCS JV Agreements |
| Professional Fees | • The Plan shall provide for the payment in full of all professional fees of PW, PJT, Jones Day, Evercore, WilmerHale, Davis Polk, and local counsel for each of the First Lien Ad Hoc Group, Second Lien Ad Hoc Group, and the Agents (if any) |
| Limitations on Equity | • Except as specifically set forth herein and in the MIP (with respect to the New Common Stock reserved for the MIP in accordance with the terms of this Plan Term Sheet), the Plan shall not provide for the issuance of any New Common Stock, any other classes of common stock, preferred stock, warrants, options, restricted stock units, or other instruments or securities exercisable or convertible into New Common Stock |
| **DIP Financing Terms** | |
| Borrower | • Checkout Holding Corp. |
| Guarantors | • All existing loan parties other than the Borrower, and any other debtors (collectively, the "Debtors") in the chapter 11 case filed in the U.S. Bankruptcy Court for the District of Delaware (the "Chapter 11 Case") |
| Administrative Agent | • [JPMorgan Chase Bank, N.A.] |
| Lenders | • Members of the Ad Hoc First Lien Group and other First Lien Lenders (including RCF lenders) party to RSA (or affiliates thereof) |
| Backstop Parties | • Members of the Ad Hoc First Lien Group (or affiliates thereof) |
| Amount | • Up to $125mm DIP financing available<br>  o $[40]mm funded at closing for filing-related costs and cash to the balance sheet<br>  o Incremental $[85]mm funded upon entry of a final DIP order<br>  o $150mm of 1L Loans of DIP Lenders (or affiliates thereof) that have executed the RSA and committed to fund the new money portion of the Exit Facility shall be rolled up into the DIP roll-up tranche upon entry of a final DIP order<br>  o Joint and several superpriority administrative claim against the Borrower and each Guarantor |
| Security | • New money portion of the DIP Facility secured by first-priority lien on unencumbered assets and priming first-priority lien on assets encumbered by 1L Term Loan<br>  o To include (i) a pledge of (x) the NCS JV (prior to entry of the final DIP order) and (y) the unencumbered equity of first-tier foreign subsidiaries, and (ii) a negative pledge of the equity and/or assets of downstream foreign subsidiaries<br>  o To include customary carve-out for professional fees and UST fees<br>• Roll-up portion of the DIP Facility secured by priming first-priority lien on assets encumbered by the RCF and 1L Term Loan |
| Use of Proceeds | • Incremental liquidity purposes during the Chapter 11 Case, subject to the budget agreed to by DIP Lenders |
| Maturity | • Earlier of six months post-petition, conversion / dismissal of cases, closing of sale of substantially all assets, acceleration of loan, and the Effective Date |
| Interest Rate | • New money drawn amounts: L + 1,000 bps, in cash (100 bps LIBOR floor)<br>• New money undrawn amounts: 500 bps per annum ticking fee, in cash<br>• Roll-up amounts: L + 550 bps PIK (100 bps LIBOR floor)<br>• Interest and fees payable monthly |
| Payments (New Money) | • 4.0% of commitment amount payable to the backstop parties at closing, in cash<br>• 2.0% of commitment amount payable to funding parties at funding, in cash |
| Lender Protections | • To include waiver of section 506(c) surcharge and section 552(b) "equities of case" exception for benefit of DIP and 1L secured parties; no marshaling |
| Waterfall | • DIP loans to be repaid first from unencumbered collateral and then from encumbered collateral; for the avoidance of doubt, in the event the Debtors propose or pursue an alternative chapter 11 plan other than the Plan (as defined in the RSA) that is not supported by the Ad Hoc Second Lien Group, the |

---

[4] Liquidity to be calculated as the sum of domestic and foreign cash balances (excludes undrawn commitments under the Exit Facility)

