## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
----------------------------------------------------------- X
                                                            :
In re                                                       :        Chapter 11
                                                            :
CHECKOUT HOLDING CORP, et al.,                              :        Case No. 18-12794 (KG)
                                                            :
                    Debtors.¹                               :        (Joint Administration Pending)
                                                            :
----------------------------------------------------------- X
```

## MOTION OF DEBTORS FOR (I) AUTHORITY TO (A) OBTAIN POSTPETITION SENIOR SECURED FINANCING, (B) USE CASH COLLATERAL, (C) GRANT ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (D) GRANT LIENS AND SUPERPRIORITY CLAIMS, (E) MODIFY THE AUTOMATIC STAY, AND (II) RELATED RELIEF

Checkout Holding Corp. and its affiliated debtors in the above-captioned chapter

11 cases (the "**Chapter 11 Cases**"), as debtors and debtors in possession (collectively, the

"**Debtors**" or the "**Company**"), respectfully request entry of an interim order in the form

attached hereto as **Exhibit A** (the "**Interim Order**"), and a final order (the "**Final Order**," and

together with the Interim Order, collectively, the "**DIP Orders**"): (i) authorizing the Debtors to

(a) enter into that certain *Senior Secured Super-Priority Debtor-in-Possession Credit Agreement*,

a substantially final form of which is attached hereto as **Exhibit B** (the "**DIP Credit**

**Agreement**," and, together with any and all other Loan Documents (as defined in the DIP Credit

Agreement), the "**DIP Documents**")² to obtain postpetition financing ("**DIP Financing**"),

---

¹ The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Catalina Marketing Corporation (9007); Catalina Marketing Procurement, LLC (9333); Catalina Marketing Technology Solutions, Inc. (8728); Catalina Marketing Worldwide, LLC (9687); Cellfire Inc. (5599); Checkout Holding Corp. (4651); Modiv Media, Inc. (3507); PDM Group Holdings Corporation (9148); PDM Holdings Corporation (5025); PDM Intermediate Holdings A Corporation (6409); and PDM Intermediate Holdings B Corporation (3278). The Debtors' principal offices are located at 200 Carillon Parkway, St. Petersburg, FL 33716.

² Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Documents or the Interim Order, as applicable.

including with respect to an interim borrowing of up to $60 million, and (b) use Cash Collateral (as such term is defined in Section 363(a) of the Bankruptcy Code); (ii) granting adequate protection to prepetition secured lenders as provided herein; (iii) granting liens and superpriority claims as provided herein; (iv) modifying the automatic stay; (v) scheduling a hearing to consider the relief requested herein on a final basis (the "**Final Hearing**"); and (vi) granting related relief.

In support of the Motion, the Debtors submit: (i) the declaration Marc Puntus, attached hereto as **Exhibit C** (the "**Puntus Declaration**") and (ii) the first day declaration of Robert A. Del Genio, filed contemporaneously herewith and incorporated herein by reference (the "**Del Genio Declaration**").   The Debtors' Approved Budget with respect to the DIP Facilities is attached hereto as **Exhibit D** (the "**Approved Budget**").

### Preliminary Statement

1.      The Debtors have negotiated a comprehensive, prepackaged restructuring supported by stakeholders throughout their capital structure, including their Prepetition First Lien Lenders and Prepetition Second Lien Lenders.  By this Motion, the Debtors seek authorization to access the DIP Financing and Cash Collateral critical to (i) the continued, uninterrupted operation of the Debtors' business in chapter 11 while they seek to implement the restructuring, (ii) providing a strong message to their customers, employees, counterparties, and business partners that the Debtors are well-capitalized and well positioned for a successful reorganization, and (iii) the payment of necessary expenses associated with administering the Chapter 11 Cases.

2.      Certain of the Debtors' Prepetition First Lien Lenders have agreed to backstop a multiple-draw super-priority senior secured term loan facility in an aggregate principal amount not to exceed $275 million (the "**DIP Facility**") agented by JPMorgan Chase

Bank. N.A. ("**JPMorgan**" and in such capacity, the "**DIP Agent**"), including interim authority to draw up to $60 million.

3.         Access to the DIP Facility is necessary to avoid the immediate and irreparable harm that would otherwise result if the Debtors are denied incremental liquidity.  The Debtors filed these Chapter 11 Cases with just a few million dollars on hand.   The commencement of these Chapter 11 Cases will place increased demands on liquidity due, among other things, to the costs of administering these Chapter 11 Cases and potential unforeseen impacts on the Debtors' operations and working capital needs that may result from the filing.  The DIP Financing and use of Cash Collateral are thus critical to ensure the Debtors' smooth entry into chapter 11 and their ability to operate their business prudently during the pendency of these Chapter 11 Cases for the benefit of their stakeholders.  The DIP Financing will provide sufficient liquidity to fund these Chapter 11 Cases and the Debtors' operations and will demonstrate to the market that the Debtors are poised for a successful turnaround.

4.         The terms of the DIP Financing are competitive and reasonable.  The DIP Financing was evaluated by the Debtors and their professionals, was thoroughly negotiated at arm's length between the Debtors and the Ad Hoc Group of Prepetition First Lien Lenders, and is supported by the Ad Hoc Group of Prepetition Second Lien Lenders.  Moreover, despite their efforts, the Debtors have been unable to obtain any alternative source of financing.  Accordingly, under the circumstances, the Debtors believe that the DIP Financing is the most favorable form of financing available.

## Jurisdiction

5.         The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United

RLF1 20433831v.1

States District Court for the District of Delaware, dated February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      Pursuant to Rule 9013–1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

**Relief Requested**

7.      By this Motion, the Debtors request the following relief as provided in the DIP Orders:

- **The DIP Financing:** authority to enter into the DIP Credit Agreement and related documents providing for a $275 million DIP Facility that will be in an amount equal to $60 million on an interim basis and an additional $65 million on a final basis (and $150 million being rolled up on a final basis) that, together, will provide the liquidity needed to ensure the Debtors are able to continue operating their business without disruption during the pendency of these Chapter 11 Cases.

- **DIP Interest and Fees:** authority to pay:

  - an interest rate of the Eurocurrency Rate or Base Rate, as applicable, plus the Applicable Rate *per annum*;

    - "Applicable Rate" means (i) with respect to any Roll-Up Loans, a percentage per annum for Eurocurrency Rate Loans or Base Rate Loans equal to 5.50% or 4.50%, respectively, and (ii) with respect to any New-Money Loans, a percentage per annum equal to (x) in the case of Eurocurrency Rate Loans 10.00% or (y) in the case of Base Rate Loans 9.00%, as applicable.

  - default interest at 2% *per annum*; and

  - certain additional fees and expenses, including, (i) a closing payment in an amount equal to 2.00% of the DIP Commitments, payable in cash at closing; (ii) a ticking premium equal to 5.00% *per annum* on the actual daily amount of unused DIP

4

Commitments, payable on a monthly basis; and (iii) an administrative agent fee, payable in cash at closing.

- **DIP Liens and Claims:** authority to grant, in each case subject to the Carve-Out (as defined in the Interim Order):

  - For the New Money Portion of DIP Financing:

    - fully-perfected first priority lien on, and security interest in, all DIP Collateral that is not subject to valid, perfected, non-avoidable and enforceable liens in existence on or as of the Petition Date or valid liens perfected (but not granted) after the Petition Date to the extent such postpetition perfection is expressly permitted by section 546(b) of the Bankruptcy Code (collectively, the "**Previously Unencumbered Property**")

    - fully-perfected first priority, senior priming lien on, and security interest in, all DIP Collateral comprising the Prepetition Collateral;

    - junior liens on any Prepetition Collateral subject to Permitted Prepetition Senior Liens; and

    - superpriority administrative expense claims.

  - For the DIP Roll-Up Loans (on a final basis only):

    - first priority priming security interests and liens on all Prepetition Collateral (other than the Permitted Prepetition Senior Liens) and proceeds of such property;

    - junior liens on any Prepetition Collateral subject to Permitted Prepetition Senior Liens; and

    - superpriority administrative expense claims.

- **Cash Collateral:** authority to use Cash Collateral within the meaning of section 363(a) and 363(c) of the Bankruptcy Code.

- **Adequate Protection:**  approval of the form and manner of adequate protection to be provided to the Prepetition First Lien Lenders, including:

  - replacement or, if applicable, new liens on and security interests in the DIP Collateral that are junior to the liens securing the DIP Facility (in the same relative priority as among the indebtedness under the First Lien Credit Agreement) (such replacement or new liens, the "**Adequate Protection Liens**");

  - superpriority claims as provided for in section 507(b) of the Bankruptcy Code that will have a priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code (the "**Adequate Protection Claims**");

  - the payment of all reasonable and documented out-of-pocket fees and expenses payable to the Prepetition First Lien Agent under the Prepetition First Lien Documents, whether incurred pre- or post-petition; and

- subject to the entry of a Final Order, the payment of $150,000 into a noninterest bearing account for the benefit of the Prepetition First Lien Secured Parties upon the commencement of an action asserting Claims and Defenses (as defined in the Interim Order).