| | respective rights of the DIP Lenders, Ad Hoc First Lien Group, and Ad Hoc Second Lien Group in connection with value allocation and distribution issues under such alternative chapter 11 plan shall be fully preserved notwithstanding anything herein, in the RSA, or in any order of the Bankruptcy Court |
|---|---|
| 1L Adequate Protection | • Replacement liens on unencumbered assets and existing 1L pre- and post-petition collateral, superpriority claim and payment of fees and expenses of the Ad Hoc First Lien Group |
| Covenants | • Minimum liquidity of $25mm at all times[5]<br>• Cumulative operating cash flow variance of TBD%, tested on a rolling two-week basis with a new budget issued every two weeks<br>• Minimum rolling LTM EBITDA of $TBD, tested monthly[6]<br>• Usual and other customary covenants |
| Reporting | • Bi-weekly update call with Company management<br>• Weekly 13-week cash flow forecast<br>• Weekly DIP budget variance report<br>• Monthly management package consistent with the monthly performance updates included in the blowout materials |
| Case Milestones | • Compliance with milestones and related documents and orders shall be in form and substance acceptable to the DIP Lenders, including, but not limited to:<br>  o Entry of an interim DIP order no later than 5 days after the Petition Date<br>  o Entry of the final DIP order no later than 40 days after the Petition Date<br>  o Amendment of the NCS JV Agreements or the Debtors' filing of a motion seeking entry of an order rejecting the NCS JV Agreements no later than 30 days after the Petition Date<br>  o Approval of a Disclosure Statement no later than 85 days after the Petition Date<br>  o Amendment of the NCS JV Agreements or entry of an order rejecting the NCS JV Agreements no later than 85 days after the Petition Date<br>  o Confirmation of a Plan no later than 125 days after the Petition Date |
| Conditions Precedent for DIP Facility | • Usual and customary for DIP facilities of this type, including, but not limited to:<br>  o Receipt of an acceptable DIP budget<br>  o Receipt of latest 13-week cash flow forecast<br>  o Before entry of final order, rating of the facility by both Moody's and S&P (the ratings need not be publicly announced)<br>  o Entry of an interim order by the Bankruptcy Court authorizing the DIP Facility to be followed by a final order by the Bankruptcy Court in substantially the same form, in each case, in form and substance acceptable to the DIP Lenders<br>• Second and final draw under the DIP Facility shall be conditioned upon, among other things, (i) amendment of the NCS JV Agreements in form and substance acceptable to the DIP Lenders or (ii) if the NCS JV Agreements are not amended in form and substance acceptable to the DIP Lenders, the Debtors' filing of a motion to reject the NCS JV Agreements pursuant to an order satisfactory to the DIP Lenders |
| DIP Party Fees | • Payment of all reasonable and documented fees and expenses of Jones Day, Evercore, and local counsel as advisors to the DIP Lenders and Paul Weiss, PJT, and applicable local counsel as advisors to certain DIP Lenders |
| **Exit Facility Financing Terms** | |
| Borrower | • Checkout Holding Corp. and/or any entity formed to hold any newly issued equity in respect of the Debtors or any assets transferred therefrom upon its emergence from the Chapter 11 Case |
| Guarantors | • All existing loan parties other than the Borrower, and any other Debtors (which shall include reorganized entities of the foregoing, and each existing and future direct and indirect domestic subsidiary of the Borrower) |
| Administrative Agent | • [JPMorgan Chase Bank, N.A.] |
| Lenders | • Members of the Ad Hoc First Lien Group and other First Lien Lenders (including RCF lenders) party to RSA and to the DIP Facility as DIP Lenders |

---

[5] Liquidity to be calculated as the sum of domestic and foreign cash balances (excludes undrawn commitments under the Exit Facility)
[6] Company to provide monthly EBITDA actuals for covenant calculation

| Backstop Parties | • Members of the Ad Hoc First Lien Group |
|---|---|
| Amount | • Exit Facility comprised of up to (x) $125mm in respect of the FLFO financing, (y) up to $40mm of New Money Exit Facility available to be drawn up to 18 months following the emergence date and (z) up to $150mm plus accrued PIK interest under the roll-up portion of the DIP Facility. |
| Security | • Subject to the waterfall below, to be secured by a first-priority lien on substantially all assets of Borrower and each Guarantor subject to legal, tax, and other diligence<br>   o To include (i) a pledge of (x) the NCS JV (to the extent such JV interest is owned by the Reorganized Debtors) and (y) the unencumbered equity of first-tier foreign subsidiaries, and (ii) a negative pledge of the equity and/or assets of downstream foreign subsidiaries |
| Waterfall | • FLFO and New Money Exit Facility loans to be repaid first from collateral on a pro rata basis until paid in full and then FLLO loans will be repaid from collateral |
| Use of Proceeds | • Ongoing liquidity and other general corporate purposes |
| Maturity | • FLFO and New Money Exit Facility: Four years after the date of emergence from the Chapter 11 Case<br>• FLLO: 4.5 years after the date of emergence from the Chapter 11 Case |
| Interest Rate | • FLFO and New Money Exit Facility: L + 750 bps cash pay (100 bps LIBOR floor)<br>• FLLO amounts: L+100 bps cash pay, plus 950 bps PIK (100 bps LIBOR floor) |
| Amortization | • FLFO and New Money Exit Facility: 1.0% per annum<br>• FLLO: none |
| Mandatory Prepayments | • Customary, including for asset sales and excess cash flow |
| Call Protection | • FLFO and New Money Exit Facility: NC1 / 103 / 101<br>• FLLO: NC1.5 / 104 / 102 |
| Payments (Exit New Money) | • 4.0% of commitment amount payable to the backstop parties at closing (expected to be simultaneous with DIP), in cash<br>• 2.0% of commitment amount payable to funding parties at funding, in cash<br>• 500 bps per annum ticking fee payable monthly from closing through funding, in cash |
| Covenants | • FLFO and New Money Exit Facility: Maximum Leverage and Maximum Capital Expenditures at levels TBD<br>• FLFO and New Money Exit Facility: Minimum Liquidity of $25mm<br>• FLLO: maintenance covenants TBD<br>• Usual and other customary covenants<br>• Negative Covenants: To be negotiated; to include debt and lien covenants |
| Reporting | • Usual and other customary reporting to be negotiated |
| Conditions Precedent for Exit Facility | • Usual and customary for exit facilities of this type, including, but not limited to:<br>• Confirmation of a Plan and emergence from the Chapter 11 Case with a minimum of $40mm of liquidity[7]<br>• Other conditions TBD, including satisfactory amendment, or entry of order approving rejection (which may be the Confirmation Order), as applicable, of NCS JV Agreements |