- **Modification of the Automatic Stay**: modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the DIP Orders, with the exercise of remedies against the DIP Collateral requiring at least five business days' written notice to the Debtors, the U.S. Trustee, and any official committee.

- **Immediate Effectiveness**: waiver of any applicable stay, including (to the extent applicable) under Bankruptcy Rule 6004, to provide for immediate effectiveness of the Interim Order.

- **Final Hearing**: scheduling a date for a hearing on the Motion to consider entry of the Final Order no later than thirty (30) days after entry of the Interim Order.

## Concise Statement Pursuant to Bankruptcy Rule 4001

8.    Pursuant to Bankruptcy Rules 4001(b), (c) and (d), the following is a concise statement and summary of the proposed material terms of the DIP Documents and Orders:[3]

| Summary of the DIP Facility | | Reference |
|---|---|---|
| **Borrower**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | Checkout Holding Corp. (the "**Borrower**") | DIP Credit Agreement, Preamble |
| **Guarantors**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | Each of the Persons set forth on the signature pages that are parties hereto as "Parent Guarantors," and each of the Wholly-Owned Domestic Subsidiaries of the Borrower from time to time parties hereto as "Subsidiary Guarantors," each as a debtor and debtor-in-possession (such Subsidiary Guarantors, together with the Parent Guarantors, being collectively, the "**Guarantors**" and each a "**Guarantor**") | DIP Credit Agreement, Preamble |
| **Lenders**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | Each lender from time to time party to the DIP Credit Agreement including each "Lender" under and as defined in the Pre-Petition First Lien Credit Agreement that elects, by notice to the Administrative Agent and the Borrower, to become a lender hereunder (collectively, the "**Lenders**") | DIP Credit Agreement, Preamble |

---

[3] This statement is qualified in its entirety by reference to the applicable provisions of the DIP Documents. To the extent there exists any inconsistency between this concise statement and the provisions of the DIP Documents or the DIP Orders, the provisions of the DIP Documents or the DIP Orders, as applicable, shall control.

| | | |
|---|---|---|
| **DIP Agent**<br>Fed. R. Bankr. P.<br>4001(c)(1)(B) | JPMorgan Chase Bank, N.A. | DIP Credit Agreement,<br>Preamble |
| **DIP Facility**<br>Fed. R. Bankr. P.<br>4001(c)(1)(B); Local<br>Rule 4001-2(a)(ii) | A secured term loan credit facility in an aggregate principal amount of $275,000,000 (the "**DIP Facility**") | DIP Credit Agreement,<br>Recitals; Interim Order<br>¶ (i) |
| **Borrowing Limits**<br>Fed. R. Bankr. P.<br>4001(c)(1)(B) | Upon entry of the Interim Order, $60 million. Following entry of the Final Order (as defined below), and subject to the terms of the DIP Credit Agreement, an additional $65 million. | DIP Credit Agreement,<br>"New-Money<br>Commitments"<br>Definition;<br>Interim Order ¶ (i) |
| **DIP Budget**<br>Fed. R. Bankr. P.<br>4001(c)(1)(B) | A copy of the Approved Budget is attached hereto as **Exhibit D**. The Approved Budget shall be updated by the Borrower (i) not less than one time in each two (2) consecutive week period and (ii) at any other time and from time to time in the sole discretion of the Borrower, with the written consent of the Required Lenders, and shall be approved in writing by, and shall be in form and substance reasonably satisfactory to, the Required Lenders in their sole discretion. | DIP Credit Agreement,<br>"Approved Budget"<br>Definition; Interim<br>Order ¶ (iv) |
| **Interest Rates**<br>Fed. R. Bankr. P.<br>4001(c)(1)(B) | (i) each New-Money Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to (x) for each such Eurocurrency Rate Loan, the Eurocurrency Rate for such Interest Period plus the Applicable Rate for New-Money Loans that are Eurocurrency Rate Loans and (y) for each such Base Rate Loan, the Base Rate plus the Applicable Rate then in effect for New-Money Loans that are Base Rate Loans and (ii) the Unfunded New-Money Commitments of each Lender shall earn a ticking premium on the aggregate daily amount thereof at a per annum rate equal to 5.00%. All Roll-Up Loans shall be deemed to be Eurocurrency Rate Loans and shall bear interest on the outstanding principal amount thereof at a rate per annum equal to the Eurocurrency Rate with an Interest Period of one month plus the Applicable Rate for the Roll-Up Loans. | DIP Credit Agreement,<br>§ 2.08 |
| **Maturity Date**<br>Fed. R. Bankr. P.<br>4001(c)(1)(B); Local<br>Rule 4001-2(a)(ii) | June 14, 2019 | DIP Credit Agreement,<br>"Maturity Date"<br>Definition |
| **Material Conditions to Closing**<br>Fed. R. Bankr. P.<br>4001(c)(1)(B) | The initial funding of the DIP Loans under the DIP Facility is subject to the following conditions precedent:<br>(a) execution and delivery of the DIP Credit Agreement, the DIP Documents, and other ancillary deliverables;<br>(b) the RSA having been executed by the parties to the RSA;<br>(c) all payment and expenses payable under the DIP Credit Agreement or otherwise to be paid to the DIP Agent, the DIP Lenders or the Backstop Lenders on or before the Closing Date shall have been paid;<br>(d) delivery of the Approved Budget;<br>(e) entry of the Interim Order no later than five days after the Petition Date;<br>(f) all proposed "first day" orders entered in form and substance reasonably satisfactory to the Administrative | DIP Credit Agreement,<br>§ 4.01 |

| | Agent and the Backstop Lenders;<br>(g) the Prior Agent and the Prior Lenders having consented to the use of collateral or having received adequate protection; and<br>(h) the Debtors having complied with the Required Milestones (defined below). | |
|---|---|---|
| **Events of Default**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | Events of default include, but are not limited to: non-payment of obligations; defaults under covenants; failure to meet any of the Required Milestones set forth below; failure to use the proceeds in accordance with the Approved Budget; the occurrence of an RSA Termination Event; appointment of a bankruptcy trustee or examiner, dismissal or conversion of these Chapter 11 Cases, certain adverse motions or Bankruptcy Court orders, termination of the Interim Order, filing of an unacceptable chapter 11 plan or disclosure statement. | DIP Credit Agreement, § 8.01 |
| **Carve-Out**<br>Fed. R. Bankr. P. 4001(c)(1)(B)<br>Local Rule 4001-2(a)(5) | The Carve-Out means the sum of (i) allowed administrative expenses pursuant to 28 U.S.C. § 1930(a)(6) and 28 U.S.C. § 156(c) for fees required to be paid to the Clerk of this Court; (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees (including success, completion, or transaction fees), disbursements, costs, and expenses accrued or incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code and any professionals retained by the Committee pursuant to section 328 or 1103 of the Bankruptcy Code (collectively the "**Professional Fees**") at any time before or on the first business day following delivery by the DIP Agent of a Carve-Out Trigger Notice, whether allowed by this Court prior to or after delivery of a Carve-Out Trigger Notice; and (iv) Professional Fees in an aggregate amount not to exceed $3.5 million incurred after the first business day following delivery by the DIP Agent of the Carve-Out Trigger Notice. | Interim Order, ¶ 7(a) |
| **Priority and Collateral**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(i) | All obligations of the Borrowers and the Guarantors to the DIP Lenders and to the DIP Agent, including, without limitation, all principal, accrued interest, costs, and fees (collectively, the "**DIP Obligations**") shall constitute claims entitled to the benefits of Bankruptcy Code section 364(c)(1), having a super-priority over any and all administrative expenses and claims, of any kind or nature whatsoever, including, without limitation, the superpriority claims granted to the Prepetition Secured Parties under the Interim Order and the Final Order, and administrative expenses, subject only to the Carve-Out, in accordance with the following:<br><br>(a) First Lien on Unencumbered Property. A valid, binding, continuing, enforceable, fully-perfected first priority lien on, and security interest in, all DIP Collateral that is not subject to valid, perfected, non-avoidable and enforceable liens in existence on or as of the Petition Date or valid liens perfected (but not granted) after the Petition Date to the extent such postpetition perfection is expressly permitted by | Interim Order, ¶¶ 3, 4 |

8

| | section 546(b) of the Bankruptcy Code (including, subject to the entry of a Final Order, the proceeds of Avoidance Actions).<br><br>(b) Priming Liens on Prepetition Collateral. A valid, binding, continuing, enforceable, fully perfected first priority, senior priming lien on, and security interest in, all DIP Collateral comprising the Prepetition Collateral, which shall be senior in all respects to the security interests in, and liens on, the Prepetition Collateral of each of the Prepetition Secured Parties, including the Adequate Protection Liens (as defined below) granted to such Prepetition Secured Parties.<br><br>(c) DIP Liens Junior to Certain Other Liens. Liens on the DIP Collateral that are junior to the liens permitted to be senior to the Prepetition First Lien Secured Parties' liens on the Prepetition Collateral pursuant to Section 7.01 of the Prepetition First Lien Credit Agreement. | |