---

[7] Liquidity to be calculated as the sum of domestic and foreign cash balances (excludes undrawn commitments under the Exit Facility)

## <u>EXHIBIT B</u>

## FORM OF JOINDER AGREEMENT FOR CONSENTING CREDITORS

This Joinder Agreement to the Restructuring Support Agreement, dated as of December 11, 2018 (as amended, supplemented or otherwise modified from time to time, the "***Agreement***"), by and among the Company and the Consenting Creditors is executed and delivered by [●] (the "***Joining Party***") as of [●].  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1. <u>Agreement to be Bound</u>.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as **<u>Annex I</u>** (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions thereof).  The Joining Party shall hereafter be deemed to be a "Consenting Creditor" and a "Party" for all purposes under the Agreement and with respect to any and all Claims held by such Joining Party.

2. <u>Representations and Warranties</u>.  With respect to the aggregate principal amount of First Lien Indebtedness and Second Lien Indebtedness, in each case, set forth below its name on the signature page hereto, the Joining Party hereby makes the representations and warranties of the Consenting Creditors set forth in <u>Section 8</u> of the Agreement to each other Party to the Agreement.

3. <u>Governing Law</u>.  This Joinder Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflict of laws provisions which would require the application of the law of any other jurisdiction.

[Signature Page Follows]

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

**CONSENTING CREDITOR**


By:_____
Name:
Title:


Principal Amount of First Lien Indebtedness:  $_____

Principal Amount of Second Lien Indebtedness:  $_____

Principal Amount of Other Indebtedness:  $_____


<u>Notice Address</u>:
[•]



Attention: [•]
Email: [•]



Acknowledged:

**[●]**

By:_____
Name:
Title:

## **Exhibit B**

**Organizational Chart**

CATALINA
Legend
Non-Debtor
Debtor
JV Partner
PDM Group Holdings Corporation
PDM Intermediate Holdings A Corporation
PDM Intermediate Holdings B Corporation
PDM Holdings Corporation
Checkout Holding Corp.
Catalina Marketing Corporation
The Nielsen Company (US), LLC
63.5%
36.5%
NC Ventures, LLC
Cellfire Inc.
Modiv Media, Inc.
Catalina Marketing Procurement, LLC
Catalina Electronic Clearing Services, Inc.
20%
80%
Catalina-Pacific Media, LLC
Catalina Marketing Japan K.K.
CMJ Investments, L.L.C.
Catalina Marketing Loyalty Holdings Inc.
Catalina Digital Holdings, LLC
Catalina Marketing Italia, S.R.L.
Catalina Marketing Technology Solutions, Inc.
Catalina Marketing Deutschland GmbH
Catalina Marketing Worldwide, LLC
Catalina Marketing Costa Rica, S.R.L.
1%
99%
CM International C.V.
Catalina Marketing Bermuda Ltd.
Catalina Marketing Coöperatief U.A.
Catalina Marketing International B.V.
Catalina Marketing France, S.A.S.
Catalina Marketing U.K. Limited
Savings4Me, Ltd
Catalina Marketing (Shanghai) Co., Ltd.
Supermarkets Online Holdings, Inc.
Supermarkets Online, Inc.