|---|---|---|
| **Use of DIP Proceeds**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(ii) | Proceeds of the DIP Loans under the DIP Facility and the Use of Cash Collateral will be used solely for the following: (a) working capital and letters of credit, (b) other general corporate purposes of the Debtors; (c) permitted payment of costs of administration of these Chapter 11 Cases; (d) payment of such other prepetition obligations as consented to by the DIP Agent, such consent not to be unreasonably withheld, and as approved by this Court; (e) payment of interest, fees and expenses (including without limitation, legal and other professionals' fees and expenses of the DIP Agent and DIP Lenders) owed under the DIP Documents; (f) payment of certain adequate protection amounts to the Prepetition First Lien Secured Parties; (g) subject to entry of a Final Order, the roll-up of a portion of the Prepetition First Lien Obligations into DIP Obligations; and (h) payment of the Carve-Out. | Interim Order, ¶ F(v) |
| **Adequate Protection/Identity of Each Entity with Interest in Cash Collateral**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(ii); (b)(1)(B)(i), (iv) | The Prepetition First Lien Agent and the Prepetition First Lien Lenders have an interest in Cash Collateral.<br><br>The following adequate protection will be provided to the Prepetition First Lien Agent and the Prepetition First Lien Lenders, subject to entry of the Final Order:<br>(a) a valid perfected security interest in and lien on all of the DIP Collateral (including all Previously Unencumbered Property), to the extent of any diminution in value of their collateral, which will be subject and subordinate only to (i) the DIP Liens and (ii) the Carve-Out;<br>(b) superpriority claims to the extent of diminution in the value of their collateral;<br>(c) all reasonable and documented out-of-pocket fees and expenses payable to the Prepetition First Lien Agent under the Prepetition Frist Lien Documents including attorneys' fees. | Interim Order, ¶ 6(a)-(c) |
| **Debtors' Stipulations**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(iii); Local Rule 4001-2(a)(i)(B) | The Debtors stipulate to, among other things, the following: (a) As of the Petition Date, the Borrower and Obligors were indebted under the Prepetition First Lien Revolving Facility in an aggregate principal amount of $55 million and were indebted under the Prepetition First Lien Term Loan in an | Interim Order, ¶ D |

| | | |
|---|---|---|
| | aggregate principal amount of $1,002,750,000.00;<br>(b) the prepetition First Lien Obligations are (i) legal, valid, binding, and non-avoidable obligations and not subject to any avoidance, recharacterization, counterclaim, defense, offset, subordination, other claim, clause of action or other challenge of any kind;<br>(c) the liens, security interests, and mortgages granted by the Debtors to the Prepetition First Lien Agent are legal, valid, binding, perfected, enforceable, first priority liens on and security interests in the Prepetition Collateral and not subject to any avoidance, recharacterization, counterclaim, defense, offset, subordination, other claim, clause of action or other challenge of any kind;<br>(d) As of the Petition Date, the Borrower and Obligors were indebted under the Prepetition Second Lien Credit Agreement. | |
| **Waiver or Modification of the Automatic Stay**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(iv) | The automatic stay of section 362(a) of the Bankruptcy Code is hereby modified so that:<br>(a) upon the occurrence and during the continuation of an Event of Default under any of the DIP Documents or the Interim Order, the DIP Agent (with the consent of the Required DIP Lenders) may declare (i) all DIP Obligations owing under the DIP Documents to be immediately due and payable, (ii) the termination, reduction or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains under the DIP Facility, (iii) termination of the DIP Facility and the DIP Documents as to any future liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the DIP Liens or the DIP Obligations, and (iv) that the application of the Carve-Out has occurred through the delivery of the Carve-Out Trigger Notice to the Borrower; and<br>(b) five (5) business days after the date a Termination Declaration is delivered the DIP Agent and the DIP Lenders shall be entitled to exercise their rights and remedies in accordance with the DIP Documents and the Interim Order to satisfy the DIP Obligations, Superpriority Claim and DIP Liens, subject to the Carve-Out. | Interim Order, ¶ 28 |
| **Waiver or Modification of Right to File a Plan**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(v) | An Event of Default will occur under the DIP Credit Agreement on the occurrence of the filing of any plan of reorganization or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by a Loan Party that does not propose to indefeasibly repay in full in cash the Obligations under this Agreement and Prior Lender Obligations, or by any other Person to which the Required Lenders do not consent, or any of the Loan Parties or their Subsidiaries shall seek, support or fail to contest in good faith the filing or confirmation of any such plan or entry of any such order. | DIP Credit Agreement, § 8.01 |

| | | |
|---|---|---|
| **Milestones**<br><br>Fed. R. Bankr. P.<br>4001(c)(1)(B)(vi) | The Loan Parties shall have caused the following to occur by the times and dates set forth below (<u>ALL</u> defined terms used below in this <u>Section 6.26</u> shall have the meanings ascribed to them in the RSA):<br>(a) by no later than 11:59 p.m. prevailing Eastern Time on December 12, 2018, as such date may be extended with the consent of the Requisite Creditors, the Company shall have commenced the Solicitation in accordance with section 1126(b) of the Bankruptcy Code;<br>(b) by no later than 11:59 p.m. prevailing Eastern Time on that date that is five (5) calendar days after the Petition Date, as such date may be extended with the consent of the Required DIP Lenders, the Interim DIP Order shall have been entered;<br>(c) by no later than 11:59 p.m. prevailing Eastern Time on the date that is thirty (30) calendar days after the Petition Date, as such date may be extended with the consent of the Requisite First Lien Lenders and, if applicable, the Requisite Second Lien Lenders, (A) the NCS JV Agreements have been amended to the satisfaction of the Requisite First Lien Lenders or (B) a motion to reject the NCS JV Agreements is pending before the Bankruptcy Court;<br>(d) by no later than 11:59 p.m. prevailing Eastern Time on the date that is forty-five (45) calendar days after the Petition Date, as such date may be extended with the consent of the Required Lenders, the Bankruptcy Court shall have entered an order authorizing the assumption of this Agreement;<br>(e) by no later than 11:59 p.m. prevailing Eastern Time on the date that is forty (40) calendar days after the Petition Date, as such date may be extended with the consent of the with the consent of the Lenders in accordance with <u>Section 10.01</u>, the Final DIP Order shall have been entered;<br>(f) by no later than 11:59 p.m. prevailing Eastern Time on the date that is eighty-five (85) calendar days after the Petition Date, as such date may be extended with the consent of the Requisite First Lien Lenders and, if applicable, the Requisite Second Lien Lenders, (A) the NCS JV Agreements have been amended to the satisfaction of the Requisite First Lien Lenders or (B) the Bankruptcy Court has entered an order rejecting the NCS JV Agreements;<br>(g) by no later than 11:59 p.m. prevailing Eastern Time on the date that is eighty-five (85) calendar days after the Petition Date, as such date may be extended with the consent of the Requisite Creditors, the Bankruptcy Court shall have entered an order approving the Disclosure Statement;<br>(h) by no later than 11:59 p.m. prevailing Eastern Time on the date that is one hundred twenty-five (125) calendar days after the Petition Date, as such date may be extended with the consent of the Requisite Creditors, the Bankruptcy Court shall have entered an order confirming the Plan; and<br>(i) by no later than 11:59 p.m. prevailing Eastern Time on the date that is one hundred forty (140) calendar days after the Petition Date, as such date may be extended with the consent of the Requisite Creditors, the Effective Date shall have occurred. | DIP Credit Agreement, § 6.26 |
| **Waiver or** | All of the DIP Liens shall be effective and perfected upon | Interim Order, ¶ 4 |

| | | |
|---|---|---|
| **Modification of Applicability of Non-Bankruptcy Law Relating to DIP Liens** Fed. R. Bankr. P. 4001(c)(1)(B)(vii) | entry of the Interim Order and without necessity of the execution of mortgages, security agreements, pledge agreements, or similar undertakings. | |
| **Release, Waiver or Limitation on any Claim or Cause of Action** Fed. R. Bankr. P. 4001(c)(1)(B)(viii) | The Debtors' Stipulations shall be binding upon all other parties in interest, subject to the Challenge Period. Any party in interest with standing to challenge must timely commence an adversary proceeding or contested matter by no later than: (i) the earlier of (A) the date of the hearing scheduled to consider confirmation of any plan of reorganization and (B) no later than (1) for a Committee, (if appointed), sixty (60) days from the date of formation of a Committee (if appointed), or (2) seventy-five (75) days following the entry of the Interim Order for any other party in interest with requisite standing; and (ii) any such later date as has been ordered by the Court for cause upon a motion filed and served within any applicable period of time set forth in this paragraph. | Interim Order, ¶ 25 |
| **Indemnification** Fed. R. Bankr. P. 4001(c)(1)(B)(ix) | The Borrower and each of the other Loan Parties shall jointly and severally indemnify and hold harmless the Administrative Agent, each Lender (without duplication) and their respective affiliates, directors, officers, employees, agents, advisors, and other representatives. | DIP Credit Agreement, § 10.05 |
| **Section 506(c) Waiver** Fed. R. Bankr. P. 4001(c)(1)(B)(x); Local Rule 4001-2(a)(i)(C) | The Interim Order provides for a waiver of any right to seek surcharge against the DIP Collateral or, upon entry of the Final Order, Prepetition Collateral pursuant section 506(c) | Interim Order, ¶ (viii) |
| **Liens on Avoidance Actions** Fed. R. Bankr. P. 4001(c)(1)(B)(xi); Local Rule 4001-2(a)(i)(D) | The DIP Collateral includes liens on the proceeds of Avoidance Actions, subject to entry of a Final Order. | Interim Order, ¶ 4 |
| **Section 552(b) Waiver** Fed. R. Bankr. P. 4001(c)(1)(B); Local Rule 4001-2(a)(i)(H) | The Interim Order provides for a waiver by the Debtors of the equities of the case exception of section 552(b) of the Bankruptcy Code with respect to the DIP Roll-Up Loans and, upon entry of the Final Order, the Prepetition Collateral. | Interim Order, ¶ (viii) |
| **Provisions that Deem Prepetition Debt to be Post Petition Debt** Local Rule 4001-2(a)(i)(E) | Subject to entry of the Final Order, without any further action by the Debtors or any other party, $150 million of the Prepetition First Lien Loans shall be converted into DIP Obligations. | Interim Order, ¶ F (vii) |
| **Application of Proceeds of DIP Collateral** Local Rule 4001-2(a)(ii) | Subject to entry of a Final Order, the DIP Obligations other than DIP Obligations relating to the DIP Roll-Up Loans, at the option of the Required Lenders (as defined in the DIP Credit Agreement, the "**Required DIP Lenders**"), to be exercised in their sole and absolute discretion, shall be | Interim Order, ¶ 5 |

<table>
<tr><td></td><td>repaid (a) first, from the DIP Collateral comprising Previously Unencumbered Property and (b) second, from all other DIP Collateral; provided, however, in the event the Debtors propose or pursue a chapter 11 plan other than the plan contemplated by the Restructuring Support Agreement and such plan is not supported by the Consenting Second Lien Lenders (as defined in the Restructuring Support Agreement), the respective rights of the DIP Lenders and the Consenting Creditors (as defined in the Restructuring Support Agreement) in connection with the allocation of value and distributions under such alternative chapter 11 plan shall be fully preserved.</td><td></td></tr>
</table>

## The Debtors' Prepetition Indebtedness

9.     As set forth below, as of the Petition Date, the Debtors have outstanding funded debt obligations consisting of approximately $1.9 billion.

## A.    The First Lien Credit Agreement

10.    Checkout Holding Corp., as borrower (the "**Borrower**"), and certain of the other Debtors, as guarantors (the "**Guarantors**"), JPMorgan Chase Bank, N.A., as administrative and collateral agent (the "**First Lien Agent**"), L/C Issuer and Swing Line Lender, and the other lender parties thereto (collectively, the "**First Lien Lenders**") are parties to the First Lien Credit Agreement, dated as of April 9, 2014, (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**First Lien Credit Agreement**"), under which the First Lien Lenders agreed to provide to the Borrower a $1.05 billion term loan facility (the "**First Lien Term Loan**") and a $100 million revolving credit facility with a swing line sublimit of up to $20 million and a letter of credit sublimit of $35 million (the "**First Lien Revolving Facility**").  The First Lien Term Loan matures on April 9, 2021.  The First Lien Revolving Facility matures on April 9, 2019.  The lenders with respect to the First Lien Term Loan are not the same lenders as those with respect to the First Lien Revolving Facility, but all of the First Lien Lenders are party to the First Lien Credit Agreement.

11.    The First Lien Term Loan and the First Lien Revolving Facility are secured on a pari passu basis by a first-priority interest in the Senior Collateral.[4]  The Senior Collateral includes, among other things, the Debtors' right, title, and interest in all accounts, chattel paper, equipment, goods, inventory, fixtures, intellectual property, and other property and the proceeds thereof. The Senior Collateral excludes, among other things, 35% of the stock of the Debtors' first tier foreign subsidiaries and 100% of the stock of the Debtors' lower tier foreign subsidiaries, all assets of the foreign subsidiaries, fee-owned real property assets with a fair market value below $10 million, certain bank accounts, and membership interests in NCS, but includes the proceeds thereof.

12.    Under the prepetition First Lien Revolving Facility, JPMorgan Chase Bank, N.A., in its capacity as L/C Issuer, issued a letter of credit for the benefit of Epson America, Inc., a contract counterparty, in the amount of $5 million (the "**JPM Letter of Credit**").  The JPM Letter of Credit is a Secured Obligation under the Prepetition First Lien Credit Agreement and is also secured by a separate first lien security interest in a cash collateral account maintained by Checkout Holding Corp. at JPMorgan Chase Bank, N.A. and all monies and funds deposited therein (as well as the proceeds thereof and investments and instruments related thereto).

13.    As of the Petition Date, approximately $1.020 billion of principal, plus interest, fees, and expenses is outstanding under the First Lien Term Loan.  Letters of credit with an aggregate face amount of approximately $5 million have been issued and approximately $56

---

[4] "Senior Collateral" means (x) any "Collateral" as defined in any Senior Debt Document (y) any other assets of the Borrower or any other Grantor with respect to which a Lien is granted or purported to be granted pursuant to a Senior Collateral Document as security for any Senior Obligations or deemed to be granted pursuant to Section 2.04. *First Lien Credit Agreement, Section 1.01.*

million of principal, plus interest, fees and expenses is outstanding under the First Lien Revolving Facility.

**B.    The Second Lien Credit Agreement**

14.    The Borrower, the Guarantors, Wilmington Savings Fund Society, FSB, as successor administrative agent and collateral agent (the "**Second Lien Agent**"), and the other lender parties thereto (collectively, the "**Second Lien Lenders**") are parties to the Second Lien Credit Agreement, dated as of April 9, 2014 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Second Lien Credit Agreement**"), under which the Second Lien Lenders provided a $460 million term loan (the "**Second Lien Term Loan**") to the Borrower.  The Second Lien Term Loan matures on April 9, 2022.  The Second Lien Credit Agreement is secured by a second-priority security interest in the Senior Collateral.    Approximately $472 million of principal, plus interest, fees and expenses is outstanding under the Second Lien Term Loan.

**C.    The Intercreditor Agreement**

15.    The rights of the First Lien Lenders and the Second Lien Lenders with respect to their shared collateral are governed by that certain Second Lien Intercreditor Agreement, dated as of April 9, 2014, by and among the Borrower, the Guarantors, JPMorgan Chase Bank, N.A., as senior representative for the First Lien Lenders and Wilmington Savings Fund Society, FSB, as the second priority representative for the Second Lien Lenders (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Intercreditor Agreement**").  The Intercreditor Agreement governs, among other things, the priority of distribution of the Senior Collateral and the respective rights of the First Lien Lenders and the Second Lien Lenders and their respective representatives in connection with certain bankruptcy matters, such as the provision of postpetition financing.  In accordance

with the Intercreditor Agreement: (i) the First Lien Lenders are afforded first priority with respect to the Senior Collateral; and (ii) the Second Lien Lenders are afforded second priority with respect to the Senior Collateral.

**D.      The Note Purchase Agreement**

16.      PDM Intermediate Holdings B Corporation, as issuer (the "**Issuer**"), and certain purchasers (the "**Note Holders**") are party to that certain Note Purchase Agreement, dated as of April 9, 2014 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Unsecured PDM Note Purchase Agreement**"), pursuant to which $230 million in aggregate principal amount of unsecured notes (the "**Unsecured HoldCo Notes**") were issued by the Issuer.  The Unsecured HoldCo Notes are unsecured and are not guaranteed by any affiliates of the Issuer.  The Issuer is a holding company, the only asset of which is the stock in its wholly owned subsidiary.  As such, the Unsecured HoldCo Notes are structurally subordinated to the operating Debtors' creditors with respect to all of the assets of such Debtors.  The Unsecured HoldCo Notes mature on April 9, 2022.[5]

17.      As of the date of this Disclosure Statement, approximately $384 million of principal, plus interest, fees and expenses is outstanding under the Unsecured HoldCo Notes.

---

[5] Prior to April 9, 2016, the Unsecured HoldCo Notes were accruing payment-in-kind ("***PIK***") interest of 11.25% per annum.  From April 9, 2016, the Unsecured HoldCo Notes were accruing interest of 10.50% per annum, all of which was payable in cash, except that for any interest period commencing after April 9, 2016, and ending on or prior to April 9, 2019, the Issuer had the option to elect to pay the following combinations of cash interest and PIK interest: (i) 10.875% per annum, of which 5.4375% was payable in cash and 5.4375% was payable in PIK interest, or (ii) 11.25% per annum, all of which was payable quarterly in PIK interest.  The Issuer has been electing to pay PIK interest up until the Petition Date.

**Debtors' Liquidity Needs and Marketing Efforts**

**I.    The Debtors' Need for DIP Financing and Use of Cash Collateral.**

18.    The Debtors require immediate access to DIP Financing and the authority to use cash collateral to ensure that they have sufficient liquidity to operate their businesses and administer their estates in the ordinary course.  The Debtors are entering chapter 11 with a de minimis cash balance and their operating cash flow is insufficient to fund projected ongoing operations and expenses, including expenses associated with these Chapter 11 Cases. In addition to the funding needs of the Debtors' businesses in the ordinary course and the expenses associated with these Chapter 11 Cases, the commencement of chapter 11 proceedings may further strain the Debtors' liquidity due, among other things, to the nature of the Debtors' businesses and its important counterparties and customers, as described in the Del Genio Declaration.

19.    In August of 2018, Centerview, with the assistance of the Debtors' management and FTI Consulting, Inc. ("**FTI**"), evaluated the Debtors' cash flow and liquidity needs in a chapter 11 scenario to determine how much DIP Financing would be reasonably required to operate the Debtors' businesses and pay restructuring and other administrative costs during a chapter 11 process, including the financing costs of a DIP financing.  This analysis included, among other things, the assessment of (i) the potential acceleration of demands on available liquidity, both with respect to the Debtors and their non-debtor affiliates, following the commencement of these Chapter 11 Cases and (ii) potential practical and other limitations on the Debtors' ability to repatriate cash from its international operations following a chapter 11 filing. Based on this analysis, the Debtors and their advisors, including Centerview, concluded that the Debtors would require $125 million of new money DIP financing and access to cash collateral to finance their operations and maintain sufficient liquidity during a six-month chapter 11 case.

17

The Approved Budget was prepared by the Debtors and FTI and was shared with the Ad Hoc Groups (as defined below) prior to the commencement of the cases.

20.     The proposed DIP Financing is essential for sustaining Catalina's business.  Importantly, it will help the Debtors instill confidence in their critical consumer packaged goods and retail customers.  It also will allow the Debtors to continue making ongoing upgrades to its hardware and software platforms required to, at a minimum, defend its current market share with key consumer packaged goods and retail customers both domestically and internationally.  Additionally, the DIP Financing will permit the Company to make critical investments in its digital platform during the pendency of the Chapter 11 Cases so that the business is better positioned to compete with key competitors upon emergence. The DIP Financing will provide assurances to the Debtors' customers, employees, counterparties, and business partners that the Debtors will be able to continue operating "business as usual" and otherwise pay their obligations as they come due after the Petition Date.  The DIP Facility will provide the Debtors with the liquidity needed, among other things, to fund payroll for employees and satisfy their other working capital, and general corporate requirements, including payment of retailer fees necessary for data collection and ink charges necessary for the printing of coupons.

21.     Further, the Debtors believe that the funding provided under the DIP Facility will allow the Debtors to pursue a reorganization and confirmation of their proposed prepackaged chapter 11 plan, as reflected in the RSA (as defined below).  Absent the ability to access the DIP Facility, even for a limited period of time, there is a substantial risk that the Debtors will be unable to continue operating their businesses and liquidate, resulting in a significant deterioration of value to Catalina's business as a whole to the detriment of all stakeholders.

22.     Based on the Debtors' current financial condition and the costs associated with effectively operating the Debtors' business and funding the chapter 11 process, the Debtors believe that their liquidity needs will be satisfied if the Debtors are authorized to borrow up to a total of $60 million under the proposed DIP Financing on an interim basis, and $125 million in total on a final basis.  The DIP Financing allows the Debtors to draw these amounts (subject to the terms and conditions set forth in the DIP Credit Agreement) and, therefore, will permit the Debtors to operate their businesses successfully.  Further, the Approved Budget provides the flexibility needed for the Debtors to run their operations in the ordinary course.

## II.    The Debtors' Efforts to Obtain Postpetition Financing.

23.     In the winter of 2017, the Debtors engaged Weil, and Centerview to explore possible liability management transactions to help address certain of the Debtors' impending debt service obligations and debt maturities.  In the spring of 2018, certain lenders under the First Lien Credit Agreement (the "**First Lien Lenders**") and certain lenders under the Second Lien Credit Agreement (the "**Second Lien Lenders**" and collectively, the "**Prepetition Secured Parties**") organized into separate *ad hoc* groups of lenders (each, an "**Ad Hoc Group**" and, together, the "**Ad Hoc Groups**") and hired their own legal and financial advisors to explore available options.

24.     In May 2018, Weil and Centerview began discussing potential liability management proposals with the legal and financial advisors to the Ad Hoc Groups - Jones Day and Evercore Group L.L.C. ("**Evercore**") for the First Lien Lenders and, Paul, Weiss, Rifkind Wharton & Garrison LLP, and PJT Partners, LP for the Second Lien Lenders and the legal and financial advisors for the agent under the revolving tranche of the First Lien Facility, Davis Polk & Wardwell LLP and Ankura Consulting, LLC ("**Ankura**").  At that time, the Debtors also engaged in discussions with the key holders of the Unsecured PDM Notes and their advisors.

19

Over the next several months, the advisors were granted access to Company information, performed extensive diligence on the Company, and participated in numerous meetings and diligence sessions with the Company's management and advisors.

25.     Unfortunately, during the pendency of the advisors' due diligence process, the operations and financial performance of the Debtors continued to deteriorate.  By the fall of 2018, it became evident that a liability management transaction or out-of-court restructuring would be impossible and that a comprehensive restructuring, most likely to be achieved through a chapter 11 process, would be the best way to preserve and maximize the value of the Debtors' enterprise.  After several weeks of discussion with the lenders' advisors in September and October, 2018, certain members of the Ad Hoc Group of Second Lien Lenders became restricted on October 16, 2018, and certain members of the Ad Hoc Group of First Lien Lenders become restricted on October 22, 2018.

26.     The Debtors' ultimate goal was and is a fully consensual restructuring supported by both the First Lien Lenders and the Second Lien Lenders that imposes minimal disruption to the Company's business.  The Company, the First Lien Lenders, and the Second Lien Lenders and their respective advisors engaged in discussions regarding a restructuring transaction that would maximize value for all stakeholders while minimizing potential damage to the business.

27.     Leading up to the Petition Date, as part of the broader restructuring process, the Debtors, with the assistance of their professionals, searched for potential sources of postpetition financing that could provide the Debtors with sufficient liquidity to fund their business operations during the restructuring process.

28.    Notably, the vast majority of the Debtors' assets are encumbered by liens granted to the First Lien Lenders and Second Lien Lenders, such that any potential third-party financing would have to be all or partially unsecured, be on a junior basis, "prime" the Debtors' existing secured lenders' prepetition liens, or be secured by the Debtors' limited unencumbered assets.  Additionally, the Debtors were informed by the First Lien Lenders that they would not consent to being primed by third-party DIP Financing, which, (i) given the value of the Debtors' encumbered and unencumbered assets, and (ii) with respect to the Debtors' encumbered assets, the lack of any equity cushion behind the first lien claims, would have made obtaining third-party financing difficult, if not impossible.

29.    Given these facts, even if one was available, a third-party DIP loan would have resulted in a long, costly, and likely losing priming fight with the First Lien Lenders. Equally important, any attempt by the Debtors to compel a nonconsensual priming would have undermined the support of the First Lien Lenders for the broader restructuring, as reflected in the RSA, and delayed the Debtors' ability to exit from chapter 11, all to the significant detriment of the Debtors' stakeholders.

30.    Accordingly, once the Ad Hoc Group of First Lien Lenders was restricted, the Debtors initiated discussions regarding the terms of a potential DIP Financing, as well as the terms of a chapter 11 plan of reorganization.

31.    On or around November 2, 2018, the Ad Hoc Group of First Lien Lenders proposed, as an integrated package deal, a term sheet for a plan of reorganization and DIP Financing.  Their proposal provided for a conversion of the entire DIP Financing amount into exit financing under the proposed chapter 11 plan (*i.e.,* no requirement that the DIP Financing be paid off or refinanced with new money upon emergence).  Importantly, the proposal also

21

provided for incremental exit financing, ultimately in the amount of $40 million, to ensure that the post-emergence Catalina is adequately funded.

32.    Upon receipt of that proposal, the Debtors and their professionals sought to negotiate the best available DIP Financing from the First Lien Lenders.  Over the course of multiple weeks, the Debtors and the DIP Lenders, with the assistance of their respective legal and financial advisors, negotiated the terms and provisions of the DIP Facility.  The negotiations resulted in concessions made by the DIP Lenders, including with respect to the size of the facility, interest rates, fees, covenants, and other provisions.

33.    Despite the challenges associated with obtaining third-party DIP Financing as described above, Centerview marketed the DIP Financing to determine whether a third party would be willing to provide the Debtors with DIP Financing on better terms than those negotiated with the Ad Hoc Group of First Lien Lenders.  Centerview contacted nine financial institutions to solicit offers to provide the Debtors with DIP Financing on a junior lien basis, a priming basis, and/or collateralized only by unencumbered collateral.  None of the third parties  contacted were willing to provide a DIP Financing proposal to the Debtors.

34.    All negotiations between the Debtors and the DIP Lenders regarding the provision of the DIP Facility were conducted in good faith and on an arm's length basis.  These negotiations culminated in the agreed upon terms set forth in the proposed DIP Credit Agreement.  On December 11, 2018, the Debtors and certain First Lien Lenders and Second Lien Lenders entered into a restructuring support agreement ("**RSA**"), a copy of which is attached to the Disclosure Statement as Exhibit B.  In connection with the RSA, the parties also reached agreement on the form of DIP Credit Agreement.  The DIP Credit Agreement reflects the most

RLF1 20433831v.1

favorable and best postpetition financing available to the Debtors, and the terms are fair and reasonable under the circumstances of these Chapter 11 Cases.

**<u>Basis for Relief Requested</u>**

**I.    The Debtors Should Be Authorized to Obtain Secured, Superpriority DIP Financing**

**A.    Entry into the DIP Facility is an Exercise of the Debtors' Sound Business Judgment**

35.    Provided that an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance with its sound business judgment in obtaining such credit. *See, e.g.*, *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility "reflect[ed] sound and prudent business judgement"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, *inter alia*, an exercise of "sound and reasonable business judgment.").

36.    In determining whether the Debtors have exercised sound business judgment in selecting a particular DIP Financing proposal, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re*

*Exide Techs*., 340 B.R. 222, 239 (Bankr. D. Del. 2006). Here, the Debtors' determination to secure DIP Financing was a business decision guided by the Debtors' financial and restructuring needs. Specifically, the Debtors, with the advice and counsel of their advisors, determined that the Debtors will require immediate liquidity for a smooth transition into chapter 11 and additional liquidity through their restructuring process for continued operations. Indeed, without immediate additional liquidity, the Debtors would be unable to preserve their business nor maximize value, to the detriment of the Debtors' customers, creditors, employees, vendors, and other parties in interest.

37.    Bankruptcy courts will not generally second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *In re Curlew Valley Assocs.*, 14 B.R. 506, 513 (Bankr. D. Utah 1981) (footnote omitted). To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" *In re Exide Techs.*, 340 B.R. at 239.

38.    The Debtors determined that they will require immediate additional liquidity to continue operating "business as usual" while completing their restructuring process. The Debtors, with the assistance of their advisors, carefully reviewed each of their options with respect to DIP Financing and carefully weighed the advantages and disadvantages of the selected proposal. The Debtors ultimately determined that the proposal from their First Lien Lenders was the best option reasonably available under the totality of the circumstances.

39.     Accordingly, the Debtors submit that entry into the DIP Financing is in the best interests of the Debtors' creditors, is necessary to preserve the value of estate assets, and is an exercise of the Debtors' sound and reasonable business judgment.

**B.      The Debtors Should be Authorized to Obtain Postpetition Financing on a Secured and Superpriority Basis**

40.     The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to obtain secured or superpriority financing under certain circumstances.  Specifically, section 364(c) of the Bankruptcy Code provides that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title; [or]
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien;
>
> (3) secured by a junior lien on property of the estate that is subject to a lien[.]

11 U.S.C. § 364(c).

41.     To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis.  *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."); *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense).  When few lenders are likely to be able and willing to extend the

25

necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989); *see also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

42.      As set forth above, the Debtors, through Centerview, solicited other potential DIP Financing sources but despite their good faith efforts, the Debtors did not receive any other proposals.   Additionally, the First Lien Lenders are only willing to extend DIP Financing to the Debtors on a senior secured basis.   Accordingly, the Debtors submit that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

### C.      The DIP Facility Provides for Consensual Priming and Cash Collateral Use

43.      In addition to authorizing financing under section 364(c) of the Bankruptcy Code, courts may authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on the encumbered property, without the consent of the existing lien holders, if the debtor cannot otherwise obtain such credit and the interests of existing lien holders are adequately protected.   *See* 11 U.S.C. § 364(d)(1). Specifically, section 364(d)(1) of the Bankruptcy Code provides:

> (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if:
>
> (A) the trustee is unable to obtain such credit otherwise; and

26

(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

(2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

11 U.S.C. § 364(d).

44.     When determining whether to authorize a debtor to obtain credit secured by senior liens as authorized by section 364(d) of the Bankruptcy Code, courts focus on whether the transaction will enhance the value of the Debtors' assets.   Courts consider a number of factors, including:

- whether the party subject to a priming lien has consented to such treatment;

- whether alternative financing is available on any other basis (*i.e.*, whether any better offers, bids, or timely proposals are before the court);

- whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtors' business;

- whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtors and proposed lender(s); and

- whether the proposed financing agreement was negotiated in good faith and at arms' length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors.

*See*, *e.g.*, *Ames Dep't Stores*, 115 B.R. at 37–39; *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003); *Farmland Indus.*, 294 B.R. at 865–79; *Barbara K. Enters.*, 2008 WL 2439649 at *10.  The DIP Financing satisfies these factors.

45.     <u>First</u>, although the DIP Facility primes the Prepetition Secured Parties' prepetition liens in the Shared Collateral, the First Lien Lenders have consented to such priming and are providing the DIP Facility and over 77% of the Second Lien Lenders have agreed to

27

support the deal via the RSA. Further, to the extent applicable, the Second Lien Lenders are deemed to have consented to the priming of their prepetition liens pursuant to the Intercreditor Agreement. (§ 6.01). Section 6.01 of the Intercreditor provides the following:

> [E]ach Second Priority Representative, for itself and on behalf of each Second Priority Debt Party under its Second Priority Debt Facility, agrees that it will raise no objection to and will not otherwise contest…(b) such DIP Financing, unless a Senior Representative or any other Senior Secured Party shall oppose or object to such DIP Financing… and, except to the extent permitted by the proviso to clause (ii) of Section 3.01(a) and by Section 6.03, will not request adequate protection or any other relief in connection therewith and, to the extent the Liens securing any Senior Obligations are subordinated or pari passu with such DIP Financing, will subordinate (and will be deemed hereunder to have subordinated) its Liens in the Shared Collateral to (x) such DIP Financing (and all obligations relating thereto) on the same basis as the Liens securing the Second Priority Debt Obligations are so subordinated to Liens securing Senior Obligations under this Agreement, (y) any adequate protection Liens provided to the Senior Secured Parties, and (z) to any "carve-out" for professional and United States Trustee fees agreed to by the Senior Representatives provided that as the maximum amount of indebtedness that may be outstanding from time to time in connection with such DIP Financing (not including any Senior Obligations rolled up therein) shall not exceed an amount equal to 10% of the maximum amount of Senior Obligations permitted to be outstanding under the First Lien Credit Agreement Loan Documents (as in effect on the date hereof) on the date of the commencement of such Insolvency or Liquidation Proceeding.

46.     Second, the DIP Facility provides the Debtors with the immediate access to capital necessary to consummate their plan process, and the financial flexibility required to administer these cases effectively and efficiently. Further, the Approved Budget provides the flexibility needed for the Debtors to run their operations in the ordinary course. Collectively, the features of the DIP Facility provide substantial benefits to the Debtors that would not otherwise be available from any other party.

47.     Third, the structure of, and the financial terms proposed under, the DIP Facility are customary and usual for debtor-in-possession financings of this type. Specifically, the contemplated interest rate and other payments related to the DIP Facility as well as the collateral structure and related terms were all negotiated for at arm's length as an integrated

package of terms from the DIP Lenders and are in the aggregate generally consistent with the cost and structure of debtor-in-possession financings in comparable circumstances.

48.     Ultimately, the DIP Facility is the best and only viable option available to the Debtors.  The DIP Facility was negotiated in good faith and at arm's length and the Debtors' entry into the DIP Facility is an exercise of sound and reasonable business judgment.  Absent access to the DIP Financing and use of the Cash Collateral, the Debtors will be unable to operate their businesses or prosecute their Chapter 11 Cases, which will immediately threaten the Debtors' going concern value.  Providing the Debtors with the liquidity necessary to preserve their going concern value through the pendency of these Chapter 11 Cases is in the best interest of the Debtors and their stakeholders.

### D.     The Prepetition Secured Parties Are Adequately Protected

49.     A debtor may obtain postpetition credit "secured by a senior or equal lien on property of the estate that is subject to a lien only if the debtor, among other things, provides "adequate protection" to those parties whose liens are primed.  *See* 11 U.S.C. § 364(d)(1)(B). What constitutes adequate protection is decided on a case-by-case basis, and adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims.  *In re Mosello,* 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("[T]he determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case."); *In re Realty Sw. Assocs.*, 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992) ("'Adequate protection' is a question of fact because it has as its linchpin the concept of value, and therefore is determined on a case-by-case basis."); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (finding the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor

from diminution in the value of its collateral during the reorganization process") (citation omitted).

50.     The proposed DIP Lenders and the Debtors propose granting to the First Lien Lenders or the First Lien Agent on their behalf adequate protection in accordance with the following, subject to the Carve-Out and the DIP Liens and Superpriority Claims granted in respect of the DIP Obligations:

o   replacement or, if applicable, new liens on and security interests in the DIP Collateral that are junior to the liens securing the DIP Facility (in the same relative priority as among the indebtedness under the First Lien Credit Agreement) (such replacement or new liens, the "**Adequate Protection Liens**");

o   superpriority claims as provided for in section 507(b) of the Bankruptcy Code that will have a priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code (the "**Adequate Protection Claims**");

o   the payment of all reasonable and documented out-of-pocket fees and expenses payable to the Prepetition First Lien Agent under the Prepetition First Lien Documents, whether incurred pre- or post-petition; and

o   subject to the entry of a Final Order, the funding of $150,000 into a noninterest bearing account for the benefit of the Prepetition First Lien Secured Parties upon the commencement of an action asserting Claims and Defenses (as defined in the Interim Order).

51.     The First Lien Lenders have consented to the proposed adequate protection.  Accordingly, the Debtors also propose to provide them replacement or, if applicable, new continuing, valid, binding, enforceable, non-avoidable and automatically perfected postpetition security interests in and liens on the DIP Collateral.  In addition, subject to entry of the Final Order, the Debtors propose to provide the First Lien Lenders with customary lender protections, including 506(c) and 552(b) waivers and stipulations in respect of the validity of prepetition liens and obligations, among other things.

52.     The Debtors submit that their provision of adequate protection to the Prepetition First Lien Secured Parties is fair and reasonable, is sufficient to satisfy the

requirements of section 364(d)(1)(B) of the Bankruptcy Code, and, in any event, is permitted by virtue of the Intercreditor Agreement.

## II.    The Debtors Should be Authorized to Use Postpetition Collateral, Including Cash Collateral

53.    Section 363 of the Bankruptcy Code places certain restrictions on a debtor's use of Cash Collateral.  Specifically, section 363(c) provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless
>
> (A) each entity that has an interest in such cash collateral consents; or
>
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).  Further, section 363(e) provides that "on request of an entity that has interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).

54.    The Debtors submit that the requirements of sections 363(c)(2) and (e) are met here, and the Debtors should be authorized to use the Cash Collateral.  First, the Prepetition Secured Parties have consented to the use of Cash Collateral, including the Second Lien Lenders that are deemed to consent to the use of Cash Collateral pursuant to the Intercreditor Agreement § 6.01.  In addition, and as more fully discussed above, the Debtors are providing the First Lien Lenders with adequate protection that is fair and reasonable, sufficient to satisfy the requirements of section 364(d)(1)(B) of the Bankruptcy Code, and permitted under the terms of the Intercreditor Agreement.  Accordingly, the Court should authorize the Debtors to use the Cash Collateral under section 363(c)(2) of the Bankruptcy Code.

RLF1 20433831v.1

### III.    The DIP Payments Are Reasonable and Should be Approved

55.    As described above, the Debtors have agreed, subject to Court approval, to pay certain payments to the DIP Lenders and DIP Agent (collectively, the "**DIP Payments**") in exchange for their providing and/or agenting the DIP Facility, as applicable.  The DIP Payments include (i) an closing payment in an amount equal to 2.00% of the DIP Commitments, payable in cash at closing; (ii) an a ticking premium equal to 5.00% *per annum* on the actual daily amount of unused DIP Commitments, payable on a monthly basis; and (iii) an administrative agent fee, payable in cash at closing.

56.    The DIP Payments, together with the other provisions of the DIP Documents, represent the most favorable terms the DIP Lenders or any other potential investor would agree to make the DIP Facility available to the Debtors.  The Debtors considered the DIP Payments when determining in their sound business judgment whether the DIP Documents constituted the best terms on which the Debtors could obtain sufficient DIP Financing necessary to continue their operations and prosecute their Chapter 11 Cases.  Paying the DIP Payments in order to obtain such DIP Financing is in the best interests of the Debtors' estates, creditors and other parties in interest.  Accordingly, the Court should authorize the Debtors to pay the DIP Payments.

56.    In addition, the financial and other terms proposed under the DIP Facility in these circumstances are customary and usual terms for debtor-in-possession financings of this type.  The interest rate and fees under the DIP Facility are reasonable and in line with other "defensive" debtor-in-possession financings provided to debtors whose value is less than their outstanding secured indebtedness.

IV.    The "Roll-Up" of Certain Prepetition Debt Is Appropriate

57.    As set forth above, the DIP Documents provide that, upon entry of the Final Order, $150 million outstanding under the prepetition First Lien Credit Agreement held by lenders that have agreed to participate in the DIP Facility will be rolled up and become obligations under the DIP Facility.  The roll-up is a material component of the structure of the DIP Facility and was required by the DIP Lenders as a condition to their commitment to provide the DIP Facility.

58.    Thus, the Debtors have determined that repayment of the First Lien Lenders' prepetition claims as part of the DIP Facility is necessary to obtain access to the liquidity necessary to preserve the value of their businesses for the benefit of the Debtors' estates.

59.    Recognizing exigent circumstances like those described above, courts in this district, as well as elsewhere, have approved repayments of prepetition debt (often referred to as a "roll-up") funded by debtor-in-possession financing proceeds in recent chapter 11 cases on an interim basis.  *See, e.g.*, *In re Remington Outdoor Co., Inc.*, No. 18-10684 (BLS) (Bankr. D. Del. Mar. 28, 2018) (D.I. 68) (approving interim order of "roll-up" of prepetition bridge term loan); *In re The Bon-Ton Stores, Inc.*, No. 18-10248 (Bankr. D. Del. Feb. 6, 2018) (D.I. 120) (approving in interim order the "roll-up" of all outstanding prepetition revolving obligations); *In re Charming Charlie LLC.*, No. 17-12906 (Bankr. D. Del. Dec. 13, 2017) (D.I. 93) (approving in interim order the "roll-up" of all outstanding prepetition revolving); *In re American Apparel, Inc.,* No. 15-12055 (Bankr. D. Del. Oct. 6, 2015) (D.I. 80) (approving in interim order the repayment in full of all outstanding amounts under the prepetition revolving credit agreement); *In re Radioshack Corp.*, No. 15-10197 (BLS) (Bankr. D. Del. Feb. 10, 2015) (D.I. 190)

33

(approving approximately $285 million DIP that included "roll-up" of approximately $250 million prepetition debt pursuant to interim order).

60.     Further, the roll-up is designed to be an economically neutral transaction for the Debtors and stakeholders other than the First Lien Lenders.  Specifically, the roll-up will not be secured by the Previously Unencumbered Property and will convert to exit financing on the Effective Date, under the current RSA, so it will not be an additional cash obligation for the Debtors at emergence.  Rather, the roll-up is structured to encourage those First Lien Lenders that may wish to take some of their recovery in debt rather than equity to participate and contribute their portion of the new money contribution being provided to the Debtors.

61.     Based on the foregoing and consistent with the above-referenced authority, the Debtors respectfully submit that the Court should approve the Debtors' decision to enter into the DIP Facility, including the roll-up.

## V.     The DIP Lenders Should be Deemed Good Faith Lenders

62.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  11 U.S.C. § 364(e).  Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

*Id.*

63.     Here, the Debtors believe the DIP Documents embody the most favorable terms on which the Debtors could obtain DIP Financing.  As discussed in the Puntus Declaration,

34

all negotiations regarding the provisions of the DIP Facility were conducted in good faith and on an arm's length basis. The terms and conditions of the DIP Facility are fair and reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the DIP Facility other than as disclosed herein. Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by that section.

## VI.  Scope of Carve-Out Is Appropriate

64.    The DIP Liens, Superpriority Claims, Prepetition Liens, Adequate Protection Liens, and Adequate Protection Claims are subject to the Carve-Out. Without the Carve-Out, the Debtors and other parties in interest may be deprived of certain rights and powers because the services for which professionals may be paid in these Chapter 11 Cases would be restricted. *See In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). The Carve-Out does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers. Additionally, the Carve-Out ensures that assets will be available for the payment of fees of the Clerk of the Bankruptcy Court or the U.S. Trustee and professional fees of the Debtors and an unsecured creditors' committee, if one is appointed. Accordingly, the Carve-Out is necessary and appropriate, and should be approved.

## VII.   Automatic Stay Should Be Modified on a Limited Basis

65.    The relief requested herein contemplates a modification of the automatic stay to permit the Debtors to grant the DIP Liens. Specifically, the DIP Facility

contemplates modifying the automatic stay so as to (i) permit the creation and perfection of the DIP Liens, and (ii) provide for the automatic vacation of such stay to permit the DIP Agent and the DIP Lenders to enforce its rights with respect to the DIP Collateral in the event of an Event of Default under the DIP Facility, subject to five business days' written notice to counsel to the Debtors, and the U.S. Trustee.

66.    Stay modifications of this kind are ordinary and standard features for DIP Financings, and in the Debtors' business judgment, are reasonable and fair under the present circumstances. *See, e.g.*, *In re The NORDAM Group, Inc.*, Case No. 18-11699 (MFW) (Bankr. D. Del. July 25, 2018) (D.I. 85); *In re Claire's Stores, Inc.*, Case No. 18-10584 (MFW) (Bankr. D. Del. Mar. 20, 2018) (D.I. 130); *In re Golfsmith Int'l Holdings, Inc.*, Case No. 16-12033 (LSS) (Bankr. D. Del. Sep. 16, 2016) (D.I. 89); *In American Apparel, Inc.*, Case No. 15-12055 (BLS) (Bankr. D. Del. Oct. 6, 2015) (D.I. 80); *In re Sears Holdings Corp.*, Case No. 18-23538 (RDD) (Bankr. S.D.N.Y Oct. 16, 2018) (D.I. 101); *In re Westinghouse Electric Co. LLC*, Case No. 17-10751 (MEW) (Bankr. S.D.N.Y May 26, 2017) (D.I. 86); *In re Breitburn Energy Partners LP*, No. 16-11390 (SMB) (Bankr. S.D.N.Y. July 19, 2016) (D.I. 278); *In re Aeropostale, Inc.*, No. 16-11275 (SHL) (Bankr. S.D.N.Y. May 6, 2016) (D.I. 99).

## Bankruptcy Rule 6003(b) is Satisfied

67.    Bankruptcy Rule 6003(b) provides that, to the extent relief is necessary to avoid immediate and *irreparable* harm, a bankruptcy court may approve "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the *petition*" prior to twenty-one (21) days after the Petition Date.  Fed. R. Bankr. P. 6003(b).

68.    The Debtors anticipate that the commencement of these Chapter 11 Cases will significantly and immediately increase the demands on their liquidity as a result of, among

other things, the costs of administering these Chapter 11 Cases, implementing critical restructuring initiatives, and addressing key constituents' concerns regarding the Debtors' financial health and ability to continue operations in light of these Chapter 11 Cases. Accordingly, the Debtors have an immediate need for access to liquidity to, among other things, continue the operation of their business, maintain important relationships with customers, meet payroll for their employees, and otherwise satisfy their working capital and operational needs, all of which are required to preserve and maintain the Debtors' going concern value for the benefit of all parties in interest.  The Debtors would suffer immediate and irreparable harm if the relief sought herein is not promptly granted.  Accordingly, the Debtors submit that the relief requested herein is necessary to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003 is satisfied.

### Bankruptcy Rules 6004(a) and (h) Should be Waived

69.    To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As explained above, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent such stay applies.

RLF1 20433831v.1

### Request for a Final Hearing

70.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date, which is no later than thirty (30) days after the entry of the Interim Order, to hold a hearing to consider entry of the Final Order and approval of the relief requested in this Motion on a final basis.

71.     The Debtors also request authority to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, to entry of the Final Order, by first class mail upon the notice parties listed below, and further request that the Court deem service thereof sufficient notice of the hearing on the Final Order under Bankruptcy Rule 4001(c)(2).

### Notice

72.     Notice of the Motion and the Interim Hearing shall be served by the Debtors on (i) the United States Trustee for Region 3, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801 (Attn: Benjamin A. Hackman, Esq.); (ii) the holders of the five (5) largest secured claims against the Debtors (on a consolidated basis); (iii) the holders of the twenty (20) largest unsecured claims against the Debtors (on a consolidated basis); (iv) Jones Day, 250 Vesey Street, New York, NY 10281 (Attn: Scott J. Greenberg, Esq. and Michael J. Cohen, Esq.) and Pachulski Stang Ziehl & Jones LLP, 919 N. Market Street, Wilmington, DE 19801 (Attn: Laura Davis Jones, Esq.), as counsel to the DIP Lenders and the First Lien Ad Hoc Group; (v) Paul, Weiss, Rifkind, Wharton & Garrison LLP ("**Paul Weiss**"), 1285 Avenue of the Americas, New York, NY 10019 (Attn: Brian S. Hermann, Esq., and Robert A. Britton, Esq.), and Young Conaway Stargatt & Taylor, LLP ("**Young Conaway**"), Rodney Square, 1000 N. King Street, Wilmington, DE 19801 (Attn: Pauline K.

Morgan, Esq.), as counsel to that certain ad hoc group of Prepetition Second Lien Lenders; (vi) Davis Polk & Wardwell LLP, 450 Lexington Ave, New York, NY 10017 (Attn: Brian M. Resnick, Esq.) and Landis Rath & Cobb, 919 Market Street, Wilmington, DE 19801 (Attn: Adam Landis, Esq. and Kerri Mumford, Esq.), as counsel to JPMorgan Chase Bank, N.A., as Prepetition First Lien Agent and DIP Agent; (vii) Wilmer Cutler Pickering Hale & Dorr LLP, 7 World Trade Center, 250 Greenwich Street, New York, NY 10007 (Attn.: Andrew N. Goldman, Esq.), as counsel to Wilmington Savings Fund Society, FSB, as administrative agent under the Second Lien Credit Agreement; (viii) Debevoise & Plimpton LLP, 919 Third Avenue, New York, NY 10022 (Attn: My Chi To, Esq.), as counsel to an ad hoc group of holders of the HoldCo PIK Toggle Notes of PDM Intermediate Holdings B Corporation; (ix) the Internal Revenue Service; and (x) the United States Attorney's Office for the District of Delaware; (xi) the Banks; (xii) all parties known by the Debtors to hold or assert a lien on any asset of any Debtor; and (xiii) any other party that has requested or is entitled to notice pursuant to Bankruptcy Rule 2002 and Local Rule 9013-1(m) (collectively, the "**Notice Parties**"). The Debtors submit that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

73.    No previous request for the relief sought herein has been made by the Debtors to this or any other court.

*[Remainder of Page Intentionally Left Blank.]*

       WHEREFORE the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as this Court may deem just and appropriate.

Dated: December 12, 2018
       Wilmington, Delaware

                     */s/ Jason M. Madron*

                 Mark D. Collins (No. 2981)
                 Jason M. Madron (No. 4431)
                 **RICHARDS, LAYTON & FINGER, P.A.**
                 One Rodney Square
                 920 North King Street
                 Wilmington, Delaware 19801
                 Telephone: (302) 651-7700
                 Facsimile: (302) 651-7701

                 -and-

                 Gary T. Holtzer (*pro hac vice* admission pending)
                 Ronit J. Berkovich (*pro hac vice* admission pending)
                 Jessica Liou (*pro hac vice* admission pending)
                 Kevin Bostel (*pro hac vice* admission pending)
                 **WEIL, GOTSHAL & MANGES LLP**
                 767 Fifth Avenue
                 New York, New York 10153
                 Telephone: (212) 310-8000
                 Facsimile: (212) 310-8007

                 *Proposed Attorneys for Debtors*
                 *and Debtors in Possession*